**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SPHERE 3D CORP.,

*Plaintiff,*

v.

GRYPHON DIGITAL MINING, INC.,

*Defendant.*

Case No. _____

**<u>Jury Trial Demanded</u>**

**<u>COMPLAINT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................... 1

PARTIES ...................................................................................................................................... 7

JURISDICTION & VENUE ......................................................................................................... 7

FACTUAL ALLEGATIONS ........................................................................................................ 8

I.      BACKGROUND ON CRYPTOCURRENCY MINING ................................................................ 8

II.     IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO
        PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND
        CRYPTOCURRENCY-RELATED OPERATIONS" .................................................................... 9

III.    THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT
        MANAGEMENT SERVICES, IN BREACH OF THE MSA ........................................................ 9

IV.     GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL
        ASSETS, IN BREACH OF THE MSA ................................................................................... 11

V.      GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH
        OF ITS FIDUCIARY DUTIES ............................................................................................. 11

VI.     GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND
        POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE
        LAW     12

        A.    Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost
              Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry
              Standard Procedures For Transferring Bitcoin ........................................................ 12

        B.    Gryphon Lacks Industry Standard Internal Controls And Policies And
              Procedures, In Violation Of The MSA And Almost Certainly In Violation Of
              Applicable Law ...................................................................................................... 13

VII.    IN AN EFFORT TO COW SPHERE AND DISSUADE IT FROM EXPOSING GRYPHON'S
        NUMEROUS BREACHES, GRYPHON HAS BASELESSLY SOUGHT TO THREATEN SPHERE
        WITH MANUFACTURED BREACHES ................................................................................. 15

VIII.   SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO
        PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES .......... 16

CAUSES OF ACTION ............................................................................................................... 17

PRAYER FOR RELIEF .............................................................................................................. 18

Plaintiff Sphere 3D Corp. ("Sphere"), by and through its undersigned attorneys, respectfully submits this Complaint against defendant Gryphon Digital Mining, Inc. ("Gryphon").

## PRELIMINARY STATEMENT

1.      This is an action for breach of contract and breach of fiduciary duty.  Sphere and Gryphon are in the business of digital asset mining—*i.e.*, using computers referred to as "miners" to earn bitcoin and bitcoin-related transaction fees.  In contemplation of a potential merger that ultimately fell through, the parties entered into a Master Services Agreement dated August 19, 2021 (the "MSA," attached as Exhibit 1), as subsequently amended on December 29, 2021 (the "MSA Amendment," attached as Exhibit 2).  Under the MSA, Gryphon (among other things) undertook an obligation to be the "exclusive provider of any and all management services for" Sphere's "blockchain and cryptocurrency-related operations" and the custodian of certain of Sphere's digital assets.  MSA at 1.  In return, Sphere promised to pay Gryphon an exorbitant management fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations" (the "Management Fee").  *Id.*  Separate from the contract, Gryphon's power over Sphere and its status as custodian of Sphere's digital assets and miners gave rise to fiduciary duties, including the duty of loyalty and to avoid self-dealing.

2.      For over a year now, the parties' relationship has proven to be completely one-sided: Gryphon has dutifully collected its exorbitant Management Fee while shirking its duties under the MSA and delivering abhorrent management services, causing untold damage to Sphere.  Worse still, Gryphon has been skimming off the top (*i.e.*, stealing) from Sphere's assets and, as recent events have revealed, has no internal controls systems or policies and procedures in place, as needed not only to comply with the MSA, but also applicable law.  And Gryphon has breached its fiduciary duties by nakedly prioritizing its own interests over those of Sphere's.

1

3.      Gryphon's failures under the MSA are persistent, ongoing, uncured despite repeated entreaties from Sphere, and too many to catalogue.  In general, Gryphon has been content to sit back and collect millions of dollars in Management Fees while delivering no services whatsoever.  When it has delivered services, the results have been appalling.  By way of illustration only, Gryphon has refused to find hosting space for Sphere's miners (and instead directed Sphere to undertake the task of finding space itself); allowed Sphere's miners to languish with the U.S. Customs and Border Protection agency ("U.S. Customs") for weeks (a situation Sphere itself ultimately resolved); persistently delayed in setting up and ensuring the operation of Sphere's miners; inexplicably ignored Sphere's instructions to sell its digital assets; failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges; and generally failed to manage relationships with third-parties.  The result has been lost revenues for Sphere while Gryphon eats a free lunch.

4.      And, egregiously, Sphere has good reason to believe that Gryphon has been skimming off the top from—in other words, stealing—Sphere's digital assets.  Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to provide Sphere with documentation to verify that it is not using or otherwise taking Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit.  The only rational reason for such concealment is to make it harder for Sphere to know which assets are mined for its own account— and to detect Gryphon stealing Sphere's assets.

5.      Recently, Gryphon's gross incompetence has reached a new level that raises substantial concerns about Gryphon's ability to safeguard Sphere's digital assets, the effectiveness of its internal controls, and compliance with the law.  Gryphon holds itself out as a sophisticated

entity and its CEO, Rob Chang, as an "experienced executive" in the crypto-space.  Gryphon and Mr. Chang, however, recently fell for multiple spoofing attacks targeting Sphere's digital assets that would have been avoided had they had internal controls systems and policies and procedures in place and adhered to applicable law.

6.      On January 27, 2023, at 1:22 p.m., Sphere CFO Kurt Kalbfleisch requested by email that Mr. Chang transfer 18 bitcoin (worth over $400,000) from a wallet controlled by Gryphon to one controlled by Sphere, which was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name: "@sphere3d.com."  Mr. Chang responded that he would initiate the transfer.

7.      At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch, as depicted in the figures below.  The email came from a different domain than the Sphere domain, namely, "@spheres3d.com"[1] (with an added s in the middle), not @sphere3d.com. In the email, the person pretending to be Mr. Kalbfleish stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address that Sphere had never used.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

---

[1] All emphases have been added unless otherwise noted.

## Re: Coin Transfer

KK    Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com>
      To ○ Rob Chang
      Cc ○ Patricia Trompeter

(Fig 1. From/to/cc line reflecting that the email originated from the spoofer with an incorrect domain, @spheres3d.com)

Rob,

Well Noted. I have just been notified that the address below is being audited. So kindly proceed with the transfer of 18 BTC from our "Sphere Mined Coins" wallet to the following address: **bc1qmrykeusq73xd7ad6h2y27mw0fu2e9wcqrfrlvr.**

(Fig. 2. The relevant portion of the body of the spoofing email containing an implausible request to transfer bitcoin to a new wallet address in light of an audit.)

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

(Fig. 3. The signature block containing the correct email address.)

8.    This was a transparent spoofing attack in which a third-party was impersonating Mr. Kalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets. Even a cursory review of the spoofing email—which did not originate from a Sphere email address,

4

included the correct email address in the signature block, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags for any competent employee, let alone a supposedly "experienced" executive like Mr. Chang, and prevented any unauthorized transfer. So too would any independent verification of the requestor's identity, such as video or other identity verification.

9. Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker. Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that Sphere had never used before, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

10. Not to be outdone, mere days later, on February 1, 2023, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000). Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again). On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company— to realize that he had been fooled by not one, but two, spoofing attacks.

11. The incident revealed to Sphere the woeful state of Gryphon's internal controls and policies and procedures, which should have prevented the attack. Following the spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide. The failure to include effective internal controls demonstrates not only that Gryphon cannot comply

with its duties under the MSA, but also that Gryphon is almost certainly in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs.  Illustratively, Gryphon panicked when Sphere suggested that the incident be reported to law enforcement, including the Federal Bureau of Investigations ("FBI"), insisted that the issue could be handled between the parties, and demanded that no one report the theft to the authorities.  This put the onus on Sphere to report the incident, which it did by filing a suspicious activity report ("SAR") with the Financial Crimes Enforcement Network ("FinCEN").

12.     There are additional indicia that Gryphon lacks anything resembling effective internal controls.  In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability).  In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere understands that Gryphon, when it goes public, intends to recognize *all* of Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.  Such disclosures are at best misleading:  Gryphon can claim only a fraction of Sphere's revenues as its own, namely, the Management Fee.

13.     Beyond the MSA, Gryphon has breached its fiduciary duties, which arise from the unusual amount of trust placed in Gryphon by Sphere, control that Gryphon has over Sphere, and status as a custodian of Sphere's digital assets and miners.  Indeed, Gryphon has taken the position that Sphere cannot even *attempt* to "create" any "business relationships" with any third-party in the crypto-space unless it obtains Gryphon's approval first.  Gryphon's breaches of fiduciary duty include prioritizing its own proprietary miners and mining pool strategies over Sphere's.  Indeed,

Gryphon's miners consistently outperform Sphere's, which would not occur if Gryphon were acting to avoid self-dealing.

14.     It is apparent that Gryphon is incapable of addressing its issues and performing under the MSA.  Accordingly, by this lawsuit, Sphere brings claims for breach of contract, of the implied covenant of good faith and fair dealing, and for breach of fiduciary duty to seek redress for the millions of dollars in damage Gryphon's misconduct has caused, as well as to recover its attorney's fees and costs under the MSA.

## PARTIES

15.     Sphere 3D Corp. is a bitcoin mining company incorporated in Ontario, Canada, with its principal place of business in Ontario, Canada.  Unlike many mining companies, Sphere's operations are net carbon neutral.  Sphere is a publicly traded company whose securities have historically been dual listed in Canada and the U.S. and is currently listed for trading in the U.S. on the Nasdaq exchange.

16.     Gryphon Digital Mining, Inc. is a bitcoin mining company with its principal place of business in Las Vegas, Nevada.  In addition to providing management services to Sphere under the MSA, Gryphon utilizes its own mining fleet for its own account.

## JURISDICTION & VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of attorneys' fees and costs and because diversity of citizenship is established.

18.     This Court has jurisdiction over this action pursuant to the forum selection clause of the MSA, which requires that "[a]ll disputes, suits, actions or proceedings relating to" the MSA "be brought solely in the state or federal courts located in the State of New York."  Venue is also proper under the forum selection clause, which provides that: "Each party hereby consents to the

exclusive jurisdiction and venue of the State of New York in connection with any such dispute, suit, action or proceeding, and waives any defense of forum non conveniens in connection therewith."

## FACTUAL ALLEGATIONS

### I.   BACKGROUND ON CRYPTOCURRENCY MINING

19.     Sphere is in the business of "mining" for bitcoin.  Mining ensures that the payment network underlying bitcoin functions.  Through mining, companies generate new bitcoin for themselves and earn revenue through transaction fees.  To mine for bitcoin, mining companies use purchased or leased "miners," which are generally sophisticated, high-capacity computers that run programs designed to support the network underlying bitcoin.  Companies may direct their miners to participate in a "mining pool," which aggregates mining power attributable to multiple miners and typically pays out on a pro rata basis based on the company's contribution to the pool.  Not all mining pools are created equal; selecting lucrative mining pools is critical to commercial success in the crypto-space.

20.     Hosting services for miners (*e.g.*, warehouse space, electricity, security, internet access, cooling, and so on) is a core component of digital asset mining.  Digital asset miners often turn to third parties for hosting services in exchange for fees, which can be among the most significant costs associated with digital asset mining.

21.     Cryptocurrency is stored in an individual's digital "wallet," which is akin to an online bank account.  A wallet is the primary mechanism for managing cryptocurrency balances and allows individuals and organizations to hold and control their cryptocurrency.

II.   IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND CRYPTOCURRENCY-RELATED OPERATIONS"

22.     On August 19, 2021, Sphere and Gryphon entered into the MSA in contemplation of a merger that never closed.  The MSA was subsequently amended on December 29, 2021.

23.     Under the MSA, Gryphon undertook an obligation to be Sphere's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations."  MSA at 1.  In return, Sphere promised to pay Gryphon a tremendous Management Fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations."  *Id.*  The Management Fee was exorbitant and meant that Sphere could expect commensurate service.

24.     In addition, the MSA made Gryphon a custodian of certain of Sphere's digital assets, which it maintains in a wallet.  *Id.*  The MSA also required Gryphon to sell Sphere's digital assets upon Sphere's "instruction."  *Id.*

25.     The MSA further required that Gryphon perform its services "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services" and not engage in "gross negligence, fraud or willful misconduct in connection with performing the Services."  MSA Amendment § 2.a.

26.     Finally, the MSA contains a prevailing party provision.  *See* MSA at 3.

III.   THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT MANAGEMENT SERVICES, IN BREACH OF THE MSA

27.     Although the MSA required Gryphon to be the "exclusive provider of any and all management services," Gryphon has completely and absolutely shirked its duties, with disastrous consequences for Sphere.  Often, Gryphon simply provides no services whatsoever—and expects to collect a Management Fee for the privilege of sitting on its hands.  When it does provide

"management services," it provides abhorrent services, far below those generally recognized in the crypto-mining industry.

28.     By way of example, when Sphere needed hosting space in 2022 (a perquisite to turning on its miners and generating money), Gryphon refused to find hosting space and instead directed Sphere to find such space on its own.  Delays in finding hosting space meant that Sphere could not run its miners, costing it money.  Moreover, Sphere had to expend its own efforts to find such hosting space.

29.     As another example, in 2022, Sphere ordered certain miners from overseas for delivery into the United States.  The miners, however, were seized and held by U.S. Customs.  Obtaining their release was simply a matter of providing U.S. Customs with certain manufacturing information, which would have informed U.S. Customs that no additional fees were due.  Despite repeated pleas from Sphere, however, Gryphon shirked its duties to provide the assistance and information needed to release the miners.  Due to Gryphon's misfeasance, the miners languished in U.S. Customs for weeks, costing Sphere dearly.  Eventually, Sphere secured the release of the miners itself by interfacing with third-parties to provide the information.

30.     As yet another example, Gryphon has inexplicably delayed setting up mining pools, resulting in lost revenue.  It has also outright ignored instructions to sell Sphere's bitcoin on a timely basis. And Gryphon has failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges.  Indeed, Gryphon has generally failed to manage any of Sphere's relationships with third-parties.

31.     These examples are part and parcel of a general failure to provide management services consistent with Gryphon's obligations under the MSA throughout the parties' relationship.  And, throughout the parties' relationship, Sphere has raised its concerns to Gryphon

over its lack of performance to no avail:  despite repeated entreaties from Sphere, Gryphon has

proven incapable of curing its innumerable and persistent breaches of the MSA.

## IV.   GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL ASSETS, IN BREACH OF THE MSA

32.     Even worse than its utter failure to provide management services, upon information

and belief, Gryphon has been skimming off the top—effectively stealing money—from Sphere.

Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to

provide Sphere with documentation to verify that it is not using or otherwise seizing Sphere's

assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs

associated with Sphere's business as opposed to for Gryphon's own benefit.  The only rational

reason for such concealment is to make it harder for Sphere to know which assets are mined for

its own account—and to detect Gryphon stealing Sphere's assets.

## V.   GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH OF ITS FIDUCIARY DUTIES

33.     Separate from the MSA, Gryphon owes fiduciary duties to Sphere, which arise from

the unusual amount of trust placed in Gryphon by Sphere, control that Gryphon has over Sphere,

and status as a custodian of Sphere's digital assets and miners.  Indeed, as discussed *infra*, Gryphon

has taken the position that Sphere cannot even *attempt* to "create" any "business relationships"

with any third-party in the crypto-space unless it obtains Gryphon's approval first.

34.     Notwithstanding its clear fiduciary duties, throughout the parties' relationship,

Gryphon has prioritized its own interests over those of Sphere's, including by prioritizing the

operations of its own miners over Sphere's and employing more advantageous mining pool

strategies for its own digital assets.  For example, on a monthly basis, Gryphon has reported a

substantially higher mining efficiency ratio than Sphere, which would not occur if Gryphon were

acting to avoid self-dealing.

## VI.    GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE LAW

### A.    Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry Standard Procedures For Transferring Bitcoin

35.    On January 27, 2023, at 1:22 p.m., Kurt Kalbfleisch, Sphere's Chief Financial Officer and Senior Vice President, requested by email to transfer 18 bitcoin (worth over $400,000) from a wallet controlled by Gryphon to one controlled by Sphere.  Mr. Kalbfleisch provided the wallet address, which he specifically noted was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name:  "@sphere3d.com."

36.    At 1:33 p.m., Mr. Chang responded: "[r]eceived and initiated."

37.    At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch.  The email came from a different domain than the Sphere domain, namely, @sphere**s**3d.com (with an added s in the middle), not @sphere3d.com.  In the email, the person pretending to be Mr. Kalbfleish stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

38.    This was a transparent spoofing attack in which a third-party was impersonating Mr. Kalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets. Even a cursory review of the spoofing email—which did not originate from a Sphere email address, included two different domains within the same email, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags and prevented any unauthorized transfer. So too would any independent verification of the requestor's identity.

39.     Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker.  Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that *Sphere had never used before*, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

40.     Merely days later, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000).  Specifically, on February 1, 2023, the spoofer again emailed Mr. Chang to ask him to transfer 8 bitcoin to his wallet.  Apparently without performing any sort of video or other check (such as a review of the domain name), Mr. Chang sent the eight bitcoin to the spoofer.

41.     Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again).  On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company—to realize that he had been fooled by not one, but two, spoofing attacks.

**B.     Gryphon Lacks Industry Standard Internal Controls And Policies And Procedures, In Violation Of The MSA And Almost Certainly In Violation Of Applicable Law**

42.     Based on the foregoing, it is apparent that Gryphon lacks the internal controls and policies and procedures needed to comply with the MSA.  Had it had such controls and policies and procedures in place, Gryphon would have detected the numerous red flags in the spoofer's emails indicating that they were illegitimate and would not have fallen for any spoofing attack, let alone multiple ones.  Indeed, following the spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide.

43.     The absence of internal controls and policies and procedures strongly suggest that Gryphon is also in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs. It is apparent, however, that Gryphon has none of these programs in place.

44.     Consistent with industry best practices, Sphere advised Gryphon to report the spoofing attack to the appropriate authorities, including the FBI.  When Sphere made the suggestion, Gryphon panicked, stated the issue could be handled between the parties, and demanded that no one report the event.  Upon information and belief, Gryphon did not want to report the theft to the authorities because it was concerned that involvement by a law enforcement agency would lead to the uncovering of Gryphon's violations of the law.  In the same vein, upon knowledge and belief, Gryphon did not file a SAR with FinCEN.

45.     This put the onus on Sphere to report the incident, which it did by filing a SAR with FinCEN earlier this month.

46.     There are additional indications that Gryphon lacks anything resembling effective internal controls.  In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability).  In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere understands that Gryphon, when it goes public, intends to recognize *all* of Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.  Such disclosures are at best misleading:  Gryphon can claim only a fraction of Sphere's revenues as its own, namely, the Management Fee.

**VII.  In An Effort To Cow Sphere And Dissuade It From Exposing Gryphon's Numerous Breaches, Gryphon Has Baselessly Sought To Threaten Sphere With Manufactured Breaches**

47.     After it came to light that Gryphon had no internal compliance program, Gryphon understood that Sphere could no longer tolerate its abject failure to comply with the MSA and numerous breaches of fiduciary duty since the inception of the parties' relationship.  Gryphon could see the writing on the wall: a lawsuit was coming.  Rather than compensate Sphere for its many breaches, however, Gryphon has taken the opposite tact by attempting to manufacture breaches of the MSA in an effort to cow Sphere into not seeking to enforce its rights in court.

48.     For example, incredibly, Gryphon has claimed that it is *Sphere* that is responsible for Gryphon's inability to detect the spoofing attacks, attacks any competent employee (let alone the CEO of a supposedly sophisticated mining company) should have been able to detect.  Gryphon has conceded that the third-party spoofer was unrelated to Sphere, but nevertheless has sought to blame Sphere, accusing it of lacking sufficient protections over its computer systems.  The allegation is untrue but it gets Gryphon nowhere:  even if it were true (and it is not), Gryphon has never identified any provision of the MSA that Sphere purportedly breached.  Spoofing attacks by now have become ubiquitous in the commercial world; the onus was on Gryphon to detect them, which it failed to do.

49.     And, recently, Gryphon has claimed that Sphere cannot even seek to "create," let alone actually enter into, business relationships with any third party in the digital asset industry.  To that end, on March 21, 2023, Gryphon sent Sphere a heavy-handed letter (attached as Exhibit 3) in which it accused Sphere of "enter[ing] into, or at a minimum, . . . attempting to enter into, business relationships with various third party cryptocurrency mining-related service providers."  According to the letter, "[a]ny such conduct, if true, is in direct violation of the" MSA.  The letter further demanded that, *in fewer than 24 hours*, Sphere "provide *any and all documentation* related to its efforts to create business

relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any."

50.    The following day, Sphere responded by letter (attached as Exhibit 4) to explain why it was not in breach (although it would consider the issues raised by Gryphon) and, yet again, explain why Gryphon was failing to perform under the MSA.  Demonstrating that the breaches were "drummed up," Gryphon had long been aware of and even blessed many of the contacts it now claimed were breaches.  In any event, as Sphere also explained, Gryphon's allegations (which Sphere is still considering the merits of) had, at most, identified technical breaches that were easily curable and gave rise to no damages.  Certainly, any damages paled in comparison to the harm Gryphon's utter mismanagement and skimming have inflicted on Sphere.

## VIII.    SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES

51.    It is time for Gryphon to be held to account for its breaches of fiduciary duty, utter failure to perform under the MSA, and apparent inability to cure its breaches, many of which are simply uncurable.  Sphere has provided Gryphon with numerous opportunities to fix its deficiencies, which have only gotten worse with time.  Gryphon's modus operandi is to simply ignore Sphere's requests while collecting its exorbitant management fee—a completely one-sided arrangement that has proved extremely lucrative for Gryphon and deleterious for Sphere.  And the absence of anything resembling internal controls at Gryphon makes clear that Sphere's digital assets are unsafe in Gryphon's hands. By this lawsuit, Sphere seeks recovery for the harm Gryphon has caused through its persistent misconduct.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

52.     Sphere repeats and re-states the allegations above as if fully set forth herein.

53.     This is a claim for breach of contract against Gryphon.

54.     The MSA is an enforceable contract.

55.     Sphere has complied with its obligations under all relevant contracts.

56.     Gryphon has materially breached the MSA, including, without limitation, by failing to provide management services for blockchain and cryptocurrency-related operations and charging Sphere in excess of the proscribed Management Fee.

57.     Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

### COUNT II
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

58.     Sphere repeats and re-states the allegations above as if fully set forth herein.

59.     This is a claim for breach of the implied covenant of good faith and fair dealing against Gryphon.

60.     The MSA is an enforceable contract.

61.     Sphere has complied with its obligations under all relevant contracts.

62.     Gryphon is in breach of its good faith obligations under the MSA.  For example, the MSA requires Gryphon to provide management services for all of Sphere's blockchain and cryptocurrency-related operations.  To the extent that the MSA does not explicitly require Gryphon to provide management services of a certain quality, an implied obligation must be read into the MSA that Gryphon must provide management services that meet an objectively reasonable

standard of care.  These implied obligations are necessary to avoid frustrating the purpose of the MSA.

63.     Gryphon has materially breached its implied obligations.

64.     Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**

65.     Sphere repeats and re-states the allegations above as if fully set forth herein.

66.     This is a claim for breach of fiduciary duty.

67.     Gryphon owes fiduciary duties to Sphere, which arise from the unusual amount of trust placed in Gryphon by Sphere, control that Gryphon has over Sphere, and status as a custodian of Sphere's digital assets and miners.  Sphere depended on Gryphon to serve its interests.

68.     Gryphon breached its fiduciary duties by prioritizing its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets.

69.     Gryphon's breach of its fiduciary duty has caused Sphere damage. Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Sphere respectfully requests that the Court award the following relief:

(1)     All damages to which Sphere is entitled, including, without limitation, compensatory and punitive damages, in an amount to be determined at trial;

(2)     All pre- and post-judgment interest to which Sphere is entitled;

18

(3)  All costs and expenses to which Sphere is entitled, including, without limitation, attorneys' fees and costs under the MSA; and

(4)  All other such relief as the Court may deem just and proper under the circumstances.

Dated:    April 7, 2023
          New York, NY

**DONTZIN NAGY & FLEISSIG LLP**

Tibor L. Nagy, Jr.
Gregory N. Wolfe
Maxine Peskens
980 Madison Avenue
New York, NY 10075
Tel: 212-717-2900
tibor@dnfllp.com
greg@dnfllp.com
mpeskens@dnfllp.com

*Counsel for Sphere 3D Corp.*