# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

GRYPHON DIGITAL MINING, INC., a    :
Delaware corporation,                     :     Case. No.

                                :

               Plaintiff,           :

                                :

     -against-                  :

                                :

SPHERE 3D CORP., a Canada corporation,   :

                                :

             Defendant.        :

------------------------------------------------------ X

------------------------------------------------------

## COMPLAINT

Plaintiff, GRYPHON DIGITAL MINING, INC. ("Gryphon"), by and through its undersigned counsel, hereby brings the foregoing Complaint against Defendant SPHERE 3D CORP. ("Defendant" and, together with Gryphon, the "Parties"), for breach of contract, breach of the implied covenant of good faith and fair dealing, and negligence, and alleges as follows:

## <u>INTRODUCTION</u>

1.     Gryphon is a privately held bitcoin mining company and industry leader in environmentally responsible bitcoin mining.

2.     Bitcoin is a decentralized digital currency (or "cryptocurrency") that can be stored on and transferred among digital wallets via peer-to-peer transactions.

3.     Bitcoin mining is the process of applying computing power to solve cryptographic problems to produce or "mint" new bitcoins, a process that is "energy intensive."

4.     Bitcoin miners who operate at a large scale typically contract with a hosting provider who will provide low cost electricity to power those bitcoin mining computers, and will host and operate those bitcoin mining computers for a fee.

5.    Many bitcoin miners will direct their mining computers to a bitcoin mining pool, which aggregates the bitcoin mining power of various miners together, and pays miners *pro rata* based on a miner's contribution to the overall production of all mining computers participating in the pool.

6.    Defendant is a cryptocurrency mining company.

7.    On or about August 19, 2021, Gryphon, as provider, and Defendant, as customer, entered into a Master Services Agreement (the "Original MSA").  On or about December 29, 2021, Gryphon and Defendant entered into Amendment No. 1 to the Master Services Agreement (the "Amendment" and, together with the Original MSA, the "MSA").  A copy of the MSA is attached hereto as **Exhibit A**.[1]

8.    Pursuant to the MSA, Gryphon and Defendant agreed that Gryphon shall serve as the exclusive provider of any and all management services to Defendant, which services include, but are not limited to: exclusive control over any and all relevant digital asset wallets and selection of the mining pool and custodians of such digital assets. *See* MSA at Exclusivity Clause and Commercial Terms Clause.  The Parties further agreed that Gryphon shall serve as the exclusive provider of services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Defendant. *Id.* at Exclusivity Clause.

9.    Together, the Parties intended to "set the bar for future bitcoin mining companies," and were "excited about the developing applications of blockchain technology" and becoming "a major player in its development[2]." Defendant publicly touted Gryphon's "world class expertise"

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the MSA.
[2] Sphere 3D News Release January 12, 2022 Questions and Answers Regarding Sphere 3D Corp.'s Proposed Merger with Gryphon Digital Mining, Inc. | Sphere3D (gcs-web.com)

in public statements.[3]

10.    The MSA has been profitable for both Parties. Under the MSA, Defendant has benefitted from Gryphon's significant and unique experience and expertise in cryptocurrency mining operations, including the "design, implementation and management of additional mining capacity" deployed by Defendant[4]. In exchange, Gryphon has enjoyed the exclusive nature of the agreement between the Parties and has collected a reasonable fee for its services.

11.    Although the Parties' business relationship has previously been mutually beneficial, in recent months, Defendant has repeatedly and in bad faith breached the MSA.

12.    Specifically, and despite Gryphon fully and competently performing its obligations under the MSA at all times, Defendant has repeatedly breached the MSA by (a) seeking mining hosting services independent of those offered by Gryphon, (b) directing its cryptocurrency miners to mining pools that Gryphon did not select and does not manage despite Gryphon maintaining mining pool relationships for Defendant's miners as part of Gryphon's services under the MSA, (c) creating its own digital wallets to receive proceeds of its mining efforts despite agreeing under the MSA that Gryphon has the exclusive right to manage digital wallets on Defendant's behalf, (d) actually receiving proceeds of cryptocurrency mining through those independently maintained and operated digital wallets without using Gryphon's choice of custodian, and (e) failing to pay Gryphon management fees for its cryptocurrency-related operations.

13.    In other words, Defendant has flagrantly violated the exclusivity provision of the MSA, as well as engaged in conduct that ultimately circumvents the profits that would be rightfully due and owing to Gryphon.

---

[3] Sphere 3D News Release August 20, 2021 Gryphon and Sphere Announce MSA and Agreement to Purchase Additional Carbon Offset Credits Bringing Total to Half a Million Credits | Sphere3D (gcs-web.com)
[4] *See* fn. 2, above.

14.     Defendant also acted negligently by allowing a hostile threat actor to infiltrate its computer and information technology infrastructure, failing to detect or intercept spoofing emails sent from Defendant's email domain, and failing to detect or intercept the threat actors before they induced Gryphon to send a material amount of bitcoin intended to be paid to Defendant pursuant to the MSA to the threat actor's bitcoin address (the "Data Security Incident").

15.     In the aftermath of the Data Security Incident, and despite Gryphon's repeated inquiries and demands, upon information and belief, Defendant has taken no action to remediate the Incident or to secure its email servers, email accounts, or other impacted computer systems, thereby subjecting Gryphon and all of Defendant's commercial partners to ongoing risk to their own financial well-being and information security infrastructure.

## PARTIES

16.     Gryphon is a corporation duly incorporated under the laws of the state of Delaware with its principal place of business located in Las Vegas, Nevada.  Gryphon is an industry-leading net carbon neutral bitcoin miner.

17.     Upon information and belief, Defendant is a Canadian corporation with its principal of business located in Toronto, Ontario, Canada.  Defendant is a publicly traded company whose shares trade on the NASDAQ.  Defendant specializes in industrial-scale cryptocurrency mining operations.

## VENUE AND JURISDICTION

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of attorneys' fees and costs and because diversity of citizenship is established.

19.     This Court has personal jurisdiction over the Defendant pursuant to the terms of the

MSA, which contains a binding forum selection clause pursuant to which the Parties explicitly "consent to the exclusive jurisdiction of the State of New York in connection with any dispute, suit action or proceeding . . ." and waived "any defense of *forum non conveniens* in connection therewith." *See* MSA at Governing Law/Jury Waiver/Fee Clause.

20.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391 and the terms of the MSA which require all actions to be brought in the state or district courts located within the State of New York. *Id.*

**FACTUAL ALLEGATIONS**

THE MSA

21.     Under the MSA, Gryphon and Defendant agreed that "[Gryphon] shall be [Defendant's] exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by [Defendant] and/or its subsidiaries and/or affiliates at any location (collectively, the 'Services')." *Id.* at Exclusivity Clause.

22.     Pursuant to the MSA, Defendant agreed that Gryphon shall "at all times control the digital wallet, which shall be a wallet address selected by Gryphon on behalf of Defendant for storing digital assets (the 'Digital Wallet'). The digital assets shall be in the denomination of cryptocurrencies, virtual currencies or coins mined by [Gryphon] for or on behalf of [Defendant] at any location whatsoever (the 'Digital Assets')." *Id.* at Commercial Terms Clause.

23.     Gryphon is obligated to "pay directly from the Digital Wallet on behalf of [Defendant] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *Id.*

24.     The MSA provides that Gryphon "shall at all times select the mining pool and

custodian of the Digital Assets." *Id.*

25.     As consideration for Gryphon's management services, Defendant agreed that "[Gryphon] shall receive the equivalent of twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of [Defendant's] blockchain and cryptocurrency-related operations (the 'Management Fee')". *Id.* at Management Fee/Operating Costs Clause.

<u>DEFENDANT'S BREACHES OF THE MSA</u>

26.     On or about October 13, 2021, Gryphon secured hosting for Defendant's miners with Core Scientific, which Defendant's then-CEO, Peter Tassiopoulos, touted as a "blue chip" and "industry leading hosting partner[5]." Defendant's miners were installed at Core Scientific's facilities and managed and operated by Gryphon.

27.     On or about April 11, 2022, Gryphon's CEO, Rob Chang, contacted Defendant with an offer to help obtain hosting. Defendant directed Gryphon to "[s]tand by" but did not follow up regarding Mr. Chang's offer.

28.     On June 17, 2022, Gryphon's president, Dan Tolhurst, contacted Defendant to determine whether Defendant needed additional hosting sites. Defendant stated it did not.

29.     On or about August 8, 2022, and despite stating it did not need additional hosting sites, Defendant entered into an agreement with Compute North, a hosting provider, without the consent, approval or involvement of Gryphon.

30.     Such relationship is a material breach of the exclusivity provision in the MSA, pursuant to which the Parties agreed that Gryphon shall serve as the exclusive provider of Services relating to cryptocurrency mining equipment.

31.     Mr. Tolhurst contacted Defendant again on September 30, 2022, but again was told

---

[5] Sphere 3D News Release October 13, 2021 Sphere 3D and Gryphon Secure Largest Single Hosting Services Deal in Core Scientific's History | Sphere3D (gcs-web.com)

314952465.4

that Defendant did not need additional hosting sites. Defendant also stated that it was looking to resolve issues with Core Scientific.

32.    On November 16, 2022, Gryphon, through its CEO Rob Chang, contacted Defendant and offered to set up a meeting with Foundry Digital, a mining pool operator ("Foundry"), to provide a hosting site.

33.    In December 2022, Core Scientific filed for relief under the US Bankruptcy Code.

34.    Thereafter, in December 2022, Gryphon attempted to obtain new hosting services for Defendant.

35.    However, Defendant refused to provide critical information required by Gryphon to enable Gryphon to procure replacement hosting for its devices, and instead sought to circumvent Gryphon's exclusive right to provide the Services by: (a) seeking alternative hosting independent of Gryphon's control, (b) creating its own digital wallets, (c) attempting to select its own crypto mining pool, and (d) actively concealing its own mining efforts and proceeds to avoid paying Gryphon Management Fees owed under the MSA.

36.    On or about December 12, 2022, Defendant entered into a business relationship with USBTC, a mining hosting provider which at the time managed prior Compute North hosting facilities, without the consent, approval or involvement of Gryphon.

37.    On March 8, 2023, Mr. Tolhurst contacted Alex Tierney, Defendant's Director of Corporate Development, and inquired regarding Defendant's hosting needs. Defendant did not respond to Mr. Tolhurst's inquiry.

38.    On March 9, 2023, Mr. Tolhurst contacted Kurt Kalbfleisch, Senior Vice President and CFO of Defendant, and further inquired regarding Defendant's hosting needs. Mr. Kalbfleisch indicated that he would speak to Defendant's CEO, Patricia Trompeter, and revert back.

39.     Such relationship is a material breach of the exclusivity provision in the MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment.

40.     On or about March 10, 2023, Defendant attempted to enter into a business relationship with Foundry without the consent, approval or involvement of Gryphon.

41.     Such attempted relationship is a material breach of the exclusivity provision in the MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment and wherein Gryphon and Defendant agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.*

42.     On March 15, 2023, Mr. Tolhurst followed up with Defendant's CFO, Mr. Kalbfleisch, regarding Mr. Tolhurst's March 9 inquiry regarding Defendant's hosting needs. Defendant did not respond.

43.     On or about March 16, 2023, Defendant entered into an agreement with Lancium Mining, a mining hosting provider, without the consent, approval or involvement of Gryphon. Defendant publicly claims to have entered additional discussions with hosting providers for the placement of over 5,000 cryptocurrency miners[6].

44.     Such relationship is a material breach of the exclusivity provision in the MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment.

45.     On or about March 19, 2023, Defendant entered into a business relationship with Luxor Technologies, a crypto mining pool provider, without the consent, approval or involvement of Gryphon. Without Gryphon's consent or approval, Defendant created an account with Luxor

---

[6] Sphere 3D News Release Sphere 3D Corp. Provides Bitcoin Production and Mining Updates for February 2023 | Sphere3D (gcs-web.com)

and obtained an account ID.

46.     Such relationship is a material breach of the exclusivity provision in the MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to Defendant's cryptocurrency mining equipment, and wherein Gryphon and Defendant agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.* at Exclusivity Clause.

47.     In furtherance of its improper relationship with Luxor and Foundry (and in breach of the MSA), Defendant has established Digital Wallets without the consent, approval, or involvement of Gryphon.  For example, March 21, 2023 Defendant, through its CEO, Patricia Trompeter, admitted to having created a digital wallet for Defendant without the consent or approval of Gryphon.  Defendant has not transferred control of that digital wallet to Gryphon and has not paid the Management Fee required to be paid to Gryphon from that digital wallet, as required under the MSA.

48.     Such actions are a material breach of the commercial terms of the MSA, which give Gryphon exclusive control over Defendant's Digital Wallets, and which specifically grant Gryphon the exclusive power to select the custodian of the Digital Assets.

49.     Gryphon has repeatedly requested from Defendants the information it would require to secure mining hosting services for Defendant but Defendant has repeatedly failed to provide that information to Gryphon.

50.     On March 21, 2023, Gryphon sent a demand letter (the "Demand Letter") to Defendant, giving Defendant notice of Defendant's breaches of the MSA and demanding all documentation relating to Defendant's efforts to circumvent the exclusive rights granted to Gryphon by Defendant including its efforts to create business relationships with third party

cryptocurrency-related service providers. A true and correct copy of the Demand Letter is attached hereto as **Exhibit B.**

51.     Defendant has not provided any of the requested documentation and remains in breach of the MSA.

<u>THE DATA SECURITY INCIDENT</u>

52.     As required under the MSA, Gryphon and Defendant have developed and relied upon a regular course of dealing to request and confirm transfers of cryptocurrency from the Digital Wallets managed by Gryphon to Defendant.

53.     Specifically, Gryphon regularly provides information to Defendant that allows Defendant to understand the Net Operating Profit generated through its cryptocurrency mining operations as managed by Gryphon.   From that, Gryphon calculates the amount to be paid to Defendant and sends an invoice to Defendant. Thereafter, Gryphon withdraws its Management Fee from Defendant's Digital Wallet. Although not required under the express terms of the MSA, Gryphon has also offered to pay Defendant by wire transfer at Defendant's election.

54.     The remaining digital assets in the Digital Wallets are then sent to Defendant, at Defendant's request, according to the same course of dealing.   First, Defendant will send an email requesting a transfer.   The transfer request will include (i) the amount of cryptocurrency to be transferred, and (ii) the public key address of the transferee digital asset wallet (the "Transferee Wallet").

55.     If Defendant requests a transfer into a new Transferee Wallet, Gryphon will take steps to confirm the new Transferee Wallet.   Specifically, when a transfer request is made by Defendant requesting that bitcoin be transferred to a new Transferee Wallet, Gryphon will send a *de minimis* test transaction to the Transferee Wallet public key address.   The test transaction amount must then be confirmed as received by the Defendant via email.   Once confirmed, Gryphon

-10-

then sends the full transfer amount to the Transferee Wallet, less the amount already transferred as part of the test transaction. For subsequent transactions paid to known Transferee Wallet public key addresses, Gryphon will send the full requested amount without verification or test transactions.

56.     Gryphon and Defendant used the established protocol described herein for six (6) transactions of bitcoin beginning on August 26, 2022 without incident or objection by Defendant at any time before January 27, 2023.

57.     On or about January 27, 2023, however, Gryphon received a transfer request for eighteen (18) bitcoin from the email address belonging to Kurt Kalbfleisch, Senior Vice President and CFO of Defendant (the "First January 27 Request"). The email included all information typically provided to Gryphon with a request for a cryptocurrency transfer by Defendant, including a request that the eighteen (18) bitcoin be transferred to a known public key address for Defendant's Transferee Wallet. The January 27 Request also copied Ms. Trompeter's Sphere3d.com email address, which is Defendant's typical practice in transmitting these requests to Gryphon.

58.     Upon receipt of the First January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request and informed Mr. Kalbfleisch that the transfer would not be completed until January 30, 2023 at the earliest.

59.     On the same day and within the same email chain, Mr. Chang received a second email from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address. The email stated that the previously-provided public key address for Defendant's Transferee Wallet was under audit and requested that the bitcoin be transferred to a different Transferee Wallet public key address (the "Second January 27 Request"). Defendant's CEO, Ms. Trompeter, was copied on this email

-11-

via her correct email address.

60.    Upon receiving the Second January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request that the bitcoin be transferred to a different Transferee Wallet public key address and responded that the request required verification of the new address.

61.    On January 30, 2023, Gryphon sent a *de minimis* test transaction (0.0001 bitcoin) to the new Transferee Wallet public key address identified in the Second January 27 Request. After the bitcoin was transferred, Mr. Chang sent an email to the email address appearing to be Mr. Kalbfleisch's Sphere3d.com email address and from which the Second January 27 Request was sent, stating that the *de minimis* test transaction was complete and requesting that Defendant confirm receipt of the test transaction.  Defendant's CEO, Ms. Trompeter, was copied on Mr. Chang's email via her correct email address.

62.    Shortly thereafter, Mr. Chang received an email response from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address stating that Defendant received the test transaction and requesting the full amount of the transfer request be sent.  Ms. Trompeter was copied on the response email confirming Defendant's receipt of the test transaction at her correct Sphere3d.com email address, again consistent with Defendant's practice in communicating such confirmations to Gryphon.

63.    After receiving confirmation of the test transaction and the request that the full amount be transferred, Gryphon sent the remainder of the requested transfer amount (17.9999 bitcoin) on January 31, 2023, to the new Transferee Wallet public key address identified in the Second January 27 Request.

64.    On February 1, 2023, Gryphon received an email from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address requesting the transfer of an additional eight (8) bitcoin

314952465.4

to the new Transferee Wallet public key address (the "February 1 Request"). Once again, Ms. Trompeter was copied on this email via her correct email address. Later that day, Gryphon received another email from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address inquiring about the status of the requested transfer. Ms. Trompeter was copied on this email as well via her correct email address.

65.     Gryphon, through Mr. Chang, responded to the email from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address stating the transfer request was being processed. Ms. Trompeter was copied on Mr. Chang's response via her correct email address.

66.     On February 1, 2023, Gryphon transferred eight (8) bitcoin to the new Transferee Wallet public key address.

67.     A true and correct copy of the email correspondence regarding the transfers described herein are attached hereto as **Exhibit C.** In total, Gryphon transferred twenty-six (26) bitcoin to the new Transferee Wallet public key address provided in the Second January 27 Request via three separate bitcoin transactions.

68.     On or about February 2, 2023, Gryphon was informed that Defendant never received the bitcoin transactions sent by Gryphon. After examination, Gryphon discovered that emails sent from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address, beginning with the Second January 27 Request, were compromised when sent by Defendant to Gryphon; those emails came from a spoofed domain impersonating Defendant. As such, the transfer amount was sent to a digital asset wallet with no affiliation to Defendant. Mr. Kalbfleisch's email was compromised as a result of the Data Security Incident; upon information and belief, Mr. Kalbfleisch's email was compromised due to Defendant's failure to implement proper security and controls over its company computer systems, including its executives' email accounts and email

-13-

server, and its failure to detect the compromise when a threat actor was actively diverting Gryphon's funds, despite Defendant's CEO, Ms. Trompeter, being accurately copied on the Second January 27 Request and the February 1 Request.

69.     Specifically, unlike Mr. Kalbfleich's email address, Ms. Trompeter's email address was not spoofed on the Second January 27 Request or any subsequent correspondence with Gryphon, including the February 1 Request; Ms. Trompeter was copied to her Sphere3d.com email address on all correspondence between Gryphon and the hostile actor spoofing Mr. Kalbfleisch's email.  Thus, Ms. Trompeter—Defendant's CEO—was well-positioned to ascertain and detect her colleague's compromise, but apparently did not do so.

70.     In an abundance of caution, in the aftermath of the Data Security Incident, Gryphon engaged a third-party forensic investigator to perform a privileged investigation of any potentially impacted systems on Gryphon's part.  The investigation revealed that the compromise of Mr. Kalbfleisch's Sphere3d email account was not the result of any intrusion, vulnerability, hostile actor, or lack of proper security or controls over computers, email accounts, or email servers used by Gryphon.

71.     On March 3, 2023, Gryphon and Defendant scheduled a meeting with the agreed upon purpose of allowing the Parties' respective experts to compare their investigations and findings into the email compromise.  In particular, Gryphon indicated in its correspondence to Defendant that it had "completed [its] forensic research and believe[s] it is the right time for our forensic investigators to discuss their findings.  Could we please arrange a time for them to connect?" On March 3, Ms. Trompeter, CEO of Defendant, agreed to a meeting including both Party's experts, noting, "We have a forensic review as well."  *See* correspondence attached as **Exhibit D**.

72.     On March 15, 2023, Gryphon and Defendant joined their scheduled call wherein their respective experts were scheduled to discuss their investigations into the Data Security Incident. Defendant, however, did not put forward any expert. Instead, Defendant refused to provide any information to Gryphon, claimed it was undergoing "many investigations" and did not know what investigation Gryphon was referring to, and claimed that its understanding of the purpose and scope of the meeting was that Gryphon would present its own findings without any exchange of information.

73.     Despite multiple requests by Gryphon, Defendant has failed to reschedule a meeting of the Parties' respective experts.

74.     Despite the transfer being the sole fault of Defendant and due to its negligence, and in order to attempt to maintain the business relationship with Defendant, Gryphon then transferred the U.S. dollar-equivalent value of twenty-six (26) bitcoin, approximately $560,215.53, from a Digital Wallet belonging to Gryphon to a Digital Wallet public key address belonging to Defendant. Defendant has acknowledged receipt of this transfer.

75.     Despite good faith efforts, including blockchain forensic tracing, Gryphon has been unable to recover the twenty-six (26) bitcoin transferred to the threat actor whose public key address was included in the emails sent to Gryphon, copying Defendant's CEO.

76.     Since the Data Security Incident, Gryphon has discontinued transfers of digital assets to Defendant. Instead, Gryphon transfers to Defendant via electronic wire transfer the USD-equivalent value of the digital assets.

77.     Pursuant to the terms of MSA, in addition to any damages incurred, Gryphon is entitled to its reasonable attorneys' fees and costs in connection with bringing this action. *See* MSA at Governing Law/Jury Waiver/Fees Clause.

78.     All conditions precedent have been met, or have been waived or would be futile to attempt prior to bringing this action.

## COUNT I - BREACH OF CONTRACT

79.     Gryphon adopts by reference the allegations of paragraphs 1 through 51 as if fully stated herein.

80.     Gryphon and Defendant are parties to the MSA.

81.     The MSA is a valid and enforceable contract governed by New York law.

82.     Under the MSA, the Parties agreed that Gryphon shall serve as Defendant's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by [Defendant] and/or its subsidiaries and/or affiliates at any location . . . ." *See* MSA at Exclusivity Clause.

83.     The Parties further agreed that Gryphon shall "at all times control the digital wallet, which shall be a wallet address selected by [Gryphon] on behalf of [Defendant] for storing digital assets," and shall "at all times select the mining pool and custodian of the Digital Assets." *See* MSA at Commercial Terms Clause.

84.     Gryphon has fully performed and complied with all of its obligations and duties under the MSA.

85.     Defendant's conduct, as described herein, constitutes a breach of the MSA.

86.     Specifically, Defendant has materially breached the exclusivity terms of the MSA by entering into agreements with, potentially among others, Luxor, Foundry, USBTC, and Lancium without the consent, approval or involvement of Gryphon.

87.     Defendant has further materially breached the commercial terms of the MSA by,

among other things, creating and operating its own digital wallets without the consent, approval or involvement of Gryphon.

88.     Defendant has further materially breached the MSA by collecting mining proceeds into its Digital Wallet and failing to remit Management Fees to Gryphon.

89.     As a direct and proximate cause of Defendant's breaches, Gryphon has been directly damaged in an amount to be determined at trial, but in all events in excess of $75,000, exclusive of interest and costs.

## COUNT II - BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

90.     Gryphon adopts by reference the allegations of paragraphs 1-51 as if fully stated herein.

91.     Gryphon and Defendant are parties to the MSA.

92.     The MSA is a valid and enforceable contract governed by New York law.

93.     Gryphon has fully performed and complied with all of its obligations and duties under the MSA.

94.     Under New York law, Defendant owes Gryphon an implied duty to act in good faith and conduct itself fairly in connection with the MSA.

95.     Pursuant to the exclusivity terms of the MSA, Gryphon is the exclusive provider of any and all management services relating to mining equipment owned, purchased, leased, or otherwise controlled by Defendant.

96.     Despite multiple requests made by Gryphon, Defendant has failed to disclose the number of cryptocurrency miners owned, purchased, leased or otherwise controlled by Defendant.

97.     Defendant's failure to disclose this information has prevented Gryphon from fulfilling its duties under the MSA, and, as such, is a breach of the implied duty of good faith and

fair dealing.

98.     Although Defendant's failure to disclose information is not an express breach of the MSA, it has prevented Gryphon from providing Services as required under the MSA and therefore deprived Gryphon of the benefits of its bargain under the MSA.

99.     As a direct and proximate cause of Defendant's breach, of the implied covenant of good faith and fair dealing, Gryphon has been damaged in an amount to be determined at trial, but in all events in excess of $75,000, exclusive of interest and costs.

## COUNT III - NEGLIGENCE

100.     Gryphon adopts by reference the allegations of paragraphs 1-25 and 52-78, above, as if fully stated herein.

101.     Defendant owed duties to Gryphon to maintain proper security and control of Defendant's technology systems, including its company email accounts and email server, to take proper precautions to protect Gryphon from being targeted by fraudulent activities in connection with Gryphon's business dealings with Defendant, including the transfer of assets under the MSA, to safeguard information relating to such business dealings and transactions, and to recognize and notify Gryphon of fraudulent activity occurring within Defendant's technology systems.

102.     Defendant knew or should have known that the failure to exercise due care in the performance of the foregoing duties would result in an unreasonable risk of harm to Gryphon.

103.     Defendant knew or should have known of the prevalence of, and industry warnings relating to, business email scams whereby a hostile actor may infiltrate a company's technology systems and impersonate an employee of the company for the purpose of fraudulently inducing a customer or business partner to send the hostile actor money or confidential business or personally identifying information.

104.    Defendant breached each of the aforementioned duties by allowing the email account of its CFO Mr. Kalbfleisch (and potentially other email accounts) to be impersonated or otherwise compromised by an unknown hostile actor.

105.    As a direct and proximate cause of Defendant's negligence, the unknown hostile actor was able to send Gryphon a fraudulent request to transfer of twenty-six (26) bitcoin.

106.    Defendant's CEO, Ms. Trompeter, was copied on all of the emails at issue using her correct Sphere3d.com email address.

107.    As such, Ms. Trompeter should have identified and notified Gryphon of the hostile actor activity and email compromise.

108.    Despite being copied on the email, Defendant's CEO Ms. Trompeter failed to recognize the hostile actor activity and failed to notify Gryphon that Mr. Kalbfleisch's email was compromised and that the transfer request was fraudulent.

109.    As a direct and proximate cause of Defendant's negligence, Gryphon was not notified of the hostile actor activity occurring within Defendant's technology systems and that the transfer request was fraudulent.

110.    As a direct result and proximate cause of Defendant's negligence, Gryphon transferred twenty-six (26) bitcoin to the unknown hostile actor, which it has been unable to recover despite diligent efforts to do so.

111.    Although Defendant claims it has investigated the email compromise, Defendant has refused and failed to provide its own report of its investigation at a meeting arranged by the Parties for that purpose. *See supra*, at 63, 64.

112.    Despite Gryphon's compliance with the standard procedures that Gryphon and Defendant used for six previous bitcoin transactions, Defendant negligently failed to follow its

314952465.4

established course of dealing and standard procedures when requesting a transfer of bitcoin from Gryphon.

113.    But for Defendant's negligence, Gryphon would not have transferred twenty-six (26) bitcoin from its own Digital Wallet to a Digital Wallet belonging to an unknown hostile actor.

114.    As a direct and proximate cause of Defendant's negligence, Gryphon has been damaged in an amount totaling twenty-six (26) bitcoin which had the market value of no less than $560,225.53 at the time of the transfers.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Gryphon respectfully asks this Court to enter judgment in its favor as follows:

1. On Count I, awarding damages, and its reasonable attorneys' fees and costs, in an amount to be determined at trial.

2. On Count II, awarding damages and its reasonable attorneys' fees and costs, in an amount to be determined at trial.

3. On Count III, awarding damages in amount to be determined at trial.

4. Any and all other and further relief that the Court deems just and proper.

Dated: New York, New York       K&L GATES LLP
   April ___, 2023


By: _____

Attorneys for Defendant