Exhibit C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Style Definition:** Normal: Indent: Left:  1.8", Hanging:  0.01", Space After:  0.25 pt, Line spacing:  Multiple 2 li

**Style Definition:** Heading 1: Font: 9.5 pt, No underline, Underline color: Auto, Justified, Indent: Left:  0", Space After:  11.5 pt, Line spacing:  Multiple 1.1 li

**Style Definition:** Heading 2: Font: 9.5 pt, Bold, No underline, Underline color: Auto, Justified, Right:  0", Space After:  11.5 pt, Line spacing:  Multiple 1.1 li

**Style Definition:** footnote description: No underline, Underline color: Auto, Font color: Black, Right:  0.04", Line spacing:  Multiple 1.08 li

**Formatted:** Font: Bold

**Formatted:** Font: Bold

**Formatted:** Indent: Left:  -0", Right:  0.03", Space After:  0.5 pt, Line spacing:  Multiple 1.04 li



SPHERE 3D CORP.,

*Plaintiff,*

v.

GRYPHON DIGITAL MINING, INC., a

~~Delaware corporation,~~

~~Plaintiff,~~

~~-against-~~

~~SPHERE 3D CORP., a Canada corporation,~~

*Defendant.*

Deleted Cells

Deleted Cells

**Formatted: Font: Bold**

**Formatted:** Indent: Left: 0", Space After: 0 pt, Position: Horizontal: Inside, Relative to: Column, Vertical: -0.68", Relative to: Paragraph, Wrap Around

**Formatted Table**

**Formatted:** Space After: 1.35 pt, Position: Horizontal: Inside, Relative to: Column, Vertical: -0.68", Relative to: Paragraph, Wrap Around

**Formatted: Font: Bold**

**Formatted:** Indent: Left: 0", Space After: 0 pt, Position: Horizontal: Inside, Relative to: Column, Vertical: -0.68", Relative to: Paragraph, Wrap Around

**Formatted: Font: Italic**

**Formatted:** Left, Indent: Left: 0", Position: Horizontal: Inside, Relative to: Column, Vertical: -0.68", Relative to: Paragraph, Wrap Around

_____

Case No. _____

**Jury Trial Demanded**

**COMPLAINT**

> **Formatted:** Underline

> **Formatted:** Indent: Left:  0.93", Right:  0.97", Space After:  0 pt

> **Formatted:** Space After:  7.9 pt

Plaintiff

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ............................................................................................ 1

**PARTIES** ................................................................................................................................. 7

**JURISDICTION & VENUE** ............................................................................................... 7

**FACTUAL ALLEGATIONS** ............................................................................................. 8

I.        Background On Cryptocurrency Mining ............................................................... 8

II.    IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND CRYPTOCURRENCY-RELATED OPERATIONS" ................................................ 9

III.    THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT MANAGEMENT SERVICES, IN BREACH OF THE MSA ...................................... 9

IV.    GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL MINING, INC. (" ASSETS, IN BREACH OF THE MSA................................................ 11

V.    GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH OF ITS FIDUCIARY DUTIES ........................................................ 11

VI.    GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE LAW 12

A.    Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry Standard Procedures For Transferring Bitcoin ...................................... 12

B.    Gryphon Lacks Industry Standard Internal Controls And Policies And Procedures, In Violation Of The MSA And Almost Certainly In Violation Of Applicable Law ........................................................................ 13

VII.    IN AN EFFORT TO COW SPHERE AND DISSUADE IT FROM EXPOSING GRYPHON'S NUMEROUS BREACHES, GRYPHON HAS BASELESSLY SOUGHT TO THREATEN SPHERE WITH MANUFACTURED BREACHES ........................................... 15

VIII.    SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES .......... 16

CAUSES OF ACTION ........................................................................ 17

PRAYER FOR RELIEF ........................................................................ 18

i

Plaintiff Sphere 3D Corp. ("Sphere"), by and through its undersigned counsel, hereby brings the foregoing attorneys, respectfully submits this Complaint against Defendant SPHERE 3D CORP. ("Defendant" and, together with Gryphon, the "Parties"), defendant Gryphon Digital Mining, Inc. ("Gryphon").

## PRELIMINARY STATEMENT

1. This is an action for breach of contract, and breach of the implied covenant of good faith and fair dealing, and negligence, and alleges as follows:fiduciary duty. Sphere and Gryphon are in the business of digital asset mining—*i.e.*, using computers referred to as "miners" to earn bitcoin and bitcoin-related transaction fees. In contemplation of a potential merger that ultimately fell through, the parties entered into a Master Services Agreement dated August 19, 2021 (the "MSA," attached as Exhibit 1), as subsequently amended on December 29, 2021 (the "MSA Amendment," attached as Exhibit 2). Under the MSA, Gryphon (among other things) undertook an obligation to be the "exclusive provider of any and all management services for"

INTRODUCTION

1. Gryphon is a privately held bitcoin mining company and industry leader in environmentally responsible bitcoin mining.

2. Bitcoin is a decentralized digital currency (or "cryptocurrency") that can be stored on and transferred among digital wallets via peer-to-peer transactions.

3. Bitcoin mining is the process of applying computing power to solve cryptographic problems to produce or "mint" new bitcoins, a process that is "energy intensive."

4. Bitcoin miners who operate at a large scale typically contract with a hosting provider who will provide low cost electricity to power those bitcoin mining computers, and will host and operate those bitcoin mining computers for a fee.

5. Many bitcoin miners will direct their mining computers to a bitcoin mining pool, which aggregates the bitcoin mining power of various miners together, and pays miners *pro rata* based on a miner's contribution to the overall production of all mining computers participating in the pool.

6. Defendant is a cryptocurrency mining company.

**Formatted:** Indent: First line: 0.5", Right: 0.03", Space After: 0 pt, Numbered + Level: 2 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.5"

7.      On or about August 19, 2021, Gryphon, as provider, and Defendant, as customer, entered into a Master Services Agreement (the "Original MSA").  On or about December 29, 2021, Gryphon and Defendant entered into Amendment No. 1 to the Master Services Agreement (the "Amendment" and, together with the Original MSA, the "MSA").  A copy of the MSA is attached hereto as **Exhibit A**.[1]

8.      Pursuant to the MSA, Gryphon and Defendant agreed that Gryphon shall serve as the exclusive provider of any and all management services to Defendant, which services include, but are not limited to: exclusive control over any and all relevant digital asset wallets and selection of the mining pool and custodians of such digital assets.  *See* MSA at Exclusivity Clause and Commercial Terms Clause.  The Parties further agreed that Gryphon shall serve as the exclusive provider of services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Defendant. *Id.* at Exclusivity Clause.

9.      Together, the Parties intended to "set the bar for future bitcoin mining companies," and were "excited about the developing applications of blockchain technology" and becoming "a major player in its development[2]." Defendant publicly touted Gryphon's "world class expertise" in public statements.[3]

10.     The MSA has been profitable for both Parties.  Under the MSA, Defendant has benefited from Gryphon's significant and unique experience and expertise in cryptocurrency mining operations, including the "design, implementation and management of additional mining

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the MSA.
[2] Sphere 3D News Release January 12, 2022 Questions and Answers Regarding Sphere 3D Corp.'s Proposed Merger with Gryphon Digital Mining, Inc. | Sphere3D (gcs-web.com)
[3] Sphere 3D News Release August 20, 2021 Gryphon and Sphere Announce MSA and Agreement to Purchase Additional Carbon Offset Credits Bringing Total to Half a Million Credits | Sphere3D (gcs-web.com) [4] *See* fn. 2, above.

Formatted: Space After:  24.85 pt

capacity" deployed by Defendant[4]. In exchange, Gryphon has enjoyed the exclusive nature of the agreement between the Parties and has collected a reasonable fee for its services.

11.    Although the Parties' business relationship has previously been mutually beneficial, in recent months, Defendant has repeatedly and in bad faith breached the MSA.

12.    Specifically, and despite Gryphon fully and competently performing its obligations under the MSA at all times, Defendant has repeatedly breached the MSA by (a) seeking mining hosting services independent of those offered by Gryphon, (b) directing its cryptocurrency miners to mining pools that Gryphon did not select and does not manage despite Gryphon maintaining mining pool relationships for Defendant's miners as part of Gryphon's services under the MSA, (c) creating its own digital wallets to receive proceeds of its mining efforts despite agreeing under the MSA that Gryphon has the exclusive right to manage digital wallets on Defendant's behalf, (d) actually receiving proceeds of cryptocurrency mining through those independently maintained and operated digital wallets without using Gryphon's choice of custodian, and (e) failing to pay Gryphon management fees for its cryptocurrency related operations.

13.    In other words, Defendant has flagrantly violated the exclusivity provision of the MSA, as well as engaged in conduct that ultimately circumvents the profits that would be rightfully due and owing to Gryphon.

14.    Defendant also acted negligently by allowing a hostile threat actor to infiltrate its computer and information technology infrastructure, failing to detect or intercept spoofing emails sent from Defendant's email domain, and failing to detect or intercept the threat actors before they induced Gryphon to send a material amount of bitcoin intended to be paid to Defendant pursuant to the MSA to the threat actor's bitcoin address (the "Data Security Incident").

15.    In the aftermath of the Data Security Incident, and despite Gryphon's repeated inquiries and demands, upon information and belief, Defendant has taken no action to remediate the Incident or to secure its email servers, email accounts, or other impacted computer systems,

thereby subjecting Gryphon and all of Defendant's commercial partners to ongoing risk to their own financial well-being and information security infrastructure.

PARTIES

Sphere's "blockchain and cryptocurrency-related operations" and the custodian of certain of Sphere's digital assets. MSA at 1. In return, Sphere promised to pay Gryphon an exorbitant management fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations" (the "Management Fee"). *Id.* Separate from the contract, Gryphon's power over Sphere and its status as custodian of Sphere's digital assets and miners gave rise to fiduciary duties, including the duty of loyalty and to avoid self-dealing.

2.    For over a year now, the parties' relationship has proven to be completely onesided: Gryphon has dutifully collected its exorbitant Management Fee while shirking its duties under the MSA and delivering abhorrent management services, causing untold damage to Sphere. Worse still, Gryphon has been skimming off the top (*i.e.*, stealing) from Sphere's assets and, as recent events have revealed, has no internal controls systems or policies and procedures in place, as needed not only to comply with the MSA, but also applicable law. And Gryphon has breached its fiduciary duties by nakedly prioritizing its own interests over those of Sphere's.

1

3.    Gryphon's failures under the MSA are persistent, ongoing, uncured despite repeated entreaties from Sphere, and too many to catalogue. In general, Gryphon has been content to sit back and collect millions of dollars in Management Fees while delivering no services whatsoever. When it has delivered services, the results have been appalling. By way of illustration only, Gryphon has refused to find hosting space for Sphere's miners (and instead directed Sphere to undertake the task of finding space itself); allowed Sphere's

miners to languish with the U.S. Customs and Border Protection agency ("U.S. Customs") for weeks (a situation Sphere itself ultimately resolved); persistently delayed in setting up and ensuring the operation of Sphere's miners; inexplicably ignored Sphere's instructions to sell its digital assets; failed to review thirdparty invoices for accuracy, resulting in Sphere paying erroneous charges; and generally failed to manage relationships with third-parties. The result has been lost revenues for Sphere while Gryphon eats a free lunch.

4.    And, egregiously, Sphere has good reason to believe that Gryphon has been skimming off the top from—in other words, stealing—Sphere's digital assets. Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to provide Sphere with documentation to verify that it is not using or otherwise taking Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit. The only rational reason for such concealment is to make it harder for Sphere to know which assets are mined for its own account— and to detect Gryphon stealing Sphere's assets.

5.    Recently, Gryphon's gross incompetence has reached a new level that raises substantial concerns about Gryphon's ability to safeguard Sphere's digital assets, the effectiveness of its internal controls, and compliance with the law. Gryphon holds itself out as a sophisticated

2

entity and its CEO, Rob Chang, as an "experienced executive" in the crypto-space. Gryphon and Mr. Chang, however, recently fell for multiple spoofing attacks targeting Sphere's digital assets that would have been avoided had they had internal controls systems and policies and procedures in place and adhered to applicable law.

6.      On January 27, 2023, at 1:22 p.m., Sphere CFO Kurt Kalbfleisch requested by email that Mr. Chang transfer 18 bitcoin (worth over $400,000) from a wallet controlled by Gryphon to one controlled by Sphere, which was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name: "@sphere3d.com."  Mr. Chang responded that he would initiate the transfer.

7.      At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch, as depicted in the figures below.  The email came from a different domain than the Sphere domain, namely, "@spheres3d.com"[1] (with an added s in the middle), not @sphere3d.com. In the email, the person pretending to be Mr. Kalbfleish stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address that Sphere had never used.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

[1] All emphases have been added unless otherwise noted.

3

## Re: Coin Transfer



KK    Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com>
      To ⚪ Rob Chang
      Cc ⚪ Patricia Trompeter

(Fig 1. From/to/cc line reflecting that the email originated from the spoofer with an incorrect domain, @spheres3d.com)

Rob,

Well Noted. I have just been notified that the address below is being audited. So kindly proceed with the transfer of 18 BTC from our "Sphere Mined Coins" wallet to the following address: **bc1qmrykeusq73xd7ad6h2y27mw0fu2e9wcqrfrlvr.**

(Fig. 2.  The relevant portion of the body of the spoofing email containing an implausible request to transfer bitcoin to a new wallet address in light of an audit.)

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

(Fig. 3.  The signature block containing the correct email address.)

8.      This was a transparent spoofing attack in which a third-party was impersonating

Mr. is a corporation duly incorporated under the laws of theKalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets.   Even a cursory review of the spoofing email—which did not originate from a Sphere email address,

4

included the correct email address in the signature block, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags for any competent employee, let alone a supposedly "experienced" executive like Mr. Chang, and prevented any unauthorized transfer.  So too would any independent verification of the requestor's identity, such as video or other identity verification.

9.    Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker.  Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that Sphere had never used before, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

10.    Not to be outdone, mere days later, on February 1, 2023, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000).  Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again).  On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company— to realize that he had been fooled by not one, but two, spoofing attacks.

11.    The incident revealed to Sphere the woeful state of DelawareGryphon's internal controls and policies and procedures, which should have prevented the attack.  Following the

spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide.  The failure to include effective internal controls demonstrates not only that Gryphon cannot comply

5

with its duties under the MSA, but also that Gryphon is almost certainly in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs.  Illustratively, Gryphon panicked when Sphere suggested that the incident be reported to law enforcement, including the Federal Bureau of Investigations ("FBI"), insisted that the issue could be handled between the parties, and demanded that no one report the theft to the authorities.  This put the onus on Sphere to report the incident, which it did by filing a suspicious activity report ("SAR") with the Financial Crimes Enforcement Network ("FinCEN").

12.     There are additional indicia that Gryphon lacks anything resembling effective internal controls.  In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability).  In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere understands that Gryphon, when it goes public, intends to recognize *all* of Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.  Such disclosures are at best misleading:  Gryphon can claim only a fraction of Sphere's revenues as its own, namely, the Management Fee.

13.     Beyond the MSA, Gryphon has breached its fiduciary duties, which arise from the unusual amount of trust placed in Gryphon by Sphere, control that Gryphon has over Sphere, and

status as a custodian of Sphere's digital assets and miners.  Indeed, Gryphon has taken the position that Sphere cannot even *attempt* to "create" any "business relationships" with any third-party in the crypto-space unless it obtains Gryphon's approval first.  Gryphon's breaches of fiduciary duty include prioritizing its own proprietary miners and mining pool strategies over Sphere's.  Indeed,

6

Gryphon's miners consistently outperform Sphere's, which would not occur if Gryphon were acting to avoid self-dealing.

14.    It is apparent that Gryphon is incapable of addressing its issues and performing under the MSA.  Accordingly, by this lawsuit, Sphere brings claims for breach of contract, of the implied covenant of good faith and fair dealing, and for breach of fiduciary duty to seek redress for the millions of dollars in damage Gryphon's misconduct has caused, as well as to recover its attorney's fees and costs under the MSA.

**PARTIES**

16.15.  Sphere 3D Corp. is a bitcoin mining company incorporated in Ontario, Canada, with its principal place of business located in Las Vegas, Nevada.  Gryphon is an industry-leading in Ontario, Canada.  Unlike many mining companies, Sphere's operations are net carbon neutral bitcoin miner.  Sphere is a publicly traded company whose securities have historically been dual listed in Canada and the U.S. and is currently listed for trading in the U.S. on the Nasdaq exchange.

17.16.  Upon information and belief, DefendantGryphon Digital Mining, Inc. is a Canadian corporation bitcoin mining company with its principal place of business located in Toronto, Ontario, Canada.  Defendant is a publicly traded company whose shares trade onLas Vegas, Nevada. In addition to providing management services to Sphere under the NASDAQ. Defendant specializes in industrial-scale cryptocurrency mining operationsMSA, Gryphon utilizes its own mining fleet for its own account.

**Formatted:** Indent: First line:  0.5", Right:  0.03", Numbered + Level: 1 + Numbering Style: 1, 2, 3, ... + Start at: 15 + Alignment: Left + Aligned at:  0" + Indent at:  0"

## ~~VENUE AND~~ **JURISDICTION & VENUE**

~~18.~~ 17.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of attorneys' fees and costs and because diversity of citizenship is established.

~~19.~~  This Court has ~~personal~~ jurisdiction over ~~the Defendant~~ this action pursuant to the ~~terms of the~~ 18.  MSA, which contains a binding forum selection clause ~~pursuant~~ of the MSA, which requires that "[a]ll disputes, suits, actions or proceedings relating to" the MSA "be brought solely in the state or federal courts located in the State of New York."  Venue is also proper under the forum selection clause, which ~~the Parties explicitly "consent~~ provides that: "Each party hereby consents to the

7

exclusive jurisdiction and venue of the State of New York in connection with any such dispute, suit, action or proceeding . . .", and ~~waived "~~ waives any defense of forum non conveniens in connection therewith." ~~See MSA at Governing Law/Jury Waiver/Fee Clause.~~

~~20.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391 and the terms of the MSA which require all actions to be brought in the state or district courts located within the State of New York.~~

~~Id.~~

## **FACTUAL ALLEGATIONS**

### ~~THE~~ I.  BACKGROUND ON CRYPTOCURRENCY MINING

19.     Sphere is in the business of "mining" for bitcoin.  Mining ensures that the payment network underlying bitcoin functions.  Through mining, companies generate new bitcoin for themselves and earn revenue through transaction fees.  To mine for bitcoin, mining companies use purchased or leased "miners," which are generally sophisticated, high-capacity computers that run programs designed to support the network underlying bitcoin.  Companies may direct their miners to participate in a "mining pool," which aggregates mining power attributable to multiple miners

and typically pays out on a pro rata basis based on the company's contribution to the pool. Not all mining pools are created equal; selecting lucrative mining pools is critical to commercial success in the crypto-space.

20.    Hosting services for miners (*e.g.*, warehouse space, electricity, security, internet access, cooling, and so on) is a core component of digital asset mining. Digital asset miners often turn to third parties for hosting services in exchange for fees, which can be among the most significant costs associated with digital asset mining.

21.    Cryptocurrency is stored in an individual's digital "wallet," which is akin to an online bank account. A wallet is the primary mechanism for managing cryptocurrency balances and allows individuals and organizations to hold and control their cryptocurrency.

8

**II. IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND CRYPTOCURRENCY-RELATED OPERATIONS"**

22.    On August 19, 2021, Sphere and Gryphon entered into the MSA in contemplation of a merger that never closed. The MSA was subsequently amended on December 29, 2021.

21.23.    Under the MSA, Gryphon and Defendant agreed that "[Gryphon] shall be [Defendant's] undertook an obligation to be Sphere's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by [Defendant] and/or its subsidiaries and/or affiliates at any location (collectively, the 'Services')."" MSA at 1. In return, Sphere promised to pay Gryphon a tremendous Management Fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's]

**Formatted:** Normal, Indent: First line: 0.5", Right: 0.03", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 22 + Alignment: Left + Aligned at: 0" + Indent at: 0"

blockchain and cryptocurrency-related operations." *Id.* The Management Fee was exorbitant and meant that Sphere could expect commensurate service. ~~*Id.* at Exclusivity Clause.~~

**Formatted:** Font: Not Italic

24.    In addition, the MSA made Gryphon a custodian of certain of Sphere's digital assets, which it maintains in a wallet. *Id.* The MSA also required Gryphon to sell Sphere's digital assets upon Sphere's "instruction." *Id.*

**Formatted:** Font: Not Italic

25.    The MSA further required that Gryphon perform its services "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services" and not engage in "gross negligence, fraud or willful misconduct in connection with performing the Services." MSA Amendment § 2.a.

26.    Finally, the MSA contains a prevailing party provision. *See* MSA at 3.

**III.    THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT MANAGEMENT SERVICES, IN BREACH OF THE MSA**

27.    Although the MSA required Gryphon to be the "exclusive provider of any and all management services," Gryphon has completely and absolutely shirked its duties, with disastrous consequences for Sphere. Often, Gryphon simply provides no services whatsoever—and expects to collect a Management Fee for the privilege of sitting on its hands. When it does provide

9

"management services," it provides abhorrent services, far below those generally recognized in the crypto-mining industry.

28.    By way of example, when Sphere needed hosting space in 2022 (a perquisite to turning on its miners and generating money), Gryphon refused to find hosting space and instead directed Sphere to find such space on its own. Delays in finding hosting space meant that Sphere could not run its miners, costing it money. Moreover, Sphere had to expend its own efforts to find such hosting space.

29.    As another example, in 2022, Sphere ordered certain miners from overseas for delivery into the United States.  The miners, however, were seized and held by U.S. Customs. Obtaining their release was simply a matter of providing U.S. Customs with certain manufacturing information, which would have informed U.S. Customs that no additional fees were due.  Despite repeated pleas from Sphere, however, Gryphon shirked its duties to provide the assistance and information needed to release the miners.  Due to Gryphon's misfeasance, the miners languished in U.S. Customs for weeks, costing Sphere dearly.  Eventually, Sphere secured the release of the miners itself by interfacing with third-parties to provide the information.

30.    As yet another example, Gryphon has inexplicably delayed setting up mining pools, resulting in lost revenue.  It has also outright ignored instructions to sell Sphere's bitcoin on a timely basis. And Gryphon has failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges.  Indeed, Gryphon has generally failed to manage any of Sphere's relationships with third-parties.

31.    These examples are part and parcel of a general failure to provide management services consistent with Gryphon's obligations under the MSA throughout the parties' relationship. And, throughout the parties' relationship, Sphere has raised its concerns to Gryphon

10

over its lack of performance to no avail:  despite repeated entreaties from Sphere, Gryphon has proven incapable of curing its innumerable and persistent breaches of the MSA.

**IV.    GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL ASSETS, IN BREACH OF THE MSA**

32. Even worse than its utter failure to provide management services, upon information and belief, Gryphon has been skimming off the top—effectively stealing money—from Sphere. Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to provide Sphere with documentation to verify that it is not using or otherwise seizing Sphere's assets

for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit. The only rational reason for such concealment is to make it harder for Sphere to know which assets are mined for its own account—and to detect Gryphon stealing Sphere's assets.

**V.    GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH OF ITS FIDUCIARY DUTIES**

33.    Separate from the MSA, Gryphon owes fiduciary duties to Sphere, which arise from the unusual amount of trust placed in Gryphon by Sphere, control that Gryphon has over Sphere and status as a custodian of Sphere's digital assets and miners. Indeed, as discussed *infra*, Gryphon has taken the position that Sphere cannot even *attempt* to "create" any "business relationships" with any third-party in the crypto-space unless it obtains Gryphon's approval first.

34.    Notwithstanding its clear fiduciary duties, throughout the parties' relationship, Gryphon has prioritized its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets. For example, on a monthly basis, Gryphon has reported a substantially higher mining efficiency ratio than Sphere, which would not occur if Gryphon were acting to avoid self-dealing.

11

**VI. GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE LAW**

**A. Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry Standard Procedures For Transferring Bitcoin**

35.    On January 27, 2023, at 1:22 p.m., Kurt Kalbfleisch, Sphere's Chief Financial Officer and Senior Vice President, requested by email to transfer 18 bitcoin (worth over $400,000)

from a wallet controlled by Gryphon to one controlled by Sphere.  Mr. Kalbfleisch provided the wallet address, which he specifically noted was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name:  "@sphere3d.com."

36.     At 1:33 p.m., Mr. Chang responded: "[r]eceived and initiated."

37.     At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch.  The email came from a different domain than the Sphere domain, namely, @spheres3d.com (with an added s in the middle), not @sphere3d.com.  In the email, the person pretending to be Mr. Kalbfleisch stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

38.     This was a transparent spoofing attack in which a third-party was impersonating Mr. ~~Pursuant to the MSA, Defendant agreed that Gryphon shall "at all times control the digital wallet, which shall be a wallet address selected by Gryphon on behalf of Defendant for storing digital assets (the 'Digital Wallet').  The digital assets shall be in the denomination of cryptocurrencies, virtual currencies or coins mined by [Gryphon] for or on behalf of [Defendant] at any location whatsoever (the 'Digital Assets')."~~Kalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets.   Even a cursory review of the spoofing email— which did not originate from a Sphere email address, included two different domains within the same email, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags and prevented any unauthorized transfer. So too would any independent verification of the requestor's identity.

12

39.    Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker.  Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that *Sphere had never used before*, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

40.    Merely days later, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000).  Specifically, on February 1, 2023, the spoofer again emailed Mr. Chang to ask him to transfer 8 bitcoin to his wallet.  Apparently without performing any sort of video or other check (such as a review of the domain name), Mr. Chang sent the eight bitcoin to the spoofer.

41.    Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again).  On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company—to realize that he had been fooled by not one, but two, spoofing attacks.

**B. Gryphon Lacks Industry Standard Internal Controls And Policies And Procedures, In Violation Of The MSA And Almost Certainly In Violation Of Applicable Law**

42.    Based on the foregoing, it is apparent that Gryphon lacks the internal controls and policies and procedures needed to comply with the MSA.  Had it had such controls and policies and procedures in place, Gryphon would have detected the numerous red flags in the spoofer's emails indicating that they were illegitimate and would not have fallen for any spoofing attack, let alone multiple ones.  Indeed, following the spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide.

13

43.     The absence of internal controls and policies and procedures strongly suggest that Gryphon is also in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs. It is apparent, however, that Gryphon has none of these programs in place.

44.     Consistent with industry best practices, Sphere advised Gryphon to report the spoofing attack to the appropriate authorities, including the FBI.  When Sphere made the suggestion, Gryphon panicked, stated the issue could be handled between the parties, and demanded that no one report the event.  Upon information and belief, Gryphon did not want to report the theft to the authorities because it was concerned that involvement by a law enforcement agency would lead to the uncovering of Gryphon's violations of the law.  In the same vein, upon knowledge and belief, Gryphon did not file a SAR with FinCEN.

45.     This put the onus on Sphere to report the incident, which it did by filing a SAR with FinCEN earlier this month.

46.     There are additional indications that Gryphon lacks anything resembling effective internal controls.  In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability).  In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere understands that Gryphon, when it goes public, intends to recognize *all* of Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.  Such disclosures are at best misleading:  Gryphon can claim only a fraction of Sphere's revenues as its own, namely, the Management Fee.

14

**VII. IN AN EFFORT TO COW SPHERE AND DISSUADE IT FROM EXPOSING GRYPHON'S NUMEROUS BREACHES, GRYPHON HAS BASELESSLY SOUGHT TO THREATEN SPHERE WITH MANUFACTURED BREACHES**

47. After it came to light that Gryphon had no internal compliance program, Gryphon understood that Sphere could no longer tolerate its abject failure to comply with the MSA and numerous breaches of fiduciary duty since the inception of the parties' relationship. Gryphon could see the writing on the wall: a lawsuit was coming. Rather than compensate Sphere for its many breaches, however, Gryphon has taken the opposite tact by attempting to manufacture breaches of the MSA in an effort to cow Sphere into not seeking to enforce its rights in court.

48. For example, incredibly, Gryphon has claimed that it is *Sphere* that is responsible for Gryphon's inability to detect the spoofing attacks, attacks any competent employee (let alone the CEO of a supposedly sophisticated mining company) should have been able to detect. Gryphon has conceded that the third-party spoofer was unrelated to Sphere, but nevertheless has sought to blame Sphere, accusing it of lacking sufficient protections over its computer systems. The allegation is untrue, but it gets Gryphon nowhere: even if it were true (and it is not), Gryphon has never identified any provision of the MSA that Sphere purportedly breached. Spoofing attacks by now have become ubiquitous in the commercial world; the onus was on Gryphon to detect them, which it failed to do.

49. And, recently, Gryphon has claimed that Sphere cannot even seek to "create," let alone actually enter into, business relationships with any third party in the digital asset industry. To that end, on March 21, 2023, Gryphon sent Sphere a heavy-handed letter (attached as Exhibit 3) in which it accused Sphere of "enter[ing] into, or at a minimum, . . . attempting to enter into, business relationships with various third party cryptocurrency mining-related service providers." According to the letter, "[a]ny such conduct, if true, is in direct violation of the" MSA. The letter further demanded that, *in fewer than 24 hours*, Sphere "provide *any and all documentation* related to its efforts to create business

15

relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any."

50. The following day, Sphere responded by letter (attached as Exhibit 4) to explain why it was not in breach (although it would consider the issues raised by Gryphon) and, yet again, explain why Gryphon was failing to perform under the MSA. Demonstrating that the breaches were "drummed up," Gryphon had long been aware of and even blessed many of the contacts it now claimed were breaches. In any event, as Sphere also explained, Gryphon's allegations (which Sphere is still considering the merits of) had, at most, identified technical breaches that were easily curable and gave rise to no damages. Certainly, any damages paled in comparison to the harm Gryphon's utter mismanagement and skimming have inflicted on Sphere.

**VIII. SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES**

51. It is time for Gryphon to be held to account for its breaches of fiduciary duty, utter failure to perform under the MSA, and apparent inability to cure its breaches, many of which are simply incurable. Sphere has provided Gryphon with numerous opportunities to fix its deficiencies, which have only gotten worse with time. Gryphon's modus operandi is to simply ignore Sphere's requests while collecting its exorbitant management fee—a completely one-sided arrangement that has proved extremely lucrative for Gryphon and deleterious for Sphere. And the absence of anything resembling internal controls at Gryphon makes clear that Sphere's digital assets are unsafe in Gryphon's hands. By this lawsuit, Sphere seeks recovery for the harm Gryphon has caused through its persistent misconduct.

16

22.    ~~CAUSES OF ACTION~~ *Id.* at Commercial Terms Clause.

23.    ~~Gryphon is obligated to "pay directly from the Digital Wallet on behalf of [Defendant] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *Id.*~~

24.    ~~The MSA provides that Gryphon "shall at all times select the mining pool and custodian of the Digital Assets." *Id.*~~

25.    ~~As consideration for Gryphon's management services, Defendant agreed that~~

~~"[Gryphon] shall receive the equivalent of twenty-two and one-half percent (22.5%) of the Net Operating Profit of all of [Defendant's]~~

### COUNT I
### BREACH OF CONTRACT

52.    Sphere repeats and re-states the allegations above as if fully set forth herein.

53.    This is a claim for breach of contract against Gryphon.

54.    The MSA is an enforceable contract.

55.    Sphere has complied with its obligations under all relevant contracts.

56.    Gryphon has materially breached the MSA, including, without limitation, by failing to provide management services for blockchain and cryptocurrency-related operations ~~(the~~and charging Sphere in excess of the proscribed Management Fee.

~~'Management Fee')". *Id.*~~Sphere is entitled to damages in an amount to be proven at ~~Management Fee/Operating Costs Clause.~~

~~DEFENDANT'S BREACHES OF THE MSA~~

26.    ~~On or about October 13, 2021, Gryphon secured hosting for Defendant's miners with Core Scientific, which Defendant's then-CEO, Peter Tassiopoulos, touted as a "blue chip" and~~

~~"industry leading hosting partner[1]." Defendant's miners were installed at Core Scientific's facilities and managed and operated by Gryphon.~~

~~27.    On or about April 11, 2022, Gryphon's CEO, Rob Chang, contacted Defendant with an offer to help obtain hosting. Defendant directed Gryphon to "[s]tand by"~~ <u>trial,</u> but ~~did not follow up regarding Mr. Chang's offer.~~

**Formatted:** Font: 11.5 pt

~~28.    On June 17, 2022, Gryphon's president, Dan Tolhurst, contacted Defendant to determine whether Defendant needed additional hosting sites. Defendant stated it did not.~~

~~29.    On or about August 8, 2022, and despite stating it did not need additional hosting sites, Defendant entered into an agreement with Compute North, a hosting provider, without the consent, approval or involvement~~<u>in all events in excess</u> of ~~Gryphon.~~

**Formatted:** Font: 11.5 pt

~~30.    Such relationship is a material breach of the exclusivity provision in the MSA, pursuant to which the Parties agreed that Gryphon shall serve as the~~<u>$75,000,</u> exclusive ~~provider of Services relating to cryptocurrency mining equipment.~~

**Formatted:** Font: 11.5 pt

~~31.    Mr. Tolhurst contacted Defendant again on September 30, 2022, but again was told that Defendant did not need additional hosting sites. Defendant also stated that it was looking to resolve issues with Core Scientific.~~

~~32.    On November 16, 2022, Gryphon, through its CEO Rob Chang, contacted Defendant and offered to set up a meeting with Foundry Digital, a mining pool operator ("Foundry"), to provide a hosting site.~~

~~33.    In December 2022, Core Scientific filed for relief under the US Bankruptcy Code.~~

~~34.    Thereafter, in December 2022, Gryphon attempted to obtain new hosting services for Defendant.~~

**Formatted:** Space After:  24.85 pt

---

~~[1] Sphere 3D News Release October 13, 2021 Sphere 3D and Gryphon Secure Largest Single Hosting Services Deal in Core Scientific's History | Sphere3D (ges-web.com)~~

35.    However, Defendant refused to provide critical information required by Gryphon to enable Gryphon to procure replacement hosting for its devices, and instead sought to circumvent Gryphon's exclusive right to provide the Services by: (a) seeking alternative hosting independent of Gryphon's control, (b) creating its own digital wallets, (c) attempting to select its own crypto mining pool, and (d) actively concealing its own mining efforts and proceeds to avoid paying Gryphon Management Fees owed under the MSA.

36.    On or about December 12, 2022, Defendant entered into a business relationship with USBTC, a mining hosting provider which at the time managed prior Compute North hosting facilities, without the consent, approval or involvement of Gryphon.

37.    On March 8, 2023, Mr. Tolhurst contacted Alex Tierney, Defendant's Director of Corporate Development, and inquired regarding Defendant's hosting needs.  Defendant did not respond to of interest Mr. Tolhurst's inquiry.

38.    On March 9, 2023, Mr. Tolhurst contacted Kurt Kalbfleisch, Senior Vice President and CFO of Defendant, and further inquired regarding Defendant's hosting needs.  Mr. Kalbfleisch indicated that he would speak to Defendant's CEO, Patricia Trompeter, and revert back.

39.    Such relationship is a material breach of the exclusivity provision in the MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment.

40.    On or about March 10, 2023, Defendant attempted to enter into a business relationship with Foundry without the consent, approval or involvement of Gryphon.

41.    Such attempted relationship is a material breach of the exclusivity provision in the MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment and wherein Gryphon and Defendant agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id*.

42.    On March 15, 2023, Mr. Tolhurst followed up with Defendant's CFO, Mr.

Kalbfleisch, regarding Mr. Tolhurst's March 9 inquiry regarding Defendant's hosting needs. Defendant did not respond.

43.    On or about March 16, 2023, Defendant entered into an agreement with Lancium Mining, a mining hosting provider, without the consent, approval or involvement of Gryphon. Defendant publicly claims to have entered additional discussions with hosting providers for the placement of over 5,000 cryptocurrency miners[1].

44.    Such relationship is a material breach of the exclusivity provision in the MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment.

45.    On or about March 19, 2023, Defendant entered into a business relationship with Luxor Technologies, a crypto mining pool provider, without the consent, approval or involvement of Gryphon. Without Gryphon's consent or approval, Defendant created an account with Luxor and obtained an account ID.

46.    Such relationship is a material breach of the exclusivity provision in the MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to Defendant's cryptocurrency mining equipment, and wherein Gryphon and Defendant agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.* at Exclusivity Clause.

47.    In furtherance of its improper relationship with Luxor and Foundry (and in breach of the MSA), Defendant has established Digital Wallets without the consent, approval, or involvement of Gryphon.  For example, March 21, 2023 Defendant, through its CEO, Patricia

---

[1] Sphere 3D News Release Sphere 3D Corp. Provides Bitcoin Production and Mining Updates for February 2023 | Sphere3D (gcs-web.com)

Formatted: Space After: 24.85 pt

Trompeter, admitted to having created a digital wallet for Defendant without the consent or approval of Gryphon. Defendant has not transferred control of that digital wallet to Gryphon and has not paid the Management Fee required to be paid to Gryphon from that digital wallet, as required under the MSA.

48. Such actions are a material breach of the commercial terms of the MSA, which give Gryphon exclusive control over Defendant's Digital Wallets, and which specifically grant Gryphon the exclusive power to select the custodian of the Digital Assets.

49. Gryphon has repeatedly requested from Defendants the information it would require to secure mining hosting services for Defendant but Defendant has repeatedly failed to provide that information to Gryphon.

50. On March 21, 2023, Gryphon sent a demand letter (the "Demand Letter") to Defendant, giving Defendant notice of Defendant's breaches of the MSA and demanding all documentation relating to Defendant's efforts to circumvent the exclusive rights granted to Gryphon by Defendant including its efforts to create business relationships with third party cryptocurrency-related service providers. A true and correct copy of the Demand Letter is attached hereto as **Exhibit B.**

51. Defendant has not provided any of the requested documentation and remains in breach of the MSA.

**THE DATA SECURITY INCIDENT**

52. As required under the MSA, Gryphon and Defendant have developed and relied upon a regular course of dealing to request and confirm transfers of cryptocurrency from the Digital Wallets managed by Gryphon to Defendant.

53. Specifically, Gryphon regularly provides information to Defendant that allows Defendant to understand the Net Operating Profit generated through its cryptocurrency mining operations as managed by Gryphon. From that, Gryphon calculates the amount to be paid to

Defendant and sends an invoice to Defendant. Thereafter, Gryphon withdraws its Management Fee from Defendant's Digital Wallet. Although not required under the express terms of the MSA, Gryphon has also offered to pay Defendant by wire transfer at Defendant's election.

54.    The remaining digital assets in the Digital Wallets are then sent to Defendant, at Defendant's request, according to the same course of dealing.  First, Defendant will send an email requesting a transfer.  The transfer request will include (i) the amount of cryptocurrency to be transferred, and (ii) the public key address of the transferee digital asset wallet (the "Transferee Wallet").

55.    If Defendant requests a transfer into a new Transferee Wallet, Gryphon will take steps to confirm the new Transferee Wallet.  Specifically, when a transfer request is made by Defendant requesting that bitcoin be transferred to a new Transferee Wallet, Gryphon will send a *de minimis* test transaction to the Transferee Wallet public key address.  The test transaction amount must then be confirmed as received by the Defendant via email.  Once confirmed, Gryphon then sends the full transfer amount to the Transferee Wallet, less the amount already transferred as part of the test transaction. For subsequent transactions paid to known Transferee Wallet public key addresses, Gryphon will send the full requested amount without verification or test transactions.

56.    Gryphon and Defendant used the established protocol described herein for six (6) transactions of bitcoin beginning on August 26, 2022 without incident or objection by Defendant at any time before January 27, 2023.

57.    On or about January 27, 2023, however, Gryphon received a transfer request for eighteen (18) bitcoin from the email address belonging to Kurt Kalbfleisch, Senior Vice President and CFO of Defendant (the "First January 27 Request").  The email included all information typically provided to Gryphon with a request for a cryptocurrency transfer by Defendant, including a request that the eighteen (18) bitcoin be transferred to a known public key address for

Defendant's Transferee Wallet.   The January 27 Request also copied Ms. Trompeter's Sphere3d.com email address, which is Defendant's typical practice in transmitting these requests to Gryphon.

58.   Upon receipt of the First January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request and informed Mr. Kalbfleisch that the transfer would not be completed until January 30, 2023 at the earliest.

59.   On the same day and within the same email chain, Mr. Chang received a second email from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address.  The email stated that the previously-provided public key address for Defendant's Transferee Wallet was under audit and requested that the bitcoin be transferred to a different Transferee Wallet public key address (the "Second January 27 Request").  Defendant's CEO, Ms. Trompeter, was copied on this email via her correct email address.

60.   Upon receiving the Second January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request that the bitcoin be transferred to a different Transferee Wallet public key address and responded that the request required verification of the new address.

61.   On January 30, 2023, Gryphon sent a *de minimis* test transaction (0.0001 bitcoin) to the new Transferee Wallet public key address identified in the Second January 27 Request.  After the bitcoin was transferred, Mr. Chang sent an email to the email address appearing to be Mr. Kalbfleisch's Sphere3d.com email address and from which the Second January 27 Request was sent, stating that the *de minimis* test transaction was complete and requesting that Defendant confirm receipt of the test transaction.  Defendant's CEO, Ms. Trompeter, was copied on Mr. Chang's email via her correct email address.

62.   Shortly thereafter, Mr. Chang received an email response from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address stating that Defendant received the test transaction and requesting the full amount of the transfer request be sent.  Ms. Trompeter was copied on the

response email confirming Defendant's receipt of the test transaction at her correct Sphere3d.com email address, again consistent with Defendant's practice in communicating such confirmations to Gryphon.

63.    After receiving confirmation of the test transaction and the request that the full amount be transferred, Gryphon sent the remainder of the requested transfer amount (17.9999 bitcoin) on January 31, 2023, to the new Transferee Wallet public key address identified in the Second January 27 Request.

64.    On February 1, 2023, Gryphon received an email from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address requesting the transfer of an additional eight (8) bitcoin to the new Transferee Wallet public key address (the "February 1 Request"). Once again, Ms. Trompeter was copied on this email via her correct email address. Later that day, Gryphon received another email from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address inquiring about the status of the requested transfer. Ms. Trompeter was copied on this email as well via her correct email address.

65.    Gryphon, through Mr. Chang, responded to the email from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address stating the transfer request was being processed. Ms. Trompeter was copied on Mr. Chang's response via her correct email address.

66.    On February 1, 2023, Gryphon transferred eight (8) bitcoin to the new Transferee Wallet public key address.

67.    A true and correct copy of the email correspondence regarding the transfers described herein are attached hereto as **Exhibit C.** In total, Gryphon transferred twenty-six (26) bitcoin to the new Transferee Wallet public key address provided in the Second January 27 Request via three separate bitcoin transactions.

68.    On or about February 2, 2023, Gryphon was informed that Defendant never received the bitcoin transactions sent by Gryphon. After examination, Gryphon discovered that emails sent

from what appeared to be Mr. Kalbfleisch's Sphere3d.com email address, beginning with the Second January 27 Request, were compromised when sent by Defendant to Gryphon; those emails came from a spoofed domain impersonating Defendant. As such, the transfer amount was sent to a digital asset wallet with no affiliation to Defendant. Mr. Kalbfleisch's email was compromised as a result of the Data Security Incident; upon information and belief, Mr. Kalbfleisch's email was compromised due to Defendant's failure to implement proper security and controls over its company computer systems, including its executives' email accounts and email server, and its failure to detect the compromise when a threat actor was actively diverting Gryphon's funds, despite Defendant's CEO, Ms. Trompeter, being accurately copied on the Second January 27 Request and the February 1 Request.

69. Specifically, unlike Mr. Kalbfleisch's email address, Ms. Trompeter's email address was not spoofed on the Second January 27 Request or any subsequent correspondence with Gryphon, including the February 1 Request; Ms. Trompeter was copied to her Sphere3d.com email address on all correspondence between Gryphon and the hostile actor spoofing Mr. Kalbfleisch's email. Thus, Ms. Trompeter — Defendant's CEO — was well positioned to ascertain and detect her colleague's compromise, but apparently did not do so.

70. In an abundance of caution, in the aftermath of the Data Security Incident, Gryphon engaged a third-party forensic investigator to perform a privileged investigation of any potentially impacted systems on Gryphon's part. The investigation revealed that the compromise of Mr. Kalbfleisch's Sphere3d email account was not the result of any intrusion, vulnerability, hostile actor, or lack of proper security or controls over computers, email accounts, or email servers used by Gryphon.

71. On March 3, 2023, Gryphon and Defendant scheduled a meeting with the agreed upon purpose of allowing the Parties' respective experts to compare their investigations and findings into the email compromise. In particular, Gryphon indicated in its correspondence to

Defendant that it had "completed [its] forensic research and believe[s] it is the right time for our forensic investigators to discuss their findings. Could we please arrange a time for them to connect?" On March 3, Ms. Trompeter, CEO of Defendant, agreed to a meeting including both Party's experts, noting, "We have a forensic review as well." *See* correspondence attached as

**Exhibit D**.

72.    On March 15, 2023, Gryphon and Defendant joined their scheduled call wherein their respective experts were scheduled to discuss their investigations into the Data Security Incident. Defendant, however, did not put forward any expert. Instead, Defendant refused to provide any information to Gryphon, claimed it was undergoing "many investigations" and did not know what investigation Gryphon was referring to, and claimed that its understanding of the purpose and scope of the meeting was that Gryphon would present its own findings without any exchange of information.

73.    Despite multiple requests by Gryphon, Defendant has failed to reschedule a meeting of the Parties' respective experts.

74.    Despite the transfer being the sole fault of Defendant and due to its negligence, and in order to attempt to maintain the business relationship with Defendant, Gryphon then transferred the U.S. dollar equivalent value of twenty-six (26) bitcoin, approximately $560,215.53, from a Digital Wallet belonging to Gryphon to a Digital Wallet public key address belonging to Defendant. Defendant has acknowledged receipt of this transfer.

75.    Despite good faith efforts, including blockchain forensic tracing, Gryphon has been unable to recover the twenty-six (26) bitcoin transferred to the threat actor whose public key address was included in the emails sent to Gryphon, copying Defendant's CEO.

76.    Since the Data Security Incident, Gryphon has discontinued transfers of digital assets to Defendant. Instead, Gryphon transfers to Defendant via electronic wire transfer the USD equivalent value of the digital assets.

~~77.~~ 57. ~~Pursuant to the terms of MSA, in addition to any damages incurred, Gryphon is entitled to its reasonable attorneys' fees~~ and costs ~~in connection with bringing this action. *See* MSA at Governing Law/Jury Waiver/Fees Clause. .~~

~~78.~~     ~~All conditions precedent have been met, or have been waived or would be futile to attempt prior to bringing this action.~~

~~COUNT I~~   COUNT II

BREACH OF ~~CONTRACT~~THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

~~79.~~ 58. ~~Gryphon adopts by reference~~Sphere repeats and re-states the allegations ~~of paragraphs 1 through 51~~above as if fully ~~stated~~set forth herein.

~~80.~~ 59. This is a claim for breach of the implied covenant of good faith and fair dealing against Gryphon ~~and Defendant are parties to the MSA.~~

~~81.~~ 60. The MSA is ~~a valid and~~an enforceable contract ~~governed by New York law~~.

~~82.     Under the MSA, the Parties agreed that Gryphon shall serve as Defendant's "exclusive provider of any and all management services for all blockchain and cryptocurrencyrelated operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by [Defendant] and/or its subsidiaries and/or affiliates at any location . . . ." *See* MSA at Exclusivity Clause.~~

~~83.     The Parties further agreed that Gryphon shall "at all times control the digital wallet, which shall be a wallet address selected by [Gryphon] on behalf of [Defendant] for storing digital assets," and shall "at all times select the mining pool and custodian of the Digital Assets." *See* MSA at Commercial Terms Clause.~~

~~84.~~ 61. ~~Gryphon~~Sphere has ~~fully performed and~~ complied with ~~all of~~its obligations ~~and duties~~ under ~~the MSA~~all relevant contracts.

~~85.     Defendant's conduct, as described herein, constitutes a breach of the MSA.~~

86.    Specifically, Defendant has materially breached the exclusivity terms of the MSA by entering into agreements with, potentially among others, Luxor, Foundry, USBTC, and Lancium without the consent, approval or involvement of Gryphon.

87.    Defendant has further materially breached the commercial terms of the MSA by, among other things, creating and operating its own digital wallets without the consent, approval or involvement of Gryphon.

88.    Defendant has further materially breached the MSA by collecting mining proceeds into its Digital Wallet and failing to remit Management Fees to Gryphon.

62.    As a direct and proximate cause of Defendant's breaches, Gryphon has been directly damagedGryphon is in breach of its good faith obligations under the MSA. For example, the MSA requires Gryphon to provide management services for all of Sphere's blockchain and cryptocurrency-related operations. To the extent that the MSA does not explicitly require Gryphon to provide management services of a certain quality, an implied obligation must be read into the MSA that Gryphon must provide management services that meet an objectively reasonable

17

standard of care. These implied obligations are necessary to avoid frustrating the purpose of the MSA.

63.    Gryphon has materially breached its implied obligations.

89.64.  Sphere is entitled to damages in an amount to be determinedproven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

COUNT II—III
BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALINGFIDUCIARY DUTY

90.65.  Gryphon adopts by referenceSphere repeats and re-states the allegations of paragraphs 1-51above as if fully statedset forth herein.

91.    Gryphon and Defendant are parties to the MSA.

92.    The MSA is a valid and enforceable contract governed by New York law.

93.    Gryphon has fully performed and complied with all of its obligations and duties under the MSA.

94.    Under New York law, Defendant owes Gryphon an implied duty to act in good faith and conduct itself fairly in connection with the MSA.

95.    Pursuant to the exclusivity terms of the MSA, Gryphon is the exclusive provider of any and all management services relating to mining equipment owned, purchased, leased, or otherwise controlled by Defendant.

96.    Despite multiple requests made by Gryphon, Defendant has failed to disclose the number of cryptocurrency miners owned, purchased, leased or otherwise controlled by Defendant.

97.    Defendant's failure to disclose this information has prevented Gryphon from fulfilling its duties under the MSA, and, as such, is a breach of the implied duty of good faith and fair dealing.

98.    Although Defendant's failure to disclose information is not an express breach of the MSA, it has prevented Gryphon from providing Services as required under the MSA and therefore deprived Gryphon of the benefits of its bargain under the MSA.

66.    As a direct and proximate cause of Defendant's breach, of the implied covenant of good faith and fair dealing, Gryphon has been damaged in an amount to be determined This is a claim for breach of fiduciary duty.

67.    Gryphon owes fiduciary duties to Sphere, which arise from the unusual amount of trust placed in Gryphon by Sphere, control that Gryphon has over Sphere, and status as a custodian of Sphere's digital assets and miners.  Sphere depended on Gryphon to serve its interests.

68.    Gryphon breached its fiduciary duties by prioritizing its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets.

~~99.~~69.  Gryphon's breach of its fiduciary duty has caused Sphere damage. Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

~~COUNT III - NEGLIGENCE~~

~~100.    Gryphon adopts by reference the allegations of paragraphs 1-25 and 52-78, above, as if fully stated herein.~~

~~101.    Defendant owed duties to Gryphon to maintain proper security and control of Defendant's technology systems, including its company email accounts and email server, to take proper precautions to protect Gryphon from being targeted by fraudulent activities in connection with Gryphon's business dealings with Defendant, including the transfer of assets under the MSA, to safeguard information relating to such business dealings and transactions, and to recognize and notify Gryphon of fraudulent activity occurring within Defendant's technology systems.~~

~~102.    Defendant knew or should have known that the failure to exercise due care in the performance of the foregoing duties would result in an unreasonable risk of harm to Gryphon.~~

~~103.    Defendant knew or should have known of the prevalence of, and industry warnings relating to, business email scams whereby a hostile actor may infiltrate a company's technology systems and impersonate an employee of the company for the purpose of fraudulently inducing a customer or business partner to send the hostile actor money or confidential business or personally identifying information.~~

~~104.    Defendant breached each of the aforementioned duties by allowing the email account of its CFO Mr. Kalbfleisch (and potentially other email accounts) to be impersonated or otherwise compromised by an unknown hostile actor.~~

Formatted: Indent: First line: 0.5", Right: 0.03", Space After: 0 pt, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 51 + Alignment: Left + Aligned at: 0.03" + Indent at: 0.03"

105.    As a direct and proximate cause of Defendant's negligence, the unknown hostile actor was able to send Gryphon a fraudulent request to transfer of twenty-six (26) bitcoin.

106.    Defendant's CEO, Ms. Trompeter, was copied on all of the emails at issue using her correct Sphere3d.com email address.

107.    As such, Ms. Trompeter should have identified and notified Gryphon of the hostile actor activity and email compromise.

108.    Despite being copied on the email, Defendant's CEO Ms. Trompeter failed to recognize the hostile actor activity and failed to notify Gryphon that Mr. Kalbfleisch's email was compromised and that the transfer request was fraudulent.

109.    As a direct and proximate cause of Defendant's negligence, Gryphon was not notified of the hostile actor activity occurring within Defendant's technology systems and that the transfer request was fraudulent.

110.    As a direct result and proximate cause of Defendant's negligence, Gryphon transferred twenty-six (26) bitcoin to the unknown hostile actor, which it has been unable to recover despite diligent efforts to do so.

111.    Although Defendant claims it has investigated the email compromise, Defendant has refused and failed to provide its own report of its investigation at a meeting arranged by the Parties for that purpose. *See supra*, at 63, 64.

112.    Despite Gryphon's compliance with the standard procedures that Gryphon and Defendant used for six previous bitcoin transactions, Defendant negligently failed to follow its established course of dealing and standard procedures when requesting a transfer of bitcoin from Gryphon.

113.    But for Defendant's negligence, Gryphon would not have transferred twenty-six (26) bitcoin from its own Digital Wallet to a Digital Wallet belonging to an unknown hostile actor.

~~114. As a direct and proximate cause of Defendant's negligence, Gryphon has been damaged in an amount totaling twenty-six (26) bitcoin which had the market value of no less than $560,225.53 at the time of the transfers.~~

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, ~~Gryphon~~<u>Sphere</u> respectfully ~~asks this~~ <u>requests that the</u> Court ~~to enter judgment in its favor as follows~~<u>award the following relief</u>:

~~1.~~    ~~On Count I, awarding~~<u>(1) All</u> damages~~, and its reasonable attorneys' fees and costs~~ <u>to which Sphere is entitled, including, without limitation, compensatory and punitive damages</u>, in an amount to be determined at trial~~.~~<u>; (2) All pre- and post-judgment interest to which Sphere is entitled;</u>

~~On Count II, awarding damages~~<u>18</u>
~~2.~~   <u>All costs</u> and ~~its reasonable~~<u>expenses to which Sphere is entitled, including, without limitation,</u> attorneys' fees and costs~~, in an amount to be determined at trial.~~

~~3.   On Count III, awarding damages in amount to be determined at trial.~~

<u>(3)        Any under the MSA;</u> and ~~all~~

<u>(4)        All</u> other ~~and further~~<u>such</u> relief ~~that~~<u>as</u> the Court ~~deems~~<u>may deem</u> just and proper~~.~~ <u>under the circumstances.</u>

<u>Dated:         April 7, 2023</u>
<u>                  New York, NY</u>

<u>DONTZIN NAGY & FLEISSIG LLP</u>

<u>Tibor L. Nagy, Jr.</u>
<u>Gregory N. Wolfe</u>

Maxine Peskens
980 Madison Avenue
New York, NY 10075 Tel:
212-717-2900
tibor@dnfllp.com
greg@dnfllp.com
mpeskens@dnfllp.com

*Counsel for Sphere 3D Corp.*

19

# Exhibit 1

## MASTER SERVICES AGREEMENT

### Binding Term Sheet

1. *This Binding Term Sheet (the "Binding Term Sheet") constitutes a legally binding commitment to enter into a transaction on the terms described herein. This Binding Term Sheet shall be superseded by a definitive agreement as set forth below, and this Binding Term Sheet constitutes a legally binding and enforceable agreement with respect to the relationship of the parties between the Effective Date until the execution and delivery of the definitive agreement and/or the Term/Termination as further defined below.*

|  |  |  |
|---|---|---|
| Dated: New York, New York | Gryphon Digital Mining Inc., a Delaware corporation, located at 5953 Mable Road, Unit 138, Las Vegas, NV 89110 ("Provider"). | K&L GATES LLP |
|  April 1, 2023 |  |  |
| **Provider,** |  |  |
| **Customer** | Sphere 3D Corp., a Canada corporation, located at 895 Don Mills Road, Building 2, Suite 900, Toronto, Canada M3C 1W3 ("Customer"). |  |

| | |
|---|---|
| **Definitive Agreement** | The parties intend to enter into a Master Services Agreement that shall contain all the terms and conditions set forth in this Binding Term Sheet, as well as other terms and conditions customary to such agreements (the "Master Services Agreement") and replace this Binding Term Sheet. Until such Master Services Agreement is entered into, this Binding Term Sheet shall govern the relationship between the parties as described herein with respect to the Services. The term "Agreement" as used herein refers to either the Binding Term Sheet or the Master Services Agreement, as the case may be, whichever is in effect at the relevant time. |
| **Exclusivity** | Provider shall be Customer's exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Customer and/or its subsidiaries and/or affiliates at any location (collectively, the "**Services**") unless the Agreement is terminated by Customer as per Term/Termination below. |
| **Management Fee / Operating Costs** | • As consideration for the Services, Provider shall receive the equivalent of twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of Customer's blockchain and cryptocurrency-related operations (the "**Management Fee**"). <br>• Net Operating Profit shall be defined as the value of digital assets mined using Customer's mining equipment as of 11:59 pm Eastern Time on the date of mining based upon the price of such digital asset quoted on Coinbase minus the cost of electricity and profit-share paid to hosts. <br>• The Management Fee shall be calculated and distributed to Provider subsequent to payment of all operating expenses, including but not limited to all payments to hosts and electricity providers. <br>• The total costs of electricity and any profit-share paid to hosts shall capped at 9 cents ($0.09) per kilowatt hour ($0.09/kwh). <br>• Provider shall assist Customer to source and negotiate the appropriate host to locate the mining equipment. |
| **Term/Termination** | • The initial term of the Agreement shall be three (3) years and shall automatically renew for consecutive one (1) year terms thereafter. <br>• Customer shall be entitled to terminate the Agreement in the event of: (i) Provider's failure to perform the Services in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services, subject to written notice and an opportunity to |

| | |
|---|---|
| | cure, or (ii) Provider's gross negligence, fraud or willful misconduct in connection with performing the Services.<br>• Provider shall be entitled to specific performance or termination for cause in the event of a breach by Customer, subject to written notice and an opportunity to cure.<br>• Customer shall be entitled to terminate the agreement on 30 days' notice in the event Provider terminates the Merger Agreement between the parties dated as of June 3, 2021, unless: (i) such termination is pursuant to Section 8.01(f) or 8.01(h) of the Merger Agreement or (ii) Customer waives its right to terminate the agreement in writing within five days of receipt of any notice to terminate the Merger Agreement by Provider<br>• Customer shall be entitled to terminate the Agreement with 30 day notice, if the Nasdaq Stock Market and/or US Securities and Exchange Commission, ("Regulators") informs Customer that either one or both, will not approve the Nasdaq Listing Application or Merger agreement as applicable, (as defined by the Merger Agreement) solely due to concerns raised by Regulators regarding Provider's business or one or more of Provider's shareholders, officers or directors (the "Provider Regulatory Concerns") and Provider has not cured the Provider Regulatory Concerns to allow for the closing of the Merger agreement within 365 days of the execution of this agreement. Provider shall be entitled to work directly with Regulators to attempt to cure any such concerns related to Provider raised by Regulators. For greater clarity, if, as of the one year anniversary of the execution of this agreement, the Merger has not closed due to unresolved Provider Regulatory Concerns the Customer may terminate this agreement on 30 days' notice. |
| **Commercial Terms** | • Customer shall not in any way, without the prior written consent of Provider, sell, subordinate, encumber or otherwise convey to any third party that is an Affiliate of Customer a security interest in the mining equipment (including but not limited to servers, machines, hashboards, controller boards, case assemblies, fans, and power units) (the "**Mining Equipment**"). "**Affiliate**" shall mean any person who directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common controller with an issuer, including but not limited to: (1) any beneficial owner or holder of 5% or more of any class of shares of Customer, and (2) any director, officer, employee or independent contractor (or a member of the immediate family of the foregoing) of Customer.<br>• Except in the case of an emergency or a potential security breach, Customer shall not voluntarily take any Mining Equipment offline without the prior written consent of Provider.<br>• Provider shall at all times control the digital wallet, which shall be a wallet address selected by Provider on behalf of Customer for storing digital assets (the "**Digital Wallet**"). The digital assets shall be in the denomination of cryptocurrencies, virtual currencies or coins mined by Provider for or on behalf of Customer at any location whatsoever (the "**Digital Assets**").<br>• Provider shall pay directly from the Digital Wallet on behalf of Customer all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee.<br>• Provider shall at all times select the mining pool and custodian of the Digital Assets. |

2

|  |  |
|---|---|
|  | • Customer shall provide written instructions to Provider with respect to all decisions to sell or hold Digital Assets.<br>• Customer agrees that the hosts shall at all times be responsible for the installation of the Mining Equipment and the provision of any ancillary items necessary to operate the Mining Equipment.<br>• Provider shall not be responsible for the uptime of the hosting site nor shall Provider be responsible for providing power or electricity to the hosting site. |
| **Mutual Indemnification** | Each party shall indemnify and hold harmless the other party from all losses and damages incurred in connection with its respective acts or omissions in connection with the Agreement. |
| **Limitation of Liability** | The parties expressly exclude all consequential, incidental, indirect, special and punitive damages, and loss of profits. The parties shall only be entitled to seek direct damages. |
| **Survival** | Customer agrees that the Agreement shall survive any bankruptcy of Customer, where permitted by law. |
| **Governing Law / Jury Waiver / Fees** | This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles. All disputes, suits, actions or proceedings relating to this Agreement ("Claims") shall be brought solely in the state or federal courts located in the State of New York. Each party hereby consents to the exclusive jurisdiction and venue of the State of New York in connection with any such dispute, suit, action or proceeding, and waives any defense of *forum non conveniens* in connection therewith. EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY OR AGAINST EITHER PARTY IN CONNECTION WITH THIS AGREEMENT.<br><br>If any Claim is brought by any party to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including, without limitation, reasonable attorney's fees and court costs, incurred by the prevailing party regarding such Claim shall be reimbursed by the losing party; provided, that if a party to such Claim prevails in part, and loses in part, the court or other adjudicator presiding over such Claim shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis. |
| **Duty to Disclose** | As this Agreement is exclusive and legally binding in nature, Customer represents and warrants that it shall disclose its existence to existing and prospective creditors, investors, lenders, finance partners, etc. and Customer shall in all circumstances provide notice to Provider of such d isclosure. |

*** Signature Page Follows ***

3

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the __19th__ day of August, 2021.

**GRYPHON DIGITAL MINING INC**


D577A860A12F40D..

By:

Attorneys for Defendant

-Name:

Title:

**SPHERE 3D CORP**.


CA566FB6317F438

By:
Name:
Title:

4

# Exhibit 2

**AMENDMENT NO. 1**
**Master Services Agreement**
**(Binding Term Sheet)**

This AMENDMENT NO. 1 TO MASTER SERVICES AGREEMENT (BINDING TERM SHEET) (this "Amendment") is made and entered into as of December 29, 2021, by and among Sphere 3D Corp., an Ontario corporation ("Customer"), and Gryphon Digital Mining, Inc., a Delaware corporation ("Provider", and Lender and Borrower, each a "Party" and collectively the "Parties").

**RECITALS**

A.        On August 10, 2021, the Parties entered into a Binding Term Sheet for a Master Services Agreement (the "MSA").

B.        On June 3, 2021, the Parties entered into an Agreement and Plan of Merger, as amended as of the date hereof (the "Merger Agreement").

C.        The Parties hereto desire to amend the MSA as set forth herein.

**AGREEMENT**

NOW THEREFORE, in consideration of the foregoing recitals and the respective covenants, agreements, representations and warranties contained herein and in the MSA, the Parties, intending to be legally bound, agree to amend and supplement the MSA as follows:

1.   Definitions. All capitalized terms used herein without definition shall have the meanings ascribed to them in the MSA unless otherwise defined herein.

2.   Amendments.

a.    The "Term/Termination" section of the MSA is replaced in its entirety with the following:

•The initial term of the Agreement shall be four (4) years, which may be extended for additional one (1) year terms with the mutual written consent of the Parties.  If Customer has not had 3.5 exahash of crypto mining equipment delivered to it by December 31, 2022, the initial term shall be automatically extended by an additional year, for a total initial term of five (5) years.

• Subject to written notice from Customer and an opportunity to cure for a period of up to one hundred eighty (180) day, Customer shall be entitled to terminate the Agreement in the event of: (i) Provider's failure to perform the Services in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services, or (ii) Provider's gross negligence, fraud or willful misconduct in connection with performing the Services.

•Provider shall be entitled to specific performance or termination for cause in the event of a breach by Customer, subject to written notice and an opportunity to cure for a period of up to one hundred eighty (180) days.

b.    Under the "Commercial Terms" section of the MSA:

(i)   The first bullet is replaced in its entirety with the following:

"•Customer shall not in any way, without the prior written consent of Provider, sell, subordinate, encumber or otherwise convey to any third party that is an Affiliate of Customer a security interest in the mining equipment (including but not limited to servers, machines, hashboards, controller boards, case assemblies, fans, and power units) (the "Mining Equipment"); provided, however, that nothing in this provision shall preclude the grant of a security interest in connection with any equipment financing. "Affiliate" shall mean any person who directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common controller with an issuer, including but not limited to: (1) any beneficial owner or holder of 5% or more of any class of shares of Customer, and (2) any director, officer, employee or independent contractor (or a member of the immediate family of the foregoing) of Customer."

(ii)  the following language is added at the end of the fourth bullet:  "After payment of all operating costs each month, Provider shall send Customer an invoice of the applicable Management Fee and deduct payment of the invoiced Management Fee from the Digital Wallet."

2.  Effect of Amendment. Except as amended by this Amendment, the MSA shall remain in full force and effect. No party shall be deemed to have waived the performance of any covenants in the MSA except as expressly amended by this Amendment.  In addition, if there are any inconsistencies between the MSA and this Amendment, the terms of this Amendment shall prevail and control for all purposes.

4.   Governing Law. This Amendment shall be construed in accordance with and governed by the Laws of the State of New York without giving effect to the principles of conflict of laws.

5.   Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original regardless of the date of its execution and delivery. All such counterparts together constitute one and the same instrument.

311399874.3

[Signature page follows]

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date first above written.

SPHERE 3D CORP.

By:

Name: Peter Tassiopoulos

Title:    Chief Executive Officer

GRYPHON DIGITAL MINING, INC.

By:

Name: Robby Chang

Title:    Chief Executive Officer

311399874.3



# Exhibit 3

New York, NY 10075
greg@dnfllp.com

March 21, 2023

**VIA ELECTRONIC MAIL**

Greg Wolfe, Esq.
Dontzin Nagy & Fleissig LLP
980 Madison Avenue

Steven L. Caponi, Esq.
steven.caponi@klgates.com

T 302-416-7080

**Re: Master Services Agreement, dated August 19, 2021**

Dear Greg,

As you know, we represent Gryphon Digital Mining Inc. ("Gryphon") in relation to the abovecaptioned matter.  It has come to our attention that your client, Sphere3d Inc. ("Sphere"), has entered into or, at a minimum, is attempting to enter into, business relationships with various third party cryptocurrency mining-related service providers for cryptocurrency-related services without the knowledge, involvement, authorization, and/or consent of Gryphon.  Specifically, among other things, we understand that Sphere has engaged or attempted to engage in business relationships regarding its cryptocurrency-related operations with USBTC, Foundry, Lancium, and Luxor, among others (collectively, the "Third Party Service Providers").

Any such conduct, if true, is in direct violation of the Master Services Agreement ("MSA") dated August 19, 2021 by and between Sphere and Gryphon.  Indeed, pursuant to the MSA, Sphere

granted and agreed that Gryphon has the exclusive right and power to manage Sphere's cryptocurrency-related operations, including: exclusive control over any and all relevant digital asset wallets for storing digital assets; to select the mining pool and custodians of such digital assets; and to sell digital assets on Sphere's behalf, among other things.  Any act by Sphere to circumvent the MSA—and, by extension, circumvent the Parties' agreement that Gryphon will exclusively manage Sphere's cryptocurrency-related operations—is a breach of the MSA.

Specifically, by way of example, Sphere's attempts to create independent business relationships with the Third Party Service Providers to provide services related to Sphere's cryptocurrencyrelated operations are a breach of the Exclusivity Provision of the MSA.  Sphere's attempts to create a relationship with Luxor and Foundry related to their mining pools violates the Commercial Terms of the MSA and constitutes a breach thereof.  Sphere's creation of its own Digital Wallet and its receipt of cryptocurrency mining proceeds from Luxor into that Digital Wallet violates the Exclusivity and Commercial Terms of the MSA.  Likewise, any other payments made to Sphere

K&L GATES LLP
600 N. KING STREET  SUITE 901  WILMINGTON  DE 19801 T
+1 302 416 7000  F +1 302 416 7020  klgates.com

related to its cryptocurrency-related operations that occurred outside of a Gryphon-controlled Digital Wallet violates the Commercial Terms of the MSA and constitutes a breach of the MSA.

Gryphon is highly concerned by the unilateral actions of Sphere which, absent context and proper communication, appear to constitute a flagrant disregard for the terms of the MSA.  While we understand Sphere may have provided Gryphon some limited information regarding its business dealings with select Third Party Service Providers, Sphere has not been transparent or forthcoming, and has not provided Gryphon any actual agreements entered into between Sphere and such Third Party Service Providers, whether written or oral, formal or informal, or otherwise, or any reconciliations of payments made between Sphere and any Third Party Service Providers.  This, of course, raises additional concern over the nature of these relationships.

By close of business on March 22, 2023, Gryphon hereby demands that Sphere provide any and all documentation related to its efforts to create business relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any.  Gryphon expects that the information will be provided in a fulsome and transparent manner so as to reassure Gryphon that Sphere has taken no action that would constitute a breach of the MSA.  To the extent Sphere has breached the MSA, Gryphon will not hesitate to invoke any and all legal rights and remedies available to it, including seeking to specifically enforce Sphere's obligations under the MSA and seeking to recover any and all attorney's fees and other legal costs incurred as a result of Sphere's misconduct.

We understand that you have already made Sphere aware of this issue; given the urgency, we assume you will notify Sphere of these further articulated concerns as described herein and revert without delay.

Very truly yours,  /s/

*Steven    L.    Caponi*

Steven L. Caponi, Esq.

cc: tibor@dnfllp.com

2

March 21, 2023

# Exhibit 4

## DONTZIN NAGY & FLEISSIG LLP

Gregory N. Wolfe
greg@dnfllp.com

980 Madison Avenue | New York, New York 10075 | (212) 717 - 2900

**BY EMAIL**                                                                March 22, 2023

Steven L. Caponi, Esq.
K&L Gates   steven.caponi@klgates.com

Re:     *Sphere's Concerns About Gryphon's Performance Under The MSA*

Dear Steven:

We represent Sphere 3D Corp. ("Sphere") and write in response to your letter dated March 21, 2023 (the "Letter").

As you know, Sphere has for some time now had significant concerns about Gryphon Digital Mining, Inc.'s ("Gryphon") performance under, and material breaches of, the Master Services Agreement dated August 19, 2021, as subsequently amended (the "MSA"). As summarized below, those concerns include that Gryphon is (i) "skimming off the top" (*i.e.*, stealing) Sphere's digital assets ("Digital Assets"); (ii) persistently violating prevailing standards and laws applicable to custodians of digital assets; and (iii) providing abhorrent "management services" under the MSA. Our concerns were recently realized when Gryphon made an unauthorized transfer to a third-party of over $500,000 worth of Sphere's Digital Assets, an egregious breach of the MSA by any measure. Gryphon attributes the unauthorized transfer to "spoofing," but even rudimentary internal control processes—which Gryphon has apparently not implemented, as required—would have caught the purported spoof.

As you also know, Gryphon had been scheduled to explain to Sphere on March 10, 2023, how it could have possibly effected such a transfer. Instead of explaining itself, Gryphon insisted

that Sphere disclose the results of its own investigation into the unauthorized transfer, which Sphere committed to do at a time convenient for its counsel and other representatives.

Rather than allowing a discussion of the foregoing issues to occur, and in an attempt to justify Gryphon's failure to adhere to the MSA, Gryphon sent the Letter, which is nothing more than an attempt to manufacture breaches based on Sphere's contacts with certain third parties, namely, USBTC, Foundry, Lancium, and Luxor (the "Third Parties").[1]  The Letter (at 2) further demands that, in fewer than 24 hours, Sphere respond to the Letter and "*provide any and all documentation* related to its efforts to create business relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any."[2]  The Letter (at 2) elaborates that "Gryphon expects that the information will be provided in a fulsome and transparent manner

2

so as to reassure Gryphon that Sphere has taken no action that would constitute a breach of the MSA."

The request for a response of this nature in fewer than 24 hours is patently unreasonable and has no basis in the MSA.  Gryphon has long been aware and indeed blessed much of the purported conduct that it now claims is a breach.  Sphere will consider your Letter and provide a full response in due course.  Sphere also welcomes a discussion of the issues at a time that is mutually agreeable for both sides.

Given your demand for a response to your Letter in fewer than 24 hours, however, Sphere in the remainder of this letter briefly sets forth some, but by no means all, of the facts (i) underlying Sphere's significant concerns about Gryphon's failure to perform under the MSA; and (ii) explaining why Sphere is in full compliance with the MSA.  Sphere will supplement this letter with a full response, either in a subsequent letter or through discussions with you.

**I.    THE MSA**

The parties entered into the MSA in contemplation of a merger that ultimately never closed.  In exchange for Sphere paying Gryphon tremendous fees equal to "twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of [Sphere's] blockchain and cryptocurrencyrelated operations," Gryphon undertook an obligation to be "[Sphere's] exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations."  MSA at 1.  The MSA, however, never contemplated that Sphere would be completely prohibited from contacting and entering into contracts with other players in the blockchain and cryptocurrency industry.  To the contrary, the MSA specifically envisions that Sphere may do so.

[1] The Letter (at 2) alleges that your firm had already raised the issues discussed in this Letter to this Firm, which is patently false.  During a March 17, 2023 call, your firm asked this Firm what it knew about Sphere's relationship with USBTC and stated, without offering any substantive detail, that Gryphon may have an issue with the relationship.  This Firm stated it would raise that issue with Sphere, which it did. [2] All emphases are added unless otherwise noted.

*Steven L. Caponi, Esq.*                                                                                          *Page  of 4*
*K&L Gates*

For example, it provides that Gryphon would "assist" Sphere in "sourc[ing] and negotiat[ing] the appropriate host to locate the mining equipment."  MSA at 1.  And, when the parties amended the MSA, they specifically provided that Sphere could engage in certain transfers of mining equipment to third parties and "grant . . . security interest[s]" to any third-party "in connection with any equipment financing."  *See* MSA Amendment § 2.b.

The MSA made Gryphon a custodian of certain of Sphere's Digital Assets.  *See* MSA at 1. It further requires that Gryphon perform "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services" and not engage in "gross negligence, fraud or willful misconduct in connection with performing the Services."  *See* MSA Amendment § 2.a.  In the event of a breach by Sphere, Gryphon may only seek "specific performance" after providing "written notice and an opportunity for a period of up to one hundred eighty (180) days."  *See* MSA Amendment § 2.a.

**II.     Sᴘʜᴇʀᴇ'ꜱ Sɪɢɴɪꜰɪᴄᴀɴᴛ Cᴏɴᴄᴇʀɴꜱ Tʜᴀᴛ Gʀʏᴘʜᴏɴ Hᴀꜱ Vɪᴏʟᴀᴛᴇᴅ Tʜᴇ MSA**

Sphere has significant concerns that Gryphon has been violating the MSA for some time now.  By way of illustration only, Sphere has concerns that Gryphon has been skimming off the top, effectively stealing money from Sphere.  Gryphon has repeatedly refused to provide documentation that would verify that it is not using Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit.

Steven L. Caponi, Esq.                                                                    *Page  of 4*
K&L Gates

_____

                                                                                            *3*

     As another example, Sphere has significant concerns that Gryphon does not have the internal controls and policies and procedures in place needed to comply with prevailing industry standards and applicable law.  This became apparent when Gryphon made an unauthorized transfer of over $500,000 worth of Sphere's Digital Assets in response to a purported spoofing attack in which a third-party impersonated a Sphere representative and requested the transfer via email. Even a cursory review of the spoofing email itself—which did not originate from a Sphere email address, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer—would have raised red flags and prevented the unauthorized transfer.  So too would any independent verification of the requestor's identity.  Gryphon failed to perform even rudimentary checks associated with a proper internal controls system.  Exacerbating Sphere's concerns that no such system exists, Gryphon refused multiple, legitimate requests to review Gryphon's relevant policies and procedures, leading to the conclusion that Gryphon simply has none to provide.

     And, since entering into the MSA, Gryphon has simply failed to deliver "management services" under the MSA.  When Sphere needed hosting space in 2022 (a perquisite to turning on its miners and generating money), Gryphon refused to find hosting space and instead directed Sphere to find such space on its own.  When Sphere's miners were held in customs (and thus not generating revenue), Gryphon shirked its duties to provide the assistance and information needed to release the miners from customs.  Throughout the contractual relationship, Gryphon has inexplicably delayed setting up mining pools, resulting in lost revenue, and ignored instructions to sell bitcoin, costing Sphere dearly.  And Gryphon has failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges.  These examples are part and parcel of a general failure to provide management services consistent with Gryphon's obligations under the MSA.

**III.    GRYPHON'S CONCERNS THAT SPHERE IS BREACHING THE MSA ARE UNFOUNDED**

     By contrast, Gryphon's concerns are unfounded.  Your Letter (at 1) states that Sphere is "attempting to create independent business relationships with the [Third Parties] to provide services related to Sphere's cryptocurrency-related operations," which is "a breach of the Exclusivity Provision of the MSA." According to your Letter, the attempted relationships concern Sphere "creat[ing] a relationship with Luxor and Foundry related to their mining pools" and "creat[ing] its own Digital Wallet" to receive "cryptocurrency mining proceeds from Luxor." The Letter also accuses Sphere of attempting to enter into purportedly illicit relationships with USBTC and Foundry, though never explains how doing so violates the MSA.

     We will address the allegations in your Letter in detail after we have had sufficient time to consider them.  In brief, however, the MSA provides that Gryphon is the "exclusive provider of any and all *management services* for all blockchain and cryptocurrency-related services."  *See* MSA at 1.  Sphere has not sought "management services" from any third-party; your Letter does not suggest otherwise.

Steven L. Caponi, Esq.                                                                                   Page  of 4
K&L Gates

 Evidencing that Gryphon's allegations are drummed up to distract from its own breaches, Gryphon has in fact encouraged and sanctioned Sphere's communications with third parties in the industry. As noted, Gryphon last year suggested that Sphere find its own hosting for miners (which, of course, was a dereliction of Gryphon's own duties to find such hosting space).   As

4

another example, Gryphon explicitly encouraged Sphere to enter into a relationship with Luxor last year.

     Finally, we note that, even if there were a breach of the nature described in your Letter (and we do not believe there is one), it would be immaterial and easily curable.  Your Letter does not identify any damages caused by Sphere's purported conduct—because there are none.  There is no allegation, for example, that Gryphon has not received payments due under the MSA.  Although we do not believe there is a breach to cure, we reiterate that we are exploring the issues raised in the Letter and will revert after we have had appropriate time to consider them.

*** 

     Given the timeframe for response, this letter was necessarily truncated.   Sphere will followup with a more extensive letter and is also available to discuss these issues with you.

     Sphere reserves all rights.

                                        Sincerely,

                                        *Gregory N. Wolfe*

                                        Gregory N. Wolfe
                                        *Counsel for Sphere 3D Corp.*

314952465.4