**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

SPHERE 3D CORP.,

       Plaintiff and Counter-Defendant

v.

GRYPHON DIGITAL MINING, INC.

       Defendant and Counter-Plaintiff

GRYPHON DIGITAL MINING, INC.,

       Third-Party Plaintiff,

v.

PATRICIA TROMPETER,

       Third-Party Defendant.

Case No. 1:23-cv-02954 (PKC)

**Oral Argument Requested**

### SPHERE 3D'S MEMORANDUM OF LAW IN OPPOSITION TO GRYPHON DIGITAL MININGS'S MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................3

I. THE MSA PROVIDED THAT GRYPHON WOULD BE THE MANAGER OF SPHERE'S CRYPTOCURRENCY OPERATIONS AND A CUSTODIAN OF SPHERE'S DIGITAL ASSETS ..........3

II. GRYPHON HAS INTERPRETED THE MSA TO GIVE IT TOTAL CONTROL OVER SPHERE'S OPERATIONS ................................................................................................5

III. GRYPHON HAS FAILED TO ACT IN THE BEST INTEREST OF SPHERE AND PRIORITIZED ITS OWN OPERATIONS TO THE DETRIMENT OF SPHERE ....................................6

IV. ONCE SPHERE FILED THIS LAWSUIT, GRYPHON CEASED HONORING SPHERE'S WRITTEN INSTRUCTIONS TO SELL DIGITAL ASSETS .................................................7

ARGUMENT ........................................................................................................7

I. THE IMPLIED COVENANT CLAIM IS VIABLE BECAUSE THE MSA IS AMBIGUOUS REGARDING WHETHER GRYPHON MUST ADHERE TO SPHERE'S WRITTEN INSTRUCTIONS TO SELL DIGITAL ASSETS ..................................................................................8

II. THE FAC PROPERLY STATES A BREACH OF FIDUCIARY DUTY CLAIM ............................12

1. Gryphon Owes Sphere Inherent Fiduciary Duties Imposed By Law ....................... 13

2. Gryphon Owes Fiduciary Duties Due To The Dominance It Exerts Over Sphere ... 14

3. Gryphon's Counterarguments Are Without Merit .................................................. 16

III. GRYPHON'S EFFORTS TO DISMISS THE ALLEGATIONS THAT IT IS MISAPPROPRIATING SHERE'S ASSETS ARE WITHOUT MERIT ...............................................................20

CONCLUSION ....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................7

*Atlantis Info. Tech., GmbH v. CA, Inc.,*
    485 F. Supp. 2d 224 (E.D.N.Y. 2007) ...................................................18

*B & M Linen, Corp. v. Kannegiesser, USA, Corp.,*
    679 F. Supp. 2d 474 (S.D.N.Y. 2010).................................................18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................7

*Bos. Consulting Grp., Inc. v. NCR Corp.,*
    2020 WL 5731963 (S.D.N.Y. Sept. 24, 2020)......................................14

*Bullmore v. Ernst & Young Cayman Islands,*
    45 A.D.3d 461 (1st Dep't 2007) ........................................................14

*Am. Express Co. v. Your Travel Agency, Inc.,*
    1981 WL 48178 (E.D.N.Y. Aug. 11, 1981)..........................................11

*Childers v. New York & Presbyterian Hosp.,*
    36 F. Supp. 3d 292 (S.D.N.Y. 2014)...................................................13

*Claridge v. N. Am. Power & Gas, LLC,*
    2015 WL 5155934 (S.D.N.Y. Sept. 2, 2015) .......................................8

*Deleu v. Scaife,*
    775 F. Supp. 712 (S.D.N.Y. 1991) .....................................................12

*Demetre v. HMS Holdings Corp.,*
    127 A.D.3d 493 (1st Dep't 2015) .......................................................9

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.,*
    2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002)....................................12

*Gravier Productions, Inc. v. Amazon Content Services, LLC,*
    2019 WL 3456633 (S.D.N.Y., 2019)...................................................9

*Impax Media, Inc. v. Northeast Advertising Corp.,*
    2018 WL 3962841 (S.D.N.Y. 2018)....................................................12

*Kern v. Robert Currie Assocs.*,
  220 A.D.2d 255 (1st Dep't 1995) ........................................13

*Lundy v. Cath. Health Sys. of Long Island Inc.*,
  711 F.3d 106 (2d Cir. 2013)..............................................8

*In re Mid-Island Hospital, Inc.*,
  276 F.3d 123 (2d Cir. 2002)..............................................18

*Murray Eng'g P.C. v. Remke*,
  2018 WL 3773991 (S.D.N.Y. Aug. 9, 2018) ........................20

*N. Shipping Funds I, LLC v. Icon Capital Corp.*,
  921 F. Supp. 2d 94 (S.D.N.Y. 2013)...................................18

*NYC Med. Prac., P.C. v. Shokrian*,
  2019 WL 1298450 (E.D.N.Y. Mar. 21, 2019) ......................8

*Off. Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) ..........................19

*Podgoretz v. Shearson Lehman Bros.*,
  1994 WL 1877200 (E.D.N.Y. Mar. 23, 1994) ......................13

*In re Refco Inc. Sec. Litig.*,
  2010 WL 11475742 (S.D.N.Y. Mar. 2, 2010) ..............12, 13, 15

*Roni LLC v. Arfa*,
  18 N.Y.3d 846 (2011) ........................................................12

*Sommer v. Fed. Signal Corp.*,
  79 N.Y.2d 540 (1992) ........................................................13

*Citigroup Mortg. Loan Tr. 2007-AMC3 ex rel. U.S. Bank, Nat. Ass'n v. Citigroup Glob. Markets Realty Corp.*,
  2014 WL 1329165 (S.D.N.Y. Mar. 31, 2014) ......................20

*Veleron Holding, B.V. v. Morgan Stanley*,
  117 F. Supp. 3d 404 (S.D.N.Y. 2015)................................16

*Vitamin Realty Assocs. LLC v. Time Rec. Storage, LLC*,
  193 A.D.3d 491 (1st Dep't 2021) ........................................8

*Westwoods Aviation, LLC v. Atl. Aviation Flight Servs., Inc.*,
  2007 WL 2454115 (S.D.N.Y. Aug. 27, 2007)....................13, 16

*Wiener v. Lazard Freres & Co.*,
  241 A.D.2d 114 (1st Dep't 1998) ........................................17

*Winklevoss Cap. Fund, LLC v. Shrem*,
    351 F. Supp. 3d 710 (S.D.N.Y. 2019).......................................................................14

*Zimmer-Masiello v Zimmer*,
    159 A.D.2d 363 (1st Dep't 1990) ............................................................................15

## PRELIMINARY STATEMENT

This case arises out of Gryphon Digital Mining, Inc.'s ("Gryphon") breach of its contractual duties under the Master Services Agreement between the parties dated August 19, 2021, as subsequently amended (the "MSA"), and Gryphon's breach of the fiduciaries duties it owes Sphere 3d Corp. ("Sphere"), including as its manager, broker, investment advisor, agent, and the custodian of its assets.  Under the MSA, Gryphon undertook an obligation to be the "exclusive provider of any and all management services for" Sphere's "blockchain and cryptocurrency-related operations"—*i.e.*, essentially Sphere's entire business.  Gryphon, however, has been content to receive the fantastic fees called for by the MSA without fulfilling its contractual duties or the fiduciary duties that come with being the exclusive manager of Sphere's business.

Gryphon concedes that Sphere's claim for breach of contract (Count I) is properly pleaded.  Through its motion to dismiss (the "Motion"), however, Gryphon wrongly seeks dismissal of Sphere's implied covenant claim (Count II), breach of fiduciary duty claim (Count III), and certain allegations related to the theft of Sphere's assets that Gryphon contends sound in fraud.  The parties have already comprehensively addressed these issues in two rounds of pre-motion letters in which Sphere established through its "Initial Pre-Motion Letter Response" (Dkt. 15) and its "FAC Pre-Motion Letter Response" (Dkt. 22) that Gryphon's arguments were without merit.  Rather than mount a serious challenge to Sphere's claims—which it by now well knows are sufficient— Gryphon instead uses its Motion as a vehicle to hawk its counterclaims.  *See, e.g.*, Mot. at 1–4. Sphere will show that those counterclaims are meritless; as set forth below, Gryphon's arguments for dismissal are without merit too.

*First*, with respect to Sphere's implied covenant claim, the MSA provides that "[Sphere] shall provide written instructions to [Gryphon] with respect to all decisions to sell or hold Digital Assets."  MSA at 4 (hereinafter, the "Sale Provision").  Once Sphere filed this litigation, Gryphon

ceased honoring Sphere's written instructions to sell Sphere's digital assets and remit the proceeds therefrom to Sphere, with the intention of starving Sphere of resources so that it would be forced to drop this litigation.  Sphere asserts that Gryphon's refusal is both a breach of contract and of the implied covenant.  The Sale Provision is plainly ambiguous because it does not expressly state what should happen when Sphere submits a written instruction.  Accordingly, the breach of contract and implied covenant claims may be maintained at the same time and are not duplicative, as Gryphon claims.  Beyond the written instruction issue, in an apparent effort to obscure Sphere's allegations, Gryphon directs its Motion to issues that have been mooted by the parties' pre-motion letters and Sphere's amendment to its initial Complaint.  The Motion must be denied as moot to the extent it addresses those issues.

*Second*, Gryphon's position that it can control Sphere to the point that Sphere cannot even "attempt[] to enter into business relationships" with any other player in the crypto-industry—*i.e.*, the industry in which Sphere operates—or receive the proceeds of its operations without that money first passing through the hands of Gryphon, with Gryphon controlling if and when those proceeds are remitted to Sphere, cannot be squared with Gryphon's claim that it does not owe Sphere fiduciary duties.  *See* FAC ¶ 65; FAC Ex. No. 3; Answer at 30 ¶ 44; Mot. at 7; Dkt. 14 at 1.  Gryphon does not dispute that it acts in various capacities that give rise to inherent fiduciary duties under New York law, including trustee, manager, agent, investment advisor, broker, and custodian.  Because it never disclaimed its fiduciary duties, it cannot now shirk them.  Independently, the degree of control and dominance Gryphon exercises over Sphere also gives rise to fiduciary duties.  The MSA, a bare three page "binding term sheet" that was to be superseded by a formal agreement but never was, is far too meagre to displace Gryphon's fiduciary duties.  In addition, the FAC easily meets the notice pleading threshold imposed by Rule 8(a), including by

alleging that Gryphon prioritized its own interests over Sphere's. Gryphon's argument that, in alleging the claim, Sphere had to rule out alternative explanations for why Gryphon's miners inexplicably outperformed Sphere's miners is frivolous.

*Finally*, Sphere's allegations that Gryphon stole its assets are sufficient under Rule 8(a) or, in the alternative, Rule 9(b). Initially, Rule 8(a) applies because the gravamen of Sphere's allegations do not depend on fraudulent conduct. Even if Rule 9(b) applied, however, Sphere has specifically alleged that "since Sphere filed this lawsuit, Gryphon . . . is holding Sphere's digital assets while refusing to sell them in accordance with Sphere's instructions. Gryphon has even sold Sphere's digital assets and simply retained the proceeds (tens of thousands of dollars), treating the funds as its own." FAC ¶ 39. Such allegations meet Rule 9(b)'s particularity standard.

## FACTUAL BACKGROUND

Sphere sets forth facts relevant to this Motion, which must be accepted as true and construed in the light most favorable to Sphere.

### I.    THE MSA PROVIDED THAT GRYPHON WOULD BE THE MANAGER OF SPHERE'S CRYPTOCURRENCY OPERATIONS AND A CUSTODIAN OF SPHERE'S DIGITAL ASSETS

Gryphon and Sphere are in the business of digital asset mining. Mining is a process in which "sophisticated, high-capacity computers"—miners—"run programs designed to support the network underlying bitcoin" (for example, by authenticating transactions between users) and generate bitcoin for their owners. *Id.* ¶ 25.

In contemplation of a merger, Sphere and Gryphon entered into the MSA, which took the form of a bare three-page "Binding Term Sheet" in anticipation of a more "definitive agreement" that was never reached. *See id.* ¶ 28; *see also* Dkt. 20-1 ("MSA") at 1. Sphere agreed to the MSA "[b]ased on Gryphon's representations that it had superior knowledge of and abilities in the crypto-

industry, including that Gryphon would be able to negotiate better deals with third-parties, implement better investment strategies, and better manage Sphere's crypto-business." FAC ¶ 45.

In the MSA, Gryphon agreed to serve as the "exclusive provider of any and all management services for Sphere's blockchain and cryptocurrency-related operations." *See* MSA at 1 (hereinafter, the "Management Services Provision"). Pursuant to the Management Services Provision, Gryphon manages Sphere miners. Mining cryptocurrency effectively is not as simple as booting up a computer and putting it to work. Instead, mining often takes place in "mining pools"—aggregations of miners which combine their computing power and distribute the resultant bitcoin on a pro rata basis. FAC ¶ 25. Because "[n]ot all mining pools are created equal," "selecting lucrative mining pools is critical to commercial success." *Id.*

In addition, "the MSA made Gryphon a custodian of certain of Sphere's digital assets," which are stored in a "digital wallet"—the rough equivalent of an online bank account—controlled by Gryphon. *See id.* ¶ 30, 37. As with a customer's online bank account, the Sale Provision gives Sphere authority to issue "written instructions . . . with respect to all decisions to sell or hold Digital Assets." *Id.* ¶ 17.

In exchange for the performance of these obligations, Gryphon received a substantial Management Fee—22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations." *Id.* ¶ 29.

Gryphon also agreed that Sphere could terminate the MSA "in the event of: (i) [Gryphon's] failure to perform the Services in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services, subject to written notice and an opportunity to cure, or (ii) [Gryphon's] gross negligence, fraud or willful misconduct

in connection with performing the Services." MSA at 1–2 (hereinafter, the "Termination Clause"). Notably, however, the parties did not include any language disclaiming the fiduciary duties.

## II.    GRYPHON HAS INTERPRETED THE MSA TO GIVE IT TOTAL CONTROL OVER SPHERE'S OPERATIONS

Gryphon has taken an extraordinarily broad view of its rights and powers under the MSA. In Gryphon's view, it, not Sphere, is in charge of Sphere's business.

For example, Gryphon asserts the exclusive right to determine with whom Sphere may do business and on what terms. In Gryphon's view, it is a breach of the MSA for Sphere to even attempt to, let alone actually enter, any "independent business relationships" in the cryptocurrency industry without Gryphon's permission. *See* Dkt. 20-3 at 1 ("Sphere's attempts to create independent business relationships . . . are a breach . . . of the MSA."); *see also* FAC ¶¶ 65–66. That includes securing hosting services for Sphere's miners—a necessary precondition to their operation. *See* Answer at 30 ¶ 44 (alleging that attempting to "create a business relationship with . . . a mining pool operator" breached the MSA). In other words, unless Gryphon gives the go-ahead, Sphere cannot do business.

It also claims comprehensive power over Sphere's money. By Gryphon's account, *every dollar* Sphere earns from its cryptocurrency operations—regardless of Gryphon's involvement—must be remitted to Gryphon. *See* Dkt 20-3 at 1–2 ("[A]ny other payments made to Sphere related to its cryptocurrency-related operations that occurred outside of a Gryphon-controlled Digital Wallet violates [sic] the Commercial Terms of the MSA and constitutes [sic] a breach of the MSA."); *see also* Answer ¶ 44 (asserting Sphere may not "create its own account[s] outside of Gryphon's control"). And Gryphon claims that, when it does receive that money, it is free to do what it pleases with it, whether that be selling Sphere's assets and pocketing the money or withholding it and remitting it to Sphere in its discretion. *See, e.g.*, FAC ¶¶ 39, 69.

5

Gryphon's pre-litigation correspondence, persistent bad faith conduct, and recent retaliatory counterclaims make clear it seeks more than its contractual right to be the exclusive provider of "management services." It demands nothing less than complete control of Sphere's business.

### III. GRYPHON HAS FAILED TO ACT IN THE BEST INTEREST OF SPHERE AND PRIORITIZED ITS OWN OPERATIONS TO THE DETRIMENT OF SPHERE

According to Gryphon, its claim to absolute power does not require it to exercise commensurate responsibility. Over the course of the parties' relationship, Gryphon has consistently disregarded Sphere's interests or subordinated them to its own. Three examples are particularly telling.

*First*, Gryphon has prioritized its miners over Sphere's and employed more advantageous investment strategies for itself, to the detriment of Sphere. *See id.* ¶ 47. Despite being managed by the same company, Gryphon's miners have consistently outperformed Sphere's, which would not happen unless Gryphon were engaged in self-dealing. *See id*.

*Second,* Gryphon failed to file a proof of claim in the bankruptcy of a party with whom Gryphon interacted on Sphere's behalf. That inexplicable inaction has jeopardized Sphere's ability to collect on its substantial claim against the debtor. *See id.* ¶ 36, 47.

*Third*, Gryphon carelessly parted with hundreds of thousands of dollars of Sphere assets and then blamed Sphere for its own incompetence. In January of 2023, Sphere's CFO Kurt Kalbfleisch asked Rob Chang, Gryphon's CEO, to transfer 18 Bitcoin—worth over $400,000—to an address to which Gryphon had previously sent bitcoin at Sphere's direction. *Id.* ¶ 48. An hour later, Chang received another email requesting a transfer, this time from a scammer impersonating Mr. Kalbfleisch. *Id.* ¶ 50. Despite Chang's self-proclaimed expertise in the industry, Chang failed to notice the obvious indicia of a spoofing attack and, without verifying the transaction's

authenticity, transferred 18 Bitcoin to the scammer. *Id.* ¶ 51–52. Mere days later, he was duped again, transferring approximately $200,000 more in Bitcoin. *Id.* ¶ 53.

When Sphere tried to investigate, Gryphon failed to cooperate. Instead, it refused to share its (likely non-existent) security protocols or report the crime to the Government, apparently out of fear its own inept (and possibly illegal) conduct would be discovered. *Id.* ¶ 55–57. Then, in a truly audacious move, Gryphon pointed the finger at Sphere, claiming that Sphere was somehow negligent for failing to prevent Gryphon from falling prey to the spoofing scam. *Id.* ¶ 64. That remarkable theory forms the basis of Gryphon's recently filed negligence counterclaim. *See* Answer at 47.

## IV. ONCE SPHERE FILED THIS LAWSUIT, GRYPHON CEASED HONORING SPHERE'S WRITTEN INSTRUCTIONS TO SELL DIGITAL ASSETS

Gryphon's retaliatory conduct has only escalated. After Sphere filed this lawsuit, Gryphon purported to discover a "deposit" requirement in the parties' agreement, pursuant to which Sphere must maintain a balance of $530,000—roughly the amount stolen in the spoofing scam—in digital wallets controlled by Gryphon at all times. FAC ¶ 70. In addition to imposing that extra-contractual requirement, Gryphon has now taken the position that, despite the MSA's Sale Provision, it need not heed any of Sphere's instructions concerning its own money and may instead indefinitely retain that money for any reason—or no reason—whatsoever. *Id.* ¶ 71. To this day, Gryphon continues to improperly retain Sphere's assets. And it has done so to pressure Sphere into dropping its claims. *Id.* ¶ 73.

## ARGUMENT

"To survive a motion to dismiss," a complaint need only set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To do so,

a complaint need not set forth "detailed factual allegations."  *See NYC Med. Prac., P.C. v. Shokrian*, 2019 WL 1298450, at *2 (E.D.N.Y. Mar. 21, 2019).  Rather, it must allege only such allegations which, taken as true and given the benefit of all reasonable inferences, raise a right to relief above the speculative level.  *See Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 113–14 (2d Cir. 2013).  The FAC meets this standard.

## I. THE IMPLIED COVENANT CLAIM IS VIABLE BECAUSE THE MSA IS AMBIGUOUS REGARDING WHETHER GRYPHON MUST ADHERE TO SPHERE'S WRITTEN INSTRUCTIONS TO SELL DIGITAL ASSETS

The Sale Provision in the MSA provides that "[Sphere] shall provide written instructions to [Gryphon] with respect to all decisions to sell or hold Digital Assets."  MSA at 4.  Before Sphere filed its initial Complaint on April 7, 2023, Gryphon sold digital assets and remitted the proceeds from such sales to Sphere pursuant to Sphere's written instructions.  After Sphere filed its initial Complaint, Gryphon ceased honoring such written instructions.  *See* FAC ¶¶ 68–73.  Sphere alleges that, by doing so, Gryphon breached the MSA (Count I) or, in the alternative, the implied covenant of good faith (Count II).  Gryphon's principal contention for dismissal, that the implied covenant claim is duplicative of the breach claim, is without merit.  *See* Mot. at 8.

"In New York, all contracts contain an implied covenant of good faith and fair dealing, under which neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Claridge v. N. Am. Power & Gas, LLC*, 2015 WL 5155934, at *6 (S.D.N.Y. Sept. 2, 2015) (Castel, J.).  As this Court has held, although an implied covenant claim may be subject to dismissal if it is duplicative of a breach of contract claim, where a provision is arguably "ambiguous," a party may maintain the claims in parallel.  *Id.* at *6 (rejecting motion to dismiss implied covenant claim on that basis); *accord Vitamin Realty Assocs. LLC v. Time Rec. Storage, LLC*, 193 A.D.3d 491, 492 (1st Dep't 2021)

("While arguably duplicative of the breach of contract claim, where, as here, the express terms of the agreement are ambiguous, plaintiff may maintain this alternate theory [for breach of the covenant of good faith and fair dealing], at least at this stage of the action."); *Demetre v. HMS Holdings Corp.*, 127 A.D.3d 493, 493–94 (1st Dep't 2015) (concluding that, because the meaning of a provision was "still undeveloped," it was premature to dismiss an implied covenant claim as duplicative).

Sphere's position is that the Sale Provision on its face requires Gryphon to comply with its written instructions—how else to give meaning to the Sale Provision given that there is no other mechanism in the MSA for selling the assets and transferring the fruits of the parties' bargain to Sphere. Gryphon's position is that it may disregard Sphere's written instructions and keep Sphere's digital assets in its own discretion. FAC ¶ 74. As the FAC spells out, because the Sale Provision does not expressly state what should happen when Gryphon receives a written instruction from Sphere (*e.g.*, must it be followed, in what time frame, and so on), there is an ambiguity that makes assertion of an implied covenant claim permissible. *See id.* ¶¶ 88–89.

Although Sphere expressly teed these arguments and cases up in its FAC Pre-Motion Letter Response (at 2), Gryphon's Motion almost entirely ignores them. The Motion, for example, does not argue that the Sale Provision is unambiguous, let alone try to even explain its meaning. The Motion (at 9 n.2) cites *Gravier Productions, Inc. v. Amazon Content Services, LLC*, where the court dismissed an implied covenant claim because the plaintiffs could "not identify any disagreement over the meaning of terms in [the] contracts that could render their implied covenant claims non-duplicative." 2019 WL 3456633, at *5 (S.D.N.Y., 2019). Here, Sphere has identified an ambiguity.

Otherwise, in an apparent effort to obscure the nature of Sphere's claims, Gryphon devotes an incredible eight pages (at 7–15) to arguing that Sphere's implied covenant claim encompasses other misconduct related to Gryphon's provision of management services that is not, in fact, encompassed by the implied covenant claim but by the breach of contract claim. The implied covenant claim (Count II) is expressly directed to Gryphon's frustration of the Sale Provision, *see* FAC ¶¶ 88–89, which Gryphon's Motion acknowledges. *See* Mot. at 8 (describing Count II as follows: "Gryphon 'has materially breached its implied obligations' and 'its good faith obligations under the MSA" by "refusing to honor [Sphere's] instructions to sell digital assets'" (quoting FAC ¶¶ 88–89)). As Sphere explained in its Initial Pre-Motion Letter Response (at 2–3), although Sphere's initial Complaint pleaded the implied covenant claim "in the alternative" to encompass Gryphon's deficient provision of management services more broadly, it did so because the Management Services Provision was "arguably ambiguous about the applicable standard of care governing Gryphon's provision of such services." As Sphere also explained:

> Gryphon concedes . . . that it must "perform the [Management] Services in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services." Gryphon's concession that Sphere may pursue its breach of contract claim for damages on the basis that Gryphon breached this standard of care in providing management services should obviate the need for motion practice on this issue.

Initial Pre-Motion Letter Response at 3. Given that that issue had been mooted, Sphere's FAC Pre-Motion Letter was devoted entirely to explaining why Gryphon had breached the implied covenant by failing to honor instructions to return digital assets. Accordingly, the Motion is addressing moot issues to the extent it is not directed toward Gryphon's failure to honor written instructions with respect to Sphere's digital assets.

10

It is difficult to discern what remaining arguments are directed toward the instructions issue. Gryphon claims (at 12) that the MSA has an explicit standard of care, but that standard applies to the provision of management services. The implied covenant claim raises a distinct issue, namely, whether Gryphon must honor Sphere's written instructions to hold and sell digital assets.

Finally, contrary to Gryphon's contention (at 10), the allegations supporting the implied covenant count explain why Gryphon is acting in bad faith and frustrating the purpose of the MSA by failing to honor Sphere's written instructions:

> [T]he intent and purpose of the [Sales Provision] was that Gryphon would sell digital assets when instructed to do so and remit the proceeds of such sales to Sphere. Any other interpretation would frustrate the purpose of the provision and the MSA itself—there is no point to providing written instructions to Gryphon unless they will be honored and unless Gryphon will remit the proceeds of such sales to Sphere. Indeed, there is no other mechanism for Sphere to receive the proceeds of sales of its own digital assets under the MSA and there is no point to the MSA unless Sphere can actually reap its benefits, namely, revenue.
>
> Gryphon has materially breached its implied obligations. By refusing to honor instructions to sell digital assets, Gryphon is acting in bad faith and in a way that is frustrating the intent and purpose of the MSA. Indeed, Gryphon has communicated it is trying to put Sphere in a position where it cannot meet its ordinary course obligations and where it cannot pay for the expenses and costs associated with this litigation so that Sphere will be forced to capitulate. This smacks of bad faith.

*Id.* It is difficult to imagine a more paradigmatic example of bad faith than refusing to transfer money owed to a counterparty to force them to end a litigation or risk bankruptcy. *Cf. Am. Express Co. v. Your Travel Agency, Inc.*, 1981 WL 48178, at *4 (E.D.N.Y. Aug. 11, 1981) ("The law will not suffer an agent to withhold moneys collected for a principal's account by the pressure of a threat that no part of the moneys will be remitted to the owner without the approval of deductions

beneficial to the agent."). Accordingly, the Motion must be denied as to the implied covenant claim.

## II.    THE FAC PROPERLY STATES A BREACH OF FIDUCIARY DUTY CLAIM

After two rounds of pre-motion letters, there is no serious dispute that the FAC properly states a breach of fiduciary duty claim. "The elements of a claim for breach of fiduciary duty are: (1) a fiduciary relationship between the parties; and (2) a breach of the fiduciary duty." *Impax Media, Inc. v. Northeast Advertising Corp.*, 2018 WL 3962841, at *6 (S.D.N.Y. 2018). Gryphon's fiduciary duties to Sphere arise from the inherent duties imposed by law and, independently, from the dominance Gryphon exerts over Sphere. And it is frivolous for Gryphon to dispute that Sphere has properly pleaded a breach of those duties under Rule 8(a)'s notice pleading standard.

### A.    The FAC Properly Pleads Fiduciary Duties, Which Involves A Fact-Specific Inquiry Inappropriate For Dismissal On The Pleadings

"To determine whether a party in a business relationship has a fiduciary duty depends on an inquiry into the 'nature and quality of that relationship' which is an issue of fact that is ill-suited for resolution on a motion to dismiss." *Id.* at *7; *accord In re Refco Inc. Sec. Litig.*, 2010 WL 11475742, at *19 (S.D.N.Y. Mar. 2, 2010) ("[A] claim for breach of fiduciary duty is likely to be fact-dependent and is an unlikely candidate for a motion to dismiss."), *report and recommendation adopted*, 2011 WL 13168455 (S.D.N.Y. May 4, 2011); *Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at *16 (S.D.N.Y. Sept. 30, 2002) ("Claims alleging the existence of a fiduciary duty are usually not subject to dismissal in a 12(b)(6) motion."); *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848 (2011) ("Ascertaining the existence of a fiduciary relationship 'inevitably requires a fact-specific inquiry.'" (citation omitted)).

"New York law is clear that a fiduciary relationship exists from the assumption of control and responsibility." *Deleu v. Scaife*, 775 F. Supp. 712, 715 (S.D.N.Y. 1991). "[T]he hallmark of

a fiduciary relationship is one party's handling of money or property for a second party's best interest." *Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 307 (S.D.N.Y. 2014). "[A] fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit." *In re Refco*, 2010 WL 11475742, at *19 (citation omitted).

      Under these standards, there is no doubt that Sphere has properly pleaded a fiduciary duty.

      1.    *Gryphon Owes Sphere Inherent Fiduciary Duties Imposed By Law*

      The relationship between Gryphon and Sphere gives rise to inherent fiduciary duties. FAC ¶¶ 41–45; *see also Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992) (noting that certain relationships subject parties "to tort liability for failure to exercise reasonable care, irrespective of their contractual duties"). Gryphon argues (at 18) that the MSA precludes a finding of a fiduciary duty because it does not include the specific words "fiduciary duty," but it is well established that "a contractual relationship may give rise to fiduciary duties regardless of whether the contract itself includes specific words or language in that regard." *Kern v. Robert Currie Assocs.*, 220 A.D.2d 255, 255–56 (1st Dep't 1995); *accord Westwoods Aviation, LLC v. Atl. Aviation Flight Servs., Inc.*, 2007 WL 2454115, at *3 (S.D.N.Y. Aug. 27, 2007). "The common law has recognized that some associations are inherently fiduciary." *Childers*, 36 F. Supp. 3d at 307 (citation omitted). Although there is no "exhaustive" list of such associations, associations that give rise to fiduciary relationships include principal-agent, trustee-beneficiary, employer-employee, broker-customer, and investment advisor-client. *See id.*; *Podgoretz v. Shearson*

*Lehman Bros.*, 1994 WL 1877200, at *10 (E.D.N.Y. Mar. 23, 1994); *Bullmore v. Ernst & Young Cayman Islands*, 45 A.D.3d 461, 463 (1st Dep't 2007).

Here, the nature of the relationship—with Gryphon managing Sphere's material operations—is akin to that of an officer or trustee and leads to the inexorable conclusion that Gryphon is a fiduciary. *See Bos. Consulting Grp., Inc. v. NCR Corp.*, 2020 WL 5731963, at *3 (S.D.N.Y. Sept. 24, 2020) (argument that defendant did not have "fiduciary obligation" was "unpersuasive because the explicit terms of the contract grant [defendant] significant influence over [plaintiff's] decision-making processes for matters related and unrelated to [defendant's] initiatives at [plaintiff] as well as nearly unfettered access to confidential information and data"). Moreover, Gryphon acts as an agent of Sphere, including in dealing with third parties, and a broker, investment advisor, and custodian, including in managing, investing, and holding Sphere's digital assets. It is undisputed that these relationships give rise to fiduciary duties. *See Winklevoss Cap. Fund, LLC v. Shrem*, 351 F. Supp. 3d 710, 720 (S.D.N.Y. 2019) ("Shrem accepted discretionary control over WCR's funds to purchase Bitcoin on its behalf based on his knowledge of the Bitcoin market; there is no doubt he had a fiduciary duty in acting as WCF's agent.").

2.    *Gryphon Owes Fiduciary Duties Due To The Dominance It Exerts Over Sphere*

Independently, Gryphon's fiduciary duties arise from the "unusual trust" Sphere places in Gryphon, as well as the unusual "control that Gryphon has over Sphere" as the exclusive provider of its management services and Gryphon's "status as a custodian of Sphere's digital assets and miners," including its ability to determine how Sphere's assets are invested and its miners are utilized. FAC ¶¶ 16, 41. Gryphon has also taken the position that, in providing its services, it controls whether and how Sphere communicates with third parties in the crypto-industry, and where and how Sphere stores its digital assets, and that it is entitled to virtually unfettered access

14

to Sphere's confidential information. *See* FAC Ex. 3 at 1; FAC ¶ 65. Such allegations of dominance clearly give rise to fiduciary duties, including the duty of loyalty and to avoid self-dealing. *See* FAC ¶ 1.

*In re Refco*—a report and recommendation authored by Professor Daniel Capra serving as special master and adopted "complete[ly]" by Judge Rakoff following "*de novo*" review, *see* 2011 WL 13168455, at *1—is instructive. The court there determined that a group of investment fund plaintiffs adequately alleged that defendant Refco owed them fiduciary duties "because Refco performed functions that established a relationship of trust and confidence," including because Refco "was the prime broker and custodial agent" for the plaintiffs; "exercised discretion over the movement of [the plaintiffs'] assets"; had "veto rights over the structuring, offering and operation of certain investment vehicles"; and had "superior knowledge" in certain matters. 2010 WL 11475742, at *21–22. The same indicia are present here: Gryphon serves as the sole broker and custodial agent for Sphere, exercises discretion over the investment and utilization of Sphere's assets, has veto rights over many of Sphere's operations, and superior knowledge of its interactions with Sphere's counterparties, as Gryphon controls those relationships, as well as superior knowledge of the crypto-market at the time the parties entered into the MSA (or at least so Sphere believed at the time it entered into the MSA). *See* FAC ¶¶ 1, 29–31, 44–46; *see also Zimmer-Masiello v Zimmer*, 159 A.D.2d 363, 365 (1st Dep't 1990) (fiduciary duty properly alleged where defendant, pursuant to agreement, "dictated the size of [plaintiff's] territory, prices and commissions, and . . . exploited . . . confidential and proprietary information which [plaintiff] was required to provide [defendant] pursuant to their agreement").

### 3.    *Gryphon's Counterarguments Are Without Merit*

Gryphon still has no good response here despite two rounds of pre-motion letters that raised the foregoing issues and cases.  Gryphon does not attempt to distinguish Sphere's cases and it does not seriously attempt to rebut that its relationships with Sphere give rise to inherent fiduciary duties under the law.  *See* Section II.A.2, *supra*.  Gryphon does not dispute that it has the foregoing relationships with Sphere (custodian, agent, broker, investment advisor, trustee, manager and so on) or that those relationships impose inherent fiduciary obligations under the law.  It also does not dispute there is no express disclaimer of its fiduciary duties in the MSA and that, in any event, certain fiduciary duties, such as those that arise from an agency relationship, cannot be disclaimed. *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 452 (S.D.N.Y. 2015) (observing that "[t]he existence of an agency relationship is a mixed question of law and fact that should generally be decided by a jury" and "where a writing erects the essential structure of an agency relationship, even an explicit disclaimer cannot undo it").  The Motion can be rejected on this basis alone.

In any event, pointing to the MSA aids Sphere, not Gryphon—and certainly does not aid Gryphon at the pleading stage.  There is no fiduciary duty disclaimer or even any affirmative language inconsistent with the imposition of a fiduciary duty, let alone so inconsistent as to exclude the possibility at the pleading stage.  *See Westwoods Aviation*, 2007 WL 2454115, at \*3 (absence of fiduciary duty disclaimer weighed in favor of denying motion to dismiss and declining to dismiss fiduciary duty claim even though, unlike here, there were "clauses in the contracts that seem to tilt against" a fiduciary duty).  The three-page MSA (with a one-and-a-half-page amendment) is a binding term sheet signed in contemplation of a more robust agreement that never

came to be and is far too barebone to blot out Gryphon's fiduciary duties in these circumstances.[1] *See Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 122 (1st Dep't 1998) ("While in some instances courts have declined to find the existence of a fiduciary relationship where the parties failed to provide for it in their written agreements, the agreements in those cases were far more extensive or comprehensive than the contract between the parties before us.").

Gryphon relies upon language in the Termination Clause, which provides that Sphere may terminate the MSA "in the event of . . . [Gryphon's] failure to perform the Services in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry." This language, located as it is in the Termination Clause, cannot be read to preclude the imposition of inherent or other fiduciary duties on Gryphon, let alone unambiguously preclude such duties as required to dismiss the fiduciary duty claim at his stage. In any event, that standard of care is not inconsistent with the imposition of fiduciary duties. Gryphon breezily asserts (at 19) that this "standard of care" is a "considerably lower standard of care . . . than a fiduciary one," an assertion that is unsupported and that the Court must discount.[2] Had Gryphon—a highly sophisticated entity—wanted to disclaim fiduciary duties, it would have done so directly and unambiguously, not obliquely through the Termination Clause, as Gryphon claims.

Gryphon also insinuates that no fiduciary duties could arise because the parties agreed to the MSA in contemplation of a merger, but cites nothing for that proposition. Moreover, this was not the usual merger scenario in which two distinct parties remained separate during merger

---

[1] While Gryphon claims the MSA is too comprehensive to permit Sphere's fiduciary duty claim (Mot. at 18), it takes the opposite position when it suits its purposes. In its response to Sphere's recent pre-motion letter seeking leave to move to dismiss Gryphon's counterclaims, Gryphon argues that the MSA is not the sole source of the parties' duties and that Sphere owed Gryphon an extra-contractual duty to prevent it from falling prey to the spoofing attack. *See* Dkt. 32 at 1–2.

[2] This issue that will no doubt be heavily litigated during the course of the case, but cannot be decided against Sphere now, when it is entitled the benefit of all reasonable inferences.

negotiations and went their own ways thereafter.  Rather, Gryphon began managing wide swaths of Sphere's operations in advance of the merger and has continued to do so following its breakdown.  And it is certainly plausible that fiduciary duties would attach in such circumstances given that Sphere has functionally placed itself at the mercy of Gryphon.

The cases cited by Gryphon (at 12–13) are readily distinguishable, as they involved materially different circumstances.  In *Northern Shipping Funds I, LLC v. Icon Capital Corp.*, the instrument allegedly giving rise to an agency relationship was executed for the benefit of a different party, not the plaintiff, and there were otherwise no allegations of dominance.  921 F. Supp. 2d 94, 104 (S.D.N.Y. 2013).  *In re Mid-Island Hospital, Inc.* involved a debtor-creditor relationship, which ordinarily "is not by itself a fiduciary relationship."  276 F.3d 123, 130 (2d Cir. 2002).  *B & M Linen, Corp. v. Kannegiesser, USA, Corp.* involved "bald[]" allegations of a fiduciary relationship between a purchaser and seller.  679 F. Supp. 2d 474, 479 (S.D.N.Y. 2010).  And *Atlantis Info. Tech., GmbH v. CA, Inc.* involved a mere distribution arrangement but "no more than a conventional business relationship."  485 F. Supp. 2d 224, 231 (E.D.N.Y. 2007).

By contrast, here, Gryphon asserts such sweeping powers over Sphere that, in its view, Sphere may not even attempt to form any business relationship, mine any cryptocurrency, or control its own money without Gryphon's permission.  *See, e.g.*, Am. Compl. ¶¶ 65, 71; *see also* Mot. at 2 (claiming that the MSA forbids Sphere to "receiv[e] cryptocurrency mining proceeds" from its operations instead of remitting the money to Gryphon).  Gryphon claims the ability to put Sphere into receivership if (for example) it decides that Sphere should not enter into business arrangements with a third-party or to not remit digital asset proceeds to Sphere, as Gryphon is presently doing.  Although it is no doubt true that "a conventional business relationship, without more, does not become a fiduciary relationship by mere allegation," *Atlantis Info. Tech.*, 485 F.

Supp. 2d at 231, the relationship between Sphere and Gryphon is unconventional and, in all the events, the "more" is alleged.

## B.  The FAC Pleads Fiduciary Duty Breaches That Easily Meet Rule 8(a)'s Notice Pleading Threshold

With the exception of Sphere's allegation related to Gryphon stealing its assets (addressed below), it is undisputed that Sphere's claims, including its breach of fiduciary duty claims, are subject to "the general pleading standards set out by Rule 8(a), not the heightened standards of Rule 9(b)." *Off. Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2002 WL 362794, at *8 (S.D.N.Y. Mar. 6, 2002).  Under this rubric, it is frivolous for Gryphon to dispute that Sphere has adequately pleaded a breach.

Sphere by and large ignores the breach allegations in the FAC.  As but one example, Sphere alleges that Gryphon "failed to file a proof of claim in a pending bankruptcy proceeding in which Sphere has a substantial claim, jeopardizing Sphere's ability to pursue its claim because Gryphon interacted with the debtor on Sphere's behalf" (FAC ¶ 47), an allegation Gryphon does not mention.  As another, Gryphon ignores the extensive allegations regarding the fact it parted with Sphere's money in connection with the spoofing attacks, breaching its duties as a custodian and which is now the subject of Gryphon's negligence action.  *See id.* ¶¶ 48–54.  Based on these allegations alone, the Court can deny the Motion.

The one allegation Gryphon fights is that it prioritized its own interests over Sphere's, "including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets." *Id.* ¶ 94.  For support, Sphere alleges that "on a monthly basis, Gryphon has reported a substantially higher mining efficiency ratio than Sphere, which would not occur if Gryphon were acting to avoid self-dealing." *Id.* ¶ 47.  Contrary to Gryphon's unsupported assertion, Sphere need not provide more detail to state a claim.

Nor must, as Gryphon argues (at 20), Sphere establish that Gryphon's misconduct was "the only possible explanation" for its injuries by excluding a purported "multitude of other reasons" for "why the mining efficiency ratio for Gryphon might be higher than" Sphere's, a contention antithetical to the Rule 12(b)(6) pleading standard. Accordingly, the Motion must be denied with respect to the fiduciary duty claim.

### III. GRYPHON'S EFFORTS TO DISMISS THE ALLEGATIONS THAT IT IS MISAPPROPRIATING SHERE'S ASSETS ARE WITHOUT MERIT

As a general matter, one of the most basic, commonly articulated theories underlying breach of contract claims is that a counterparty failed to pay what was due under the contract. Sphere's FAC includes such well-trod allegations in support of its breach of contract claim (Count I), namely, that Gryphon has not paid Sphere what it is due on the MSA. FAC ¶¶ 4, 38. Sphere, in its FAC, termed the failure to make the payments "skimming" and "stealing." *Id*. Gryphon concedes that Sphere's breach of contract claim is properly pleaded but incorrectly claims (at 16) that, because Sphere used those words, these commonplace nonpayment allegations are now subject to dismissal under the heightened pleading standards of Rule 9(b).

Initially, as many courts hold, "[a] party advancing a breach of contract claim need not satisfy the particularity requirement of Rule 9(b)." *Murray Eng'g P.C. v. Remke*, 2018 WL 3773991, at *6 (S.D.N.Y. Aug. 9, 2018). But even if Rule 9(b) could be applied to breach of contract claims, that would still be irrelevant because courts generally look to the "gravamen" of a claim before applying Rule 9(b), and the gravamen of Sphere's breach of contract claim is not Gryphon's theft, but Gryphon's persistent failure to provide management services consistent with the MSA. *See Citigroup Mortg. Loan Tr. 2007-AMC3 ex rel. U.S. Bank, Nat. Ass'n v. Citigroup Glob. Markets Realty Corp.*, 2014 WL 1329165, at *4 (S.D.N.Y. Mar. 31, 2014). Sphere's breach of contract claim is "therefore not the type of fraud-based claim that necessitates the heightened

pleading standard of Rule 9(b)." *Id.* Because Sphere seeks a "cognizable remedy on a traditional breach of contract claim that does not sound in fraud," Rule 9(b) does not apply. *Id.* Gryphon's cases are distinguishable, as they involved claims where the gravamen was fraud and thus Rule 9(b) applied. *See* Mot. at 16–17.

And even if the nonpayment allegations were isolated and subjected to the Rule 9(b) standard, the allegations are sufficiently particularized. Gryphon claims that Sphere relies exclusively on "information and belief" and fails to specify what was stolen (at 16), which is incorrect. As alleged in the FAC, "since Sphere filed this lawsuit, Gryphon has dropped the pretense and is holding Sphere's digital assets while refusing to sell them in accordance with Sphere's instructions. Gryphon has even sold Sphere's digital assets and simply retained the proceeds (tens of thousands of dollars), treating the funds as its own." FAC ¶ 39. There can be no dispute that the allegations of theft are sufficiently particularized and provides sufficient notice of what is being alleged under Rule 9(b).

## CONCLUSION

Because Sphere has plausibly alleged each of the elements of its claims, Gryphon's meritless Motion should be denied.

Dated:  September 8, 2023
        New York, NY

                                        **DONTZIN NAGY & FLEISSIG LLP**

                                        *Gregory N. Wolfe*
                                        _____
                                        Tibor L. Nagy, Jr.
                                        Gregory N. Wolfe
                                        David Moosmann (*pro hac vice*
                                        forthcoming)
                                        tibor@dnfllp.com

greg@dnfllp.com
dmoosmann@dnfllp.com
980 Madison Avenue
New York, NY 10075
(212) 717-2900

*Attorneys for Sphere*