**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SPHERE 3D CORP.,

                    *Plaintiff*,

        v.

GRYPHON DIGITAL MINING, INC.,

                    *Defendant*.

Case No. 23-cv-02954 (PKC)

**<u>Jury Trial Demanded</u>**

**<u>SECOND AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

PARTIES ................................................................................................................... 9

JURISDICTION & VENUE ....................................................................................... 10

FACTUAL ALLEGATIONS ........................................................................................ 10

I.      BACKGROUND ON CRYPTOCURRENCY MINING ................................................. 10

II.     IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND CRYPTOCURRENCY-RELATED OPERATIONS" ....................................................... 11

III.    THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT MANAGEMENT SERVICES, IN BREACH OF THE MSA ......................................... 12

IV.     GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL ASSETS, IN BREACH OF THE MSA ................................................................. 13

V.      GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH OF ITS FIDUCIARY DUTIES ......................................................................... 14

VI.     GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE LAW    17

        A.    Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry Standard Procedures For Transferring Bitcoin ................................................. 17

        B.    Gryphon Lacks Industry Standard Internal Controls And Policies And Procedures, In Violation Of The MSA And Almost Certainly In Violation Of Applicable Law ............................................................................................. 18

VII.    IN AN EFFORT TO COW SPHERE AND DISSUADE IT FROM EXPOSING GRYPHON'S NUMEROUS BREACHES, GRYPHON HAS BASELESSLY SOUGHT TO THREATEN SPHERE WITH MANUFACTURED BREACHES ................................................................. 21

VIII.   SINCE SPHERE FILED THIS LAWSUIT, GRYPHON HAS RETALIATED BY REFUSING TO TRANSFER THE PROCEEDS OF THE SALES OF SPHERE'S DIGITAL ASSETS TO SPHERE ...... 22

IX.     SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES .......... 25

X.      AFTER SPHERE FILED THIS LAWSUIT, GRYPHON ASSERTED MERITLESS DEFAMATION
        CLAIMS DESIGNED TO PUNISH SPHERE FOR BRINGING THIS LAWSUIT ............................ 26

**CAUSES OF ACTION** ............................................................................................................ 28

**PRAYER FOR RELIEF**........................................................................................................... 31

Plaintiff Sphere 3D Corp. ("Sphere"), by and through its undersigned attorneys, respectfully submits this Amended Complaint against defendant Gryphon Digital Mining, Inc. ("Gryphon").

## PRELIMINARY STATEMENT

1.      This is an action for breach of contract and breach of fiduciary duty.  Sphere and Gryphon are in the business of digital asset mining—*i.e.*, using computers referred to as "miners" to earn bitcoin and bitcoin-related transaction fees.  In contemplation of a potential merger that ultimately fell through, the parties entered into a Master Services Agreement dated August 19, 2021 (the "MSA," attached as Exhibit 1), as subsequently amended on December 29, 2021 (the "MSA Amendment," attached as Exhibit 2).  Under the MSA, Gryphon (among other things) undertook an obligation to be the "exclusive provider of any and all management services for" Sphere's "blockchain and cryptocurrency-related operations" and the custodian of certain of Sphere's digital assets.  MSA at 1.  In return, Sphere promised to pay Gryphon an exorbitant management fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations" (the "Management Fee").  *Id.*  Separate from the contract, Gryphon's power over Sphere and its status as custodian of Sphere's digital assets and miners gave rise to fiduciary duties, including the duty of loyalty, including to avoid self-dealing, duty of care, and duty of good faith.

2.      For over a year now, the parties' relationship has proven to be completely one-sided: Gryphon has dutifully collected its exorbitant Management Fee while shirking its duties under the MSA and delivering abhorrent management services, causing untold damage to Sphere. Worse still, Gryphon has been skimming off the top (*i.e.*, stealing) from Sphere's assets and, as recent events have revealed, has no internal controls systems or policies and procedures in place,

as needed not only to comply with the MSA, but also applicable law. And Gryphon has breached its fiduciary duties by nakedly prioritizing its own interests over those of Sphere's.

3.      Gryphon's failures under the MSA are persistent, ongoing, uncured despite repeated entreaties from Sphere, and too many to catalogue. In general, Gryphon has been content to sit back and collect millions of dollars in Management Fees while delivering no services whatsoever. When it has delivered services, the results have been appalling. By way of illustration only, Gryphon has refused to find hosting space for Sphere's miners (and instead directed Sphere to undertake the task of finding space itself); allowed Sphere's miners to languish with the U.S. Customs and Border Protection agency ("U.S. Customs") for weeks (a situation Sphere itself ultimately resolved); persistently delayed in setting up and ensuring the operation of Sphere's miners; inexplicably ignored Sphere's instructions to sell its digital assets; failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges; and generally failed to manage relationships with third-parties. The result has been lost revenues for Sphere while Gryphon eats a free lunch.

4.      And, egregiously, Sphere has good reason to believe that Gryphon has been skimming off the top from—in other words, stealing—Sphere's digital assets. Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to provide Sphere with documentation to verify that it is not using or otherwise taking Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit. The only rational reason for such concealment is to make it harder for Sphere to know which assets are mined for its own account— and to detect Gryphon stealing Sphere's assets. Regardless of Gryphon's intent, it is apparent that it has failed to remit all that Sphere is owed.

5.      Recently, Gryphon's gross incompetence has reached a new level that raises substantial concerns about Gryphon's ability to safeguard Sphere's digital assets, the effectiveness of its internal controls, and its compliance with the law.  Gryphon holds itself out as a sophisticated entity and its CEO, Rob Chang, as an "experienced executive" in the crypto-space.  Gryphon and Mr. Chang, however, recently fell for multiple spoofing attacks targeting Sphere's digital assets that would have been avoided had Gryphon had internal controls systems and policies and procedures in place and adhered to applicable law.

6.      On January 27, 2023, at 1:22 p.m., Sphere CFO Kurt Kalbfleisch requested by email that Mr. Chang transfer 18 bitcoin (worth over $400,000) from a wallet controlled by Gryphon to one controlled by Sphere, which was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name: "@sphere3d.com."  Mr. Chang responded that he would initiate the transfer.

7.      At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch, as depicted in the figures below.  The email came from a different domain than the Sphere domain, namely, "@sphere**s**3d.com"[1] (with an added s in the middle), not @sphere3d.com. In the email, the person pretending to be Mr. Kalbfleisch stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address that Sphere had never used.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

---

[1] All emphases have been added unless otherwise noted.

## Re: Coin Transfer

KK   Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com>
To  ◯ Rob Chang
Cc  ◯ Patricia Trompeter

(Fig 1. From/to/cc line reflecting that the email originated from the spoofer with an incorrect domain, @spheres3d.com)

Rob,

Well Noted. I have just been notified that the address below is being audited. So kindly proceed with the transfer of 18 BTC from our "Sphere Mined Coins" wallet to the following address: **bc1qmrykeusq73xd7ad6h2y27mw0fu2e9wcqrfrlvr.**

(Fig. 2.  The relevant portion of the body of the spoofing email containing an implausible request to transfer bitcoin to a new wallet address in light of an audit.)

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

(Fig. 3.  The signature block containing the correct email address.)

8.     This was a transparent spoofing attack in which a third-party was impersonating

Mr. Kalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets.

Even a cursory review of the spoofing email—which did not originate from a Sphere email address,

included the correct email address in the signature block, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags for any competent employee, let alone a supposedly "experienced" executive like Mr. Chang, and prevented any unauthorized transfer. So too would any independent verification of the requestor's identity, such as video or other identity verification.

9.      Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker. Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that Sphere had never used before, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

10.      Not to be outdone, mere days later, on February 1, 2023, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000). Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again). On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company— to realize that he had been fooled by not one, but two, spoofing attacks.

11.      The incident revealed to Sphere the woeful state of Gryphon's internal controls and policies and procedures, which should have prevented the attack. Following the spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide. The failure to include effective internal controls demonstrates not only that Gryphon cannot comply

5

with its duties under the MSA, but also that Gryphon is almost certainly in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs.  Illustratively, Gryphon panicked when Sphere suggested that the incident be reported to law enforcement, including the Federal Bureau of Investigations ("FBI"), insisted that the issue could be handled between the parties, and demanded that no one report the theft to the authorities.  This put the onus on Sphere to report the incident, which it did by filing a suspicious activity report ("SAR") with the Financial Crimes Enforcement Network ("FinCEN").

12.    Gryphon's official version of events raises substantial concerns regarding its ability to rectify any of the issues raised by this litigation—and also its ability to tell the truth.  Gryphon is presently in the process of merging with Akerna Co. ("Akerna"), a publicly-traded cannabis company.  The Form S-4 Registration Statement dated May 11, 2023 for the transaction (the "Gryphon-Akerna Form S-4" or the "Form S-4") describes the spoofing attacks as follows:

> The threat actor requested that the BTC be transferred to an alternate wallet. As a result, 26 BTC, with a value of approximately $560,000 at the time, was transferred to a wallet controlled by the threat actor. Via counsel, Gryphon engaged with US Federal law enforcement to recover the BTC. Despite these attempts by law enforcement to recover the BTC, recovery was not possible. Gryphon subsequently wired the commensurate amount in USD to Sphere 3D to make them whole for the stolen BTC. . . . Sphere 3D made a claim with its insurance carrier. If Sphere 3D's is reimbursed from its insurance carrier, the Company would request a reimbursement from Sphere 3D. The Company has also subsequently modified its control systems to protect against any future attempted incursion.

*See* Gryphon-Akerna Form S-4 at F-76.

13.    The description contains material inaccuracies.  Most glaringly, the assertion that Sphere "made a claim with its insurance carrier" is totally wrong.  On the contrary, as Sphere

explicitly informed Gryphon shortly after the spoofing attacks and long before the filing of the Form S-4, Sphere *did not make a claim with its insurance carrier, as it does not have any insurance that would cover the incident*.  That Gryphon could claim the direct opposite is beyond belief.

14.     In addition, the claim that Gryphon made Sphere "whole" for the theft of approximately $560,000 worth of Sphere's assets omits that Gryphon has demanded that Sphere repay that amount to Gryphon.  And while Gryphon claims it engaged with law enforcement, it has not disclosed any information about that engagement to Sphere—to the contrary, it actively tried to dissuade Sphere from engaging with law enforcement.  Nor has Gryphon disclosed its purportedly updated internal controls to Sphere, despite multiple requests by Sphere.  Finally, the description omits the most salient details, such as that Mr. Chang sent Sphere's digital assets to the "threat actor" on multiple occasions in response to email requests from an email address not associated with Sphere.

15.     There are additional indicia that Gryphon lacks anything resembling effective internal controls.  In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability).  In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere understands that Gryphon, when it goes public, intends to recognize Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.

16.     Beyond the MSA, Gryphon has breached its fiduciary duties.  These fiduciary duties are inherent in nature and arise from, among other places, Gryphon's role as a manager of substantially all of Sphere's business operations (a role akin to an officer or trustee), agent, custodian, investment adviser, and broker-dealer.  They also arise from the unusual trust and confidence Sphere places in Gryphon and the control and dominance Gryphon exerts over Sphere's

operations.  Gryphon has taken the position that Sphere cannot even *attempt* to "create" any "business relationships" with any third-party in the crypto-space unless it obtains Gryphon's approval first.  Gryphon's breaches of fiduciary duty include prioritizing its own proprietary miners and mining pool strategies over Sphere's.  Indeed, Gryphon's miners consistently outperform Sphere's, which would not occur if Gryphon were acting to avoid self-dealing.

17.     The situation has only become more dire since Sphere initiated this litigation on April 7, 2023.  In the ordinary course, Sphere generates substantially all of its revenue by mining for digital assets and those digital assets flow through a wallet controlled by Gryphon.  In the ordinary course, Gryphon is required to remit the proceeds from sales of those digital assets to Sphere.  The MSA specifically provides that Gryphon must honor Sphere's "written instructions . . . with respect to all decisions to sell or hold Digital Assets."  MSA at 3.  The Gryphon-Akerna Form S-4 (at F-55, F-66) likewise acknowledges that Gryphon must "[s]ell and/or transfer the coins at the request of Sphere" and that Sphere "retains legal ownership of the cryptocurrency" and "has the right to sell, pledge, or transfer the cryptocurrency."

18.     Since Sphere initiated this lawsuit, however, Gryphon has taken the position, for the first time in the history of the parties' relationship, it need *not* remit the proceeds of Sphere's own digital assets to Sphere and has ignored repeated instructions to sell assets.  Gryphon has offered no viable justification for failing to do so.  To the contrary, it has communicated that it is trying to put Sphere in a position where Sphere cannot meet its ordinary course obligations and where it cannot pay for the expenses and costs associated with this litigation so that it will be forced to capitulate.  Indeed, Gryphon has communicated that it will resume selling Sphere's digital assets and remitting the proceeds to Sphere if Sphere drops this lawsuit.  Sphere, however, will not give into this extortionate behavior.

19.     It is apparent that Gryphon is incapable of addressing its issues and performing under the MSA, both because the breaches are incurable and because Gryphon is simply unwilling to remedy its breaches.  Confirming as much, since Sphere filed its lawsuit, Gryphon has denied breaching any of its obligations.  Incredibly, it has denied that Sphere has given it sufficient specificity to know what its material breaches of the MSA are.  It has done so *even though Gryphon has conceded that Sphere's breach claims are sufficient to state a claim and thus inherently gave it reasonable notice of the allegations against it.*

20.     Accordingly, by this lawsuit, Sphere brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and for breach of fiduciary duty to seek redress for the millions of dollars in damage Gryphon's misconduct has caused, as well as to recover its attorney's fees and costs under the MSA.

## PARTIES

21.     Sphere 3D Corp. is a bitcoin mining company incorporated in Ontario, Canada, with its principal place of business in Ontario, Canada.  Unlike many mining companies, Sphere's operations are net carbon neutral.  Sphere is a publicly traded company whose securities have historically been dual listed in Canada and the U.S. and is currently listed for trading in the U.S. on the Nasdaq exchange.

22.     Gryphon Digital Mining, Inc. is a bitcoin mining company with its principal place of business in Las Vegas, Nevada.  In addition to providing management services to Sphere under the MSA, Gryphon utilizes its own mining fleet for its own account.

## JURISDICTION & VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of attorneys' fees and costs and because diversity of citizenship is established.

24.     This Court has jurisdiction over this action pursuant to the forum selection clause of the MSA, which requires that "[a]ll disputes, suits, actions or proceedings relating to" the MSA "be brought solely in the state or federal courts located in the State of New York."  Venue is also proper under the forum selection clause, which provides that: "Each party hereby consents to the exclusive jurisdiction and venue of the State of New York in connection with any such dispute, suit, action or proceeding, and waives any defense of forum non conveniens in connection therewith."

## FACTUAL ALLEGATIONS

### I.     BACKGROUND ON CRYPTOCURRENCY MINING

25.     Sphere is in the business of "mining" for bitcoin.  Mining ensures that the payment network underlying bitcoin functions.  Through mining, companies generate new bitcoin for themselves and earn revenue through transaction fees.  To mine for bitcoin, mining companies use purchased or leased "miners," which are generally sophisticated, high-capacity computers that run programs designed to support the network underlying bitcoin.  Companies may direct their miners to participate in a "mining pool," which aggregates mining power attributable to multiple miners and typically pays out on a pro rata basis based on the company's contribution to the pool.  Not all mining pools are created equal; selecting lucrative mining pools is critical to commercial success in the crypto-space.

26.     Hosting services for miners (*e.g.*, warehouse space, electricity, security, internet access, cooling, and so on) is a core component of digital asset mining.  Digital asset miners often

turn to third parties for hosting services in exchange for fees, which can be among the most significant costs associated with digital asset mining.

27.     Cryptocurrency is stored in an individual's digital "wallet," which is akin to an online bank account.  A wallet is the primary mechanism for managing cryptocurrency balances and allows individuals and organizations to hold and control their cryptocurrency.

## II.   IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND CRYPTOCURRENCY-RELATED OPERATIONS"

28.     On August 19, 2021, Sphere and Gryphon entered into the MSA in contemplation of a merger that never closed.  The MSA was subsequently amended on December 29, 2021.

29.     Under the MSA, Gryphon undertook an obligation to be Sphere's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations."  MSA at 1.  In return, Sphere promised to pay Gryphon a tremendous Management Fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations."  *Id.*  The Management Fee was exorbitant and meant that Sphere could expect commensurate service.

30.     In addition, the MSA made Gryphon a custodian of certain of Sphere's digital assets, which it maintains in a wallet.  *Id.*  The MSA also required Gryphon to sell Sphere's digital assets upon Sphere's "instruction."  *Id.*

31.     The MSA further required that Gryphon perform its services "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services" and not engage in "gross negligence, fraud or willful misconduct in connection with performing the Services."  MSA Amendment § 2.a.

32.     Finally, the MSA contains a prevailing party provision.  *See* MSA at 3.

### III. THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT MANAGEMENT SERVICES, IN BREACH OF THE MSA

33.     Although the MSA required Gryphon to be the "exclusive provider of any and all management services" and to perform its duties "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services," Gryphon has completely and absolutely shirked its duties, with disastrous consequences for Sphere.  MSA at 1.  Often, Gryphon simply provides no services whatsoever—and expects to collect a Management Fee for the privilege of sitting on its hands.  When it does provide "management services," it provides abhorrent services, far below those generally recognized in the crypto-mining industry.

34.     By way of example, when Sphere needed hosting space in 2022 (a perquisite to turning on its miners and generating money), Gryphon refused to find hosting space and instead directed Sphere to find such space on its own.  Delays in finding hosting space meant that Sphere could not run its miners, costing it money.  Moreover, Sphere had to expend its own efforts to find such hosting space.

35.     As another example, in 2022, Sphere ordered certain miners from overseas for delivery into the United States.  The miners, however, were seized and held by U.S. Customs. Obtaining their release was simply a matter of providing U.S. Customs with certain manufacturing information, which would have informed U.S. Customs that no additional fees were due.  Despite repeated pleas from Sphere, however, Gryphon shirked its duties to provide the assistance and information needed to release the miners.  Due to Gryphon's misfeasance, the miners languished in U.S. Customs for weeks, costing Sphere dearly.  Eventually, Sphere secured the release of the miners itself by interfacing with third-parties to provide the information.

36.     As yet another example, Gryphon has inexplicably delayed setting up mining pools, resulting in lost revenue.  It has also outright ignored instructions to sell Sphere's bitcoin on a timely basis. And Gryphon has failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges.  Indeed, Gryphon has generally failed to manage any of Sphere's relationships with third-parties.  It has not had regular calls with mining hosts.  It has not, in a way that is consistent with industry standard, responded to inquiries about why miners are down or acted appropriately to ensure they remain running.  It does not, consistent with industry standard, provide evaluations or recommendations to improve miner efficiency. It failed to file a proof of claim in a pending bankruptcy proceeding in which Sphere has a substantial claim, jeopardizing Sphere's ability to pursue its claim because Gryphon interacted with the debtor on Sphere's behalf.

37.     These examples are part and parcel of a general failure to provide management services consistent with Gryphon's obligations under the MSA throughout the parties' relationship.  And, throughout the parties' relationship, Sphere has raised its concerns to Gryphon over its lack of performance to no avail:  despite repeated entreaties from Sphere, Gryphon has proven incapable of curing its innumerable and persistent breaches of the MSA.

## IV.   GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL ASSETS, IN BREACH OF THE MSA

38.     Even worse than its utter failure to provide management services, upon information and belief, Gryphon has been skimming off the top—effectively stealing money—from Sphere. Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to provide Sphere with documentation to verify that it is not using or otherwise seizing Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit.  For example, it appears that Gryphon is comminglingly its assets with Sphere's, as it refuses to provide Sphere

with bank statements.  The only rational reason for such concealment is to make it harder for Sphere to know which assets are mined for its own account—and to detect Gryphon stealing Sphere's assets.

39.     Since Sphere filed this lawsuit, Gryphon has dropped the pretense and is holding Sphere's digital assets while refusing to sell them in accordance with Sphere's instructions. Gryphon has even sold Sphere's digital assets and simply retained the proceeds (tens of thousands of dollars), treating the funds as its own.

40.     In all events, regardless of Gryphon's intent, it is apparent that it has failed to remit all that Sphere is owed.

## V.    GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH OF ITS FIDUCIARY DUTIES

41.     Separate from the MSA, Gryphon owes fiduciary duties to Sphere, which arise from the unusual amount of trust placed in Gryphon by Sphere, control that Gryphon has over Sphere, and status as a custodian of Sphere's digital assets and miners.  Indeed, as discussed *infra*, Gryphon has taken the position that Sphere cannot even *attempt* to "create" any "business relationships" with any third-party in the crypto-space unless it obtains Gryphon's approval first.

42.     The fiduciary duties Gryphon owes Sphere's are inherent in nature.  By any conception, Gryphon exercises a dominant role and undue influence over Sphere's operations. Indeed, Gryphon's serves as the exclusive manager of Sphere's "blockchain and cryptocurrency-related operations"—*i.e.*, essentially Sphere's business.  As an exclusive manager, Gryphon occupies a relationship akin to an officer or trustee of Sphere's business, classic relationships that give rise to inherent fiduciary duties.

43.     In addition, Gryphon acts as Sphere's agent in managing Sphere's "blockchain and cryptocurrency-related operations"—including in managing Sphere's miner fleet and digital

assets, and in interacting with third-parties—and must act on Sphere's behalf consistent with the fiduciary duties inherent in an agency relationship.

44.     Also, Gryphon acts as a custodian of Sphere's digital assets and miners, including in holding, safekeeping, and selling Sphere's digital assets and in transferring the proceeds therefrom.  Likewise, Gryphon also effectively acts as a broker-dealer and investment advisor for Sphere, including in selling digital assets, transferring the proceeds therefrom, making investments on behalf of Sphere, and determining how Sphere's miners are utilized.  Gryphon must act as a fiduciary consistent with the obligations inherent in a custodial, broker-dealer, and investment adviser relationship.

45.     Even aside from inherent fiduciary duties, the pure dominance Gryphon has over Sphere too gives rise to fiduciary duties, including due to its status as a broker and agent, exercise of discretionary control over Sphere's assets, operations, and investments, veto rights over many of Sphere's operations, superior knowledge of its interactions with Sphere's counterparties—as Gryphon controls those relationships—as well as its superior knowledge of the crypto-market at the time the parties entered into the MSA (or at least so Sphere believed at the time it entered into the MSA).  Indeed, Gryphon often interacts with actual and potential counterparties without informing Sphere or disclosing the contents of its discussions—even when requested.   And when Sphere entered into the MSA, it did so based on Gryphon's representations that it had superior knowledge of and abilities in the crypto-industry, including that Gryphon would be able to negotiate better deals with third-parties, implement better investment strategies, and better manage Sphere's crypto-business.

46.     The terms of the MSA confirm that Gryphon owes fiduciary duties to Sphere. There is no fiduciary duty disclaimer anywhere in the MSA—or in fact any affirmative language

that is even inconsistent with the imposition of a fiduciary duty. Nor is there a waiver of an agency, brokerage relationship, or other relationship that gives rise to inherent fiduciary duties. The barebone MSA (all of three pages, with a one-and-a-half-page amendment) is merely a binding term sheet in contemplation of a more robust agreement that never came to be and is entirely consistent with the imposition of fiduciary duties on Gryphon.

47.     Notwithstanding its clear fiduciary duties, throughout the parties' relationship, Gryphon has prioritized its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets. For example, on a monthly basis, Gryphon has reported a substantially higher mining efficiency ratio than Sphere, which would not occur if Gryphon were acting to avoid self-dealing. And, as noted, Gryphon failed to file a proof of claim in a pending bankruptcy proceeding in which Sphere has a substantial claim, jeopardizing Sphere's ability to pursue its claim because Gryphon interacted with the debtor on Sphere's behalf. At bottom, Gryphon has breached its duties of loyalty, including the duty to avoid self-dealing, the duty of care, and the duty of good faith.

**VI.    GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE LAW**

**A.    Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry Standard Procedures For Transferring Bitcoin**

48.     On January 27, 2023, at 1:22 p.m., Kurt Kalbfleisch, Sphere's Chief Financial Officer and Senior Vice President, requested by email to transfer 18 bitcoin (worth over $400,000) from a wallet controlled by Gryphon to one controlled by Sphere.  Mr. Kalbfleisch provided the wallet address, which he specifically noted was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name:  "@sphere3d.com."

49.     At 1:33 p.m., Mr. Chang responded: "[r]eceived and initiated."

50.     At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch.  The email came from a different domain than the Sphere domain, namely, @sphere**s**3d.com (with an added s in the middle), not @sphere3d.com.  In the email, the person pretending to be Mr. Kalbfleish stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

51.     This was a transparent spoofing attack in which a third-party was impersonating Mr. Kalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets. Even a cursory review of the spoofing email—which did not originate from a Sphere email address, included two different domains within the same email, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags and prevented any unauthorized transfer. So too would any independent verification of the requestor's identity.

52.     Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker.  Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that *Sphere had never used before*, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

53.     Merely days later, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000).  Specifically, on February 1, 2023, the spoofer again emailed Mr. Chang to ask him to transfer 8 bitcoin to his wallet.  Apparently without performing any sort of video or other check (such as a review of the domain name), Mr. Chang sent the eight bitcoin to the spoofer.

54.     Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again).  On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company— to realize that he had been fooled by not one, but two, spoofing attacks.

**B.      Gryphon Lacks Industry Standard Internal Controls And Policies And Procedures, In Violation Of The MSA And Almost Certainly In Violation Of Applicable Law**

55.     Based on the foregoing, it is apparent that Gryphon lacks the internal controls and policies and procedures needed to comply with the MSA.  Had it had such controls and policies and procedures in place, Gryphon would have detected the numerous red flags in the spoofer's emails indicating that they were illegitimate and would not have fallen for any spoofing attack, let alone multiple ones.  Indeed, following the spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide.

56.     The absence of internal controls and policies and procedures strongly suggest that Gryphon is also in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs.  It is apparent, however, that Gryphon has none of these programs in place. The laws Gryphon appears to be in violation of include federal regulations promulgated by FinCEN and various state laws applicable to money transmitters.[2]

57.     Consistent with industry best practices, Sphere advised Gryphon to report the spoofing attack to the appropriate authorities, including the FBI.  When Sphere made the suggestion, Gryphon panicked, stated the issue could be handled between the parties, and demanded that no one report the event.  Upon information and belief, Gryphon did not want to report the theft to the authorities because it was concerned that involvement by a law enforcement agency would lead to the uncovering of Gryphon's violations of the law.  In the same vein, upon knowledge and belief, Gryphon did not file a SAR with FinCEN.

58.     This put the onus on Sphere to report the incident, which it did by filing a SAR with FinCEN.

59.     Gryphon's official version of events raises substantial concerns regarding its ability to rectify any of the many issues Sphere has raised—and also regarding its ability to tell the truth. Gryphon is presently in the process of merger with Akerna, a cannabis company.  The Gryphon-Akerna Form S-4 describes the spoofing attacks as follows:

> The threat actor requested that the BTC be transferred to an alternate wallet. As a result, 26 BTC, with a value of approximately $560,000 at the time, was transferred to a wallet controlled by the threat actor. Via counsel, Gryphon engaged with US Federal law enforcement to

---

[2] *See* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf, at 27.

recover the BTC. Despite these attempts by law enforcement to recover the BTC, recovery was not possible. Gryphon subsequently wired the commensurate amount in USD to Sphere 3D to make them whole for the stolen BTC. . . . Sphere 3D made a claim with its insurance carrier. If Sphere 3D's is reimbursed from its insurance carrier, the Company would request a reimbursement from Sphere 3D. The Company has also subsequently modified its control systems to protect against any future attempted incursion.

*See* Gryphon-Akerna Form S-4 at F-76.

60.     The description contains material inaccuracies.  Most glaringly, the assertion that Sphere "made a claim with its insurance carrier" is totally wrong.  On the contrary, as Sphere explicitly informed Gryphon shortly after the spoofing attacks and long before the filing of the Form S-4, Sphere *did not make a claim with its insurance carrier, as it does not have any insurance that would cover the incident*.  That Gryphon could claim the direct opposite is beyond belief.

61.     In addition, the claim that Gryphon made Sphere "whole" for the theft of approximately $560,000 worth of Sphere's assets omits that Gryphon has demanded that Sphere repay that amount to Gryphon.  And while Gryphon claims it engaged with law enforcement, it has not disclosed any information about that engagement to Sphere.  Nor has Gryphon disclosed its purportedly updated internal controls to Sphere—an apparent concession that its internal controls were inadequate at the time of the spoofing attacks.  Finally, the description omits the most salient details, such as that Mr. Chang sent bitcoin on multiple occasions in response to email requests from an email address not associated with Sphere.

62.     There are additional indications that Gryphon lacks anything resembling effective internal controls.  In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability).  In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere

understands that Gryphon, when it goes public, intends to recognize Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.

**VII.   IN AN EFFORT TO COW SPHERE AND DISSUADE IT FROM EXPOSING GRYPHON'S NUMEROUS BREACHES, GRYPHON HAS BASELESSLY SOUGHT TO THREATEN SPHERE WITH MANUFACTURED BREACHES**

63.    After it came to light that Gryphon had no internal compliance program, Gryphon understood that Sphere could no longer tolerate its abject failure to comply with the MSA and numerous breaches of fiduciary duty since the inception of the parties' relationship.  Gryphon could see the writing on the wall: a lawsuit was coming.  Rather than compensate Sphere for its many breaches, however, Gryphon has taken the opposite tact by attempting to manufacture breaches of the MSA in an effort to cow Sphere into not seeking to enforce its rights in court.

64.    For example, incredibly, Gryphon has claimed that it is *Sphere* that is responsible for Gryphon's inability to detect the spoofing attacks, attacks any competent employee (let alone the CEO of a supposedly sophisticated mining company) should have been able to detect.  Gryphon has conceded that the third-party spoofer was unrelated to Sphere, but nevertheless has sought to blame Sphere, accusing it of lacking sufficient protections over its computer systems.  The allegation is untrue but it gets Gryphon nowhere: even if it were true (and it is not), Gryphon has never identified any provision of the MSA that Sphere purportedly breached.  Spoofing attacks by now have become ubiquitous in the commercial world; the onus was on Gryphon to detect them, which it failed to do.

65.    And, recently, Gryphon has claimed that Sphere cannot even seek to "create," let alone actually enter into, business relationships with any third party in the digital asset industry. To that end, on March 21, 2023, Gryphon sent Sphere a heavy-handed letter (attached as Exhibit 3) in which it accused Sphere of "enter[ing] into, or at a minimum, . . . attempting to enter into, business relationships with various third-party cryptocurrency mining-related service providers."

According to the letter, "[a]ny such conduct, if true, is in direct violation of the" MSA.  The letter further demanded that, *in fewer than 24 hours*, Sphere "provide *any and all documentation* related to its efforts to create business relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any."

66.     The following day, Sphere responded by letter (attached as Exhibit 4) to explain why it was not in breach (although it would consider the issues raised by Gryphon) and, yet again, explain why Gryphon was failing to perform under the MSA.  Demonstrating that the breaches were "drummed up," Gryphon had long been aware of and even blessed many of the contacts it now claimed were breaches.  In any event, as Sphere also explained, Gryphon's allegations (which Sphere is still considering the merits of) had, at most, identified technical breaches that were easily curable and gave rise to no damages.  Certainly, any damages paled in comparison to the harm Gryphon's utter mismanagement and skimming have inflicted on Sphere.

67.     Gryphon has tried to continue manufacturing breaches since Sphere filed this litigation.  For example, after Sphere filed this litigation, Gryphon claimed that Sphere had not provided it with certain contacts at counterparties as it tried to build a case that Sphere was frustrating its ability to perform under the MSA.  The claims were demonstrably false claims, as Sphere provided the contacts long ago.  Indeed, Gryphon had already *interacted* with the contacts before repeatedly insisting that it had not been provided with them.

## VIII.  SINCE SPHERE FILED THIS LAWSUIT, GRYPHON HAS RETALIATED BY REFUSING TO TRANSFER THE PROCEEDS OF THE SALES OF SPHERE'S DIGITAL ASSETS TO SPHERE

68.     The situation has only become more dire since Sphere initiated this litigation on April 7, 2023.  In the ordinary course, Sphere generates substantially all of its revenue by mining for digital assets and those digital assets flow through a wallet controlled by Gryphon.  In the

ordinary course, Gryphon is required to remit the proceeds from sales of those digital assets to Sphere pursuant to Sphere's written instructions.  The MSA specifically provides that Gryphon must honor Sphere's "written instructions . . . with respect to all decisions to sell or hold Digital Assets."  MSA at 3.  The Gryphon-Akerna Form S-4 (at F-55, F-66) likewise acknowledges that Gryphon must "[s]ell and/or transfer the coins at the request of Sphere" and that Sphere "retains legal ownership of the cryptocurrency" and "has the right to sell, pledge, or transfer the cryptocurrency."

69.     Since Sphere initiated this lawsuit, however, Gryphon has taken the position, for the first time in the history of the parties' relationship, it need *not* remit the proceeds resulting from the sales of Sphere's own digital assets to Sphere and has ignored repeated instructions to sell digital assets.  Gryphon has offered no viable justification for failing to do so and its breach goes to the very essence of the MSA.  Its explanations have shifted over time:

70.     For example, Gryphon has claimed that it needs to keep a minimum deposit of over $530,000 before it can release any funds to Sphere—an amount that just so happens to coincide with the amount Gryphon lost in the spoofing attacks and has stated it will seek to recover in this litigation.

71.     Next, Gryphon has claimed that the MSA, in fact, *does not require Gryphon to sell Sphere's digital assets and transfer the proceeds to Sphere upon Sphere's written instruction*. Gryphon has done so by advancing an unreasonable interpretation of the MSA, which provides: "[Sphere] shall provide written instructions to [Gryphon] with respect to all decisions to sell or hold Digital Assets."  MSA at 3.  Although the Form S-4 acknowledges the obvious—that the provision requires Gryphon to honor each and every of Sphere's instructions to sell digital assets and further to transfer the proceeds to Sphere at its request—Gryphon has taken the position that

23

"the MSA simply requires that appropriate requests as contemplated . . . must be in writing; the MSA does not state that if a request is made in writing, it must be adhered to."  The made-for-litigation position is inconsistent with the plain language of the MSA, the obvious intent of the parties, the past practice of the parties, and the position in the Gryphon-Akerna Form S-4 that Sphere "retains legal ownership of the cryptocurrency" and "has the right to sell, pledge, or transfer the cryptocurrency."  Gryphon-Akerna Form S-4 at F-66.

72.     Gryphon has also taken the position that it must pay certain hosting obligations with Sphere's digital assets and that selling Sphere's digital assets will not leave sufficient funds to do so.  The position is contrary to the MSA but also plainly wrong:  the sales requests Sphere has made would leave Gryphon with sufficient funds to pay the hosting obligations, as Sphere has repeatedly made clear.   Sphere has made numerous requests to sell digital assets (*e.g.,* 13 bitcoin one day, 17 another) all of which have been rebuffed.  To support its refusal to sell digital assets on this basis, however, Gryphon has resorted to alchemy:  Gryphon recently treated each of Sphere's individual requests (each of which Gryphon refused to comply with) as cumulative, adding them all together to claim there were insufficient funds to cover the requests.  The requests were clearly not cumulative—and illustrating that there was no confusion from Gryphon, it has continued to refuse to honor any subsequent requests for the sale of Sphere's digital assets, regardless of the size of the request, small or large.  As another example of Gryphon's obfuscation, it has treated what it knows to be non-recurring expenses as recurring expenses to inflate Sphere's expenses and support its baseless position that it need not remit the proceeds of the sale of digital assets to Sphere.

73.     The truth is that, as Gryphon has communicated, it is trying to put Sphere in a position where Sphere cannot meet its ordinary course obligations and where it cannot pay for the

expenses and costs associated with this litigation so that Sphere will be forced to capitulate. Indeed, Gryphon has communicated that it will resume selling Sphere's digital assets and remitting the proceeds to Sphere if Sphere's drops this lawsuit.  Sphere, however, will not give into this extortionate behavior.

## IX.   SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES

74.     It is time for Gryphon to be held to account for its breaches of fiduciary duty, utter failure to perform under the MSA, and apparent inability to cure its breaches, many of which are simply uncurable.   Sphere has provided Gryphon with numerous opportunities to fix its deficiencies, which have only gotten worse with time.  Gryphon's modus operandi is to simply ignore Sphere's requests while collecting its exorbitant management fee—a completely one-sided arrangement that has proved extremely lucrative for Gryphon and deleterious for Sphere.  And the absence of anything resembling internal controls at Gryphon makes clear that Sphere's digital assets are unsafe in Gryphon's hands.

75.     Since Sphere filed this lawsuit, Gryphon has confirmed that is incapable of addressing its issues and performing under the MSA, both because the breaches are incurable and because Gryphon is simply unwilling to remedy its breaches.  Indeed, since Sphere filed its lawsuit, Gryphon has denied breaching any of its obligations.  And incredibly, Gryphon has denied that Sphere has given it sufficient specificity to know what its material breaches of the MSA are.  It has done so *even though Gryphon has conceded that Sphere breach claims are sufficient to state a claim and thus inherently gave it reasonable notice of the allegations against it*.

76.     This is part-and-parcel of Gryphon's general ostrich strategy:  accept exorbitant fees, play dumb regarding what services should be delivered.  What Gryphon should have done to not breach the MSA is obvious.  By way of example only, rather than direct Sphere to find hosting,

Gryphon should have found hosting for Sphere.  Rather than allow Sphere's miners to languish in U.S. Customs, depriving Sphere of millions of dollars in revenue, Gryphon should have provided the information needed to secure their release—which Sphere ultimately had to do itself.  Rather than failing to properly review vendor invoices, Gryphon should have ensured that Sphere is only charged for what is owed.  Rather than falling for transparent spoofing attacks that led Gryphon to part with Sphere's assets, Gryphon should have detected the attack—and should have compensated Sphere for the loss without reservation, instead of asserting that Sphere is responsible and threatening litigation.   Rather than refusing to honor written instructions to sell Sphere's digital assets, Gryphon should comply.

77.    Instead of even attempting to rectify its historical breaches, such as by compensating Sphere for the losses caused, Gryphon has decided to double-down by breaching the MSA further.  Unwilling to be bullied, Sphere pursued its claims.

**X.    AFTER SPHERE FILED THIS LAWSUIT, GRYPHON ASSERTED MERITLESS DEFAMATION CLAIMS DESIGNED TO PUNISH SPHERE FOR BRINGING THIS LAWSUIT**

78.    On April 7, 2023, Sphere issued a press release (the "Press Release") in which it announced the filing of this action and accurately summarized the allegations of the Complaint.[3] The Press Release did not set forth any facts or allegations beyond those set forth in the Complaint.

79.    On August 22, 2023, Gryphon stooped to a new low by initiating frivolous litigation designed to punish Sphere for bringing this lawsuit.

80.    First, Gryphon asserted a meritless defamation claim against Sphere premised solely upon Sphere's issuance of the Press Release and the statements contained therein.  Notably,

---

[3] The Press Release is available at https://sphere3d.gcs-web.com/news-releases/news-release-details/sphere-3d-files-litigation-against-gryphon-digital-mining

Gryphon failed to identify any statement of fact not described in the Complaint, let alone a false statement of fact.

81.    Second, Gryphon took the remarkable step of suing Patricia Trompeter, Sphere's CEO, in her personal capacity.  Gryphon's defamation claim against Ms. Trompeter is premised on Ms. Trompeter tweeting a hyperlink to the Press Release.  Yet again, Gryphon did not even try to identify any statement of fact not described in the Complaint, let alone a false statement of fact.

82.    Gryphon asserted these claims not because they have merit but because they serve its broader strategic aims.  Gryphon knows that the content of the challenged communications is substantially identical to the allegations of Sphere's Complaint.  Rather than fight Sphere's claims on their merits, Gryphon through the use of frivolous defamation claims seeks to force Sphere to expend resources and pressure it to drop this lawsuit.  This is a quintessential strategic litigation against public participation.

83.    While Sphere will not give into Gryphon's sharp tactics, Gryphon's meritless claims have already imposed significant costs.  By way of example, Sphere prepared, as required by this Court's Individual Practices, a pre-motion letter (Dkt. 31) setting forth the multitude of reasons why Gryphon's defamation claims are frivolous.  In doing so, Sphere incurred costs and attorneys' fees that it would not have were it not for Gryphon's bad-faith efforts to snuff out speech it disfavors and retaliate against Sphere.  Because Gryphon has refused to withdraw its groundless claims, Sphere anticipates that it will continue to suffer such damages until Gryphon's groundless claims are dismissed.

### CAUSES OF ACTION

#### COUNT I
#### BREACH OF CONTRACT

84.     Sphere repeats and re-states the allegations above as if fully set forth herein.

85.     This is a claim for breach of contract against Gryphon.

86.     The MSA is an enforceable contract.

87.     Sphere has complied with its obligations under all relevant contracts.

88.     Gryphon has materially breached the MSA, including, without limitation, by failing to provide management services for blockchain and cryptocurrency-related operations at the level required by the MSA, charging Sphere in excess of the proscribed Management Fee, and refusing to honor Sphere's written instructions to sell digital assets.

89.     Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

#### COUNT II
#### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(IN THE ALTERNATIVE TO COUNT I)

90.     Sphere repeats and re-states the allegations above as if fully set forth herein.

91.     This is a claim for breach of the implied covenant of good faith and fair dealing against Gryphon.

92.     The MSA is an enforceable contract.

93.     Sphere has complied with its obligations under all relevant contracts.

94.     Gryphon is in breach of its good faith obligations under the MSA.  For example, the MSA provides that "[Sphere] shall provide written instructions to [Gryphon] with respect to all decisions to sell or hold Digital Assets."  MSA at 3.  To the extent this provision is unclear on its face, the intent and purpose of the provision was that Gryphon would sell digital assets when

instructed to do so and remit the proceeds of such sales to Sphere.  Any other interpretation would frustrate the purpose of the provision and the MSA itself—there is no point to providing written instructions to Gryphon unless they will be honored and unless Gryphon will remit the proceeds of such sales to Sphere.  Indeed, there is no other mechanism for Sphere to receive the proceeds of sales of its own digital assets under the MSA and there is no point to the MSA unless Sphere can actually reap its benefits, namely, revenue.

95.     Gryphon has materially breached its implied obligations.  By refusing to honor instructions to sell digital assets, Gryphon is acting in bad faith and in a way that is frustrating the intent and purpose of the MSA.  Indeed, Gryphon has communicated it is trying to put Sphere in a position where it cannot meet its ordinary course obligations and where it cannot pay for the expenses and costs associated with this litigation so that Sphere will be forced to capitulate.  This smacks of bad faith.

96.     Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

## COUNT III
## BREACH OF FIDUCIARY DUTY

97.     Sphere repeats and re-states the allegations above as if fully set forth herein.

98.     This is a claim for breach of fiduciary duty.

99.     Gryphon owes Sphere fiduciary duties.  Those fiduciary duties are inherent in nature and arise from, among other places, Gryphon's role as a manager of substantially all of Sphere's business operations (a role akin to an officer or trustee), agent, custodian, investment adviser, and broker-dealer.  Those fiduciary duties also arise from the unusual trust and confidence Sphere places in Gryphon and the control and dominance Gryphon exerts over Sphere's operations.  Sphere depended on Gryphon to serve its interests.

100.     Gryphon breached its fiduciary duties by prioritizing its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets.

101.     Gryphon's breach of its fiduciary duty has caused Sphere damage. Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

**COUNT IV**
**NEW YORK'S ANTI-SLAPP STATUTE**

102.     Under New York law, a party to "an action involving public petition and participation . . . may maintain an action, claim, cross claim, or counterclaim to recover damages, including costs and attorney's fees" if a court finds that a defamation claim asserted against it "was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification, or reversal of existing law."  N.Y. Civ. Rights Law § 70-a(1)(a)–(b).

103.     Gryphon's defamation claim involves public petition and participation because it is premised on Sphere's substantially accurate and privileged speech concerning "an issue of public interest"—namely, the institution of proceedings before this Court.

104.     Gryphon's claim was commenced or continued without a substantial basis in fact or law, and could not be supported by a substantial argument for the extension, modification, or reversal of existing law, because the statements set forth in the Press Release and any link to the Press Release were a substantially accurate—and thus absolutely privileged—fair report of a judicial proceeding.

105.     Despite its actual awareness of the accuracy of the statements set forth in the Press Release and the privileged nature of such statements, Gryphon commenced and continued its claim

against Sphere in a transparent attempt to punish Sphere for asserting its rights. Reinforcing Gryphon's bad faith conduct, it has maintained its defamation claim even after Sphere explained the many reasons Gryphon's defamation claim is frivolous and expressly stated that it would not seek its attorney's fees under the anti-SLAAP law if Gryphon dropped the claim. Dkt. 31.

106.    In its anticipated motion to dismiss (or a motion for summary judgment), Sphere will demonstrate that Gryphon's defamation claim lacks any basis in fact or law. Upon grant of that motion, Sphere shall be entitled to recover the costs and fees incurred in defending against Gryphon's meritless claims.

## **PRAYER FOR RELIEF**

WHEREFORE, Sphere respectfully requests that the Court award the following relief:

(1)    All damages to which Sphere is entitled, including, without limitation, compensatory and punitive damages, in an amount to be determined at trial;

(2)    All pre- and post-judgment interest to which Sphere is entitled;

(3)    All costs and expenses to which Sphere is entitled, including, without limitation, attorneys' fees and costs under the MSA and under New York's anti-SLAPP statute; and

(4)    All other such relief as the Court may deem just and proper under the circumstances.

Dated:  September 20, 2023
     New York, NY

         **DONTZIN NAGY & FLEISSIG LLP**

         Tibor L. Nagy, Jr.
         Gregory N. Wolfe
         Maxine Peskens
         Rahul Srinivas (pro hac vice forthcoming)
         David Moosmann (pro hac vice forthcoming)
         980 Madison Avenue
         New York, NY 10075
         Tel: 212-717-2900
         tibor@dnfllp.com
         greg@dnfllp.com
         mpeskens@dnfllp.com
         rsrinivas@dnfllp.com
         dmoosmann@dnfllp.com

         *Counsel for Sphere 3D Corp.*