**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X

SPHERE 3D CORP.,

    *Plaintiff and Counter-Defendant*,

      v.

GRYPHON DIGITAL MINING, INC.,

    *Defendant and Counter-Plaintiff*,

------------------------------------------------------- :

Case No. 1:23-cv-02954

The Hon. Judge P. Kevin Castel

Magistrate Judge Valerie Figueredo

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF**
**GRYPHON DIGITAL MINING, INC.'S AMENDED ANSWER, AFFIRMATIVE DEFENSES,**
**AND FOURTH AMENDED COUNTERCLAIMS**

      Defendant and Counter-Plaintiff GRYPHON DIGITAL MINING, INC. ("Gryphon"), by and through its undersigned counsel, Hogan Lovells US LLP, hereby responds to and answers the Second Amended Complaint filed by Plaintiff and Counter-Defendant SPHERE 3D CORP. ("Sphere"), and alleges the following affirmative defenses and amended counterclaims against Sphere (together with Gryphon, the "Parties"):

**ANSWER**

      1.    Gryphon admits that the Second Amended Complaint purports to assert claims for breach of contract and breach of fiduciary duty but denies that Gryphon has breached any contract with Sphere and denies that Gryphon owes any fiduciary duty or has breached any fiduciary duty. Answering further, Gryphon admits Sphere and Gryphon are in the business of digital asset mining and that Gryphon and Sphere entered into a Master Services Agreement, dated August 19, 2021, and subsequently amended on December 29, 2021 (referred to herein as the "Sphere MSA"), in contemplation of a potential merger of the companies that was not consummated. Answering further, Gryphon states that the document or documents referred to in Paragraph 1 as the "Master Services

1

Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Answering further, the allegation that "Gryphon's power over Sphere and its status as custodian of Sphere's digital assets and miners gave rise to fiduciary duties, including the duty of loyalty and to avoid self-dealing" is a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegation and specifically denies that it has ever owed any fiduciary duty to Sphere. Except as so stated, Gryphon denies the allegations in Paragraph 1.

2.      Gryphon denies the allegations in Paragraph 2.

3.      Gryphon denies the allegations in Paragraph 3.

4.      Gryphon denies the allegations in Paragraph 4.

5.      Gryphon admits only that as a consequence of Sphere's negligence, a third-party hostile threat actor was able to infiltrate Sphere's computer and technology infrastructure, send spoofing emails appearing to emanate from Sphere's email domain while impersonating Sphere's Chief Financial Officer, Kurt Kalbfleisch, and induce Gryphon to send cryptocurrency that was intended to be sent to Sphere to the hostile threat actor's public key address instead. Except as so stated, Gryphon denies the allegations in Paragraph 5.

6.      Gryphon answers Paragraph 6 by stating that the emails described in this paragraph speak for themselves and hereby denies any allegations inconsistent therewith. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 6 that "all Sphere emails have the same domain name," and therefore denies such allegation. Answering further, Gryphon states that throughout the course of its dealings with Sphere, both Mr. Kalbfleisch and Sphere's Chief Executive Officer, Ms. Trompeter, have used and sent e-mails from multiple e-mail addresses and domains. Except as so stated, Gryphon denies the allegations in Paragraph 6.

7.      Gryphon answers Paragraph 7 by stating that the email described in this paragraph and purportedly depicted in Figs. 1-3 speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 7.

8.      Gryphon admits only that the allegations in Paragraph 8 describe a spoofing attack, caused by Sphere's negligence and failure to maintain proper security and control of its own technology and computer infrastructure, by which a third-party hostile threat actor was allowed to impersonate Sphere's CFO, Mr. Kalbfleisch, and induce Gryphon to send digital assets to the hostile threat actor's public key address rather than to a public key address controlled by Sphere. Except as so stated, Gryphon denies the allegations in Paragraph 8.

9.      Gryphon admits only that, as a result of Sphere's negligence and the failure of Sphere's CEO and others at Sphere, including any information security personnel, to recognize the spoofing attack despite being properly copied on the emails at issue, Gryphon was induced to transfer eighteen (18) bitcoin to a public key address controlled by a third-party hostile threat actor. Except as so stated, Gryphon denies the allegations in Paragraph 9.

10.     Gryphon admits only that, as a result of Sphere's negligence and the failure of Sphere's CEO and others at Sphere, including any information security personnel, to recognize the spoofing attack despite being properly copied on the emails at issue, Gryphon was induced to transfer an additional eight (8) bitcoin to a public key address controlled by a third-party hostile threat actor on or about February 1, 2023. Answering further, Gryphon states that the emails described in this paragraph speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 10.

11.     Gryphon admits that following the spoofing attacks, Sphere requested to review certain of Gryphon's policies and procedures. Answering further, Gryphon states that it has established processes, developed in coordination with Sphere, for transferring digital assets to Sphere—and, in fact,

has successfully transferred digital assets to Sphere on numerous occasions pursuant to such processes, without incident. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 11 that Sphere "report[ed] the incident . . . by filing a suspicious activity report ('SAR') with the Financial Crimes Enforcement Network ('FinCEN')," and therefore denies such allegation.[1] Answering further, Gryphon states that it suggested to Sphere that the spoofing attacks be reported to the appropriate law enforcement agencies by one of the parties—as opposed to both parties reporting the attacks— to avoid creating separate reporting tracks. Gryphon denies the remaining allegations in Paragraph 11, and specifically denies that it "panicked" or "demanded that no one report the theft to the authorities."

12.     Gryphon admits only that a proposed merger between itself and Akerna Corp., a publicly-traded technology firm, has been publicly announced. Answering further, Gryphon states that the Form S-4 Registration Statement referenced in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 12.

13.     Gryphon answers Paragraph 13 by stating that the Form S-4 Registration Statement referenced in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 13.

14.     Gryphon answers Paragraph 14 by stating that the Form S-4 Registration Statement referenced in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 14.

---

[1] Gryphon understands that the submission of a Suspicious Activity Report to FinCen is strictly confidential and its disclosure is, upon information and belief, a violation of federal law.

15.      Gryphon admits only that a proposed merger between itself and Akerna Corp., a publicly-traded technology firm, has been publicly announced. Gryphon denies the remaining allegations in Paragraph 15.

16.      Paragraph 16 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon denies the allegations in Paragraph 16.

17.      Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 17 that Sphere "generates substantially all of its revenue by mining for digital assets," and therefore denies such allegation. Answering further, Gryphon admits that, pursuant to the Sphere MSA, digital assets generated by Sphere's cryptocurrency mining machines are, or should be, maintained on a digital wallet operated by Gryphon. Answering further, Gryphon states that the document or documents referred to in Paragraph 17 as the "Master Services Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint, and the Form S-4 Registration Statement referenced in this paragraph, speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 17.

18.      Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs on Sphere's behalf, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover such costs and expenses as they come due. Answering further, Gryphon admits it has informed Sphere that Gryphon, consistent with its obligations under the Sphere MSA, cannot fulfill a request to sell assets in Sphere's digital wallet that would leave the value of the remaining assets in Sphere's digital wallet insufficient to cover amounts due and owing on Sphere's behalf or otherwise render Sphere unable to pay its debts as they become due. Gryphon specifically denies Sphere's allegation in Paragraph 18 that Gryphon has demanded Sphere resolve this litigation as a condition of selling Sphere's digital assets, or that Gryphon has otherwise advised Sphere it will simply resume selling Sphere's digital assets, irrespective of

Sphere's financial condition, if the litigation is resolved. Except as so stated, Gryphon denies the allegations in Paragraph 18.

19.     Gryphon admits that it has denied breaching any obligation under the Sphere MSA or otherwise. Answering further, Gryphon admits that Sphere has failed to provide Gryphon with sufficiently specific factual information concerning Gryphon's purported breaches of the Sphere MSA. Except as so stated, Gryphon denies the allegations in Paragraph 19.

20.     Gryphon denies the allegations in Paragraph 20.

21.     Gryphon admits only that Sphere is a publicly-traded bitcoin mining company listed on the Nasdaq stock exchange. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21, and therefore denies such allegations.

22.     Gryphon admits the allegations in Paragraph 22.

23.     Paragraph 23 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegations in Paragraph 23.

24.     Paragraph 24 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon denies the allegations in Paragraph 24. Further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith.

25.     Gryphon admits the allegations in Paragraph 25

26.     Gryphon admits the allegations in Paragraph 26.

27.     Gryphon admits the allegations in Paragraph 27.

28.     Gryphon admits the allegations in Paragraph 28 and otherwise states that the contents of the Sphere MSA speak for themselves.

29.     Gryphon states that the document or documents referred to in Paragraph 29 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Gryphon specifically denies

the characterization of the management fee set forth in the Sphere MSA as "exorbitant," particularly in light of the fact that this was an agreed-upon fee that was freely negotiated by sophisticated parties and that the Sphere MSA enabled Sphere to transform its business into a bitcoin mining company by leveraging Gryphon's credibility, contacts, and expertise in the crypto-currency mining industry. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation regarding Sphere's "expect[ations]," and therefore denies such allegation. Except as so stated, Gryphon denies the allegations in Paragraph 29.

30.     Gryphon states that the document or documents referred to in Paragraph 30 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 30.

31.     Gryphon states that the document or documents referred to in Paragraph 31 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 31.

32.     Gryphon states that the document or documents referred to in Paragraph 32 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 32.

33.     Gryphon states that the document or documents referred to in Paragraph 33 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 33.

34.     Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and therefore denies the allegations in Paragraph 34.

35.     Gryphon admits its understanding that, in 2022, Sphere ordered mining equipment from overseas for delivery into the United States. Answering further, Gryphon states that although Gryphon knew the mining equipment was ordered, Gryphon had no knowledge of when the equipment would be delivered. Answering further, Gryphon states that by the time Sphere requested assistance from Gryphon, the mining equipment had already been seized by U.S. Customs and Border Protection, leaving little that Gryphon could do at that point to assist Sphere with the release of the equipment. Answering further, Gryphon specifically denies the allegation in Paragraph 35 that it "shirked its duties to provide the assistance and information needed to release the miners" and asserts that Gryphon at all times complied with its obligations under the Sphere MSA. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35, and therefore denies such allegations.

36.     Gryphon denies the allegations in Paragraph 36.

37.     Gryphon denies the allegations in Paragraph 37.

38.     Gryphon denies the allegations in Paragraph 38.

39.     In response to the first sentence in Paragraph 39, Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover Sphere's costs and expenses as they come due. Answering further, Gryphon admits it has informed Sphere that Gryphon, consistent with its obligations under the Sphere MSA, cannot fulfill a request to sell assets in Sphere's digital wallet that would leave the value of the remaining assets in Sphere's digital wallet insufficient to cover amounts due and owing on Sphere's behalf or otherwise leave Sphere

unable to pay its debts as they become due. Except as so stated, Gryphon denies the allegations in the first sentence of Paragraph 39, and denies the remaining allegations in Paragraph 39.

40.     Gryphon denies the allegations in Paragraph 40.

41.     Paragraph 41 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegations of Paragraph 41.

42.     Paragraph 42 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the parties' relationship, including without limitation any role in which Gryphon serves for Sphere and any obligation Gryphon owes to Sphere, is set forth in the Master Services Agreement between Gryphon and Sphere, dated August 19, 2021 (the "Original Sphere MSA"), as subsequently amended on December 29, 2021 (together with the Original Sphere MSA, the "Sphere MSA"), copies of which are purportedly attached as Exhibits 1 and 2, respectively, to the Second Amended Complaint. Answering further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 42.

43.     Paragraph 43 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the parties' relationship, including without limitation any role in which Gryphon serves for Sphere and any obligation Gryphon owes to Sphere, is set forth in the Sphere MSA, a copy of which is purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint. Answering further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 43.

44.     Paragraph 44 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the parties' relationship, including without limitation any role in which Gryphon serves for Sphere and any obligation Gryphon owes to Sphere, is set forth in the

9

Sphere MSA, a copy of which is purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint. Answering further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 44.

45.    The first sentence of Paragraph 45 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegation in the first sentence of Paragraph 45. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 45 that "when Sphere entered into the Sphere MSA, it did so based on Gryphon's representations that it had superior knowledge of and abilities in the crypto-industry, including that Gryphon would be able to negotiate better deals with third-parties, implement better investment strategies, and better manage Sphere's crypto-business," and therefore denies such allegation. Gryphon denies the remaining allegations in paragraph 45.

46.    Paragraph 46 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the document or documents referred to in Paragraph 46 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 46.

47.    Paragraph 47 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegation in Paragraph 47 that Gryphon "has prioritized its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets." Answering further, Gryphon admits that it has reported a higher mining efficiency ratio than Sphere, but denies the allegation in Paragraph 47 that this "would not occur if Gryphon were acting to avoid self-dealing" because there are a multitude of factors that may determine mining efficiency, including

without limitation the type and quality of mining equipment used and how the mining efficiency ratio is calculated. Gryphon denies the allegation that it engaged in "self -dealing." Except as so stated, Gryphon denies the allegations in Paragraph 47.

48. Gryphon answers Paragraph 48 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation that "all Sphere emails have the same domain name," and therefore denies such allegation. Except as so stated, Gryphon denies the allegations in Paragraph 48.

49. Gryphon answers Paragraph 49 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Gryphon denies the allegations in Paragraph 49.

50. Gryphon answers Paragraph 50 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Gryphon denies the allegations in Paragraph 50.

51. Gryphon admits only that, due to Sphere's negligence and failure to maintain proper security and control of its own technology and computer infrastructure, a third-party hostile threat actor was allowed to impersonate Sphere's CFO, Mr. Kalbfleisch, and induce Gryphon to send digital assets to a hostile threat actor's public key address rather than to Sphere, even though Sphere's CEO was copied on all such emails. Except as so stated, Gryphon denies the allegations in Paragraph 51.

52. Gryphon admits only that, as a result of Sphere's negligence, it was induced to transfer eighteen (18) bitcoin to the third-party hostile threat actor's public key address. Except as so stated, Gryphon denies the allegations in Paragraph 52.

53. Gryphon admits only that, as a result of Sphere's negligence, it was induced to transfer an additional eight (8) bitcoin to the third-party hostile threat actor's public key address on or about

February 1, 2023. Answering further, Gryphon states that the emails described in this paragraph speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 53.

54.     Gryphon answers Paragraph 54 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 54.

55.     Gryphon admits that following the spoofing attacks, Sphere requested to review certain of Gryphon's policies and procedures. Answering further, Gryphon states that it has established processes, developed in coordination with Sphere, for transferring digital assets to Sphere—and, in fact, has successfully transferred digital assets to Sphere on several occasions pursuant to such processes, without incident. Except as so stated, Gryphon denies the allegations in Paragraph 55.

56.     Gryphon denies the allegations in Paragraph 56.

57.     Gryphon denies the allegations in Paragraph 57.

58.     Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58, and therefore denies such allegations.

59.     Gryphon admits only that a proposed merger between itself and Akerna Corp., a publicly-traded technology firm, has been publicly announced. Answering further, Gryphon states that the Form S-4 Registration Statement described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 59.

60.     Gryphon answers Paragraph 60 by stating that the Form S-4 Registration Statement described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 60.

61.     Gryphon answers Paragraph 61 by stating that the Form S-4 Registration Statement described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 61.

62.     Gryphon admits that a proposed merger between itself and a publicly-traded technology firm has been publicly announced. Gryphon denies the remaining allegations in Paragraph 62.

63.     Gryphon denies the allegations in Paragraph 63.

64.     Gryphon admits only that it alleges Sphere, as a consequence of Sphere's negligence, allowed a third-party hostile threat actor to infiltrate Sphere's computer and technology infrastructure, send spoofing emails appearing to emanate from Sphere's email domain while impersonating Sphere's CFO, Mr. Kalbfleisch, and induce Gryphon to send cryptocurrency that was intended to be sent to Sphere but instead was sent to the hostile threat actor's public key address. Except as so stated, Gryphon denies the allegations in Paragraph 64.

65.     Gryphon answers Paragraph 65 by stating that the letter described in this paragraph and purportedly attached as Exhibit 3 to the Second Amended Complaint speaks for itself and hereby denies any allegations inconsistent therewith and specifically denies Sphere's characterization of such letter. Except as so stated, Gryphon denies the allegations in Paragraph 65.

66.     Gryphon answers Paragraph 66 by stating that the letter described in this paragraph and purportedly attached as Exhibit 4 to the Second Amended Complaint speaks for itself and hereby denies any allegations inconsistent therewith and specifically denies Sphere's characterization of such letter. Except as so stated, Gryphon denies the allegations in Paragraph 66.

67.     Gryphon admits that it has informed Sphere of its failure to provide Gryphon with the contact information for certain third parties Gryphon understands as performing services relevant to the Sphere MSA, including services the parties agreed Gryphon is obligated to perform under the Sphere

MSA, and that Sphere did not promptly provide such information when requested by Gryphon. Except as so stated, Gryphon denies the allegations in Paragraph 67.

68.    Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 68 that Sphere "generates substantially all of its revenue by mining for digital assets," and therefore denies such allegation. Answering further, Gryphon admits that, pursuant to the Sphere MSA, digital assets generated by Sphere's cryptocurrency mining machines are maintained on a digital wallet operated by Gryphon. Answering further, Gryphon states that the document or documents referred to in Paragraph 68 as the "Master Services Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint, and the Form S4 Registration Statement quoted in this paragraph, speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 68.

69.    Gryphon denies the allegations in Paragraph 69.

70.    Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover Sphere's costs and expenses as they come due. Answering further, Gryphon admits that it has requested Sphere maintain a minimum amount of funds in its digital wallet sufficient to pay Sphere's projected monthly costs, but Gryphon specifically denies that any minimum amounts requested bear any relation to any claim asserted by Gryphon in this action or otherwise; rather, the amounts requested reflect Gryphon's estimate of Sphere's projected near-term costs and expenses arising from its cryptocurrency mining efforts, which Gryphon is obligated to pay on Sphere's behalf from the Digital Wallet, pursuant to the Sphere MSA. Except as so stated, Gryphon denies the allegations in Paragraph 70.

71.    Paragraph 71 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the document or documents referred to in Paragraph 71 as

the "Master Services Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint, the Form S-4 Registration Statement quoted in this paragraph, and the unidentified document or communication quoted in this paragraph, speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 71.

72. Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover Sphere's costs and expenses as they come due. Answering further, Gryphon admits it has informed Sphere that Gryphon, consistent with its obligations under the Sphere MSA, cannot fulfill a request to sell assets in Sphere's Digital Wallet that would leave the value of the remaining assets in Sphere's Digital Wallet, when converted to fiat currency, insufficient to cover amounts due and owing on Sphere's behalf, or otherwise leave Sphere unable to pay its debts as they become due. Answering further, Gryphon states that Sphere's allegations to the contrary are efforts to twist correspondence between the parties that speaks for itself to Sphere's own devices, and are expressly denied. Except as so stated, Gryphon denies the allegations in Paragraph 72.

73. Gryphon denies the allegations in Paragraph 73. Gryphon specifically denies Sphere's allegation in Paragraph 73 that Gryphon has demanded Sphere resolve this litigation as a condition of selling Sphere's digital assets, or that Gryphon has otherwise advised Sphere it will simply resume selling Sphere's digital assets, irrespective of Sphere's financial condition, if the litigation is resolved.

74. Gryphon denies the allegations in Paragraph 74.

75. Gryphon admits that it has denied breaching any obligation under the Sphere MSA or otherwise. Answering further, Gryphon admits that Sphere has failed to provide Gryphon with

sufficiently specific factual information concerning Gryphon's purported breaches of the Sphere MSA.
Except as so stated, Gryphon denies the allegations in Paragraph 75.

76.   Gryphon denies the allegations in Paragraph 76.

77.   Gryphon denies the allegations in Paragraph 77.

78.   Gryphon admits the allegation in Paragraph 78 that "[o]n April 7, 2023, Sphere issued
a press release . . . ." Gryphon denies the remaining allegations in Paragraph 78.

79.   Gryphon denies the allegations in Paragraph 79.

80.   Gryphon has withdrawn its defamation claim against Sphere. Gryphon denies the
remaining allegations in Paragraph 80.

81.   Gryphon has withdrawn its defamation claim against Sphere. against Sphere's Chief
Executive Officer, Patricia Trompeter. Gryphon denies the remaining allegations in Paragraph 81.

82.   Gryphon denies the allegations in Paragraph 82.

83.   Gryphon admits the allegation in Paragraph 83 that Sphere has "prepared" and filed a
"pre-motion letter" which purports to identify bases for dismissal of Gryphon's defamation claim.
Gryphon has now withdrawn its defamation claim against Sphere. Gryphon denies the remaining
allegations in Paragraph 83.

84.   Gryphon incorporates and re-alleges its answers to Paragraphs 1 through 83 of the
Second Amended Complaint as if fully set forth herein.

85.   Paragraph 85 contains a legal conclusion to which no answer is required. To the extent
that an answer may be required, Gryphon admits only that Count I purports to assert a claim for breach
of contract against Gryphon, but Gryphon specifically denies that Gryphon has breached any contract
with Sphere, including without limitation the Sphere MSA, and asserts that Gryphon has complied at
all times with all obligations to Sphere. Gryphon denies the remaining allegations in Paragraph 85.

86.     Paragraph 86 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith.

87.     Gryphon denies the allegations in Paragraph 87, as set forth in more detail in Gryphon's Counterclaims below.

88.     The allegation in Paragraph 88 that Gryphon "has materially breached the Sphere MSA" is a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegation. Gryphon denies the remaining allegations in Paragraph 88.

89.     Paragraph 89 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

90.     Gryphon incorporates and re-alleges its answers to Paragraphs 1 through 83 of the Second Amended Complaint as if fully set forth herein.

91.     Paragraph 91 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon admits only that Count II purports to assert a claim for breach of the implied covenant of good faith and fair dealing against Gryphon, but Gryphon specifically denies that Gryphon has breached any implied covenant, and asserts that Gryphon acted in good faith at all times with respect to all obligations to Sphere. Gryphon denies the remaining allegations in Paragraph 91.

92.     Paragraph 92 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith.

93.     Gryphon denies the allegations in Paragraph 93, as set forth in more detail in Gryphon's Counterclaims below.

94.     Paragraph 94 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

95.     Paragraph 95 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

96.     Paragraph 96 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

97.     Gryphon incorporates and re-alleges its answers to Paragraphs 1 through 83 of the Second Amended Complaint as if fully set forth herein.

98.     Paragraph 98 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon admits only that Count III purports to assert a claim for breach of fiduciary duty against Gryphon, but Gryphon specifically denies that Gryphon has breached any fiduciary duty.  Gryphon denies the remaining allegations in Paragraph 98.

99.     Paragraph 99 contains a legal conclusion to which no answer is required.

100.    Paragraph 100 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

101.    Paragraph 101 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

102.    Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 102.

103.    Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 103.

104.    Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 104.

105.     Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 105.

106.     Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 106.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof or burden going forward not required by law, Gryphon alleges the following affirmative defenses, while reserving the right to amend its affirmative defenses or add affirmative defenses as this case and/or discovery proceeds:

1.     Sphere's Second Amended Complaint fails to state any claim upon which relief may be granted.

2.     Sphere's claim for breach of the implied covenant of good faith and fair dealing is barred because it is duplicative of its claim for breach of contract.

3.     Sphere's claims against Gryphon are extinguished by Sphere's own breaches of the Sphere MSA.

4.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrines of waiver, estoppel, acquiescence, and/or ratification.

5.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrine of unclean hands.

6.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrine of accord and satisfaction.

7.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrine of payment.

8. Sphere's claims against Gryphon are barred, in whole or in part, by Sphere's failure to exercise due care or due diligence and/or failure to act reasonably to protect itself from, or to mitigate, any alleged damages.

9. Sphere's claims against Gryphon are barred, in whole or in part, by Sphere's own negligence.

10. Sphere's claims against Gryphon are barred, in whole or in part, because its claimed damages are speculative, uncertain, and/or not ripe.

11. Sphere fails to allege facts sufficient to entitle Sphere to an award of punitive damages.

12. Sphere's claims against Gryphon are barred, in whole or in part, because the alleged breaches by Gryphon are not material.

13. Sphere's claims against Gryphon are barred, in whole or in part, because Sphere has not suffered any damages as a result of any conduct by Gryphon.

14. Sphere's claims for relief against Gryphon are barred, in whole or in part, because Sphere has waived its right to recover any damages, including specifically punitive damages.

Gryphon reserves its right to amend and supplement its affirmative defenses subject to discovery in this action.

## FOURTH AMENDED COUNTERCLAIMS

For its Counterclaims against Plaintiff and Counterclaim-Defendant SPHERE 3D CORP.

("Sphere"), Defendant and Counterclaim-Plaintiff GRYPHON DIGITAL MINING, INC.

("Gryphon"), by and through its undersigned counsel, Hogan Lovells US LLP, states as follows:

### INTRODUCTION

1.      Gryphon is a privately held bitcoin mining company and industry leader in environmentally responsible bitcoin mining.

2.      Bitcoin is a decentralized digital currency (or "cryptocurrency") that can be stored on and transferred among digital wallets via peer-to-peer transactions.

3.      Bitcoin mining is the process of applying computing power to solve cryptographic problems to produce or "mint" new bitcoins, a process that is "energy intensive."

4.      Bitcoin miners who operate at a large scale typically either operate their own facilities, or contract with a hosting provider who will provide low-cost electricity to power those bitcoin mining computers, and will host and operate those bitcoin mining computers for a fee. Both Sphere and Gryphon contract with hosting providers.

5.      Most bitcoin miners will direct their mining computers to a bitcoin mining pool, which aggregates the bitcoin mining power of various miners together, and pays miners *pro rata* based on a miner's contribution to the overall production of all mining computers participating in the pool.

6.      Sphere is a cryptocurrency mining company.

7.      On or about June 3, 2021, Sphere announced a planned merger with Gryphon, to be closed in Q3 2021.[2]  As a result of the merger, Gryphon and Sphere intended to "set the bar for future

---

[2] Sphere 3D News Release June 3, 2021, *available at* Sphere 3D Corp. Announces Merger Agreement with Gryphon Digital Mining, Inc.

bitcoin mining companies," and were "excited about the developing applications of blockchain technology" and becoming "a major player in its development."[3] Sphere publicly touted Gryphon's "world class expertise" and its "expertise in bitcoin mining" in its own public statements.[4]

8.    On or about August 5, 2021, Sphere announced that it has assumed and executed an agreement pursuant to which it would purchase 60,000 new bitcoin mining machines.[5] Sphere repeatedly touted the anticipated mining capacity it and Gryphon would have following the anticipated merger, resulting from the 60,000 machines Sphere would contribute and the 7,200 machines Gryphon would contribute to the newly formed company.[6]

9.    In anticipation of the eventual merger, on or about August 19, 2021, Gryphon, as provider, and Sphere, as customer, entered into a Master Services Agreement governing the pre-merger relationship between the parties.  On or about December 29, 2021, Gryphon and Sphere entered into Amendment No. 1 to the August 19, 2021 Master Services Agreement (the Amendment and the August 19, 2021 Master Services Agreement are together defined as the "Sphere MSA").[7]

---

[3] Sphere 3D News Release January 12, 2022, *available at* Questions and Answers Regarding Sphere 3D Corp.'s Proposed Merger with Gryphon Digital Mining, Inc. | Sphere3D (gcs-web.com)

[4] Sphere 3D News Release August 20, 2021, *available at* Gryphon and Sphere Announce SPHERE MSA and Agreement to Purchase Additional Carbon Offset Credits Bringing Total to Half a Million Credits | Sphere3D (gcs-web.com), *and* Sphere 3D News Release April 4, 2022, *available at* https://sphere3d.gcs-web.com/news-releases/news-release-details/sphere-3d-corp-and-gryphon-digital-mining-inc-move-forward-after

[5] Sphere 3D News Release August 5, 2021, *available at* Sphere 3D Announces Agreement to Acquire Exclusive Rights for Assignment of Cryptocurrency Mining Assets.

[6] Sphere 3D News Release September 3, 2021, *available at* Sphere 3D Announces Pricing of $192.1 Million Registered Direct Offering Priced At-the-Market to Help Secure the Initial Order of 60,000 Miners ("The 60,000 miners, in combination with the Gryphon Digital Mining's 7200 miners will have a combined capacity of approximately 6.4 Exahash."); Sphere 3D News Release September 21, 2021, *available at* Sphere 3D Secures Order for 60,000 BTC Antminers, One of the Largest Single Orders in Digital Mining Industry History ("In addition, upon the closing of the Gryphon Digital Mining merger, the combined companies will have a total capacity of 6.7 exahash, which is capable of producing in excess of 1,300 bitcoin per month, based on current difficulty rates.").

[7] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the SPHERE MSA.

10.     Pursuant to the Sphere MSA, Gryphon and Sphere agreed that up until closing of the planned merger, Gryphon would serve as the exclusive provider of any and all management services to Sphere for all of its blockchain and cryptocurrency-related operations, which services include, but are not limited to: exclusive control over any and all relevant digital asset wallets and selection of the mining pool and custodians of such digital assets. *See* Sphere MSA at Exclusivity Clause and Commercial Terms Clause. The Parties further agreed that Gryphon would serve as the exclusive provider of services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Sphere. *Id.* at Exclusivity Clause.

11.     The Sphere MSA has been fruitful for both Parties. Under the Sphere MSA, Sphere has benefitted from Gryphon's significant and unique experience, credibility, and expertise in cryptocurrency mining operations, including the "design, implementation and management of additional mining capacity" deployed by Sphere.[8] In exchange, Gryphon has enjoyed the exclusive nature of the agreement between the Parties and has collected a reasonable, specifically negotiated and contractually agreed-upon fee for its services.

12.     On or about September 12, 2021 Gryphon and Sphere secured a hosting services deal with Core Scientific, Inc. ("Core"), a blockchain data center operator.[9]  The deal was governed by a Master Services Agreement (the "Core MSA") executed by Gryphon and Core.  A true and correct copy of the Core MSA is attached hereto as **Exhibit A**. Pursuant to the Core MSA, Gryphon and Core on September 12, 2021, Gryphon and Core entered into an order ("Order #2") pursuant to which Core agreed to provide the infrastructure to host 71,000 Gryphon mining machines. A true and correct copy of Order #2 is attached hereto as **Exhibit B**. Under the terms of the Core MSA, Gryphon was

---

[8] *Supra,* n. 4, *available at* Gryphon and Sphere Announce SPHERE MSA and Agreement to Purchase Additional Carbon Offset Credits Bringing Total to Half a Million Credits | Sphere3D (gcs-web.com).
[9] Sphere 3D News Release October 13, 2021, *available at* Sphere 3D and Gryphon Secure Largest Single Hosting Services Deal in Core Scientific's History.

obligated to deliver all 71,000 machines to Core pursuant to an agreed-upon schedule.  Pursuant to the Sphere MSA, Gryphon and Sphere understood that Sphere's machines would be used to fulfill Order #2.

13.    On or about October 8, 2021, Gryphon and Sphere entered into a Sub-License and Delegation Agreement, pursuant to which Gryphon sub-licensed certain rights and delegated certain obligations under the MSA and Order #2 to Sphere, and Sphere accepted such sub-license of rights and delegation of obligations. On or about December 29, 2021, Gryphon and Sphere entered into Amendment No. 1 to the October 8, 2021 Sub-License and Delegation Agreement (the Amendment and the October 8, 2021 Sub-License and Delegation Agreement are together defined as the "Sub-License Agreement"). A true and correct copy of the Sub-License Agreement is attached hereto as **Exhibit C**.

14.    Pursuant to the Sub-License Agreement, Sphere contractually assumed, among other things, Gryphon's obligation to provide Core with the 71,000 machines contemplated by Order #2. In an October 13, 2021 press release issued by Sphere, Sphere acknowledged that it had assumed this obligation and promised to provide at least 60,000 of those machines. Specifically Sphere stated that the Core agreement would "provide hosting capacity for up to 71,000 state-of-the-art bitcoin mining machines, and furnishes [Sphere] with a world-class partner to host the 60,000 Bitmain S19j Pro miners whose purchase was previously announced by Sphere."

15.    Although Gryphon and Sphere's business relationship has previously been mutually beneficial, in recent months, Sphere has repeatedly and in bad faith breached the Sphere MSA.

16.    Specifically, and despite Gryphon fully and competently performing its obligations under the Sphere MSA at all times, Sphere has repeatedly breached the Sphere MSA by (a) seeking mining hosting services independent of those arranged by Gryphon while rebuffing or ignoring Gryphon's inquiries as to whether Sphere required additional hosting services, (b) directing its

cryptocurrency miners to mining pools that Gryphon did not select and does not manage despite Gryphon maintaining mining pool relationships for Sphere's miners as part of Gryphon's exclusive services under the Sphere MSA, (c) creating its own digital wallets to receive proceeds of its mining efforts despite agreeing under the Sphere MSA that Gryphon has the exclusive right to manage digital wallets on Sphere's behalf, (d) actually receiving proceeds of cryptocurrency mining through those independently maintained and operated digital wallets without using Gryphon's choice of custodian in violation of the Sphere MSA, and (e) failing to pay Gryphon management fees for its cryptocurrency-related operations.

17.    In other words, Sphere has flagrantly violated the exclusivity provision of the Sphere MSA and other express obligations under the Sphere MSA, engaged in conduct that stymies and frustrates Gryphon's ability to provide the Services required under the Sphere MSA, and engaged in conduct that ultimately circumvents the fees that would be rightfully due and owing to Gryphon under the Sphere MSA.

18.    Moreover, Sphere has breached the Sphere MSA by failing to deliver the 71,000 mining machines to Core, despite its assumption of the obligation under Order #2. As a result of this breach, Gryphon suffered losses including, but not limited to, loss of the value of the MSA, lost profits, loss of business opportunities, and losses associated with litigation against Core.

19.    Sphere also acted negligently by allowing a hostile threat actor to infiltrate its computer systems and information technology infrastructure, failing to detect or intercept spoofing emails appearing to be sent from Sphere's email domain which copied Sphere's CEO, and failing to detect or intercept the emails sent by threat actors (and before that, the presence of a threat actor in Sphere's systems) before such threat actors impersonated Sphere and induced Gryphon to send a material amount of bitcoin intended to be paid to Sphere pursuant to the Sphere MSA to the threat actor's bitcoin public key address (the "Data Security Incident").

20.     In the aftermath of the Data Security Incident, and despite Gryphon's repeated inquiries and demands, upon information and belief, Sphere has taken no action to remediate the Data Security Incident or to secure its email servers, email accounts, or other impacted computer systems and information technology infrastructure, thereby subjecting Gryphon and all of Sphere's other commercial partners to ongoing risk to their own financial well-being and to those commercial partners' own information security infrastructure.

21.     The parties announced termination of the planned merger in early 2022.

## PARTIES

22.     Gryphon is a corporation duly incorporated under the laws of the state of Delaware with its principal place of business located in Las Vegas, Nevada. Gryphon is an industry-leading net carbon neutral bitcoin miner.

23.     Upon information and belief, Plaintiff and Counter-Defendant Sphere is a Canadian corporation with its principal of business located in Toronto, Ontario, Canada. Sphere is a publicly traded company whose shares trade on the NASDAQ. Sphere specializes in industrial-scale cryptocurrency mining operations.

## VENUE AND JURISDICTION

24.     This Court has personal jurisdiction over the Sphere pursuant to the terms of the Sphere MSA, which contains a binding forum selection clause pursuant to which the Parties explicitly "consent to the exclusive jurisdiction of the State of New York in connection with any dispute, suit action or proceeding . . ." and waived "any defense of *forum non conveniens* in connection therewith." *See* Sphere MSA at Governing Law/Jury Waiver/Fee Clause.

25.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391 and the terms of the Sphere MSA which require all actions to be brought in the state or district courts located within the State of New York. *Id.*

## FACTUAL ALLEGATIONS

<u>SPHERE'S BREACHES OF THE SPHERE MSA</u>

26.     In advance of their anticipated merger, Sphere and Gryphon began combining their business operations in 2021 pursuant to the terms of the Sphere MSA.  Shortly after entering into the Sphere MSA, the parties secured the deal with Core governed by the Core MSA. On or about October 13, 2021, Gryphon secured hosting for Sphere's miners with Core Scientific, which Sphere's then-CEO, Peter Tassiopoulos, touted as a "blue chip" and "industry leading hosting partner."[10]

27.     Pursuant to the Core MSA and in light of the Sphere MSA providing Gryphon with access to Sphere's mining machines, Core agreed to provide location hosting services for Gryphon and Sphere's mining machines.  The agreement provided that the parties would subsequently agree to Orders setting forth the number of machines to be hosted by Core. The agreement further provided that Gryphon would be "fully responsible for delivering" the machines required by each order to Core.

28.     Following the execution of Order #2, Sphere assumed certain rights and responsibilities pursuant to the Sub-License Agreement.  Specifically, the agreement provided "Gryphon hereby (i) exclusively sub-licenses to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2. Sphere hereby accepts such sub-license and delegation in all respects."  As evidenced by Sphere's statements to the public, the parties understood this to include the obligation to deliver the machines required by Order #2.

29.     Despite assuming these obligations, Sphere failed to deliver the entirety of the mining machines to Core, thereby breaching its obligations under the Sublicense Agreement.

---

[10] Sphere 3D News Release October 13, 2021, *available at* Sphere 3D and Gryphon Secure  Largest Single Hosting Services Deal in Core Scientific's History | Sphere3D (gcs-web.com)

30.     Moreover, pursuant to the Sphere MSA, Sphere agreed that Gryphon "shall at all times control the digital wallet, which shall be a wallet address selected by Gryphon on behalf of Sphere for storing digital assets (the 'Digital Wallet'). The digital assets shall be in the denomination of cryptocurrencies, virtual currencies or coins mined by [Gryphon] for or on behalf of [Sphere] at any location whatsoever (the 'Digital Assets')." *Id.* at Commercial Terms Clause.

31.     Under the Sphere MSA, Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *Id.*

32.     The Sphere MSA provides that Gryphon "shall at all times select the mining pool and custodian of the Digital Assets." *Id.*

33.     As consideration for Gryphon's management services, Sphere agreed that "[Gryphon] shall receive the equivalent of twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations (the 'Management Fee')." *Id.* at Management Fee/Operating Costs Clause.

34.     Pursuant to the terms of Sphere MSA, in addition to any damages incurred, Gryphon is entitled to its reasonable attorneys' fees and costs in connection with bringing this action. *See* Sphere MSA at Governing Law/Jury Waiver/Fees Clause.

35.     On or about April 11, 2022, Gryphon's CEO, Rob Chang, contacted Sphere with an offer to help obtain hosting for Sphere's bitcoin miners. Sphere directed Gryphon to "[s]tand by" but did not follow up regarding Mr. Chang's offer.

36.     On June 17, 2022, Gryphon's president, Dan Tolhurst, contacted Sphere to determine whether Sphere needed additional hosting for its bitcoin miners. Sphere stated it did not.

37.     Despite stating that it did not need additional bitcoin miner hosting, on or about August 8, 2022, Sphere entered into an agreement with Compute North, a hosting provider, without the consent, approval, or involvement of Gryphon.

38.     Such relationship is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which the Parties agreed that Gryphon shall serve as the exclusive provider of Services relating to cryptocurrency mining equipment.

39.     Mr. Tolhurst contacted Sphere again on September 30, 2022, but again was told that Sphere did not need additional hosting. Sphere also stated that it was looking to resolve issues directly with Core Scientific.

40.     On November 16, 2022, Gryphon, through its CEO Rob Chang, contacted Sphere and offered to set up a meeting with Foundry Digital, a mining pool operator ("Foundry").

41.     In December 2022, Core Scientific filed for relief under the U.S. Bankruptcy Code.

42.     Thereafter, in December 2022, Gryphon again attempted to obtain new hosting services for Sphere's bitcoin miners.

43.     However, Sphere refused to provide critical information required by Gryphon to enable Gryphon to procure replacement hosting for Sphere's devices, and instead sought to circumvent Gryphon's exclusive right to provide the Services by: (a) seeking alternative hosting independent of Gryphon's control, (b) creating its own digital wallets, (c) attempting to select its own crypto mining pool, and (d) actively concealing, beginning in Spring 2023, its own mining efforts and proceeds to avoid paying Gryphon the Management Fees owed under the Sphere MSA.

44.     On or about December 12, 2022, Sphere entered into a business relationship with US Bitcoin ("USBTC"), a mining hosting provider which at the time managed prior Compute North hosting facilities, without the consent, approval, or involvement of Gryphon.

45.     On March 8, 2023, Mr. Tolhurst contacted Alex Tierney, Sphere's Director of Corporate Development, and inquired regarding Sphere's hosting needs. Sphere did not respond to Mr. Tolhurst's inquiry.

46.     On March 9, 2023, Mr. Tolhurst contacted Kurt Kalbfleisch, Senior Vice President and CFO of Sphere, and further inquired regarding Sphere's hosting needs. Mr. Kalbfleisch indicated that he would speak to Sphere's CEO, Patricia Trompeter, and revert back.

47.     On or about March 10, 2023, Sphere attempted to enter into a business relationship with Foundry without the knowledge, consent, approval, or involvement of Gryphon.

48.     This attempt to create a business relationship with Foundry, a mining pool operator, and to create its own account outside of Gryphon's control, is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment and wherein Gryphon and Sphere agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.*

49.     Moreover, Sphere's attempt to establish its own mining pool accounts with Foundry, without the consent, approval or involvement of Gryphon, would result in higher costs to Sphere because it does not enjoy the same lower cost tier available to Gryphon through the mining pools Gryphon manages; while this would reduce Sphere's profitability, it would also reduce the Management Fee ultimately received by Gryphon.

50.     In response to Gryphon's inquiries concerning Sphere's attempts to establish a mining pool account with Foundry, Sphere has claimed that it did so at the recommendation of Sphere's auditor for purposes of revenue recognition. However, the mere fact that Sphere's attempt to establish an account with Foundry was recommended and/or even demanded by Sphere's auditor does not excuse Sphere's breach of the Sphere MSA. Furthermore, Sphere has failed to engage with Gryphon for purposes of considering alternative solutions concerning its revenue recognition issues.

51.     On March 15, 2023, Mr. Tolhurst followed up with Sphere's CFO, Mr. Kalbfleisch, regarding Mr. Tolhurst's March 9 inquiry regarding Sphere's hosting needs. Sphere did not respond.

52.     On or about March 16, 2023, Sphere entered into an agreement with Lancium Mining, a mining hosting provider, without the knowledge, consent, approval, or involvement of Gryphon.

53.     The Lancium agreement included an expectation to direct the hashrate deployed at Lancium to a mining pool managed by Luxor Technologies as compensation for the introduction of Lancium by Luxor to Sphere.

54.     Such relationship and agreement with Lancium and with Luxor is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment, and wherein Gryphon and Sphere agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.* at Exclusivity Clause and Commercial Terms Clause

55.     On or about March 19, 2023, Sphere entered into a business relationship with Luxor Technologies, a crypto mining pool provider, without the consent, approval or involvement of Gryphon. Without Gryphon's consent or approval, Sphere created an account with Luxor and obtained an account ID.

56.     This relationship is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to Sphere's cryptocurrency mining equipment, and wherein Gryphon and Sphere agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.* at Exclusivity Clause and Commercial Terms Clause.

57.     In furtherance of its improper relationships with Luxor and Foundry (and in breach of the Sphere MSA), Sphere has established Digital Wallets without the consent, approval, or

involvement of Gryphon. On March 21, 2023 Sphere, through its CEO, Patricia Trompeter, admitted to having created a digital wallet for Sphere without the consent or approval of Gryphon. Sphere has not transferred control of that digital wallet to Gryphon and has not paid the Management Fee required to be paid to Gryphon from that digital wallet, as required under the Sphere MSA.

58.     These actions are a material breach of the commercial terms of the Sphere MSA, which give Gryphon exclusive control over Sphere's Digital Wallets, and which specifically grant Gryphon the exclusive power to select the custodian of the Digital Assets. These actions prevent Gryphon from accurately calculating Sphere's operating costs and paying those amounts for Sphere as Gryphon is required to do under the Sphere MSA. These actions further prevent Gryphon from accurately calculating the Management Fee due to be paid to Gryphon.

59.     Gryphon has repeatedly requested from Sphere the information it would require to secure mining hosting services for Sphere but Sphere has repeatedly failed to provide that information to Gryphon. Sphere also refused for months to provide Gryphon with information relating to current hosting providers, only doing so recently, and has continued to refuse to provide Gryphon with authorization to manage those relationships to the current hosting providers as required under the SPHERE MSA.

60.     On March 21, 2023, Gryphon sent a demand letter (the "Demand Letter"), to Sphere, putting Sphere on notice of its breaches of the Sphere MSA and demanding all documentation relating to Sphere's efforts to circumvent the exclusive rights granted to Gryphon by Sphere, including its efforts to create business relationships with third party cryptocurrency-related service providers. A true and correct copy of the Demand Letter is attached hereto as **Exhibit D.**

61.     Sphere has not provided the requested documentation and remains in breach of the Sphere MSA.

62.     Even after filing its lawsuit, Sphere continues to breach the Sphere MSA and to tout its breaches publicly. For example, in its March 2023 Investor Update, Sphere disclosed that it has established a "partnership with Rebel Mining," and that it is "deploying miners to a facility in Missouri for anticipated energization in May."[11] Sphere publicly claims to have entered additional discussions with hosting providers for the placement of over 5,000 cryptocurrency miners.[12]

63.     Subsequent to its receipt of the Demand Letter, Sphere has continued to breach the Sphere MSA and continued to withhold information required by Gryphon to perform the services required of Gryphon under the Sphere MSA.

64.     Sphere has breached the Sphere MSA by directly paying vendors for operating costs associated with mining, the responsibility for which is explicitly charged to Gryphon under the Sphere MSA. Moreover, Sphere has refused to provide Gryphon with certain information relating to the hosting services it has independently (and in breach of the Sphere MSA) sought out and obtained. Such information is necessary for Gryphon to fulfill its obligations under the Sphere MSA relating to management of payments for operating costs.

65.     Specifically, the Sphere MSA provides, in pertinent part, that Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *See* Sphere MSA at Commercial Terms Clause. Consistent with its obligations under the Sphere MSA, Gryphon historically has directly paid invoices for hosting services relating to Sphere's mining operations out of Sphere's Digital Wallet.

---

[11] *See, e.g*., Sphere 3D Corp. Provides Bitcoin Production and Mining Updates for March 2023 | Sphere3D (gcs-web.com)

[12] Sphere 3D News Release March 16, 2023, *available at* Sphere 3D Corp. Provides Bitcoin Production and Mining Updates for February 2023 | Sphere3D (gcs-web.com)

66.    Sphere's independent arrangement of hosting services has and continues to prevent Gryphon from managing payments for such services. Sphere has refused to provide Gryphon with access and contact information relating to these services so that Gryphon can fulfill its obligations under the Sphere MSA. Instead, Sphere insists that it pay these vendors directly. Not only is this a breach of the Sphere MSA, but it has caused delay in payment because for Sphere to pay the vendors directly it has required Gryphon to first sell assets in the Digital Wallet, which requires Gryphon to transfer the cash received for those assets to Gryphon's bank account, then to transfer the cash from Gryphon's bank account to Sphere's bank account, and then finally for Sphere to transfer the cash from Sphere's bank account to the vendor. This unnecessarily convoluted process, which violates the Sphere MSA, creates a payment lag that has resulted in, and continues to pose a risk of, Sphere failing to timely pay invoices (and which poses a risk to Sphere's broader mining operations).

67.    For example, Sphere has admitted to independently establishing hosting agreements with hosting providers, *e.g.*, Lancium and Rebel Mining. Despite multiple requests, Sphere has refused to authorize Rebel to provide Gryphon with authority to make changes concerning the designated addresses of mining pools. Despite multiple requests, Sphere repeatedly refused to provide contact information for Lancium until finally such information was provided to Gryphon on May 16, 2023, and Lancium still has not responded to Gryphon's inquiries because Sphere's CEO, Ms. Trompeter, has not authorized Lancium to do so, notwithstanding the Sphere MSA's requirements. As a result of Sphere's actions and inactions, Gryphon is and/or has been unable to provide the Services required of it by the Sphere MSA. (*See* correspondence attached as **Group Exhibit E**.)

68.    Sphere has likewise continued to act to frustrate Gryphon's ability to perform under the Sphere MSA. Specifically, Sphere has on multiple occasions requested that Gryphon liquidate bitcoin held in the digital wallets managed by Gryphon. Although this is not, in and of itself, a breach of the Sphere MSA, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly

34

pay Sphere's operating costs, the Digital Wallet must maintain adequate value to cover Sphere's costs and expenses as they come due. Although Gryphon has informed Sphere of this necessity, Sphere has repeatedly demanded the sale of assets in the Digital Wallet such that the value of the remaining assets in the Digital Wallet would be insufficient to cover amounts due and owing by Sphere, which Gryphon is supposed to pay on Sphere's behalf. (*See* correspondence attached as **Group Exhibit F**.)

69.     Sphere's refusal to maintain sufficient value in the Digital Wallet prevents payment of Sphere's operating costs as they come due, prevents payment of those costs in a timely manner, and prevents payment to Gryphon of its contractually mandated Management Fee. The result would be Gryphon providing the equivalent of working capital financing to Sphere, which is not required by the Sphere MSA.

70.     These breaches, and the damage they caused Gryphon, have been further compounded by Sphere's creation and use of digital wallets other than the Digital Wallet that Gryphon created for Sphere pursuant to the Sphere MSA. Indeed, on August 14, 2023, Sphere announced its Q2 2023 financial results. (A true and correct copy of Sphere's press release announcing those results is attached hereto as **Exhibit G**.) According to Sphere's own press release, Sphere mined 178.4 Bitcoin in Q2 2023. But only 92.7 Bitcoin was mined using the miners and pools that Gryphon manages for Sphere pursuant to the Sphere MSA. By definition, then, the other 85.7 Bitcoin that Sphere mined in Q2 2023 was directed to pools and addresses not selected by Gryphon, in breach of the Sphere MSA. And Gryphon has therefore lost its right, under the Sphere MSA, to that portion of the Management Fee that would otherwise be due and owing to Gryphon for Sphere's mining of those 85.7 Bitcoin (whose market value as of this filing is $2,514,609.40), all due to Sphere's flagrant breaches of the Sphere MSA, which Sphere has all but admitted in its most recent financial release.

## THE DATA SECURITY INCIDENT

71.     As required under the Sphere MSA, Gryphon and Sphere have developed and relied upon a regular course of dealing whereby the parties request and confirm transfers of cryptocurrency from the Digital Wallets managed by Gryphon to Sphere.

72.     Specifically, Gryphon regularly provides information to Sphere that allows Sphere to understand the Net Operating Profit generated through its cryptocurrency mining operations as managed by Gryphon. From that information, Gryphon calculates the amount owned by Sphere and sends an invoice to Sphere pursuant to the policies and procedures jointly developed by the parties and as required by the first Amendment to the Sphere MSA. Gryphon is required to pay Sphere's operating costs and is required to withdraw its Management Fee from Sphere's Digital Wallet. Thereafter, Gryphon has on several occasions transferred any remaining funds to Sphere by wire or, at Sphere's request, via a bitcoin transfer.

73.     If Sphere has requested a direct transfer of BTC, Gryphon sends the requested amount of digital assets in the Digital Wallets to Sphere, at Sphere's request, according to an established course of dealing. First, Sphere will send an email requesting a transfer. The transfer request will generally include (i) the amount of cryptocurrency to be transferred, and (ii) the public key address of its digital asset wallet (the "Transferee Wallet").

74.     If Sphere requests a transfer into a new Transferee Wallet, Gryphon will take steps to confirm the new Transferee Wallet. Specifically, when a transfer request is made by Sphere requesting that bitcoin be transferred to a new Transferee Wallet, Gryphon will send a *de minimis* test transaction to the Transferee Wallet public key address. The test transaction amount must then be confirmed as received by Sphere via email. Once confirmed, Gryphon then sends the full transfer amount to the Transferee Wallet, less the amount already transferred as part of the test transaction.

For subsequent transactions paid to known Transferee Wallet public key addresses, Gryphon will send the full requested amount without verification or test transactions.

75.    Gryphon and Sphere used the established protocol described herein for six (6) transactions of bitcoin beginning on August 26, 2022 without incident or objection by Sphere at any time before January 27, 2023.

76.    On or about January 27, 2023, however, Gryphon received a transfer request for eighteen (18) bitcoin from the email address belonging to Kurt Kalbfleisch, Senior Vice President and CFO of Sphere (the "First January 27 Request"). The email included all information typically provided to Gryphon by Sphere when requesting a cryptocurrency transfer, including a request that the eighteen (18) bitcoin be transferred to a known public key address for Sphere's Transferee Wallet. The January 27 Request also copied Ms. Trompeter's Sphere3d.com email address, which is consistent with Sphere's typical practice in transmitting these requests to Gryphon.

77.    Upon receipt of the First January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request and in a response email informed Mr. Kalbfleisch that the transfer would not be completed until January 30, 2023 at the earliest.

78.    On the same day and within the same email chain, Mr. Chang received a second email from what appeared to be Mr. Kalbfleisch's email address. The email stated that the previously-provided public key address for Sphere's Transferee Wallet was under audit and requested that the bitcoin be transferred to a different Transferee Wallet public key address (the "Second January 27 Request"). Sphere's CEO, Ms. Trompeter, was copied on this email via her correct email address.

79.    Upon receiving the Second January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request that the bitcoin be transferred to a different Transferee Wallet public key address and consistent with established practice, responded that the request required verification of the new address.

80.     On January 30, 2023, Gryphon sent a *de minimis* test transaction (0.0001 bitcoin) to the new Transferee Wallet public key address identified in the Second January 27 Request. After the bitcoin was transferred, Mr. Chang sent an email to the email address appearing to be Mr. Kalbfleisch's [Sphere3d.com](Sphere3d.com) email address from which the Second January 27 Request was sent, stating that the *de minimis* test transaction was complete and requesting that Sphere confirm receipt of the test transaction. Sphere's CEO, Ms. Trompeter, was copied on Mr. Chang's email via her correct email address.

81.     Shortly thereafter, Mr. Chang received an email response from what appeared to be Mr. Kalbfleisch's email address confirming that Sphere received the test transaction and requesting the full amount of the transfer request be sent. Ms. Trompeter was copied on the response email confirming Sphere's receipt of the test transaction at her correct email address, again consistent with Sphere's practice in communicating such confirmations to Gryphon.

82.     After receiving confirmation of the test transaction and the request that the full amount be transferred, Gryphon sent the remainder of the requested transfer amount (17.9999 bitcoin) on January 31, 2023, to the new Transferee Wallet public key address identified in the Second January 27 Request.

83.     On February 1, 2023, Gryphon received an email from what appeared to be Mr. Kalbfleisch's email address requesting the transfer of an additional eight (8) bitcoin to the new Transferee Wallet public key address (the "February 1 Request"). Once again, Ms. Trompeter was copied on this email via her correct email address. Later that day, Gryphon received another email from what appeared to be Mr. Kalbfleisch's email address inquiring about the status of the requested transfer. Ms. Trompeter was copied on this email via her correct email address.

84. Gryphon, through Mr. Chang, responded to the email from what appeared to be Mr. Kalbfleisch's email address stating the transfer request was being processed. Ms. Trompeter was copied on Mr. Chang's response via her correct email address.

85. On February 1, 2023, Gryphon transferred eight (8) bitcoin to the new Transferee Wallet public key address.

86. A true and correct copy of the email correspondence regarding the transfers described herein are attached hereto as **Group Exhibit H.** In total, Gryphon transferred twenty-six (26) bitcoin to the new Transferee Wallet public key address provided in the Second January 27 Request via three separate bitcoin transactions.

87. On or about February 2, 2023, Gryphon was informed that Sphere never received the bitcoin transactions sent by Gryphon. After examination, Gryphon discovered that emails sent from what appeared to be Mr. Kalbfleisch's email address, beginning with the Second January 27 Request, were compromised when sent by Sphere to Gryphon; those emails came from a spoofed domain impersonating Sphere's domain. As such, the transfers of bitcoin were sent to a digital asset wallet address with no apparent affiliation to Sphere. Mr. Kalbfleisch's email was compromised as a result of the Data Security Incident in Sphere's systems; upon information and belief, Mr. Kalbfleisch's email was compromised due to Sphere's failure to implement proper security and controls over its computer systems, including its executives' email accounts and email server, and its failure to detect the compromise when a threat actor was actively diverting Gryphon's funds, despite Sphere's CEO, Ms. Trompeter, being copied on and privy to all relevant communications. *See* **Group Exhibit H**.

88. Unlike Mr. Kalbfleisch's email address, Ms. Trompeter's email address was not spoofed on the Second January 27 Request or any subsequent correspondence with Gryphon, including the February 1 Request; Ms. Trompeter was copied to her Sphere3d.com email address on all correspondence between Gryphon and the hostile actor spoofing Mr. Kalbfleisch's email. Thus,

Ms. Trompeter—Sphere's CEO—was well-positioned to ascertain and detect her colleague's compromise, but apparently did not do so. *See* **Group Exhibit H**.

89.    In an abundance of caution, in the aftermath of the Data Security Incident, Gryphon engaged an independent third-party forensic investigator to perform a privileged investigation of any potentially impacted systems on Gryphon's part. The investigation revealed that the compromise of Mr. Kalbfleisch's Sphere3d email account was not the result of any intrusion, vulnerability, hostile actor, or lack of proper security or controls over computers, email accounts, or email servers used by Gryphon.

90.    On March 3, 2023, Gryphon and Sphere scheduled a meeting with the documented stipulated purpose of allowing the Parties' respective experts to compare their investigations and findings into the Data Security Incident. In particular, Gryphon indicated in its correspondence to Sphere that it had "completed [its] forensic research and believe[s] it is the right time for our forensic investigators to discuss their findings. Could we please arrange a time for them to connect?" On March 3, Ms. Trompeter, CEO of Sphere, agreed to a meeting including both parties' experts, noting, "[w]e have a forensic review as well." (*See* correspondence attached as **Group Exhibit I**.)

91.    On March 15, 2023, Gryphon and Sphere joined their scheduled call wherein their respective experts were expected to discuss their investigations into the Data Security Incident. Gryphon attended the call with its expert. Sphere, however, did not put forward any expert on the call. Instead, Sphere refused to provide any information to Gryphon, claimed it was undergoing "many investigations" and did not know what investigation Gryphon was referring to, and claimed that its understanding of the purpose and scope of the meeting was that Gryphon would present its own findings without any exchange of information.

92.    Despite multiple requests by Gryphon, Sphere has failed to reschedule a meeting of the parties' respective experts, has failed to provide any information regarding its investigation, and

has failed to provide any evidence that it undertook any investigation into the Data Security Incident at all.

93.     Upon information and belief, the hostile actor that caused the spoofed emails acted through Sphere's computer systems and/or information technology infrastructure and, without adequate investigation and remedial measures, presents a continuing threat to Sphere's ongoing operations, and specifically to Sphere's existing and future commercial partners.

94.     Despite the transfer of bitcoin to the hostile threat actor being the sole fault of Sphere and due to Sphere's negligence alone, in order to attempt to maintain an amicable business relationship with Sphere, Gryphon transferred the U.S. dollar-equivalent value of twenty-six (26) bitcoin, approximately $560,215.53, from a digital wallet of Gryphon's to Sphere via wire transfer on a courtesy basis, reserving Gryphon's rights. Sphere has acknowledged receipt of this transfer.

95.     Despite good faith efforts, including blockchain forensic tracing, Gryphon has been unable to recover the twenty-six (26) bitcoin transferred to the threat actor whose public key address was included in the emails sent to Gryphon, copying Sphere's CEO.

96.     Since the Data Security Incident, Gryphon has discontinued transfers of digital assets to Sphere. Instead, Gryphon makes payments to Sphere in U.S. Dollars via wire transfer.

### UNLAWFUL AND DISPARAGING STATEMENTS
### BY SPHERE AND TROMPETER

97.     Following the Data Security Incident, Sphere and its Chief Executive Officer, Patricia Trompeter, have made unlawful and disparaging statements to third parties concerning Gryphon. In a news release issued on April 7, 2023, Trompeter, acting in her capacity as Sphere's CEO, accused Gryphon of "materially breaching the Master Services Agreement," "put[ting] [Sphere's] assets at significant risk," "willfully violat[ing] [Gryphon's] contractual duties," and "bull[ying] [and]

threaten[ing]" Sphere.[13] After acknowledging that "[c]orporate integrity is essential . . . in [the cryptocurrency] industry," Trompeter further accuses Gryphon of "fail[ing] to act with integrity . . . [and] . . . fail[ing] to honor our contract." Trompeter's statement that Sphere will "hold . . . accountable" and "protect" itself from "the likes of Gryphon," alongside the statement that Gryphon has "failed to act with integrity," is a transparent attempt to improperly associate Gryphon, a well-respected industry leader, with certain high-profile bad actors in the crypto industry whose wrongful conduct has recently come to light.

98.     The false and disparaging statements of Sphere and Trompeter in the April 7, 2023 news release were reported on, quoted, and re-published by various cryptocurrency news media outlets, including without limitation CoinDesk, Cointelegraph, Binance, and Blockchain News, as well as by the broader news media, including without limitation Barron's, Law.com, MarketWatch, Seeking Alpha, and Yahoo! Finance.

99.     Apparently acting in her individual capacity, Trompeter further republished the April 7, 2023 news release containing the false statements on her personal Twitter account.

100.     Despite the serious nature of Sphere's allegations, it did not identify any specific action Gryphon took that it should not have taken, or any specific action Gryphon failed to take but should have, leaving Gryphon incapable of responding meaningfully, let alone determining how it might try to cure any purported breaches.

101.     On April 7, 2023, Sphere initiated this action against Gryphon. Sphere's original Complaint in this action, as well as its later-filed Amended and Second Amended Complaints, lack specific detail concerning Gryphon's purported breaches of the Sphere MSA. *See* ECF Nos. 1, 20, 36. For example, none of these pleadings identifies any specific instance in which Gryphon "refused to

---

[13] Sphere 3D News Release April 7, 2023, *available at* Sphere 3D Files Litigation Against Gryphon Digital Mining | Sphere3D (gcs-web.com)

find hosting space for Sphere's miners" or "delayed in setting up and ensuring the operation of Sphere's miners." *See generally* ECF Nos. 1, 20, 36.

102.     In light of the vague and generic allegations in Sphere's various pleadings, Gryphon made multiple requests to Sphere—both directly and through counsel—asking Sphere to specify exactly how Gryphon allegedly breached the Sphere MSA, and how Gryphon could, in Sphere's view, cure any such breaches, so that Gryphon could review and evaluate such information and attempt to cure, as Gryphon is entitled to do under the Sphere MSA.

103.     For example, Gryphon's Chief Executive Officer, Rob Chang, asked Sphere to provide specific information concerning the nature of Gryphon's purported breaches of the Sphere MSA on at least the following occasions, with Sphere each time failing to respond substantively, if at all:

- May 10, 2023: Gryphon emailed Sphere that Gryphon was "willing to work with [Sphere] to address any perceived shortcomings," but that it was "not at all clear from [Sphere's] various correspondence (or lawsuit, frankly) what Sphere actually thinks Gryphon has done to breach the Sphere MSA," and asking Sphere to "identify, in detail, how [Sphere] thinks Gryphon has purportedly breached the Sphere MSA." (*See* correspondence attached as **Group Exhibit J**.) Sphere did not respond to this email.

- May 23, 2023: After Sphere did not respond, Gryphon emailed Sphere "[f]ollowing up" on Gryphon's May 10, 2023 email. *Id.* Sphere responded by stating Gryphon's response "was clear that [Gryphon] had no intent to undertake any effort at remediation, so [Sphere] [does] not see any need to engage further." *Id.*

- May 24, 2023: Gryphon emailed Sphere reiterating that "[a]ll [Gryphon] [is] asking is for Sphere to identify for Gryphon what, exactly, Gryphon needs to do, in Sphere's

view, to cure any breaches," and informing Sphere that, "[w]ithout that specificity, it is hard to see how [Gryphon] can even attempt to cure." *See id.* Gryphon further asked Sphere "to specifically identify how Sphere believes that Gryphon has purportedly breached the Sphere MSA, so [Gryphon] can attempt to move forward productively," and informed Sphere that, "absent a clear and consistent recitation of how [Gryphon] [has] breached the Sphere MSA, any cure becomes difficult, if not impossible to accomplish." Sphere responded by "refer[ring] [Gryphon] to [its] attorney's correspondence to [Gryphon's] lawyers and [Sphere's] Complaint," and stating that "[i]t is [Gryphon's] job to cure the breaches we identified, not ours." *See id.*

104.    Similarly, Gryphon's counsel sent three separate letters to Sphere's counsel—on June 6, 2023, on June 22, 2023, and on August 1, 2023—each asking Sphere to specify "***exactly what*** Gryphon has allegedly done to breach the Sphere MSA, and as to ***exactly how*** Gryphon can cure those alleged breaches." (*See* correspondence attached as **Group Exhibit K** (all emphasis in original).)

105.    Despite the clear and unambiguous language of the Sphere MSA and the clear requirements of New York law with respect to the Sphere MSA's notice-and-cure provisions, Sphere has ***never*** provided Gryphon sufficient notice of Gryphon's purported breaches of the Sphere MSA. This has made it impossible for Gryphon to exercise its cure rights under the Sphere MSA in response.

106.    Nevertheless, on October 6, 2023, Sphere purported to terminate the Sphere MSA on the basis of its prior correspondence and pleadings in this action. Because Sphere has failed to comply with the Sphere MSA's explicit notice-and-cure provisions, however, Sphere's purported termination is wrongful and ineffective

107.    All conditions precedent to bring these claims have been met, or have been waived, or would be futile to attempt prior to bringing this action.

## COUNT I – BREACH OF THE SPHERE MSA

(Against Counter-Defendant Sphere 3D Corp.)

108.    Gryphon adopts by reference the allegations of Paragraphs 1-107 as if fully stated herein.

109.    Gryphon and Sphere are parties to the Sphere MSA.

110.    The Sphere MSA is a valid and enforceable contract governed by New York law.

111.    Sphere knew it was responsible for delivering the 71,000 mining machines to Core.

112.    Gryphon has fully performed and complied with all of its obligations and duties under the Sphere MSA.

113.    Sphere's conduct, as described herein, constitutes a breach of the Sphere MSA.

114.    Specifically, Sphere has breached its obligations to deliver to Core the 71,000 mining machines.

115.    As a direct and proximate cause of Sphere's breaches, Gryphon has been directly damaged in an amount to be determined at trial, but in all events including but not limited to loss of the value of the MSA, lost profits, loss of business opportunities, and losses associated with litigation against Core.

## COUNT II – BREACH OF THE SPHERE MSA

(Against Counter-Defendant Sphere 3D Corp.)

116.    Gryphon adopts by reference the allegations of Paragraphs 1-107 as if fully stated herein.

117.    Gryphon and Sphere are parties to the Sphere MSA.

118.    The Sphere MSA is a valid and enforceable contract governed by New York law.

119.     Under the Sphere MSA, the Parties agreed that Gryphon shall serve as Sphere's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by [Sphere] and/or its subsidiaries and/or affiliates at any location . . . ." *See* Sphere MSA at Exclusivity Clause.

120.     The Parties further agreed that Gryphon shall "at all times control the digital wallet, which shall be a wallet address selected by [Gryphon] on behalf of [Sphere] for storing digital assets," and shall "at all times select the mining pool and custodian of the Digital Assets." *See* Sphere MSA at Commercial Terms Clause.

121.     The Parties also agreed that Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *See id.*

122.     The Parties further agreed that Sphere could terminate the Sphere MSA under certain conditions "[s]ubject to written notice from [Sphere] and an opportunity by [Gryphon] to cure for a period of up to one hundred eighty (180) days." *See id.*

123.     Gryphon has fully performed and complied with all of its obligations and duties under the Sphere MSA.

124.     Sphere's conduct, as described herein, constitutes a breach of the Sphere MSA.

125.     Specifically, Sphere has materially breached the exclusivity terms of the Sphere MSA by entering into agreements with, potentially among others, Luxor, Foundry, USBTC, Rebel Mining, and Lancium without the consent, approval, or involvement of Gryphon.

126.     Sphere has further materially breached the commercial terms of the Sphere MSA by, among other things, creating and operating its own digital wallets without the consent, approval or involvement of Gryphon.

127.    Sphere has further materially breached the Sphere MSA by collecting amounts believed to be mining proceeds, in the amount of 2.82168614 bitcoin, into its Digital Wallet and failing to remit Management Fees to Gryphon.

128.    Sphere has further materially breached the Sphere MSA by directly paying the operating costs associated with its mining activity rather than allowing Gryphon, as required under the Sphere MSA, to pay such costs and expenses from the Digital Wallet.

129.    Finally, Sphere has materially breached the Sphere MSA by purporting to terminate the Sphere MSA on October 6, 2023 without granting Gryphon its contractually bargained-for rights to sufficient notice of any alleged breaches and a 180-day period to cure those alleged breaches.

130.    As a direct and proximate cause of Sphere's breaches, Gryphon has been directly damaged in an amount to be determined at trial, but in all events in excess of $75,000, exclusive of interest and costs, for its prior breaches of the Sphere MSA, plus at least $10,000,000 for its wrongful purported termination of the Sphere MSA.

## COUNT III – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(Against Counter-Defendant Sphere 3D Corp.)

131.    Gryphon adopts by reference the allegations of Paragraphs 1-107 as if fully stated herein.

132.    Gryphon and Sphere are parties to the Sphere MSA.

133.    The Sphere MSA is a valid and enforceable contract governed by New York law.

134.    Gryphon has fully performed and complied with all of its obligations and duties under the Sphere MSA.

135.    Under New York law, Sphere owes Gryphon an implied duty to act in good faith and conduct itself fairly in connection with the Sphere MSA.

136.    Pursuant to the exclusivity terms of the Sphere MSA, Gryphon is the exclusive provider of any and all management services relating to mining equipment owned, purchased, leased, or otherwise controlled by Sphere.

137.    Despite multiple requests made by Gryphon, Sphere has failed to disclose the number of cryptocurrency miners owned, purchased, leased or otherwise controlled by Sphere.

138.    Despite multiple requests made by Gryphon, Sphere has failed to provide Gryphon with information required for Gryphon to find hosting for Sphere's cryptocurrency miners.

139.    Despite multiple requests made by Gryphon, Sphere has failed to provide Gryphon with certain access and contact information relating to the various hosting facilities that Sphere has, on its own, arranged to host its cryptocurrency miners.

140.    Further, Sphere has refused to provide authorization for Gryphon to manage the relationships it has created with those hosting facilities, which has prevented Gryphon from managing the cryptocurrency miners hosted at those hosting facilities.

141.    Further, Sphere has refused to provide Gryphon with sufficient information to allow Gryphon to pay operating costs incurred by Sphere.

142.    Though the Sphere MSA does not explicitly address Sphere's failure to disclose all this information, Sphere's failure to provide this information to Gryphon has prevented Gryphon from fulfilling its duties under the Sphere MSA, and, as such, frustrated the parties from obtaining the benefit of their bargain under New York law.

143.    Although Sphere's failure to disclose information is not an express breach of the Sphere MSA, it has prevented Gryphon from providing Services as required under the Sphere MSA and therefore deprived Gryphon of the benefits of its bargain under the Sphere MSA.

144.    Sphere's failures to disclose this information thus constitute a breach of the implied covenant of good faith and fair dealing inherent in every contract under New York law.

48

145.    As a direct and proximate cause of Sphere's breach, of the implied covenant of good faith and fair dealing, Gryphon has been damaged in an amount to be determined at trial, but in all events in excess of $75,000, exclusive of interest and costs.

### COUNT IV – NEGLIGENCE

(Against Counter-Defendant Sphere 3D Corp.)

146.    Gryphon adopts by reference the allegations of Paragraphs 1-107, above, as if fully stated herein.

147.    Sphere owed duties to Gryphon to maintain proper security and control of Sphere's computer systems and information technology infrastructure, including its company email accounts and email server, to take proper precautions to protect Gryphon from being targeted by fraudulent activities in connection with Gryphon's business dealings with Sphere, including the transfer of assets under the Sphere MSA, to safeguard information relating to such business dealings and transactions, and to recognize and notify Gryphon of fraudulent activity occurring within Sphere's computer systems and information technology infrastructure.

148.    Sphere knew or should have known that its failure to exercise due care in the performance of the foregoing duties would result in an unreasonable risk of harm to Gryphon.

149.    Sphere knew or should have known of the prevalence of, and industry warnings relating to, business email scams whereby a hostile actor may infiltrate a company's technology systems and impersonate an employee of the company for the purpose of fraudulently inducing a customer or business partner to send the hostile actor money or confidential business or personally identifying information.

150.    Sphere breached each of the aforementioned duties by allowing the email account of its CFO Mr. Kalbfleisch (and potentially other email accounts) to be impersonated or otherwise compromised by an unknown hostile actor in connection with the Data Security Incident.

151.     As a direct and proximate cause of Sphere's negligence, the unknown hostile actor was able to send Gryphon a fraudulent request to transfer of twenty-six (26) bitcoin.

152.     Sphere's CEO, Ms. Trompeter, was copied on all of the emails at issue using her correct email address.

153.     As such, Ms. Trompeter should have identified and notified Gryphon of the hostile actor activity and email compromise.

154.     Despite being copied on the email, Sphere's CEO Ms. Trompeter failed to recognize the hostile actor activity and failed to notify Gryphon that Mr. Kalbfleisch's email was compromised and that the Second January 27 Request and the February 1 Requests were fraudulent.

155.     Despite being copied on the email, Sphere's CEO Ms. Trompeter failed to recognize the hostile actor activity within Sphere's own computer systems and information technology infrastructure and failed to take reasonable steps to address the hostile actor activity within Sphere's own computer systems and information technology infrastructure.

156.     As a direct and proximate cause of Sphere's negligence in connection with the Data Security Incident, including Sphere's CEO Ms. Trompeter's failure to recognize that a hostile actor had impersonated Sphere's CFO, Gryphon was not notified of the hostile actor activity occurring within Sphere's technology systems and that the Second January 27 Request and the February 1 Requests were fraudulent.

157.     As a direct result and proximate cause of Sphere's negligence, Gryphon transferred twenty-six (26) bitcoin to the unknown hostile actor, which it has been unable to recover despite diligent efforts to do so.

158.     Although Sphere claims it has investigated the email compromise, Sphere has refused and failed to provide its own report of its investigation at a meeting arranged by the Parties for that purpose. *Supra*, ¶¶ 85-89. Sphere has subsequently refused multiple requests for the parties to allow

their forensic experts to meet and share their investigative findings, and has refused to share their findings with Gryphon.

159. Despite Gryphon's compliance with the standard procedures that Gryphon and Sphere used for six previous bitcoin transactions, Sphere negligently failed to follow its established course of dealing and standard procedures when requesting a transfer of bitcoin from Gryphon, including by failing to ensure that the transfer of bitcoin was initiated by Sphere personnel and directed into a Sphere controlled account and not by an unknown threat actor impersonating Sphere and diverting Gryphon's funds into unauthorized accounts not affiliated with Sphere.

160. But for Sphere's negligence, Gryphon would not have transferred twenty-six (26) bitcoin from its own digital wallet to one belonging to an unknown hostile actor, and would not have been required to pay the value of those 26 bitcoin to Sphere out of its own assets.

161. As a direct and proximate cause of Sphere's negligence, Gryphon has been damaged in an amount totaling twenty-six (26) bitcoin which had the market value of no less than $560,225.53 at the time of the transfers.

## **PRAYER FOR RELIEF**

WHEREFORE, Gryphon respectfully asks this Court to enter judgment in its favor as follows:

1.   An order dismissing Sphere's Second Amended Complaint in its entirety with prejudice;

2.   On Count I, awarding Gryphon damages, and its reasonable attorneys' fees and costs pursuant to the prevailing party provision of the Sphere MSA (Ex. A, p. 3), in an amount to be determined at trial;

3.   On Count II, awarding Gryphon damages and its reasonable attorneys' fees and costs pursuant to the prevailing party provision of the Sphere MSA (Ex. A, p. 3), in an amount to be determined at trial;

4.   On Count III, awarding Gryphon damages, and its reasonable attorneys' fees and costs  (Ex. A, p. 3), in an amount to be determined at trial

5.   On Count IV, awarding Gryphon damages, including punitive damages, in an amount to be determined at trial;

6.   Any and all other and further relief that the Court deems just and proper.


 Dated: January 17, 2024

> */s/ Dennis H. Tracey*
> Dennis H. Tracey, III
> Allegra M. Bianchini
> HOGAN LOVELLS US LLP
> 390 Madison Avenue
> New York, NY 10017
> T  +1 212 918 3000
> dennis.tracey@hoganlovells.com
> allegra.bianchini@hoganlovells.com
>
> *Attorneys for Defendant*
> *Gryphon Digital Mining, Inc.*