# DONTZIN NAGY & FLEISSIG LLP

31 E 62nd Street, New York, NY 10065 | (212) 717 - 2900

Gregory N. Wolfe
greg@dnfllp.com

**VIA ECF & FEDEX**　　　　　　　　　　　　　　　　　　　　　　　　　　March 29, 2024

Hon. P. Kevin Castel
United States District Court Judge
Southern District of New York
500 Pearl Street, Courtroom 11D
New York, NY 10007

　　　　　　　　Re:　　*Sphere 3D Corp. v. Gryphon Digital Mining, Inc.*, 1:23-cv-02954-PKC

Dear Judge Castel:

　　We represent plaintiff Sphere and write in response to Gryphon's pre-motion letter dated March 25, 2024 (the "Letter") requesting—after a year of litigation—leave to file a motion seeking prejudgment attachment of Sphere's assets under CPLR § 6201 ("§ 6201") on an expedited briefing schedule.[1]  As further detailed below, leave to seek such drastic and disfavored relief should be denied for several reasons:

　　Initially, the Letter's sole basis for seeking prejudgment attachment is Gryphon's claim that Sphere "is a foreign corporation not qualified to do business in the state" under § 6201(1). After it received the Letter, Sphere registered to do business in New York.  *See* Kalbfleisch Decl., Ex. 1.  Doing so eliminated Gryphon's ability to resort to § 6201(1).  *See Gov't Emps. Ins. Co. v. Grody*, 2023 WL 5979206, at *6 (E.D.N.Y. July 24, 2023) (holding that post-motion registration eliminates § 6201(1) as a ground for attachment), *report and recommendation adopted*, 2023 WL 6307340 (E.D.N.Y. Sept. 28, 2023).

　　That ends the matter, but Gryphon cannot meet the other required attachment elements. For example, Gryphon cannot show it is likely to recover $30 million in damages.  As will be shown at trial, and in briefing on the attachment application if necessary, Sphere was permitted to enter into contracts with third-parties both under the express terms of the MSA[2] and independently through discussions with Gryphon.  More salient for these purposes, however, the purported breaches outlined in the Letter are at most technical breaches that might entitle Gryphon to all of $1 in damages if successful.  Gryphon's real complaint—unmentioned in its Letter because it knows it cannot prevail on it—is its claim that Sphere improperly terminated the MSA and ceased payments to Gryphon.  Only proving that could entitle Gryphon to damages beyond the nominal—and nowhere near even the $10 million in damages Gryphon pleaded in its Fourth Amended Counterclaims dated February 1, 2024 (*see* Dkt. 65 ¶ 130), let alone $30 million.  And Sphere's damages on its claims—which are actually grounded in reality—exceed $25 million and, by extension, any credible claim to damages Gryphon may have.

　　Nor can Gryphon credibly claim that Sphere is on the "verge of economic collapse" and at risk of being unable to satisfy a judgment because the "Core Equity Proceeds are likely the only source of payment of a judgment in this case."  Lt. at 1–2.  As reflected on Sphere's balance sheet

---

[1] Capitalized terms have the meanings ascribed in the Letter unless otherwise noted.  The parties are scheduled to appear at the initial pre-trial conference on September 30, 2024.

[2] The MSA and its amendment are available at Dkts. 36-1, 36-2.

included in its 2023 Annual Report, Sphere had as of December 31, 2023 approximately $45 million in assets (*i.e.*, $35 million beyond the value of the Core Equity Proceeds) and $5 million in liabilities, exclusive of common stock and preferred stock convertible into common stock.  Since then, Gryphon has returned an additional $1.2 million in funds to Sphere, an act incongruous with any claim that Gryphon believes Sphere to be on the verge of collapse.  Sphere has taken no loans and has no encumbered assets or no secured debt.  A judgment of even $30 million could be rendered against Sphere tomorrow and it would have the means to pay.

The purported basis for Gryphon's urgent relief is Gryphon's claim that, in its 2023 Annual Report, "Sphere disclosed, for the first time" its "doubt" regarding its "ability to continue as a going concern within the next twelve months."  Ltr at 2.  This is at best disingenuous:  Sphere has included the risk factors cited by Gryphon in its filings for years, including in its 2022 Form 10-K filed *before this litigation began.  See* Kalbfleisch Decl., Exs. 2–5.  And, as detailed in the declaration of Sphere's CFO Kurt Kalbfleisch, Sphere has neither the present intent nor taken steps to declare bankruptcy.  *See id.* ¶ 7.

So, after a year of litigation and months after Sphere received the Core Equity Proceeds, the Court may "question" the sudden urgency for an attachment.  *See Katz Agency, Inc. v. Evening News Ass'n*, 514 F. Supp. 423, 429 n.19 (S.D.N.Y. 1981) ("The Court questions plaintiff's good faith in bringing this motion for attachment sixteen months after it commenced the action, since the only reason advanced in support of the motion was known to it when the action was commenced.").  As Gryphon is well aware because Sphere is publicly traded, Sphere is presently seeking to enter into accretive business transactions; attaching the Core Equity Proceeds would make that more difficult.  Trying to hurt Sphere's business is not a legitimate use of the attachment procedure.

The Court should accordingly deny the relief sought by the Letter.  In the alternative, it should order a rational briefing schedule, as there is no need for urgent relief here.

## I. BACKGROUND

### A. Gryphon Has A History Of Unreasonably Multiplying The Proceedings, Including Through Four Meritless Counterclaims That It Maintained For Months And Voluntarily Dropped Rather Than Even Try To Defend In Court

The Letter is just the latest in a series of filings and actions by Gryphon that have unreasonably multiplied the proceedings and seem calculated to unnecessarily burden Sphere.  As Sphere warned in its initial Complaint filed on April 7, 2023, Gryphon had threatened Sphere with scorched earth litigation and a series of baseless claims "in an effort to cow Sphere" and dissuade it from bringing this lawsuit.  Compl. ¶¶ 47–49.  After that, over the course of four amended complaints, Gryphon made good on its threat by filing five counterclaims.  *See* Dkts. 30, 38, 55, 65.  Although all of the counterclaims were without merit, four were frivolous and purely designed to burden Sphere and even its CEO Patricia Trompeter personally with needless discovery.[3]

---

[3] Gryphon asserted a defamation claim against Ms. Trompeter based on privileged public statements describing this lawsuit.  *See* Dkt. 31.

2

Gryphon's actions here are the best evidence of its intentions: In an effort to winnow the case, Sphere ultimately filed three premotion letters and two motions to dismiss explaining why the four counterclaims were without merit. *See* Dkts. 31, 39, 48–49, 56, 67. Although Sphere stated its intention to file only a partial motion to dismiss, the Court nevertheless imposed a discovery stay on October 27, 2023 pending the resolution of that motion, thereby denying Gryphon the opportunity to conduct discovery on its frivolous counterclaims in the interim. *See* Dkt. 40. Although the motion had not been resolved, Gryphon sought to lift the discovery stay on January 23, 2024, which the Court rejected. *See* Dkts. 63, 68. It was only then that Gryphon, rather than even oppose Sphere's latest pending motion to dismiss, dismissed its counterclaims *with prejudice*.[4] Dkt. 70. Litigants asserting claims in good faith do not continue to maintain them for months in the face of repetitive premotion letters and motions to dismiss and in fact try to seek discovery on them, only to drop them with prejudice once the Court declines to lift a brief discovery stay expected to last only a few months. They especially do not do so where, as here, Sphere has become the prevailing party on those claims, entitling it to recover its attorney's fees, which it intends to do at an appropriate juncture in the case.[5]

Other examples of Gryphon's sharp tactics abound. As detailed in Sphere's action for conversion initiated on March 19, 2024 (the "Conversion Action"), for nearly half a year, Gryphon impermissibly refused to return well over $1 million in Sphere's digital assets that it conceded were rightfully Sphere's. *See Sphere 3D Corp. v. Gryphon Digital Mining, Inc.*, Case No. 1:24-cv-02074 (S.D.N.Y.), Dkt. 1. To try to avoid litigation, Sphere requested—again and again—that its assets be returned; in response, Gryphon contrived increasingly absurd and indefensible excuses for its failure to return the assets. It was only after Sphere filed suit that Gryphon almost immediately returned $1.2 million to Sphere—an act inconsistent with Gryphon's apparent belief that Sphere cannot satisfy a judgment in this case.[6]

### B. Gryphon's Lone Remaining Counterclaim Has Two Components, Only One Of Which Is Addressed In The Letter

Gryphon's sole remaining counterclaim is for breach of the MSA. It, however, has two components. One rests on the MSA's exclusivity provision, under which Gryphon undertook an obligation to be the "exclusive provider of any and all management services for" Sphere's "blockchain and cryptocurrency-related operations." As the Letter details (at 1–2), Gryphon's theory is that Sphere breached this aspect of the counterclaim by purportedly entering into four hosting agreements "without the consent, approval, or involvement of Gryphon." This aspect of

---

[4] Gryphon had dismissed its defamation claims without prejudice on November 7, 2023. Dkt. 47.
[5] *See* MSA at 3 ("If any Claim is brought by any party to enforce its rights under this Agreement against any other party, all fees, costs, and expenses, including, without limitation, attorney's fees and court costs, incurred by the prevailing party regarding such Claim shall be reimbursed by the losing party . . . .").
[6] Sphere is presently evaluating whether to maintain the Conversion Action based upon, among other considerations, (i) Gryphon's impermissible conversion of Sphere's assets from digital assets into U.S. dollars, which Sphere had explicitly instructed Gryphon not to do; (ii) whether Gryphon remitted the correct amount; (iii) Gryphon's failure to compensate Sphere for interest on the proceeds; and (iv) the availability of punitive damages for Gryphon's willful and malicious conduct.

3

the counterclaim has been live since Gryphon filed its initial counterclaims on August 22, 2023. *See* Dkt. 30.

The counterclaim has another component, which rests on Sphere's purported wrongful termination of the MSA on October 6, 2023. This aspect of the counterclaim is unaddressed in the Letter. It is through this aspect of its counterclaim, added for the first time in its First Amended Counterclaims dated October 11, 2023, that Gryphon purports to seek $10 million in damages. *Compare* Dkt. 38 (First Am. Counterclaim) ¶ 125 (alleging that Gryphon suffered "at least $10,000,000 for [Sphere's] wrongful purported termination of the MSA) *with* Dkt. 30 (Initial Counterclaim) ¶ 125 (not including the $10 million number or wrongful termination allegations).

Under the MSA, Gryphon was entitled to receive 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations." MSA at 1. During the life of the MSA, including through the alleged technical breaches of the MSA, Sphere paid that fee. Specifically, the MSA was live for 25 months and Sphere paid Gryphon approximately $1.22 million in fees. Gryphon's apparent theory is that Sphere would have kept paying Gryphon through the term of the contract, which Gryphon argues would have been an additional 35 months. Accordingly, although Sphere paid $1.22 million in fees over the first 25 months of the contract, Gryphon's theory as of the filing of its First Amended Complaint is that Sphere would have paid an additional $10 million over the next 35 months had the MSA remained in effect—a number that has now ballooned to over $30 million despite, according to Gryphon, Sphere's sorry state.

The Fourth Amended Counterclaim dated February 1, 2024, continues to attribute "$10,000,000" in damages to the "wrongful purported termination of the Sphere MSA," *not* the purported breaches of the exclusivity provisions. Dkt. 65 ¶ 130. The theory does not account for the MSA's limitation of liability, which provides: "The parties expressly exclude all consequential, incidental, indirect, special and punitive damages, and loss of profits." MSA at 3.

### C. Following Litigation With Non-Party Core, And Despite Being Hampered By Gryphon, Sphere Obtained The Core Equity Proceeds

In January 2024—months ago—Sphere obtained the Core Equity Proceeds through litigation with non-party Core. Among other things, the gist of the claim against Core was that Sphere provided $35 million in deposits to Core in exchange for hosting services. Core rendered approximately $1 million in services and refused to host Sphere's miners at an agreed-upon hosting rate, including because the cost of hosting had gone up, making the hosting rate less economic for Core. Core filed for bankruptcy in the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and Sphere ultimately settled the case for $10 million in reorganized Core equity—*i.e.*, the Core Equity Proceeds.

A critical problem for Sphere, which hurt its case, was that the relevant contract with Core—known as "Order #2"—had been entered into with Gryphon, leading Core to argue that Sphere was not in direct privity with Core. Gryphon had purported to assign certain rights under Order #2 to Sphere, but had no record that Sphere had actually met the requirements needed for the assignment to be effective under Order #2. Accordingly, Core argued that Sphere was a stranger to Order #2 and that the proper course was for Gryphon to seek recovery of the deposit and remit the proceeds to Sphere.

Further compounding matters, Gryphon had not filed a proof of claim before the bar date on April 14, 2023 in the Core bankruptcy, meaning that even if Gryphon was in fact entitled to recover the deposit (and then remit the money to Sphere), it was barred from doing so.  During a hearing, the Bankruptcy Court expressed shock that Gryphon had not done so, noting that "managers take action all the time that have financial benefits to the folks that they're managing for."  Wolfe Decl., Ex. 1 at 2:14-16.  It was only after Core brought Gryphon into the case in November 2023 by suing Gryphon for, among other things, a declaratory judgment that Core was in fact in privity with Gryphon that Gryphon finally filed a contingent proof of claim on December 15, 2023—long after the passage of the bar date and without any hope of establishing excusable neglect.

### D.  Sphere's Claims Seek In Excess Of $25 Million

Sphere has asserted claims for breach of contract and breach of fiduciary duty.  Sphere seeks to recover from Gryphon the damages associated with Gryphon's failure to file a proof of claim, which impaired its ability to recover from Core.  Those damages, predicated on the deposit alone, are at a minimum approximately $24 million.[7]

Sphere also seeks recovery for, among other things, Gryphon's prioritization of its own interests over Sphere's—which inexplicably led Gryphon's miners to run more efficiently than Sphere's—misappropriation of Sphere's assets, and mismanagement of Sphere's machines.  Although the precise measure of damages awaits discovery, they would come to at least another $1 million on top.

## II.  THE LETTER OFFERS NO BASIS TO ATTACH SPHERE'S ASSETS

Attachment is a "drastic provisional remedy." *J.V.W. Inv. Ltd. v. Kelleher*, 41 A.D.3d 233, 234 (1st Dep't 2007).  Attachment is "strictly construed … in favor of those against whom it may employed" and must be established through competent evidence, not mere allegations or speculation.  *Onewoo Corp. v. Hampshire Brands, Inc.*, 2016 WL 11779677, at *5 (S.D.N.Y. Nov. 15, 2016) (Castel, J.).  "Whether to grant a motion for an order of attachment rests within the discretion of the court."  *Id.*

"To obtain prejudgment attachment under New York law," Gryphon "must show that (1) there is a cause of action for money judgment, (2) it is probable that the claim will succeed on the merits, (3) grounds for attachment under CPLR § 6201 exist, and (4) the amount demanded exceeds all counterclaims known to" Gryphon.  *Gov't Emps. Ins.*, 2023 WL 5979206, at *2.  "The party moving for attachment bears the burden of demonstrating that the four requirements for attachment are met."  *Id.*  Where, as here, the movant seeks "an attachment for security purposes, New York courts … require an additional showing that something, whether it is a defendant's financial position or past and present conduct, poses a real risk of the enforcement of a future judgment."  *Id.* (cleaned up).

---

[7] $24 million = the $35 million deposit less the approximate $1 million benefit Sphere actually derived through receipt of hosting services and $10 million in recovery from Core.

Gryphon cannot meet the requirements for attachment. Accordingly further briefing on the issue is unnecessary: the relief it seeks through the Letter should be rejected.

### A.   Gryphon Has No Grounds For Attachment Under § 6201

The only ground for attachment Gryphon invokes is § 6201(1), under which attachment may lie where the defendant "is a foreign corporation not qualified to do business in the state." However, Sphere as of March 26, 2024 is qualified to do business in New York. *See* Kalbfleisch Decl., Ex. 1. Consequently, there is no basis for Gryphon to invoke § 6201(1), which ends the matter.

Confronted with materially identical circumstances, the United States District Court for the Eastern District of New York just last year reached the same conclusion in *Gov't Emps. Ins.*, 2023 WL 5979206. There, "[a]t the time Plaintiffs" served their motion on the corporate-defendant seeking attachment, the corporate-defendant "was not registered to do business in New York; however, [the corporate-defendant] subsequently registered with the New York Department of State." *Id.* at *6. As the court concluded, "[b]ecause" the corporate-defendant had become "qualified to do business within New York, there [was] no ground for attachment under NY CPLR § 6201(1)" and "because Plaintiffs [did] not assert any other grounds for attachment under NY CPLR § 6201, they [did] not meet the third requirement for prejudgment attachment."[8] *Id.* at *6–7. So too here. In any event, Gryphon cannot meet the remaining requirements either.[9]

### B.   Gryphon Cannot Demonstrate A Likelihood Of Success On The Merits, Let Alone That It Is Likely To Obtain $30 Million

Gryphon cannot demonstrate the requisite likelihood of success on the merits, as Sphere will address in more depth should the Court permit Gryphon to file a motion. In brief, through its remaining counterclaim, Gryphon alleges that (i) Sphere's entry into four contracts for hosting violated the MSA's exclusivity provision; and (ii) separately, that Sphere wrongfully terminated the MSA.

With respect to the exclusivity provision allegations, the exclusivity provision merely made Gryphon an "exclusive provider" of "management services," which Sphere honored: it did not contract with anyone else to provide management services. The MSA, however, cannot be understood to prevent Sphere's officers from running the company in the ordinary course or entering into contracts. Gryphon shared this understanding, as it actively encouraged Sphere to seek hosting arrangements without Gryphon's involvement. More importantly for present purposes, any breach of the exclusivity provision would be merely technical and entitle Gryphon

---

[8] The court acknowledged the result may have been different had the defendant registered *after* "any order of attachment was entered." 2023 WL 5979206, at *6. Here, as there, no order of attachment has been entered.

[9] Not even Gryphon seeks to invoke § 6201(3), which only applies where "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." As Gryphon well knows, nothing in the record supports that conclusion.

6

to nominal damages. During the life of the MSA, Sphere paid the management fees to Gryphon called for by the MSA, even on those contracts that Gryphon contends breached the exclusivity provision. Gryphon cannot claim to need to attach any assets to preserve its right to collect on a $1 judgment.

Gryphon's allegation that Sphere wrongfully terminated the MSA goes unmentioned in its Letter, but is the only conceivable basis that could support a damages award beyond the nominal. The theory goes unmentioned for a reason: Gryphon has no good story to tell why the termination was improper; indeed, it was justified for multiple reasons. *See* Wolfe Decl., Ex. 2 (termination letter dated October 6, 2023). In all events, this is going to be a heavily disputed issue—including in light of the limitation of liability provision—on which Gryphon cannot demonstrate the requisite likelihood of success now.

And even if Gryphon could demonstrate a likelihood of success on the merits, it certainly could not demonstrate a likelihood that it will obtain a $30 million judgment. Over the first 25 months of the MSA, Sphere paid Gryphon approximately $1.22 million in fees. It is absurd to suggest, as Gryphon does, that Gryphon would be entitled to in excess of $30 million in fees over the remaining life of the MSA, which Sphere assumes Gryphon will contend is 35 months. To be able to pay $30 million in fees to Gryphon, Sphere would have to generate approximately $135 million in *profit* over that period. If Gryphon truly believes Sphere is going to perform like that, it is difficult to see why an attachment would be needed. Sphere will reserve on what an appropriate damages figure might look like if the Court grants Gryphon leave to file its motion.

### C. The Damages Sought Through Sphere's Claims Exceed The Damages Sought By Gryphon

By contrast, the damages Sphere seeks through its claims well exceed anything Gryphon can muster that is tied to reality. Those damages are tied to something that is identifiable and concrete, including the delta between the Core settlement and what Sphere could have achieved at trial had Gryphon filed a timely proof of claim. Knowing that Sphere's damages exceed $25 million, Gryphon seems to have plucked its $30 million figure out of thin air purely so that it can claim its damages exceed Sphere's.

### D. Sphere Could Satisfy Any Judgment, Even The Absurd $30 Million Judgment Gryphon Asserts It Will Win

Finally, Gryphon cannot demonstrate that Sphere is at risk of being unable to satisfy a judgment—including the unsupportable $30 million it claims entitlement to. Gryphon argues this case is like *Elton Leather Corp. v First Gen. Res. Co.*, where the defendant was in "serious financial distress," as evidenced by a quarterly filing with the Securities & Exchange Commission (the "SEC") indicating that the defendant's "current liabilities exceed its current assets by more than one million dollars." 138 A.D.2d 132 (1st Dep't 1998).

This case could not be more different: excluding common stock and preferred stock that is convertible into preferred stock, Sphere's 2023 Annual Report reflects that its *assets exceed its liabilities by $40 million*. As reflected in Sphere's balance sheet (excerpted below), Sphere had as of December 31, 2023 approximately $45 million in assets (only $10 million of which is comprised

of the Core Equity Proceeds) and $5 million in liabilities:

| Assets | | |
|---|---|---|
| Current assets: | | |
|     Cash and cash equivalents | $ | 586 |
|     Digital assets | | 986 |
|     Restricted cash | | — |
|     Accounts receivable, net | | — |
|     Notes receivable, net of allowance for credit losses of $3,821 and $0, respectively | | — |
|     Other current assets | | 11,938 |
|       Total current assets | | 13,510 |
| Property and equipment, net | | 24,166 |
| Intangible assets, net | | 4,581 |
| Funds held in trust account | | — |
| Other non-current assets | | 3,406 |
|     Total assets | $ | 45,663 |
| **Liabilities, Temporary Equity and Shareholders' Equity** | | |
| Current liabilities: | | |
|     Accounts payable | $ | 2,374 |
|     Accrued liabilities | | 1,179 |
|     Accrued payroll and employee compensation | | 1,482 |
|     Warrant liabilities | | 205 |
|     Other current liabilities | | 106 |
|       Total current liabilities | | 5,346 |
| Deferred underwriting fee | | — |
| Warrant liabilities | | — |
| Other non-current liabilities | | — |
|     Total liabilities | | 5,346 |

*See* Kalbfleisch Decl., Ex. 2 at 3.

Gryphon has since added another $1.2 million in cash to Sphere's assets—a payment Gryphon would have never made if it truly believed it might be able to secure a judgment that Sphere could not satisfy. Sphere's balance sheet is otherwise clean. It has taken no loans and has no secured debt or encumbered assets.

Gryphon's claim that it only came to appreciate that it needs to pursue attachment following its review of Sphere's 2023 Annual Report filed on March 13, 2024 is not credible. Gryphon's statement that "Sphere admits that its current asset balance, as of December 31, 2023, is made up almost exclusively of the $10 million in Core Equity Proceeds" (Ltr. at 3) is demonstrably false, as seen above: Sphere's balance sheet reflects that the Core Equity Proceeds comprise less than one-fourth of Sphere's assets. Otherwise, Gryphon cites to risk factors, such as the following in which Sphere discloses its cash reserves are low but that Sphere is likely to raise money to avert any bankruptcy risk:

> Management has projected that based on our hashing rate at December 31, 2023, cash on hand may not be sufficient to allow the Company to continue operations and there is substantial doubt about the Company's ability to continue as a going concern within 12 months from the date of issuance of the financial statements if *we are unable to raise additional funding for operations*. We expect our working capital needs to increase in the future as we continue to expand and enhance our operations. Our ability to raise additional funds for working capital through equity or debt financings or other sources may depend on the financial success of our then current

8

> business and successful implementation of our key strategic initiatives, financial, economic and market conditions and other factors, some of which are beyond our control. Further equity financings may have a dilutive effect on shareholders and any debt financing, if available, may require restrictions to be placed on our future financing and operating activities. If we require additional capital and are unsuccessful in raising that capital at a reasonable cost and at the required times, or at all, we may not be able to continue our business operations in the cryptocurrency mining industry or we may be unable to advance our growth initiatives, either of which could adversely impact our business, financial condition and results of operations.

*See* Kalbfleisch Decl., Ex. 2 at 2. The risk factors cited are unremarkable; materially identical language has been included in Sphere's annual filings for years. *See, e.g.*, Kalbfleisch Decl., Exs. 3 at 2, 4 at 2, 5 at 2. Moreover, what Gryphon cites as revelatory had been known to it when it entered in the MSA in 2021, when Sphere filed its Complaint in April 2023, when Gryphon filed its initial counterclaims in August of 2023, and when Sphere actually received a right to the Core Equity Proceeds in January 2024. Gryphon is unable to point to any disclosure indicating a bankruptcy filing is actually imminent, such as an announcement that advisors have been hired to evaluate declaring bankruptcy, an announcement that typically presages a bankruptcy filing. That is because no bankruptcy is imminent. *See* Kalbfleisch Decl. ¶ 7.

Gryphon's sudden purported belief that Sphere's financials are deteriorating also cannot be reconciled with its public statements to investors. In a presentation to investors filed with the SEC on March 18, 2024 (*i.e.*, after the filing of the 2023 Annual Report), Gryphon projected that it will in 2024 earn approximately $12,000,000 in management fees through the MSA, meaning Gryphon is projecting that Sphere will *earn approximately $53 million in profit* ($53.3 million x 22.5% = $12 million) in this year alone. *See* Wolfe Decl., Ex. 3 at 3. If Gryphon truly believes what it is communicating to investors, it cannot believe that Sphere is in fact in danger of being unable to satisfy a judgment.[10]

Next, Gryphon cites statements made by counsel that it contends indicates that Sphere is in financial trouble. Whatever gloss Gryphon wants to place on those statements, they do not change that Sphere's balance sheet is incredibly healthy and capable of withstanding even a $30 million judgment, as evidenced by the recent 2023 Annual Report. And the gloss Gryphon seeks to add is at best misleading. For example, Gryphon argued that "Sphere claimed it could not participate in a meet-and-confer with Gryphon's counsel because Sphere did not have sufficient resources to pay its counsel to attend the call." Ltr. at 2 n.2. The assertion is ridiculous—*see, e.g.*, the thoroughness of this letter and other filings. Rather, the undersigned wrote: "There is a

---

[10] Sphere has no idea how Gryphon is projecting that Sphere will earn $53 million in profit. Sphere also does not know why Gryphon is apparently adopting Sphere's revenues as its own. In its presentation to investors filed with the SEC, Gryphon bizarrely states that "Sphere has moved to terminate" the MSA. This is not true; it is beyond dispute that Sphere *terminated* the MSA on October 6, 2023. Although Gryphon threatened to seek emergent relief preventing Sphere from doing so (*see* Wolfe Decl., Exs. 2 at 6–7, 4 at 1), it elected not to do so.

discovery stay in place, so I'm not sure the point of a call now, especially when my client is thin on resources. We'll be happy to engage in that discussion at an appropriate point, however." Wolfe Decl., Ex. 5 at 1. The undersigned was being diplomatic: he did not want to waste his client's resources on a premature meet-and-confer. Since then, the undersigned has met-and-conferred with opposing counsel on topics that were not premature. Sphere will address any other statements as needed should the Court order briefing.

Finally, it bears emphasizing that Gryphon has put forth no evidence whatsoever that Sphere's assets "will soon be dissipated." Ltr. at 4. Sphere's 2023 Annual Report—which, as demonstrated, Gryphon badly misreads—makes clear that, rather than dissipate its assets, Sphere intends to "raise additional funding." *See* Kalbfleisch Decl., Ex. 2 at 2. Similarly, as Mr. Kalbfleisch's declaration explains, Sphere is presently holding the Core Equity Proceeds as investment assets on the belief that they will accrete value. *See* Kalbfleisch Decl. ¶ 8. Beyond the pedestrian observation that Sphere's continued operations will cost money—something that is true of every single business—Gryphon points to no evidence that Sphere's assets will be unavailable in the unlikely event Gryphon prevails.

### III. CONCLUSION

Given the foregoing, the Court should deny Gryphon leave to file the motion. If the matter is to be briefed, however, it should not be briefed on the truncated schedule Gryphon has proposed, as there is no reason why a motion premised on information Gryphon has had for months must be briefed in less than two weeks.[11]

Instead, given the evidentiary nature of the attachment application, Sphere respectfully proposes that, if the Court is inclined to grant leave, it direct:

- Gryphon to file its opening brief no later than one day after issuance of the Court's order;

- Sphere to file its opposition no later than thirty days after service of Gryphon's opening brief; and

- Gryphon to file its reply no later than ten days after service of Sphere's Opposition.

For a motion that seeks attachment of what Gryphon contends is Sphere's principal asset, and given the absence of any allegation that Sphere is trying to avoid its creditors, that schedule is reasonable.

***

---

[11] *See, e.g.*, Ltr at 2 (citing a document filed five months ago as evidence of Sphere's "growing financial troubles").

10

We are available to discuss these issues at your Honor's convenience.

Respectfully submitted,

*/s/  Gregory N. Wolfe*

cc:      Counsel for Gryphon (*via ECF only*)