Exhibit 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SPHERE 3D CORP.,

        *Plaintiff-Counterdefendant*,

    v.

GRYPHON DIGITAL MINING, INC.,

        *Defendant-Counterplaintiff.*

Case No. 23-cv-02954 (PKC)

The Hon. Judge P. Kevin Castel

---

## SPHERE 3D CORP.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 5

I.   THE MSA PROVIDED THAT GRYPHON WOULD BE THE MANAGER OF SPHERE'S
     CRYPTOCURRENCY OPERATIONS AND A CUSTODIAN OF SPHERE'S DIGITAL ASSETS.... 5

II.  GRYPHON ENTERED INTO THE CORE MSA AND ORDER #2 THAT OBLIGATED *IT*, NOT
     *SPHERE*, TO DELIVER 71,000 MINERS TO CORE ........................................................... 5

III. DESPITE ITS STATUS AS CUSTODIAN OF SPHERE'S ASSETS, GRYPHON WAS DUPED BY
     A FRAUDSTER INTO PARTING WITH THOSE ASSETS ....................................................... 6

IV.  FOLLOWING THE SPOOFING INCIDENT, GRYPHON SUDDENLY BEGAN THREATENING
     VARIOUS "CLAIMS" AGAINST SPHERE ........................................................................ 7

PROCEDURAL HISTORY .................................................................................................. 8

I.   SPHERE FILED CLAIMS AGAINST GRYPHON FOR BREACH OF THE MSA AND OF
     GRYPHON'S FIDUCIARY DUTIES ............................................................................... 8

II.  IN REACTION TO SPHERE'S SUIT, GRYPHON FILED COUNTERCLAIMS, WHICH IT HAS
     NOW AMENDED THREE TIMES .................................................................................. 9

III. GRYPHON'S THREE AMENDMENTS HAVE PLACED ON SPHERE THE BURDEN OF FILING
     THREE PREMOTION LETTERS AND NOW TWO MOTIONS TO DISMISS ......................... 10

ARGUMENT .................................................................................................................... 11

I.   THE CORE BREACH CLAIM (COUNT I) MUST BE DISMISSED ................................... 11

     A.  Gryphon Does Not Identify Any Obligation Sphere Owed It To Deliver Miners In The
         MSA—Or In Any Other Agreement .......................................................................... 12

     B.  Independently, Count I Must Also Be Dismissed Because The Damages Sought Are
         Barred By The MSA's Limitation Of Liability .......................................................... 14

II.  SPHERE HAD NO DUTY TO PROTECT GRYPHON FROM THE ECONOMIC
     CONSEQUENCES OF ITS OWN INCOMPETENCE ........................................................ 15

III. GRYPHON'S IMPLIED COVENANT CLAIM SHOULD BE DISMISSED .............................. 21

     A.  Gryphon's Implied Covenant Must Be Dismissed As Impermissibly Duplicative..... 21

     B.  Gryphon's Implied Covenant Claim Improperly Seeks To Impose Obligations Beyond
         Those Set Forth In The MSA .................................................................................... 22

CONCLUSION ................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C.L. Computers & Software, Inc. v. United States*,
727 F. App'x 376 (9th Cir. 2018) ....................................................................................3, 20

*Advanced Knowledge Tech, LLC v. Fleitas*,
2021 WL 6126966 (S.D.N.Y. Dec. 28, 2021) ........................................................................11

*Alfaro v. Wal-Mart Stores, Inc.*,
210 F.3d 111 (2d Cir. 2000)....................................................................................................19

*ARI & Co. v. Regent Int'l Corp.*,
273 F. Supp. 2d 518 (S.D.N.Y. 2003)......................................................................................21

*Asian Vegetable Rsch. & Dev. Ctr. v. Inst. of Int'l Educ.*,
944 F. Supp. 1169 (S.D.N.Y. 1996)........................................................................................16

*Avazpour Networking Servs., Inc. v. Falconstor Software, Inc.*,
937 F. Supp. 2d 355 (E.D.N.Y. 2013) ...............................................................................16, 17

*Bell v. S. Bay Eur. Corp.*,
2008 WL 4298542 (S.D.N.Y. Sept. 12, 2008)........................................................................13

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002).......................................................................................................1

*Clemmons v. Upfield US Inc.*,
2023 WL 2752454 (S.D.N.Y. Mar. 31, 2023) .......................................................................12

*County of Orange v. Travelers Indem. Co.*,
2014 WL 1998240 (S.D.N.Y. May 14, 2014) ........................................................................21

*Cruz v. TD Bank, N.A.*,
855 F. Supp. 2d 157 (S.D.N.Y. 2012)......................................................................................16

*D'Amico v. Christie*,
71 N.Y.2d 76 (N.Y. 1987) .......................................................................................................20

*Deleu v. Scaife*,
775 F. Supp. 712 (S.D.N.Y. 1991) ..........................................................................................18

*Delta Air Lines, Inc. v. Bombardier, Inc.*,
2021 WL 1163702 (S.D.N.Y. Mar. 25, 2021) ........................................................................13

*Doe v. Maier*,
    2020 WL 9812927 (E.D.N.Y. Mar. 24, 2020) ........................................................................20

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
    309 F. Supp. 3d 89 (S.D.N.Y. 2018)......................................................................................22

*Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA.*,
    2023 WL 6812984 (S.D.N.Y. Oct. 16, 2023) ........................................................................16

*Harris v. Provident Life & Acc. Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002)......................................................................................................21

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
    723 F. Supp. 976 (S.D.N.Y. 1989) ........................................................................................23

*J & R Elecs. Inc. v. One Beacon Ins. Co.*,
    35 A.D.3d 169 (1st Dep't 2006) ............................................................................................15

*JTRE Manhattan Ave. LLC v. Cap. One, N.A.*,
    585 F. Supp. 3d 474 (S.D.N.Y. 2022)....................................................................................18

*Labajo v. Best Buy Stores, L.P.*,
    478 F. Supp. 2d 523 (S.D.N.Y. 2007)....................................................................................11

*Landon v. Kroll Lab'y Specialists, Inc.*,
    91 A.D.3d 79 (2d Dep't 2011) ...............................................................................................17

*Lopez v. City of New York*,
    2014 WL 5090041 (S.D.N.Y. Oct. 10, 2014) ........................................................................11

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
    84 N.Y.2d 430 (N.Y. 1994) ...................................................................................................14

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
    998 F. Supp. 2d 157 (S.D.N.Y. 2014)....................................................................................16

*Najjar Grp., LLC v. W. 56th Hotel LLC*,
    106 A.D.3d 640 (1st Dep't 2013) ..........................................................................................13

*Napster, LLC v. Rounder Recs. Corp.*,
    761 F. Supp. 2d 200 (S.D.N.Y. 2011)....................................................................................12

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.*,
    25 A.D.3d 309 (1st Dep't 2006) ............................................................................................22

*Negrete v. Citibank, N.A.*,
    187 F. Supp. 3d 454 (S.D.N.Y. 2016), *aff'd*, 759 F. App'x 42 (2d Cir. 2019)......................14

*Osborn v. Kemp*,
    991 A.2d 1153 (Del. 2010) ........................................................................13

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)......................................................................11

*Payne v. Malemathew*,
    2011 WL 3043920 (S.D.N.Y. July 22, 2011) ...........................................23

*Presnall v. Analogic Corp.*,
    2018 WL 4473337 (S.D.N.Y. Sept. 18, 2018)..........................................17

*In re Refco Inc. Sec. Litig.*,
    2010 WL 11475742 (S.D.N.Y. Mar. 2, 2010) ..........................................19

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*,
    109 F. Supp. 3d 587 (S.D.N.Y. 2015)......................................................17

*Santoro v. GEICO*,
    117 A.D.3d 1026 (2d Dep't 2014) ............................................................15

*Serengeti Express, LLC v. JP Morgan Chase Bank*,
    2020 WL 2216661 (S.D.N.Y. May 7, 2020) ............................................14

*TD Waterhouse Inv. Servs., Inc. v. Integrated Fund Servs., Inc.*,
    2003 WL 42013 (S.D.N.Y. Jan. 6, 2003) .................................................17

*Timberg v. Toombs*,
    2022 WL 954739 (E.D.N.Y. Mar. 30, 2022) ...........................................12

*Verzani v. Costco Wholesale Corp.*,
    641 F. Supp. 2d 291 (S.D.N.Y. 2009).......................................................22

*Vitolo v. Mentor H/S, Inc.*,
    426 F. Supp. 2d 28 (E.D.N.Y. 2006) ........................................................17

*Vought v. Tchrs. Coll., Columbia Univ.*,
    127 A.D.2d 654 (2d Dep't 1987)..............................................................16

*Waxman v. Cliffs Nat. Res. Inc.*,
    222 F. Supp. 3d 281 (S.D.N.Y. 2016).......................................................23

*Woodhill Elec. v. Jeffrey Beamish, Inc.*,
    73 A.D.3d 1421 (3d Dep't 2010) ..............................................................12

## PRELIMINARY STATEMENT

This case arises out of Defendant-Counterplaintiff Gryphon Digital Mining Inc.'s ("Gryphon") breach of contractual duties it owed to Plaintiff-Counterdefendant Sphere 3D Corp. ("Sphere") under the Master Services Agreement between the parties dated August 19, 2021, as subsequently amended (the "MSA"[1]), and Gryphon's breach of the fiduciary duties it owed as, among other things, Sphere's manager, broker, investment advisor, agent, and the custodian of its assets. As set forth in Sphere's Second Amended Complaint, Gryphon neglected Sphere's interests in favor of its own, engaged in naked self-dealing, and squandered Sphere's assets. To distract from its own misfeasance, Gryphon's operative pleading (the "Fourth Amended Counterclaim," Dkt. 65) asserts four Counts: (1) a breach of contract claim, *i.e.*, the "Core Breach Claim"; (2) a distinct breach of contract claim, *i.e.*, the "Exclusive Provider Breach Claim"; (3) a claim for breach of the implied covenant; and (4) a claim for negligence. Although Sphere will demonstrate that the Exclusive Provider Breach Claim is meritless with the benefit of a full record, the Core Breach Claim, negligence claim, and implied covenant claim should be dismissed now because they are squarely foreclosed as a matter of law.

*First*, the Core Breach Claim is frivolous. Count I alleges that Sphere breached the MSA because it purportedly failed to "deliver[] . . . 71,000 [Bitcoin] mining machines" to Core Scientific, Inc. ("Core"), a non-party. *See* Fourth Amended Counterclaim ¶¶ 111–14. Although premised on a "breach of the Sphere MSA"[2] (*id.* at ¶ 113), Gryphon cannot identify any provision in the MSA that even arguably imposed an obligation on Sphere to deliver miners to Core; indeed, the MSA does not mention Core at all. In its Fourth Amended Counterclaim, Gryphon also

---

[1] The MSA is available as an exhibit to Sphere's Second Amended Complaint (*see* Dkt. 36-1) and may be considered by the Court because it is integral to Gryphon's Fourth Amended Counterclaim, including Counts I and II. *E.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[2] The Fourth Amended Counterclaim defines the MSA as the "Sphere MSA."

references three other agreements:  (1) a Master Services Agreement between Gryphon and Core (the "Core MSA"); (2) an agreement between Core and Gryphon ("Order #2") pursuant to which "Gryphon was obligated to deliver all 71,000 machines to Core"; and (3) an October 8, 2021 Sub-License and Delegation Agreement, as subsequently amended on December 29, 2021 (the "Sub-License Agreement").  *Id.* ¶¶ 12–14, Exs. A–C.  None of those agreements can be read to impose any obligation on Sphere to deliver miners to Core.  Even if they could, the claim would be barred by the MSA's limitation of liability, as it expressly "exclude[s] all consequential, incidental, indirect, special and punitive damages, and loss of profits"—the precise damages Gryphon is seeking here.  MSA at 3; *compare* Fourth Amended Counterclaim ¶ 115 (seeking to recover "the value of the MSA, lost profits, loss of business opportunities, and losses associated with litigation against Core").

*Second*, Gryphon's negligence claim should be dismissed because Gryphon has failed to allege an essential element of the claim, namely, that Sphere owed a duty to Gryphon.  The negligence claim is predicated on Gryphon's falling prey to a fraudster who, through use of several spoofed[3] emails, tricked Gryphon into transferring 26 of Sphere's bitcoin (worth many hundreds of thousands of dollars then and even more now) to the fraudster's account.  The emails contained the telltale signs of fraud that any competent custodian should have detected, including misspellings and a facially implausible explanation for the need to transfer assets not to Sphere's normal account but to an account associated with the fraudster.  Despite the fact that it is *Gryphon* that is the custodian of *Sphere's* digital assets, Gryphon asserts that Sphere bears sole responsibility for Gryphon's own lack of care.

---

[3] Email spoofing is a technique in which a hostile actor impersonates a person by imitating—a.k.a. spoofing—his or her email address by using an address that closely resembles it.

But Gryphon can point to no contractual obligation that would impose such a responsibility on Sphere.  And the law is unequivocal that, where, as here, there is a contract, no duty will arise in the absence of a special relationship between the parties.  Although Gryphon owes Sphere extracontractual duties by virtue of its role as, among other things, the custodian of Sphere's assets, Gryphon has done nothing to plead that Sphere owes any such duties in turn by virtue of a special relationship.  Instead, it alleges that, because Sphere (like Gryphon) was copied on the fraudster's emails, and Sphere (like Gryphon) was allegedly aware of the general phenomenon of fraudulent spoofing attacks, Sphere (apparently unlike Gryphon) bore responsibility for preventing Gryphon from being duped.  As the Ninth Circuit has held, that is a wholly insufficient basis for the imposition of an extracontractual duty because there is no "common-law duty requiring a business to prevent third-party fraudsters from impersonating the business." *A.C.L. Computers & Software, Inc. v. United States*, 727 F. App'x 376, 376 (9th Cir. 2018) (applying California law).  The case against imposing a duty here is even stronger than in the ordinary commercial context given Gryphon's admitted responsibility for ensuring that Sphere's digital assets are transferred to the proper recipient.

*Third*, Gryphon's implied covenant claim should be dismissed because it is impermissibly duplicative and, independently, because it seeks to impose obligations beyond the four corners of the MSA.  Under the MSA, Gryphon was to serve as the "exclusive provider of any and all management services for all [of Sphere's] blockchain and cryptocurrency-related operations." *See* MSA at 1.  In the Exclusive Provider Breach Claim, Gryphon asserts that Sphere breached that express provision (and others) because it allegedly conducted operations without Gryphon's consent.  Gryphon's implied covenant claim—which expressly invokes that contractual language—contends that the failure to provide certain information concerning those operations is

independently actionable because it prevented Gryphon from performing the services required under the MSA.

The implied covenant claim should be dismissed because it is impermissibly duplicative of the Exclusive Provider Breach Claim. Courts dismiss implied covenant claims when they concern the same factual matter, or allege the same damages, as a claim for breach of contract. That is the case here because the sole injury allegedly caused by breach of the implied covenant is Gryphon's loss of exclusivity—*i.e.*, an injury underlying its breach of contract claim. *Compare* Fourth Amended Counterclaim ¶ 125 (Gryphon alleging, in its breach of contract count, that Sphere "breached the exclusivity terms of the Sphere MSA") *with id.* ¶¶ 136, 143 (Gryphon alleging that it was injured because it was unable to provide services "[p]ursuant to the exclusivity terms of the Sphere MSA"). Because the conduct and damages asserted by the implied covenant claim also form the basis of Gryphon's Exclusive Provider Breach Claim, the implied covenant claim is impermissibly duplicative and should be dismissed.

The claim should also be dismissed because the implied covenant may not be used to impose obligations beyond those contemplated by the parties' agreement. The MSA sets forth Sphere's obligations to Gryphon related to Gryphon's role as manager and custodian. Because Gryphon admits that an obligation to provide the supposedly "critical" information sought is not among them, and because Gryphon has not alleged the existence of any gap or ambiguity that would permit the implication of an obligation to provide certain information, Gryphon's implied covenant claim should be dismissed as an improper attempt to impose obligations for which the parties did not bargain.

Gryphon has now amended its counterclaims an incredible three times in less than half a year, including in response to a motion to dismiss by, and comprehensive premotion letters from,

Sphere that set forth the arguments below.  *See* Dkts. 31, 39, 49, 56.  Because those claims remain deficient despite ample opportunities for Gryphon to improve upon them, they should be dismissed with prejudice.

## FACTUAL BACKGROUND[4]

## I.   THE MSA PROVIDED THAT GRYPHON WOULD BE THE MANAGER OF SPHERE'S CRYPTOCURRENCY OPERATIONS AND A CUSTODIAN OF SPHERE'S DIGITAL ASSETS

On August 19, 2021, the parties entered into the MSA.  In the MSA, Gryphon agreed to serve as the "exclusive provider of any and all management services for all [Sphere's] blockchain and cryptocurrency-related operations."  *See* MSA at 1 (the "Management Services Provision"). In addition, the MSA made Gryphon a custodian of certain of Sphere's "digital assets," which are stored in a "digital wallet"—the rough equivalent of an online bank account—controlled by Gryphon.  *Id.* at 2.  As with a customer's online bank account, the MSA gave Sphere authority to issue "written instructions to [Gryphon] with respect to all decisions to sell or hold Digital Assets." *Id.* at 3 (the "Sale Provision").  In exchange for these services, Gryphon received a substantial Management Fee—22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations."  *Id.* at 1.  The MSA contains a limitation of liability that "expressly exclude[s] all consequential, incidental, indirect, special and punitive damages, and loss of profits."  *Id.* at 3.

## II.  GRYPHON ENTERED INTO THE CORE MSA AND ORDER #2 THAT OBLIGATED *IT*, NOT *SPHERE*, TO DELIVER 71,000 MINERS TO CORE

On September 12, 2021, Gryphon entered into the Core MSA, pursuant to which Gryphon and non-party Core agreed that Core would provide certain hosting services for miners to be

---

[4] The factual background set forth in this motion is drawn from the allegations of Gryphon's Fourth Amended Counterclaim, the truth of which is assumed for purposes of this motion only, and the exhibits referenced therein.

delivered by Gryphon, the numbers of which were to be specified in "Orders" executed after Gryphon's entry into the Core MSA.  *See* Core MSA § 1; Fourth Amended Counterclaim ¶ 27.  On October 5, 2021, Core and Gryphon entered into Order #2, pursuant to which Gryphon agreed to deliver 71,000 miners to Core between October 2021 and November 2022.  *See* Order #2; Fourth Amended Counterclaim ¶ 12.

On the same date, Gryphon and Sphere entered into the Sub-License Agreement, pursuant to which Gryphon sought to "sub-license and delegate certain rights and obligations under Order 2 to Sphere."  Sub-License Agreement at 1; Fourth Amended Counterclaim ¶ 12.  In that agreement, Gryphon purported to "(i) exclusively sub-license[] to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegate[] to Sphere all of its obligations to make payments to Core pursuant to Order 2."  Sub-License Agreement at 1 § 1.

Indicative of the limited scope of the assignment in Section 1, the Sub-License Agreement included a "Contingent Assignment" provision that provided that, "upon the consummation of" a contemplated "Merger" between Sphere and Gryphon, "all of Gryphon's rights and obligations under Order 2 shall be automatically assigned to, and assumed by, the Surviving Corporation."  *Id.* § 2.  As the Fourth Amended Counterclaim pleads, the merger was never consummated, meaning the Contingent Assignment never occurred.  *See* ¶ 21.

## III.   DESPITE ITS STATUS AS CUSTODIAN OF SPHERE'S ASSETS, GRYPHON WAS DUPED BY A FRAUDSTER INTO PARTING WITH THOSE ASSETS

On January 27, 2023, Kurt Kalbfleisch, Sphere's Chief Financial Officer and Senior Vice President, requested by email that Gryphon transfer 18 bitcoin from a wallet controlled by Gryphon to one controlled by Sphere.  *See id.* ¶ 76.  At 1:32 p.m., Rob Chang, Gryphon's CEO, responded, "Received and initiated."  Dkt. 65-8 at 3 ("Counterclaim Ex. H").

One hour later, Mr. Chang received an email from a "hostile threat actor" pretending to be Mr. Kalbfleisch. *See* Fourth Amended Counterclaim ¶¶ 83, 94. The email came from a different domain from the Sphere domain, namely @sphere**s**3d.com (with an added "s" in the middle), not @sphere3d.com. Counterclaim Ex. H at 2. It also included a different email—Mr. Kalbfleisch's correct address—in the signature block. *Id.* at 3. In the email, the person pretending to be Mr. Kalbfleisch stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be routed to a different wallet address that had not previously been used by Sphere. *Id.* at 2; *see also* Fourth Amended Counterclaim ¶ 78.

Despite these indicia that the request was not from Mr. Kalbfleisch, Mr. Chang initiated the transaction, apparently without performing the identify verification he had previously informed Mr. Kalbfleisch was required. *See* Fourth Amended Counterclaim ¶ 82; *see also* Counterclaim Ex. H at 3 (Mr. Chang stating that "[a]ll Sphere withdrawals require a video ID call" for "verification" of the request). Three days later, the hostile threat actor—using the same misspelled email address—asked Mr. Chang to transfer another 8 bitcoin to the unaffiliated wallet. *See* Fourth Amended Counterclaim ¶ 83. Consistent with Gryphon's "protocol," Mr. Chang made the transfer without conducting any verification of its propriety. *Id.* ¶ 85. After the real Kurt Kalbfleisch asked about the status of Sphere's bitcoin, Gryphon realized it had been duped. It was, however, "unable to recover" the bitcoin it had transferred to the fraudster. *Id.* ¶ 95. It then "transferred the U.S. dollar-equivalent value of" the bitcoin—at the time, approximately $560,215.53—to Sphere "on a courtesy basis" but reserved all rights, including apparently to bring its counterclaims. *Id.* ¶ 94.

## IV. FOLLOWING THE SPOOFING INCIDENT, GRYPHON SUDDENLY BEGAN THREATENING VARIOUS "CLAIMS" AGAINST SPHERE

Less than a week after the parties held a March 15, 2023 call to discuss Gryphon's loss of Sphere's bitcoin, Gryphon sent Sphere a demand letter in which it asserted that Sphere had

7

breached the MSA, including by "attempting to enter" into business relationships without Gryphon's permission. *See* Dkt. 65-4 at 1 ("Counterclaim Exhibit D"). Based on the purported "urgency" of its concerns, Gryphon demanded that Sphere respond in *less than 24 hours. Id.* at 2. After Sphere timely responded and pressed Gryphon on its responsibility for its various breaches of its contractual and fiduciary duties (including the loss of Sphere's bitcoin), Gryphon demanded that Sphere maintain a balance of $530,000—the then-approximate value of the bitcoin Gryphon had given away to the fraudster—in accounts controlled by Gryphon. *See* Dkt. 65-6 at 5 ("Counterclaim Ex. F"). It also asserted that it had the unilateral right to *refuse* to heed Sphere's instructions to sell its own assets, thereby permitting Gryphon to hold them hostage indefinitely. *Id.*

## **PROCEDURAL HISTORY**

### I.   SPHERE FILED CLAIMS AGAINST GRYPHON FOR BREACH OF THE MSA AND OF GRYPHON'S FIDUCIARY DUTIES

On April 7, 2023, Sphere filed its original Complaint. As it explained then, the relationship between the parties had "proven to be completely one-sided," with Gryphon "collect[ing] its exorbitant Management Fee while shirking its duties under the MSA," "nakedly prioritizing its own interests over those of Sphere's," and engaging in rampant self-dealing that enriched Gryphon at Sphere's expense in violation of its fiduciary duties. *See* Complaint ¶¶ 2, 4, 13. To recover the damages it suffered and continues to suffer at the hands of Gryphon, Sphere asserted claims for breach of contract, breach of the implied covenant, and breach of fiduciary duty. *See id.* ¶¶ 52–69.

## II.    IN REACTION TO SPHERE'S SUIT, GRYPHON FILED COUNTERCLAIMS, WHICH IT HAS NOW AMENDED THREE TIMES

On August 22, 2023, Gryphon filed its initial Counterclaim; five months later, on January 17, 2024, Gryphon filed the operative Fourth Amended Counterclaim asserting four claims: two claims for breach of contract and claims for negligence and breach of the implied covenant.

In Count I, Gryphon alleges that Sphere breached the MSA by purportedly failing to deliver the 71,000 miners Gryphon had agreed to deliver to Core, which allegedly caused Gryphon to suffer damages in the form of "loss of the value of the MSA, lost profits, loss of business opportunities, and losses associated with litigation against Core."  Fourth Amended Counterclaim ¶ 115.

In its Exclusive Provider Breach Claim (Count II), Gryphon alleges, *inter alia*, that Sphere breached the Management Services Provision by conducting its own business operations without Gryphon's consent.  *See id.* ¶ 125.  Through its implied covenant claim (Count III), Gryphon alleges that the failure to provide information concerning those operations constitutes an independently actionable breach of the implied covenant of good faith and fair dealing.  *See id.* ¶¶ 136, 143.

Finally, the gist of Gryphon's negligence claim (Count IV) is that Sphere, not Gryphon, bears total responsibility for Gryphon's failure to detect the spoofing fraud.  Gryphon contends that Sphere owed and breached a series of duties, namely:

- "to maintain proper security and control of Sphere's computer systems and information technology infrastructure, including its company email accounts and email server";

- "to take proper precautions to protect Gryphon from being targeted by fraudulent activities in connection with Gryphon's business dealings with Sphere, including the transfer of assets under the Sphere MSA";

- "to safeguard information relating to such business dealings and transactions"; and

- "to recognize and notify Gryphon of fraudulent activity occurring within Sphere's computer systems and information technology infrastructure."

*Id.* ¶ 147.  Contending that it bears zero responsibility for being duped by the fraudster because Gryphon's conduct was somehow "the sole fault of Sphere and due to Sphere's negligence alone," Gryphon now seeks to recover the funds it remitted to Sphere as a "courtesy" for losing its digital assets.  *Id.* ¶¶ 94, 161.

## III.  GRYPHON'S THREE AMENDMENTS HAVE PLACED ON SPHERE THE BURDEN OF FILING THREE PREMOTION LETTERS AND NOW TWO MOTIONS TO DISMISS

In less than half a year, Gryphon has amended its pleading three times.  Each of those amendments was precipitated in material part by comprehensive pre-motion letters in which Sphere set out the counterclaims' many defects.

Gryphon asserted its negligence and implied covenant claims in its initial pleading.  *See* Dkt. 30.  In response to Sphere's pre-motion letter, Gryphon sought (Dkt. 32) and subsequently received (Dkt. 33) leave to amend its counterclaims.  Despite that opportunity, Gryphon's next pleading substantially stood on its allegations related to the implied covenant and negligence claims.  On November 9, 2023, Sphere moved to dismiss the negligence and implied covenant claims.  Dkts. 48, 49.  In response, Gryphon again sought to amend its pleading.  Dkt. 50.  It nevertheless did not seek to improve either claim in its amended pleadings.

Instead, on December 14, 2023, Gryphon asserted the Core Breach Claim for the first time in its Third Amended Counterclaim.  Dkt. 55.  In its pre-motion letter dated December 21, 2023,

Sphere explained why the claim is deficient, including because "Gryphon cannot point to any provision of the MSA—or of any other agreement between the parties—imposing" the alleged obligation to deliver miners to Core.  Dkt. 56 at 1.  After once again seeking leave to amend and improve its claims (Dkt. 60), Gryphon filed the operative Fourth Amended Counterclaim. The promised improvement amounted to two conclusory assertions related to Gryphon's purported damages.  *See* Dkt. 60-1 at 25 ¶ 18, 45 ¶ 115 (reflecting changes against Gryphon's Third Amended Counterclaim).

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Lopez v. City of New York*, 2014 WL 5090041, at *1 (S.D.N.Y. Oct. 10, 2014).  While the Court must take a pleading's factual allegations as true for purposes of deciding the motion, "[t]he Court must disregard purely legal conclusions that are framed as factual allegations, as these legal conclusions are not entitled to the presumption of truth."  *See Advanced Knowledge Tech, LLC v. Fleitas*, 2021 WL 6126966, at *2 (S.D.N.Y. Dec. 28, 2021).  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014).

## I.    THE CORE BREACH CLAIM (COUNT I) MUST BE DISMISSED

"Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement, (2) performance of the contract by the plaintiff, (3) breach of the agreement by the defendant, and (4) damages."  *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 529 (S.D.N.Y. 2007).  Count I fails because Gryphon has failed to identify a contractual obligation Sphere allegedly breached and, independently, because it has failed to plead cognizable damages.

### A.    Gryphon Does Not Identify Any Obligation Sphere Owed It To Deliver Miners In The MSA—Or In Any Other Agreement

It is axiomatic that, to state a claim for breach of contract, "the plaintiff must identify . . . a specific provision of the contract that was breached." *Clemmons v. Upfield US Inc.*, 2023 WL 2752454, at *8 (S.D.N.Y. Mar. 31, 2023) (Castel, J.); *see also Woodhill Elec. v. Jeffrey Beamish, Inc.*, 73 A.D.3d 1421, 1422 (3d Dep't 2010) (affirming dismissal of contract claim because the "the complaint [did] not set forth the particular terms of the contract upon which [the] plaintiff's claim [was] based"). Gryphon alleges that Sphere's purported failure to deliver 71,000 miners to non-party Core constituted a breach of the MSA (*see* Fourth Amended Counterclaim ¶ 113), but has not identified any provision of the MSA imposing such an obligation on Sphere. Instead, Gryphon conclusorily alleges that "Sphere knew it was responsible for delivering the 71,000 mining machines to Core." *Id.* ¶ 111. But there is no provision that can be even remotely construed to that effect in the MSA, and Gryphon's assertions cannot vary the plain terms of the MSA. *See Napster, LLC v. Rounder Recs. Corp.*, 761 F. Supp. 2d 200, 206 (S.D.N.Y. 2011) ("Absent ambiguity, the intent of the parties is determined objectively by looking to the language of the contract; subjective intent is irrelevant."). Because Gryphon cannot point to *any* provision of the MSA imposing an obligation on Sphere to deliver miners to Core, it has failed to plead the existence or breach of a contractual duty. *See Timberg v. Toombs*, 2022 WL 954739, at *11 (E.D.N.Y. Mar. 30, 2022) (concluding that a pleading that merely "describes actions that [the claimant] alleges violate the agreement" but "fail[s] to identify a specific promise" that was breached "fails to plead a breach of contract claim").

Gryphon also references the Core MSA between it and Core, Order #2 between it and Core, and the Sub-License Agreement between it and Sphere. Initially, its theory of harm expressly depends on Sphere's alleged breach of the MSA. *See* Fourth Amended Counterclaim ¶¶ 108–115

(alleging that "Sphere's conduct, as described herein, constitutes a breach of the Sphere MSA" and "[a]s a direct and proximate cause of Sphere's breaches, Gryphon has been directly damaged in an amount to be determined at trial").  Accordingly, even if Sphere had breached these three agreements, it would not make a difference:  without a viable breach of the MSA, Gryphon has not even attempted to allege a cognizable damage stemming from a breach of the other three agreements independent of the MSA.

In any event, reference to the three other agreements does not plausibly allege an obligation by Sphere to deliver any miners to Core at all.  Order #2 and the MSA are contracts between Gryphon and Core; they by their terms do not purport to impose any obligations on Sphere.  *See* Core MSA at 8–9  (reflecting that Core and Gryphon were the sole parties to the Core MSA); Order #2 at 6 (reflecting that Core and Gryphon were the sole parties to Order #2).

Gryphon does allege that, under the Sub-License Agreement, Sphere "contractually assumed . . . Gryphon's obligation to provide Core with the 71,000 machines contemplated by Order #2."  Fourth Amended Counterclaim ¶ 14.  That assertion "founders on the plain language of the relevant provision of the assignment agreement."  *Delta Air Lines, Inc. v. Bombardier, Inc.*, 2021 WL 1163702, at *16 (S.D.N.Y. Mar. 25, 2021); *see also Najjar Grp., LLC v. W. 56th Hotel LLC*, 106 A.D.3d 640, 641 (1st Dep't 2013) ("[T]he plain language of an assignment determines its breadth and scope.").[5]  Under Section 1 of the Sub-License Agreement, Gryphon purported to

---

[5] The Sub-License Agreement is governed by Delaware law.  *See* Sub-License Agreement § 4.  It is well-established, however, that, where "[n]o party has pointed to a material difference between New York law and the law of other potentially applicable jurisdictions . . . , this Court will apply New York law."  *Bell v. S. Bay Eur. Corp.*, 2008 WL 4298542, at *2 (S.D.N.Y. Sept. 12, 2008). There is no relevant distinction between Delaware and New York law on the primacy of plain language in contract interpretation.  *See Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010) ("When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions.").

"(i) exclusively sub-license[] to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegate[] to Sphere all of its obligations to make payments to Core pursuant to Order 2."[6]  Nothing in that language can be remotely construed to make Sphere obligated to deliver any miners to Core.

Confirming that Section 1 was a narrow assignment, Section 2 of the Sub-License Agreement provided for a "Contingent Assignment" that would transfer, "upon the consummation of" a contemplated "Merger" between Sphere and Gryphon, "all of Gryphon's rights and obligations under Order 2" to "the Surviving Corporation." *Id.* § 2.  This Contingent Assignment provision would have been unnecessary had the parties intended to assign rights and obligations beyond the plain terms of Section 1, which they did not.  Count I accordingly must be dismissed.

### B.    Independently, Count I Must Also Be Dismissed Because The Damages Sought Are Barred By The MSA's Limitation Of Liability

Under New York law, "[a] limitation on liability provision in a contract represents the parties' [a]greement on the allocation of the risk of economic loss . . . , which the courts should honor."  *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (N.Y.  1994).  Where a category of damages is barred by a limitation of liability clause, a contract claim seeking to recover such damages must be dismissed.  *See, e.g.*, *Serengeti Express, LLC v. JP Morgan Chase Bank*, 2020 WL 2216661, at *4 (S.D.N.Y. May 7, 2020) (Castel, J.) (dismissing party's "request for consequential damages on its breach of contract claim" as barred by provision excluding liability "for indirect, special, or consequential damages"); *Negrete v. Citibank, N.A.*, 187 F. Supp.

---

[6] Order #2 provides that Gryphon was "permitted to" assign its rights and obligations to Sphere only if it "satisfie[d] [Core's] requirements prior to" the assignment.  Order #2 at 2.  This issue was heavily litigated in related litigation by Sphere in a bankruptcy proceeding against Core in which Sphere sought to recover payments it had made to Core, with Core denying that Sphere had met the requirements.  Sphere settled its claims against Core before depositions on the subject and reserves on the issue, as they are outside the scope of this motion.

3d 454, 469 (S.D.N.Y. 2016) (dismissing breach of contract claim because it sought to recover damages excluded by agreement's limitation on liability), *aff'd*, 759 F. App'x 42 (2d Cir. 2019).

Count I seeks four categories of damages: "loss of the value of the MSA, lost profits, loss of business opportunities, and losses associated with litigation against Core." Fourth Amended Counterclaim ¶ 115. Each category is precluded by the express terms of the MSA's limitation on liability, which "exclude[s] all consequential, incidental, indirect, special and punitive damages, and loss of profits"—the precise damages Gryphon is seeking here. MSA at 3.

First, Gryphon's claim for "lost profits" tracks the exclusion in the limitation of liability and is barred.

Second, lost business opportunities are quintessential consequential damages, *see J & R Elecs. Inc. v. One Beacon Ins. Co.*, 35 A.D.3d 169, 169 (1st Dep't 2006), which are also precluded by the limitation of liability.

Third, the only form a "loss of the value of the MSA" (Fourth Amended Complaint ¶ 115) could take is a loss of profits or some other indirect, consequential loss precluded by the MSA.

Finally, Gryphon's demand for damages for "losses associated with litigation against Core" (*id.*) appears to be a claim for "attorney's fee[s] and costs and disbursements," which are likewise considered to be indirect and "consequential," *Santoro v. GEICO*, 117 A.D.3d 1026, 1028 (2d Dep't 2014), and thus are also within the ambit of the limitation of liability.

Accordingly, because each category of damages sought by Count I is barred by the MSA's limitation of liability provision, Count I should be dismissed.

## II.    SPHERE HAD NO DUTY TO PROTECT GRYPHON FROM THE ECONOMIC CONSEQUENCES OF ITS OWN INCOMPETENCE

Under New York law, "a party to a contract that suffers economic loss only . . . is, in most cases, limited to recovery pursuant to a claim for breach of contract and cannot recover economic

or consequential damages in tort." *Avazpour Networking Servs., Inc. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 361 (E.D.N.Y. 2013).  There is no dispute that the MSA is a binding contract between the parties.  Although Gryphon claims that Sphere owed it various duties—all of which boil down to an alleged obligation by Sphere to protect Gryphon from the economic loss caused by Gryphon's own failure to detect the spoofing fraud—Gryphon does not contend that any of these duties can be found within the four corners of the contract itself; hence its resort to a negligence claim in lieu of a breach of contract claim.  Because there is no general obligation to protect others from economic loss, Gryphon thus bears the burden of establishing the existence and breach of "'a legal duty separate and apart from obligations bargained for and subsumed within the transaction'" that required Sphere to protect Gryphon from the economic loss caused by the spoofing fraud.  *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 185 (S.D.N.Y. 2014); *see also Asian Vegetable Rsch. & Dev. Ctr. v. Inst. of Int'l Educ.*, 944 F. Supp. 1169, 1181 (S.D.N.Y. 1996) (recognizing the "longstanding New York rule that 'economic loss is not recoverable under a theory of negligence'").

It has failed to meet that burden.  In New York, "parties are permitted to define their obligations to one another *ex ante* by agreement" and courts are "loathe to impose any extracontractual obligations on them *ex post*."  *Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA.*, 2023 WL 6812984, at *10 (S.D.N.Y. Oct. 16, 2023).  Thus, when parties enter into an agreement, that agreement, not the law of tort, ordinarily defines their obligations to each other. *See Vought v. Tchrs. Coll., Columbia Univ.*, 127 A.D.2d 654 (2d Dep't 1987).  A limited exception to that principle applies when the parties share "a special relationship" giving rise to a duty by one party to "protect against the risk of harm to" the other.  *Cruz v. TD Bank, N.A.*, 855 F. Supp. 2d 157, 178 (S.D.N.Y. 2012) (Castel, J.).  The existence of a duty is a question of law, the

16

determination of which requires a "policy-driven scrutiny of whether" one party should bear responsibility to "protect [another] against purely economic losses." *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 599 (S.D.N.Y. 2015). Because this case concerns a commercial transaction, Gryphon must point to an "identifiable source of a special duty of care" that obligated Sphere to prevent Gryphon from being duped by the fraudster. *Presnall v. Analogic Corp.*, 2018 WL 4473337, at *9 (S.D.N.Y. Sept. 18, 2018).

"New York law is clear in limiting imposition of [such] a duty, the breach of which can support a claim in tort, to a limited class of professionals and circumstances." *Avazpour*, 937 F. Supp. 2d at 364. Courts will not impose such duties when the "damages alleged, however significant to the parties, do not implicate a larger public interest." *Id.* The "imposition of an independent duty of care" in the commercial context is "reserved for the most serious of situations directly affecting the public at large, and not sophisticated parties." *Vitolo v. Mentor H/S, Inc.*, 426 F. Supp. 2d 28, 36 (E.D.N.Y. 2006). Thus, while "professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties," ordinary parties to a commercial transaction are not. *Landon v. Kroll Lab'y Specialists, Inc.*, 91 A.D.3d 79, 83 (2d Dep't 2011); *see also, e.g., TD Waterhouse Inv. Servs., Inc. v. Integrated Fund Servs., Inc.*, 2003 WL 42013, at *13 (S.D.N.Y. Jan. 6, 2003) (holding that an accounting firm did not owe an independent duty to its client because the injury asserted was "economic in nature" and did not implicate the public interest).

Gryphon's Fourth Amended Counterclaim fails to allege the existence of a special relationship or any other basis for the imposition of an independent duty to prevent Gryphon from

being duped by the fraudster.[7]  To the contrary, its allegations make clear that it was Gryphon, not Sphere, who was responsible for protecting the economic interests of its contractual counterparty. The Court should therefore dismiss Gryphon's negligence claim for failure to allege the existence and breach of an extracontractual duty.

Gryphon alleges that it is a "sophisticated part[y]" with "unique experience, credibility, and expertise in cryptocurrency mining operations."   *See* Answer ¶ 11, 29; Fourth Amended Counterclaim ¶ 11.  It further alleges Sphere "leverag[ed]" those characteristics to "transform its business" by vesting immense power in Gryphon.  Answer ¶ 29.  Under the MSA, Gryphon was the "exclusive provider of any and all management services for all [Sphere's] blockchain and cryptocurrency-related operations."  *See* MSA at 1.  And it also was a custodian of Sphere's digital assets and charged with responsibility for maintaining them on Sphere's behalf.  *See* Fourth Amended Counterclaim ¶ 74.  By Gryphon's account, those twin responsibilities gave it comprehensive power, including "exclusive control over" Sphere's digital assets and the right to determine when and with whom Sphere does business.  *See id.* ¶¶ 10, 47 (alleging that Sphere breached the MSA by "enter[ing] into a business relationship . . . without the knowledge, consent, approval, or involvement of Gryphon").  Those characteristics give rise to a special relationship in which *Gryphon owes extracontractual duties to Sphere*, not the other way around.  *See JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, 585 F. Supp. 3d 474, 479 (S.D.N.Y. 2022) (observing that, "[i]n the commercial context," one party's "unique or special expertise" may give rise to a special relationship imposing duties of care to its contractual counterparty); *Deleu v. Scaife*, 775 F. Supp.

---

[7] In its response to Sphere's pre-motion letter identifying defects in its first attempt to plead its negligence claim, Gryphon relied on a series of consumer data privacy cases.  *See* Dkt. 32.  This case is nothing like those data privacy cases, not least because it involves a commercial transaction and purely economic losses, as opposed to the disclosure of consumers' personally identifying information, the damage for which is not purely economic.

712, 715 (S.D.N.Y. 1991) ("New York law is clear that a fiduciary relationship exists from the assumption of control and responsibility."); *In re Refco Inc. Sec. Litig.*, 2010 WL 11475742, at *19 (S.D.N.Y. Mar. 2, 2010) ("[A] fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit" (citation omitted)); *see also* Dkt. 36 ("Second Amended Compl.") ¶¶ 42–46 (setting forth Gryphon's fiduciary duties as manager, custodian, broker, advisor, and agent).

By contrast, the grounds for Sphere's purported duties are patently insufficient to impose obligations outside of the parties' agreement.

For example, Gryphon alleges that Sphere's executives owed it a duty to scrutinize emails sent to Gryphon to determine whether they originated from the proper email address. *See* Fourth Amended Counterclaim ¶¶ 88, 152–55 (faulting Sphere's CEO for failing to review emails on which she was copied to determine whether they originated from Mr. Kalbfleisch's real email address). But Gryphon admits that *Gryphon* was the recipient of the spoofed emails, that *Gryphon* had received requests originating from authentic Sphere email addresses in the past, and that, consistent with its obligation to "manage digital wallets on Sphere's behalf," *Gryphon* had processed those requests following a protocol designed to ensure that Sphere's digital assets were transferred to the proper recipient. *See, e.g., id.* ¶¶ 74–75. If any party was "well-positioned" to discern the propriety of a request to transfer assets, it was the one whose admitted role was to effectuate and verify such transfers on its counterparty's behalf. *See id.* ¶ 75 (Gryphon admitting that it had processed multiple requests to transfer Sphere's digital assets). The mere fact that Sphere's CEO was copied on emails from the fraudster is not a sufficient basis to impose duties to protect Gryphon, the party contractually charged with responsibility for safeguarding Sphere's assets, from the consequences of Gryphon's own incompetence. *See Alfaro v. Wal-Mart Stores,*

*Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (observing that "[i]dentifying the scope of an alleged tortfeasor's duty" requires consideration of "contractual assumptions of responsibility").

Gryphon also alleges that, because Sphere "knew or should have known" of the alleged "prevalence of, and industry warnings relating to," spoofing attacks, it owed a duty to protect Gryphon from the consequences of those attacks and implement robust policies to ward them off. Fourth Amended Counterclaim ¶ 149.  As the Ninth Circuit has held, there is no "common-law duty requiring a business to prevent third-party fraudsters from impersonating the business." *A.C.L. Computers & Software, Inc.*, 727 F. App'x at 376 (applying California law).  This follows the general rule that "[a] defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter [the] defendant can exercise such control." *D'Amico v. Christie*, 71 N.Y.2d 76, 88 (N.Y. 1987).  The consequences of a different rule would be far reaching: every business would be charged with implementing costly programs to ward off spoofing attacks, which are by now understood to be ubiquitous. *See Doe v. Maier*, 2020 WL 9812927, at *17 (E.D.N.Y. Mar. 24, 2020) ("[A]ny extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs."). Gryphon's attempt to impose this duty here is particularly undesirable given its "significant and unique experience, credibility, and expertise in cryptocurrency mining operations."  Fourth Amended Counterclaim ¶ 11.  That Gryphon was aware of spoofing risks yet failed to bargain for any obligations concerning them—and apparently failed in its own right to mitigate them—weighs heavily against the imposition of any extracontractual duty on its allegedly less sophisticated contractual counterparty.

In sum, Gryphon has offered nothing to overcome the law's strong presumption that parties to a contractual relationship are limited to contractual remedies for purely economic loss.

20

Accordingly, it has failed to plead the existence of an independent duty sufficient to give rise to a claim for negligence, which should be dismissed.

## III.   GRYPHON'S IMPLIED COVENANT CLAIM SHOULD BE DISMISSED

Gryphon's implied covenant claim alleges that Sphere breached the covenant by refusing to provide information concerning its miners and the third parties responsible for hosting them, thereby preventing Gryphon from providing the services required by the Management Services Provision by securing hosting and paying related bills on Sphere's behalf. *See id.* ¶¶ 136–38.  That claim should be dismissed because it is duplicative of the breach of contract claim and, independently, because it improperly seeks to impose obligations beyond those agreed to by the parties.

### A.   Gryphon's Implied Covenant Must Be Dismissed As Impermissibly Duplicative

An implied covenant claim can be maintained only if it is independent of a party's breach of contract claim.  To be independent, the implied covenant claim must rest on different conduct than that underlying the breach of contract claim and seek to recover distinct damages.  *See Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) (observing that "New York law . . . does not recognize a separate cause of action for breach of the implied covenant . . . when a breach of contract claim, based upon the same facts, is also pled"); *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003) (holding that implied covenant claims "which seek to recover damages that are intrinsically tied to the damages allegedly resulting from the breach of contract must be dismissed as redundant").  Courts consistently dismiss implied covenant claims as duplicative where they address the "same ultimate grievance" as a breach of contract claim or seek damages resulting from a breach of an agreement's express provisions.  *County of Orange v. Travelers Indem. Co.*, 2014 WL 1998240, at *3 (S.D.N.Y. May 14, 2014).

21

Gryphon's implied covenant claim is duplicative and must be dismissed because it rests on the same conduct and injury underlying Gryphon's breach of contract claim: Sphere's alleged failure to provide Gryphon with exclusive control over its business. In its breach of contract claim, Gryphon complains that Sphere has denied its rights under the Management Services Clause by conducting its own operations without Gryphon's consent. *See* Fourth Amended Counterclaim ¶ 125. That alleged deprivation also lies at the heart of the implied covenant claim. *See id.* ¶ 143 (alleging that the failure to provide information "prevented Gryphon from providing Services as required under the Sphere MSA"); MSA at 1 (defining the term "Services" to means the exclusive provision of "management services" under the MSA). The purported refusal to provide information is not a distinct wrong; it is simply another way of describing Sphere's allegedly improper decision to conduct its own affairs without Gryphon's involvement. Indeed, there is no distinct damage that could accrue from breach of the alleged right to information that is not already subsumed by the alleged breach of the exclusivity provision. The implied covenant claim must therefore be dismissed as impermissibly duplicative. *See EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 94 (S.D.N.Y. 2018) (holding that an implied covenant claim based on the "allege[d] non-disclosure of documents" justifying a rate increase was duplicative of a breach of contract claim alleging that the increase was improper).

### B. Gryphon's Implied Covenant Claim Improperly Seeks To Impose Obligations Beyond Those Set Forth In The MSA

It is well established that "the obligation of good faith and fair dealing does not obligate a party to do more than what was expressly promised under the contract." *See Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 300 (S.D.N.Y. 2009); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.*, 25 A.D.3d 309, 310 (1st Dep't 2006) ("The covenant of good faith and fair dealing cannot be construed . . . to create independent contractual rights."). "'The implied

covenant' is a limited, gap-filling cause of action." *See Waxman v. Cliffs Nat. Res. Inc.*, 222 F. Supp. 3d 281, 295 (S.D.N.Y. 2016). Thus, when the parties' agreement addresses a particular subject matter and is not alleged to be ambiguous regarding it, a court may not find an implied covenant on the same subject. *See Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989).

As Gryphon concedes, the MSA "does not . . . address Sphere's [alleged] failure to disclose" the information sought. *See Fourth Amended Counterclaim ¶ 142.* But it undoubtedly addresses the services Gryphon must perform under the Management Services Provision, including Sphere's obligations in relation to them. Gryphon has not suggested that those express provisions contain language sufficiently ambiguous to invoke the implied covenant or that there is a "gap" which the implied covenant must fill. This is neither a case in which the obligation Gryphon seeks to impose is a necessary incident of an express obligation, nor one in which Gryphon's purported need for the information sought could not have been contemplated at the time of contracting. Instead, Gryphon impermissibly seeks to impose a substantive obligation "for which the parties did not bargain." *See Hartford Fire Ins. Co.* 723 F. Supp. at 991. The claim should therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Count I (the Core Breach Claim), Count III (the implied covenant claim), and Count IV (the negligence claim) of the Fourth Amended Counterclaim should be dismissed for failure to state a claim. Because Gryphon has now amended its pleadings thre times in response to the same arguments raised in this motion, the dismissal should be with prejudice. *Payne v. Malemathew*, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That Plaintiff was provided notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte*.").

Dated:       February 2, 2024
             New York, NY

**DONTZIN NAGY & FLEISSIG LLP**

*Gregory N. Wolfe*
_____
Tibor L. Nagy, Jr.
Gregory N. Wolfe
Maxine Peskens
Rahul Srinivas (pro hac vice forthcoming)
David Moosmann (pro hac vice forthcoming)
31 E 62nd St.
New York, NY 10065
Tel: 212-717-2900
tibor@dnfllp.com
greg@dnfllp.com
mpeskens@dnfllp.com
rsrinivas@dnfllp.com
dmoosmann@dnfllp.com

*Counsel for Sphere 3D Corp.*