# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------- X
                                                   :
SPHERE 3D CORP.,                                   :
                                                   :         Case No. 1:23-cv-02954- PKC-VF
         *Plaintiff and*                           :
         *Counterclaim-*                            :
         *Defendant,*                               :
                                                   :
         vs.                                        :
                                                   :
GRYPHON DIGITAL MINING, INC.,                       :
                                                   :
         *Defendant and*                            :
         *Counterclaim-Plaintiff.*                  :
-------------------------------------------------- X

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION ON TAKING EVIDENCE ABROAD IN A CIVIL MATTER

The United States District Court for the Southern District of New York ("the Court") presents its compliments to the appropriate judicial authority of the United Kingdom for assistance in obtaining evidence to be used at trial in the above-captioned civil proceeding before this Court. This request is made pursuant to and in conformity with the Hague Convention of 18 March 1970 on the Taking of Evidence in Civil or Commercial Matters ("Hague Convention"). This Court is a court of law and equity and has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a) and pursuant to the forum selection clause of the Master Services Agreement (the "MSA").

The Court has determined that it would further the interests of justice and that justice cannot be completely done between the parties without the testimony, under oath, of Daniel Tolhurst residing within your jurisdiction. The action involves claims for breach of contract and breach of fiduciary duty. While no longer associated with the company, Mr. Tolhurst was the co-founder and president of Gryphon Digital Mining, Inc. ("Gryphon"). Gryphon is the Defendant and Counter-Plaintiff in the above-captioned action. Mr. Tolhurst has knowledge relevant to this action as described in more detail below.

1

The testimony of Mr. Tolhurst is not available from any source within the jurisdiction of this Court and cannot be obtained by any means other than pursuant to an order of appropriate judicial authority of the United Kingdom compelling the witness to appear for examination.  Mr. Tolhurst, a non-party to this action, is currently a partner at Channel 4 Ventures, based in London, with an address of Flat 24, Petersham House 29–37, Harrington Road, London SW7 3HD.

This request is made with the understanding that, and on the basis that, any order made pursuant to this request: (1) will not require Mr. Tolhurst to commit any offense; (2) will not require Mr. Tolhurst to undergo a broader form of inquiry than he would have if the litigation were conducted in England and Wales; and (3) will not violate the laws of civil procedure of any English court.

The Court, therefore, and in conformity with Article 3 of the Hague Convention, respectfully requests that you, in furtherance of justice by proper process, (1) cause Mr. Tolhurst to appear before an official authorized to administer oaths and to provide testimony and answer questions and cross-questions on his oath or affirmation, and (2) direct his testimony to be transcribed and recorded by video, and the transcript and video be sent to counsel for the parties in the action, who so request a copy.  The Court stands ready to provide similar judicial assistance to judicial authorities in the United Kingdom when required.

The particulars of this Letter of Request are as follows:

**1.      Sender**

The Honorable Valerie Figueredo
United States Magistrate Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007
United States of America

**2.      Central Authority Of The Requested State**

Central Authority for the United Kingdom
The Senior Master

2

Foreign Process Section
Room E16
Royal Courts of Justice
Strand
London WC2A 2LL

**3.    Person To Whom The Executed Request Is To Be Returned**

This Court hereby further requests that a copy of the executed Letter of Request and all documents and materials covered by this Letter of Request be returned to:

The Honorable Valerie Figueredo
United States Magistrate Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007
United States of America

And

This Court hereby further requests that a copy of the executed Letter of Request and all documents and materials covered by this Letter of Request be returned to:

Steven Loble
W Legal Limited
47 Red Lion Street
London WC1R 4PF
United Kingdom

Gregory N. Wolfe
DNF LLP (Dontzin, Nagy & Fleissig)
31 East 62nd St.
New York, NY 10065
Tel.: (212) 717-2900
greg@dnfllp.com

**4.    Specification Of The Date By Which The Requesting Authority Requires Receipt Of The Response For International Judicial Assistance ("Request For Assistance")**

The requesting authority would greatly appreciate a response to the Request for Assistance within 14 days or as soon thereafter as is practicable.

**IN CONFORMITY WITH ARTICLE 3 OF THE HAGUE CONVENTION, THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK THEREFORE HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST**

**5.a.    Requesting Judicial Authority**

United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007
United States of America

**5.b.    To The Competent Authority Of**

England, United Kingdom

**5.c.    Name Of The Case And Any Identifying Number**

*Sphere 3D Corp. v. Gryphon Digital Mining, Inc.*, No. 1:23-cv-02954- PKC-VF (S.D.N.Y.)

**6.    Names And Addresses Of The Parties And Their Representatives**

 **a.    Plaintiff And Counter-Defendant**

  Sphere 3D Corp.

 **b.    Plaintiff And Counter-Defendant's Representatives**

  DNF LLP (Dontzin, Nagy & Fleissig)
  Tibor L. Nagy
  Gregory N. Wolfe
  31 East 62nd St.
  New York, NY 10065

 **c.    Defendant And Counter-Plaintiff**

  Gryphon Digital Mining, Inc.

 **d.    Defendant And Counter-Plaintiff's Representatives**

  Hogan Lovells US LLP
  Dennis H. Tracey, III
  Elizabeth C. Carter
  William Winter
  390 Madison Avenue
  New York, NY 10017

**7.a.    Nature Of The Proceedings**

This is a civil action pending in the United States District Court for the Southern District of New York in which Plaintiff asserts claims for, inter alia, breach of contract and breach of fiduciary duty. Defendant and Counter-Plaintiff Gryphon also brings a claim of breach of contract. The parties

are actively conducting fact discovery in anticipation of trial.

**7.b.    Summary Of Complaint**

Sphere and Gryphon are both in the business of digital asset mining.  In short, both companies utilize sophisticated computers, called miners, to run programs that generate new bitcoin.  Both Sphere and Gryphon contract with third parties to host their miners.  These third parties provide warehouse space, electricity, security, internet access, temperature control, and other services in exchange for fees.

On August 19, 2021, Sphere and Gryphon entered into the MSA, as subsequently amended on December 29, 2021.  As per the MSA, Gryphon would be Sphere's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations" and agreed to be a custodian of some of Sphere's digital assets.  In return, Gryphon received a large percentage of the profit Sphere generated on its blockchain and cryptocurrency-related operations (i.e., its entire business).

Sphere initiated this lawsuit, alleging that Gryphon did not fulfill its duties under the MSA and was in breach of contract.  By way of example, Sphere alleges that Gryphon failed to properly manage Sphere's miners; that Gryphon failed to follow Sphere's instructions with respect to the digital assets Gryphon was holding on Sphere's behalf; that Gryphon failed to protect Sphere's interests in a bankruptcy proceeding involving Core Scientific, Inc ("Core"), a third party with whom Gryphon contracted on Sphere's behalf; and that Gryphon failed to assist Sphere in releasing a shipment of Sphere's miners from U.S. Customs and Border Patrol, causing Sphere to lose out on revenue it would have otherwise generated.

Sphere also alleges that by entering the MSA, Gryphon took on fiduciary duties with respect to Sphere and that Gryphon is in breach of those duties.  In support of its claim, Sphere alleges that Gryphon prioritized its miners over Sphere's, leading Gryphon's miners to outperform Sphere's, despite Gryphon being charged with securing optimal performance for Sphere's miners.  Furthermore, Sphere alleges that Gryphon erroneously sent 18 Bitcoin belonging to Sphere to a malicious third party, an event which the parties refer to as the "Spoofing Incident."

On October 6, 2023, after the suit was initiated, Sphere terminated the MSA.

A true and correct copy of Sphere's operative pleading is attached hereto as Exhibit A-1.

**7.c.    Summary Of Defenses And Counterclaims**

Gryphon denies that it breached the MSA and denies that it owes Sphere any fiduciary duties.  Gryphon has also filed a counterclaim alleging that it is Sphere who is in breach of the MSA, contending that Sphere breached the exclusivity clause of the MSA by allegedly securing its own hosting without securing permission from Gryphon and by allegedly improperly terminating the MSA.

A true and correct copy of Gryphon's Fourth Amended Counterclaims is attached hereto as Exhibit A-2.

**7.d.    Other Necessary Information Or Documents**

The case is currently at the pre-trial discovery stage.  In the course of discovery, Sphere and Gryphon will exchange documents and information relevant to their respective claims and defenses. In addition to such written discovery, the parties will conduct depositions of relevant witnesses, including designees of each of the parties.  Depositions are presently set to be conducted in September and October of 2024.  Fact discovery (that is, all discovery other than that concerning expert witnesses) will conclude on October 11, 2024.  Discovery concerning expert witnesses will conclude by December 20, 2024.  Summary judgment briefing, if any, will be due thereafter.

**8.a.    Evidence To Be Obtained Or Other Judicial Act To Be Performed**

Because Mr. Tolhurst resides outside the subpoena power of this Court, and therefore cannot be compelled to testify at trial, this Court respectfully requests that the appropriate judicial authority in the United Kingdom cause the appropriate orders to be issued to direct the testimony, under oath, of Mr. Tolhurst to be used at trial in these proceedings.

**8b.    Purpose Of The Evidence Or Judicial Act Sought**

At trial, Sphere must prove that Defendant breached the MSA and breached its fiduciary duties to Plaintiff.  Similarly, Sphere must defend against Gryphon's allegations that Sphere breached the MSA.  Sphere seeks deposition testimony from Mr. Tolhurst both to prove its own claims and to defend against Gryphon's claims at trial.

Sphere has represented and furnished sufficient evidence to satisfy this Court that Mr. Tolhurst has personal knowledge of matters material and relevant to the matters at issue in the proceedings.  Specifically, Sphere has furnished this Court with evidence that:

- Mr. Tolhurst negotiated the MSA (*see* Exhibit A-3, where Mr. Tolhurst sends Sphere's CEO a draft MSA).

- Mr. Tolhurst was involved in purportedly seeking to secure hosting for Sphere's miners (*see* Exhibit A-4, where Mr. Tolhurst sends Sphere's CEO a draft contract with a third-party hosting provider; Exhibit A-5, a text message thread where Mr. Tolhurst updates Sphere's CEO about Gryphon's efforts to secure hosting for Sphere's miners; Exhibit A-6, a text message thread with a Sphere employee where Mr. Tolhurst inquires as to whether Sphere needs additional hosting for its miners; and Exhibit A-7, an email thread where Mr. Tolhurst voices his opinion on where Sphere should ship its miners).

- Mr. Tolhurst was involved in fulfilling Sphere's requests for Gryphon to sell Sphere's digital assets that Gryphon managed (*see* Exhibit A-8, where Mr. Tolhurst asks to be copied on Sphere's requests).

- Mr. Tolhurst was involved with, and knowledgeable of, the process by which Gryphon calculated the fees Sphere owed Gryphon under the MSA (*see* Exhibit A-9, where Mr. Tolhurst sends Sphere's CFO the amount Sphere owed Gryphon for May of 2022 and the calculations behind the amount).

- Mr. Tolhurst corresponded with Sphere to secure the release of a shipment of Sphere's miners from the custody of the U.S. Customs and Border Protection Agency (*see* Exhibit A-10, where Mr. Tolhurst provides Sphere's CEO and CFO with the customs invoice to release Sphere's miners).

- Mr. Tolhurst has knowledge of the parties' relationship (*see* Exhibit A-11).

As set forth below, the evidence sought by Sphere relates to the matters in question in the litigation:

- Mr. Tolhurst's background and employment are relevant to establishing the foundation for him to testify about several aspects of the parties' claims and defenses.

- Mr. Tolhurst's testimony regarding his knowledge of why the parties entered the MSA and the underlying negotiations is relevant to the parties' claims and defenses.

- Mr. Tolhurst's testimony regarding either party's performance under the MSA is relevant to the parties' claims and defenses.

- Mr. Tolhurst's testimony regarding payments Gryphon received under the MSA, and the calculation behind those payments, is relevant to the parties' claims and defenses.

- Mr. Tolhurst's testimony regarding his knowledge of the parties' relationships with any third-party host is relevant to the parties' claims and defenses.

- Mr. Tolhurst's testimony regarding the difference in performance between Gryphon's own miners and those that Gryphon managed for Sphere is relevant to the parties' claims and defenses.

**9.    Identity And Address Of Any Person To Be Examined**

Daniel Tolhurst
Flat 24, Petersham House
29–37 Harrington Road
London SW7 3HD
United Kingdom

**10.    Questions To Be Put To The Person Examined Or Statement Of The Subject Matter About Which They Are To Be Examined**

1. Mr. Tolhurst's educational background, employment history, professional qualifications, cooperation or separation agreements, and personal preparation for the deposition (to include any contacts the witness may have had with the parties, their lawyers, and other witnesses, but excluding any privileged content of such communications).

2. Mr. Tolhurst's knowledge regarding the reasons why the parties entered the MSA, including, but not limited to, the parties' negotiations regarding the MSA and its amendment.

3. Mr. Tolhurst's knowledge regarding any services Gryphon provided Sphere, including but not limited to:

    a.  Gryphon's efforts to secure hosting for Sphere's miners;

    b.  Gryphon's efforts to ensure the operation of Sphere's miners;

    c.  Gryphon's adherence to Sphere's written instructions to hold or sell Sphere's digital assets; and

    d.  Gryphon's payments or non-payment to Sphere's third-party hosts.

4. Mr. Tolhurst's knowledge regarding Sphere's performance under the MSA, including the factual basis for any claim that Sphere breached the MSA, for the time period from August 19, 2021, to October 6, 2023.

5. Mr. Tolhurst's knowledge about payments Gryphon received pursuant to the MSA, including, but not limited to, the calculations supporting any such payments, for the time period from August 19, 2021, to October 6, 2023.

6. Mr. Tolhurst's knowledge regarding Gryphon's claimed damages.

7. Mr. Tolhurst's knowledge of the parties' relationships and agreements with any third-party hosts, including, but not limited to, the following entities, for the time period from August 19, 2021, to October 6, 2023:

    a.  Core;

    b.  Coinmint;

    c.  Compute North;

    d.  Foundry;

    e.  Rebel Mining;

    f.  Lancium;

    g.  Luxor;

    h.  North County Colocation Services;

    i.  U.S. Bitcoin; and

    j.  Joshi Petroleum.

8. Mr. Tolhurst's knowledge of Gryphon's efforts to protect Sphere's interests in a bankruptcy proceeding involving Core, a third-party host that Gryphon contracted with to host Sphere's miners.

9. Mr. Tolhurst's knowledge of Gryphon's communications, including his own, with the U.S. Customs And Border Protection Agency between June 2022 and September 2022, when a shipment of Sphere's miners was seized.

10. Mr. Tolhurst's knowledge of the Spoofing Incident, by which Gryphon erroneously sent Sphere's digital assets to a malicious third party.

11. Mr. Tolhurst's knowledge of Sphere's October 6, 2023, termination of the MSA.

12. Mr. Tolhurst's knowledge of Gryphon's efforts to secure hosting for its own miners from August 19, 2021, to October 6, 2023.

13. Mr. Tolhurst's knowledge of the selection of mining pools for both Gryphon and Sphere's miners and the reasons for any differences, for the time period from August 19, 2021, to October 6, 2023.

14. Mr. Tolhurst's knowledge regarding the factual basis for the differences in the performance of Gryphon's miners as compared with the performance of Sphere's miners, for the time period from August 19, 2021, to October 6, 2023.

15. Mr. Tolhurst's knowledge of any treasury management strategy employed on behalf of either Sphere or Gryphon for the time period from August 19, 2021, to October 6, 2023.

**11.     Documents Or Other Property To Be Inspected**

There is no request for Mr. Tolhurst to produce any documents.

**12.     Any Requirements That The Evidence Be Given Under Oath And Any Special Form To Be Used**

The examination of the individuals identified in Section 9 above will be taken under oath before: (1) a secretary of embassy, consul general, consul, vice-consul, or consular agent of the United States of America; (2) any officer authorized to administer oaths under the laws of the United States of America or of the United Kingdom; or (3) before a person appointed by you and empowered to administer oaths and take testimony.

This Court further requests that you, by your proper process, require that the testimony given during the above-described testimony be given under the following oath or affirmation: "I [deponent] swear that the testimony that I am about to give is the truth, the whole truth, and nothing but the truth."

**13.     Special Methods Or Procedure To Be Followed**

This Court respectfully requests that:

a.   The examination of the individuals identified in Section 9 above be taken under the Federal Rules of Civil Procedure of the United States of America, except to the extent that any such procedure is incompatible with the law of the United Kingdom.

b.   The examination of Mr. Tolhurst be conducted by (i) attorneys for the Plaintiff or other duly authorized representatives, qualified to practice law in United States jurisdictions and/or in the United Kingdom, nominated by the Defendants; (ii) the witness's counsel; and (iii) attorneys for Defendant.

c. The examinations and cross-examinations be recorded verbatim by stenographic means and by videotape, with a professional videographer and a professional stenographer—provided at the charge of Plaintiff—being permitted to attend the oral testimony in order to record the testimony.

**14.  Request For Notification Of The Time And Place For The Execution Of The Request And Identity And Address Of Any Person To Be Notified**

It is requested that testimony be taken at such place, date, or time as ordered by Royal Courts of Justice Strand, London, and/or as otherwise scheduled by the representatives of the Plaintiff and/or as otherwise agreed to by the witnesses and the respective representatives of the Parties.

Notice thereof should be made to Plaintiff's designee:

> Gregory N. Wolfe
> DNF LLP (Dontzin, Nagy & Fleissig)
> 31 East 62nd St.
> New York, NY 10065
> Tel.: (212) 717-2900
> greg@dnfllp.com

Counsel for Plaintiff will promptly send notice to counsel for all parties to the action.

**15.  Request For Attendance Or Participation Of Judicial Personnel Of The Requesting Authority At The Execution Of The Letter of Request**

None.

**16.  Specification Of Privilege Or Duty To Refuse To Give Evidence Under The Law Of The State Of Origin**

Neither this request for international judicial assistance, the transmission of documents pursuant to the Hague Convention, nor any examination, including, without limitation, this request and all transcripts of Mr. Tolhurst's examinations shall waive, or be deemed or argued to have waived, the attorney-client privilege, the work product doctrine, or any other privileges, rights, protections, or prohibitions that may apply to that evidence under the laws of the United Kingdom, the United States of America, or the State of New York, including the privilege against self-incrimination.

The examination of Mr. Tolhurst will not be oppressive.  Moreover, Mr. Tolhurst's testimony will proceed under the terms of the Protective Order (*see* Exhibit A-12) and, therefore, will be given confidential treatment in connection with this litigation.

**17.  The Fees And Costs Incurred Which Are Reimbursable Under The Second Paragraph Of Article 14 Or Under Article 26 Of The Convention Will Be Borne By:**

Plaintiff.

Date of Request: _____

_____
Signature and Seal of the Requesting Authority

Exhibit A-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SPHERE 3D CORP.,

*Plaintiff*,

v.

GRYPHON DIGITAL MINING, INC.,

*Defendant*.

Case No. 23-cv-02954 (PKC)

**Jury Trial Demanded**

**SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

PARTIES ............................................................................................................... 9

JURISDICTION & VENUE ................................................................................... 10

FACTUAL ALLEGATIONS ................................................................................... 10

I.      BACKGROUND ON CRYPTOCURRENCY MINING ............................................. 10

II.     IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND CRYPTOCURRENCY-RELATED OPERATIONS" ...................................................... 11

III.    THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT MANAGEMENT SERVICES, IN BREACH OF THE MSA .......................................... 12

IV.    GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL ASSETS, IN BREACH OF THE MSA .................................................................... 13

V.     GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH OF ITS FIDUCIARY DUTIES ................................................................. 14

VI.    GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE LAW   17

        A.    Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry Standard Procedures For Transferring Bitcoin ................................................. 17

        B.    Gryphon Lacks Industry Standard Internal Controls And Policies And Procedures, In Violation Of The MSA And Almost Certainly In Violation Of Applicable Law ............................................................................................ 18

VII.   IN AN EFFORT TO COW SPHERE AND DISSUADE IT FROM EXPOSING GRYPHON'S NUMEROUS BREACHES, GRYPHON HAS BASELESSLY SOUGHT TO THREATEN SPHERE WITH MANUFACTURED BREACHES .................................................................. 21

VIII.  SINCE SPHERE FILED THIS LAWSUIT, GRYPHON HAS RETALIATED BY REFUSING TO TRANSFER THE PROCEEDS OF THE SALES OF SPHERE'S DIGITAL ASSETS TO SPHERE ...... 22

IX.    SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES .......... 25

ii

X.      AFTER SPHERE FILED THIS LAWSUIT, GRYPHON ASSERTED MERITLESS DEFAMATION
        CLAIMS DESIGNED TO PUNISH SPHERE FOR BRINGING THIS LAWSUIT ............................ 26

**CAUSES OF ACTION** ............................................................................................................ 28

**PRAYER FOR RELIEF** ......................................................................................................... 31

Plaintiff Sphere 3D Corp. ("Sphere"), by and through its undersigned attorneys, respectfully submits this Amended Complaint against defendant Gryphon Digital Mining, Inc. ("Gryphon").

## PRELIMINARY STATEMENT

1.      This is an action for breach of contract and breach of fiduciary duty.  Sphere and Gryphon are in the business of digital asset mining—*i.e.*, using computers referred to as "miners" to earn bitcoin and bitcoin-related transaction fees.  In contemplation of a potential merger that ultimately fell through, the parties entered into a Master Services Agreement dated August 19, 2021 (the "MSA," attached as Exhibit 1), as subsequently amended on December 29, 2021 (the "MSA Amendment," attached as Exhibit 2).  Under the MSA, Gryphon (among other things) undertook an obligation to be the "exclusive provider of any and all management services for" Sphere's "blockchain and cryptocurrency-related operations" and the custodian of certain of Sphere's digital assets.  MSA at 1.  In return, Sphere promised to pay Gryphon an exorbitant management fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations" (the "Management Fee").  *Id.*  Separate from the contract, Gryphon's power over Sphere and its status as custodian of Sphere's digital assets and miners gave rise to fiduciary duties, including the duty of loyalty, including to avoid self-dealing, duty of care, and duty of good faith.

2.      For over a year now, the parties' relationship has proven to be completely one-sided: Gryphon has dutifully collected its exorbitant Management Fee while shirking its duties under the MSA and delivering abhorrent management services, causing untold damage to Sphere. Worse still, Gryphon has been skimming off the top (*i.e.*, stealing) from Sphere's assets and, as recent events have revealed, has no internal controls systems or policies and procedures in place,

as needed not only to comply with the MSA, but also applicable law. And Gryphon has breached its fiduciary duties by nakedly prioritizing its own interests over those of Sphere's.

3.       Gryphon's failures under the MSA are persistent, ongoing, uncured despite repeated entreaties from Sphere, and too many to catalogue. In general, Gryphon has been content to sit back and collect millions of dollars in Management Fees while delivering no services whatsoever. When it has delivered services, the results have been appalling. By way of illustration only, Gryphon has refused to find hosting space for Sphere's miners (and instead directed Sphere to undertake the task of finding space itself); allowed Sphere's miners to languish with the U.S. Customs and Border Protection agency ("U.S. Customs") for weeks (a situation Sphere itself ultimately resolved); persistently delayed in setting up and ensuring the operation of Sphere's miners; inexplicably ignored Sphere's instructions to sell its digital assets; failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges; and generally failed to manage relationships with third-parties. The result has been lost revenues for Sphere while Gryphon eats a free lunch.

4.       And, egregiously, Sphere has good reason to believe that Gryphon has been skimming off the top from—in other words, stealing—Sphere's digital assets. Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to provide Sphere with documentation to verify that it is not using or otherwise taking Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit. The only rational reason for such concealment is to make it harder for Sphere to know which assets are mined for its own account— and to detect Gryphon stealing Sphere's assets. Regardless of Gryphon's intent, it is apparent that it has failed to remit all that Sphere is owed.

5.      Recently, Gryphon's gross incompetence has reached a new level that raises substantial concerns about Gryphon's ability to safeguard Sphere's digital assets, the effectiveness of its internal controls, and its compliance with the law.  Gryphon holds itself out as a sophisticated entity and its CEO, Rob Chang, as an "experienced executive" in the crypto-space.  Gryphon and Mr. Chang, however, recently fell for multiple spoofing attacks targeting Sphere's digital assets that would have been avoided had Gryphon had internal controls systems and policies and procedures in place and adhered to applicable law.

6.      On January 27, 2023, at 1:22 p.m., Sphere CFO Kurt Kalbfleisch requested by email that Mr. Chang transfer 18 bitcoin (worth over $400,000) from a wallet controlled by Gryphon to one controlled by Sphere, which was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name: "@sphere3d.com."  Mr. Chang responded that he would initiate the transfer.

7.      At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch, as depicted in the figures below.  The email came from a different domain than the Sphere domain, namely, "@sphere**s**3d.com"[1] (with an added s in the middle), not @sphere3d.com. In the email, the person pretending to be Mr. Kalbfleisch stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address that Sphere had never used.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

---

[1] All emphases have been added unless otherwise noted.



Re: Coin Transfer

KK    Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com>
      To    ◯ Rob Chang
      Cc    ◯ Patricia Trompeter

(Fig 1. From/to/cc line reflecting that the email originated from the spoofer with an incorrect domain, @spheres3d.com)

Rob,

Well Noted. I have just been notified that the address below is being audited. So kindly proceed with the transfer of 18 BTC from our "Sphere Mined Coins" wallet to the following address: **bc1qmrykeusq73xd7ad6h2y27mw0fu2e9wcqrfrlvr.**

(Fig. 2. The relevant portion of the body of the spoofing email containing an implausible request to transfer bitcoin to a new wallet address in light of an audit.)

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

(Fig. 3. The signature block containing the correct email address.)

8.     This was a transparent spoofing attack in which a third-party was impersonating

Mr. Kalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets.

Even a cursory review of the spoofing email—which did not originate from a Sphere email address,

included the correct email address in the signature block, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags for any competent employee, let alone a supposedly "experienced" executive like Mr. Chang, and prevented any unauthorized transfer. So too would any independent verification of the requestor's identity, such as video or other identity verification.

9.      Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker. Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that Sphere had never used before, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

10.      Not to be outdone, mere days later, on February 1, 2023, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000). Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again). On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company— to realize that he had been fooled by not one, but two, spoofing attacks.

11.      The incident revealed to Sphere the woeful state of Gryphon's internal controls and policies and procedures, which should have prevented the attack. Following the spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide. The failure to include effective internal controls demonstrates not only that Gryphon cannot comply

with its duties under the MSA, but also that Gryphon is almost certainly in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs. Illustratively, Gryphon panicked when Sphere suggested that the incident be reported to law enforcement, including the Federal Bureau of Investigations ("FBI"), insisted that the issue could be handled between the parties, and demanded that no one report the theft to the authorities. This put the onus on Sphere to report the incident, which it did by filing a suspicious activity report ("SAR") with the Financial Crimes Enforcement Network ("FinCEN").

12. Gryphon's official version of events raises substantial concerns regarding its ability to rectify any of the issues raised by this litigation—and also its ability to tell the truth. Gryphon is presently in the process of merging with Akerna Co. ("Akerna"), a publicly-traded cannabis company. The Form S-4 Registration Statement dated May 11, 2023 for the transaction (the "Gryphon-Akerna Form S-4" or the "Form S-4") describes the spoofing attacks as follows:

> The threat actor requested that the BTC be transferred to an alternate wallet. As a result, 26 BTC, with a value of approximately $560,000 at the time, was transferred to a wallet controlled by the threat actor. Via counsel, Gryphon engaged with US Federal law enforcement to recover the BTC. Despite these attempts by law enforcement to recover the BTC, recovery was not possible. Gryphon subsequently wired the commensurate amount in USD to Sphere 3D to make them whole for the stolen BTC. . . . Sphere 3D made a claim with its insurance carrier. If Sphere 3D's is reimbursed from its insurance carrier, the Company would request a reimbursement from Sphere 3D. The Company has also subsequently modified its control systems to protect against any future attempted incursion.

*See* Gryphon-Akerna Form S-4 at F-76.

13. The description contains material inaccuracies. Most glaringly, the assertion that Sphere "made a claim with its insurance carrier" is totally wrong. On the contrary, as Sphere

explicitly informed Gryphon shortly after the spoofing attacks and long before the filing of the Form S-4, Sphere *did not make a claim with its insurance carrier, as it does not have any insurance that would cover the incident*. That Gryphon could claim the direct opposite is beyond belief.

14.     In addition, the claim that Gryphon made Sphere "whole" for the theft of approximately $560,000 worth of Sphere's assets omits that Gryphon has demanded that Sphere repay that amount to Gryphon. And while Gryphon claims it engaged with law enforcement, it has not disclosed any information about that engagement to Sphere—to the contrary, it actively tried to dissuade Sphere from engaging with law enforcement. Nor has Gryphon disclosed its purportedly updated internal controls to Sphere, despite multiple requests by Sphere. Finally, the description omits the most salient details, such as that Mr. Chang sent Sphere's digital assets to the "threat actor" on multiple occasions in response to email requests from an email address not associated with Sphere.

15.     There are additional indicia that Gryphon lacks anything resembling effective internal controls. In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability). In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere understands that Gryphon, when it goes public, intends to recognize Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.

16.     Beyond the MSA, Gryphon has breached its fiduciary duties. These fiduciary duties are inherent in nature and arise from, among other places, Gryphon's role as a manager of substantially all of Sphere's business operations (a role akin to an officer or trustee), agent, custodian, investment adviser, and broker-dealer. They also arise from the unusual trust and confidence Sphere places in Gryphon and the control and dominance Gryphon exerts over Sphere's

operations.  Gryphon has taken the position that Sphere cannot even *attempt* to "create" any "business relationships" with any third-party in the crypto-space unless it obtains Gryphon's approval first.  Gryphon's breaches of fiduciary duty include prioritizing its own proprietary miners and mining pool strategies over Sphere's.  Indeed, Gryphon's miners consistently outperform Sphere's, which would not occur if Gryphon were acting to avoid self-dealing.

17.    The situation has only become more dire since Sphere initiated this litigation on April 7, 2023.  In the ordinary course, Sphere generates substantially all of its revenue by mining for digital assets and those digital assets flow through a wallet controlled by Gryphon.  In the ordinary course, Gryphon is required to remit the proceeds from sales of those digital assets to Sphere.  The MSA specifically provides that Gryphon must honor Sphere's "written instructions . . . with respect to all decisions to sell or hold Digital Assets."  MSA at 3.  The Gryphon-Akerna Form S-4 (at F-55, F-66) likewise acknowledges that Gryphon must "[s]ell and/or transfer the coins at the request of Sphere" and that Sphere "retains legal ownership of the cryptocurrency" and "has the right to sell, pledge, or transfer the cryptocurrency."

18.    Since Sphere initiated this lawsuit, however, Gryphon has taken the position, for the first time in the history of the parties' relationship, it need *not* remit the proceeds of Sphere's own digital assets to Sphere and has ignored repeated instructions to sell assets.  Gryphon has offered no viable justification for failing to do so.  To the contrary, it has communicated that it is trying to put Sphere in a position where Sphere cannot meet its ordinary course obligations and where it cannot pay for the expenses and costs associated with this litigation so that it will be forced to capitulate.  Indeed, Gryphon has communicated that it will resume selling Sphere's digital assets and remitting the proceeds to Sphere if Sphere drops this lawsuit.  Sphere, however, will not give into this extortionate behavior.

8

19.     It is apparent that Gryphon is incapable of addressing its issues and performing under the MSA, both because the breaches are incurable and because Gryphon is simply unwilling to remedy its breaches.  Confirming as much, since Sphere filed its lawsuit, Gryphon has denied breaching any of its obligations.  Incredibly, it has denied that Sphere has given it sufficient specificity to know what its material breaches of the MSA are.  It has done so *even though Gryphon has conceded that Sphere's breach claims are sufficient to state a claim and thus inherently gave it reasonable notice of the allegations against it.*

20.     Accordingly, by this lawsuit, Sphere brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and for breach of fiduciary duty to seek redress for the millions of dollars in damage Gryphon's misconduct has caused, as well as to recover its attorney's fees and costs under the MSA.

## PARTIES

21.     Sphere 3D Corp. is a bitcoin mining company incorporated in Ontario, Canada, with its principal place of business in Ontario, Canada.  Unlike many mining companies, Sphere's operations are net carbon neutral.  Sphere is a publicly traded company whose securities have historically been dual listed in Canada and the U.S. and is currently listed for trading in the U.S. on the Nasdaq exchange.

22.     Gryphon Digital Mining, Inc. is a bitcoin mining company with its principal place of business in Las Vegas, Nevada.  In addition to providing management services to Sphere under the MSA, Gryphon utilizes its own mining fleet for its own account.

## JURISDICTION & VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of attorneys' fees and costs and because diversity of citizenship is established.

24.     This Court has jurisdiction over this action pursuant to the forum selection clause of the MSA, which requires that "[a]ll disputes, suits, actions or proceedings relating to" the MSA "be brought solely in the state or federal courts located in the State of New York."  Venue is also proper under the forum selection clause, which provides that: "Each party hereby consents to the exclusive jurisdiction and venue of the State of New York in connection with any such dispute, suit, action or proceeding, and waives any defense of forum non conveniens in connection therewith."

## FACTUAL ALLEGATIONS

### I.     BACKGROUND ON CRYPTOCURRENCY MINING

25.     Sphere is in the business of "mining" for bitcoin.  Mining ensures that the payment network underlying bitcoin functions.  Through mining, companies generate new bitcoin for themselves and earn revenue through transaction fees.  To mine for bitcoin, mining companies use purchased or leased "miners," which are generally sophisticated, high-capacity computers that run programs designed to support the network underlying bitcoin.  Companies may direct their miners to participate in a "mining pool," which aggregates mining power attributable to multiple miners and typically pays out on a pro rata basis based on the company's contribution to the pool.  Not all mining pools are created equal; selecting lucrative mining pools is critical to commercial success in the crypto-space.

26.     Hosting services for miners (*e.g.*, warehouse space, electricity, security, internet access, cooling, and so on) is a core component of digital asset mining.  Digital asset miners often

turn to third parties for hosting services in exchange for fees, which can be among the most significant costs associated with digital asset mining.

27.     Cryptocurrency is stored in an individual's digital "wallet," which is akin to an online bank account.  A wallet is the primary mechanism for managing cryptocurrency balances and allows individuals and organizations to hold and control their cryptocurrency.

## II.     IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND CRYPTOCURRENCY-RELATED OPERATIONS"

28.     On August 19, 2021, Sphere and Gryphon entered into the MSA in contemplation of a merger that never closed.  The MSA was subsequently amended on December 29, 2021.

29.     Under the MSA, Gryphon undertook an obligation to be Sphere's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations."  MSA at 1.  In return, Sphere promised to pay Gryphon a tremendous Management Fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations."  *Id.*  The Management Fee was exorbitant and meant that Sphere could expect commensurate service.

30.     In addition, the MSA made Gryphon a custodian of certain of Sphere's digital assets, which it maintains in a wallet.  *Id.*  The MSA also required Gryphon to sell Sphere's digital assets upon Sphere's "instruction."  *Id.*

31.     The MSA further required that Gryphon perform its services "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services" and not engage in "gross negligence, fraud or willful misconduct in connection with performing the Services."  MSA Amendment § 2.a.

32.     Finally, the MSA contains a prevailing party provision.  *See* MSA at 3.

11

### III. THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT MANAGEMENT SERVICES, IN BREACH OF THE MSA

33. Although the MSA required Gryphon to be the "exclusive provider of any and all management services" and to perform its duties "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services," Gryphon has completely and absolutely shirked its duties, with disastrous consequences for Sphere. MSA at 1. Often, Gryphon simply provides no services whatsoever—and expects to collect a Management Fee for the privilege of sitting on its hands. When it does provide "management services," it provides abhorrent services, far below those generally recognized in the crypto-mining industry.

34. By way of example, when Sphere needed hosting space in 2022 (a perquisite to turning on its miners and generating money), Gryphon refused to find hosting space and instead directed Sphere to find such space on its own. Delays in finding hosting space meant that Sphere could not run its miners, costing it money. Moreover, Sphere had to expend its own efforts to find such hosting space.

35. As another example, in 2022, Sphere ordered certain miners from overseas for delivery into the United States. The miners, however, were seized and held by U.S. Customs. Obtaining their release was simply a matter of providing U.S. Customs with certain manufacturing information, which would have informed U.S. Customs that no additional fees were due. Despite repeated pleas from Sphere, however, Gryphon shirked its duties to provide the assistance and information needed to release the miners. Due to Gryphon's misfeasance, the miners languished in U.S. Customs for weeks, costing Sphere dearly. Eventually, Sphere secured the release of the miners itself by interfacing with third-parties to provide the information.

36.     As yet another example, Gryphon has inexplicably delayed setting up mining pools, resulting in lost revenue.  It has also outright ignored instructions to sell Sphere's bitcoin on a timely basis. And Gryphon has failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges.  Indeed, Gryphon has generally failed to manage any of Sphere's relationships with third-parties.  It has not had regular calls with mining hosts.  It has not, in a way that is consistent with industry standard, responded to inquiries about why miners are down or acted appropriately to ensure they remain running.  It does not, consistent with industry standard, provide evaluations or recommendations to improve miner efficiency. It failed to file a proof of claim in a pending bankruptcy proceeding in which Sphere has a substantial claim, jeopardizing Sphere's ability to pursue its claim because Gryphon interacted with the debtor on Sphere's behalf.

37.     These examples are part and parcel of a general failure to provide management services consistent with Gryphon's obligations under the MSA throughout the parties' relationship.  And, throughout the parties' relationship, Sphere has raised its concerns to Gryphon over its lack of performance to no avail:  despite repeated entreaties from Sphere, Gryphon has proven incapable of curing its innumerable and persistent breaches of the MSA.

## IV.   GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL ASSETS, IN BREACH OF THE MSA

38.     Even worse than its utter failure to provide management services, upon information and belief, Gryphon has been skimming off the top—effectively stealing money—from Sphere. Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to provide Sphere with documentation to verify that it is not using or otherwise seizing Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit.  For example, it appears that Gryphon is comminglingly its assets with Sphere's, as it refuses to provide Sphere

with bank statements.  The only rational reason for such concealment is to make it harder for Sphere to know which assets are mined for its own account—and to detect Gryphon stealing Sphere's assets.

39.     Since Sphere filed this lawsuit, Gryphon has dropped the pretense and is holding Sphere's digital assets while refusing to sell them in accordance with Sphere's instructions. Gryphon has even sold Sphere's digital assets and simply retained the proceeds (tens of thousands of dollars), treating the funds as its own.

40.     In all events, regardless of Gryphon's intent, it is apparent that it has failed to remit all that Sphere is owed.

## V.    GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH OF ITS FIDUCIARY DUTIES

41.     Separate from the MSA, Gryphon owes fiduciary duties to Sphere, which arise from the unusual amount of trust placed in Gryphon by Sphere, control that Gryphon has over Sphere, and status as a custodian of Sphere's digital assets and miners.  Indeed, as discussed *infra*, Gryphon has taken the position that Sphere cannot even *attempt* to "create" any "business relationships" with any third-party in the crypto-space unless it obtains Gryphon's approval first.

42.     The fiduciary duties Gryphon owes Sphere's are inherent in nature.  By any conception, Gryphon exercises a dominant role and undue influence over Sphere's operations. Indeed, Gryphon's serves as the exclusive manager of Sphere's "blockchain and cryptocurrency-related operations"—*i.e.*, essentially Sphere's business.  As an exclusive manager, Gryphon occupies a relationship akin to an officer or trustee of Sphere's business, classic relationships that give rise to inherent fiduciary duties.

43.     In addition, Gryphon acts as Sphere's agent in managing Sphere's "blockchain and cryptocurrency-related operations"—including in managing Sphere's miner fleet and digital

assets, and in interacting with third-parties—and must act on Sphere's behalf consistent with the fiduciary duties inherent in an agency relationship.

44. Also, Gryphon acts as a custodian of Sphere's digital assets and miners, including in holding, safekeeping, and selling Sphere's digital assets and in transferring the proceeds therefrom. Likewise, Gryphon also effectively acts as a broker-dealer and investment advisor for Sphere, including in selling digital assets, transferring the proceeds therefrom, making investments on behalf of Sphere, and determining how Sphere's miners are utilized. Gryphon must act as a fiduciary consistent with the obligations inherent in a custodial, broker-dealer, and investment adviser relationship.

45. Even aside from inherent fiduciary duties, the pure dominance Gryphon has over Sphere too gives rise to fiduciary duties, including due to its status as a broker and agent, exercise of discretionary control over Sphere's assets, operations, and investments, veto rights over many of Sphere's operations, superior knowledge of its interactions with Sphere's counterparties—as Gryphon controls those relationships—as well as its superior knowledge of the crypto-market at the time the parties entered into the MSA (or at least so Sphere believed at the time it entered into the MSA). Indeed, Gryphon often interacts with actual and potential counterparties without informing Sphere or disclosing the contents of its discussions—even when requested. And when Sphere entered into the MSA, it did so based on Gryphon's representations that it had superior knowledge of and abilities in the crypto-industry, including that Gryphon would be able to negotiate better deals with third-parties, implement better investment strategies, and better manage Sphere's crypto-business.

46. The terms of the MSA confirm that Gryphon owes fiduciary duties to Sphere. There is no fiduciary duty disclaimer anywhere in the MSA—or in fact any affirmative language

that is even inconsistent with the imposition of a fiduciary duty.  Nor is there a waiver of an agency, brokerage relationship, or other relationship that gives rise to inherent fiduciary duties.  The barebone MSA (all of three pages, with a one-and-a-half-page amendment) is merely a binding term sheet in contemplation of a more robust agreement that never came to be and is entirely consistent with the imposition of fiduciary duties on Gryphon.

47.     Notwithstanding its clear fiduciary duties, throughout the parties' relationship, Gryphon has prioritized its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets.  For example, on a monthly basis, Gryphon has reported a substantially higher mining efficiency ratio than Sphere, which would not occur if Gryphon were acting to avoid self-dealing.  And, as noted, Gryphon failed to file a proof of claim in a pending bankruptcy proceeding in which Sphere has a substantial claim, jeopardizing Sphere's ability to pursue its claim because Gryphon interacted with the debtor on Sphere's behalf.  At bottom, Gryphon has breached its duties of loyalty, including the duty to avoid self-dealing, the duty of care, and the duty of good faith.

## VI.   GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE LAW

### A.   Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry Standard Procedures For Transferring Bitcoin

48.     On January 27, 2023, at 1:22 p.m., Kurt Kalbfleisch, Sphere's Chief Financial Officer and Senior Vice President, requested by email to transfer 18 bitcoin (worth over $400,000) from a wallet controlled by Gryphon to one controlled by Sphere.  Mr. Kalbfleisch provided the wallet address, which he specifically noted was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name:  "@sphere3d.com."

49.     At 1:33 p.m., Mr. Chang responded: "[r]eceived and initiated."

50.     At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch.  The email came from a different domain than the Sphere domain, namely, @sphere**s**3d.com (with an added s in the middle), not @sphere3d.com.  In the email, the person pretending to be Mr. Kalbfleish stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

51.     This was a transparent spoofing attack in which a third-party was impersonating Mr. Kalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets. Even a cursory review of the spoofing email—which did not originate from a Sphere email address, included two different domains within the same email, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags and prevented any unauthorized transfer. So too would any independent verification of the requestor's identity.

17

52. Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker. Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that *Sphere had never used before*, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

53. Merely days later, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000). Specifically, on February 1, 2023, the spoofer again emailed Mr. Chang to ask him to transfer 8 bitcoin to his wallet. Apparently without performing any sort of video or other check (such as a review of the domain name), Mr. Chang sent the eight bitcoin to the spoofer.

54. Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again). On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company—to realize that he had been fooled by not one, but two, spoofing attacks.

**B.** **Gryphon Lacks Industry Standard Internal Controls And Policies And Procedures, In Violation Of The MSA And Almost Certainly In Violation Of Applicable Law**

55. Based on the foregoing, it is apparent that Gryphon lacks the internal controls and policies and procedures needed to comply with the MSA. Had it had such controls and policies and procedures in place, Gryphon would have detected the numerous red flags in the spoofer's emails indicating that they were illegitimate and would not have fallen for any spoofing attack, let alone multiple ones. Indeed, following the spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide.

56.     The absence of internal controls and policies and procedures strongly suggest that Gryphon is also in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs.  It is apparent, however, that Gryphon has none of these programs in place. The laws Gryphon appears to be in violation of include federal regulations promulgated by FinCEN and various state laws applicable to money transmitters.[2]

57.     Consistent with industry best practices, Sphere advised Gryphon to report the spoofing attack to the appropriate authorities, including the FBI.  When Sphere made the suggestion, Gryphon panicked, stated the issue could be handled between the parties, and demanded that no one report the event.  Upon information and belief, Gryphon did not want to report the theft to the authorities because it was concerned that involvement by a law enforcement agency would lead to the uncovering of Gryphon's violations of the law.  In the same vein, upon knowledge and belief, Gryphon did not file a SAR with FinCEN.

58.     This put the onus on Sphere to report the incident, which it did by filing a SAR with FinCEN.

59.     Gryphon's official version of events raises substantial concerns regarding its ability to rectify any of the many issues Sphere has raised—and also regarding its ability to tell the truth. Gryphon is presently in the process of merger with Akerna, a cannabis company.  The Gryphon-Akerna Form S-4 describes the spoofing attacks as follows:

> The threat actor requested that the BTC be transferred to an alternate wallet. As a result, 26 BTC, with a value of approximately $560,000 at the time, was transferred to a wallet controlled by the threat actor. Via counsel, Gryphon engaged with US Federal law enforcement to

---

[2] *See* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf, at 27.

recover the BTC. Despite these attempts by law enforcement to recover the BTC, recovery was not possible. Gryphon subsequently wired the commensurate amount in USD to Sphere 3D to make them whole for the stolen BTC. . . . Sphere 3D made a claim with its insurance carrier. If Sphere 3D's is reimbursed from its insurance carrier, the Company would request a reimbursement from Sphere 3D. The Company has also subsequently modified its control systems to protect against any future attempted incursion.

*See* Gryphon-Akerna Form S-4 at F-76.

60. The description contains material inaccuracies. Most glaringly, the assertion that Sphere "made a claim with its insurance carrier" is totally wrong. On the contrary, as Sphere explicitly informed Gryphon shortly after the spoofing attacks and long before the filing of the Form S-4, Sphere *did not make a claim with its insurance carrier, as it does not have any insurance that would cover the incident*. That Gryphon could claim the direct opposite is beyond belief.

61. In addition, the claim that Gryphon made Sphere "whole" for the theft of approximately $560,000 worth of Sphere's assets omits that Gryphon has demanded that Sphere repay that amount to Gryphon. And while Gryphon claims it engaged with law enforcement, it has not disclosed any information about that engagement to Sphere. Nor has Gryphon disclosed its purportedly updated internal controls to Sphere—an apparent concession that its internal controls were inadequate at the time of the spoofing attacks. Finally, the description omits the most salient details, such as that Mr. Chang sent bitcoin on multiple occasions in response to email requests from an email address not associated with Sphere.

62. There are additional indications that Gryphon lacks anything resembling effective internal controls. In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability). In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere

understands that Gryphon, when it goes public, intends to recognize Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.

## VII.   IN AN EFFORT TO COW SPHERE AND DISSUADE IT FROM EXPOSING GRYPHON'S NUMEROUS BREACHES, GRYPHON HAS BASELESSLY SOUGHT TO THREATEN SPHERE WITH MANUFACTURED BREACHES

63.   After it came to light that Gryphon had no internal compliance program, Gryphon understood that Sphere could no longer tolerate its abject failure to comply with the MSA and numerous breaches of fiduciary duty since the inception of the parties' relationship.  Gryphon could see the writing on the wall: a lawsuit was coming.  Rather than compensate Sphere for its many breaches, however, Gryphon has taken the opposite tact by attempting to manufacture breaches of the MSA in an effort to cow Sphere into not seeking to enforce its rights in court.

64.   For example, incredibly, Gryphon has claimed that it is *Sphere* that is responsible for Gryphon's inability to detect the spoofing attacks, attacks any competent employee (let alone the CEO of a supposedly sophisticated mining company) should have been able to detect.  Gryphon has conceded that the third-party spoofer was unrelated to Sphere, but nevertheless has sought to blame Sphere, accusing it of lacking sufficient protections over its computer systems.  The allegation is untrue but it gets Gryphon nowhere: even if it were true (and it is not), Gryphon has never identified any provision of the MSA that Sphere purportedly breached.  Spoofing attacks by now have become ubiquitous in the commercial world; the onus was on Gryphon to detect them, which it failed to do.

65.   And, recently, Gryphon has claimed that Sphere cannot even seek to "create," let alone actually enter into, business relationships with any third party in the digital asset industry.  To that end, on March 21, 2023, Gryphon sent Sphere a heavy-handed letter (attached as Exhibit 3) in which it accused Sphere of "enter[ing] into, or at a minimum, . . . attempting to enter into, business relationships with various third-party cryptocurrency mining-related service providers."

21

According to the letter, "[a]ny such conduct, if true, is in direct violation of the" MSA.  The letter further demanded that, *in fewer than 24 hours*, Sphere "provide *any and all documentation* related to its efforts to create business relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any."

66.     The following day, Sphere responded by letter (attached as Exhibit 4) to explain why it was not in breach (although it would consider the issues raised by Gryphon) and, yet again, explain why Gryphon was failing to perform under the MSA.  Demonstrating that the breaches were "drummed up," Gryphon had long been aware of and even blessed many of the contacts it now claimed were breaches.  In any event, as Sphere also explained, Gryphon's allegations (which Sphere is still considering the merits of) had, at most, identified technical breaches that were easily curable and gave rise to no damages.  Certainly, any damages paled in comparison to the harm Gryphon's utter mismanagement and skimming have inflicted on Sphere.

67.     Gryphon has tried to continue manufacturing breaches since Sphere filed this litigation.  For example, after Sphere filed this litigation, Gryphon claimed that Sphere had not provided it with certain contacts at counterparties as it tried to build a case that Sphere was frustrating its ability to perform under the MSA.  The claims were demonstrably false claims, as Sphere provided the contacts long ago.  Indeed, Gryphon had already *interacted* with the contacts before repeatedly insisting that it had not been provided with them.

## VIII.   SINCE SPHERE FILED THIS LAWSUIT, GRYPHON HAS RETALIATED BY REFUSING TO TRANSFER THE PROCEEDS OF THE SALES OF SPHERE'S DIGITAL ASSETS TO SPHERE

68.     The situation has only become more dire since Sphere initiated this litigation on April 7, 2023.  In the ordinary course, Sphere generates substantially all of its revenue by mining for digital assets and those digital assets flow through a wallet controlled by Gryphon.  In the

22

ordinary course, Gryphon is required to remit the proceeds from sales of those digital assets to Sphere pursuant to Sphere's written instructions. The MSA specifically provides that Gryphon must honor Sphere's "written instructions . . . with respect to all decisions to sell or hold Digital Assets." MSA at 3. The Gryphon-Akerna Form S-4 (at F-55, F-66) likewise acknowledges that Gryphon must "[s]ell and/or transfer the coins at the request of Sphere" and that Sphere "retains legal ownership of the cryptocurrency" and "has the right to sell, pledge, or transfer the cryptocurrency."

69. Since Sphere initiated this lawsuit, however, Gryphon has taken the position, for the first time in the history of the parties' relationship, it need *not* remit the proceeds resulting from the sales of Sphere's own digital assets to Sphere and has ignored repeated instructions to sell digital assets. Gryphon has offered no viable justification for failing to do so and its breach goes to the very essence of the MSA. Its explanations have shifted over time:

70. For example, Gryphon has claimed that it needs to keep a minimum deposit of over $530,000 before it can release any funds to Sphere—an amount that just so happens to coincide with the amount Gryphon lost in the spoofing attacks and has stated it will seek to recover in this litigation.

71. Next, Gryphon has claimed that the MSA, in fact, *does not require Gryphon to sell Sphere's digital assets and transfer the proceeds to Sphere upon Sphere's written instruction*. Gryphon has done so by advancing an unreasonable interpretation of the MSA, which provides: "[Sphere] shall provide written instructions to [Gryphon] with respect to all decisions to sell or hold Digital Assets." MSA at 3. Although the Form S-4 acknowledges the obvious—that the provision requires Gryphon to honor each and every of Sphere's instructions to sell digital assets and further to transfer the proceeds to Sphere at its request—Gryphon has taken the position that

"the MSA simply requires that appropriate requests as contemplated . . . must be in writing; the MSA does not state that if a request is made in writing, it must be adhered to."  The made-for-litigation position is inconsistent with the plain language of the MSA, the obvious intent of the parties, the past practice of the parties, and the position in the Gryphon-Akerna Form S-4 that Sphere "retains legal ownership of the cryptocurrency" and "has the right to sell, pledge, or transfer the cryptocurrency."  Gryphon-Akerna Form S-4 at F-66.

72.    Gryphon has also taken the position that it must pay certain hosting obligations with Sphere's digital assets and that selling Sphere's digital assets will not leave sufficient funds to do so.  The position is contrary to the MSA but also plainly wrong:  the sales requests Sphere has made would leave Gryphon with sufficient funds to pay the hosting obligations, as Sphere has repeatedly made clear.   Sphere has made numerous requests to sell digital assets (*e.g.,* 13 bitcoin one day, 17 another) all of which have been rebuffed.  To support its refusal to sell digital assets on this basis, however, Gryphon has resorted to alchemy:  Gryphon recently treated each of Sphere's individual requests (each of which Gryphon refused to comply with) as cumulative, adding them all together to claim there were insufficient funds to cover the requests.  The requests were clearly not cumulative—and illustrating that there was no confusion from Gryphon, it has continued to refuse to honor any subsequent requests for the sale of Sphere's digital assets, regardless of the size of the request, small or large.  As another example of Gryphon's obfuscation, it has treated what it knows to be non-recurring expenses as recurring expenses to inflate Sphere's expenses and support its baseless position that it need not remit the proceeds of the sale of digital assets to Sphere.

73.    The truth is that, as Gryphon has communicated, it is trying to put Sphere in a position where Sphere cannot meet its ordinary course obligations and where it cannot pay for the

expenses and costs associated with this litigation so that Sphere will be forced to capitulate. Indeed, Gryphon has communicated that it will resume selling Sphere's digital assets and remitting the proceeds to Sphere if Sphere's drops this lawsuit. Sphere, however, will not give into this extortionate behavior.

IX. **SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES**

74. It is time for Gryphon to be held to account for its breaches of fiduciary duty, utter failure to perform under the MSA, and apparent inability to cure its breaches, many of which are simply uncurable. Sphere has provided Gryphon with numerous opportunities to fix its deficiencies, which have only gotten worse with time. Gryphon's modus operandi is to simply ignore Sphere's requests while collecting its exorbitant management fee—a completely one-sided arrangement that has proved extremely lucrative for Gryphon and deleterious for Sphere. And the absence of anything resembling internal controls at Gryphon makes clear that Sphere's digital assets are unsafe in Gryphon's hands.

75. Since Sphere filed this lawsuit, Gryphon has confirmed that is incapable of addressing its issues and performing under the MSA, both because the breaches are incurable and because Gryphon is simply unwilling to remedy its breaches. Indeed, since Sphere filed its lawsuit, Gryphon has denied breaching any of its obligations. And incredibly, Gryphon has denied that Sphere has given it sufficient specificity to know what its material breaches of the MSA are. It has done so *even though Gryphon has conceded that Sphere breach claims are sufficient to state a claim and thus inherently gave it reasonable notice of the allegations against it*.

76. This is part-and-parcel of Gryphon's general ostrich strategy: accept exorbitant fees, play dumb regarding what services should be delivered. What Gryphon should have done to not breach the MSA is obvious. By way of example only, rather than direct Sphere to find hosting,

25

Gryphon should have found hosting for Sphere.  Rather than allow Sphere's miners to languish in U.S. Customs, depriving Sphere of millions of dollars in revenue, Gryphon should have provided the information needed to secure their release—which Sphere ultimately had to do itself.  Rather than failing to properly review vendor invoices, Gryphon should have ensured that Sphere is only charged for what is owed.  Rather than falling for transparent spoofing attacks that led Gryphon to part with Sphere's assets, Gryphon should have detected the attack—and should have compensated Sphere for the loss without reservation, instead of asserting that Sphere is responsible and threatening litigation.   Rather than refusing to honor written instructions to sell Sphere's digital assets, Gryphon should comply.

77.     Instead of even attempting to rectify its historical breaches, such as by compensating Sphere for the losses caused, Gryphon has decided to double-down by breaching the MSA further.  Unwilling to be bullied, Sphere pursued its claims.

## X.     AFTER SPHERE FILED THIS LAWSUIT, GRYPHON ASSERTED MERITLESS DEFAMATION CLAIMS DESIGNED TO PUNISH SPHERE FOR BRINGING THIS LAWSUIT

78.     On April 7, 2023, Sphere issued a press release (the "Press Release") in which it announced the filing of this action and accurately summarized the allegations of the Complaint.[3] The Press Release did not set forth any facts or allegations beyond those set forth in the Complaint.

79.     On August 22, 2023, Gryphon stooped to a new low by initiating frivolous litigation designed to punish Sphere for bringing this lawsuit.

80.     First, Gryphon asserted a meritless defamation claim against Sphere premised solely upon Sphere's issuance of the Press Release and the statements contained therein.  Notably,

---

[3] The Press Release is available at https://sphere3d.gcs-web.com/news-releases/news-release-details/sphere-3d-files-litigation-against-gryphon-digital-mining

Gryphon failed to identify any statement of fact not described in the Complaint, let alone a false statement of fact.

81.    Second, Gryphon took the remarkable step of suing Patricia Trompeter, Sphere's CEO, in her personal capacity.  Gryphon's defamation claim against Ms. Trompeter is premised on Ms. Trompeter tweeting a hyperlink to the Press Release.  Yet again, Gryphon did not even try to identify any statement of fact not described in the Complaint, let alone a false statement of fact.

82.    Gryphon asserted these claims not because they have merit but because they serve its broader strategic aims.  Gryphon knows that the content of the challenged communications is substantially identical to the allegations of Sphere's Complaint.  Rather than fight Sphere's claims on their merits, Gryphon through the use of frivolous defamation claims seeks to force Sphere to expend resources and pressure it to drop this lawsuit.  This is a quintessential strategic litigation against public participation.

83.    While Sphere will not give into Gryphon's sharp tactics, Gryphon's meritless claims have already imposed significant costs.  By way of example, Sphere prepared, as required by this Court's Individual Practices, a pre-motion letter (Dkt. 31) setting forth the multitude of reasons why Gryphon's defamation claims are frivolous.  In doing so, Sphere incurred costs and attorneys' fees that it would not have were it not for Gryphon's bad-faith efforts to snuff out speech it disfavors and retaliate against Sphere.  Because Gryphon has refused to withdraw its groundless claims, Sphere anticipates that it will continue to suffer such damages until Gryphon's groundless claims are dismissed.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

84.     Sphere repeats and re-states the allegations above as if fully set forth herein.

85.     This is a claim for breach of contract against Gryphon.

86.     The MSA is an enforceable contract.

87.     Sphere has complied with its obligations under all relevant contracts.

88.     Gryphon has materially breached the MSA, including, without limitation, by failing

to provide management services for blockchain and cryptocurrency-related operations at the level

required by the MSA, charging Sphere in excess of the proscribed Management Fee, and refusing

to honor Sphere's written instructions to sell digital assets.

89.     Sphere is entitled to damages in an amount to be proven at trial, but in all events in

excess of $75,000, exclusive of interest and costs.

### COUNT II
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (IN THE ALTERNATIVE TO COUNT I)

90.     Sphere repeats and re-states the allegations above as if fully set forth herein.

91.     This is a claim for breach of the implied covenant of good faith and fair dealing

against Gryphon.

92.     The MSA is an enforceable contract.

93.     Sphere has complied with its obligations under all relevant contracts.

94.     Gryphon is in breach of its good faith obligations under the MSA.  For example,

the MSA provides that "[Sphere] shall provide written instructions to [Gryphon] with respect to

all decisions to sell or hold Digital Assets."  MSA at 3.  To the extent this provision is unclear on

its face, the intent and purpose of the provision was that Gryphon would sell digital assets when

instructed to do so and remit the proceeds of such sales to Sphere.  Any other interpretation would frustrate the purpose of the provision and the MSA itself—there is no point to providing written instructions to Gryphon unless they will be honored and unless Gryphon will remit the proceeds of such sales to Sphere.  Indeed, there is no other mechanism for Sphere to receive the proceeds of sales of its own digital assets under the MSA and there is no point to the MSA unless Sphere can actually reap its benefits, namely, revenue.

95.     Gryphon has materially breached its implied obligations.  By refusing to honor instructions to sell digital assets, Gryphon is acting in bad faith and in a way that is frustrating the intent and purpose of the MSA.  Indeed, Gryphon has communicated it is trying to put Sphere in a position where it cannot meet its ordinary course obligations and where it cannot pay for the expenses and costs associated with this litigation so that Sphere will be forced to capitulate.  This smacks of bad faith.

96.     Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

### COUNT III
### BREACH OF FIDUCIARY DUTY

97.     Sphere repeats and re-states the allegations above as if fully set forth herein.

98.     This is a claim for breach of fiduciary duty.

99.     Gryphon owes Sphere fiduciary duties.  Those fiduciary duties are inherent in nature and arise from, among other places, Gryphon's role as a manager of substantially all of Sphere's business operations (a role akin to an officer or trustee), agent, custodian, investment adviser, and broker-dealer.  Those fiduciary duties also arise from the unusual trust and confidence Sphere places in Gryphon and the control and dominance Gryphon exerts over Sphere's operations.  Sphere depended on Gryphon to serve its interests.

100.     Gryphon breached its fiduciary duties by prioritizing its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets.

101.     Gryphon's breach of its fiduciary duty has caused Sphere damage. Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

<div align="center">

**COUNT IV**
**NEW YORK'S ANTI-SLAPP STATUTE**

</div>

102.     Under New York law, a party to "an action involving public petition and participation . . . may maintain an action, claim, cross claim, or counterclaim to recover damages, including costs and attorney's fees" if a court finds that a defamation claim asserted against it "was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification, or reversal of existing law."  N.Y. Civ. Rights Law § 70-a(1)(a)–(b).

103.     Gryphon's defamation claim involves public petition and participation because it is premised on Sphere's substantially accurate and privileged speech concerning "an issue of public interest"—namely, the institution of proceedings before this Court.

104.     Gryphon's claim was commenced or continued without a substantial basis in fact or law, and could not be supported by a substantial argument for the extension, modification, or reversal of existing law, because the statements set forth in the Press Release and any link to the Press Release were a substantially accurate—and thus absolutely privileged—fair report of a judicial proceeding.

105.     Despite its actual awareness of the accuracy of the statements set forth in the Press Release and the privileged nature of such statements, Gryphon commenced and continued its claim

against Sphere in a transparent attempt to punish Sphere for asserting its rights. Reinforcing Gryphon's bad faith conduct, it has maintained its defamation claim even after Sphere explained the many reasons Gryphon's defamation claim is frivolous and expressly stated that it would not seek its attorney's fees under the anti-SLAAP law if Gryphon dropped the claim. Dkt. 31.

106.    In its anticipated motion to dismiss (or a motion for summary judgment), Sphere will demonstrate that Gryphon's defamation claim lacks any basis in fact or law. Upon grant of that motion, Sphere shall be entitled to recover the costs and fees incurred in defending against Gryphon's meritless claims.

## **PRAYER FOR RELIEF**

WHEREFORE, Sphere respectfully requests that the Court award the following relief:

(1)    All damages to which Sphere is entitled, including, without limitation, compensatory and punitive damages, in an amount to be determined at trial;

(2)    All pre- and post-judgment interest to which Sphere is entitled;

(3)    All costs and expenses to which Sphere is entitled, including, without limitation, attorneys' fees and costs under the MSA and under New York's anti-SLAPP statute; and

(4)    All other such relief as the Court may deem just and proper under the circumstances.

Dated:       September 20, 2023
             New York, NY


                              **DONTZIN NAGY & FLEISSIG LLP**


                              _____
                              Tibor L. Nagy, Jr.
                              Gregory N. Wolfe
                              Maxine Peskens
                              Rahul Srinivas (pro hac vice forthcoming)
                              David Moosmann (pro hac vice forthcoming)
                              980 Madison Avenue
                              New York, NY 10075
                              Tel: 212-717-2900
                              tibor@dnfllp.com
                              greg@dnfllp.com
                              mpeskens@dnfllp.com
                              rsrinivas@dnfllp.com
                              dmoosmann@dnfllp.com


                              _Counsel for Sphere 3D Corp._

Exhibit 1

# MASTER SERVICES AGREEMENT

### Binding Term Sheet

*This Binding Term Sheet (the "Binding Term Sheet") constitutes a legally binding commitment to enter into a transaction on the terms described herein. This Binding Term Sheet shall be superseded by a definitive agreement as set forth below, and this Binding Term Sheet constitutes a legally binding and enforceable agreement with respect to the relationship of the parties between the Effective Date until the execution and delivery of the definitive agreement and/or the Term/Termination as further defined below.*

| | |
|---|---|
| **Provider** | Gryphon Digital Mining Inc., a Delaware corporation, located at 5953 Mable Road, Unit 138, Las Vegas, NV 89110 ("Provider"). |
| **Customer** | Sphere 3D Corp., a Canada corporation, located at 895 Don Mills Road, Building 2, Suite 900, Toronto, Canada M3C IW3 ("Customer"). |
| **Definitive Agreement** | The parties intend to enter into a Master Services Agreement that shall contain all the terms and conditions set forth in this Binding Term Sheet, as well as other terms and conditions customary to such agreements (the "Master Services Agreement") and replace this Binding Term Sheet. Until such Master Services Agreement is entered into, this Binding Term Sheet shall govern the relationship between the parties as described herein with respect to the Services. The term "Agreement" as used herein refers to either the Binding Term Sheet or the Master Services Agreement, as the case may be, whichever is in effect at the relevant time. |
| **Exclusivity** | Provider shall be Customer's exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Customer and/or its subsidiaries and/or affiliates at any location (collectively, the "**Services**") unless the Agreement is terminated by Customer as per Term/Termination below. |
| **Management Fee / Operating Costs** | • As consideration for the Services, Provider shall receive the equivalent of twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of Customer's blockchain and cryptocurrency-related operations (the "**Management Fee**"). <br>• Net Operating Profit shall be defined as the value of digital assets mined using Customer's mining equipment as of 11:59 pm Eastern Time on the date of mining based upon the price of such digital asset quoted on Coinbase minus the cost of electricity and profit-share paid to hosts. <br>• The Management Fee shall be calculated and distributed to Provider subsequent to payment of all operating expenses, including but not limited to all payments to hosts and electricity providers. <br>• The total costs of electricity and any profit-share paid to hosts shall capped at 9 cents ($0.09) per kilowatt hour ($0.09/kwh). <br>• Provider shall assist Customer to source and negotiate the appropriate host to locate the mining equipment. |
| **Term/Termination** | • The initial term of the Agreement shall be three (3) years and shall automatically renew for consecutive one (1) year terms thereafter. <br>• Customer shall be entitled to terminate the Agreement in the event of: (i) Provider's failure to perform the Services in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services, subject to written notice and an opportunity to |

DocuSign Envelope ID: 27B206E4-528C-4608-9E78-2661009EF779

| | |
|---|---|
| | cure, or (ii) Provider's gross negligence, fraud or willful misconduct in connection with performing the Services. |
| | • Provider shall be entitled to specific performance or termination for cause in the event of a breach by Customer, subject to written notice and an opportunity to cure. |
| | • Customer shall be entitled to terminate the agreement on 30 days' notice in the event Provider terminates the Merger Agreement between the parties dated as of June 3, 2021, unless: (i) such termination is pursuant to Section 8.01(f) or 8.01(h) of the Merger Agreement or (ii) Customer waives its right to terminate the agreement in writing within five days of receipt of any notice to terminate the Merger Agreement by Provider |
| | • Customer shall be entitled to terminate the Agreement with 30 day notice, if the Nasdaq Stock Market and/or US Securities and Exchange Commission, ("<u>Regulators</u>") informs Customer that either one or both, will not approve the Nasdaq Listing Application or Merger agreement as applicable, (as defined by the Merger Agreement) solely due to concerns raised by Regulators regarding Provider's business or one or more of Provider's shareholders, officers or directors (the "<u>Provider Regulatory Concerns</u>") and Provider has not cured the Provider Regulatory Concerns to allow for the closing of the Merger agreement within 365 days of the execution of this agreement. Provider shall be entitled to work directly with Regulators to attempt to cure any such concerns related to Provider raised by Regulators. For greater clarity, if, as of the one year anniversary of the execution of this agreement, the Merger has not closed due to unresolved Provider Regulatory Concerns the Customer may terminate this agreement on 30 days' notice. |
| **Commercial Terms** | • Customer shall not in any way, without the prior written consent of Provider, sell, subordinate, encumber or otherwise convey to any third party that is an Affiliate of Customer a security interest in the mining equipment (including but not limited to servers, machines, hashboards, controller boards, case assemblies, fans, and power units) (the "**Mining Equipment**"). "**Affiliate**" shall mean any person who directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common controller with an issuer, including but not limited to: (1) any beneficial owner or holder of 5% or more of any class of shares of Customer, and (2) any director, officer, employee or independent contractor (or a member of the immediate family of the foregoing) of Customer. |
| | • Except in the case of an emergency or a potential security breach, Customer shall not voluntarily take any Mining Equipment offline without the prior written consent of Provider. |
| | • Provider shall at all times control the digital wallet, which shall be a wallet address selected by Provider on behalf of Customer for storing digital assets (the "**Digital Wallet**"). The digital assets shall be in the denomination of cryptocurrencies, virtual currencies or coins mined by Provider for or on behalf of Customer at any location whatsoever (the "**Digital Assets**"). |
| | • Provider shall pay directly from the Digital Wallet on behalf of Customer all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee. |
| | • Provider shall at all times select the mining pool and custodian of the Digital Assets. |

| | • Customer shall provide written instructions to Provider with respect to all decisions to sell or hold Digital Assets.<br>• Customer agrees that the hosts shall at all times be responsible for the installation of the Mining Equipment and the provision of any ancillary items necessary to operate the Mining Equipment.<br>• Provider shall not be responsible for the uptime of the hosting site nor shall Provider be responsible for providing power or electricity to the hosting site. |
|---|---|
| **Mutual Indemnification** | Each party shall indemnify and hold harmless the other party from all losses and damages incurred in connection with its respective acts or omissions in connection with the Agreement. |
| **Limitation of Liability** | The parties expressly exclude all consequential, incidental, indirect, special and punitive damages, and loss of profits. The parties shall only be entitled to seek direct damages. |
| **Survival** | Customer agrees that the Agreement shall survive any bankruptcy of Customer, where permitted by law. |
| **Governing Law / Jury Waiver / Fees** | This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles. All disputes, suits, actions or proceedings relating to this Agreement ("Claims") shall be brought solely in the state or federal courts located in the State of New York. Each party hereby consents to the exclusive jurisdiction and venue of the State of New York in connection with any such dispute, suit, action or proceeding, and waives any defense of *forum non conveniens* in connection therewith. EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY OR AGAINST EITHER PARTY IN CONNECTION WITH THIS AGREEMENT.<br><br>If any Claim is brought by any party to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including, without limitation, reasonable attorney's fees and court costs, incurred by the prevailing party regarding such Claim shall be reimbursed by the losing party; provided, that if a party to such Claim prevails in part, and loses in part, the court or other adjudicator presiding over such Claim shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis. |
| **Duty to Disclose** | As this Agreement is exclusive and legally binding in nature, Customer represents and warrants that it shall disclose its existence to existing and prospective creditors, investors, lenders, finance partners, etc. and Customer shall in all circumstances provide notice to Provider of such d isclosure. |

*\*\* Signature Page Follows \*\**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the _19th_ day of August, 2021.

**GRYPHON DIGITAL MINING INC**

By: _____

Name: Robby Chang

Title: CEO & Director

**SPHERE 3D CORP**.

By: _____

Name: Peter Tassiopoulos

Title: CEO

4

# Exhibit 2

DocuSign Envelope ID: 0E74669E-5DFB-4269-BC98-5BPA792A1F5

**AMENDMENT NO. 1**
**Master Services Agreement**
**(Binding Term Sheet)**


This AMENDMENT NO. 1 TO MASTER SERVICES AGREEMENT (BINDING TERM SHEET) (this "Amendment") is made and entered into as of December 29, 2021, by and among Sphere 3D Corp., an Ontario corporation ("Customer"), and Gryphon Digital Mining, Inc., a Delaware corporation ("Provider", and Lender and Borrower, each a "Party" and collectively the "Parties").

### RECITALS

A. On August 10, 2021, the Parties entered into a Binding Term Sheet for a Master Services Agreement (the "MSA").

B. On June 3, 2021, the Parties entered into an Agreement and Plan of Merger, as amended as of the date hereof (the "Merger Agreement").

C. The Parties hereto desire to amend the MSA as set forth herein.

### AGREEMENT

NOW THEREFORE, in consideration of the foregoing recitals and the respective covenants, agreements, representations and warranties contained herein and in the MSA, the Parties, intending to be legally bound, agree to amend and supplement the MSA as follows:

1. Definitions. All capitalized terms used herein without definition shall have the meanings ascribed to them in the MSA unless otherwise defined herein.

2. Amendments.

   a. The "Term/Termination" section of the MSA is replaced in its entirety with the following:

   • The initial term of the Agreement shall be four (4) years, which may be extended for additional one (1) year terms with the mutual written consent of the Parties. If Customer has not had 3.5 exahash of crypto mining equipment delivered to it by December 31, 2022, the initial term shall be automatically extended by an additional year, for a total initial term of five (5) years.

   • Subject to written notice from Customer and an opportunity by Provider to cure for a period of up to one hundred eighty (180) day, Customer shall be entitled to terminate the Agreement in the event of: (i) Provider's failure to perform the Services in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services, or (ii) Provider's gross negligence, fraud or willful misconduct in connection with performing the Services.

   • Provider shall be entitled to specific performance or termination for cause in the event of a breach by Customer, subject to written notice and an opportunity to cure for a period of up to one hundred eighty (180) days.

   b. Under the "Commercial Terms" section of the MSA:

   (i) The first bullet is replaced in its entirety with the following:

"•Customer shall not in any way, without the prior written consent of Provider, sell, subordinate, encumber or otherwise convey to any third party that is an Affiliate of Customer a security interest in the mining equipment (including but not limited to servers, machines, hashboards, controller boards, case assemblies, fans, and power units) (the "<u>Mining Equipment</u>"); provided, however, that nothing in this provision shall preclude the grant of a security interest in connection with any equipment financing. "<u>Affiliate</u>" shall mean any person who directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common controller with an issuer, including but not limited to: (1) any beneficial owner or holder of 5% or more of any class of shares of Customer, and (2) any director, officer, employee or independent contractor (or a member of the immediate family of the foregoing) of Customer."

(ii)     the following language is added at the end of the fourth bullet:  "After payment of all operating costs each month, Provider shall send Customer an invoice of the applicable Management Fee and deduct payment of the invoiced Management Fee from the Digital Wallet."

2.     <u>Effect of Amendment</u>. Except as amended by this Amendment, the MSA shall remain in full force and effect. No party shall be deemed to have waived the performance of any covenants in the MSA except as expressly amended by this Amendment.  In addition, if there are any inconsistencies between the MSA and this Amendment, the terms of this Amendment shall prevail and control for all purposes.

4.     <u>Governing Law.</u> This Amendment shall be construed in accordance with and governed by the Laws of the State of New York without giving effect to the principles of conflict of laws.

5.     <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original regardless of the date of its execution and delivery. All such counterparts together shall constitute one and the same instrument.

[Signature page follows]

DocuSign Envelope ID: 0E74669F-CDFD-49C0-BC76-5DBA7D09A1457

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date first above written.

SPHERE 3D CORP.

By: _____
CA566FB6317F438...

Name:   Peter Tassiopoulos

Title:    Chief Executive Officer


GRYPHON DIGITAL MINING, INC.

By: _____
D577A860A12F40D...

Name:   Robby Chang

Title:    Chief Executive Officer

Exhibit 3

**K&L GATES**

March 21, 2023

Steven L. Caponi, Esq.
steven.caponi@klgates.com

**VIA ELECTRONIC MAIL**

T 302-416-7080

Greg Wolfe, Esq.
Dontzin Nagy & Fleissig LLP
980 Madison Avenue
New York, NY 10075
greg@dnfllp.com

**Re:  Master Services Agreement, dated August 19, 2021**

Dear Greg,

As you know, we represent Gryphon Digital Mining Inc. ("Gryphon") in relation to the above-captioned matter.  It has come to our attention that your client, Sphere3d Inc. ("Sphere"), has entered into or, at a minimum, is attempting to enter into, business relationships with various third party cryptocurrency mining-related service providers for cryptocurrency-related services without the knowledge, involvement, authorization, and/or consent of Gryphon.  Specifically, among other things, we understand that Sphere has engaged or attempted to engage in business relationships regarding its cryptocurrency-related operations with USBTC, Foundry, Lancium, and Luxor, among others (collectively, the "Third Party Service Providers").

Any such conduct, if true, is in direct violation of the Master Services Agreement ("MSA") dated August 19, 2021 by and between Sphere and Gryphon.  Indeed, pursuant to the MSA, Sphere granted and agreed that Gryphon has the exclusive right and power to manage Sphere's cryptocurrency-related operations, including: exclusive control over any and all relevant digital asset wallets for storing digital assets; to select the mining pool and custodians of such digital assets; and to sell digital assets on Sphere's behalf, among other things.  Any act by Sphere to circumvent the MSA—and, by extension, circumvent the Parties' agreement that Gryphon will exclusively manage Sphere's cryptocurrency-related operations—is a breach of the MSA.

Specifically, by way of example, Sphere's attempts to create independent business relationships with the Third Party Service Providers to provide services related to Sphere's cryptocurrency-related operations are a breach of the Exclusivity Provision of the MSA.  Sphere's attempts to create a relationship with Luxor and Foundry related to their mining pools violates the Commercial Terms of the MSA and constitutes a breach thereof.  Sphere's creation of its own Digital Wallet and its receipt of cryptocurrency mining proceeds from Luxor into that Digital Wallet violates the Exclusivity and Commercial Terms of the MSA.  Likewise, any other payments made to Sphere

related to its cryptocurrency-related operations that occurred outside of a Gryphon-controlled Digital Wallet violates the Commercial Terms of the MSA and constitutes a breach of the MSA.

Gryphon is highly concerned by the unilateral actions of Sphere which, absent context and proper communication, appear to constitute a flagrant disregard for the terms of the MSA. While we understand Sphere may have provided Gryphon some limited information regarding its business dealings with select Third Party Service Providers, Sphere has not been transparent or forthcoming, and has not provided Gryphon any actual agreements entered into between Sphere and such Third Party Service Providers, whether written or oral, formal or informal, or otherwise, or any reconciliations of payments made between Sphere and any Third Party Service Providers. This, of course, raises additional concern over the nature of these relationships.

By close of business on March 22, 2023, Gryphon hereby demands that Sphere provide any and all documentation related to its efforts to create business relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any. Gryphon expects that the information will be provided in a fulsome and transparent manner so as to reassure Gryphon that Sphere has taken no action that would constitute a breach of the MSA. To the extent Sphere has breached the MSA, Gryphon will not hesitate to invoke any and all legal rights and remedies available to it, including seeking to specifically enforce Sphere's obligations under the MSA and seeking to recover any and all attorney's fees and other legal costs incurred as a result of Sphere's misconduct.

We understand that you have already made Sphere aware of this issue; given the urgency, we assume you will notify Sphere of these further articulated concerns as described herein and revert without delay.

Very truly yours,

*/s/ Steven L. Caponi*

Steven L. Caponi, Esq.

cc: tibor@dnfllp.com

2

March 21, 2023

# Exhibit 4

# DONTZIN NAGY & FLEISSIG LLP

Gregory N. Wolfe
greg@dnfllp.com

980 Madison Avenue | New York, New York 10075 | (212) 717 - 2900

**BY EMAIL**

March 22, 2023

Steven L. Caponi, Esq.
K&L Gates
steven.caponi@klgates.com

Re:   ***Sphere's Concerns About Gryphon's Performance Under The MSA***

Dear Steven:

We represent Sphere 3D Corp. ("Sphere") and write in response to your letter dated March 21, 2023 (the "Letter").

As you know, Sphere has for some time now had significant concerns about Gryphon Digital Mining, Inc.'s ("Gryphon") performance under, and material breaches of, the Master Services Agreement dated August 19, 2021, as subsequently amended (the "MSA").   As summarized below, those concerns include that Gryphon is (i) "skimming off the top" (*i.e.*, stealing) Sphere's digital assets ("Digital Assets"); (ii) persistently violating prevailing standards and laws applicable to custodians of digital assets; and (iii) providing abhorrent "management services" under the MSA.   Our concerns were recently realized when Gryphon made an unauthorized transfer to a third-party of over $500,000 worth of Sphere's Digital Assets, an egregious breach of the MSA by any measure.   Gryphon attributes the unauthorized transfer to "spoofing," but even rudimentary internal control processes—which Gryphon has apparently not implemented, as required—would have caught the purported spoof.

As you also know, Gryphon had been scheduled to explain to Sphere on March 10, 2023, how it could have possibly effected such a transfer.   Instead of explaining itself, Gryphon insisted that Sphere disclose the results of its own investigation into the unauthorized transfer, which Sphere committed to do at a time convenient for its counsel and other representatives.

Rather than allowing a discussion of the foregoing issues to occur, and in an attempt to justify Gryphon's failure to adhere to the MSA, Gryphon sent the Letter, which is nothing more than an attempt to manufacture breaches based on Sphere's contacts with certain third parties, namely, USBTC, Foundry, Lancium, and Luxor (the "Third Parties").[1]   The Letter (at 2) further demands that, in fewer than 24 hours, Sphere respond to the Letter and "*provide any and all documentation* related to its efforts to create business relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any."[2]   The Letter (at 2) elaborates that "Gryphon expects that the information will be provided in a fulsome and transparent manner

---

[1] The Letter (at 2) alleges that your firm had already raised the issues discussed in this Letter to this Firm, which is patently false.  During a March 17, 2023 call, your firm asked this Firm what it knew about Sphere's relationship with USBTC and stated, without offering any substantive detail, that Gryphon may have an issue with the relationship. This Firm stated it would raise that issue with Sphere, which it did.

[2] All emphases are added unless otherwise noted.

so as to reassure Gryphon that Sphere has taken no action that would constitute a breach of the MSA."

The request for a response of this nature in fewer than 24 hours is patently unreasonable and has no basis in the MSA. Gryphon has long been aware and indeed blessed much of the purported conduct that it now claims is a breach. Sphere will consider your Letter and provide a full response in due course. Sphere also welcomes a discussion of the issues at a time that is mutually agreeable for both sides.

Given your demand for a response to your Letter in fewer than 24 hours, however, Sphere in the remainder of this letter briefly sets forth some, but by no means all, of the facts (i) underlying Sphere's significant concerns about Gryphon's failure to perform under the MSA; and (ii) explaining why Sphere is in full compliance with the MSA. Sphere will supplement this letter with a full response, either in a subsequent letter or through discussions with you.

## I. THE MSA

The parties entered into the MSA in contemplation of a merger that ultimately never closed. In exchange for Sphere paying Gryphon tremendous fees equal to "twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations," Gryphon undertook an obligation to be "[Sphere's] exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations." MSA at 1. The MSA, however, never contemplated that Sphere would be completely prohibited from contacting and entering into contracts with other players in the blockchain and cryptocurrency industry. To the contrary, the MSA specifically envisions that Sphere may do so. For example, it provides that Gryphon would "assist" Sphere in "sourc[ing] and negotiat[ing] the appropriate host to locate the mining equipment." MSA at 1. And, when the parties amended the MSA, they specifically provided that Sphere could engage in certain transfers of mining equipment to third parties and "grant . . . security interest[s]" to any third-party "in connection with any equipment financing." *See* MSA Amendment § 2.b.

The MSA made Gryphon a custodian of certain of Sphere's Digital Assets. *See* MSA at 1. It further requires that Gryphon perform "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services" and not engage in "gross negligence, fraud or willful misconduct in connection with performing the Services." *See* MSA Amendment § 2.a. In the event of a breach by Sphere, Gryphon may only seek "specific performance" after providing "written notice and an opportunity for a period of up to one hundred eighty (180) days." *See* MSA Amendment § 2.a.

## II. SPHERE'S SIGNIFICANT CONCERNS THAT GRYPHON HAS VIOLATED THE MSA

Sphere has significant concerns that Gryphon has been violating the MSA for some time now. By way of illustration only, Sphere has concerns that Gryphon has been skimming off the top, effectively stealing money from Sphere. Gryphon has repeatedly refused to provide documentation that would verify that it is not using Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit.

As another example, Sphere has significant concerns that Gryphon does not have the internal controls and policies and procedures in place needed to comply with prevailing industry standards and applicable law.  This became apparent when Gryphon made an unauthorized transfer of over $500,000 worth of Sphere's Digital Assets in response to a purported spoofing attack in which a third-party impersonated a Sphere representative and requested the transfer via email.  Even a cursory review of the spoofing email itself—which did not originate from a Sphere email address, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer—would have raised red flags and prevented the unauthorized transfer.  So too would any independent verification of the requestor's identity.  Gryphon failed to perform even rudimentary checks associated with a proper internal controls system.  Exacerbating Sphere's concerns that no such system exists, Gryphon refused multiple, legitimate requests to review Gryphon's relevant policies and procedures, leading to the conclusion that Gryphon simply has none to provide.

And, since entering into the MSA, Gryphon has simply failed to deliver "management services" under the MSA.  When Sphere needed hosting space in 2022 (a perquisite to turning on its miners and generating money), Gryphon refused to find hosting space and instead directed Sphere to find such space on its own.  When Sphere's miners were held in customs (and thus not generating revenue), Gryphon shirked its duties to provide the assistance and information needed to release the miners from customs.  Throughout the contractual relationship, Gryphon has inexplicably delayed setting up mining pools, resulting in lost revenue, and ignored instructions to sell bitcoin, costing Sphere dearly.  And Gryphon has failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges.  These examples are part and parcel of a general failure to provide management services consistent with Gryphon's obligations under the MSA.

### III.  GRYPHON'S CONCERNS THAT SPHERE IS BREACHING THE MSA ARE UNFOUNDED

By contrast, Gryphon's concerns are unfounded.  Your Letter (at 1) states that Sphere is "attempting to create independent business relationships with the [Third Parties] to provide services related to Sphere's cryptocurrency-related operations," which is "a breach of the Exclusivity Provision of the MSA."  According to your Letter, the attempted relationships concern Sphere "creat[ing] a relationship with Luxor and Foundry related to their mining pools" and "creat[ing] its own Digital Wallet" to receive "cryptocurrency mining proceeds from Luxor."  The Letter also accuses Sphere of attempting to enter into purportedly illicit relationships with USBTC and Foundry, though never explains how doing so violates the MSA.

We will address the allegations in your Letter in detail after we have had sufficient time to consider them.  In brief, however, the MSA provides that Gryphon is the "exclusive provider of any and all *management services* for all blockchain and cryptocurrency-related services."  *See* MSA at 1.  Sphere has not sought "management services" from any third-party; your Letter does not suggest otherwise.

Evidencing that Gryphon's allegations are drummed up to distract from its own breaches, Gryphon has in fact encouraged and sanctioned Sphere's communications with third parties in the industry.  As noted, Gryphon last year suggested that Sphere find its own hosting for miners (which, of course, was a dereliction of Gryphon's own duties to find such hosting space).  As

another example, Gryphon explicitly encouraged Sphere to enter into a relationship with Luxor last year.

  Finally, we note that, even if there were a breach of the nature described in your Letter (and we do not believe there is one), it would be immaterial and easily curable.  Your Letter does not identify any damages caused by Sphere's purported conduct—because there are none.  There is no allegation, for example, that Gryphon has not received payments due under the MSA.  Although we do not believe there is a breach to cure, we reiterate that we are exploring the issues raised in the Letter and will revert after we have had appropriate time to consider them.

<div align="center">***</div>

  Given the timeframe for response, this letter was necessarily truncated.  Sphere will follow-up with a more extensive letter and is also available to discuss these issues with you.

  Sphere reserves all rights.

    Sincerely,

    *Gregory N. Wolfe*

    _____

    Gregory N. Wolfe
    *Counsel for Sphere 3D Corp.*

Exhibit A-2

Case 1:23-cv-02954-PKC-VF   Document 95    Filed 02/21/24    Page 67 of 283

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
SPHERE 3D CORP.,                  :

                                :

*Plaintiff and Counter-Defendant*,   :

                                :

     v.                         :

                                :

GRYPHON DIGITAL MINING, INC.,    :

                                :

*Defendant and Counter-Plaintiff*,    :
-------------------------------------------------------- :

Case No. 1:23-cv-02954

The Hon. Judge P. Kevin Castel

Magistrate Judge Valerie Figueredo

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF
GRYPHON DIGITAL MINING, INC.'S AMENDED ANSWER, AFFIRMATIVE DEFENSES,
AND FOURTH AMENDED COUNTERCLAIMS**

Defendant and Counter-Plaintiff GRYPHON DIGITAL MINING, INC. ("Gryphon"), by and through its undersigned counsel, Hogan Lovells US LLP, hereby responds to and answers the Second Amended Complaint filed by Plaintiff and Counter-Defendant SPHERE 3D CORP. ("Sphere"), and alleges the following affirmative defenses and amended counterclaims against Sphere (together with Gryphon, the "Parties"):

**ANSWER**

1.      Gryphon admits that the Second Amended Complaint purports to assert claims for breach of contract and breach of fiduciary duty but denies that Gryphon has breached any contract with Sphere and denies that Gryphon owes any fiduciary duty or has breached any fiduciary duty. Answering further, Gryphon admits Sphere and Gryphon are in the business of digital asset mining and that Gryphon and Sphere entered into a Master Services Agreement, dated August 19, 2021, and subsequently amended on December 29, 2021 (referred to herein as the "Sphere MSA"), in contemplation of a potential merger of the companies that was not consummated. Answering further, Gryphon states that the document or documents referred to in Paragraph 1 as the "Master Services

1

Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Answering further, the allegation that "Gryphon's power over Sphere and its status as custodian of Sphere's digital assets and miners gave rise to fiduciary duties, including the duty of loyalty and to avoid self-dealing" is a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegation and specifically denies that it has ever owed any fiduciary duty to Sphere. Except as so stated, Gryphon denies the allegations in Paragraph 1.

2.   Gryphon denies the allegations in Paragraph 2.

3.   Gryphon denies the allegations in Paragraph 3.

4.   Gryphon denies the allegations in Paragraph 4.

5.   Gryphon admits only that as a consequence of Sphere's negligence, a third-party hostile threat actor was able to infiltrate Sphere's computer and technology infrastructure, send spoofing emails appearing to emanate from Sphere's email domain while impersonating Sphere's Chief Financial Officer, Kurt Kalbfleisch, and induce Gryphon to send cryptocurrency that was intended to be sent to Sphere to the hostile threat actor's public key address instead. Except as so stated, Gryphon denies the allegations in Paragraph 5.

6.   Gryphon answers Paragraph 6 by stating that the emails described in this paragraph speak for themselves and hereby denies any allegations inconsistent therewith. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 6 that "all Sphere emails have the same domain name," and therefore denies such allegation. Answering further, Gryphon states that throughout the course of its dealings with Sphere, both Mr. Kalbfleisch and Sphere's Chief Executive Officer, Ms. Trompeter, have used and sent e-mails from multiple e-mail addresses and domains. Except as so stated, Gryphon denies the allegations in Paragraph 6.

7.    Gryphon answers Paragraph 7 by stating that the email described in this paragraph and purportedly depicted in Figs. 1-3 speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 7.

8.    Gryphon admits only that the allegations in Paragraph 8 describe a spoofing attack, caused by Sphere's negligence and failure to maintain proper security and control of its own technology and computer infrastructure, by which a third-party hostile threat actor was allowed to impersonate Sphere's CFO, Mr. Kalbfleisch, and induce Gryphon to send digital assets to the hostile threat actor's public key address rather than to a public key address controlled by Sphere. Except as so stated, Gryphon denies the allegations in Paragraph 8.

9.    Gryphon admits only that, as a result of Sphere's negligence and the failure of Sphere's CEO and others at Sphere, including any information security personnel, to recognize the spoofing attack despite being properly copied on the emails at issue, Gryphon was induced to transfer eighteen (18) bitcoin to a public key address controlled by a third-party hostile threat actor. Except as so stated, Gryphon denies the allegations in Paragraph 9.

10.    Gryphon admits only that, as a result of Sphere's negligence and the failure of Sphere's CEO and others at Sphere, including any information security personnel, to recognize the spoofing attack despite being properly copied on the emails at issue, Gryphon was induced to transfer an additional eight (8) bitcoin to a public key address controlled by a third-party hostile threat actor on or about February 1, 2023. Answering further, Gryphon states that the emails described in this paragraph speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 10.

11.    Gryphon admits that following the spoofing attacks, Sphere requested to review certain of Gryphon's policies and procedures. Answering further, Gryphon states that it has established processes, developed in coordination with Sphere, for transferring digital assets to Sphere—and, in fact,

3

has successfully transferred digital assets to Sphere on numerous occasions pursuant to such processes, without incident. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 11 that Sphere "report[ed] the incident . . . by filing a suspicious activity report ('SAR') with the Financial Crimes Enforcement Network ('FinCEN')," and therefore denies such allegation.[1] Answering further, Gryphon states that it suggested to Sphere that the spoofing attacks be reported to the appropriate law enforcement agencies by one of the parties—as opposed to both parties reporting the attacks— to avoid creating separate reporting tracks. Gryphon denies the remaining allegations in Paragraph 11, and specifically denies that it "panicked" or "demanded that no one report the theft to the authorities."

12.    Gryphon admits only that a proposed merger between itself and Akerna Corp., a publicly-traded technology firm, has been publicly announced. Answering further, Gryphon states that the Form S-4 Registration Statement referenced in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 12.

13.    Gryphon answers Paragraph 13 by stating that the Form S-4 Registration Statement referenced in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 13.

14.    Gryphon answers Paragraph 14 by stating that the Form S-4 Registration Statement referenced in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 14.

---

[1] Gryphon understands that the submission of a Suspicious Activity Report to FinCen is strictly confidential and its disclosure is, upon information and belief, a violation of federal law.

15.     Gryphon admits only that a proposed merger between itself and Akerna Corp., a publicly-traded technology firm, has been publicly announced. Gryphon denies the remaining allegations in Paragraph 15.

16.     Paragraph 16 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon denies the allegations in Paragraph 16.

17.     Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 17 that Sphere "generates substantially all of its revenue by mining for digital assets," and therefore denies such allegation. Answering further, Gryphon admits that, pursuant to the Sphere MSA, digital assets generated by Sphere's cryptocurrency mining machines are, or should be, maintained on a digital wallet operated by Gryphon. Answering further, Gryphon states that the document or documents referred to in Paragraph 17 as the "Master Services Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint, and the Form S-4 Registration Statement referenced in this paragraph, speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 17.

18.     Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs on Sphere's behalf, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover such costs and expenses as they come due. Answering further, Gryphon admits it has informed Sphere that Gryphon, consistent with its obligations under the Sphere MSA, cannot fulfill a request to sell assets in Sphere's digital wallet that would leave the value of the remaining assets in Sphere's digital wallet insufficient to cover amounts due and owing on Sphere's behalf or otherwise render Sphere unable to pay its debts as they become due. Gryphon specifically denies Sphere's allegation in Paragraph 18 that Gryphon has demanded Sphere resolve this litigation as a condition of selling Sphere's digital assets, or that Gryphon has otherwise advised Sphere it will simply resume selling Sphere's digital assets, irrespective of

Sphere's financial condition, if the litigation is resolved. Except as so stated, Gryphon denies the allegations in Paragraph 18.

19.     Gryphon admits that it has denied breaching any obligation under the Sphere MSA or otherwise. Answering further, Gryphon admits that Sphere has failed to provide Gryphon with sufficiently specific factual information concerning Gryphon's purported breaches of the Sphere MSA. Except as so stated, Gryphon denies the allegations in Paragraph 19.

20.     Gryphon denies the allegations in Paragraph 20.

21.     Gryphon admits only that Sphere is a publicly-traded bitcoin mining company listed on the Nasdaq stock exchange. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21, and therefore denies such allegations.

22.     Gryphon admits the allegations in Paragraph 22.

23.     Paragraph 23 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegations in Paragraph 23.

24.     Paragraph 24 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon denies the allegations in Paragraph 24. Further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith.

25.     Gryphon admits the allegations in Paragraph 25

26.     Gryphon admits the allegations in Paragraph 26.

27.     Gryphon admits the allegations in Paragraph 27.

28.     Gryphon admits the allegations in Paragraph 28 and otherwise states that the contents of the Sphere MSA speak for themselves.

29.     Gryphon states that the document or documents referred to in Paragraph 29 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Gryphon specifically denies

the characterization of the management fee set forth in the Sphere MSA as "exorbitant," particularly in light of the fact that this was an agreed-upon fee that was freely negotiated by sophisticated parties and that the Sphere MSA enabled Sphere to transform its business into a bitcoin mining company by leveraging Gryphon's credibility, contacts, and expertise in the crypto-currency mining industry. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation regarding Sphere's "expect[ations]," and therefore denies such allegation. Except as so stated, Gryphon denies the allegations in Paragraph 29.

30. Gryphon states that the document or documents referred to in Paragraph 30 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 30.

31. Gryphon states that the document or documents referred to in Paragraph 31 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 31.

32. Gryphon states that the document or documents referred to in Paragraph 32 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 32.

33. Gryphon states that the document or documents referred to in Paragraph 33 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 33.

34. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and therefore denies the allegations in Paragraph 34.

35. Gryphon admits its understanding that, in 2022, Sphere ordered mining equipment from overseas for delivery into the United States. Answering further, Gryphon states that although Gryphon knew the mining equipment was ordered, Gryphon had no knowledge of when the equipment would be delivered. Answering further, Gryphon states that by the time Sphere requested assistance from Gryphon, the mining equipment had already been seized by U.S. Customs and Border Protection, leaving little that Gryphon could do at that point to assist Sphere with the release of the equipment. Answering further, Gryphon specifically denies the allegation in Paragraph 35 that it "shirked its duties to provide the assistance and information needed to release the miners" and asserts that Gryphon at all times complied with its obligations under the Sphere MSA. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35, and therefore denies such allegations.

36. Gryphon denies the allegations in Paragraph 36.

37. Gryphon denies the allegations in Paragraph 37.

38. Gryphon denies the allegations in Paragraph 38.

39. In response to the first sentence in Paragraph 39, Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover Sphere's costs and expenses as they come due. Answering further, Gryphon admits it has informed Sphere that Gryphon, consistent with its obligations under the Sphere MSA, cannot fulfill a request to sell assets in Sphere's digital wallet that would leave the value of the remaining assets in Sphere's digital wallet insufficient to cover amounts due and owing on Sphere's behalf or otherwise leave Sphere

8

unable to pay its debts as they become due. Except as so stated, Gryphon denies the allegations in the first sentence of Paragraph 39, and denies the remaining allegations in Paragraph 39.

40.     Gryphon denies the allegations in Paragraph 40.

41.     Paragraph 41 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegations of Paragraph 41.

42.     Paragraph 42 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the parties' relationship, including without limitation any role in which Gryphon serves for Sphere and any obligation Gryphon owes to Sphere, is set forth in the Master Services Agreement between Gryphon and Sphere, dated August 19, 2021 (the "Original Sphere MSA"), as subsequently amended on December 29, 2021 (together with the Original Sphere MSA, the "Sphere MSA"), copies of which are purportedly attached as Exhibits 1 and 2, respectively, to the Second Amended Complaint. Answering further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 42.

43.     Paragraph 43 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the parties' relationship, including without limitation any role in which Gryphon serves for Sphere and any obligation Gryphon owes to Sphere, is set forth in the Sphere MSA, a copy of which is purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint. Answering further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 43.

44.     Paragraph 44 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the parties' relationship, including without limitation any role in which Gryphon serves for Sphere and any obligation Gryphon owes to Sphere, is set forth in the

Sphere MSA, a copy of which is purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint. Answering further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 44.

45.     The first sentence of Paragraph 45 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegation in the first sentence of Paragraph 45. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 45 that "when Sphere entered into the Sphere MSA, it did so based on Gryphon's representations that it had superior knowledge of and abilities in the crypto-industry, including that Gryphon would be able to negotiate better deals with third-parties, implement better investment strategies, and better manage Sphere's crypto-business," and therefore denies such allegation. Gryphon denies the remaining allegations in paragraph 45.

46.     Paragraph 46 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the document or documents referred to in Paragraph 46 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 46.

47.     Paragraph 47 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegation in Paragraph 47 that Gryphon "has prioritized its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets." Answering further, Gryphon admits that it has reported a higher mining efficiency ratio than Sphere, but denies the allegation in Paragraph 47 that this "would not occur if Gryphon were acting to avoid self-dealing" because there are a multitude of factors that may determine mining efficiency, including

10

without limitation the type and quality of mining equipment used and how the mining efficiency ratio is calculated. Gryphon denies the allegation that it engaged in "self-dealing." Except as so stated, Gryphon denies the allegations in Paragraph 47.

48.     Gryphon answers Paragraph 48 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation that "all Sphere emails have the same domain name," and therefore denies such allegation. Except as so stated, Gryphon denies the allegations in Paragraph 48.

49.     Gryphon answers Paragraph 49 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Gryphon denies the allegations in Paragraph 49.

50.     Gryphon answers Paragraph 50 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Gryphon denies the allegations in Paragraph 50.

51.     Gryphon admits only that, due to Sphere's negligence and failure to maintain proper security and control of its own technology and computer infrastructure, a third-party hostile threat actor was allowed to impersonate Sphere's CFO, Mr. Kalbfleisch, and induce Gryphon to send digital assets to a hostile threat actor's public key address rather than to Sphere, even though Sphere's CEO was copied on all such emails. Except as so stated, Gryphon denies the allegations in Paragraph 51.

52.     Gryphon admits only that, as a result of Sphere's negligence, it was induced to transfer eighteen (18) bitcoin to the third-party hostile threat actor's public key address. Except as so stated, Gryphon denies the allegations in Paragraph 52.

53.     Gryphon admits only that, as a result of Sphere's negligence, it was induced to transfer an additional eight (8) bitcoin to the third-party hostile threat actor's public key address on or about

February 1, 2023. Answering further, Gryphon states that the emails described in this paragraph speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 53.

54. Gryphon answers Paragraph 54 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 54.

55. Gryphon admits that following the spoofing attacks, Sphere requested to review certain of Gryphon's policies and procedures. Answering further, Gryphon states that it has established processes, developed in coordination with Sphere, for transferring digital assets to Sphere—and, in fact, has successfully transferred digital assets to Sphere on several occasions pursuant to such processes, without incident. Except as so stated, Gryphon denies the allegations in Paragraph 55.

56. Gryphon denies the allegations in Paragraph 56.

57. Gryphon denies the allegations in Paragraph 57.

58. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58, and therefore denies such allegations.

59. Gryphon admits only that a proposed merger between itself and Akerna Corp., a publicly-traded technology firm, has been publicly announced. Answering further, Gryphon states that the Form S-4 Registration Statement described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 59.

60. Gryphon answers Paragraph 60 by stating that the Form S-4 Registration Statement described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 60.

61.     Gryphon answers Paragraph 61 by stating that the Form S-4 Registration Statement described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 61.

62.     Gryphon admits that a proposed merger between itself and a publicly-traded technology firm has been publicly announced. Gryphon denies the remaining allegations in Paragraph 62.

63.     Gryphon denies the allegations in Paragraph 63.

64.     Gryphon admits only that it alleges Sphere, as a consequence of Sphere's negligence, allowed a third-party hostile threat actor to infiltrate Sphere's computer and technology infrastructure, send spoofing emails appearing to emanate from Sphere's email domain while impersonating Sphere's CFO, Mr. Kalbfleisch, and induce Gryphon to send cryptocurrency that was intended to be sent to Sphere but instead was sent to the hostile threat actor's public key address. Except as so stated, Gryphon denies the allegations in Paragraph 64.

65.     Gryphon answers Paragraph 65 by stating that the letter described in this paragraph and purportedly attached as Exhibit 3 to the Second Amended Complaint speaks for itself and hereby denies any allegations inconsistent therewith and specifically denies Sphere's characterization of such letter. Except as so stated, Gryphon denies the allegations in Paragraph 65.

66.     Gryphon answers Paragraph 66 by stating that the letter described in this paragraph and purportedly attached as Exhibit 4 to the Second Amended Complaint speaks for itself and hereby denies any allegations inconsistent therewith and specifically denies Sphere's characterization of such letter. Except as so stated, Gryphon denies the allegations in Paragraph 66.

67.     Gryphon admits that it has informed Sphere of its failure to provide Gryphon with the contact information for certain third parties Gryphon understands as performing services relevant to the Sphere MSA, including services the parties agreed Gryphon is obligated to perform under the Sphere

MSA, and that Sphere did not promptly provide such information when requested by Gryphon. Except as so stated, Gryphon denies the allegations in Paragraph 67.

68.     Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 68 that Sphere "generates substantially all of its revenue by mining for digital assets," and therefore denies such allegation. Answering further, Gryphon admits that, pursuant to the Sphere MSA, digital assets generated by Sphere's cryptocurrency mining machines are maintained on a digital wallet operated by Gryphon. Answering further, Gryphon states that the document or documents referred to in Paragraph 68 as the "Master Services Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint, and the Form S4 Registration Statement quoted in this paragraph, speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 68.

69.     Gryphon denies the allegations in Paragraph 69.

70.     Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover Sphere's costs and expenses as they come due. Answering further, Gryphon admits that it has requested Sphere maintain a minimum amount of funds in its digital wallet sufficient to pay Sphere's projected monthly costs, but Gryphon specifically denies that any minimum amounts requested bear any relation to any claim asserted by Gryphon in this action or otherwise; rather, the amounts requested reflect Gryphon's estimate of Sphere's projected near-term costs and expenses arising from its cryptocurrency mining efforts, which Gryphon is obligated to pay on Sphere's behalf from the Digital Wallet, pursuant to the Sphere MSA. Except as so stated, Gryphon denies the allegations in Paragraph 70.

71.     Paragraph 71 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the document or documents referred to in Paragraph 71 as

the "Master Services Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint, the Form S-4 Registration Statement quoted in this paragraph, and the unidentified document or communication quoted in this paragraph, speak for themselves and hereby denies any allegations inconsistent therewith.  Except as so stated, Gryphon denies the allegations in Paragraph 71.

72.     Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover Sphere's costs and expenses as they come due. Answering further, Gryphon admits it has informed Sphere that Gryphon, consistent with its obligations under the Sphere MSA, cannot fulfill a request to sell assets in Sphere's Digital Wallet that would leave the value of the remaining assets in Sphere's Digital Wallet, when converted to fiat currency, insufficient to cover amounts due and owing on Sphere's behalf, or otherwise leave Sphere unable to pay its debts as they become due. Answering further, Gryphon states that Sphere's allegations to the contrary are efforts to twist correspondence between the parties that speaks for itself to Sphere's own devices, and are expressly denied. Except as so stated, Gryphon denies the allegations in Paragraph 72.

73.     Gryphon denies the allegations in Paragraph 73. Gryphon specifically denies Sphere's allegation in Paragraph 73 that Gryphon has demanded Sphere resolve this litigation as a condition of selling Sphere's digital assets, or that Gryphon has otherwise advised Sphere it will simply resume selling Sphere's digital assets, irrespective of Sphere's financial condition, if the litigation is resolved.

74.     Gryphon denies the allegations in Paragraph 74.

75.     Gryphon admits that it has denied breaching any obligation under the Sphere MSA or otherwise. Answering further, Gryphon admits that Sphere has failed to provide Gryphon with

15

sufficiently specific factual information concerning Gryphon's purported breaches of the Sphere MSA. Except as so stated, Gryphon denies the allegations in Paragraph 75.

76.    Gryphon denies the allegations in Paragraph 76.

77.    Gryphon denies the allegations in Paragraph 77.

78.    Gryphon admits the allegation in Paragraph 78 that "[o]n April 7, 2023, Sphere issued a press release . . . ." Gryphon denies the remaining allegations in Paragraph 78.

79.    Gryphon denies the allegations in Paragraph 79.

80.    Gryphon has withdrawn its defamation claim against Sphere. Gryphon denies the remaining allegations in Paragraph 80.

81.    Gryphon has withdrawn its defamation claim against Sphere. against Sphere's Chief Executive Officer, Patricia Trompeter. Gryphon denies the remaining allegations in Paragraph 81.

82.    Gryphon denies the allegations in Paragraph 82.

83.    Gryphon admits the allegation in Paragraph 83 that Sphere has "prepared" and filed a "pre-motion letter" which purports to identify bases for dismissal of Gryphon's defamation claim. Gryphon has now withdrawn its defamation claim against Sphere. Gryphon denies the remaining allegations in Paragraph 83.

84.    Gryphon incorporates and re-alleges its answers to Paragraphs 1 through 83 of the Second Amended Complaint as if fully set forth herein.

85.    Paragraph 85 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon admits only that Count I purports to assert a claim for breach of contract against Gryphon, but Gryphon specifically denies that Gryphon has breached any contract with Sphere, including without limitation the Sphere MSA, and asserts that Gryphon has complied at all times with all obligations to Sphere. Gryphon denies the remaining allegations in Paragraph 85.

86.     Paragraph 86 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith.

87.     Gryphon denies the allegations in Paragraph 87, as set forth in more detail in Gryphon's Counterclaims below.

88.     The allegation in Paragraph 88 that Gryphon "has materially breached the Sphere MSA" is a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegation. Gryphon denies the remaining allegations in Paragraph 88.

89.     Paragraph 89 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

90.     Gryphon incorporates and re-alleges its answers to Paragraphs 1 through 83 of the Second Amended Complaint as if fully set forth herein.

91.     Paragraph 91 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon admits only that Count II purports to assert a claim for breach of the implied covenant of good faith and fair dealing against Gryphon, but Gryphon specifically denies that Gryphon has breached any implied covenant, and asserts that Gryphon acted in good faith at all times with respect to all obligations to Sphere. Gryphon denies the remaining allegations in Paragraph 91.

92.     Paragraph 92 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith.

93.     Gryphon denies the allegations in Paragraph 93, as set forth in more detail in Gryphon's Counterclaims below.

94. Paragraph 94 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

95. Paragraph 95 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

96. Paragraph 96 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

97. Gryphon incorporates and re-alleges its answers to Paragraphs 1 through 83 of the Second Amended Complaint as if fully set forth herein.

98. Paragraph 98 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon admits only that Count III purports to assert a claim for breach of fiduciary duty against Gryphon, but Gryphon specifically denies that Gryphon has breached any fiduciary duty. Gryphon denies the remaining allegations in Paragraph 98.

99. Paragraph 99 contains a legal conclusion to which no answer is required.

100. Paragraph 100 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

101. Paragraph 101 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

102. Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 102.

103. Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 103.

104. Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 104.

105.     Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 105.

106.     Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 106.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof or burden going forward not required by law, Gryphon alleges the following affirmative defenses, while reserving the right to amend its affirmative defenses or add affirmative defenses as this case and/or discovery proceeds:

1.     Sphere's Second Amended Complaint fails to state any claim upon which relief may be granted.

2.     Sphere's claim for breach of the implied covenant of good faith and fair dealing is barred because it is duplicative of its claim for breach of contract.

3.     Sphere's claims against Gryphon are extinguished by Sphere's own breaches of the Sphere MSA.

4.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrines of waiver, estoppel, acquiescence, and/or ratification.

5.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrine of unclean hands.

6.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrine of accord and satisfaction.

7.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrine of payment.

8.      Sphere's claims against Gryphon are barred, in whole or in part, by Sphere's failure to exercise due care or due diligence and/or failure to act reasonably to protect itself from, or to mitigate, any alleged damages.

9.      Sphere's claims against Gryphon are barred, in whole or in part, by Sphere's own negligence.

10.     Sphere's claims against Gryphon are barred, in whole or in part, because its claimed damages are speculative, uncertain, and/or not ripe.

11.     Sphere fails to allege facts sufficient to entitle Sphere to an award of punitive damages.

12.     Sphere's claims against Gryphon are barred, in whole or in part, because the alleged breaches by Gryphon are not material.

13.     Sphere's claims against Gryphon are barred, in whole or in part, because Sphere has not suffered any damages as a result of any conduct by Gryphon.

14.     Sphere's claims for relief against Gryphon are barred, in whole or in part, because Sphere has waived its right to recover any damages, including specifically punitive damages.

Gryphon reserves its right to amend and supplement its affirmative defenses subject to discovery in this action.

## FOURTH AMENDED COUNTERCLAIMS

For its Counterclaims against Plaintiff and Counterclaim-Defendant SPHERE 3D CORP.

("Sphere"), Defendant and Counterclaim-Plaintiff GRYPHON DIGITAL MINING, INC.

("Gryphon"), by and through its undersigned counsel, Hogan Lovells US LLP, states as follows:

### INTRODUCTION

1.      Gryphon is a privately held bitcoin mining company and industry leader in environmentally responsible bitcoin mining.

2.      Bitcoin is a decentralized digital currency (or "cryptocurrency") that can be stored on and transferred among digital wallets via peer-to-peer transactions.

3.      Bitcoin mining is the process of applying computing power to solve cryptographic problems to produce or "mint" new bitcoins, a process that is "energy intensive."

4.      Bitcoin miners who operate at a large scale typically either operate their own facilities, or contract with a hosting provider who will provide low-cost electricity to power those bitcoin mining computers, and will host and operate those bitcoin mining computers for a fee. Both Sphere and Gryphon contract with hosting providers.

5.      Most bitcoin miners will direct their mining computers to a bitcoin mining pool, which aggregates the bitcoin mining power of various miners together, and pays miners *pro rata* based on a miner's contribution to the overall production of all mining computers participating in the pool.

6.      Sphere is a cryptocurrency mining company.

7.      On or about June 3, 2021, Sphere announced a planned merger with Gryphon, to be closed in Q3 2021.[2]  As a result of the merger, Gryphon and Sphere intended to "set the bar for future

---

[2] Sphere 3D News Release June 3, 2021, *available at* Sphere 3D Corp. Announces Merger Agreement with Gryphon Digital Mining, Inc.

bitcoin mining companies," and were "excited about the developing applications of blockchain technology" and becoming "a major player in its development."[3] Sphere publicly touted Gryphon's "world class expertise" and its "expertise in bitcoin mining" in its own public statements.[4]

8.  On or about August 5, 2021, Sphere announced that it has assumed and executed an agreement pursuant to which it would purchase 60,000 new bitcoin mining machines.[5] Sphere repeatedly touted the anticipated mining capacity it and Gryphon would have following the anticipated merger, resulting from the 60,000 machines Sphere would contribute and the 7,200 machines Gryphon would contribute to the newly formed company.[6]

9.  In anticipation of the eventual merger, on or about August 19, 2021, Gryphon, as provider, and Sphere, as customer, entered into a Master Services Agreement governing the pre-merger relationship between the parties.  On or about December 29, 2021, Gryphon and Sphere entered into Amendment No. 1 to the August 19, 2021 Master Services Agreement (the Amendment and the August 19, 2021 Master Services Agreement are together defined as the "Sphere MSA").[7]

---

[3] Sphere 3D News Release January 12, 2022, *available at* Questions and Answers Regarding Sphere 3D Corp.'s Proposed Merger with Gryphon Digital Mining, Inc. | Sphere3D (gcs-web.com)

[4] Sphere 3D News Release August 20, 2021, *available at* Gryphon and Sphere Announce SPHERE MSA  and Agreement to Purchase Additional Carbon Offset Credits Bringing Total to Half a Million Credits | Sphere3D (gcs-web.com), *and* Sphere 3D News Release April 4, 2022, *available at* https://sphere3d.gcs-web.com/news-releases/news-release-details/sphere-3d-corp-and-gryphon-digital-mining-inc-move-forward-after

[5] Sphere 3D News Release August 5, 2021, *available at* Sphere 3D Announces Agreement to Acquire Exclusive Rights for Assignment of Cryptocurrency Mining Assets.

[6] Sphere 3D News Release September 3, 2021, *available at* Sphere 3D Announces Pricing of $192.1 Million Registered Direct Offering Priced At-the-Market to Help Secure the Initial Order of 60,000 Miners ("The 60,000 miners, in combination with the Gryphon Digital Mining's 7200 miners will have a combined capacity of approximately 6.4 Exahash."); Sphere 3D News Release September 21, 2021, *available at* Sphere 3D Secures Order for 60,000 BTC Antminers, One of the Largest Single Orders in Digital Mining Industry History ("In addition, upon the closing of the Gryphon Digital Mining merger, the combined companies will have a total capacity of 6.7 exahash, which is capable of producing in excess of 1,300 bitcoin per month, based on current difficulty rates.").

[7] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the SPHERE MSA.

22

10.     Pursuant to the Sphere MSA, Gryphon and Sphere agreed that up until closing of the planned merger, Gryphon would serve as the exclusive provider of any and all management services to Sphere for all of its blockchain and cryptocurrency-related operations, which services include, but are not limited to: exclusive control over any and all relevant digital asset wallets and selection of the mining pool and custodians of such digital assets. *See* Sphere MSA at Exclusivity Clause and Commercial Terms Clause. The Parties further agreed that Gryphon would serve as the exclusive provider of services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Sphere. *Id.* at Exclusivity Clause.

11.     The Sphere MSA has been fruitful for both Parties. Under the Sphere MSA, Sphere has benefitted from Gryphon's significant and unique experience, credibility, and expertise in cryptocurrency mining operations, including the "design, implementation and management of additional mining capacity" deployed by Sphere.[8] In exchange, Gryphon has enjoyed the exclusive nature of the agreement between the Parties and has collected a reasonable, specifically negotiated and contractually agreed-upon fee for its services.

12.     On or about September 12, 2021 Gryphon and Sphere secured a hosting services deal with Core Scientific, Inc. ("Core"), a blockchain data center operator.[9]  The deal was governed by a Master Services Agreement (the "Core MSA") executed by Gryphon and Core.  A true and correct copy of the Core MSA is attached hereto as **Exhibit A**. Pursuant to the Core MSA, Gryphon and Core on September 12, 2021, Gryphon and Core entered into an order ("Order #2") pursuant to which Core agreed to provide the infrastructure to host 71,000 Gryphon mining machines. A true and correct copy of Order #2 is attached hereto as **Exhibit B**. Under the terms of the Core MSA, Gryphon was

---

[8] *Supra,* n. 4, *available at* Gryphon and Sphere Announce SPHERE MSA and Agreement to Purchase Additional Carbon Offset Credits Bringing Total to Half a Million Credits | Sphere3D (gcs-web.com).
[9] Sphere 3D News Release October 13, 2021, *available at* Sphere 3D and Gryphon Secure Largest Single Hosting Services Deal in Core Scientific's History.

obligated to deliver all 71,000 machines to Core pursuant to an agreed-upon schedule. Pursuant to the Sphere MSA, Gryphon and Sphere understood that Sphere's machines would be used to fulfill Order #2.

13.     On or about October 8, 2021, Gryphon and Sphere entered into a Sub-License and Delegation Agreement, pursuant to which Gryphon sub-licensed certain rights and delegated certain obligations under the MSA and Order #2 to Sphere, and Sphere accepted such sub-license of rights and delegation of obligations. On or about December 29, 2021, Gryphon and Sphere entered into Amendment No. 1 to the October 8, 2021 Sub-License and Delegation Agreement (the Amendment and the October 8, 2021 Sub-License and Delegation Agreement are together defined as the "Sub-License Agreement"). A true and correct copy of the Sub-License Agreement is attached hereto as **Exhibit C**.

14.     Pursuant to the Sub-License Agreement, Sphere contractually assumed, among other things, Gryphon's obligation to provide Core with the 71,000 machines contemplated by Order #2. In an October 13, 2021 press release issued by Sphere, Sphere acknowledged that it had assumed this obligation and promised to provide at least 60,000 of those machines. Specifically Sphere stated that the Core agreement would "provide hosting capacity for up to 71,000 state-of-the-art bitcoin mining machines, and furnishes [Sphere] with a world-class partner to host the 60,000 Bitmain S19j Pro miners whose purchase was previously announced by Sphere."

15.     Although Gryphon and Sphere's business relationship has previously been mutually beneficial, in recent months, Sphere has repeatedly and in bad faith breached the Sphere MSA.

16.     Specifically, and despite Gryphon fully and competently performing its obligations under the Sphere MSA at all times, Sphere has repeatedly breached the Sphere MSA by (a) seeking mining hosting services independent of those arranged by Gryphon while rebuffing or ignoring Gryphon's inquiries as to whether Sphere required additional hosting services, (b) directing its

cryptocurrency miners to mining pools that Gryphon did not select and does not manage despite Gryphon maintaining mining pool relationships for Sphere's miners as part of Gryphon's exclusive services under the Sphere MSA, (c) creating its own digital wallets to receive proceeds of its mining efforts despite agreeing under the Sphere MSA that Gryphon has the exclusive right to manage digital wallets on Sphere's behalf, (d) actually receiving proceeds of cryptocurrency mining through those independently maintained and operated digital wallets without using Gryphon's choice of custodian in violation of the Sphere MSA, and (e) failing to pay Gryphon management fees for its cryptocurrency-related operations.

17. In other words, Sphere has flagrantly violated the exclusivity provision of the Sphere MSA and other express obligations under the Sphere MSA, engaged in conduct that stymies and frustrates Gryphon's ability to provide the Services required under the Sphere MSA, and engaged in conduct that ultimately circumvents the fees that would be rightfully due and owing to Gryphon under the Sphere MSA.

18. Moreover, Sphere has breached the Sphere MSA by failing to deliver the 71,000 mining machines to Core, despite its assumption of the obligation under Order #2. As a result of this breach, Gryphon suffered losses including, but not limited to, loss of the value of the MSA, lost profits, loss of business opportunities, and losses associated with litigation against Core.

19. Sphere also acted negligently by allowing a hostile threat actor to infiltrate its computer systems and information technology infrastructure, failing to detect or intercept spoofing emails appearing to be sent from Sphere's email domain which copied Sphere's CEO, and failing to detect or intercept the emails sent by threat actors (and before that, the presence of a threat actor in Sphere's systems) before such threat actors impersonated Sphere and induced Gryphon to send a material amount of bitcoin intended to be paid to Sphere pursuant to the Sphere MSA to the threat actor's bitcoin public key address (the "Data Security Incident").

20.     In the aftermath of the Data Security Incident, and despite Gryphon's repeated inquiries and demands, upon information and belief, Sphere has taken no action to remediate the Data Security Incident or to secure its email servers, email accounts, or other impacted computer systems and information technology infrastructure, thereby subjecting Gryphon and all of Sphere's other commercial partners to ongoing risk to their own financial well-being and to those commercial partners' own information security infrastructure.

21.     The parties announced termination of the planned merger in early 2022.

## PARTIES

22.     Gryphon is a corporation duly incorporated under the laws of the state of Delaware with its principal place of business located in Las Vegas, Nevada. Gryphon is an industry-leading net carbon neutral bitcoin miner.

23.     Upon information and belief, Plaintiff and Counter-Defendant Sphere is a Canadian corporation with its principal of business located in Toronto, Ontario, Canada. Sphere is a publicly traded company whose shares trade on the NASDAQ. Sphere specializes in industrial-scale cryptocurrency mining operations.

## VENUE AND JURISDICTION

24.     This Court has personal jurisdiction over the Sphere pursuant to the terms of the Sphere MSA, which contains a binding forum selection clause pursuant to which the Parties explicitly "consent to the exclusive jurisdiction of the State of New York in connection with any dispute, suit action or proceeding . . ." and waived "any defense of *forum non conveniens* in connection therewith." *See* Sphere MSA at Governing Law/Jury Waiver/Fee Clause.

25.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391 and the terms of the Sphere MSA which require all actions to be brought in the state or district courts located within the State of New York. *Id.*

## FACTUAL ALLEGATIONS

<u>SPHERE'S BREACHES OF THE SPHERE MSA</u>

26.    In advance of their anticipated merger, Sphere and Gryphon began combining their business operations in 2021 pursuant to the terms of the Sphere MSA.  Shortly after entering into the Sphere MSA, the parties secured the deal with Core governed by the Core MSA. On or about October 13, 2021, Gryphon secured hosting for Sphere's miners with Core Scientific, which Sphere's then-CEO, Peter Tassiopoulos, touted as a "blue chip" and "industry leading hosting partner."[10]

27.    Pursuant to the Core MSA and in light of the Sphere MSA providing Gryphon with access to Sphere's mining machines, Core agreed to provide location hosting services for Gryphon and Sphere's mining machines.  The agreement provided that the parties would subsequently agree to Orders setting forth the number of machines to be hosted by Core. The agreement further provided that Gryphon would be "fully responsible for delivering" the machines required by each order to Core.

28.    Following the execution of Order #2, Sphere assumed certain rights and responsibilities pursuant to the Sub-License Agreement.  Specifically, the agreement provided "Gryphon hereby (i) exclusively sub-licenses to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2. Sphere hereby accepts such sub-license and delegation in all respects."  As evidenced by Sphere's statements to the public, the parties understood this to include the obligation to deliver the machines required by Order #2.

29.    Despite assuming these obligations, Sphere failed to deliver the entirety of the mining machines to Core, thereby breaching its obligations under the Sublicense Agreement.

---

[10] Sphere 3D News Release October 13, 2021, *available at* Sphere 3D and Gryphon Secure  Largest Single Hosting Services Deal in Core Scientific's History | Sphere3D (gcs-web.com)

30.     Moreover, pursuant to the Sphere MSA, Sphere agreed that Gryphon "shall at all times control the digital wallet, which shall be a wallet address selected by Gryphon on behalf of Sphere for storing digital assets (the 'Digital Wallet'). The digital assets shall be in the denomination of cryptocurrencies, virtual currencies or coins mined by [Gryphon] for or on behalf of [Sphere] at any location whatsoever (the 'Digital Assets')." *Id.* at Commercial Terms Clause.

31.     Under the Sphere MSA, Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *Id.*

32.     The Sphere MSA provides that Gryphon "shall at all times select the mining pool and custodian of the Digital Assets." *Id.*

33.     As consideration for Gryphon's management services, Sphere agreed that "[Gryphon] shall receive the equivalent of twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations (the 'Management Fee')." *Id.* at Management Fee/Operating Costs Clause.

34.     Pursuant to the terms of Sphere MSA, in addition to any damages incurred, Gryphon is entitled to its reasonable attorneys' fees and costs in connection with bringing this action. *See* Sphere MSA at Governing Law/Jury Waiver/Fees Clause.

35.     On or about April 11, 2022, Gryphon's CEO, Rob Chang, contacted Sphere with an offer to help obtain hosting for Sphere's bitcoin miners. Sphere directed Gryphon to "[s]tand by" but did not follow up regarding Mr. Chang's offer.

36.     On June 17, 2022, Gryphon's president, Dan Tolhurst, contacted Sphere to determine whether Sphere needed additional hosting for its bitcoin miners. Sphere stated it did not.

37.     Despite stating that it did not need additional bitcoin miner hosting, on or about August 8, 2022, Sphere entered into an agreement with Compute North, a hosting provider, without the consent, approval, or involvement of Gryphon.

38.     Such relationship is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which the Parties agreed that Gryphon shall serve as the exclusive provider of Services relating to cryptocurrency mining equipment.

39.     Mr. Tolhurst contacted Sphere again on September 30, 2022, but again was told that Sphere did not need additional hosting. Sphere also stated that it was looking to resolve issues directly with Core Scientific.

40.     On November 16, 2022, Gryphon, through its CEO Rob Chang, contacted Sphere and offered to set up a meeting with Foundry Digital, a mining pool operator ("Foundry").

41.     In December 2022, Core Scientific filed for relief under the U.S. Bankruptcy Code.

42.     Thereafter, in December 2022, Gryphon again attempted to obtain new hosting services for Sphere's bitcoin miners.

43.     However, Sphere refused to provide critical information required by Gryphon to enable Gryphon to procure replacement hosting for Sphere's devices, and instead sought to circumvent Gryphon's exclusive right to provide the Services by: (a) seeking alternative hosting independent of Gryphon's control, (b) creating its own digital wallets, (c) attempting to select its own crypto mining pool, and (d) actively concealing, beginning in Spring 2023, its own mining efforts and proceeds to avoid paying Gryphon the Management Fees owed under the Sphere MSA.

44.     On or about December 12, 2022, Sphere entered into a business relationship with US Bitcoin ("USBTC"), a mining hosting provider which at the time managed prior Compute North hosting facilities, without the consent, approval, or involvement of Gryphon.

45.     On March 8, 2023, Mr. Tolhurst contacted Alex Tierney, Sphere's Director of Corporate Development, and inquired regarding Sphere's hosting needs. Sphere did not respond to Mr. Tolhurst's inquiry.

46.     On March 9, 2023, Mr. Tolhurst contacted Kurt Kalbfleisch, Senior Vice President and CFO of Sphere, and further inquired regarding Sphere's hosting needs. Mr. Kalbfleisch indicated that he would speak to Sphere's CEO, Patricia Trompeter, and revert back.

47.     On or about March 10, 2023, Sphere attempted to enter into a business relationship with Foundry without the knowledge, consent, approval, or involvement of Gryphon.

48.     This attempt to create a business relationship with Foundry, a mining pool operator, and to create its own account outside of Gryphon's control, is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment and wherein Gryphon and Sphere agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.*

49.     Moreover, Sphere's attempt to establish its own mining pool accounts with Foundry, without the consent, approval or involvement of Gryphon, would result in higher costs to Sphere because it does not enjoy the same lower cost tier available to Gryphon through the mining pools Gryphon manages; while this would reduce Sphere's profitability, it would also reduce the Management Fee ultimately received by Gryphon.

50.     In response to Gryphon's inquiries concerning Sphere's attempts to establish a mining pool account with Foundry, Sphere has claimed that it did so at the recommendation of Sphere's auditor for purposes of revenue recognition. However, the mere fact that Sphere's attempt to establish an account with Foundry was recommended and/or even demanded by Sphere's auditor does not excuse Sphere's breach of the Sphere MSA. Furthermore, Sphere has failed to engage with Gryphon for purposes of considering alternative solutions concerning its revenue recognition issues.

51.     On March 15, 2023, Mr. Tolhurst followed up with Sphere's CFO, Mr. Kalbfleisch, regarding Mr. Tolhurst's March 9 inquiry regarding Sphere's hosting needs. Sphere did not respond.

52.     On or about March 16, 2023, Sphere entered into an agreement with Lancium Mining, a mining hosting provider, without the knowledge, consent, approval, or involvement of Gryphon.

53.     The Lancium agreement included an expectation to direct the hashrate deployed at Lancium to a mining pool managed by Luxor Technologies as compensation for the introduction of Lancium by Luxor to Sphere.

54.     Such relationship and agreement with Lancium and with Luxor is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment, and wherein Gryphon and Sphere agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.* at Exclusivity Clause and Commercial Terms Clause

55.     On or about March 19, 2023, Sphere entered into a business relationship with Luxor Technologies, a crypto mining pool provider, without the consent, approval or involvement of Gryphon. Without Gryphon's consent or approval, Sphere created an account with Luxor and obtained an account ID.

56.     This relationship is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to Sphere's cryptocurrency mining equipment, and wherein Gryphon and Sphere agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.* at Exclusivity Clause and Commercial Terms Clause.

57.     In furtherance of its improper relationships with Luxor and Foundry (and in breach of the Sphere MSA), Sphere has established Digital Wallets without the consent, approval, or

31

involvement of Gryphon. On March 21, 2023 Sphere, through its CEO, Patricia Trompeter, admitted to having created a digital wallet for Sphere without the consent or approval of Gryphon. Sphere has not transferred control of that digital wallet to Gryphon and has not paid the Management Fee required to be paid to Gryphon from that digital wallet, as required under the Sphere MSA.

58.     These actions are a material breach of the commercial terms of the Sphere MSA, which give Gryphon exclusive control over Sphere's Digital Wallets, and which specifically grant Gryphon the exclusive power to select the custodian of the Digital Assets. These actions prevent Gryphon from accurately calculating Sphere's operating costs and paying those amounts for Sphere as Gryphon is required to do under the Sphere MSA. These actions further prevent Gryphon from accurately calculating the Management Fee due to be paid to Gryphon.

59.     Gryphon has repeatedly requested from Sphere the information it would require to secure mining hosting services for Sphere but Sphere has repeatedly failed to provide that information to Gryphon. Sphere also refused for months to provide Gryphon with information relating to current hosting providers, only doing so recently, and has continued to refuse to provide Gryphon with authorization to manage those relationships to the current hosting providers as required under the SPHERE MSA.

60.     On March 21, 2023, Gryphon sent a demand letter (the "Demand Letter"), to Sphere, putting Sphere on notice of its breaches of the Sphere MSA and demanding all documentation relating to Sphere's efforts to circumvent the exclusive rights granted to Gryphon by Sphere, including its efforts to create business relationships with third party cryptocurrency-related service providers. A true and correct copy of the Demand Letter is attached hereto as **Exhibit D.**

61.     Sphere has not provided the requested documentation and remains in breach of the Sphere MSA.

62. Even after filing its lawsuit, Sphere continues to breach the Sphere MSA and to tout its breaches publicly. For example, in its March 2023 Investor Update, Sphere disclosed that it has established a "partnership with Rebel Mining," and that it is "deploying miners to a facility in Missouri for anticipated energization in May."[11] Sphere publicly claims to have entered additional discussions with hosting providers for the placement of over 5,000 cryptocurrency miners.[12]

63. Subsequent to its receipt of the Demand Letter, Sphere has continued to breach the Sphere MSA and continued to withhold information required by Gryphon to perform the services required of Gryphon under the Sphere MSA.

64. Sphere has breached the Sphere MSA by directly paying vendors for operating costs associated with mining, the responsibility for which is explicitly charged to Gryphon under the Sphere MSA. Moreover, Sphere has refused to provide Gryphon with certain information relating to the hosting services it has independently (and in breach of the Sphere MSA) sought out and obtained. Such information is necessary for Gryphon to fulfill its obligations under the Sphere MSA relating to management of payments for operating costs.

65. Specifically, the Sphere MSA provides, in pertinent part, that Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *See* Sphere MSA at Commercial Terms Clause. Consistent with its obligations under the Sphere MSA, Gryphon historically has directly paid invoices for hosting services relating to Sphere's mining operations out of Sphere's Digital Wallet.

---

[11] *See, e.g.*, Sphere 3D Corp. Provides Bitcoin Production and Mining Updates for March 2023 | Sphere3D (gcs-web.com)

[12] Sphere 3D News Release March 16, 2023, *available at* Sphere 3D Corp. Provides Bitcoin Production and Mining Updates for February 2023 | Sphere3D (gcs-web.com)

66.     Sphere's independent arrangement of hosting services has and continues to prevent Gryphon from managing payments for such services. Sphere has refused to provide Gryphon with access and contact information relating to these services so that Gryphon can fulfill its obligations under the Sphere MSA. Instead, Sphere insists that it pay these vendors directly. Not only is this a breach of the Sphere MSA, but it has caused delay in payment because for Sphere to pay the vendors directly it has required Gryphon to first sell assets in the Digital Wallet, which requires Gryphon to transfer the cash received for those assets to Gryphon's bank account, then to transfer the cash from Gryphon's bank account to Sphere's bank account, and then finally for Sphere to transfer the cash from Sphere's bank account to the vendor. This unnecessarily convoluted process, which violates the Sphere MSA, creates a payment lag that has resulted in, and continues to pose a risk of, Sphere failing to timely pay invoices (and which poses a risk to Sphere's broader mining operations).

67.     For example, Sphere has admitted to independently establishing hosting agreements with hosting providers, *e.g.*, Lancium and Rebel Mining. Despite multiple requests, Sphere has refused to authorize Rebel to provide Gryphon with authority to make changes concerning the designated addresses of mining pools. Despite multiple requests, Sphere repeatedly refused to provide contact information for Lancium until finally such information was provided to Gryphon on May 16, 2023, and Lancium still has not responded to Gryphon's inquiries because Sphere's CEO, Ms. Trompeter, has not authorized Lancium to do so, notwithstanding the Sphere MSA's requirements. As a result of Sphere's actions and inactions, Gryphon is and/or has been unable to provide the Services required of it by the Sphere MSA. (*See* correspondence attached as **Group Exhibit E**.)

68.     Sphere has likewise continued to act to frustrate Gryphon's ability to perform under the Sphere MSA. Specifically, Sphere has on multiple occasions requested that Gryphon liquidate bitcoin held in the digital wallets managed by Gryphon. Although this is not, in and of itself, a breach of the Sphere MSA, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly

34

pay Sphere's operating costs, the Digital Wallet must maintain adequate value to cover Sphere's costs and expenses as they come due. Although Gryphon has informed Sphere of this necessity, Sphere has repeatedly demanded the sale of assets in the Digital Wallet such that the value of the remaining assets in the Digital Wallet would be insufficient to cover amounts due and owing by Sphere, which Gryphon is supposed to pay on Sphere's behalf. (*See* correspondence attached as **Group Exhibit F**.)

69.      Sphere's refusal to maintain sufficient value in the Digital Wallet prevents payment of Sphere's operating costs as they come due, prevents payment of those costs in a timely manner, and prevents payment to Gryphon of its contractually mandated Management Fee. The result would be Gryphon providing the equivalent of working capital financing to Sphere, which is not required by the Sphere MSA.

70.      These breaches, and the damage they caused Gryphon, have been further compounded by Sphere's creation and use of digital wallets other than the Digital Wallet that Gryphon created for Sphere pursuant to the Sphere MSA. Indeed, on August 14, 2023, Sphere announced its Q2 2023 financial results. (A true and correct copy of Sphere's press release announcing those results is attached hereto as **Exhibit G**.) According to Sphere's own press release, Sphere mined 178.4 Bitcoin in Q2 2023. But only 92.7 Bitcoin was mined using the miners and pools that Gryphon manages for Sphere pursuant to the Sphere MSA. By definition, then, the other 85.7 Bitcoin that Sphere mined in Q2 2023 was directed to pools and addresses not selected by Gryphon, in breach of the Sphere MSA. And Gryphon has therefore lost its right, under the Sphere MSA, to that portion of the Management Fee that would otherwise be due and owing to Gryphon for Sphere's mining of those 85.7 Bitcoin (whose market value as of this filing is $2,514,609.40), all due to Sphere's flagrant breaches of the Sphere MSA, which Sphere has all but admitted in its most recent financial release.

## THE DATA SECURITY INCIDENT

71.     As required under the Sphere MSA, Gryphon and Sphere have developed and relied upon a regular course of dealing whereby the parties request and confirm transfers of cryptocurrency from the Digital Wallets managed by Gryphon to Sphere.

72.     Specifically, Gryphon regularly provides information to Sphere that allows Sphere to understand the Net Operating Profit generated through its cryptocurrency mining operations as managed by Gryphon. From that information, Gryphon calculates the amount owned by Sphere and sends an invoice to Sphere pursuant to the policies and procedures jointly developed by the parties and as required by the first Amendment to the Sphere MSA. Gryphon is required to pay Sphere's operating costs and is required to withdraw its Management Fee from Sphere's Digital Wallet. Thereafter, Gryphon has on several occasions transferred any remaining funds to Sphere by wire or, at Sphere's request, via a bitcoin transfer.

73.     If Sphere has requested a direct transfer of BTC, Gryphon sends the requested amount of digital assets in the Digital Wallets to Sphere, at Sphere's request, according to an established course of dealing. First, Sphere will send an email requesting a transfer. The transfer request will generally include (i) the amount of cryptocurrency to be transferred, and (ii) the public key address of its digital asset wallet (the "Transferee Wallet").

74.     If Sphere requests a transfer into a new Transferee Wallet, Gryphon will take steps to confirm the new Transferee Wallet. Specifically, when a transfer request is made by Sphere requesting that bitcoin be transferred to a new Transferee Wallet, Gryphon will send a *de minimis* test transaction to the Transferee Wallet public key address. The test transaction amount must then be confirmed as received by Sphere via email. Once confirmed, Gryphon then sends the full transfer amount to the Transferee Wallet, less the amount already transferred as part of the test transaction.

36

For subsequent transactions paid to known Transferee Wallet public key addresses, Gryphon will send the full requested amount without verification or test transactions.

75.     Gryphon and Sphere used the established protocol described herein for six (6) transactions of bitcoin beginning on August 26, 2022 without incident or objection by Sphere at any time before January 27, 2023.

76.     On or about January 27, 2023, however, Gryphon received a transfer request for eighteen (18) bitcoin from the email address belonging to Kurt Kalbfleisch, Senior Vice President and CFO of Sphere (the "First January 27 Request"). The email included all information typically provided to Gryphon by Sphere when requesting a cryptocurrency transfer, including a request that the eighteen (18) bitcoin be transferred to a known public key address for Sphere's Transferee Wallet. The January 27 Request also copied Ms. Trompeter's Sphere3d.com email address, which is consistent with Sphere's typical practice in transmitting these requests to Gryphon.

77.     Upon receipt of the First January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request and in a response email informed Mr. Kalbfleisch that the transfer would not be completed until January 30, 2023 at the earliest.

78.     On the same day and within the same email chain, Mr. Chang received a second email from what appeared to be Mr. Kalbfleisch's email address. The email stated that the previously-provided public key address for Sphere's Transferee Wallet was under audit and requested that the bitcoin be transferred to a different Transferee Wallet public key address (the "Second January 27 Request"). Sphere's CEO, Ms. Trompeter, was copied on this email via her correct email address.

79.     Upon receiving the Second January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request that the bitcoin be transferred to a different Transferee Wallet public key address and consistent with established practice, responded that the request required verification of the new address.

37

80.     On January 30, 2023, Gryphon sent a *de minimis* test transaction (0.0001 bitcoin) to the new Transferee Wallet public key address identified in the Second January 27 Request. After the bitcoin was transferred, Mr. Chang sent an email to the email address appearing to be Mr. Kalbfleisch's Sphere3d.com email address from which the Second January 27 Request was sent, stating that the *de minimis* test transaction was complete and requesting that Sphere confirm receipt of the test transaction. Sphere's CEO, Ms. Trompeter, was copied on Mr. Chang's email via her correct email address.

81.     Shortly thereafter, Mr. Chang received an email response from what appeared to be Mr. Kalbfleisch's email address confirming that Sphere received the test transaction and requesting the full amount of the transfer request be sent. Ms. Trompeter was copied on the response email confirming Sphere's receipt of the test transaction at her correct email address, again consistent with Sphere's practice in communicating such confirmations to Gryphon.

82.     After receiving confirmation of the test transaction and the request that the full amount be transferred, Gryphon sent the remainder of the requested transfer amount (17.9999 bitcoin) on January 31, 2023, to the new Transferee Wallet public key address identified in the Second January 27 Request.

83.     On February 1, 2023, Gryphon received an email from what appeared to be Mr. Kalbfleisch's email address requesting the transfer of an additional eight (8) bitcoin to the new Transferee Wallet public key address (the "February 1 Request"). Once again, Ms. Trompeter was copied on this email via her correct email address. Later that day, Gryphon received another email from what appeared to be Mr. Kalbfleisch's email address inquiring about the status of the requested transfer. Ms. Trompeter was copied on this email via her correct email address.

84.     Gryphon, through Mr. Chang, responded to the email from what appeared to be Mr. Kalbfleisch's email address stating the transfer request was being processed. Ms. Trompeter was copied on Mr. Chang's response via her correct email address.

85.     On February 1, 2023, Gryphon transferred eight (8) bitcoin to the new Transferee Wallet public key address.

86.     A true and correct copy of the email correspondence regarding the transfers described herein are attached hereto as **Group Exhibit H.** In total, Gryphon transferred twenty-six (26) bitcoin to the new Transferee Wallet public key address provided in the Second January 27 Request via three separate bitcoin transactions.

87.     On or about February 2, 2023, Gryphon was informed that Sphere never received the bitcoin transactions sent by Gryphon. After examination, Gryphon discovered that emails sent from what appeared to be Mr. Kalbfleisch's email address, beginning with the Second January 27 Request, were compromised when sent by Sphere to Gryphon; those emails came from a spoofed domain impersonating Sphere's domain. As such, the transfers of bitcoin were sent to a digital asset wallet address with no apparent affiliation to Sphere. Mr. Kalbfleisch's email was compromised as a result of the Data Security Incident in Sphere's systems; upon information and belief, Mr. Kalbfleisch's email was compromised due to Sphere's failure to implement proper security and controls over its computer systems, including its executives' email accounts and email server, and its failure to detect the compromise when a threat actor was actively diverting Gryphon's funds, despite Sphere's CEO, Ms. Trompeter, being copied on and privy to all relevant communications. *See* **Group Exhibit H**.

88.     Unlike Mr. Kalbfleisch's email address, Ms. Trompeter's email address was not spoofed on the Second January 27 Request or any subsequent correspondence with Gryphon, including the February 1 Request; Ms. Trompeter was copied to her Sphere3d.com email address on all correspondence between Gryphon and the hostile actor spoofing Mr. Kalbfleisch's email. Thus,

39

Ms. Trompeter—Sphere's CEO—was well-positioned to ascertain and detect her colleague's compromise, but apparently did not do so. *See* **Group Exhibit H**.

89.     In an abundance of caution, in the aftermath of the Data Security Incident, Gryphon engaged an independent third-party forensic investigator to perform a privileged investigation of any potentially impacted systems on Gryphon's part. The investigation revealed that the compromise of Mr. Kalbfleisch's Sphere3d email account was not the result of any intrusion, vulnerability, hostile actor, or lack of proper security or controls over computers, email accounts, or email servers used by Gryphon.

90.     On March 3, 2023, Gryphon and Sphere scheduled a meeting with the documented stipulated purpose of allowing the Parties' respective experts to compare their investigations and findings into the Data Security Incident. In particular, Gryphon indicated in its correspondence to Sphere that it had "completed [its] forensic research and believe[s] it is the right time for our forensic investigators to discuss their findings. Could we please arrange a time for them to connect?" On March 3, Ms. Trompeter, CEO of Sphere, agreed to a meeting including both parties' experts, noting, "[w]e have a forensic review as well." (*See* correspondence attached as **Group Exhibit I**.)

91.     On March 15, 2023, Gryphon and Sphere joined their scheduled call wherein their respective experts were expected to discuss their investigations into the Data Security Incident. Gryphon attended the call with its expert. Sphere, however, did not put forward any expert on the call. Instead, Sphere refused to provide any information to Gryphon, claimed it was undergoing "many investigations" and did not know what investigation Gryphon was referring to, and claimed that its understanding of the purpose and scope of the meeting was that Gryphon would present its own findings without any exchange of information.

92.     Despite multiple requests by Gryphon, Sphere has failed to reschedule a meeting of the parties' respective experts, has failed to provide any information regarding its investigation, and

has failed to provide any evidence that it undertook any investigation into the Data Security Incident at all.

93.     Upon information and belief, the hostile actor that caused the spoofed emails acted through Sphere's computer systems and/or information technology infrastructure and, without adequate investigation and remedial measures, presents a continuing threat to Sphere's ongoing operations, and specifically to Sphere's existing and future commercial partners.

94.     Despite the transfer of bitcoin to the hostile threat actor being the sole fault of Sphere and due to Sphere's negligence alone, in order to attempt to maintain an amicable business relationship with Sphere, Gryphon transferred the U.S. dollar-equivalent value of twenty-six (26) bitcoin, approximately $560,215.53, from a digital wallet of Gryphon's to Sphere via wire transfer on a courtesy basis, reserving Gryphon's rights. Sphere has acknowledged receipt of this transfer.

95.     Despite good faith efforts, including blockchain forensic tracing, Gryphon has been unable to recover the twenty-six (26) bitcoin transferred to the threat actor whose public key address was included in the emails sent to Gryphon, copying Sphere's CEO.

96.     Since the Data Security Incident, Gryphon has discontinued transfers of digital assets to Sphere. Instead, Gryphon makes payments to Sphere in U.S. Dollars via wire transfer.

### UNLAWFUL AND DISPARAGING STATEMENTS BY SPHERE AND TROMPETER

97.     Following the Data Security Incident, Sphere and its Chief Executive Officer, Patricia Trompeter, have made unlawful and disparaging statements to third parties concerning Gryphon. In a news release issued on April 7, 2023, Trompeter, acting in her capacity as Sphere's CEO, accused Gryphon of "materially breaching the Master Services Agreement," "put[ting] [Sphere's] assets at significant risk," "willfully violat[ing] [Gryphon's] contractual duties," and "bull[ying] [and]

41

threaten[ing]" Sphere.[13] After acknowledging that "[c]orporate integrity is essential . . . in [the cryptocurrency] industry," Trompeter further accuses Gryphon of "fail[ing] to act with integrity . . . [and] . . . fail[ing] to honor our contract." Trompeter's statement that Sphere will "hold . . . accountable" and "protect" itself from "the likes of Gryphon," alongside the statement that Gryphon has "failed to act with integrity," is a transparent attempt to improperly associate Gryphon, a well-respected industry leader, with certain high-profile bad actors in the crypto industry whose wrongful conduct has recently come to light.

98.     The false and disparaging statements of Sphere and Trompeter in the April 7, 2023 news release were reported on, quoted, and re-published by various cryptocurrency news media outlets, including without limitation CoinDesk, Cointelegraph, Binance, and Blockchain News, as well as by the broader news media, including without limitation Barron's, Law.com, MarketWatch, Seeking Alpha, and Yahoo! Finance.

99.     Apparently acting in her individual capacity, Trompeter further republished the April 7, 2023 news release containing the false statements on her personal Twitter account.

100.     Despite the serious nature of Sphere's allegations, it did not identify any specific action Gryphon took that it should not have taken, or any specific action Gryphon failed to take but should have, leaving Gryphon incapable of responding meaningfully, let alone determining how it might try to cure any purported breaches.

101.     On April 7, 2023, Sphere initiated this action against Gryphon. Sphere's original Complaint in this action, as well as its later-filed Amended and Second Amended Complaints, lack specific detail concerning Gryphon's purported breaches of the Sphere MSA. *See* ECF Nos. 1, 20, 36. For example, none of these pleadings identifies any specific instance in which Gryphon "refused to

---

[13] Sphere 3D News Release April 7, 2023, *available at* Sphere 3D Files Litigation Against Gryphon Digital Mining | Sphere3D (gcs-web.com)

find hosting space for Sphere's miners" or "delayed in setting up and ensuring the operation of Sphere's miners." *See generally* ECF Nos. 1, 20, 36.

102.    In light of the vague and generic allegations in Sphere's various pleadings, Gryphon made multiple requests to Sphere—both directly and through counsel—asking Sphere to specify exactly how Gryphon allegedly breached the Sphere MSA, and how Gryphon could, in Sphere's view, cure any such breaches, so that Gryphon could review and evaluate such information and attempt to cure, as Gryphon is entitled to do under the Sphere MSA.

103.    For example, Gryphon's Chief Executive Officer, Rob Chang, asked Sphere to provide specific information concerning the nature of Gryphon's purported breaches of the Sphere MSA on at least the following occasions, with Sphere each time failing to respond substantively, if at all:

- May 10, 2023: Gryphon emailed Sphere that Gryphon was "willing to work with [Sphere] to address any perceived shortcomings," but that it was "not at all clear from [Sphere's] various correspondence (or lawsuit, frankly) what Sphere actually thinks Gryphon has done to breach the Sphere MSA," and asking Sphere to "identify, in detail, how [Sphere] thinks Gryphon has purportedly breached the Sphere MSA." (*See* correspondence attached as **Group Exhibit J**.) Sphere did not respond to this email.

- May 23, 2023: After Sphere did not respond, Gryphon emailed Sphere "[f]ollowing up" on Gryphon's May 10, 2023 email. *Id.* Sphere responded by stating Gryphon's response "was clear that [Gryphon] had no intent to undertake any effort at remediation, so [Sphere] [does] not see any need to engage further." *Id.*

- May 24, 2023: Gryphon emailed Sphere reiterating that "[a]ll [Gryphon] [is] asking is for Sphere to identify for Gryphon what, exactly, Gryphon needs to do, in Sphere's

43

view, to cure any breaches," and informing Sphere that, "[w]ithout that specificity, it is hard to see how [Gryphon] can even attempt to cure." *See id.* Gryphon further asked Sphere "to specifically identify how Sphere believes that Gryphon has purportedly breached the Sphere MSA, so [Gryphon] can attempt to move forward productively," and informed Sphere that, "absent a clear and consistent recitation of how [Gryphon] [has] breached the Sphere MSA, any cure becomes difficult, if not impossible to accomplish." Sphere responded by "refer[ring] [Gryphon] to [its] attorney's correspondence to [Gryphon's] lawyers and [Sphere's] Complaint," and stating that "[i]t is [Gryphon's] job to cure the breaches we identified, not ours." *See id.*

104.    Similarly, Gryphon's counsel sent three separate letters to Sphere's counsel—on June 6, 2023, on June 22, 2023, and on August 1, 2023—each asking Sphere to specify "***exactly what*** Gryphon has allegedly done to breach the Sphere MSA, and as to ***exactly how*** Gryphon can cure those alleged breaches." (*See* correspondence attached as **Group Exhibit K** (all emphasis in original).)

105.    Despite the clear and unambiguous language of the Sphere MSA and the clear requirements of New York law with respect to the Sphere MSA's notice-and-cure provisions, Sphere has ***never*** provided Gryphon sufficient notice of Gryphon's purported breaches of the Sphere MSA. This has made it impossible for Gryphon to exercise its cure rights under the Sphere MSA in response.

106.    Nevertheless, on October 6, 2023, Sphere purported to terminate the Sphere MSA on the basis of its prior correspondence and pleadings in this action. Because Sphere has failed to comply with the Sphere MSA's explicit notice-and-cure provisions, however, Sphere's purported termination is wrongful and ineffective

107.    All conditions precedent to bring these claims have been met, or have been waived, or would be futile to attempt prior to bringing this action.

<div align="center"><b><u>COUNT I – BREACH OF THE SPHERE MSA</u></b></div>

<div align="center">(Against Counter-Defendant Sphere 3D Corp.)</div>

108.    Gryphon adopts by reference the allegations of Paragraphs 1-107 as if fully stated herein.

109.    Gryphon and Sphere are parties to the Sphere MSA.

110.    The Sphere MSA is a valid and enforceable contract governed by New York law.

111.    Sphere knew it was responsible for delivering the 71,000 mining machines to Core.

112.    Gryphon has fully performed and complied with all of its obligations and duties under the Sphere MSA.

113.    Sphere's conduct, as described herein, constitutes a breach of the Sphere MSA.

114.    Specifically, Sphere has breached its obligations to deliver to Core the 71,000 mining machines.

115.    As a direct and proximate cause of Sphere's breaches, Gryphon has been directly damaged in an amount to be determined at trial, but in all events including but not limited to loss of the value of the MSA, lost profits, loss of business opportunities, and losses associated with litigation against Core.

<div align="center"><b><u>COUNT II – BREACH OF THE SPHERE MSA</u></b></div>

<div align="center">(Against Counter-Defendant Sphere 3D Corp.)</div>

116.    Gryphon adopts by reference the allegations of Paragraphs 1-107 as if fully stated herein.

117.    Gryphon and Sphere are parties to the Sphere MSA.

118.    The Sphere MSA is a valid and enforceable contract governed by New York law.

<div align="center">45</div>

119.     Under the Sphere MSA, the Parties agreed that Gryphon shall serve as Sphere's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by [Sphere] and/or its subsidiaries and/or affiliates at any location . . . ." *See* Sphere MSA at Exclusivity Clause.

120.     The Parties further agreed that Gryphon shall "at all times control the digital wallet, which shall be a wallet address selected by [Gryphon] on behalf of [Sphere] for storing digital assets," and shall "at all times select the mining pool and custodian of the Digital Assets." *See* Sphere MSA at Commercial Terms Clause.

121.     The Parties also agreed that Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *See id.*

122.     The Parties further agreed that Sphere could terminate the Sphere MSA under certain conditions "[s]ubject to written notice from [Sphere] and an opportunity by [Gryphon] to cure for a period of up to one hundred eighty (180) days." *See id.*

123.     Gryphon has fully performed and complied with all of its obligations and duties under the Sphere MSA.

124.     Sphere's conduct, as described herein, constitutes a breach of the Sphere MSA.

125.     Specifically, Sphere has materially breached the exclusivity terms of the Sphere MSA by entering into agreements with, potentially among others, Luxor, Foundry, USBTC, Rebel Mining, and Lancium without the consent, approval, or involvement of Gryphon.

126.     Sphere has further materially breached the commercial terms of the Sphere MSA by, among other things, creating and operating its own digital wallets without the consent, approval or involvement of Gryphon.

46

127.     Sphere has further materially breached the Sphere MSA by collecting amounts believed to be mining proceeds, in the amount of 2.82168614 bitcoin, into its Digital Wallet and failing to remit Management Fees to Gryphon.

128.     Sphere has further materially breached the Sphere MSA by directly paying the operating costs associated with its mining activity rather than allowing Gryphon, as required under the Sphere MSA, to pay such costs and expenses from the Digital Wallet.

129.     Finally, Sphere has materially breached the Sphere MSA by purporting to terminate the Sphere MSA on October 6, 2023 without granting Gryphon its contractually bargained-for rights to sufficient notice of any alleged breaches and a 180-day period to cure those alleged breaches.

130.     As a direct and proximate cause of Sphere's breaches, Gryphon has been directly damaged in an amount to be determined at trial, but in all events in excess of $75,000, exclusive of interest and costs, for its prior breaches of the Sphere MSA, plus at least $10,000,000 for its wrongful purported termination of the Sphere MSA.

## COUNT III – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(Against Counter-Defendant Sphere 3D Corp.)

131.     Gryphon adopts by reference the allegations of Paragraphs 1-107 as if fully stated herein.

132.     Gryphon and Sphere are parties to the Sphere MSA.

133.     The Sphere MSA is a valid and enforceable contract governed by New York law.

134.     Gryphon has fully performed and complied with all of its obligations and duties under the Sphere MSA.

135.     Under New York law, Sphere owes Gryphon an implied duty to act in good faith and conduct itself fairly in connection with the Sphere MSA.

47

136.    Pursuant to the exclusivity terms of the Sphere MSA, Gryphon is the exclusive

provider of any and all management services relating to mining equipment owned, purchased, leased,

or otherwise controlled by Sphere.

137.    Despite multiple requests made by Gryphon, Sphere has failed to disclose the number

of cryptocurrency miners owned, purchased, leased or otherwise controlled by Sphere.

138.    Despite multiple requests made by Gryphon, Sphere has failed to provide Gryphon

with information required for Gryphon to find hosting for Sphere's cryptocurrency miners.

139.    Despite multiple requests made by Gryphon, Sphere has failed to provide Gryphon

with certain access and contact information relating to the various hosting facilities that Sphere has,

on its own, arranged to host its cryptocurrency miners.

140.    Further, Sphere has refused to provide authorization for Gryphon to manage the

relationships it has created with those hosting facilities, which has prevented Gryphon from managing

the cryptocurrency miners hosted at those hosting facilities.

141.    Further, Sphere has refused to provide Gryphon with sufficient information to allow

Gryphon to pay operating costs incurred by Sphere.

142.    Though the Sphere MSA does not explicitly address Sphere's failure to disclose all

this information, Sphere's failure to provide this information to Gryphon has prevented Gryphon from

fulfilling its duties under the Sphere MSA, and, as such, frustrated the parties from obtaining the

benefit of their bargain under New York law.

143.    Although Sphere's failure to disclose information is not an express breach of the

Sphere MSA, it has prevented Gryphon from providing Services as required under the Sphere MSA

and therefore deprived Gryphon of the benefits of its bargain under the Sphere MSA.

144.    Sphere's failures to disclose this information thus constitute a breach of the implied

covenant of good faith and fair dealing inherent in every contract under New York law.

145.     As a direct and proximate cause of Sphere's breach, of the implied covenant of good faith and fair dealing, Gryphon has been damaged in an amount to be determined at trial, but in all events in excess of $75,000, exclusive of interest and costs.

## COUNT IV – NEGLIGENCE

(Against Counter-Defendant Sphere 3D Corp.)

146.     Gryphon adopts by reference the allegations of Paragraphs 1-107, above, as if fully stated herein.

147.     Sphere owed duties to Gryphon to maintain proper security and control of Sphere's computer systems and information technology infrastructure, including its company email accounts and email server, to take proper precautions to protect Gryphon from being targeted by fraudulent activities in connection with Gryphon's business dealings with Sphere, including the transfer of assets under the Sphere MSA, to safeguard information relating to such business dealings and transactions, and to recognize and notify Gryphon of fraudulent activity occurring within Sphere's computer systems and information technology infrastructure.

148.     Sphere knew or should have known that its failure to exercise due care in the performance of the foregoing duties would result in an unreasonable risk of harm to Gryphon.

149.     Sphere knew or should have known of the prevalence of, and industry warnings relating to, business email scams whereby a hostile actor may infiltrate a company's technology systems and impersonate an employee of the company for the purpose of fraudulently inducing a customer or business partner to send the hostile actor money or confidential business or personally identifying information.

150.     Sphere breached each of the aforementioned duties by allowing the email account of its CFO Mr. Kalbfleisch (and potentially other email accounts) to be impersonated or otherwise compromised by an unknown hostile actor in connection with the Data Security Incident.

151.     As a direct and proximate cause of Sphere's negligence, the unknown hostile actor was able to send Gryphon a fraudulent request to transfer of twenty-six (26) bitcoin.

152.     Sphere's CEO, Ms. Trompeter, was copied on all of the emails at issue using her correct email address.

153.     As such, Ms. Trompeter should have identified and notified Gryphon of the hostile actor activity and email compromise.

154.     Despite being copied on the email, Sphere's CEO Ms. Trompeter failed to recognize the hostile actor activity and failed to notify Gryphon that Mr. Kalbfleisch's email was compromised and that the Second January 27 Request and the February 1 Requests were fraudulent.

155.     Despite being copied on the email, Sphere's CEO Ms. Trompeter failed to recognize the hostile actor activity within Sphere's own computer systems and information technology infrastructure and failed to take reasonable steps to address the hostile actor activity within Sphere's own computer systems and information technology infrastructure.

156.     As a direct and proximate cause of Sphere's negligence in connection with the Data Security Incident, including Sphere's CEO Ms. Trompeter's failure to recognize that a hostile actor had impersonated Sphere's CFO, Gryphon was not notified of the hostile actor activity occurring within Sphere's technology systems and that the Second January 27 Request and the February 1 Requests were fraudulent.

157.     As a direct result and proximate cause of Sphere's negligence, Gryphon transferred twenty-six (26) bitcoin to the unknown hostile actor, which it has been unable to recover despite diligent efforts to do so.

158.     Although Sphere claims it has investigated the email compromise, Sphere has refused and failed to provide its own report of its investigation at a meeting arranged by the Parties for that purpose. *Supra*, ¶¶ 85-89. Sphere has subsequently refused multiple requests for the parties to allow

50

their forensic experts to meet and share their investigative findings, and has refused to share their findings with Gryphon.

159. Despite Gryphon's compliance with the standard procedures that Gryphon and Sphere used for six previous bitcoin transactions, Sphere negligently failed to follow its established course of dealing and standard procedures when requesting a transfer of bitcoin from Gryphon, including by failing to ensure that the transfer of bitcoin was initiated by Sphere personnel and directed into a Sphere controlled account and not by an unknown threat actor impersonating Sphere and diverting Gryphon's funds into unauthorized accounts not affiliated with Sphere.

160. But for Sphere's negligence, Gryphon would not have transferred twenty-six (26) bitcoin from its own digital wallet to one belonging to an unknown hostile actor, and would not have been required to pay the value of those 26 bitcoin to Sphere out of its own assets.

161. As a direct and proximate cause of Sphere's negligence, Gryphon has been damaged in an amount totaling twenty-six (26) bitcoin which had the market value of no less than $560,225.53 at the time of the transfers.

## PRAYER FOR RELIEF

WHEREFORE, Gryphon respectfully asks this Court to enter judgment in its favor as follows:

1.     An order dismissing Sphere's Second Amended Complaint in its entirety with prejudice;

2.     On Count I, awarding Gryphon damages, and its reasonable attorneys' fees and costs pursuant to the prevailing party provision of the Sphere MSA (Ex. A, p. 3), in an amount to be determined at trial;

3.     On Count II, awarding Gryphon damages and its reasonable attorneys' fees and costs pursuant to the prevailing party provision of the Sphere MSA (Ex. A, p. 3), in an amount to be determined at trial;

4.     On Count III, awarding Gryphon damages, and its reasonable attorneys' fees and costs  (Ex. A, p. 3), in an amount to be determined at trial

5.     On Count IV, awarding Gryphon damages, including punitive damages, in an amount to be determined at trial;

6.     Any and all other and further relief that the Court deems just and proper.


Dated: January 17, 2024

<div style="margin-left:40%">

*/s/ Dennis H. Tracey*
Dennis H. Tracey, III
Allegra M. Bianchini
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
T  +1 212 918 3000
dennis.tracey@hoganlovells.com
allegra.bianchini@hoganlovells.com

*Attorneys for Defendant*
*Gryphon Digital Mining, Inc.*

</div>

52

# Exhibit A

Case 4:23-cv-00494-ALM Document 55-1 Filed 08/20/24 Page 120 of 283

<u>Exhibit</u> A

**<u>MASTER SERVICES AGREEMENT</u>**

This Master Services Agreement ("**Agreement**") effective as of September 12, 2021 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and GRYPHON DIGITAL MINING, INC. ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

**1. AGREEMENT STRUCTURE**

a. This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**"). Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order. In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

**2. SERVICES AND COMPANY FACILITY**

a. Company will provide Client the Services at a Company Facility set forth in an Order. This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest. Unless otherwise set forth in an Order, Client Equipment is owned by Client will not be construed as fixtures or fittings or otherwise attached to a Company Facility. Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services. Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b. Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility. Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order. Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c. Client Equipment will adhere to Company's specifications, procedures, rules, and regulations, including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference. If Company determines in its sole discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software. Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

1

d. Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment. Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment. The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e. In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f. If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

## 3. PAYMENT TERMS AND TAXES

a. Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order. Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice. All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b. Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

c. All amounts payable to Company under this Agreement exclude applicable taxes. Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment; and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities. If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

# 4. TERM, TERMINATION, MODIFICATION AND SUSPENSION

a. This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement. Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the order not to renew.

b. Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period). If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c. Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d. In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

    (i)   suspend the provision of the Services;

    (ii)  disconnect Client Equipment and store it;

    (iii) declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;

    (iv) operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;

    (v)  terminate this Agreement and all Orders; and

    (vi) exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee. Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

e. Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of all or a portion of the Services and disconnect all or a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection. Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order. Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period. For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period. Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f. Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g. Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement. Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Company as a result of such termination, outstanding fees, costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h. In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension. Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

## 5. WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY

a. Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement. Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner. Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has not been modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with applicable laws and regulations in connection with this Agreement. Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

b. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS. ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK. CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANYS CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER. COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID SUCH EVENTS. HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS. COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e. EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS 4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f. Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated. Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g. Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement. Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h. Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, or (vii) Client's installation or use of any non-standard software or firmware in connection with the Client Equipment.

## 6. CONFIDENTIAL INFORMATION

a. Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, '**Confidential Information**'). Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement. Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement. Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event less than commercially reasonable measures.

b. The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party. For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c. Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d. Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

e. Notwithstanding any contrary provisions in this Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to freely incorporate such changes or suggestions into Company's products and services without restriction.

## 7. INSURANCE

a. Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b. Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory. Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

## 8. MISCELLANEOUS

a. <u>Notice</u>. Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement. Notice is effective when received.

b. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement. This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument. Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c. <u>Survival</u>. Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation, those provisions concerning confidentiality, indemnification and limitation of liability.

d. <u>Subcontracting and Assignment</u>. Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client. Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e. <u>Force Majeure</u>. Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event. A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f. <u>Governing Law and Arbitration</u>. This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures. Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award. The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

g. <u>General</u>. The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have. The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them. Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent. There are no third-party beneficiaries to this Agreement. No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

[*Signature page follows*]

8

Case 1:22-cv-00294-PKC-VF   Document 651-X   Filed 06/09/24   Page 126 of 283

**Core Scientific, Inc.**

By:    /s/ Michael Trzupek
Name:  Michael Trzupek
Title:  Authorized Representative
Date:  9/13/2021

**Gryphon Digital Mining, Inc.**

By:    /s/ Dan Tolhurst
Name:  Dan Tolhurst
Title:  President
Date:  9/12/2021

9

# Exhibit B

**Exhibit B**

**MASTER SERVICES AGREEMENT ORDER #2**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September 12, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | As of September 24, 2021 and then the fifteenth of every remaining month beginning with October 15, 2021 until November 15, 2022, respectively. | | |
|---|---|---|---|
| Facility: | Company Facility as determined by Company. | | |
| Client Equipment hosted**: | **Deployment Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |
| Hosting-Services Rate: | [***] | | |
| Payment Due Prior to Installation: | [***] | | |
| Estimated Delivery Date: | As of September 24, 2021 and then the fifteenth of every month beginning with October 15, 2021 until November 15, 2022, respectively.<br><br>Client to notify Company as soon as reasonably possible in advance if Units will not be delivered by this date. Company may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| Fees: | [***] | | |
| Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension | [***] | | |

[***] = CONFIDENTIAL PORTION HAS BEEN OMITTED BECAUSE IT (I) IS NOT MATERIAL AND (II) WOULD BE COMPETITIVELY HARMFUL IF PUBLICLY DISCLOSED

**Order Term.** Subject to acceptance by Company, the term of this Order shall commence on the **Commencement Date** and continue until the fourth anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Company, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Amendment to Section 8.d of the Agreement**. Both Company and Client agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that Client is permitted to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent of Company as long as Sphere 3D Corp. satisfies Company requirements prior to.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Company's determination of power utilized by Client during that month, as well as any adjustments to Company's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Services.** Company and Client agree that all services to be provided by Company to Client shall be provided in a data center owned or operated by Company or its affiliate which is defined as a company that is wholly owned or jointly owned but operated and managed by the Company ("**Company Facility**"). At least ten percent (10 %) of the computer hardware ("**Equipment**") (hosted in the Company Facility in which Client Equipment is hosted must be Equipment that is owned by Company. If however, there is a single occupancy restriction at a Company Facility for purposes of maintaining a qualifying data center status for sales tax purposes, the Client shall have the option to either waive this requirement or pay the requisite sales tax. In addition, Company covenants that all power provided to Client under this Order 2 shall be one hundred percent (100%) net carbon neutral. In addition, Company intends to achieve 100% net carbon neutral status for its mining operations. The Company will achieve and maintain this status by continuing to increase relationships with power suppliers providing a higher mix of non-carbon emitting energy sources and by purchasing certified green carbon offset certificates using United States Environmental Protection Agency guidelines for calculating carbon emissions.

**Company Disclosures.** Company shall disclose to Client all specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement prior to executing the Agreement and any Order. Company shall not be liable, or assessed any penalty, sanction, installation suspension, or fine for violation of or failure to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which are not disclosed to Client prior to execution of the Agreement and Order. If Client violates or fails to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which were not disclosed to Client prior to execution of the Agreement and Order, Company agrees to provide Client reasonable time to comply with such undisclosed specifications, procedures, rules, policies and regulations.

**Time to Retrieve Client Equipment:** Upon the presentation of any Retrieval Notice to Client, Client shall have fifteen (15) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility.

**Failure or Delay by Client to Retrieve Client Equipment.** The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice shall entitle Company to pursue at Client's sole risk and expense all actions set forth in Section 4(d), as applicable, only, and that any such failure or delay by Client to retrieve Client Equipment shall not impact legal title to said Client Equipment.

**Time to Dispute Amounts Billed by Company:** Client may, in good faith, dispute any Disputed Amount by submitting a written notice of such dispute along with reasonable supporting documentation within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.

**Remedies and Notice for Change in Law.** If a Change in law as defined in the Agreement has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders only with Client's express agreement to such termination; and/or (ii) modify the Services as may be necessary to account for such Change in Law.

**Notice under Section 4.e.** Company shall notify Client of such Company actions described in 4.e as soon as possible and in no event later than within three (3) calendar days of Company determining that it will take any action contemplated, described or enumerated in Section 4.e.

**Ordinary routine maintenance and repairs.** Ordinary, routine maintenance and repairs are defined to include routine maintenance of Client Equipment Units, power supply, internet connection.

**Exception to Confidential Information provision for agents and contractors**. Either party may disclose Confidential Information its employees, contractors, or agents who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.

**Exception to Confidential Information provision for regulatory and legal requirements and obligations.** Notwithstanding any contrary provision in this Agreement, Company acknowledges and agrees that Client is or intends to become a U.S. publicly traded company and may be required to disclose this Agreement and Order in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended. Client may therefore disclose any information that is reasonably necessary to comply with any legal or regulatory requirement or obligation.

**Prohibition against including Client Equipment Units in any Security Agreement or collateralized transaction.** Company agrees to not include Client Equipment Units in any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or other instrument granting any third party any rights to the Client Equipment Units, or otherwise to cause or allow the creation of any lien or cloud on title of the Client Equipment Units without the express written consent of Client.

**Performance Information**. Company shall prepare reports of Client performance data related to the Uptime of the Client Equipment Units, and any costs assessed. Such reports including data related to the Uptime of Client Equipment Units and costs assessed shall be created on a daily basis and provided to Client upon Client's request. Such data related to Uptime of the Client Equipment Units shall be reported on a monthly basis to Client Uptime is defined for each calendar month as an expression of the availability of the Client Equipment Units as a percentage equal to (a) the difference between the total number of minutes of Downtime in such month and the total number of minutes in such month, divided by (b) the total number of minutes in such calendar month. Downtime as used herein means, for each calendar month, time that the Client Equipment Units are not available to mine digital assets in accordance with this Agreement, excluding periods of time in which the Client Equipment Units are not available resulting from or relating to: (a) a Force Majeure Event; (b) scheduled maintenance or emergency maintenance, provided that Company shall provide Client with reasonable advanced notice of any such maintenance; (c) downtime resulting from Client's breach of this Agreement; (d) faults or errors in the Client Equipment Units not resulting from Company's breach of this Agreement; or (e) downtime related to any other forces beyond the reasonable control of Company or its agents or subcontractors and not avoidable by reasonable due diligence. Client may request one audit per month at the Client's own cost (an "Audit") of Company to determine whether all fees and costs charged to Client under this Agreement were calculated in accordance with this Agreement. If that audit reveals that Company has undercharged Client, then Client shall pay the difference between the charged amount and the actual amount to Company. Conversely, if an Audit reveals that Company has overcharged Client, then Company shall pay Client the difference between the charged amount and the actual amount.

12

**Third Party Code.** Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment. Notwithstanding any contrary provisions in the Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to incorporate such changes or suggestions into Company's products and services without restriction.

**Warranty.** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

**Client Equipment Disclosures**. Client shall disclose to Company (a) whether any Client Equipment Units have been financed or are otherwise subject to any security interest, (b) whether any Client Equipment Units were previously used, and (c) and shall confirm that Company has all rights and title necessary to comply with all duties assumed in the Agreement. Provided such disclosures are made by Client and security interest granted to financing entity does not impact Company's rights under this Agreement, Company shall approve the usage of any Client Equipment Units.

Client agrees and confirms that:

(i)  It has clean title to the Client Equipment or has otherwise provided Client Equipment Disclosures regarding the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.

(ii)  Neither Client nor Client's customers will use the Services for any illegal activity; and

(iii)  Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

\*\*Client agrees to replace sold, damaged and other inoperable Units within 60 days to maintain the aggregate number of Units subject to this Order, unless Company has been hired to repair the Unit or Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

**Gryphon Digital Mining, Inc. "Client"**       **Core Scientific, Inc., "Company"**

**By:**   /s/ Rob Chang                                    **By:**   /s/ Michael Trzupek
**Name:** Rob Chang                                       **Name:** Michael Trzupek
**Title:**  CEO                                                   **Title:**  CFO

# Exhibit C

## SUB-LICENSE AND DELEGATION AGREEMENT

This Sub-License and Delegation Agreement (this "**Agreement**"), dated as of October 8, 2021, is entered into by and between Gryphon Digital Mining, Inc. ("**Gryphon**") and Sphere 3D Corp. ("**Sphere**"), and relates to that certain Services Agreement, dated as of September 12, 2021 (the "**MSA**"), by and between Core Scientific, Inc. ("**Core**") and Gryphon, and Master Services Agreement Order #2 thereunder ("**Order 2**"), attached hereto as Exhibits A and B, respectively. Capitalized terms used herein without definition shall have the meanings assigned to them in Order #2.

**WHEREAS**, Section 8.d of the MSA, as amended by Order 2, provides that Gryphon is permitted to sub-lease, sub-license, assign, delegate or transfer the MSA and Order 2, or any of its rights and obligations thereunder to Sphere without the prior written consent of Core; and

**WHEREAS**, Gryphon desires to sub-license and delegate certain rights and obligations under Order 2 to Sphere as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Sub-License and Delegation.  Gryphon hereby (i) exclusively sub-licenses to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2.  Sphere hereby accepts such sub-license and delegation in all respects.  In the event that any funds are advanced by Sphere to Gryphon for the purposes of making payments to Core pursuant to the MSA or Order 2, the entirety of any such funds advanced by Sphere to Gryphon shall be sent from Gryphon to Core within 48 hours of receipt of such funds from Sphere.

2. Contingent Assignment.  Effective immediately upon the consummation of the Merger (as defined in that certain Agreement and Plan of Merger, dated as of June 3, 2021, by and among Sphere, Sphere GDM Corp. and Gryphon, as amended from time to time (the "**Merger Agreement**")), all of Gryphon's rights and obligations under Order 2 shall be automatically assigned to, and assumed by, the Surviving Corporation (as defined in the Merger Agreement), without any further action required by either such party.

3. Termination.  This Agreement shall automatically terminate upon the termination of the MSA and/or Order 2 in accordance with their respective terms.  In addition, upon any termination of the Merger Agreement by Sphere, Gryphon shall have the right, in its sole discretion, to terminate this Agreement in its entirety (including the sublicense and delegation described in Section 1) upon not less than one hundred and eighty (180) calendar days' written notice to Sphere.  In the event of any termination as referenced in this Section 3, upon the return of any pre-payment, deposit, or any other funds returned by Core to Gryphon, the entirety of such funds shall be sent by Gryphon to Sphere immediately, and in no event later than 48 hours after the receipt of such funds from Core.

4. Governing Law. This Agreement shall be construed in accordance with and governed by the Laws of the State of Delaware without giving effect to the principles of conflict of laws.

5. Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not

relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement. This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument. This Agreement may be amended only by the written agreement of both parties.

[*Remainder of page intentionally blank – signature page follows*]

*[Signature Page to Sub-License and Delegation Agreement]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**GRYPHON DIGITAL MINING, INC.**

By:

Name: Robby Chang

Title: CEO & Director

**SPHERE 3D CORP.**

By:

Name: Peter Tassiopoulos

Title: CEO

## **Exhibit A**

Master Services Agreement

## **Exhibit B**

Master Services Agreement Order #2

**AMENDMENT NO. 1**
**TO AGREEMENT AND PLAN OF MERGER**

This AMENDMENT NO. 1 TO AGREEMENT AND PLAN OF MERGER (this "Amendment") is made and entered into as of December 29, 2021, by and among Sphere 3D Corp., an Ontario corporation ("Public Company"), Sphere GDM Corp., a Delaware corporation and a wholly-owned subsidiary of Public Company (the "Merger Sub") and Gryphon Digital Mining, Inc., a Delaware corporation ("Merger Partner", together with Public Company and Merger Sub, the "Parties").

**RECITALS**

A.     On June 3, 2021, the Parties entered into an Agreement and Plan of Merger (the "Merger Agreement").

B.     Pursuant to Section 8.04 of the Merger Agreement, the Merger Agreement may be amended by the Parties at any time by execution of an instrument in writing signed on behalf of each of the Parties.

C.     The parties hereto desire to amend the Merger Agreement as set forth herein.

**AGREEMENT**

NOW THEREFORE, in consideration of the foregoing recitals and the respective covenants, agreements, representations and warranties contained herein and in the Merger Agreement, the Parties, intending to be legally bound, agree to amend and supplement the Merger Agreement as follows:  Definitions. All capitalized terms used herein without definition shall have the meanings ascribed to them in the Merger Agreement unless otherwise defined herein.

1.   Amendments.

a.   The definition of "Merger Partner Business Consideration" in Section 2.01(c) of the Merger Agreement is hereby amended and restated in its entirety as follows:

"Merger Partner Business Consideration" means 122,005,564 Public Company Common Shares, subject to an equitable adjustment for stock splits, stock combinations, recapitalizations or similar transactions.

b.   The definition of "Merger Partner Financing Consideration" in Section 2.01(c) of the Merger Agreement is hereby amended and restated in its entirety as follows:

"Merger Partner Financing Consideration" means, with respect to any sale by Merger Partner of equity or equity-linked securities from or after December 29, 2021, up to a maximum of $7.4 million, the quotient of (a) the net proceeds received by Merger

Partner from such sale, divided by (b) 70% of the volume-weighted average trading price of the Public Company Common Shares for the consecutive ten (10) trading days prior to the date on which Merger Partner provides written notice to Public Company of such sale pursuant to Section 5.01(b); provided, that such sale is consummated within five (5) business days of the date that Public Company receives written notice of such sale .

c.   Section 5.01 of the Merger Agreement is hereby amended such that the following section (t) shall be included:

(t) amend the terms of any existing notes, warrants or other convertible securities existing as of December 29, 2021 without the prior written consent of Public Company.

d.   The following shall be added as Section 7.02(j) of the Merger Agreement:

(j) Conversion of Debt. Prior to or concurrently with the Closing, all convertible debt issued pursuant to those certain Gryphon Unit Subscription Agreements between Gryphon and the subscribers thereunder, dated as of various dates between June 25, 2021 and August 3, 2021, inclusive, shall have been converted to Gryphon common stock.

e.   Each of Sections 8.01, 8.02 and 8.03 of Article VIII of the Merger Agreement shall be replaced in its entirety with the following:

## ARTICLE VIII
### TERMINATION AND AMENDMENT

**Section 8.01**. Termination.

(a)   Prior to March 31, 2022, this Agreement may be terminated by either Public Company or Merger Partner as a result of any breach by the other party of or failure by the other party to perform any representation, warranty, covenant or agreement set forth in this Agreement; provided that prior to any such termination, the terminating party shall have provided breaching party thirty (30) days prior written notice of such breach of or failure to perform this Agreement, and the breaching party shall have failed to cure such breach or failure to perform during such thirty (30) day period. Notwithstanding the foregoing, in the event of a breach of Section 8.03(a) hereof, Merger Partner may immediately terminate the Agreement by notifying the Public Company under this Section 8.01.

(b)   On or after March 31, 2022, this Agreement may be terminated at any time prior to the Effective Time, whether before or, subject to the terms hereof, after approval of the Merger Partner Voting Proposal by the Shareholders of Merger Partner or approval of the Public Company Voting Proposals by the Shareholders of Public Company, by either Public Company or Merger Partner, for any reason whatsoever, by notifying the other party in writing of such termination under this Section 8.01.

**Section 8.02**. Effect of Termination.

(a)   Upon termination of this Agreement pursuant to Section 8.01:

(i)   without any further action by either party, except as provided in Section 8.02(a)(iv) below, (A) all obligations of both Public Company and Merger Partner to the other party under this Agreement shall be deemed to be waived by the other party or satisfied in full, (B) this Agreement shall be terminated and (C) the Escrow Agent (as defined below) shall be authorized by the Escrow Agreement (as defined below) to release the Escrow Amount (as defined below);

(ii)   Public Company and all of its affiliates, successors, predecessors, assigns, parents, subsidiaries, divisions (whether incorporated or unincorporated), and all of its and their past and present owners, directors, officers, trustees, employees and agents (in their individual and representative capacities) (collectively, the "Public Company Parties") do hereby fully and forever release, acquit and discharge Merger Partner and all of its affiliates, successors, predecessors, assigns, parents, subsidiaries, divisions (whether incorporated or unincorporated), and all of its and their past and

3

present owners, directors, officers, trustees, employees and agents (in their individual and representative capacities) (collectively, the "<u>Merger Partner Parties</u>") from and for all manner of claims, actions, suits, charges, grievances and/or causes of action, in law or in equity, existing by reason of and/or based upon any fact or set of facts, known or unknown, or any action or inaction existing from the date of this Agreement, including but not limited to any claims arising out of  or based upon this Agreement, or the execution and delivery hereof or the performance of duties or obligations hereunder, whether known or unknown, suspected or unsuspected, including, without limitation, any claim or recovery for any type of damages, attorneys' fees, costs, or other relief that is or may be available to the Public Company Parties through the date this Agreement is terminated pursuant to <u>Section 8.01</u> of this Agreement. While nothing in this Agreement prevents federal, state or local authorities from enforcing laws within their jurisdictions or prevents the Public Company Parties from participating in investigations by such agencies, the Public Company Parties release and relinquish any right to receive any money, property, or any other thing of value, or any other financial benefit or award, as a result of any proceeding of any kind or character whether initiated by such agency or some other person or group. Notwithstanding the foregoing, this release does not constitute a release or waiver of: (A) claims which cannot be waived as a matter of law or (B) the Public Company Parties' rights to enforce this Agreement. To the fullest extent permitted by law, the Public Company Parties shall not take any action that is contrary to the promises made by the Public Company Parties in <u>Section 8.02(b)</u> of this Agreement.

(iii)    Merger Partner Parties do hereby fully and forever release, acquit and discharge the Public Company Parties from and for all manner of claims, actions, suits, charges, grievances and/or causes of action, in law or in equity, existing by reason of and/or based upon any fact or set of facts, known or unknown, or any action or inaction existing from the date of this Agreement, including but not limited to any claims arising out of or based upon this Agreement, or the execution and delivery hereof or the performance of duties or obligations hereunder, whether known or unknown, suspected or unsuspected, including, without limitation, any claim or recovery for any type of damages, attorneys' fees, costs, or other relief that is or may be available to the Merger Partner Parties through the date Public Company or Merger Partner provides notice of termination under <u>Section 8.01</u> of this Agreement. While nothing in this Agreement prevents federal, state or local authorities from enforcing laws within their jurisdictions or prevents the Merger Partner Parties from participating in investigations by such agencies, the Merger Partner Parties release and relinquish any right to receive any money, property, or any other thing of value, or any other financial benefit or award, as a result of any proceeding of any kind or character whether initiated by such agency or some other person or group. Notwithstanding the foregoing, this release does not constitute a release or waiver of: (A) claims which cannot be waived as a matter of law or (B) the Merger Partner Parties' rights to enforce this Agreement. To the fullest extent permitted by law, the Merger Partner Parties shall not take any action that is contrary to the promises made by the Merger Partner Parties in this Agreement;

(iv)    the provisions of Section 5.03 (Confidentiality), this Section 8.02 (Effect of Termination), Section 8.03 (Fees and Expenses) and Article IX

(Miscellaneous), of this Agreement and the Confidentiality Agreement shall remain in full force and effect and survive any termination of this Agreement.

(c)    Each of the Public Company Parties and the Merger Partner Parties hereby covenants not to, directly or indirectly, commence any action, suit or other proceeding or make any claim of any kind or nature against the other party arising out of or relating to any matter, cause, event, action, omission or circumstance under this Agreement occurring on or prior to the consummation of the Merger, other than with respect to a claim, action, suit or other proceeding that cannot be released under applicable law;

(d)    Neither party will defame, disparage, denigrate or cast aspersions on the other party, including without limitation through any media, social media, Facebook, Twitter or similar mechanism. In the event either the Public Company Released Parties or the Merger Partner Released Parties violates the terms of this provision, such party agrees to pay liquidated damages of $25,000.00 per breach, which amount such party agrees is reasonable. The Public Company Released Parties and the Merger Partner Released Parties further agree that the other party shall be entitled to immediate injunctive relief and/or other equitable relief to prevent or remedy a breach of these non-disparagement provisions, including the recovery of legal fees and costs the successful party incurs in obtaining the aforementioned relief or defending against a claim of such breach. Nothing in this Agreement prohibits any party from providing truthful information and/or testimony in response to any litigation matter, or any inquiry, investigation or proceeding conducted by a governmental entity or a self-regulatory organization.

**Section 8.03**. Escrow Shares; Fees and Expenses.

(a)    On or before February 15, 2022, Public Company shall issue and deliver to an agreed upon professional escrow agent reasonably satisfactory to Public Company and Merger Agreement (the "Escrow Agent") the escrow amount (the "Escrow Amount"), which shall be 850,000 Public Company Common Shares registered in the name of Merger Partner represented by a stock certificate deposited with the Escrow Agent (the "Share Escrow Amount"), provided that if in the opinion of Public Company's legal counsel the issuance of such Share Escrow Amount shall negatively impact the ability of the Registration Statement being declared effective under the Securities Act or shall negatively impact the ability of Public Company to comply with the Nasdaq Listing covenants set forth in Section 6.03 of this Agreement then Public Company shall instead deposit $2,500,000 in cash with the Escrow Agent as the Escrow Amount. The Escrow Amount shall be held in escrow by the Escrow Agent pursuant to the terms of an escrow agreement among Public Company, Merger Partner and the Escrow Agent, in form and substance reasonably satisfactory to Public Company, Merger Partner and the Escrow Agent (the "Escrow Agreement"). Upon any termination of the Agreement pursuant to Section 8.01 of this Agreement, the Escrow Agent shall release the Escrow Amount to Merger Partner. If the Merger Agreement is not terminated before the Effective Time, the Escrow Agent shall release the Escrow Amount to the Surviving Corporation within five (5) business days of the Effective Time.

5

(b)      All fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such expenses, whether or not the Merger is consummated; provided, however, that Merger Partner and Public Company shall share equally (i) all fees and expenses of the Exchange Agent, and (ii) all fees and expenses, other than accountant's and attorneys' fees, incurred with respect to the printing, filing and mailing of the Proxy Statement/Prospectus (including any related preliminary materials) and the Registration Statement and any amendments or supplements thereto.

(f) Section 9.10 of the Merger Agreement is amended and restated in its entirety as follows:

**Section 9.10.** Remedies. The only remedy available to any party for a breach by the other party of or a failure by the other party to perform any representation, warranty, covenant or agreement set forth in this Agreement shall be a termination of this Agreement pursuant to Section 8.01 hereof. Such remedy shall be the exclusive remedy for any such breach or failure to perform, and Public Company and Merger Partner each expressly waive any other remedy that may be conferred by Law or equity upon such party, and waive the right to any injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement.

2.   Effect of Amendment. Except as amended by this Amendment, the Merger Agreement shall remain in full force and effect. No party shall be deemed to have waived the performance of any covenants in the Merger Agreement except as expressly amended by this Amendment.   In addition, if there are any inconsistencies between the Merger Agreement and this Amendment, the terms of this Amendment shall prevail and control for all purposes.

3.   Governing Law. This Amendment shall be construed in accordance with and governed by the Laws of the State of Delaware without giving effect to the principles of conflict of laws.

4.   Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original regardless of the date of its execution and delivery. All such counterparts together shall constitute one and the same instrument.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

SPHERE 3D CORP.

By: _____

Name:  Peter Tassiopoulos

Title:  Chief Executive Officer

SPHERE GDM CORP.

By: _____

Name:  Peter Tassiopoulos

Title:  Chief Executive Officer

GRYPHON DIGITAL MINING, INC.

By: _____

Name:  Robby Chang

Title:  Chief Executive Officer

# Exhibit D

**K&L GATES**

March 21, 2023

Steven L. Caponi, Esq.
steven.caponi@klgates.com

**VIA ELECTRONIC MAIL**

T 302-416-7080

Greg Wolfe, Esq.
Dontzin Nagy & Fleissig LLP
980 Madison Avenue
New York, NY 10075
greg@dnfllp.com

**Re:  Master Services Agreement, dated August 19, 2021**

Dear Greg,

As you know, we represent Gryphon Digital Mining Inc. ("Gryphon") in relation to the above-captioned matter.  It has come to our attention that your client, Sphere3d Inc. ("Sphere"), has entered into or, at a minimum, is attempting to enter into, business relationships with various third party cryptocurrency mining-related service providers for cryptocurrency-related services without the knowledge, involvement, authorization, and/or consent of Gryphon.  Specifically, among other things, we understand that Sphere has engaged or attempted to engage in business relationships regarding its cryptocurrency-related operations with USBTC, Foundry, Lancium, and Luxor, among others (collectively, the "Third Party Service Providers").

Any such conduct, if true, is in direct violation of the Master Services Agreement ("MSA") dated August 19, 2021 by and between Sphere and Gryphon.  Indeed, pursuant to the MSA, Sphere granted and agreed that Gryphon has the exclusive right and power to manage Sphere's cryptocurrency-related operations, including: exclusive control over any and all relevant digital asset wallets for storing digital assets; to select the mining pool and custodians of such digital assets; and to sell digital assets on Sphere's behalf, among other things.  Any act by Sphere to circumvent the MSA—and, by extension, circumvent the Parties' agreement that Gryphon will exclusively manage Sphere's cryptocurrency-related operations—is a breach of the MSA.

Specifically, by way of example, Sphere's attempts to create independent business relationships with the Third Party Service Providers to provide services related to Sphere's cryptocurrency-related operations are a breach of the Exclusivity Provision of the MSA.  Sphere's attempts to create a relationship with Luxor and Foundry related to their mining pools violates the Commercial Terms of the MSA and constitutes a breach thereof.  Sphere's creation of its own Digital Wallet and its receipt of cryptocurrency mining proceeds from Luxor into that Digital Wallet violates the Exclusivity and Commercial Terms of the MSA.  Likewise, any other payments made to Sphere

related to its cryptocurrency-related operations that occurred outside of a Gryphon-controlled Digital Wallet violates the Commercial Terms of the MSA and constitutes a breach of the MSA.

Gryphon is highly concerned by the unilateral actions of Sphere which, absent context and proper communication, appear to constitute a flagrant disregard for the terms of the MSA. While we understand Sphere may have provided Gryphon some limited information regarding its business dealings with select Third Party Service Providers, Sphere has not been transparent or forthcoming, and has not provided Gryphon any actual agreements entered into between Sphere and such Third Party Service Providers, whether written or oral, formal or informal, or otherwise, or any reconciliations of payments made between Sphere and any Third Party Service Providers. This, of course, raises additional concern over the nature of these relationships.

By close of business on March 22, 2023, Gryphon hereby demands that Sphere provide any and all documentation related to its efforts to create business relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any. Gryphon expects that the information will be provided in a fulsome and transparent manner so as to reassure Gryphon that Sphere has taken no action that would constitute a breach of the MSA. To the extent Sphere has breached the MSA, Gryphon will not hesitate to invoke any and all legal rights and remedies available to it, including seeking to specifically enforce Sphere's obligations under the MSA and seeking to recover any and all attorney's fees and other legal costs incurred as a result of Sphere's misconduct.

We understand that you have already made Sphere aware of this issue; given the urgency, we assume you will notify Sphere of these further articulated concerns as described herein and revert without delay.

Very truly yours,

*/s/ Steven L. Caponi*

Steven L. Caponi, Esq.

cc: tibor@dnfllp.com

March 21, 2023

# Group Exhibit E

**From:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>
**Date:** May 11, 2023 at 1:52:50 PM EDT
**To:** Rob Chang <rob@gryphonmining.com>
**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>, dan@gryphonmining.com
**Subject: RE: Sale**

Rob,

This is a made-for-litigation position. As you are well aware, Sphere has routinely paid hosts directly, which is consistent with the term in the MSA that "Customer shall provide written instructions to Provider with respect to all decisions to sell or hold Digital Assets." Gryphon has never asserted that our direct payment is a breach of the MSA. If you wish to dispose of Digital Assets in order to pay operating costs, that must come with our approval. We of course will not unreasonably hold that approval, but you must explicitly seek permission before doing so. Please confirm you will do so.

Next, there is no basis in the MSA for your assertion that Gryphon needs to keep approximately $530,000 of USD value in the wallet at all times, which is again another made-for-litigation position. There is no basis in the text of the MSA for the position. Nor is it consistent with the prior practice of the parties—indeed, this is the first time that Gryphon has ever indicated that there must be any sort of minimum in the account. Instead, it appears that Gryphon is resorting to self-help: Gryphon's "required minimum deposit" just so happens to correspond to its damages against Sphere for alleged negligence (which of course is money Gryphon lost due to its own negligence in falling for a spoofing attack). Again, we of course ensure that all bills for operating costs are paid, but it cannot be that Gryphon can unilaterally refuse our requests to honor written instructions to hold or sell Digital Assets.

So I ask again: will you adhere to my written instruction to sell the 11 BTC, and also send us the cash from the 4.200681BTC you sold on 5/10 related to an USBTC invoice we have already paid? Or are you refusing?

Finally, Patti believes she already sent the contacts you requested; she will follow up there in any event and make sure you have them.

Thanks
Kurt

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
**Sphere 3D**
858.775.6801
kurt.kalbfleisch@sphere3d.com

---

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Wednesday, May 10, 2023 10:40 AM

**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>
**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>; dan@gryphonmining.com
**Subject:** Re: Sale

Kurt,

Thank you for your email. The parties already agreed in the MSA that Gryphon would sell Digital Assets to pay these fees. Specifically, in the MSA, the parties agreed that Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." Sphere paying these fees directly, or preventing Gryphon from so doing, is a breach of the MSA.

As to the USBTC charges mentioned below, I've attached two PDFs of emails from USBTC noting past due payments. Gryphon is selling bitcoin to pay Sphere's operating costs consistent with its obligations in the MSA.

Given that the parties agreed that Gryphon is required to pay operating costs for Sphere in the MSA, Gryphon needs to maintain an adequate amount of value to cover these cash flows. Based on the bills seen from USBTC and CoinMint, Gryphon needs to keep approximately $530,000 of USD value in the wallet for these purposes (based on USBTC monthly invoice of ~$450,000 and most recent CoinMint semi-monthly invoice of ~$40,000 x 2). As there is currently only 14.38750744 BTC in your wallet (USD equivalent of ~$417,000) we are unable to withdraw and sell at this time (understanding that we also need to assume these responsibilities for Lancium and Rebel Mining). However, Gryphon cannot fulfil its obligations under the MSA if Sphere refuses to allow Gryphon to retain sufficient cash flows to pay Sphere's expenses as they come due. As to your request to confirm the transfer at issue, we received confirmation of the wire transfer this yesterday. Attached is the confirmation as well.

Unfortunately, despite multiple requests, we still have not been provided with contacts at Lancium and Rebel. Please send along the names/telephone numbers/email addresses for Sphere's contacts at Lancium and Rebel, along with Sphere's consent for Gryphon to manage those accounts as agreed to by the parties in the MSA.

Thank you,

On Tue, 9 May 2023 at 12:11, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com> wrote:

Rob,


The Agreement provides that "Customer shall provide written instructions to Provider with respect to all decisions to sell or hold Digital Assets." Please let me know how your proposal is consistent with that language. Please also let me know if you have made any other decisions to sell or hold our Digital Assets that we did not authorize.


While we want to be efficient, any proposal must be consistent with the MSA. You also state in your email that you have "noticed multiple delayed payment notices from USBTC." Please detail what those delays were and how they caused any issues with USBTC or otherwise.

Next, I noticed this morning that you sold 4.200681BTC, apparently to pay the most recent USBTC invoice.  We did not authorize that sale of BTC or that use of proceeds.  We are already processing payment for that invoice, and we will continue to pay invoices.   Please send the cash from the already processed sale to our RBC account.

In addition, please sell another 11 BTC from our wallet and send that cash to our RBC account.  Can you also provide confirmation of the wire for the sale on May 3, as we have not yet received that transfer.

Finally, my understanding is that Patti provided you with the contacts you requested some time ago.

**Kurt Kalbfleisch**

**Senior Vice President and CFO**

**Sphere 3D**

858.775.6801
kurt.kalbfleisch@sphere3d.com

---

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Friday, May 5, 2023 10:32 AM
**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>
**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>; dan@gryphonmining.com
**Subject:** Re: Sale

Kurt

The MSA notes that Gryphon manages all blockchain operations for Sphere.  Currently we are already paying the CoinMint invoices in this manner.  The current setup of having Sphere request, Gryphon transfer to an account that can sell, Gryphon selling the coin, Gryphon transferring the cash to its bank account, and Gryphon transferring the cash to Sphere to then send payment to host providers creates a lag that may cause missed payments which is a risk to the blockchain operation.  We are not charging any additional fees for this management outside of standard transaction costs charged by BitGo and/or financial institutions.  We have already noticed multiple delayed payment notices from USBTC and we believe us doing this for Sphere directly is ideal for all parties and consistent with the language of the MSA.

This also reminds us that we have requested access and contacts for Lancium and Rebel. The former we have no contacts for and for both we do not believe either has been instructed to provide Gryphon with admin access that is consistent with the MSA.

On Fri, 5 May 2023 at 13:22, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com> wrote:

Rob —

Sphere intends to continue to pay in these vendor invoices in cash as they come due. The MSA provides that only Sphere can make a decision to sell digital assets. Can you please explain how your plan is consistent with the MSA?

Thanks,

**Kurt Kalbfleisch**

**Senior Vice President and CFO**

**Sphere 3D**

858.775.6801
kurt.kalbfleisch@sphere3d.com

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Thursday, May 4, 2023 12:17 AM
**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>
**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>; Dan Tolhurst <dan@gryphonmining.com>
**Subject:** Re: Sale

Sale of 13 BTC completed. Proceeds less Bitgo's customary $10 withdrawal fee will be sent to your RBC account as soon as it clears and is deposited into our bank account. Confirmation attached.

Please note, now that we have setup bill visibility with USBTC, we will assume management responsibility and pay their invoices out of your BTC earned starting with bills received after today. Sphere will still be responsible for paying bills sent by USBTC prior to today.

Please also, set us up with similar access and controls with Lancium and Rebel so that we can continue managing your blockchain operations as per the MSA.

On Wed, 3 May 2023 at 12:30, Rob Chang <rob@gryphonmining.com> wrote:

Underway

On Tue, 2 May 2023 at 17:01, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com> wrote:

Rob,

Please sell 13 BTC form our wallet and wire the proceeds to our RBC account.

Thanks

Kurt

**Kurt Kalbfleisch**

**Senior Vice President and CFO**

**Sphere 3D**

858.775.6801
kurt.kalbfleisch@sphere3d.com

--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining

<image003.jpg>

--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining

<image001.jpg>

--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining

--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining



Sim Salzman <sim@gryphonmining.com>

---

## Re: Energy Consumption / Usage Reports for Rebel Mining

**Sim Salzman** <sim@gryphonmining.com>                              Fri, Jul 28, 2023 at 11:55 AM
To: Kurt.Kalbfleisch@sphere3d.com, ap@rebelmines.io
Bcc: Rob Chang <rob@gryphonmining.com>

Good afternoon Kurt and Gerri. I hope you are both having a great Friday. Can you advise on my below requests?

On Mon, Jul 24, 2023 at 9:59 AM Sim Salzman <sim@gryphonmining.com> wrote:
Good morning Kurt and Gerri. Just checking in on the status of this request. Thanks.

On Wed, Jul 19, 2023 at 1:16 PM Sim Salzman <sim@gryphonmining.com> wrote:
Good afternoon Kurt and Gerri. I'm trying to put together a revenue reasonableness/energy analysis report that utilizes the daily energy consumption from the co-hosted facilities and have run into a roadblock.

Based on the invoices we have received, I cannot identify the daily energy consumed by the hosted miners. Could you please provide the daily energy consumption reports that we would then be able to tie back to what has been billed to date for 2023?

In addition, I noticed there are two distinct hosting order numbers on the invoices I have seen:
RMC-TX-HI-3D-001 and RMC-MO-ST-3D-001

I apologize for my confusion as it's only my 3rd week but can you clarify those order numbers for my own edification? Would it be possible to share the hosting agreements with me as well?

I appreciate your help in this matter. Thank you.

Sim Salzman
Chief Financial Officer
Gryphon Digital Mining

| From: | Rob Chang <rob@gryphonmining.com> |
|---|---|
| Sent: | Tuesday, August 1, 2023 5:31 PM |
| To: | Patricia Trompeter |
| Cc: | Dan Tolhurst; Sim Salzman; Kurt Kalbfleisch; Chris Ensey |
| Subject: | Re: EMail Intro - Luxor |

If these requests did occur, asking Chris to set up an account to a pool Gryphon did not designate is not a valid instruction.  Sphere has insisted on setting up its own pool accounts in contravention of the MSA; our efforts to gain access to those pools is merely an attempt to perform our duties under the MSA (while reserving our rights), which Sphere has made extremely difficult to do through its actions and lack of cooperation.  We have requested access to this pool several times since March to which you did not send any instructions. There has been no "misrepresentation" to Sphere's counter-parties or anyone else.  Only a lack of cooperation on the part of Sphere.  **In any event, as stated numerous times, per the MSA, Sphere must move all hashing to Foundry regardless of what account name it is under.  Put simply, Founder is the only permissible pool to be used.  Please make your transfers accordingly.**

On Mon, 31 Jul 2023 at 13:01, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote:

Rob –

This is incorrect.  We sent several emails to Chris Ensey back in March asking him to set up an address.  We have also explained this to you several times in various emails what must be done.    You have chosen to ignore this for 4.5 months.  Please do not make misrepresentations to Sphere's counterparties.

Patricia

**Patricia Trompeter**

Chief Executive Officer

203.524-6524

1



**From:** Rob Chang <rob@gryphonmining.com>
**Date:** Monday, July 31, 2023 at 11:26 AM
**To:** Aaron Foster <aaron@luxor.tech>, Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Cc:** Ethan Vera <ethan@luxor.tech>, Dan Tolhurst <dan@gryphonmining.com>, Sim Salzman <sim@gryphonmining.com>
**Subject:** Re: EMail Intro - Luxor

Following up on this again. I was newly informed that we were supposed to set up an account with Luxor but we do not have any records of this. Luxor team, please provide information on how to do so as we have been unable to fulfill our management obligations under our contract with Sphere without full access to its Luxor pool. Patti is cc'd here and she can confirm. Also, please provide a copy of Luxor's contract with Sphere as Patti has indicated to us that she expected the pool provider to provide this to us.


On Thu, 25 May 2023 at 11:13, Rob Chang <rob@gryphonmining.com> wrote:

Following up on this. Have the necessary sign offs occurred?


On Tue, 23 May 2023 at 12:52, Rob Chang <rob@gryphonmining.com> wrote:

Patti


Aaron is under the impression that he still needs to get authorization from Sphere for Gryphon's basic management duties (please see below). We were operating with the understanding that Sphere had already notified all partners including Luxor that Gryphon has management access to Sphere's blockchain and cryptocurrency operations. Could you please address this with Luxor and any other partners who have yet to be notified?


On Tue, 23 May 2023 at 12:38, Aaron Foster <aaron@luxor.tech> wrote:

Hi Rob,

2

Understood, However we will need written permission (cc'd email is fine) from Sphere3D/Patti to share any information or provide account access.

Alternatively, the account owner can also delegate View/Update permission to the respective Luxor subaccount in their profile using our Account Delegation feature.

Aaron

On Tue, May 23, 2023 at 12:29 PM Rob Chang <rob@gryphonmining.com> wrote:

> Aaron
>
> Patti has already noted to you that we are the exclusive provider of management services to Sphere, which includes selecting their pool.  We had a call to discuss the possibility of using your pool which is still under consideration.   I believe you already have the authorization needed to grant me this visibility.
>
>> On Tue, 23 May 2023 at 12:21, Aaron Foster <aaron@luxor.tech> wrote:
>>
>> Hi Rob - Trust you had a great time at Bitcoin 2023.
>>
>> Unfortunately due to NDA's and internal policies,  we cannot disclose hashing status of accounts to external parties, unless permission is given by the profile owner.
>>
>> Trust you understand our position on account privacy,
>>
>> Aaron
>>
>>> On Tue, May 23, 2023 at 11:58 AM Rob Chang <rob@gryphonmining.com> wrote:
>>>
>>> Aaron/Ethan
>>>
>>> Want to verify.  Are any Sphere machines currently using Luxor pool right now?
>>>
>>>> On Thu, 27 Apr 2023 at 12:31, Aaron Foster <aaron@luxor.tech> wrote:
>>>>
>>>> Rob - Looking forward to connecting
>>>> Sent an invite for 12pm EST on Monday.

On Thu, Apr 27, 2023 at 12:11 PM Ethan Vera <ethan@luxor.tech> wrote:

That works - Aaron will send over an invite.


> On Apr 27, 2023, at 10:33 AM, Rob Chang <rob@gryphonmining.com> wrote:


> Hi Ethan. How about 11-2pm Monday?
>
> Rob Chang
>
> CEO & Director
>
> (416) 500-5675
>
> Rob@GryphonMining.com
>
> GryphonDigitalMining.com
>
> Twitter: @GryphonMining
>
> 
>
>
> > On Apr 27, 2023, at 8:43 AM, Ethan Vera <ethan@luxor.tech> wrote:
> >
> > Hi Rob,
> >
> >
> > Good to reconnect. Perhaps we can have a call on Monday or Tuesday next week when you are done travelling to get a better understanding of a path forward?
> >
> >
> > We are looking forward to working with Sphere in more ways beyond the hosting introduction and the mining pool is an important piece to the relationship.

For a bit more background our mining pool was the first major pool to exist in the United States, and first to receive SOC 2 Type 2 compliance. We currently rank #7 globally and have built out a robust UI & API to support institutional level miners. Our mining pool fee is industry standard FPPS and our rates are very competitive.

Regards,

**Ethan Vera**

Chief Operating Officer
Luxor Technology Corporation

Website | Telegram | LinkedIn

On Apr 25, 2023, at 3:11 PM, Rob Chang <rob@gryphonmining.com> wrote:

Hi Ethan.  We should circle up on this and get Gryphon up to speed on management of Sphere's machines. I am travelling this week but can try my best to have a quick update on the issues with the machines.

Further noting for the record that we disagree with the comment regarding Brian Chase.

Rob Chang

CEO & Director

(416) 500-5675

Rob@GryphonMining.com

GryphonDigitalMining.com

Twitter: @GryphonMining



On Apr 25, 2023, at 3:38 PM, Patricia Trompeter
<Patricia.Trompeter@sphere3d.com> wrote:

Rob –

Please meet Ethan Vera of Luxor.

Ethan –

Please meet Rob Chang of Gryphon.

Back in June 2022, Sphere was directed by Brian Chase, Gryphon CFO, to "find any hosting we can".   Alex Tierney met with Brian Chase and got confirmation that it was OK to use Luxor pools in exchange for Luxor assisting us with finding mining.   Luxor assisted us in finding Lancium.  We have asked Gryphon to set up an account at Luxor and point the hashrate there.

I would ask that the two of you connect on this.   There are issues with the machines at Lancium (Rob – can we please get an update on that?).  I believe they are getting closer to bringing them online as the tests seem to be OK.

Thanks –

P

*Patricia Trompeter*

Chief Executive Officer

203.524-6524


<image001.png>


--

**Aaron Foster**

Director, Business Development

Luxor & Hashrate Index

Email | Telegram | LinkedIn
Schedule a meeting


--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining



--

**Aaron Foster**

Director, Business Development

Luxor & Hashrate Index

Email | Telegram | LinkedIn
Schedule a meeting

--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining



--

**Aaron Foster**

Director, Business Development

Luxor & Hashrate Index

Email | Telegram | LinkedIn
Schedule a meeting

--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining



--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining



--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining



--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining



| | |
|---|---|
| **From:** | Rob Chang <rob@gryphonmining.com> |
| **Sent:** | Sunday, August 6, 2023 10:45 AM |
| **To:** | Patricia Trompeter |
| **Cc:** | Sim Salzman; Dan Tolhurst; Kurt Kalbfleisch; Tiah Reppas |
| **Subject:** | Re: Request #3 |
| **Attachments:** | Daily Statistics - spusbitcoin - 2023-06-01–2023-08-06.csv; Earnings Data - spusbitcoin - 2023-05-31–2023-08-05.csv; Daily Statistics - gryphonspcore - 2023-06-01–2023-08-06.csv; Daily Statistics - s3ddelta - 2023-06-01–2023-08-06.csv; Daily Statistics - gryphonsp - 2023-06-01–2023-08-06.csv; Earnings Data - gryphonspcore - 2023-05-31–2023-08-05.csv; Earnings Data - gryphonsp - 2023-05-31–2023-08-05.csv; Earnings Data - s3ddelta - 2023-05-31–2023-08-05.csv |

Patricia,

We have sent instructions and reminders on how Sphere can regain access to view all mining pools managed by Gryphon on three separate occasions (July 6, July 16, and July 10).  This fourth reminder (see relevant section in July 16 email copied below) will again allow Sphere to regain access to view its pools after Sphere cut off its own access when it set up pools on its own account and moved the emails that worked for our pool account to its own pool account. We further note that this process should not be foreign to Sphere since it is the same process in reverse for when Sphere granted Gryphon technician and later accountant access to the Foundry pools that Sphere controls (for which Gryphon continues to reserve all rights).

Attached are the requested reports.  As they were in the past, these reports are accessible directly by Sphere once it provides Gryphon with the information needed to reconnect Sphere's access to the pools.


Patti/Kurt

We have resolved the issues with Foundry and similar to the situation you communicated with us, we will need email addresses from Sphere that are not already associated with an account at Foundry to proceed.  Please provide this and we will set up the appropriate access in short order.


On Fri, 4 Aug 2023 at 20:42, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote:
Rob -

My team has made 2 requests for data that we do not have access to.   This is critical to monitoring our operations.


I am making a 3rd request.

Foundry report for BTC mined for Core, Coinmint and USBTC — GC sites, so I can tie out to the Bitgo wallet and confirm my calc. — Kurt requests this each month from Gryphon.

Please remit this asap as well as access ro the accounts.

Patricia

Get [Outlook for iOS](#)

--
Rob Chang
CEO & Director
(416) 500-5675
[Rob@gryphonmining.com](mailto:Rob@gryphonmining.com)
GryphonDigitalMining.com
Twitter: @GryphonMining



| From: | Rob Chang <rob@gryphonmining.com> |
|---|---|
| Sent: | Monday, July 10, 2023 6:18 PM |
| To: | Patricia Trompeter |
| Cc: | Kurt Kalbfleisch; Dan Tolhurst; Chris Ensey; Sim Salzman |
| Subject: | Re: REorting |

Patti,

Sphere has access to real-time reporting on all available metrics via its access links to the Foundry pool and its BitGo wallet. We have repeatedly noted how Sphere can regain access to view its pools after Sphere cut off its own access when it set up pools on its own account and moved the emails that worked for our pool account to its own pool account. These emails were sent on several occasions including: June 16 and July 6. This access also answers the requests Kurt has sent recently for reports, which in his emails he indicated that he used to be able to access prior to Sphere cutting itself off.

Relatedly, we have requested the same access to the pool accounts Sphere set up so that Gryphon can continue operating under the MSA. We have received no such access or even attempts to connect us to this access with any pools Sphere operates outside of Foundry, to date we are only aware of Luxor pool. This access was partially given to Sphere's pool accounts at Foundry but we note that the access is incomplete. We require, at the minimum, all access granted to the "Accountant" and "Technician" roles noted in the table below, which is provided by Foundry. We further note that according to the MSA, which states,"Provider shall be Customer's exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Customer and/or its subsidiaries and/or affiliates at any location", Gryphon should have access to all features listed on the table for all pools with any provider.

To reiterate, we reserve all rights under this request and this request for disclosure cannot and should not in any way be construed as Gryphon's acceptance or acquiescence in Sphere's breaches of the MSA by using pools not designated by Gryphon, and indeed it expressly is not.

## What user roles are available?

Foundry USA Pool has 3 different user roles: "Owner", "Accountant", and "Technician". Additionally, we offer Viewer Links. The different roles enable users to easily manage who within their organization has access to what type of data.

| Feature | Owner | Accountant | Technician | Viewer Link |
|---|---|---|---|---|
| View Hashrate | ☑ | ☑ | ☑ | ☑ |
| View Workers | ☑ | ☑ | ☑ | ☑ |
| View Earnings/TX | ☑ | ☑ | ✕ | ✕ |
| View Sub-Accounts | ☑ | ☑ | ☑ | ✕ |
| Create Sub-Accounts | ☑ | ✕ | ✕ | ✕ |
| Manage Worker Tags | ☑ | ✕ | ☑ | ✕ |
| Manage Alerts | ☑ | ✕ | ☑ | ✕ |
| View Payout Settings | ☑ | ☑ | ✕ | ✕ |
| Edit Payout Settings | ☑ | ✕ | ✕ | ✕ |
| Manage Users | ☑ | ✕ | ✕ | ✕ |
| Manage API Keys and Viewer Links | ☑ | ✕ | ✕ | ✕ |

On Mon, 10 Jul 2023 at 08:58, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote:

Requesting again.

**_Patricia Trompeter_**

Chief Executive Officer

203.524-6524



---

**From:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Date:** Thursday, May 25, 2023 at 3:19 PM
**To:** Rob Chang <rob@gryphonmining.com>
**Cc:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>, Dan Tolhurst <dan@gryphonmining.com>, Chris

Ensey <chris@gryphonmining.com>
**Subject:** REorting

Rob –


As we have previously asked, we would like reporting on the performance of our miners.  To date we have not received any metric reporting such as usage, downtime, miner performance, nor KPI reporting from Gryphon.  Can you please forward us these reports?


Patricia



**Patricia Trompeter**

Chief Executive Officer

203.524-6524





--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining



| From: | Rob Chang <rob@gryphonmining.com> |
|---|---|
| **Sent:** | Friday, August 11, 2023 11:06 PM |
| **To:** | Patricia Trompeter |
| **Cc:** | Sim Salzman; Dan Tolhurst |
| **Subject:** | Re: Invoice #INV-01272 from Lancium, LLC |

Patti,

Any notion that I have been "rude" to Lancium is fabricated.  In fact, let me state this more plainly: it is a lie.  I have never spoken with Lancium.  They have ignored – presumably at your direction – any outreach from me, and all of my outreach (all of which you have seen) has been cordial and professional.  Your attempt to craft a false narrative by email is of no consequence -- legal, business, or otherwise.  The written correspondence will speak for itself.

**For avoidance of any doubt**, Gryphon has in no way "cancelled" the MSA.  The MSA is and remains in full force and effect, and we expect Sphere to adhere to its terms, which Sphere has intentionally skirted, breached, and otherwise failed to do for many months now.  The documentation on this will also speak for itself.  Gryphon reserves any and all rights.

On Fri, 11 Aug 2023 at 09:59, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote:
Rob –

We have instructed Lancium to meet with you.  Lancium does not want to do it because you have apparently been rude to them—much like with Foundry, they want nothing to do with you.  If you can suggest a workable solution, we are all ears.  Note a workable solution is obviously not canceling our relationship with Lancium—we are not going to hurt Sphere because you cannot get along with one of our counterparties.

All that said, it appears that Gryphon is not interested in working through any solutions.  Given that Gryphon is not remitting proceeds of any asset sales to Sphere, and that it is has now made clear it will not pay one of our counterparties, are we to understand that Gryphon has canceled the MSA?

Patricia

Get Outlook for iOS

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Tuesday, August 8, 2023 12:15:09 AM
**To:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Cc:** Sim Salzman <sim@gryphonmining.com>; Dan Tolhurst <dan@gryphonmining.com>
**Subject:** Fwd: Invoice #INV-01272 from Lancium, LLC

Patti,

We have repeatedly sought Lancium's assistance in gaining visibility into - and taking over the management of - Sphere's machines. Lancium has failed to act or even respond to our requests. Likewise, despite being copied on our correspondence directed to Lancium, you have failed to provide any indication that this is a joint request as required for Gryphon to perform its duties under the MSA. In this regard, while we have been accommodating and, as always, have made every effort to comply with our obligations under the MSA, we are becoming increasingly uncomfortable with this outright frustration of purpose, and specifically the notion that we are in any way required to pay bills without confirmation, acknowledgement, contact, or verification from Lancium. Indeed, we are not required to do any such thing under the MSA. Going forward, and in a protective gesture for both Sphere and Gryphon, we will require Lancium's cooperation in Gryphon's management of Sphere's machines. Absent this structure, which we have repeatedly asked for and which the MSA requires, we will not be in position to pay Lancium-related bills.


---------- Forwarded message ---------
From: **Beth Fouliard (beth.fouliard@lancium.com)** <system@sent-via.netsuite.com>
Date: Mon, 7 Aug 2023 at 17:49
Subject: Invoice #INV-01272 from Lancium, LLC
To: <patricia.trompeter@sphere3d.com>, <Kurt.Kalbfleisch@sphere3d.com>,
<accountspayable@sphere3d.com>, <rob@gryphonmining.com>, <dan@gryphonmining.com>,
<chris@gryphonmining.com>
Cc: <ryan.mckenny@lancium.com>, <trent.lafour@lancium.com>, <callum.rock@lancium.com>,
<beth.fouliard@lancium.com>


Here is your invoice. We appreciate your prompt payment.

Thanks for your business!
Lancium, LLC



--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining





--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com

Twitter: @GryphonMining



# Group Exhibit F

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Monday, May 15, 2023 5:07 PM
**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>
**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>; dan@gryphonmining.com
**Subject:** Re: Sale

**External Sender:**

Kurt,

Unfortunately you either misunderstand the MSA or are mischaracterizing the MSA. The Parties agreed that Gryphon is responsible for paying "all operating costs" for Sphere; Gryphon continues to be frustrated by Sphere's refusal to provide information that Gryphon needs to pay Sphere's operating costs, such as contact information and invoices from its various vendors, including those you admit Sphere is paying directly (a square breach of the MSA). The MSA likewise does not require Gryphon to transfer any amount of BTC to Sphere any time Sphere requests it; the MSA simply requires that appropriate requests as contemplated in the MSA must be in writing; the MSA does not state that if a request is made in writing, it must be adhered to.

By way of an easy example to demonstrate that your reading of the MSA is wrong, under your interpretation, Sphere could attempt to demand that Gryphon transfer more BTC than is held in the digital wallet. There is no reasonable reading of the MSA that would require this. Likewise, even in a less extreme hypothetical, according to your reading, Sphere could request all funds in the wallet, which would leave nothing in the digital wallet to pay Sphere's operating costs, to pay those operating costs in a timely manner (the failure of which could subject Sphere to additional costs), and/or pay Gryphon's agreed upon Management Fees. There is simply no support for the way you are reading the MSA. Given the amount of fees expected to be due, Gryphon estimates that it will need to keep a balance to cover payment of Sphere's operating expenses as they come due; otherwise Sphere appears to be demanding that Gryphon provide working capital loans to Sphere, which is not contemplated in the MSA or otherwise ever agreed to or practiced by the parties.

As I've mentioned many times, Gryphon cannot perform under the MSA if Sphere will not provide the minimum, basic information required for Gryphon to do so. This includes contacts at Lancium and Rebel, which I've requested 3 times in the below email thread alone. Please send me that information as soon as possible. As to operating expenses that Sphere has already paid, all of which should have been paid by Gryphon under the MSA, please send evidence of the invoice received and matching payment so we can consider releasing amounts accordingly (amounts that under the MSA should have been paid by Gryphon). Thereafter, Gryphon will take over those payments going forward as the parties agreed under the MSA. Gryphon is not waiving, acquiescing, or ratifying any conduct by Sphere, and expressly reserves all rights.

Thanks,

Rob

On Fri, 12 May 2023 at 14:05, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com> wrote:

Rob,

To be clear, you are refusing to honor our clear instructions to sell Digital Assets.

•        I requested the sale of 11 BTC on 5/9 and asked you to remit the funds to RBC – You did not sell

•        I requested you remit the funds from the sale you made on 5/9 for 4.2 BTC informing you payment was already in process– You have not confirmed that cash will be transferred.

•        I requested again on 5/11 that you sell 11 BTC and again requested the funds from the sale be remitted to our account—You did not sell.

•        I also in the same email on 5/11 requested that the funds from the sale of 4.2 BTC, which we did not request, be remitted to our account as that invoice for USBTC had already been paid.—You did not do so.

All I am trying to do is get you to sell the BTC and remit the funds to my operating account, which Gryphon is required to do under the MSA.  There is nothing in the MSA about "required minimum deposit".  If I have missed that, please point out that language so I can review.  We have never left you in a position to not have adequate funds to cover any invoices that you have paid on our behalf, either by sending cash or authorizing the sale of BTC to cover.

The invoice upcoming next week for Coinmint should be aprox $40,000.  The invoice due to Generate Capital at the end of the month will be $346,000, unless you double paid the invoice we already paid, then it will be only $230,000 .  Over the past 10 days we have averaged deposits of over 2.6 BTC each day.  There should be no issues generating adequate BTC to cover the amount due to Coinmint and Generate Capital when they come due.  If you are insisting you must take over and make payments directly to Generate Capital moving forward, we should discuss to be sure the logistics are in place to do so and no payments are missed.  If we move Generate Capital to this method, you will need to request authorization to sell BTC to cover the amount of the invoice at that time just as we have done with Coinmint since the inception.

Because these amounts due are not significant I would again request you sell BTC and remit the proceeds to our RBC account.  The amount of BTC I would like you to sell is 19 BTC.  And if you did not double pay the Generate capital invoice, please remit the $117,000 from that sale as well.

Finally, if you are refusing to talk to me, please inform me how that is consistent with the MSA.


Thanks

Kurt


**Kurt Kalbfleisch**

**Senior Vice President and CFO**

**Sphere 3D**

858.775.6801
kurt.kalbfleisch@sphere3d.com


**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Friday, May 12, 2023 7:59 AM
**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>
**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>; dan@gryphonmining.com
**Subject:** Re: Sale


Kurt,


We are going in circles.  I don't understand what you mean by "made-for-litigation position" in this context.  Our position is wholly dependent on your failures to adhere to the MSA – or to in any way act in good faith with respect to the parties' contractual agreement and business dealings in the ordinary course.  To be clear, we would much rather not litigate every straightforward contractual term in the MSA and instead rely on Sphere adhering to its obligations as promised.  Sphere, apparently, feels differently.  In any event, this back and forth is not productive.  We will be in touch through counsel.


On Thu, 11 May 2023 at 13:52, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com> wrote:

 Rob,

This is a made-for-litigation position. As you are well aware, Sphere has routinely paid hosts directly, which is consistent with the term in the MSA that "Customer shall provide written instructions to Provider with respect to all decisions to sell or hold Digital Assets." Gryphon has never asserted that our direct payment is a breach of the MSA. If you wish to dispose of Digital Assets in order to pay operating costs, that must come with our approval. We of course will not unreasonably hold that approval, but you must explicitly seek permission before doing so. Please confirm you will do so.

Next, there is no basis in the MSA for your assertion that Gryphon needs to keep approximately $530,000 of USD value in the wallet at all times, which is again another made-for-litigation position. There is no basis in the text of the MSA for the position. Nor is it consistent with the prior practice of the parties—indeed, this is the first time that Gryphon has ever indicated that there must be any sort of minimum in the account. Instead, it appears that Gryphon is resorting to self-help: Gryphon's "required minimum deposit" just so happens to correspond to its damages against Sphere for alleged negligence (which of course is money Gryphon lost due to its own negligence in falling for a spoofing attack). Again, we of course ensure that all bills for operating costs are paid, but it cannot be that Gryphon can unilaterally refuse our requests to honor written instructions to hold or sell Digital Assets.

So I ask again: will you adhere to my written instruction to sell the 11 BTC, and also send us the cash from the 4.200681BTC you sold on 5/10 related to an USBTC invoice we have already paid? Or are you refusing?

Finally, Patti believes she already sent the contacts you requested; she will follow up there in any event and make sure you have them.

Thanks

Kurt

**Kurt Kalbfleisch**

**Senior Vice President and CFO**

**Sphere 3D**

858.775.6801
kurt.kalbfleisch@sphere3d.com

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Wednesday, May 10, 2023 10:40 AM
**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>

**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>; dan@gryphonmining.com
**Subject:** Re: Sale

Kurt,

Thank you for your email. The parties already agreed in the MSA that Gryphon would sell Digital Assets to pay these fees. Specifically, in the MSA, the parties agreed that Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." Sphere paying these fees directly, or preventing Gryphon from so doing, is a breach of the MSA.

As to the USBTC charges mentioned below, I've attached two PDFs of emails from USBTC noting past due payments. Gryphon is selling bitcoin to pay Sphere's operating costs consistent with its obligations in the MSA.

Given that the parties agreed that Gryphon is required to pay operating costs for Sphere in the MSA, Gryphon needs to maintain an adequate amount of value to cover these cash flows.  Based on the bills seen from USBTC and CoinMint, Gryphon needs to keep approximately $530,000 of USD value in the wallet for these purposes (based on USBTC monthly invoice of ~$450,000 and most recent CoinMint semi-monthly invoice of ~$40,000 x 2).  As there is currently only 14.38750744 BTC in your wallet (USD equivalent of ~$417,000) we are unable to withdraw and sell at this time (understanding that we also need to assume these responsibilities for Lancium and Rebel Mining). However, Gryphon cannot fulfil its obligations under the MSA if Sphere refuses to allow Gryphon to retain sufficient cash flows to pay Sphere's expenses as they come due.   As to your request to confirm the transfer at issue, we received confirmation of the wire transfer this yesterday.  Attached is the confirmation as well.

Unfortunately, despite multiple requests, we still have not been provided with contacts at Lancium and Rebel. Please send along the names/telephone numbers/email addresses for Sphere's contacts at Lancium and Rebel, along with Sphere's consent for Gryphon to manage those accounts as agreed to by the parties in the MSA.

Thank you,

On Tue, 9 May 2023 at 12:11, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com> wrote:

  Rob,

The Agreement provides that "Customer shall provide written instructions to Provider with respect to all decisions to sell or hold Digital Assets." Please let me know how your proposal is consistent with that language. Please also let me know if you have made any other decisions to sell or hold our Digital Assets that we did not authorize.

While we want to be efficient, any proposal must be consistent with the MSA. You also state in your email that you have "noticed multiple delayed payment notices from USBTC." Please detail what those delays were and how they caused any issues with USBTC or otherwise.

Next, I noticed this morning that you sold 4.200681BTC, apparently to pay the most recent USBTC invoice. We did not authorize that sale of BTC or that use of proceeds. We are already processing payment for that invoice, and we will continue to pay invoices. Please send the cash from the already processed sale to our RBC account.

In addition, please sell another 11 BTC from our wallet and send that cash to our RBC account. Can you also provide confirmation of the wire for the sale on May 3, as we have not yet received that transfer.

Finally, my understanding is that Patti provided you with the contacts you requested some time ago.

**Kurt Kalbfleisch**

**Senior Vice President and CFO**

**Sphere 3D**

858.775.6801
kurt.kalbfleisch@sphere3d.com

---

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Friday, May 5, 2023 10:32 AM
**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>
**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>; dan@gryphonmining.com
**Subject:** Re: Sale

Kurt

The MSA notes that Gryphon manages all blockchain operations for Sphere. Currently we are already paying the CoinMint invoices in this manner. The current setup of having Sphere request, Gryphon transfer to an account that can sell, Gryphon selling the coin, Gryphon transferring the cash to its bank account, and Gryphon transferring the cash to Sphere to then send payment to host providers creates a lag that may cause missed payments which is a risk to the blockchain operation. We are not charging any additional fees for this management outside of standard transaction costs charged by BitGo and/or financial institutions. We have already noticed multiple delayed payment notices from USBTC and we believe us doing this for Sphere directly is ideal for all parties and consistent with the language of the MSA.

This also reminds us that we have requested access and contacts for Lancium and Rebel. The former we have no contacts for and for both we do not believe either has been instructed to provide Gryphon with admin access that is consistent with the MSA.

On Fri, 5 May 2023 at 13:22, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com> wrote:

Rob –

Sphere intends to continue to pay in these vendor invoices in cash as they come due. The MSA provides that only Sphere can make a decision to sell digital assets. Can you please explain how your plan is consistent with the MSA?

Thanks,

**Kurt Kalbfleisch**

**Senior Vice President and CFO**

**Sphere 3D**

858.775.6801
kurt.kalbfleisch@sphere3d.com

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Thursday, May 4, 2023 12:17 AM
**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>
**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>; Dan Tolhurst <dan@gryphonmining.com>
**Subject:** Re: Sale

Sale of 13 BTC completed.   Proceeds less Bitgo's customary $10 withdrawal fee will be sent to your RBC account as soon as it clears and is deposited into our bank account.  Confirmation attached.

Please note, now that we have setup bill visibility with USBTC, we will assume management responsibility and pay their invoices out of your BTC earned starting with bills received after today.   Sphere will still be responsible for paying bills sent by USBTC prior to today.

Please also, set us up with similar access and controls with Lancium and Rebel so that we can continue managing your blockchain operations as per the MSA.

On Wed, 3 May 2023 at 12:30, Rob Chang <rob@gryphonmining.com> wrote:

Underway

On Tue, 2 May 2023 at 17:01, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com> wrote:

Rob,

Please sell 13 BTC form our wallet and wire the proceeds to our RBC account.

Thanks

Kurt

**Kurt Kalbfleisch**

**Senior Vice President and CFO**

**Sphere 3D**

858.775.6801
kurt.kalbfleisch@sphere3d.com

--

Rob Chang

CEO & Director

(416) 500-5675

[Rob@gryphonmining.com](mailto:Rob@gryphonmining.com)

GryphonDigitalMining.com

Twitter: @GryphonMining

--

Rob Chang

CEO & Director

(416) 500-5675

[Rob@gryphonmining.com](mailto:Rob@gryphonmining.com)

GryphonDigitalMining.com

Twitter: @GryphonMining

--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining

--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining

--

Rob Chang

CEO & Director

(416) 500-5675

Rob@gryphonmining.com

GryphonDigitalMining.com

Twitter: @GryphonMining

--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining

# Exhibit G



## Sphere 3D Corp. Reports Second Quarter 2023 Financial Results and Operational Updates

August 14, 2023

Toronto, Ontario--(Newsfile Corp. - August 14, 2023) - Sphere 3D Corp. (NASDAQ: ANY) ("Sphere 3D" or the "Company"), dedicated to becoming the leading carbon-neutral Bitcoin mining company operating at an industrial scale, today reported financial results for the second quarter ended June 30, 2023.

### Q2 2023 Highlights and Recent Developments

- Revenue increased 189% year-over-year to $5.5 million.
- Mined 178.4 Bitcoin, representing a 381% increase year-over-year.
- As of June 30, 2023, the Company held 10.2 Bitcoin with a market value of $0.6 million.
- As of August 11, 2023, the Company increased total operating hash rate to 1.35 EH/s.

### CEO Comments

"I'm pleased to report that we delivered very strong results and made significant progress in our operations during the quarter," said Patricia Trompeter, CEO of Sphere 3D. "We increased our operating hashrate to 1.0 EH/s at the end of June 2023 from just under 0.1 EH/s in the same period last year. This resulted in a 381% increase in Bitcoin mined year-over-year from 37.1 to 178.4. Looking forward, we are excited to complete our near-term target of 1.5 EH/s and achieve positive operating cash flows on a run-rate basis at prevailing market levels."

### Three Months Ended June 30, 2023 Financial Results

- Bitcoin production was 178.4 Bitcoin, compared to 37.1 in same period last year, an increase of 381%.
- Revenue was $5.5 million, compared to $1.9 million in same period last year, an increase of 189%.
- Digital mining revenue was $5.0 million, compared to $1.2 million in same period last year, an increase of 317%.
- Operating costs and expenses were $10.2 million, compared to $17.3 million in same period last year, a reduction of 41%.
- Net loss attributable to common shareholders was $4.8 million, or a net loss of $0.44 per share, compared to a net loss attributable to common shareholders of $40.7 million, or a net loss of $4.31 per share, in same period last year.

### Six Months Ended June 30, 2023 Financial Results

- Bitcoin production was 348.5 Bitcoin, compared to 55.3 in same period last year, an increase of 530%.
- Revenue was $8.5 million, compared to $3.3 million in same period last year, an increase of 158%.
- Digital mining revenue was $7.5 million, compared to $2.0 million in same period last year, an increase of 275%.
- Operating costs and expenses were $16.9 million, compared to $33.8 million in same period last year, a reduction of 50%.
- Net loss attributable to common shareholders was $8.3 million, or a net loss of $0.78 per, compared to a net loss attributable to common shareholders of $55.3 million, or a net loss of $5.96 per share, in same period last year.

### About Sphere 3D

Sphere 3D Corp. (NASDAQ: ANY) is a net carbon-neutral cryptocurrency miner with decades of proven enterprise data-services expertise. The Company is growing its industrial-scale digital asset mining operation through the capital-efficient procurement of next-generation mining equipment and partnering with best-in-class data center operators. Sphere 3D is dedicated to increasing shareholder value while honoring its commitment to strict environmental, social, and governance standards. For more information about the Company, please visit Sphere3D.com.

### Forward-Looking Statements

This communication contains forward-looking statements within the meaning of Section 27A of the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements generally relate to future events, including the timing of the proposed transaction and other information related to the proposed transaction. In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these words or other similar terms or expressions. Expectations and beliefs regarding matters discussed herein may not materialize, and actual results in future periods are subject to risks and uncertainties that could cause actual results to differ materially from those projected. The forward-looking statements contained in this communication are also subject to other risks and uncertainties, including those more fully described in filings with the SEC, including Sphere 3D's reports filed on Form 10-K and Form 8-K and in other filings made by Sphere 3D with the SEC from time to time and available at www.sec.gov. These forward-looking statements are based on current expectations, which are subject to change.

### Sphere 3D Contact

Kurt Kalbfleisch, CFO, Sphere 3D
Investor.relations@sphere3d.com

**Sphere 3D Corp.**
**Condensed Consolidated Statements of Operations**
**(in thousands of U.S. dollars, except share and per share amounts)**
**(unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Revenues: | | | | |
| Digital mining revenue | $ 4,966 | $ 1,211 | $ 7,490 | $ 1,958 |
| Service and product revenue | 500 | 710 | 1,002 | 1,335 |
| Total revenues | 5,466 | 1,921 | 8,492 | 3,293 |
| | | | | |
| Operating costs and expenses: | | | | |
| Cost of digital mining revenue | 4,074 | 619 | 6,039 | 974 |
| Cost of service and product revenue | 209 | 341 | 507 | 700 |
| Sales and marketing | 277 | 264 | 551 | 495 |
| Research and development | 227 | 139 | 497 | 253 |
| General and administrative | 3,634 | 7,788 | 7,105 | 16,757 |
| Depreciation and amortization | 1,375 | 7,485 | 2,400 | 13,849 |
| Loss on disposal of property and equipment | 251 | — | 251 | — |
| Realized gain on sale of digital assets | (139) | — | (772) | — |
| Impairment of digital assets | 254 | 679 | 350 | 770 |
| Total operating expenses | 10,162 | 17,315 | 16,928 | 33,798 |
| Loss from operations | (4,696) | (15,394) | (8,436) | (30,505) |
| Other income (expense): | | | | |
| Interest expense | (1,173) | — | (1,173) | — |
| Interest income and other expense, net | 1,113 | 281 | 1,364 | 745 |
| Forgiveness of note receivable | — | (13,145) | — | (13,145) |
| Impairment of investments | — | (12,429) | — | (12,429) |
| Net loss before taxes | (4,756) | (40,687) | (8,245) | (55,334) |
| Provision for income taxes | 4 | — | 4 | — |
| Net loss | (4,760) | (40,687) | (8,249) | (55,334) |
| Less: Non-controlling interest - income | 67 | — | 83 | — |
| Net loss available to common shareholders | $ (4,827) | $ (40,687) | $ (8,332) | $ (55,334) |
| | | | | |
| Net loss per share: | | | | |
| Net loss per share basic and diluted | $ (0.44) | $ (4.31) | $ (0.78) | $ (5.96) |
| Shares used in computing net loss per share: | | | | |
| Basic and diluted | 11,051,588 | 9,449,735 | 10,673,876 | 9,285,878 |

**Sphere 3D Corp.**
**Condensed Consolidated Balance Sheet**
**(in thousands of U.S. dollars)**
**(unaudited)**

| | June 30, 2023 | December 31, 2022 |
| --- | --- | --- |
| | (Unaudited) | (Unaudited) |
| **ASSETS** | | |
| Cash and cash equivalents | $ 506 | $ 1,337 |
| Digital assets, net | 626 | 1,695 |
| Other current assets | 3,546 | 7,252 |
| Total current assets | 4,678 | 10,284 |
| Property and equipment, net | 28,695 | 34,259 |
| Intangible assets, net | 8,666 | 9,477 |
| Funds held in trust account | 8,542 | 10,297 |
| Other assets | 20,697 | 18,699 |
| Total assets | $ 71,278 | $ 83,016 |
| | | |
| **LIABILITIES, TEMPORARY EQUITY AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities | $ 7,160 | $ 6,200 |
| Other long-term liabilities | 5,675 | 5,784 |
| Total temporary equity | 30,541 | 36,467 |
| Total shareholders' equity | 27,902 | 34,565 |
| Total liabilities, temporary equity, and shareholders' equity | $ 71,278 | $ 83,016 |



To view the source version of this press release, please visit https://www.newsfilecorp.com/release/177140

# Group Exhibit H

**Alvis, Matt A.**

| | |
|---|---|
| **From:** | Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com> |
| **Sent:** | Monday, January 30, 2023 6:15 PM |
| **To:** | Rob Chang |
| **Cc:** | patricia trompeter |
| **Subject:** | Re: Coin Transfer |

Rob,

Test received.

Please go ahead with the whole amount.

Thanks,
Kurt

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

---

---- On Mon, 30 Jan 2023 18:08:00 -0500 **Rob Chang <rob@gryphonmining.com>** wrote ---

Test transaction sent.  Please advise if you have received it.
On Fri, 27 Jan 2023 at 15:18, Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com> wrote:

--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining



Rob,

Yes. Go ahead please.

Also, If you think it will take too much time, perhaps you could move the BTC to an already whitelisted address
controlled by you first, then make the transfer to our address.

Please let me know as soon as you send the test transfer.

Thanks,

Kurt

**Kurt Kalbfleisch**

**Senior Vice President and CFO**

4542 Ruffner Street Suite 250, San Diego, CA 92111 USA

t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

---

---- On Fri, 27 Jan 2023 15:02:43 -0500 **Rob Chang** <rob@gryphonmining.com> wrote ---

Kurt. I can add that address but this will take time to approve in BitGo and also we should do a test transaction before sending the whole amount. This will definitely delay the entire process.  Please confirm that you want this and I will get started as soon as possible.

Rob Chang
CEO & Director
(416) 500-5675
Rob@GryphonMining.com
GryphonDigitalMining.com
Twitter: @GryphonMining

GRYPHON
DIGITAL MINING

> On Jan 27, 2023, at 2:44 PM, Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com> wrote:
>
> Rob,
>
> Well Noted. I have just been notified that the address below is being audited. So kindly proceed with the transfer of 18 BTC from our "Sphere Mined Coins" wallet to the following address: **bc1qmrykeusq73xd7ad6h2y27mw0fu2e9wcqrfrlvr.**
>
> Please let me know on Monday when the transfer has been completed.
>
> Thanks
> Kurt
>
>
> **Kurt Kalbfleisch**

**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

---

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Friday, January 27, 2023 1:32 PM
**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@spheres3d.com>
**Cc:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Subject:** Re: Coin Transfer

Received and initiated. Please note. All Sphere withdrawals require a video ID call with BitGo for your security. They do not have any verification windows until early Monday morning. I have already scheduled it but you will not receive the transfer until later in the day Monday.


Rob Chang
CEO & Director
(416) 500-5675
Rob@GryphonMining.com
GryphonDigitalMining.com
Twitter: @GryphonMining



> On Jan 27, 2023, at 1:22 PM, Kurt Kalbfleisch
> <Kurt.Kalbfleisch@spheres3d.com> wrote:
>
> Rob,
>
> Please transfer 18 BTC from our "Sphere Mined Coins" wallet to the following address: **3LEzBSVIArXGAg3vpWSAJ3VQ9KCu9HCVAW.** This is the same address you have used previously.
>
> Please make this transfer today and if you can let me know when complete and I will confirm receipt.
>
> Thanks
> Kurt
>
>
> **Kurt Kalbfleisch**
> **Senior Vice President and CFO**
> 4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
> t 858.495.4211: m 858.775.6801
> kurt.kalbfleisch@sphere3d.com

3

| From: | Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com> |
| Sent: | Wednesday, February 1, 2023 4:28 PM |
| To: | rob |
| Cc: | patriciatrompeter |
| Subject: | Re: Coin Transfer |

Rob,

Could you please provide me with a status update on the below request.

Thanks
Kurt

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

---

---- On Wed, 01 Feb 2023 08:46:46 -0500 **Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com>** wrote ---

Rob,

Please transfer 8 BTC from our "Sphere Mined Coins" wallet to the following
address: **bc1qmrykeusq73xd7ad6h2y27mw0fu2e9wcqrfrlvr.**  This is the same address you used previously.

Please make this transfer today.

Thanks

Kurt

**Kurt Kalbfleisch**

**Senior Vice President and CFO**

4542 Ruffner Street Suite 250, San Diego, CA 92111 USA

t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

# Group Exhibit I

| From: | Hinkes, Andrew M. |
|---|---|
| To: | Patricia Trompeter; Rob Chang |
| Cc: | Dan Tolhurst; Kurt Kalbfleisch; Panjwani, M. Ali; Joe W; Moore, Desiree F.; Greg Wolfe; Tibor Nagy; Joseph O"Daniel |
| Subject: | RE: Stolen Bitcoin |
| Date: | Friday, March 10, 2023 1:34:21 PM |
| Attachments: | image004.png |
| | image005.jpg |

Sphere3d Team ,

Thanks for joining us on the call today. By way of follow up, and to clarify any potential misunderstanding, we would like to have a call where the experts for Gryphon and Sphere3d discuss their findings as to their investigations of the business email compromise dated on January 27 2023 (which Sphere3d confirmed was done on Feb 10, 2023 and March 3, 2023, see below), consistent with Gryphon's request on 3/3 that was agreed to by Sphere3d on 3/3 as well. See the below email chain. As it concerns Sphere3d as Gryphon's customer, we understand that Sphere3d has been made whole, notwithstanding the business email compromise. Please let me know if you have any questions in this regard.

Thank you,

-Drew



**Andrew M. Hinkes**
K&L Gates LLP
200 South Biscayne Blvd. Suite 3900
Miami, Fl 33131-2399
Phone: 305-539-3354
Fax: 305-358-7095
Andrew.Hinkes@klgates.com
www.klgates.com

---

**From:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Sent:** Monday, March 6, 2023 3:36 PM
**To:** Rob Chang <rob@gryphonmining.com>
**Cc:** Dan Tolhurst <dan@gryphonmining.com>; Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>; Panjwani, M. Ali <Ali.Panjwani@pryorcashman.com>; Joe W <joseph.michael.wall@gmail.com>; Hinkes, Andrew M. <Drew.Hinkes@klgates.com>; Moore, Desiree F. <Desiree.Moore@klgates.com>; Greg Wolfe <greg@dnfllp.com>; Tibor Nagy <tibor@dnfllp.com>; Joseph O'Daniel <joe@ucx.co>
**Subject:** Re: Stolen Bitcoin

**External Sender:**

Friday 1pm

*Patricia Trompeter*
Chief Executive Officer

203.524-6524



**From:** Rob Chang <rob@gryphonmining.com>
**Date:** Monday, March 6, 2023 at 2:48 PM
**To:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Cc:** Dan Tolhurst <dan@gryphonmining.com>, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>, Panjwani, M. Ali <Ali.Panjwani@pryorcashman.com>, Joe W <joseph.michael.wall@gmail.com>, Hinkes, Andrew M. <Drew.Hinkes@klgates.com>, Moore, Desiree F. <Desiree.Moore@klgates.com>, Greg Wolfe <greg@dnfllp.com>, Tibor Nagy <tibor@dnfllp.com>, Joseph O'Daniel <joe@ucx.co>
**Subject:** Re: Stolen Bitcoin

Wednesday is no good. Thursday or Friday would need to check with the team again.

Rob Chang
CEO & Director
(416) 500-5675
Rob@GryphonMining.com
GryphonDigitalMining.com
Twitter: @GryphonMining

Image removed by sender.

On Mar 6, 2023, at 2:47 PM, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote:

Can we do Wednesday?  I am unable to get all the parties necessary on the phone.    Let me know if availability on Wednesday – say noon EST?

*Patricia Trompeter*
Chief Executive Officer
203.524-6524

**From:** Rob Chang <rob@gryphonmining.com>
**Date:** Monday, March 6, 2023 at 2:43 PM
**To:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Cc:** Dan Tolhurst <dan@gryphonmining.com>, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>, Panjwani, M. Ali <Ali.Panjwani@pryorcashman.com>, Joe W <joseph.michael.wall@gmail.com>, Hinkes, Andrew M. <Drew.Hinkes@klgates.com>, Moore, Desiree F. <Desiree.Moore@klgates.com>, Greg Wolfe <greg@dnfllp.com>, Tibor Nagy <tibor@dnfllp.com>
**Subject:** Re: Stolen Bitcoin

Patti. Our forensics team is available 1:30-5 pm eastern tomorrow. Does that work for your group?

Rob Chang
CEO & Director
(416) 500-5675
Rob@GryphonMining.com
GryphonDigitalMining.com
Twitter: @GryphonMining

Image removed by sender.


On Mar 3, 2023, at 4:37 PM, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote:

Yes.   Let's get something f on the calendar.   We have a forensic review as well.   Please let me know what works and if we should have counsel on the phone.

Get Outlook for iOS

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Friday, March 3, 2023 1:22:00 PM
**To:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Cc:** Dan Tolhurst <dan@gryphonmining.com>; Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>; Panjwani, M. Ali <Ali.Panjwani@pryorcashman.com>; Joe W

<joseph.michael.wall@gmail.com>; Hinkes, Andrew M.
<Drew.Hinkes@klgates.com>; Moore, Desiree F.
<Desiree.Moore@klgates.com>
**Subject:** Re: Stolen Bitcoin

Patti/Kurt

We have completed our forensic research and believe it is the right time for our forensic investigators to discuss their findings.  Could we please arrange a time for them to connect?

On Fri, 10 Feb 2023 at 10:28, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote:

> Rob –
>
> We have concluded  one part of our investigation.  We have a 14 page report tracing the bitcoin It appears some of the funds are still sitting in the wallet.  The security team running the investigation has suggested  that Binance is notified immediately, however they will require a police report for recovery.    We are happy you share thee report with you as a courtesy.
>
> Please let us know when our bitcoin will be back in the "3Dsphere GDM" wallet.

Thank you

Patti

*Patricia Trompeter*

Chief Executive Officer

203.524-6524

&lt;image001.png&gt;

--
Rob Chang
CEO & Director
(416) 500-5675
[Rob@gryphonmining.com](mailto:Rob@gryphonmining.com)
GryphonDigitalMining.com
Twitter: @GryphonMining

Image removed by sender.


# Group Exhibit J

# Re: Remediation Plan & Cure

| From: | Patricia Trompeter <patricia.trompeter@sphere3d.com> |
|-------|---|
| To: | Rob Chang <rob@gryphonmining.com> |
| Cc: | Kurt Kalbfleisch <kurt.kalbfleisch@sphere3d.com>, Dan Tolhurst <dan@gryphonmining.com> |
| Date: | Wed, 24 May 2023 15:18:57 -0400 |

Rob –

I refer you to my attorney's correspondence to your lawyers and our Complaint, which Gryphon has conceded, in Court,  states a claim and thus that it provides fair notice of the breaches Gryphon committed.  You cannot exhibit ostrich behavior to claim that you do not know what the problem is.  It is your job to cure the breaches we identified, not ours.

In any event, my lawyer will send a letter to your attorneys identifying our best approximation of the damage Gryphon has caused.  We are of course at a disadvantage here given that discovery has yet to occur, but you have asked, so we will provide it.  Our agreement to do so does not change the fact that Gryphon has full notice of its breaches—as evidenced, again, by its concession that Sphere's Complaint states a claim for breach of contract—and that Gryphon will not cure (most likely because the breaches are incurable).

Best,

Patricia


***Patricia Trompeter***
Chief Executive Officer
203.524-6524





---

**From:** Rob Chang <rob@gryphonmining.com>
**Date:** Wednesday, May 24, 2023 at 10:13 AM
**To:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Cc:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>, Dan Tolhurst <dan@gryphonmining.com>
**Subject:** Re: Remediation Plan & Cure

Patti,

Thanks for your email. Contrary to the notion that my email did not warrant a response, I expressly asked Sphere to explain any purported breach by Gryphon so Gryphon could attempt to cure those breaches. That is why we both built a cure period into the MSA, so that we could address and remedy any breaches that may occur.  And that is why my email below asked Sphere to "identify, in detail, how it thinks Gryphon has purportedly breached the MSA."  Your mischaracterizations cannot change the emails. Your response below only complains that Gryphon did not sell Sphere digital assets under conditions that would require Gryphon to provide Sphere with a working capital loan.  But that is not required by the MSA and we do not see how refusing to do so could in any way be construed as a breach. All we are asking is for Sphere to identify for Gryphon what, exactly, Gryphon needs to do, in Sphere's view, to cure any breaches.  Without that specificity, it is hard to see how we can even attempt to cure.  Maybe that's what Sphere wants, but it's not what Gryphon wants, and it's not what the MSA's cure provisions provide.  I urge you to specifically identify how Sphere believes that Gryphon has purportedly breached the MSA, so we can attempt to move forward productively.  Your lawyer can guide you further as to how answering versus moving to dismiss Sphere's breach of contract claim has nothing whatsoever to do with whether you have sufficiently identified any alleged wrongdoing so that Gryphon can cure, but suffice it to reiterate that, absent a clear and consistent recitation of how we have breached the MSA, any cure becomes difficult, if not impossible to accomplish.

NX_GDMECAL_00000135

On Tue, 23 May 2023 at 17:13, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote:

Rob –

Your response was clear that you had no intent to undertake any effort at remediation, so I did not see any need to engage further.  Rather than offer any sort of remediation, Gryphon has doubled down on its misconduct by refusing to sell our digital assets, in clear violation of the MSA and your fiduciary duties.

You claim to not "understand the breaches," but Gryphon has not moved to dismiss our breach of contract allegations, so it clearly understands them.  Instead, it denies they occurred at all.  Given this posture, we are proceeding under the assumption that Gryphon has no intention to remediate.

Best,

Patricia

**_Patricia Trompeter_**
Chief Executive Officer
203.524-6524



---

**From:** Rob Chang <rob@gryphonmining.com>
**Date:** Tuesday, May 23, 2023 at 2:01 AM
**To:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Cc:** Greg Wolfe <greg@dnfllp.com>, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>, Dan Tolhurst <dan@gryphonmining.com>, Hinkes, Andrew M. <Drew.Hinkes@klgates.com>, Moore, Desiree F. <Desiree.Moore@klgates.com>
**Subject:** Re: Remediation Plan & Cure

Patti.  Following up on this.

On Wed, 10 May 2023 at 13:42, Rob Chang <rob@gryphonmining.com> wrote:

Patti,

I appreciate you reaching out.  Obviously, much of what you mention in your email is the subject of active litigation, which I will let our respective lawyers handle.  From a business-to-business standpoint, though, here are my thoughts.

First, Gryphon hasn't breached the parties' MSA in any way, so I don't think there's anything for Gryphon to "cure" here.  Nor do I think such imagined breaches give Sphere any legitimate basis to terminate the MSA.

Second, in order to try and be constructive, we are willing to work with you to address any perceived shortcomings.  Still, it is not at all clear from your various correspondences (or your lawsuit, frankly) **_what_** Sphere actually thinks Gryphon has done to breach the MSA.  Instead, you are hurling lots of vague and amorphous buzzwords -- like the "misfeasance" in your email below, or "skimming" in your complaint -- that don't have any actual meaning (or any basis in fact).

Accordingly, if you want us to take your claims seriously – and potentially propose a "remediation plan" (which Gryphon is not obligated to do under the MSA or otherwise), Sphere at a minimum needs to identify, in detail, how it thinks Gryphon has purportedly breached the MSA.  As I'm sure you can appreciate, Gryphon cannot effectively cure without that detail.

Bottom line from our standpoint is that both sides entered the MSA, as amended, with eyes wide open less than 18 months ago.  Gryphon values the MSA with Sphere, has complied with it at all times, and expects Sphere to do the same.  Your accusations now that Gryphon has breached and needs to cure (but also that the breaches are somehow "non-curable") do not signal that you want to have a good faith conversation about how the parties can maintain their contractual relationship, particularly in light of Sphere's breaches of the MSA.  Instead, it looks like Sphere is just looking for a way out of this deal.  I look forward to your response.

On Sat, 6 May 2023 at 08:24, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote:

Robby –

As you aware, Gryphon is and has been in gross violation of its duties and responsibilities under the MSA. We have raised your non-performance under the MSA throughout the parties' relationship.

Through our letter from our attorney Mr. Wolfe to your attorney Mr. Caponi dated March 22, 2023, we reiterated Gryphon's non-performance, gross negligence, and misconduct. Gryphon's material non-compliance, gross negligence, and misconduct in connection with the MSA is also the subject of our Complaint dated April 7, 2023. Despite the passage of more than a month since Mr. Wolfe's letter and nearly a month since the filing of our Complaint, Gryphon has made no effort to address the issues we have raised, which we in any event view as non-curable given the pattern of gross misfeasance. Given that Gryphon has made no effort to address its misfeasance, it appears that Gryphon shares this view.

If Gryphon contends that its misfeasance is curable, please let us know as soon as possible and set forth, in detail, a remediation plan, including how Gryphon plans to compensate Sphere for its past misconduct. We will otherwise proceed under the assumption that Gryphon has no intention of even attempting to cure its misfeasance.

Best,

Patricia

**_Patricia Trompeter_**
Chief Executive Officer
203.524-6524



--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining



--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining



--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining

NX_GDMECAL_00000135

# Group Exhibit K

# K&L GATES

June 6, 2023

Brian D Koosed
Partner
brian.koosed@klgates.com

Gregory N. Wolfe
Dontzin Nagy & Fleissig LLP
980 Madison Avenue
New York, NY 10075

T +1 202 778 9204
F +1 202 778 9100

Re: *Sphere 3D Corp. v. Gryphon Digital Mining, Inc.*, 1:23-cv-02954-PKC

Dear Greg:

We write in response to your May 30, 2023 letter (the "Letter") regarding the referenced action. (Capitalized terms not defined herein have the meaning ascribed to them in the Letter.)

Initially, please note that Gryphon will not be responding to the settlement demands set forth in the Letter, which are not serious for a variety of reasons, including that the demands ignore entirely the "Limitation of Liability" provision of the MSA. *See, e.g.,* MSA, p. 3. Accordingly, and for the avoidance of doubt, this response is not being sent subject to Federal Rule of Evidence 408 or any other state or federal analogue.

With that said, we do believe it is necessary to respond to the portion of the Letter concerning your contention that "Despite Notice, Gryphon Has Persistently Failed to Cure Breaches—Or Articulate How It Can." Letter, p. 1. Put simply, Gryphon takes its obligations under the MSA extremely seriously, and Gryphon therefore takes any allegations that it has breached the MSA equally seriously. This is why Gryphon has repeatedly sought clarification directly from your client as to ***exactly what*** Gryphon has allegedly done to breach the MSA, and as to ***exactly how*** Gryphon can cure those alleged breaches.

At no point has your client ever provided ***any*** specificity on those points. And your recent Letter does not provide any further clarification. Indeed, your Letter—and your client's prior responses—all seem to go out of their way to avoid clarifying these points, contending instead that Sphere has provided such information at some prior, unspecified time. (Notably, if, in fact, this information has been previously provided in a clear and fulsome manner, it should be no trouble to reiterate it, whether in your Letter or otherwise.)

Your Letter identifies three purported breaches of the MSA: (i) Gryphon allegedly "failed to deliver 'management services' under the MSA"; (ii) Gryphon allegedly "did not have the internal controls and policies and procedures needed to be a custodian of Sphere's digital assets"; and (iii) Gryphon allegedly "was skimming off the top by not paying Sphere what it was due under the MSA." Letter, p. 1.

As with every other communication from you or your client on these topics, your Letter fails to specify _**what**_ Gryphon did not do, but should have done, that constitutes Gryphon's alleged "fail[ure] to deliver 'management services' under the MSA." Nor does your Letter specify what "internal controls and policies and procedures" Gryphon should have had, but did not have, "to be a custodian of Sphere's digital assets." Likewise, your Letter does not specify what funds Sphere should have received, but did not receive, because of Gryphon's alleged "skimming off the top" (which, for the record, is complete nonsense).

My client and my colleagues and I have repeatedly asked for this basic level of detail because, as Sphere well knows, there is no way Gryphon can actually cure any of these purported breaches unless and until Sphere specifies what it believes constitutes a breach, and thus what specific actions are necessary to fix the alleged breaches. In this regard, your Letter's repeated echoing of your client's position—essentially, that Gryphon did not move to dismiss Sphere's breach of contract claim, so Gryphon somehow must know what the breaches are and how to cure them—reflects inexperience in the litigation process (which we assume is a refrain your client is pushing, and not one that you have adopted in earnest). As an accomplished lawyer, you well know the extremely low bar for pleading a breach of contract claim under the Federal Rules of Civil Procedure. That is far short of the specificity that the parties obviously contemplated—and expressly bargained for—in agreeing to the MSA's cure provisions.

In short, the parties expressly granted each other a cure right in the MSA. Your Letter repeats your client's long-standing refusal to actually identify what Gryphon supposedly did wrong, and thus how it can be cured. Your and your client's failure to identify these basic facts effectively deprives Gryphon of its contractually bargained-for cure right, thereby rendering it a nullity. That is not what the parties agreed to under the MSA, and it is not what New York law allows under these circumstances. Sphere must provide Gryphon with the specificity required to allow Gryphon to exercise its cure rights under the MSA. Gryphon reserves all rights in the event that Sphere does not do so, including the right to seek relief from the Court in the coming months.

We expect, and look forward to, a substantive response to this letter and as it concerns Gryphon's contractually bargained-for requests. Thank you.

Very truly yours,

/s/ _Brian D. Koosed_

Brian D. Koosed

cc:    Desiree Moore  (_via email only_)
       Andrew Hinkes  (_via email only_)

**K&L GATES**

June 22, 2023

Brian D Koosed
Partner
brian.koosed@klgates.com

T +1 202 778 9204
F +1 202 778 9100

Gregory N. Wolfe
Dontzin Nagy & Fleissig LLP
980 Madison Avenue
New York, NY 10075

Re: ***Sphere 3D Corp. v. Gryphon Digital Mining, Inc.*, 1:23-cv-02954-PKC**

Dear Greg:

We write to follow up on our June 6, 2023 letter, as well as to address a troubling new development caused by your client's most recent actions in violation of the MSA. (Capitalized terms not defined herein have the meaning ascribed to them in our June 6, 2023 letter.)

*First*, it has now been more than two weeks since our June 6, 2023 letter requesting that your client specify ***exactly what*** Gryphon has allegedly done to breach the MSA, and ***exactly how*** Gryphon can cure those alleged breaches, with no response at all from Sphere. As we noted in our June 6, 2023 letter, the MSA expressly grants Gryphon the right to cure any alleged breaches of the MSA. For that right to have any meaning at all, Sphere must specify what breaches it actually alleges, and how Gryphon may, in Sphere's view, cure them. Yet still, months into the parties' dispute, Sphere has never provided such specificity, either before or since our June 6 letter. This is contrary to the MSA and effectively deprives Gryphon of its contractually bargained-for cure rights. (We reiterate again that any notion that Gryphon is somehow aware of the alleged breaches because Sphere potentially managed to state a claim for breach of contract under the Federal Rules of Civil Procedure is unserious—and we are confident no court would allow Sphere to rest on its bare notice pleading as a sufficient articulation of the alleged breaches at issue in the context of the MSA's more specific cure provision.) Please immediately provide the requested specificity to which Gryphon is entitled, so that Gryphon may exercise its cure rights under the MSA.

*Second*, and even more troubling, we now have express and articulated confirmation that Sphere has diverted the proceeds of its Bitcoin mining operations to a separate digital wallet that is not operated or controlled by Gryphon (and that Gryphon was not even aware of). This is in direct violation of the MSA, which expressly provides:

- "Provider [Gryphon] *shall at all times control the digital wallet, which shall be a wallet address selected by Provider [Gryphon] on behalf of Customer [Sphere]* for storing digital assets (the "**Digital Wallet**"). . . ."

K&L GATES LLP
1601 K STREET NW WASHINGTON DC 20006
T +1 202 778 9000 F +1 202 778 9100 klgates.com

- "Provider [Gryphon] *shall pay directly from the Digital Wallet on behalf of Customer all operating costs*, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee."

MSA, p. 2 (italicized emphasis added).

This language is crystal-clear:  Gryphon, not Sphere, "shall at all times control" the Digital Wallet, which "shall be a wallet address selected by" Gryphon.  MSA, p. 2.  Sphere's conduct—establishing pooling relationships with Foundry, with the proceeds of Sphere's mining operations re-directed to a separate wallet controlled by Sphere, not Gryphon—is in direct and flagrant breach of these MSA provisions.

Further, Sphere's actions in breach of the MSA directly prevent Gryphon from fulfilling its obligations to "pay directly from the Digital Wallet on behalf of [Sphere] all operating costs." MSA, p. 2.  Indeed, as we have repeatedly advised since late May 2023, Sphere's rolling requests that Gryphon liquidate Bitcoin for Sphere would put Sphere in an untenable position where Gryphon cannot pay Sphere's debts as those debts become due.  Sphere's recent actions in establishing its own digital wallet not controlled by Gryphon only exacerbate Sphere's inability to pay its debts, because: (i) Gryphon is obligated to pay Sphere's debts from the Digital Wallet that Gryphon established and maintains for Sphere pursuant to the MSA; and (ii) Sphere is now ensuring that that Digital Wallet is effectively deprived of Digital Assets going forward, thus rendering it incapable of being used to pay Sphere's debts.

Gryphon demands that Sphere immediately re-direct all proceeds of its mining operations back to the Digital Wallet that Gryphon established and maintains for Sphere, as the MSA expressly requires.  Sphere's failure to do so will result in irreparable harm to Sphere, as Sphere will be unable to have its debts paid as required by the MSA, thereby allowing its creditors to potentially put Sphere into bankruptcy (and potentially exposing Sphere's officers to personal liability as well).

For the avoidance of doubt, Sphere's failure to immediately re-direct the proceeds of its mining operations back to the Digital Wallet that Gryphon established and maintains for Sphere will further irreparably harm Gryphon.  As Sphere well knows, the mining industry is a small and discrete community, and everyone within it knows that Gryphon is obligated, under the MSA, to pay Sphere's operating costs on Sphere's behalf.  By operating its own digital wallet in breach of the MSA, Sphere is damaging Gryphon's reputation, as the industry may well soon (wrongly) impute Sphere's inability to pay its debts to either Gryphon's mismanagement of Sphere, or to Gryphon's own financial issues.  Either way, this would create a false impression within the industry that would cause Gryphon enormous and permanent damage to its reputation, which monetary damages would nowhere come close to compensating.  Likewise, Sphere's actions will cause irreparable harm to Gryphon in that it will necessarily force a shut-down of the miners, which would lead to those miners being kicked out of their host facilities (and/or confiscation of the miners).  This would cause significant disruption to Gryphon's business operations and is simply untenable—and certainly cannot be compensated monetarily.

For all these reasons, Sphere must cease its breaches of the MSA immediately and restore Gryphon's control over Sphere's Digital Wallet, as the MSA expressly requires.

We expect, and look forward to, a substantive response to this letter and as it concerns Gryphon's contractually bargained-for rights, and Sphere's breaches thereof.  Gryphon reserves all rights in the event of Sphere's failure to respond or otherwise.  Thank you.

Very truly yours,

/s/  *Brian D. Koosed*

Brian D. Koosed

cc:     Desirée Moore  (*via email only*)
        Andrew Hinkes  (*via email only*)

3

# K&L GATES

August 1, 2023

Brian D. Koosed
brian.koosed@klgates.com
202-778- 9204

**By E-mail**

Gregory N. Wolfe
Dontzin Nagy & Fleissig LLP
980 Madison Avenue
New York, New York 10075
(212) 717-2900
greg@dnfllp.com

Re:     ***Sphere 3D Corp. v. Gryphon Digital Mining, Inc.***, No. 1:23-cv-02954

Dear Mr. Wolfe:

As you know, we are counsel to Gryphon Digital Mining, Inc. ("Gryphon").

Initially, we note that Sphere has utterly failed to respond to the explicit requests, made in our prior letters dated June 6, 2023 and June 22, 2023, that Sphere specify ***exactly what*** Gryphon has allegedly done to breach the MSA, and ***exactly how*** Gryphon can cure those alleged breaches, so that Gryphon can exercise its cure rights under the MSA.  Sphere's inability to specify those breaches is telling and Gryphon continues to reserve all rights on those issues.

This letter further responds to your letter dated July 19, 2023, regarding purported deficiencies in Gryphon's Objections and Responses to the First Set of Requests for Production of Documents (the "RFP Responses") and the First Set of Interrogatories (the "Interrogatory Responses"), served on Sphere 3D Corp. ("Sphere") on June 8, 2023.

This response conforms to the organization of your July 19 letter.  Accordingly, both the headings and numbering system correspond to the headings and numbering system in your letter.  Gryphon includes these merely for ease of reference in addressing the various items in your July 19 letter.  For the avoidance of doubt, Gryphon disputes Sphere's characterizations of the RFP and Interrogatory Responses writ large.

I.      **Improper Objections Seeking to Limit Gryphon's Discovery Obligations to Documents and Information in Its Actual Possession, as Opposed to Its Control**

*Through its objections, Gryphon has stated it will not produce documents or information unless in Gryphon's actual possession. E.g., General Objection No. 7 of the Interrogatory and*

*RFP Responses; Instructions And Definitions Objection No. 2 of the Interrogatory Responses (seeking to limit the definition of "You," "Your," and "Gryphon" to Gryphon only); Definitions Objection No. 2 of the RFP Responses (same); Instructions Objection Nos. 2–3 of the RFP Responses (same); Response to RFP No. 1 (same).*

*These objections are improper. Gryphon is obligated to produce documents and provide information in its possession, custody, or control, including without limitation documents and information in the possession of a non-party. See In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 195 (S.D.N.Y. 2007) ("'[C]ontrol' does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action."), aff'd sub nom.* Gordon Partners v. Blumenthal, *No. 02 CIV 7377 LAK, 2007 WL 1518632 (S.D.N.Y. May 17, 2007). Please confirm that Gryphon will withdraw such objections and produce documents and provide information in its possession, custody, or control.*

**Response**:  We disagree with your characterization of Gryphon's objections as stating that Gryphon "will not produce documents or information unless in Gryphon's actual possession."  For example, General Objection No. 7 of the Interrogatory Responses and the RFP Responses clearly states that Gryphon objects to the extent Sphere's interrogatories or requests for production seek documents or information "not in the possession, custody, *or control* of Gryphon."  (Emphasis supplied.)  Limiting the definition of the terms "You," "Your" and "Gryphon" to Gryphon only, and clarifying that Gryphon responds to Sphere's interrogatories and requests for production on behalf of itself and not on behalf of any third party, does not in any way state or imply Gryphon is objecting to the production of documents "unless in Gryphon's actual possession."  Nevertheless, and for the sake of your clarity, Gryphon confirms that, in accordance with its obligations under the Federal Rules of Civil Procedure, it will produce documents and provide information within its possession, custody, or control.

## II.    Improper Objection to Form Interrogatories

*Pursuant to Local Rule 33.3, Sphere served two form interrogatories requesting information about custodians and repositories reasonably likely to possess relevant information and documents. Gryphon interposed numerous objections, none of which are proper, given that the interrogatories are called for by the Local Rule. Please confirm that Gryphon is not withholding any relevant information based on its objections.*

*Given the content of Gryphon's responses, it does not appear that they were provided in good faith, as they omit apparent repositories of documents or communications. For example, Gryphon lists "Sphere's facilities" as holding relevant discovery, but not Gryphon's. Please confirm that the responses are comprehensive.*

**Response**:  We disagree that Gryphon's objections to Interrogatory Nos. 1 and 2 are not "proper."  For example, Local Rule 33.3 provides that at the commencement of discovery a party may serve interrogatories "seeking names of witnesses with knowledge of information relevant to the subject matter of the action . . . and the existence, custodian, location and general description of relevant documents."  But such interrogatories should, as always, be considered within the particular context of each case and may become objectionable depending on the specific facts and circumstances of the case and claims asserted therein.  Here, Sphere's purported claims involve and/or implicate numerous non-party companies, employees, and individuals who may possess relevant knowledge or documents.  As such, there likely are persons with relevant knowledge or documents not controlled by Gryphon (including persons Gryphon may not even be aware of at the present time).  Gryphon is not in a position at this time to identify "each" such person, let alone identify the scope of "each" such person's knowledge as called for by Interrogatory No. 1.  Because it cannot identify each person with knowledge, Gryphon also cannot identify each potential repository of relevant documents.

Moreover, in this case (which again involves and/or implicates numerous non-parties and encompasses the entirety of the parties' commercial agreement and relationship), the identification of "each" person and "all" repositories of documents is overly broad, unduly burdensome, and not proportional to the needs of the case because there are countless persons who may potentially have some level of knowledge or documents (whether small or large or otherwise) rendering identification of each such person impracticable, if not impossible.

That said, Gryphon confirms that it is not withholding any information in its possession, custody, or control on the basis of its objections to Interrogatory Nos. 1 and 2.  Gryphon further confirms that in response to Interrogatory Nos. 1 and 2 it has endeavored to provide Sphere with a comprehensive list of individuals Gryphon believes may have relevant knowledge and repositories of relevant documents.  With regard specifically to your concern that Gryphon's "facilities" are not identified, Gryphon does not have "facilities" where documents may be located; rather, relevant documents are believed to be in the possession of, among others, Gryphon's individual employees and largely stored digitally.

## III.   Improper Boilerplate Objections

*Throughout the Interrogatory Responses and RFP Responses, Gryphon interposes boiler plate objections, which is wholly improper. E.g., Fischer v. Forrest, 2017 WL 773694 (S.D.N.Y. Feb. 28, 2017).*

*By way of illustration:*

- *In General Objection No. 6 of the RFP Responses, Gryphon objected "to the extent [the] Requests, Instructions, and Definitions are overly broad, unduly burdensome and*

3

*oppressive, and purport to require the search for and production of documents or information that is not relevant to any claim or defense and is not proportional to the needs of the case. Gryphon is withholding responsive documents on the basis of this objection." Gryphon includes a parallel objection in its Interrogatory Responses.*

- *Gryphon interposed virtually identical objections to each RFP Request, including based on overbreadth, undue burden, and proportionality, but without elaboration or particularity.*

- *In General Objection No. 3 of the Interrogatory Responses, "Gryphon objects generally to the Interrogatories, and to the Instructions and Definitions set forth or incorporated therein, on the basis that, taken collectively, they render the Interrogatories duplicative, unreasonably burdensome, vexatious, and oppressive."*

- *In General Objection No. 9 of the Interrogatory Responses, "Gryphon objects generally to the Interrogatories, and to the Instructions and Definitions set forth or incorporated therein, to the extent those Interrogatories, Instructions, and Definitions are vague, ambiguous, or incomprehensible, contain terms that are not adequately defined, or otherwise lack sufficient precision, and thereby require Gryphon to engage in conjecture as to their meaning."*

- *In General Objection No. 10 of the Interrogatory Responses, "Gryphon objects to each of the Interrogatories, and to the Instructions and Definitions set forth or incorporated therein, to the extent those Interrogatories, Instructions, and Definitions include legal conclusions or assumptions."*

*Please confirm that Gryphon will withdraw the foregoing General Objections and all boilerplate objections based on overbreadth, undue burden, and proportionality*

**Response**: We disagree that the general objections in Gryphon's RFP Responses and Interrogatory Responses are "improper." General objections are not prohibited and, in any event, Gryphon does not rely solely on its general objections in its RFP Responses. Rather, Gryphon additionally asserts applicable, specific objections to each of Sphere's individual Requests which state with specificity the basis for the objection, in accordance with Federal Rule of Civil Procedure 34(b)(2)(B). Gryphon also states whether responsive documents are being withheld on the basis of each general and specific objection, again consistent with Gryphon's obligations under the Rules.

With respect to Sphere's interrogatories, Gryphon similarly asserts both general *and* specific objections and provides substantive responses consistent with those objections. As such, Gryphon's use of general objections and its incorporation of those objections into its responses to specific requests for production or interrogatories is not improper. Gryphon declines Sphere's request that it withdraw those objections.

## IV.    Improper Refusal to Search for Documents Potentially Covered by a Privilege

*In its RFP Responses, Gryphon objected to each RFP "to the extent it such seeks documents or information protected by the attorney-client privilege, work-product doctrine, or any other privilege or immunity afforded by law" and further states that it "is not searching for such documents and therefore is without sufficient knowledge or information to determine whether responsive documents are being withheld on the basis of this objection." E.g., Specific Objections to RFP No. 1.*

*Gryphon, however, may not decline to search for documents merely because they may be privileged, which it cannot possibly know until it reviews the document. Rather, Gryphon may withhold such documents, as reflected on its privilege log. Please confirm that Gryphon will withdraw these objections.*

**Response**:  Gryphon is not specifically undertaking a search for documents protected by the attorney-client privilege, work-product doctrine, or any other privilege or immunity afforded by law, as opposed to a general search for responsive documents.  To the extent Gryphon has agreed to search for documents in its RFP Responses, it will conduct a reasonable search for such documents, produce relevant, non-privileged documents (if any), and separately identify any documents withheld from production on the basis of any privilege in a privilege log in accordance with Federal Rule of Civil Procedure 26(b).

## V.    Improper Vagueness Objections

*Throughout, Gryphon has interposed improper vagueness objections. At the outset, even if terms were ambiguous, it was incumbent on Gryphon to provide reasonable constructions and produce documents accordingly, which it did not do in a single instance. But the terms were not ambiguous. For example, Gryphon objected to the following as vague and ambiguous, which have ordinary meanings intelligible to any reasonable person:*

- *"negotiation" (see RFP Response No. 2)*

- *"efforts" (see RFP Response Nos. 4–5)*

- *"interactions" (see RFP Response No. 6)*

- *"calculation" (see RFP Response Nos. 9–10)*

- *"instruction" (see RFP Response No. 11)*

- *"revenues" (see RFP Response Nos. 20–21)*

- *"investigation" (see RFP Response No. 15)*

- *"business relationships" (see RFP Response No. 14)*

- *"policies" (see RFP Response No. 3)*

- *"procedures" (see RFP Response No. 3)*

- *"handling" (see RFP Response No. 3)*

*It is difficult to see how objections to terms like "negotiation" can be seen as made in good faith. Other terms have clear meanings in the context of the case:*

- *Gryphon objected to the term "services" as vague. See RFP Responses Nos. 1, 12–13. The term is not vague, as it is taken from the Master Services Agreement between the parties dated August 19, 2021 (the "MSA").*

- *Gryphon objected to the phrase "ensure the operation of" as vague. See RFP Responses Nos. 7–8. There is nothing, however, vague about asking for the production of documents related to Gryphon ensuring the operation of miners.*

- *Gryphon objected to the term "strategies" as vague. See RFP Responses Nos. 16–17, 24–25. Given that Gryphon is charged with managing many aspects of Sphere's business, however, there is nothing vague about that term.*

*Please confirm Gryphon will withdraw its vagueness objections; to the extent it intends to maintain them, it must provide reasonable constructions that Sphere can evaluate.*

**Response**:  We disagree that any of Gryphon's objections based on vagueness or ambiguity are "improper" or that Gryphon is under any obligation to supply a definition or construction to the vague and ambiguous terms used by Sphere in its own discovery requests.  The terms identified above, even within the broader context of the request or even the case itself, have more than one singular, "ordinary meaning[ ] intelligible to any reasonable person."  Rather, each of the terms is susceptible to more than one reasonable interpretation, each of which may significantly alter the scope of documents requested.  Nevertheless, in an effort to constructively move forward, Gryphon is willing to meet and confer with Sphere at a mutually convenient time to discuss Sphere's understanding of the terms Gryphon has identified as vague and ambiguous.

## VI.    Improper Refusal to Produce Documents on the Ground that They Contain Confidential Information

*Gryphon objected to numerous RFPs on the basis that each "seeks the production of documents that comprise or reveal trade secrets or confidential proprietary and business information of Gryphon, where any purported marginal benefits of production of the requested documents are outweighed by the burden associated with producing such highly sensitive materials." See, e.g., RFP Responses Nos. 5, 13, 21; see also General Objection No. 8 of the Interrogatory Responses. These are not proper objections because there is a Protective Order negotiated by the parties and so-ordered by the Court in place, which provides adequate protections to Gryphon. Please confirm that Gryphon will withdraw these objections.*

**Response**:  We disagree that the identified objections are "not proper."  Notwithstanding the Protective Order, some documents may be so sensitive and bear such little relevance to the case that any purported benefit of production is outweighed by the burden of producing such material, even if dissemination of the material would be limited by the Protective Order in this case.  Gryphon will not withdraw these objections.  To the extent Sphere believes this is improper, Gryphon is willing to meet and confer on the topic and consider, among other things, seeking a revised Protective Order with Attorneys' Eyes Only protections, if necessary.

## VII.    Improper Refusal to Search All Relevant Repositories

*In General Objection No. 5 to the RFP and Interrogatory Responses, Gryphon stated that it will not search for documents or provide information that "is not reasonably accessible because of undue burden, undue cost, and/or technological complication, and/or that is not reasonably specified by the Request." While Sphere is willing to accept that certain repositories may not be reasonably accessible, Gryphon must specify such repositories. Given that this lawsuit covers recent events, it would surprise Sphere if any repositories were not reasonably accessible.*

**Response**:  Gryphon will inform Sphere of any known repository of electronically stored information or data that may contain documents Gryphon has agreed to search for and produce and which Gryphon believes to be not reasonably accessible because of undue burden, undue cost, and/or technological complication.

## VIII.    Improper Effort to Limit the Scope of Documents Responsive to RFP No. 2, Which Seeks Discovery Related to the MSA

*RFP No. 2 seeks the production of documents and communications "related to the MSA." In response, Gryphon proposes to limit its search to documents and communications "relating to*

*the negotiation and execution of the" MSA. Gryphon, however, makes no effort to explain why the limited search is proper; indeed, the MSA is critical to the case. Gryphon must search for discovery responsive to RFP No. 2 as written.*

**Response**:  As written, Request No. 2 is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case to the extent it purports to seek the production of "all" documents and communications even tangentially "related to" the Master Services Agreement (the "MSA"), potentially encompassing every single document or communication ever generated that relates in any way to, *inter alia*, Sphere, the MSA, the parties' commercial relationship, and/or services provided under the MSA, regardless of whether such documents or communications are relevant to any claim or defense actually asserted in this case.  Indeed, Gryphon specifically objected to Request No. 2 on the ground that it is not tailored to seek the production of documents or information relevant to any specific claim or defense in the case.  Gryphon is not searching for documents responsive to Request No. 2 as written, but will agree to meet and confer with Sphere for the purpose of coming to a mutually agreeable understanding as to the scope of Request No. 2.

## IX.   Improper Effort to Limit the Scope of Documents Response [sic] to RFP No. 3, Which Seeks Discovery Into Gryphon's Policies and Procedures

*RFP No. 3 seeks the production of documents and communications "related Your [sic] internal policies and procedures." In response, Gryphon proposes to limit its search "documents and/or communications sufficient to show its internal policies and procedures governing the maintenance, control and transfer of digital assets." Gryphon, however, makes no effort to explain why the limited search is proper. Communications related to Gryphon's interpretation of its policies and procedures and any updates thereto are relevant. Similarly, policies and procedures related to, for example, Gryphon's accounting, cybersecurity, and protective measures are plainly relevant. Gryphon must search for discovery responsive to RFP No. 3 as written.*

**Response**:  As written, Request No. 3 is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case to the extent it purports to seek the production of "all Documents and Communications related to [Gryphon's] internal policies and procedures," regardless of whether those policies and procedures are relevant to the claims and defenses actually asserted in this case.  Indeed, Gryphon specifically objected to Request No. 3 on the ground that it is not tailored to seek the production of documents or information relevant to any specific claim or defense in the case.  Even in your own letter you implicitly acknowledge that only certain policies and procedures may be relevant by specifically referencing "policies and procedures related to . . . Gryphon's accounting, cybersecurity, and protective measures . . . ."  Sphere has made no effort to explain how or why

each and every policy and procedure—let alone "all Documents and Communications related to" each and every policy and procedure—is relevant. Gryphon is not searching for documents responsive to Request No. 3 as written, but, again, will agree to meet and confer with Sphere at a mutually convenient time for the purpose of coming to a mutually agreeable understanding as to the scope of Request No. 3.

## X.     Improper Effort to Limit the Scope of Documents Response [sic] to RFP Nos. 9-10, Which Seek Discovery into Gryphon's Failure to Make Proper Payments to Sphere Due Under the MSA

*RFP No. 9 seeks the production of documents and communications related to the "calculation of any payment or consideration due to Sphere under the MSA." In response, Gryphon proposes to limit its search to documents "sufficient to show how Gryphon determines the amount of any payment or consideration paid to Sphere." RFP No. 10 seeks parallel discovery into Gryphon's calculations of consideration due to itself under the MSA and Gryphon seeks to limit its search in the same way.*

*Gryphon, however, makes no particularized effort to explain why the limited search is proper. The search cannot be properly limited to a mere showing of the method by which Gryphon calculates payments due Sphere or itself. Rather, Gryphon must produce any documents and communications related to all calculations of payments owed Sphere, a central issue in this case given the allegations that Gryphon did not properly make payments to Sphere. Gryphon must search for discovery responsive to RFP No. 9 as written.*

**Response**: Gryphon disputes the relevance and purported benefit (if any) of the production of each and every document and communication "related to the calculation of any payment or consideration due to" Gryphon or Sphere under the MSA. Moreover, Gryphon has requested leave to move to dismiss Sphere's claims to the extent they are based on allegations that Gryphon "did not properly make payments to Sphere." In the event that leave is granted and Gryphon's motion is granted, documents and communications relating to payments, or the calculation of payments, to Sphere or Gryphon will be completely irrelevant. As such, Gryphon is not searching for documents responsive to Request Nos. 9-10 as written, but will agree to meet and confer with Sphere at a mutually convenient time in the hopes of coming to a mutually agreeable understanding as to the scope of Request Nos. 9-10 given the current procedural posture of the case.

## XI.    Improper Objection to RFP No. 19 Seeking Documents Related to How Gryphon Treats Its Own Digital Asset Repositories as Compared to How It Treated Sphere's

*In RFP No. 19, Sphere requested documents and communications "related to any wallets or other similar repositories maintained for Gryphon's benefit." Without asserting any*

*particularized objection, Gryphon has flatly refused to produce discovery responsive to this RFP. This is improper. Among other reasons, at issue in the litigation is Gryphon's treatment of Sphere's wallet—i.e., the repository for Sphere's digital assets. It is fair to assess how Gryphon treats its own digital assets and whether it applied the different standards to Sphere's.*

**Response**:  The documents and communications sought under Request No. 19 are wholly irrelevant to any claim or defense in this case.  Any services or obligations owed by Gryphon to Sphere, including the management of any digital wallet or similar repository of digital assets maintained by Gryphon for Sphere's benefit, are governed entirely by an express, written agreement between the parties, *i.e.*, the MSA.  Documents and communications related to wallets or repositories of digital assets maintained for the benefit of Gryphon have absolutely no bearing or relevance whatsoever with respect to any claim or defense in this case, including Sphere's purported claims concerning the "treatment of Sphere's wallet."  Gryphon is not searching for and will not produce such documents and communications.  To the extent you disagree, Gryphon is willing to discuss these items with you at a mutually convenient time during which Gryphon expects Sphere would specifically articulate why, among other things, Gryphon's individual wallets—separate and apart from any wallets used to perform Gryphon's duties under the MSA—are relevant based on the claims and defenses in this case.

## XII.   Improper Objection to RFP No. 21 Seeking Documents Related to the Revenues Gryphon Generated

*In RFP No. 21, Sphere requested documents and communications "related to any digital assets or other revenues generated for Gryphon's benefit." Without asserting any particularized objection, Gryphon has flatly refused to produce discovery responsive to this RFP. This is improper. Among other reasons, Sphere is entitled to explore how Gryphon treated its own business and whether it applied a different standard when fulfilling its obligations under the MSA.*

**Response**:  The documents and communications sought under Request No. 21 are wholly irrelevant to any claim or defense in this case.  Any services or obligations owed by Gryphon to Sphere are governed entirely by an express, written agreement between the parties, *i.e.*, the MSA.  Documents and communications related to "any digital assets or other revenues generated for Gryphon's benefit" have absolutely no bearing or relevance whatsoever with respect to any claim or defense in this case.  Gryphon is not searching for and will not produce such documents and communications.  To the extent you disagree, Gryphon is willing to discuss these items with you at a mutually convenient time during which Gryphon expects Sphere would specifically articulate why, among other things, Gryphon's individual digital assets—separate and apart from any digital assets connected with the MSA—are relevant based on the claims and defenses in this case.

Please advise as to the earliest date and time at which you are available to meet and confer concerning the above.

Sincerely,

*/s/ Brian D. Koosed*

Brian D. Koosed

cc:  Andrew M. Hinkes
     Desirée F. Moore
     Matthew A. Alvis
     Tibor L. Nagy
     Maxine Peskens

11

Exhibit A-3

| | |
|---|---|
| **From:** | Dan Tolhurst[dan@gryphonmining.com] |
| **Sent:** | Thur 8/5/2021 12:47:38 PM (UTC) |
| **To:** | Peter Tassiopoulos[Peter.Tassiopoulos@sphere3d.com] |
| **Cc:** | Rob Chang[rob@gryphonmining.com]; Eric Lazer[eric@lazercapital.com]; Greg Lipschitz[greg@lazercapital.com]; Patricia Trompeter[patricia@7mbholdings.com] |
| **Subject:** | MSA & Merger Amendment |
| **Attachment:** | Gryphon  Sphere 3D - MSA Binding Term Sheet - August 4, 2021 Blackline.docx |
| **Attachment:** | Amendment No 1 to Agreement and Plan of Merger - Gryphon - Sphere - August 4, 2021 Blackline.docx |

Hi Pete,
Please find attached the Merger Amendment and Revised MSA.

Best,
Dan

Dan Tolhurst
Co-Founder/President
+44(74)6214-1860
dan@gryphonmining.com

Exhibit A-4

| **From:** | Dan Tolhurst[dan@gryphonmining.com] |
| **Sent:** | Thur 9/23/2021 9:23:38 PM (UTC) |
| **To:** | Peter Tassiopoulos[Peter.Tassiopoulos@sphere3d.com] |
| **Cc:** | Rob Chang[rob@gryphonmining.com] |
| **Subject:** | Draft Core Agreement and executed MSA |
| **Attachment:** | Gryphon_-_MSA_and_Order_1_Gryphon_Redline_FINAL.docx.pdf |
| **Attachment:** | Gryphon Mining _ Core Scientific - Order 2 GDM Comments.docx |

Pete,

As discussed, please find attached the draft Core agreement and executed MSA. They've indicated that they have accepted all of our comments, but have not sent their turn back yet.

Guidance from our counsel is that the best way to proceed is a sublease agreement between Sphere and Gryphon. They will make themselves available to collaborate with Ali in structuring the sublease.

Please let me know if you have any questions.

Best,
Dan

Dan Tolhurst
Co-Founder/President
+44(74)6214-1860
dan@gryphonmining.com



Exhibit A-5

**Short Message Report**

| | |
|---|---|
| Conversations: 1 | Participants: 4 |
| Total Messages: 11 | Date Range: 8/24/2021 |

**Outline of Conversations**

 **Pete-Dan-Rob** • 11 messages on 8/24/2021 • Dan Tolhurst <447462141860@s.whatsapp.net> • Peter <14169391937@s.whatsapp.net> • Rob Chang <14165005675@s.whatsapp.net>

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬  **Pete-Dan-Rob**

\#    **Rob Chang <14165005675@s.whatsapp.net>**                                      8/24/2021, 4:13 PM
As an FYI to everyone looking.  If we are receiving 1,000 machines per month, the power needs are 3 MW per month

\#    **Peter <14169391937@s.whatsapp.net>**                                          8/24/2021, 4:14 PM
Ok

\#    **Rob Chang <14165005675@s.whatsapp.net>**                                      8/24/2021, 7:03 PM
Pete.  Heads up.  We are having good traction with Core Scientific to gives us a good amount of space beginning Q1.  Will keep you informed.

\#    **Dan Tolhurst <447462141860@s.whatsapp.net>**                                  8/24/2021, 7:04 PM
they say they can take both the 10K units and the 60K units, all zero carbon w/o recs in 2022

\#    **Rob Chang <14165005675@s.whatsapp.net>**                                      8/24/2021, 7:04 PM
And maybe the 220,000

\#    **Peter <14169391937@s.whatsapp.net>**                                          8/24/2021, 7:13 PM
That's incredible. If I can get a commit, we can trigger the larger equipment financing at 9%

\#    **Rob Chang <14165005675@s.whatsapp.net>**                                      8/24/2021, 7:13 PM
That's the plan.

\#    **Dan Tolhurst <447462141860@s.whatsapp.net>**                                  8/24/2021, 7:13 PM
we'll likely need to make a sizeable deposit. will send through details as soon as we receive them

\#    **Peter <14169391937@s.whatsapp.net>**                                          8/24/2021, 7:14 PM
That's easy to raise I would think as it puts the final piece to the puzzle.

\#    **Dan Tolhurst <447462141860@s.whatsapp.net>**                                  8/24/2021, 7:15 PM
agreed. just flagging it ahead of time for visibility

\#    **Peter <14169391937@s.whatsapp.net>**                                          8/24/2021, 7:15 PM
Thank you. Very exciting.

Exhibit A-6

**Short Message Report**

| Conversations: 1 | Participants: 2 |
|---|---|
| Total Messages: 6 | Date Range: 6/17/2022 |

**Outline of Conversations**

 **WhatsApp Conversation 00001 - 2022/06/17** • 6 messages on 6/17/2022 • Alex Tierney • Dan Tolherst

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬 **WhatsApp Conversation 00001 - 2022/06/17**

**DT** **Dan Tolherst**                                                6/17/2022, 6:40 AM
are you guys still looking for a home for the 2,500 units you have that were waiting to ship?

**AT** **Alex Tierney**                                                6/17/2022, 9:34 AM
not really looking, still trying to paper something with Core.

**DT** **Dan Tolherst**                                                6/17/2022, 9:59 AM
How's that coming along?

**AT** **Alex Tierney**                                                6/17/2022, 10:00 AM
Patti has been handling that, but sounds optimistic.

**AT** **Alex Tierney**                                                6/17/2022, 10:00 AM
although getting anything done in this market is tough

**DT** **Dan Tolherst**                                                6/17/2022, 10:01 AM
We're rooting for you guys.  As always, let us know if we can be of any help.

# Exhibit A-7

**From:**  Dan Tolhurst[dan@gryphonmining.com]

**Sent:**  Wed 12/15/2021 2:44:19 PM (UTC)

**To:**  Patricia Trompeter[patricia@7mbholdings.com]

**Cc:**  Kurt Kalbfleisch[Kurt.Kalbfleisch@sphere3d.com]; Peter Tassiopoulos[Peter.Tassiopoulos@sphere3d.com]; Rob Chang[rob@gryphonmining.com]; Rosenfeld, Margaret N.[Margaret.Rosenfeld@klgates.com]; Hellige, Eric M.[EHellige@pryorcashman.com]; Mendelsohn, Evan[EMendelsohn@pryorcashman.com]; Panjwani, M. Ali[Ali.Panjwani@pryorcashman.com]

**Subject:**  Re: URGENT - Dec shipment

Hi Peter / Patti,

Circling back on this, available to discuss at your convenience. Also, please feel free to connect Chris and I to the Bitmain point of contact so that we can ensure a smooth process on this and future shipments.

Best,
Dan

Dan Tolhurst
Co-Founder/President
+44(74)6214-1860
dan@gryphonmining.com



On Wed, Dec 15, 2021 at 12:35 AM Dan Tolhurst <dan@gryphonmining.com> wrote:

Hi Patti,
I defer to Pete's email with regards to Core and picking up the conversation in the morning as it is past midnight here in the UK.

The capacity is absolutely there under the contract. However, I must advise that splitting the shipment to multiple destinations will likely materially increase the shipping cost, as this was the case when we did our pilot program with Core under Order 1. Ultimately, it is Sphere's call. My advice, which you are absolutely free to disregard, would be to ask for quotes for both a single shipment to Coinmint and a split shipment to Core (using Marble, NC 28905 as the destination for cost purposes) and Coinmint. The split shipment would be 300 units to Core / 200 units to Coinmint.

Should you choose to proceed with the split shipment, we will confirm with Core which of their facilities it should be shipped to.

With regards to the November shipment, please advise as to the tracking info so that we can appropriately advise Coinmint as we have yet to receive any tracking info.

Looking forward to discussing it in the morning.

Best,
Dan

Dan Tolhurst
Co-Founder/President
+44(74)6214-1860
dan@gryphonmining.com



On Wed, Dec 15, 2021 at 12:10 AM Patricia Trompeter <patricia@7mbholdings.com> wrote:

Dan –

You are correct we communicated 20 days ago - that was the November shipment, I am now trying to confirm the December shipment.  The November shipment is in transit.

I am asking about December.  Can you please advise our instructions to Bitmain on the remaining machines?

My concern is that if we do not communicate in the next couple days, we will experience a delay in shipping after Christmas.

Thanks!


Patricia


## Patricia Trompeter

Chief Operating Officer


(203) 524-6524

(203) 998-1149
309 Lukes Wood Rd.
New Canaan, CT 06840




**From:** Dan Tolhurst <[dan@gryphonmining.com](mailto:dan@gryphonmining.com)>
**Date:** Tuesday, December 14, 2021 at 6:37 PM
**To:** Patricia Trompeter <[patricia@7mbholdings.com](mailto:patricia@7mbholdings.com)>
**Cc:** Kurt Kalbfleisch <[Kurt.Kalbfleisch@sphere3d.com](mailto:Kurt.Kalbfleisch@sphere3d.com)>, Peter Tassiopoulos
<[Peter.Tassiopoulos@sphere3d.com](mailto:Peter.Tassiopoulos@sphere3d.com)>, Rob Chang <[rob@gryphonmining.com](mailto:rob@gryphonmining.com)>, Rosenfeld,
Margaret N. <[Margaret.Rosenfeld@klgates.com](mailto:Margaret.Rosenfeld@klgates.com)>
**Subject:** Re: URGENT - Dec shipment

Hi Patricia,


I am confused by this note as there have been no unreturned emails or texts regarding the
deployment of the December shipment. Please see the screenshots, below which include our
most recent text exchanges, 22 and 20 days ago, respectively, where I have actively sought
the shipping details to facilitate the arrival and installation in any way possible and re-shared
the shipping address.

23/11/2021

You may want to remind your boy Adam that I am head of the Audit committee and have pre meetings with the BOD.    We are working as hard and fast as we can but to be honest Dan - you guys have been late with lot of the financials.   We have been drafting, buying machines (which Rob hilariously took credit for.  How does he know Allen? Remind me), raising debt, getting F3s done in less than 24 hrs
 and running operations.   you guys are sitting back and saying "we need money to pay for our machines".

With all due respect - every call has turned into you guys accusing us of not doing our jobs.

Totally get you guys dislike me. I don't care but I wont have you guys picking on my finance team.

again - I am not trying to be an asshole here but we ar… Read more

3:3

I think it's best if v

yeah.  agree.  I was participating in the calls so I could be up to speed and keep the BOD up to speed to condense the timeframe.  At this point - I think it's best if I drop off and let the process go it's own way

3:3

resp

Do you know who is shipping your miners? Ju
delivery coming into JFK next week. Don't beli

Also, pls s



We have been unambiguous that the machines should be sent to Coinmint, as the Core deployment does not provide for sufficient capacity for 500 machines at this time. While I understand your concerns with the shipment being delayed, it is in no way, shape or form due to a lack of engagement / response on our end. I most recently asked for the shipping details in a conversation with Peter on Friday, but none have been forthcoming.

As always, we are more than happy to facilitate the shipping , delivery, and installation process in any way, shape or form possible, but have neither been provided with tracking information, nor with the contact information of the appropriate contact person at BitFuFu/Bitmain to do so.

Kind Regards,
Dan

On Tue, 14 Dec 2021 at 11:18 pm, Patricia Trompeter <patricia@7mbholdings.com> wrote:

Dan,

I have not heard from back from you.  Bitmain is waiting for our direction to ship the December machines.  We would like to know if we should ship the entire 500 machines to Core or if they still do not have space for the total order, what number should send?   I have emailed and texted you.  My concern is that the delay in response will delay our shipment until after Christmas.

Can you please provide the following:

1. How many machines should be shipped to Core?
2. What is the address of Core?
3. If #1 above is less than the total order to be shipped, where should the remaining miners go?

Can you please respond to this email?  I need to get back to Bitmain.  I am concerned about the timing here and potentially losing our shipment window creating a delay in getting the machines operational.

Thank you –

Patti

## Patricia Trompeter

Chief Operating Officer

(203) 524-6524

(203) 998-1149
309 Lukes Wood Rd.
New Canaan, CT 06840



Exhibit A-8

| | |
|---|---|
| **From:** | Kurt Kalbfleisch[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8664325D6B834E5ABD2B6E504 17D0A23-KURT KALBFL] |
| **Sent:** | Fri 8/26/2022 4:59:00 PM (UTC) |
| **To:** | Rob Chang[rob@gryphonmining.com]; Patricia Trompeter[Patricia.Trompeter@sphere3d.com] |
| **Cc:** | Dan Tolhurst[dan@gryphonmining.com]; brian@gryphonmining.com[brian@gryphonmining.com] |
| **Subject:** | RE: BTC Transfer Request |

Rob,

Thanks, I have confirmed receipt.

Kurt

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

**From:** Rob Chang <rob@gryphonmining.com>
**Sent:** Friday, August 26, 2022 9:08 AM
**To:** Patricia Trompeter <Patricia.Trompeter@sphere3d.com>
**Cc:** Dan Tolhurst <dan@gryphonmining.com>; Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>; brian@gryphonmining.com
**Subject:** Re: BTC Transfer Request

Kurt.  Test transfer of 0.0001 BTC was just confirmed on the blockchain. Please confirm receipt.  If all is in order, I'll send the remainder of your request.

On Wed, 24 Aug 2022 at 20:01, Patricia Trompeter <Patricia.Trompeter@sphere3d.com> wrote: OK.  I understand.  Then go ahead and do the test. It shouldn't take a day.   At least not in my experience but we can get Mike on a conf call if you want.    Please send us the screen print tomorrow morning when you send it.

Rob – are you attending Goldman's Crypto conference and or Salt this month?  If so – I will see you there.  You should choose the panel I am on.  It would be good.

Thanks

P

Thanks.

*Patricia Trompeter*

Chief Executive Officer
203.524-6524



---

**From:** Rob Chang <<u>rob@gryphonmining.com</u>>
**Date:** Wednesday, August 24, 2022 at 7:44 PM
**To:** Patricia Trompeter <<u>Patricia.Trompeter@sphere3d.com</u>>
**Cc:** Dan Tolhurst <<u>dan@gryphonmining.com</u>>, Kurt Kalbfleisch <<u>Kurt.Kalbfleisch@sphere3d.com</u>>, <u>brian@gryphonmining.com</u> <<u>brian@gryphonmining.com</u>>
**Subject:** Re: BTC Transfer Request

To be clear. The test is a standard practice whenever new addresses are used to transfer btc. Since there are no ways to recover btc that is sent to the wrong address, it is standard protocol to always do a test transaction to make absolute sure there are no errors.

Rob Chang
CEO & Director
(416) 500-5675
Rob@GryphonMining.com
GryphonDigitalMining.com
Twitter: @GryphonMining

> On Aug 24, 2022, at 6:42 PM, Patricia Trompeter <<u>Patricia.Trompeter@sphere3d.com</u>> wrote:
>
> Go ahead and add the address.  It's been tested so no need to test.
>
> I authorize you to send it
>
> ***Patricia Trompeter***
> Chief Executive Officer
> 203.524-6524



**From:** Rob Chang <rob@gryphonmining.com>
**Date:** Wednesday, August 24, 2022 at 1:39 PM
**To:** Dan Tolhurst <dan@gryphonmining.com>
**Cc:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>, Patricia Trompeter <Patricia.Trompeter@sphere3d.com>, brian@gryphonmining.com <brian@gryphonmining.com>
**Subject:** Re: BTC Transfer Request

Request received.  To execute this,  I will first need to add the destination address, which will require a verification process with Bitgo that may take a day.  Once that is complete, I'll send a small amount for us to verify that it has been set up correctly. Once that is done we can transfer the remaining amount.  I'll start the process now.

On Wed, 24 Aug 2022 at 13:31, Dan Tolhurst <dan@gryphonmining.com> wrote:
 Thanks Kurt. Please include Rob, Brian, and I on such requests.

 @Rob will handle the transfer from our end.


 On Wed, 24 Aug 2022 at 8:29 pm, Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com> wrote:
  Dan/Brian,

  I was not sure which of you should receive this request, so I am sending it to both of you.  We would like you to transfer **70 BTC** from our "Sphere Mined Coins" wallet to the following address: **3LEzBSVLArXGAg3vpWSAJ3VQ9KCu9HCVAW**

  Let me know for future requests who should receive.

  Thanks,
  Kurt

  **Kurt Kalbfleisch**
  **Senior Vice President and CFO**
  4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
   m 858.775.6801
  kurt.kalbfleisch@sphere3d.com


  --
  Dan Tolhurst
  Co-Founder/President

+44(74)6214-1860
dan@gryphonmining.com

--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining

--
Rob Chang
CEO & Director
(416) 500-5675
Rob@gryphonmining.com
GryphonDigitalMining.com
Twitter: @GryphonMining

Exhibit A-9

| | |
|---|---|
| **From:** | Kurt Kalbfleisch[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8664325D6B834E5ABD2B6E504 17D0A23-KURT KALBFL] |
| **Sent:** | Wed 8/31/2022 5:03:41 PM (UTC) |
| **To:** | Patricia Trompeter[Patricia.Trompeter@sphere3d.com] |
| **Subject:** | FW: Core Profit Share May 2022 |
| **Attachment:** | 20220620 - Invoice and Profit Share Calcuations Core - May 2022.xlsx |

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

---

**From:** Dan Tolhurst <dan@gryphonmining.com>
**Sent:** Tuesday, June 28, 2022 5:00 AM
**To:** Kurt Kalbfleisch <Kurt.Kalbfleisch@sphere3d.com>
**Cc:** Brian Chase <brian@gryphonmining.com>
**Subject:** Core Profit Share May 2022

Hi Kurt,

Please find attached the profit share calculations for Sphere's operations at Core Scientific for May of 2022. Total profit share owed to Gryphon is **$30,137.**

Best,
Dan
Dan Tolhurst
Co-Founder/President
+44(74)6214-1860
dan@gryphonmining.com

Exhibit A-10

| | |
|---|---|
| **From:** | Dan Tolhurst[dan@gryphonmining.com] |
| **Sent:** | Thur 12/30/2021 8:15:48 PM (UTC) |
| **To:** | Peter Tassiopoulos[Peter.Tassiopoulos@sphere3d.com]; Kurt Kalbfleisch[Kurt.Kalbfleisch@sphere3d.com] |
| **Cc:** | Chris Ensey[chris@gryphonmining.com]; Rob Chang[rob@gryphonmining.com] |
| **Subject:** | Fwd: FW: Dimerco |
| **Attachment:** | 00120150_0.pdf |

Hi Kurt and Peter,
Please see attached the customs invoice for Sphere's miners. Please advise once payment has been made as the miners will not be released by the customs broker until it is paid.

I should also note that the stated value of the equipment on the invoice seems quite low

Best,
Dan


Dan Tolhurst
Co-Founder/President
+44(74)6214-1860
dan@gryphonmining.com




---------- Forwarded message ---------
From: **Chris Ensey** <chris@gryphonmining.com>
Date: Thu, Dec 30, 2021 at 2:58 PM
Subject: Fwd: FW: Dimerco
To: Dan Tolhurst <dan@gryphonmining.com>, Rob Chang <rob@gryphonmining.com>


Guys - here are the charges for Sphere.


---------- Forwarded message ---------
From: **Tony Chen** <tchen@accb.us>
Date: Thu, Dec 30, 2021 at 3:57 PM
Subject: Re: FW: Dimerco
To: Chris Ensey <chris@gryphonmining.com>

this is good, please see below summary of charges
customs clearance - $125
Customs import tax and duty - $6,436.79
title transfer processing with Customs - $30
wire transfer fee - $15
total: $6606.79

please ACH or wire transfer to the below account

Wire/ACH Info
BANK: CAPITAL ONE, N.A.
BANK ADDRESS: 369 MERRICK AVE, EAST MEADOW, NY11554
RECIPIENT: ALL CLEARED CUSTOMS BROKERAGE
ACCOUNT # : 7528669489
ROUTING # : 021407912
ADDRESS: 24 MERRY LN., WESTBURY, NY 11590


*This is a courtesy reminder that shipments by sea must have ISF filed no later than 48 hours prior to vessel loading at the origin. U.S customs has been issuing liquidated damages (penalties up to $10000.00 per shipment) against ISF importer for ISF non-compliance(e.g. late or inaccurate ISF).*


Best Regards

Tony Chen
Licensed Customs Broker
Import Manager
All Cleared Customs Brokerage
email: tchen@accb.us
Office: 347-891-6219
fax: 646-680-0619


On Thu, Dec 30, 2021 at 2:18 PM Chris Ensey <chris@gryphonmining.com> wrote:

See attached.

---------- Forwarded message ---------
From: **Norbert Guiol** <n@coinmint.one>
Date: Thu, Dec 30, 2021 at 3:16 PM
Subject: RE: FW: Dimerco
To: Chris Ensey <chris@gryphonmining.com>
CC: Dan Tolhurst <dan@gryphonmining.com>, Rob Chang <rob@gryphonmining.com>, Suppplies NCCS <supplies@nccs.one>


Right. Please see attached.

**From:** Chris Ensey <chris@gryphonmining.com>
**Sent:** Thursday, December 30, 2021 14:11
**To:** Norbert Guiol <n@coinmint.one>
**Cc:** Dan Tolhurst <dan@gryphonmining.com>; Rob Chang <rob@gryphonmining.com>;
Suppplies NCCS <supplies@nccs.one>
**Subject:** Re: FW: Dimerco

Looking at this we need it signed.

On Thu, Dec 30, 2021 at 3:10 PM Norbert Guiol <n@coinmint.one> wrote:

Please see attached in case needed.

**From:** Chris Ensey <chris@gryphonmining.com>
**Sent:** Thursday, December 30, 2021 12:26
**To:** Dan Tolhurst <dan@gryphonmining.com>; Rob Chang <rob@gryphonmining.com>;
Norbert Guiol <n@coinmint.one>
**Subject:** Re: Dimerco

Norbert here is a signed copy from our side.  Please expedite if you can...

On Thu, Dec 30, 2021 at 1:19 PM Chris Ensey <chris@gryphonmining.com> wrote:

Guys we this signed ASAP so we can get this cleared through customs.  We should make
sure Bitmain names this stuff correctly in the future.

---------- Forwarded message ---------
From: **Tony Chen** <tchen@accb.us>
Date: Thu, Dec 30, 2021 at 1:17 PM
Subject: Re: Dimerco
To: Chris Ensey <chris@gryphonmining.com>

please have the attached letter completed by your company and  NORTH COUNTRY DATA CENTER

*This is a courtesy reminder that shipments by sea must have ISF filed no later than 48 hours prior to vessel loading at the origin. U.S customs has been issuing liquidated damages (penalties up to $10000.00 per shipment) against ISF importer for ISF non-compliance(e.g. late or inaccurate ISF).*

Best Regards

Tony Chen

Licensed Customs Broker

Import Manager

All Cleared Customs Brokerage

email: tchen@accb.us

Office: 347-891-6219

fax: 646-680-0619

On Thu, Dec 30, 2021 at 12:01 PM Chris Ensey <chris@gryphonmining.com> wrote:

 Yes that is our datacenter that is run by a company called CoinMint

On Thu, Dec 30, 2021 at 1:00 PM Tony Chen <tchen@accb.us> wrote:

 Hi Chris

the documents we received show NORTH COUNTRY DATA CENTER

*This is a courtesy reminder that shipments by sea must have ISF filed no later than 48 hours prior to vessel loading at the origin. U.S customs has been issuing liquidated damages (penalties up to $10000.00 per shipment) against ISF importer for ISF non-compliance(e.g. late or inaccurate ISF).*

Best Regards

Tony Chen

Licensed Customs Broker

Import Manager

All Cleared Customs Brokerage

email: tchen@accb.us

Office: 347-891-6219

fax: 646-680-0619

On Thu, Dec 30, 2021 at 9:13 AM Tony Chen <tchen@accb.us> wrote:

 Good morning Chris

 We have not heard from them regarding your shipment

 Can you send me airway bill so I can check

 On Thursday, December 30, 2021, Chris Ensey <chris@gryphonmining.com> wrote:

 Hey Tony,

 Any chance someone from Dimerco reached out to you?

 They are holding a shipment for us and they were provided your info.  I just heard they called our facility asking for our customs broker.  We provided your detail through the

manufacturer that is shipping our units but maybe it didn't get passed along.


Thanks,

Chris


--


*This is a courtesy reminder that shipments by sea must have ISF filed no later than 48 hours prior to vessel loading at the origin. U.S customs has been issuing liquidated damages (penalties up to $10000.00 per shipment) against ISF importer for ISF non-compliance(e.g. late or inaccurate ISF).*


Best Regards


Tony Chen

Licensed Customs Broker

Import Manager

All Cleared Customs Brokerage

email: tchen@accb.us

Office: 347-891-6219

fax: 646-680-0619

Exhibit A-11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                :

SPHERE 3D CORP.,                  :
                                :

              *Plaintiff and*     :
              *Counter-Defendant,* :

                                :

           v.                :     Case No. 1:23-cv-02954-PKC
                                :

                                :

GRYPHON DIGITAL MINING, INC.,  :

                                :

             *Defendant and*    :
             *Counter-Plaintiff*   :
------------------------------------------------------------x

## GRYPHON DIGITAL MINING, INC.'S RESPONSES AND OBJECTIONS TO SPHERE 3D CORP.'S FIRST AMENDED SET OF INTERROGATORIES

      Defendant and Counterclaim-Plaintiff Gryphon Digital Mining, Inc. ("Gryphon"), by and through its undersigned counsel, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Federal Rules") and the Local Rules of this Court (the "Local Rules"), hereby submits these responses and objections to the First Amended Set of Interrogatories ("the "Interrogatories" and each, an "Interrogatory") served by Plaintiff and Counterclaim-Defendant Sphere 3D Corp. ("Sphere") in connection with the above-captioned action (the "Action").

## GENERAL OBJECTIONS

      1.    Gryphon objects to each and every Instruction, Definition, and Interrogatory to the extent that they purport to impose obligations on Gryphon that exceed or vary from the requirements of, or call for Gryphon to do more than is required under, the Federal Rules, the Local Rules, and/or any other applicable rules, statutes, case law, or orders.

      2.    Gryphon objects to each and every Instruction, Definition, and Interrogatory insofar as they seek, or can be construed to seek, the production or disclosure of any information that is

1

protected from disclosure by the attorney-client privilege, the joint defense or common interest privileges, the work product doctrine or any other applicable privilege or immunity from disclosure.

3.      Gryphon objects to each and every Instruction, Definition, and Interrogatory to the extent they seek information that is publicly available, already within Sphere's knowledge, possession, custody, or control, otherwise equally accessible to Sphere, and/or already being obtained from other sources.

4.      Gryphon objects to each and every Instruction, Definition, and Interrogatory as overly broad and unduly burdensome to the extent they seek information that is not relevant to any claim or defense asserted in the Action, and/or not proportional to the needs of the Action.

5.      Gryphon objects to each and every Instruction, Definition, and Interrogatory that purports to require Gryphon to identify information or provide discovery with respect to "each," "every," "all," "any," or similar all-encompassing wording, when doing so would be unduly burdensome and not proportional to the needs of the Action.

6.      To the extent that Gryphon agrees to produce information in response to the Interrogatories, Gryphon will only produce information that are relevant to claims and defenses that are then-pending in this Action.

7.      Gryphon makes no admission of any nature herein, and no admission may be implied by, or inferred from, these Responses and Objections. In particular, and without limitation, Gryphon objects to each and every Interrogatory insofar as they assume facts or legal conclusions.

8.      Gryphon reserves the right to supplement, clarify, and revise these Responses and Objections to the extent additional information becomes available in accordance with the Federal Rules, the Local Rules, and/or any other applicable rules, statutes, case law, or orders.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.      Gryphon objects to Instruction No. 3 as overbroad, unduly burdensome, not proportionate to the needs of the Action, and not reasonably calculated to lead to the discovery of admissible evidence.  Gryphon further objects to this Instruction insofar as they seek, or can be construed to seek, the production or disclosure of any information that is protected from disclosure by the attorney-client privilege, the joint defense or common interest privileges, the work product doctrine or any other applicable privilege or immunity from disclosure.  Privileged information will not be produced.  Gryphon will only produce responsive, non-privileged information for its employees and officers. Gryphon further objects to the Instruction to the extent it purports to include information that is not readily accessible or otherwise seeks to impose obligations on Gryphon greater than, or inconsistent with, the Federal Rules, the Local Rules, and/or any other applicable rules, statutes, case law, or orders.

2.      Gryphon objects to Instruction No. 5 to the extent it purports to include information that is not readily accessible or otherwise seeks to impose obligations on Gryphon greater than, or inconsistent with, the Federal Rules, the Local Rules, and/or any other applicable rules, statutes, case law, or orders.  Gryphon objects to this Instruction insofar as they seek, or can be construed to seek, the production or disclosure of any information that is protected from disclosure by the attorney-client privilege, the joint defense or common interest privileges, the work product doctrine or any other applicable privilege or immunity from disclosure.  Privileged information will not be produced.

3.      Gryphon objects to the definition of "the Counterclaim" (No. 9(b)) as vague and ambiguous.  Gryphon will interpret the term to mean the Amended Answer and Fourth Amended Counterclaims filed by Gryphon on February 1, 2024 in the Action. ECF No. 65.

3

4.      Gryphon objects to the definition of "Gryphon" (No. 9(c)) as overbroad, unduly burdensome, not proportionate to the needs of the Action, and not reasonably calculated to lead to the discovery of admissible evidence.  Gryphon will interpret the term to mean Gryphon and its employees and officers.

5.      Gryphon objects to the definition of "Sphere" (No. 9(e)) as overbroad, unduly burdensome, not proportionate to the needs of the Action, and not reasonably calculated to lead to the discovery of admissible evidence.  Gryphon will interpret the term Sphere to mean Sphere and its employees and officers.

<p align="center">**SPECIFIC RESPONSES AND OBJECTIONS**</p>

**INTERROGATORY NO. 1**

Identify each Person (including, for the avoidance of doubt, third-parties) with knowledge of information relevant to the Complaint or Your Counterclaim and the topic(s) of such individual's knowledge.

**RESPONSE TO INTERROGATORY NO. 1**

Gryphon objects to Interrogatory No. 1 to the extent it purports to include third-parties because Gryphon does not know the knowledge that third-parties do or do not possess.   Subject to and without waiving the foregoing General Objections, Objections to the Instructions and Definitions, and specific objections, Gryphon identifies the following individuals with potential knowledge of the relevant to the Complaint and Gryphon's Amended Answer and Fourth Amended Counterclaims.

- **Rob Chang:** Mr. Chang has knowledge of topics, including but not limited to, the MSA, Gryphon's provision of services to Sphere under the MSA, Gryphon's

<div align="center">4</div>

relationship with Sphere, and the events described by Sphere in paragraphs 5, 7-13, and 48-62 of Sphere's Complaint.

- **Brian Chase:** Mr. Chase has knowledge of topics, including but not limited to, Gryphon's relationship with Sphere.

- **Adam Levin:** Mr. Levin has knowledge of topics, including, but not limited to, Gryphon's relationship with Sphere.

- **Eric Lazer:** Mr. Lazer has knowledge of topics, including, but not limited to, Gryphon's relationship with Sphere.

- **Dean Lazer:** Mr. Lazer has knowledge of topics, including, but not limited to, Gryphon's relationship with Sphere.

- **Dan Tolhurst:** Mr. Tolhurst has knowledge of topics, including, but not limited to, Gryphon's relationship with Sphere.

- **Patricia Trompeter:** Ms. Trompeter has knowledge of topics, including, but not limited to, the MSA, Sphere's hosting agreements entered by Sphere with third-party providers, Sphere's relationships with other hosting providers, and the events described by Sphere in paragraphs 5, 7-13, and 48-62 of Sphere's Complaint.

- **Kurt Kalbfleisch:** Mr. Kalbfleisch has knowledge of topics including, but not limited to, the MSA, Sphere's hosting agreements entered by Sphere with third-party providers, Sphere's relationships with other hosting providers, and the events described by Sphere in paragraphs 5, 7-13, and 48-62 of Sphere's Complaint.

- **Mark Valentine:** Mr. Valentine has knowledge of topics including, but not limited to, Gryphon's relationship with Sphere.

- **Jordan Spring:** Mr. Spring has knowledge of topics including, but not limited to, Sphere's hosting agreements, Gryphon's relationship with Sphere, and Gryphon's relationship with other hosting providers.

- **Peter Tassiopoulos:** Mr. Tassiopoulos has knowledge of topics including, but not limited to, Gryphon's relationship with Sphere, Sphere's hosting agreements, and Sphere's relationship with other hosting providers.

## INTERROGATORY NO. 2

Identify all relevant repositories of Documents and Communications, including without limitation custodians, electronic repositories (such as servers, desktops, laptops, mobile devices, local drives, and share drives) and the locations of hard copy Documents.

## RESPONSE TO INTERROGATORY NO. 2

Gryphon objects to Interrogatory No. 2 to the extent it purports to include third-parties because Gryphon does not have knowledge as to the electronic repositories that may or may not have been maintained by third-parties. Subject to and without waiving the foregoing General Objections, Objections to the Instructions and Definitions, and specific objections, Gryphon identifies the following repositories of Documents and Communications:

- Rob Chang
- Brian Chase
- Adam Levin
- Eric Lazer
- Dean Lazer
- Dan Tolhurst
- Patricia Trompeter
- Kurt Kalbfleisch
- Mark Valentine
- Jordan Spring
- Peter Tassiopoulos

Gryphon further identifies the following electronic depositories for Documents and

Communications:

- Google Web Client
- Microsoft Exchange
- Whatsapp
- Local hard drive

## INTERROGATORY NO. 3

State Your damages for each claim listed in Your Counterclaim.

## RESPONSE TO INTERROGATORY NO. 3

Gryphon will disclose the full extent of the damages it has suffered as a result of Sphere's repeated breaches of the MSA at the appropriate stage in the proceedings and in accordance with the Federal Rules, the Local Rules, and/or any other applicable rules, statutes, case law, or orders.

Dated: April 15, 2024

Respectfully submitted,

HOGAN LOVELLS US LLP

*/s/ Dennis H. Tracey, III*
Dennis H. Tracey, III
Elizabeth C. Carter
William C. Winter
390 Madison Avenue
New York, New York 10017
dennis.tracey@hoganlovells.com
elizabeth.carter@hoganlovells.com
william.winter@hoganlovells.com

*Attorneys for*
*Gryphon Digital Mining, Inc.*

Exhibit A-12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SPHERE 3D CORP.,

*Plaintiff,*

-against-

GRYPHON DIGITAL MINING, INC.,

*Defendant.*

No. 1:23-CV-02954

## STIPULATED CONFIDENTIALITY AGREEMENT

## AND [PROPOSED] PROTECTIVE ORDER

Plaintiff Sphere 3D Corp. ("Sphere" or "Plaintiff") and Defendant Gryphon Digital Mining, Inc. ("Gryphon" or "Defendant" and, collectively with Sphere, the "Parties" and each, a "Party"), by and through their undersigned counsel, hereby stipulate and agree, as follows:

1. This Stipulation is being entered into to facilitate the production, exchange and discovery of documents and information that the Parties agree merit confidential treatment (hereinafter the "Documents" or "Testimony").

2. Any Party or non-party may designate Documents produced, or Testimony given, in connection with this action as "confidential," either by notation on each page of the Document so designated, statement on the record of the deposition, or written advice to the respective undersigned counsel for the Parties hereto, or by any other reasonable means agreed to by the Parties.

3. As used herein:

(a) "Confidential Information" shall mean all Documents and Testimony, and all information contained therein, and other information designated as confidential, if such Documents or Testimony contain trade secrets, proprietary business information, private or personal information, competitively sensitive information or other information the disclosure of which would, in the good faith judgment of the Party or non-party designating the material as confidential, be detrimental to the conduct of that Party's or non-party's business or the business of any of that Party's or non-party's customers or clients.

(b) "Producing Party" shall mean the Parties to this action and any non-parties producing documents, communications, or other information in connection with depositions, document production, subpoenas or otherwise.

(c) "Receiving Party" shall mean the Parties to this action and/or any non-party receiving documents, communications, or other information in connection with depositions, document production, subpoenas or otherwise.

4. The Receiving Party may, at any time, notify the Producing Party that the Receiving Party does not concur in the designation of a document or other material as Confidential Information. If the Producing Party does not agree to declassify such document or material within seven (7) days of the written request, the Receiving Party may move before the Court for an order declassifying those documents or materials. If no such motion is filed, such documents or materials shall continue to be treated as Confidential Information. If such motion is filed, the documents or other materials shall be deemed Confidential Information unless and until the Court rules otherwise. Notwithstanding anything herein to

the contrary, the Producing Party bears the burden of establishing the propriety of its designation of documents or information as Confidential Information.

5. Except with the prior written consent of the Producing Party or by Order of the Court, Confidential Information shall not be furnished, shown or disclosed to any person or entity except to:

(a) personnel of the Parties actually engaged in assisting in the preparation of this action for trial or other proceeding herein and who have been advised of their obligations hereunder;

(b) counsel for the Parties to this action and their associated attorneys, paralegals and other professional and non-professional personnel (including support staff and outside copying services) who are directly assisting such counsel in the preparation of this action for trial or other proceeding herein, are under the supervision or control of such counsel, and who have been advised by such counsel of their obligations hereunder;

(c) expert witnesses or consultants retained by the Parties or their counsel to furnish technical or expert services in connection with this action or to give testimony with respect to the subject matter of this action at the trial of this action or other proceeding herein; provided, however, that such Confidential Information is furnished, shown or disclosed in accordance with paragraph 7 hereof;

(d) persons who appear on the face of Confidential Information as an author, addressee, recipient, copyee/cc, bcc, or persons that counsel for either Party believes in good faith to have received the Confidential Information in the ordinary course of business;

(e) the Court and court personnel;

(f) any designated mediator chosen by the Parties;

(g) an officer before whom a deposition is taken, including stenographic reporters and any necessary secretarial, clerical or other personnel of such officer;

(h) trial and deposition witnesses in accordance with the terms of this order; and

(i) any other person agreed to by the Producing Party.

6.  All documents and other materials produced or exchanged in this litigation shall be utilized by the Receiving Party and its counsel only for purposes of this litigation and for no other purpose.

7.  Before any disclosure of Confidential Information is made to an expert witness or consultant pursuant to paragraph 5(c) hereof, counsel for the Receiving Party making such disclosure shall provide to the expert witness or consultant a copy of this Stipulation and obtain the expert's or consultant's written agreement to comply with and be bound by its terms.  The agreement should be in the form of Exhibit A. Counsel for the Receiving Party obtaining the agreement shall supply a copy to counsel for the other Parties at the time designated for expert disclosure, except that any agreement signed by an expert or consultant who is not expected to be called as a witness at trial is not required to be supplied.

8.  All depositions shall presumptively be treated as Confidential Information and subject to this Stipulation during the deposition and for a period of fifteen (15) days after a transcript of said deposition is received by counsel for each of the Parties. At or before the end of such fifteen day period, the deposition shall be classified appropriately.

9.  Should the need arise for any Party or non-party to disclose Confidential Information during any hearing or trial before the Court, including through argument or the presentation

of evidence, such Party or non-party may do so only after taking such steps as the Court shall deem necessary to preserve the confidentiality of such Confidential Information.

10. A Party may designate as Confidential Information subject to this Stipulation any document, information, or deposition testimony produced or given by any non-party to this case, or any portion thereof. In the case of Documents produced by a non-party, designation shall be made by notifying all counsel in writing of those documents which are to be stamped and treated as such at any time up to fifteen (15) days after actual receipt of copies of those documents by counsel for the Party asserting the confidentiality. In the case of deposition Testimony, designation shall be made by notifying all counsel in writing of those portions which are to be stamped or otherwise treated as such at any time up to fifteen (15) days after the transcript is received by counsel for the Party (or, as appropriate, non-party) asserting the confidentiality. Prior to the expiration of such fifteen (15) day period (or until a designation is made by counsel, if such a designation is made in a shorter period of time), all such Documents and Testimony shall be treated as Confidential Information.

11.

    (a) A Party or non-party who seeks to file with the Court (i) any deposition transcripts, exhibits, answers to interrogatories, or other documents which have previously been designated as comprising or containing Confidential Information, or (ii) any pleading, brief or memorandum which reproduces, paraphrases or discloses Confidential Information shall file the document, pleading, brief, or memorandum in accordance with Rule 5 of Judge Castel's Individual Practices in Civil Cases.

    (b) In the event that the Party's or non-party's filing includes Confidential Information produced by a Producing Party that is a non-party, the filing Party shall so notify

that Producing Party within twenty four (24) hours after the redacted filing by providing the Producing Party with a copy of the redacted filing as well as a version of the filing with the relevant Producing Party's Confidential Information unredacted.

(c) If the Producing Party makes a timely motion to seal, and the motion is granted, the filing Party or non-party shall ensure that all documents (or, if directed by the court, portions of documents) that are the subject of the order to seal are filed in accordance with Rule 5 of Judge Castel's Individual Practices in Civil Cases. If the Producing Party's timely motion to seal is denied, then the Party or non-party making the filing shall take steps to replace the redacted filing with its corresponding unredacted version.

(d) All pleadings, briefs or memoranda which reproduce, paraphrase or disclose any materials which have previously been designated by a party as comprising or containing Confidential Information shall identify such documents by the production number ascribed to them at the time of production.

12. Any person receiving Confidential Information shall not reveal or discuss such information to or with any person not entitled to receive such information under the terms hereof and shall use reasonable measures to store and maintain the Confidential Information so as to prevent unauthorized disclosure.

13. Failure to designate a document as Confidential when it is initially produced shall not constitute a waiver of the right to later designate it or the information therein contained as confidential, but the receiving Party's disclosure of the document or its contents during such intervening time period shall not constitute a violation of this Stipulation.

14. The Parties agree that an inadvertent production or disclosure of any material that either Party claims to be protected by the attorney-client privilege, attorney work product doctrine, or any other privilege does not waive that privilege, to the extent allowed by law. Upon request, the Receiving Party of such material shall promptly return all such material as well as any copies thereof. Return of such material shall not constitute a waiver of the right to challenge the Party's claims with respect to the attorney-client privilege, attorney work product doctrine, or any other asserted privilege, to the extent allowed by law.

15. The production of privileged or work-product protected documents, electronically stored information ("ESI") or information, whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding.

    (a) This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).

    (b) Pursuant to Federal Rule of Evidence 502(d), if a Producing Party at any time notifies any Receiving Party that the Producing Party disclosed documents, testimony, information, and/or things that are protected from disclosure under the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity from disclosure, the disclosure shall not be deemed a waiver in this action or in any other proceeding, including in federal or state proceedings, of the applicable privilege or protection.

    (c) The Receiving Party shall, upon request, (i) refrain from disclosure of the inadvertently produced material and refrain from examining the materials, (ii) within three (3) business days, return to the Producing Party, sequester, or destroy

all copies and summaries of such documents, testimony, information, and/or things, and (iii) shall not use such items for any purpose except as set forth in subsections (d) and (e) herein, until further order of the Court. Within ten (10) business days of the Producing Party's request to return or destroy such documents, the Producing Party shall produce a privilege log with respect to the disclosed materials. The return or destruction of any documents claimed to be privileged shall not constitute an acknowledgement by the Receiving Party that the claimed documents or information are in fact privileged or entitled to protections of immunity.

(d) The return of any discovery material to the Producing Party shall not in any way preclude the Receiving Party from moving the Court for a ruling that the disclosed information is not privileged; however, the Receiving Party cannot assert as a basis for the relief it seeks the fact or circumstance that the Producing Party produced such documents in this Action, nor shall such motion include or otherwise disclose, as an attachment, exhibit, or otherwise, the produced material (or any portion thereof) that is the subject of such motion, except as an under seal filing. Allegedly privileged documents shall remain protected against disclosure and use during the pendency of any dispute over their status. If such a sealed filing is made or is being promptly prepared, the Receiving Party may also retain a copy of the document or information for this limited purpose until the Court has resolved such claim of privilege or immunity. The Producing Party must preserve the document or information until the claim is resolved.

(e) If any information, document, or thing has been offered at a deposition, or as a sealed exhibit to, or redacted part of, a dispositive motion or opposition to a

dispositive motion and the Producing Party claims that such information, document, or thing filed under seal or in redacted form was inadvertently produced and is protected by privilege or work-product immunity, all Parties shall comply with Fed. R. Civ. P. 26(b)(5)(B), except that the Producing Party, within five (5) business days of the deposition or filing and service of the dispositive motion or opposition to dispositive motion, shall identify the inadvertently disclosed material and simultaneously produce to all Parties a privilege log specifically identifying the inadvertently disclosed material and a basis for the claim of privilege or work-product immunity. Promptly after the production of such a log, the Producing and Receiving Parties must conduct a meet-and-confer to try to resolve the issue. If, after the Parties meet and confer, they cannot reach agreement, the Receiving Party shall, within five (5) business days of the meet and confer, present the dispute to the Court by means of a motion for protective order pursuant to Rule 26(c) or otherwise. Any portion of the deposition transcript discussing or reflecting the inadvertently disclosed material shall be deemed Confidential Information until the claim of privilege or immunity is resolved.

(f) Nothing in this Stipulation shall alter or infringe on the right of counsel to instruct a deposition witness not to answer a question on the basis of privilege. Nothing in this Stipulation shall prevent the Producing Party from seeking immediate relief from the Court, including a protective order under Rule 26(c) where necessary to preserve the claimed privilege or work-product protection and prevent or limit further disclosure of the information, document, or thing pending resolution of the claim. If the inadvertently disclosed information, document, or thing has been

submitted as part of a filed dispositive motion or opposition to a dispositive motion, any motion for a protective order under Rule 26(c) shall be fully briefed so that it may be heard by the Court before or simultaneously with the hearing on the relevant dispositive motion or opposition to dispositive motion.

(g) Nothing contained herein is intended to or shall serve to limit a party's right to conduct a review of documents, ESI or information (including metadata) for relevance, responsiveness and/or segregation of privileged and/or protected information before production.

(h) For the avoidance of doubt, the provisions of Federal Rule of Evidence 502(b) do not apply.

16. Extracts and summaries of Confidential Information shall also be treated as confidential in accordance with the provisions of this Stipulation.

17. The production or disclosure of Confidential Information shall in no way constitute a waiver of each Producing Party's right to object to the production or disclosure of other information in this action or in any other action. Nothing in this Stipulation shall operate as an admission by any Party or non-party that any particular document or information is, or is not, confidential. Failure to challenge a Confidential Information designation shall not preclude a subsequent challenge thereto.

18. This Stipulation is entered into without prejudice to the right of any Party or non-party to seek relief from, or modification of, this Stipulation or any provisions thereof by properly noticed motion to the Court or to challenge any designation of confidentiality as inappropriate under applicable law.

19. This Stipulation shall continue to be binding after the conclusion of this litigation except that there shall be no restriction on documents that are used as exhibits in Court (unless such exhibits were filed under seal); and (b) that a Receiving Party may seek the written permission of the Producing Party or further order of the Court with respect to dissolution or modification of the Stipulation. The provisions of this Stipulation shall, absent prior written consent of the parties, continue to be binding after the conclusion of this action.

20. Nothing herein shall be deemed to waive any privilege recognized by law, or shall be deemed an admission as to the admissibility in evidence of any facts or documents revealed in the course of disclosure.

21. This Stipulation is not intended to waive any objection or otherwise to preclude any Party or non-party from objecting to any discovery request believed to be improper, or from seeking an order sealing the record of this matter.

22. Nothing herein shall bar either Party or non-party from seeking heightened confidentiality protections regarding any material on the ground that the protections of this Stipulation are not sufficient to protect such material.

23. Nothing herein shall be construed to limit in any way a Party's use of its own material that has been designated confidential.

24. Within thirty (30) days after the final termination of this litigation by settlement or exhaustion of all appeals, all Confidential Information produced or designated and all reproductions thereof shall be returned to the Producing Party or, at the Receiving Party's option, shall be destroyed. In the event that any Receiving Party chooses to destroy physical objects and documents, such Party shall certify in writing within thirty (30) days of the final termination of this litigation that it has undertaken its best efforts to destroy such

11

physical objects and documents, and that such physical objects and documents have been destroyed to the best of its knowledge. Notwithstanding anything to the contrary, counsel of record for the Parties may retain Confidential Information that exist on their servers and copies of documents constituting work product, a copy of pleadings, motion papers, discovery responses, deposition transcripts and deposition and trial exhibits. This Stipulation shall not be interpreted in a manner that would violate any applicable rules of professional conduct. Nothing in this Stipulation shall prohibit or interfere with the ability of counsel for any Receiving Party, or of experts specially retained for this case, to represent any individual, corporation or other entity adverse to any Party or non-party or their affiliate(s) in connection with any other matter.

25. If a Receiving Party is called upon to produce Confidential Information in order to comply with a court order, subpoena, or other direction by a court, administrative agency, or legislative body, the Receiving Party from which the Confidential Information is sought shall (a) give written notice by overnight mail and either email or facsimile to the counsel for the Producing Party within five (5) business days of receipt of such order, subpoena, or direction, and (b) give the Producing Party five (5) business days to object to the production of such Confidential Information, if the Producing Party so desires. Notwithstanding the foregoing, nothing in this paragraph shall be construed as requiring any party to this Stipulation to subject itself to any penalties for noncompliance with any court order, subpoena, or other direction by a court, administrative agency, or legislative body.

26. This Stipulation may be changed by further order of this Court, and is without prejudice to the rights of a Party to move for relief from any of its provisions, or to seek or agree to different or additional protection for any particular material or information.

27. This Stipulation may be signed in counterparts, which, when fully executed, shall constitute a single original, and electronic signatures shall be deemed original signatures.

28. Notwithstanding any other provision, no document may be filed with the Clerk under seal without a further Order of this Court addressing the specific documents or portions of documents to be sealed. Any application to seal shall be accompanied by an affidavit or affidavits and a memorandum of law, demonstrating that the standards for sealing have been met and specifically addressing the applicability of *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-120 (2d Cir. 2006) and any other controlling authority. Unless otherwise ordered, a party seeking to file an opposing party's confidential

information shall so advise the opposing party fourteen (14) days in advance specifying the precise portion of the information the party seeks to use, the general purpose thereof and any redactions to which the party does not object. Within seven (7) days thereafter, the party whose confidential information is sought to be used may make an application to seal in accordance with the first paragraph of this Order, indicating the portion or portions of the information it seeks to have sealed. Nothing herein is intended to alter or modify the applicability of Rule 5.2, Fed. R. Civ. P., to this case. The redactions expressly authorized by Rule 5.2 may be made without further application to the Court.

**DONTZIN NAGY & FLEISSIG LLP**

*Gregory N. Wolfe*

Tibor L. Nagy, Jr.
Gregory N. Wolfe
Maxine Peskens
980 Madison Avenue
New York, NY 10075
Tel: 212-717-2900
tibor@dnfllp.com
greg@dnfllp.com
mpeskens@dnfllp.com
*Counsel for Sphere 3D Corp.*


**K&L GATES LLP**

Brian D. Koosed
1601 K Street, NW
Washington, D.C. 20006
Tel: 202-778-9000
brian.koosed@klgates.com

*Counsel for Defendant Gryphon Digital
Mining, Inc.*


**SO ORDERED:**

Dated: June 13, 2023

By: _____

Hon. P. Kevin Castel, District Court Judge