# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SPHERE 3D CORP.,

       *Plaintiff and Counterclaim-*
       *Defendant*,

       v.

GRYPHON DIGITAL MINING, INC.,

       *Defendant and Counterclaim-*
       *Plaintiff*

---

Civil Action No. 1:23-cv-02954-PKC

**Letter Rogatory for International Judicial Assistance Seeking Testimony from Mark Edward Valentine**

To the Appropriate Judicial Authority of Canada:

The United States District Court for the Southern District of New York presents its compliments to the appropriate judicial authority of Canada, and respectfully requests international judicial assistance to obtain evidence to be used at trial in the above-captioned civil proceeding before this Court.

The Court has determined that it would further the interests of justice and that justice cannot be completely done between the parties without the testimony, under oath, of Mark Edward Valentine residing within your jurisdiction. The action involves claims for breach of contract and breach of fiduciary duty. Mr. Valentine occupied a key position of influence and authority within Sphere 3D Corp. ("Sphere"). Sphere is the Plaintiff and Counterclaim-Defendant in the above-captioned proceeding.  Mr. Valentine has knowledge relevant to both the claims and defenses in this action as described in more detail below.

The testimony of Mr. Valentine is not available from any source within the jurisdiction of this Court and cannot be obtained by any means other than pursuant to an order of appropriate judicial authority of Canada compelling the witness to appear for examination.

1

| | | |
|---|---|---|
| 1. | **Sender And Requesting Judicial Authority** | The Honorable Valerie Figueredo<br>United States Magistrate Judge<br>United States District Court for the Southern District of New York<br>500 Pearl Street<br>New York, New York 10007<br>United States of America |
| 2. | **Appropriate Judicial Authority Of The Requested State** | Ontario Superior Court of Justice<br>330 University Avenue<br>Toronto, Ontario<br>Canada<br>M5G 1R7 |
| 3. | **Person(s) To Whom The Executed Request Is To Be Returned** | Dennis H. Tracey, III, Elizabeth C. Carter, and William C. Winter<br>Hogan Lovells US LLP<br>390 Madison Avenue<br>New York, New York 10017<br>United States of America<br>dennis.tracey@hoganlovells.com<br>elizabeth.carter@hoganlovells.com<br>william.winter@hoganlovells.com |
| 4. | **Names And Addresses Of The Parties And Their Representatives** | Plaintiff and Counterclaim-Defendant:<br>Sphere 3D Corp.<br>Gregory N. Wolfe<br>Rahul Srinivas<br>David Moosmann<br>Dontzin Nagy & Fleissig LLP<br>31 East 62nd Street<br>New York, New York 10065<br>Tel.: (212) 717-2900<br>greg@dnfllp.com<br>rsrinivas@dnfllp.com<br>dmoosmann@dnfllp.com<br><br>Defendant and Counterclaim-Plaintiff:<br>Gryphon Digital Mining, Inc.<br>Dennis H. Tracey, III<br>Elizabeth C. Carter<br>William C. Winter<br>Hogan Lovells US LLP<br>390 Madison Avenue<br>New York, New York 10017 |

dennis.tracey@hoganlovells.com
elizabeth.carter@hoganlovells.com
william.winter@hoganlovells.com

**5.**    **Date By Which The Requesting**    September 13, 2024, or as soon as
         **Authority Requires Receipt Of The**    practicable.
         **Response To The Letter Rogatory**

**6.**    **Name Of The Case And Any**    *Sphere 3D Corp. v. Gryphon Digital*
         **Identifying Number**    *Mining, Inc.*, No. 1:23-cv-02954- PKC-VF
                                  (S.D.N.Y.)

**7.**    **Nature And Purpose Of The Proceeding**

On April 7, 2023, Sphere 3D Corp. ("Sphere") commenced a civil action against

Gryphon Digital Mining, Inc. ("Gryphon") for a monetary judgment based on claims for

breach of contract (Count I), breach of the implied covenant of good faith and fair dealing

(Count II), and breach of fiduciary duty (Count III). Gryphon has asserted counterclaims

against Sphere, including a claim for breach of contract which is premised on Sphere's

repeated and willful breaching of the Master Services Agreement ("MSA") entered

between the parties on August 19, 2021, as amended on December 29, 2021. The parties

are actively conducting fact discovery in anticipation of trial.

A true and correct copy of Gryphon's operative pleading is attached hereto as

Exhibit A. A true and correct copy of Sphere's operative pleading is attached hereto as

Exhibit B.

**8.**    **Evidence To Be Obtained Or Other Judicial Action To Be Performed**

At trial, Gryphon must prove that Sphere breached the MSA and the obligations

that Sphere owed to Gryphon thereunder. Similarly, Gryphon must defend against Sphere's

allegation that it breached the MSA and the fiduciary duties it allegedly owed to Sphere

under the MSA. Gryphon seeks deposition testimony from Mr. Valentine both to prove its

own claim and to defend against Sphere's claims at trial.

3

The evidence sought in Canada through this request is directly relevant testimony necessary for the trial of this case and may be so used by the parties. Given that Mr. Valentine resides outside the subpoena power of this Court, and therefore cannot be compelled to testify at trial, this Court respectfully requests that the appropriate judicial authority in Canada cause the appropriate orders to be issued to direct the testimony, under oath, of Mr. Valentine to be used at trial in these proceedings. The evidence sought from Mr. Valentine is not otherwise obtained by this Court through its own compulsory process.

Gryphon seeks testimony from Mr. Valentine relating to Mr. Valentine's role within Sphere, the negotiations between the parties concerning the MSA, performance by the parties pursuant to the terms of the MSA, and other matters relevant and necessary to establish Gryphon's claim against Sphere for breach of contract. Gryphon also seeks testimony from Mr. Valentine regarding Gryphon's performance under the MSA in order to establish Gryphon's affirmative defenses of failure to state a claim, unclean hands, failure to exercise due care and due diligence, and negligence, as well as to rebut the quantum of damages claimed by Sphere.

As set forth below, the evidence sought by Gryphon relates to the matters in question in the litigation:

- Mr. Valentine's background and employment are relevant to establishing the foundation for him to testify about several aspects of the parties' claims and defenses.

- Mr. Valentine's testimony regarding his knowledge of why the parties entered the MSA and the underlying negotiations is relevant to the parties' claims and defenses.

- Mr. Valentine's testimony regarding the terms of the MSA (and the negotiation of those terms) is relevant to the parties' claims and defenses.

- Mr. Valentine's testimony regarding either party's performance under the MSA is relevant to the parties' claims and defenses.

- Mr. Valentine's testimony regarding Sphere's purported termination of the MSA on October 6, 2023.

4

**9.     Identity And Location Of Any Person To Be Examined**

Mark Edward Valentine
Ontario, Canada

**10.     Questions To Be Put To The Person Examined Or Statement Of The Subject Matter About Which They Are To Be Examined**

1.     Mr. Valentine's educational background, criminal background, employment history, professional qualifications, cooperation or separation agreements, and personal preparation for the deposition.

2.     Mr. Valentine's position within Sphere and any management, supervisory, or decision-making authority that he maintained.

3.     Mr. Valentine's knowledge regarding the reasons why the parties entered the MSA, including, but not limited to, the parties' negotiations regarding the MSA and its amendment.

4.     Mr. Valentine's knowledge regarding the terms of the MSA.

5.     Mr. Valentine's knowledge regarding Gryphon's provision of management services to Sphere.

6.     Mr. Valentine's knowledge of the duties that Gryphon owed to Sphere, if any, under the MSA for the time period from August 19, 2021 to October 6, 2023.

7.     Mr. Valentine's knowledge regarding Sphere's performance under the MSA, including the factual basis for any claim that Sphere breached the MSA, for the time period from August 19, 2021 to October 6, 2023.

8.     Mr. Valentine's knowledge of the parties' relationships and agreements with any third party hosts, including, but not limited to, the following entities, for the time period from August 19, 2021 to October 6, 2023:

    a.      Core;

    b.      Coinmint;

    c.      Compute North;

    d.      Foundry;

    e.      Rebel Mining;

    f.      Lancium;

    g.      Luxor;

    h.      North Country Colocation Services;

    i.      U.S. Bitcoin;

    j.      Arthur Digital Mining;

    k.      Highwire Energy X; and

    l.      Joshi Petroleum.

9.      Mr. Valentine's knowledge of Sphere's purported termination of the MSA on October 6, 2023.

10.    Mr. Valentine's knowledge of Gryphon's efforts to secure hosting for Sphere's miners from August 19, 2021, to October 6, 2023.

11.    Mr. Valentine's knowledge of the selection of mining pools for Sphere's miners for the time period from August 19, 2021, to October 6, 2023.

12.    Mr. Valentine's knowledge of the parties' relationship with Core Scientific, Inc.

13.    Mr. Valentine's knowledge of the agreement entered into by Sphere with Hertford Advisors, Ltd. on July 31, 2021, as amended on August 1, 2023.

14.    Mr. Valentine's knowledge of the Spoofing Incident that occurred in early 2023 whereby a hostile threat actor impersonated Sphere's CFO and stole twenty-six bitcoin from a wallet held for Sphere's benefit.

## 11.  Documents Or Other Property To Be Inspected

There is no request for Mr. Valentine to produce any documents.

**12.    Any Requirements That The Evidence Be Given Under Oath And Any Special Form To Be Used**

      The examination of the individuals identified in Section 9 above will be taken under oath before: (1) a secretary of embassy, consul general, consul, vice-consul, or consular agent of the United States of America; (2) any officer authorized to administer oaths under the laws of the United States of America or of Canda; or (3) before a person appointed by you and empowered to administer oaths and take testimony.

      This Court further requests that you, by your proper process, require that the testimony given during the above-described testimony be given under the following oath or affirmation: "I [deponent] swear that the testimony that I am about to give is the truth, the whole truth, and nothing but the truth."

**13.    Special Methods Or Procedure To Be Followed**

This Court respectfully requests that:

a.    The examination of the individuals identified in Section 9 above be taken under the Federal Rules of Civil Procedure of the United States of America, except to the extent that any such procedure is incompatible with the law of Canada.

b.    The examination of Mr. Valentine be conducted by (i) attorneys for the Plaintiff or other duly authorized representatives, qualified to practice law in United States jurisdictions and/or in Canada, nominated by the Defendants; (ii) the witness's counsel; and (iii) attorneys for Defendant.

c.    The examinations and cross-examinations be recorded verbatim by stenographic means and by videotape, with a professional videographer and a professional stenographer— provided at the charge of Gryphon—being permitted to attend the oral testimony in order to record the testimony.

d.    Gryphon will limit the time period of its oral examination of Mr. Valentine to seven (7) hours of live deposition testimony. In addition, Gryphon is willing to proceed with taking Mr. Valentine's oral examination in a remote setting via videoconferencing link.

**14.    Reimbursement for Costs**

Gryphon will pay to Mr. Valentine attendance money calculated in accordance with

Ontario's Rules of Civil Procedure or as the Ontario Court may otherwise order.


Dennis H. Tracey, III, Elizabeth C. Carter,
and William C. Winter
Hogan Lovells US LLP
390 Madison Avenue
New York, New York 10017
United States of America
dennis.tracey@hoganlovells.com
elizabeth.carter@hoganlovells.com
william.winter@hoganlovells.com


Date of Request:


_____

The Honorable Valerie Figueredo
United States Magistrate Judge

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
SPHERE 3D CORP.,                                        :
                                                        :        Case No. 1:23-cv-02954
*Plaintiff and Counter-Defendant*,                      :
                                                        :        The Hon. Judge P. Kevin Castel
        v.                                              :
                                                        :        Magistrate Judge Valerie Figueredo
GRYPHON DIGITAL MINING, INC.,                           :
                                                        :
*Defendant and Counter-Plaintiff*,                      :
------------------------------------------------------- :

## DEFENDANT AND COUNTERCLAIM-PLAINTIFF
## GRYPHON DIGITAL MINING, INC.'S AMENDED ANSWER, AFFIRMATIVE DEFENSES,
## AND FOURTH AMENDED COUNTERCLAIMS

        Defendant and Counter-Plaintiff GRYPHON DIGITAL MINING, INC. ("Gryphon"), by and

through its undersigned counsel, Hogan Lovells US LLP, hereby responds to and answers the Second

Amended Complaint filed by Plaintiff and Counter-Defendant SPHERE 3D CORP. ("Sphere"), and

alleges the following affirmative defenses and amended counterclaims against Sphere (together with

Gryphon, the "Parties"):

## ANSWER

        1.      Gryphon admits that the Second Amended Complaint purports to assert claims for

breach of contract and breach of fiduciary duty but denies that Gryphon has breached any contract with

Sphere and denies that Gryphon owes any fiduciary duty or has breached any fiduciary duty. Answering

further, Gryphon admits Sphere and Gryphon are in the business of digital asset mining and that

Gryphon and Sphere entered into a Master Services Agreement, dated August 19, 2021, and

subsequently amended on December 29, 2021 (referred to herein as the "Sphere MSA"), in

contemplation of a potential merger of the companies that was not consummated. Answering further,

Gryphon states that the document or documents referred to in Paragraph 1 as the "Master Services

1

Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Answering further, the allegation that "Gryphon's power over Sphere and its status as custodian of Sphere's digital assets and miners gave rise to fiduciary duties, including the duty of loyalty and to avoid self-dealing" is a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegation and specifically denies that it has ever owed any fiduciary duty to Sphere. Except as so stated, Gryphon denies the allegations in Paragraph 1.

2.      Gryphon denies the allegations in Paragraph 2.

3.      Gryphon denies the allegations in Paragraph 3.

4.      Gryphon denies the allegations in Paragraph 4.

5.      Gryphon admits only that as a consequence of Sphere's negligence, a third-party hostile threat actor was able to infiltrate Sphere's computer and technology infrastructure, send spoofing emails appearing to emanate from Sphere's email domain while impersonating Sphere's Chief Financial Officer, Kurt Kalbfleisch, and induce Gryphon to send cryptocurrency that was intended to be sent to Sphere to the hostile threat actor's public key address instead. Except as so stated, Gryphon denies the allegations in Paragraph 5.

6.      Gryphon answers Paragraph 6 by stating that the emails described in this paragraph speak for themselves and hereby denies any allegations inconsistent therewith. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 6 that "all Sphere emails have the same domain name," and therefore denies such allegation. Answering further, Gryphon states that throughout the course of its dealings with Sphere, both Mr. Kalbfleisch and Sphere's Chief Executive Officer, Ms. Trompeter, have used and sent e-mails from multiple e-mail addresses and domains. Except as so stated, Gryphon denies the allegations in Paragraph 6.

7.      Gryphon answers Paragraph 7 by stating that the email described in this paragraph and purportedly depicted in Figs. 1-3 speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 7.

8.      Gryphon admits only that the allegations in Paragraph 8 describe a spoofing attack, caused by Sphere's negligence and failure to maintain proper security and control of its own technology and computer infrastructure, by which a third-party hostile threat actor was allowed to impersonate Sphere's CFO, Mr. Kalbfleisch, and induce Gryphon to send digital assets to the hostile threat actor's public key address rather than to a public key address controlled by Sphere. Except as so stated, Gryphon denies the allegations in Paragraph 8.

9.      Gryphon admits only that, as a result of Sphere's negligence and the failure of Sphere's CEO and others at Sphere, including any information security personnel, to recognize the spoofing attack despite being properly copied on the emails at issue, Gryphon was induced to transfer eighteen (18) bitcoin to a public key address controlled by a third-party hostile threat actor. Except as so stated, Gryphon denies the allegations in Paragraph 9.

10.     Gryphon admits only that, as a result of Sphere's negligence and the failure of Sphere's CEO and others at Sphere, including any information security personnel, to recognize the spoofing attack despite being properly copied on the emails at issue, Gryphon was induced to transfer an additional eight (8) bitcoin to a public key address controlled by a third-party hostile threat actor on or about February 1, 2023. Answering further, Gryphon states that the emails described in this paragraph speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 10.

11.     Gryphon admits that following the spoofing attacks, Sphere requested to review certain of Gryphon's policies and procedures. Answering further, Gryphon states that it has established processes, developed in coordination with Sphere, for transferring digital assets to Sphere—and, in fact,

has successfully transferred digital assets to Sphere on numerous occasions pursuant to such processes, without incident. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 11 that Sphere "report[ed] the incident . . . by filing a suspicious activity report ('SAR') with the Financial Crimes Enforcement Network ('FinCEN')," and therefore denies such allegation.[1] Answering further, Gryphon states that it suggested to Sphere that the spoofing attacks be reported to the appropriate law enforcement agencies by one of the parties—as opposed to both parties reporting the attacks— to avoid creating separate reporting tracks. Gryphon denies the remaining allegations in Paragraph 11, and specifically denies that it "panicked" or "demanded that no one report the theft to the authorities."

12.     Gryphon admits only that a proposed merger between itself and Akerna Corp., a publicly-traded technology firm, has been publicly announced. Answering further, Gryphon states that the Form S-4 Registration Statement referenced in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 12.

13.     Gryphon answers Paragraph 13 by stating that the Form S-4 Registration Statement referenced in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 13.

14.     Gryphon answers Paragraph 14 by stating that the Form S-4 Registration Statement referenced in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 14.

---

[1] Gryphon understands that the submission of a Suspicious Activity Report to FinCen is strictly confidential and its disclosure is, upon information and belief, a violation of federal law.

15.     Gryphon admits only that a proposed merger between itself and Akerna Corp., a publicly-traded technology firm, has been publicly announced. Gryphon denies the remaining allegations in Paragraph 15.

16.     Paragraph 16 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon denies the allegations in Paragraph 16.

17.     Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 17 that Sphere "generates substantially all of its revenue by mining for digital assets," and therefore denies such allegation. Answering further, Gryphon admits that, pursuant to the Sphere MSA, digital assets generated by Sphere's cryptocurrency mining machines are, or should be, maintained on a digital wallet operated by Gryphon. Answering further, Gryphon states that the document or documents referred to in Paragraph 17 as the "Master Services Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint, and the Form S-4 Registration Statement referenced in this paragraph, speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 17.

18.     Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs on Sphere's behalf, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover such costs and expenses as they come due. Answering further, Gryphon admits it has informed Sphere that Gryphon, consistent with its obligations under the Sphere MSA, cannot fulfill a request to sell assets in Sphere's digital wallet that would leave the value of the remaining assets in Sphere's digital wallet insufficient to cover amounts due and owing on Sphere's behalf or otherwise render Sphere unable to pay its debts as they become due. Gryphon specifically denies Sphere's allegation in Paragraph 18 that Gryphon has demanded Sphere resolve this litigation as a condition of selling Sphere's digital assets, or that Gryphon has otherwise advised Sphere it will simply resume selling Sphere's digital assets, irrespective of

Sphere's financial condition, if the litigation is resolved. Except as so stated, Gryphon denies the allegations in Paragraph 18.

19.     Gryphon admits that it has denied breaching any obligation under the Sphere MSA or otherwise. Answering further, Gryphon admits that Sphere has failed to provide Gryphon with sufficiently specific factual information concerning Gryphon's purported breaches of the Sphere MSA. Except as so stated, Gryphon denies the allegations in Paragraph 19.

20.     Gryphon denies the allegations in Paragraph 20.

21.     Gryphon admits only that Sphere is a publicly-traded bitcoin mining company listed on the Nasdaq stock exchange. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21, and therefore denies such allegations.

22.     Gryphon admits the allegations in Paragraph 22.

23.     Paragraph 23 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegations in Paragraph 23.

24.     Paragraph 24 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon denies the allegations in Paragraph 24. Further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith.

25.     Gryphon admits the allegations in Paragraph 25

26.     Gryphon admits the allegations in Paragraph 26.

27.     Gryphon admits the allegations in Paragraph 27.

28.     Gryphon admits the allegations in Paragraph 28 and otherwise states that the contents of the Sphere MSA speak for themselves.

29.     Gryphon states that the document or documents referred to in Paragraph 29 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Gryphon specifically denies

the characterization of the management fee set forth in the Sphere MSA as "exorbitant," particularly in light of the fact that this was an agreed-upon fee that was freely negotiated by sophisticated parties and that the Sphere MSA enabled Sphere to transform its business into a bitcoin mining company by leveraging Gryphon's credibility, contacts, and expertise in the crypto-currency mining industry. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation regarding Sphere's "expect[ations]," and therefore denies such allegation. Except as so stated, Gryphon denies the allegations in Paragraph 29.

30. Gryphon states that the document or documents referred to in Paragraph 30 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 30.

31. Gryphon states that the document or documents referred to in Paragraph 31 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 31.

32. Gryphon states that the document or documents referred to in Paragraph 32 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 32.

33. Gryphon states that the document or documents referred to in Paragraph 33 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 33.

34.     Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and therefore denies the allegations in Paragraph 34.

35.     Gryphon admits its understanding that, in 2022, Sphere ordered mining equipment from overseas for delivery into the United States. Answering further, Gryphon states that although Gryphon knew the mining equipment was ordered, Gryphon had no knowledge of when the equipment would be delivered. Answering further, Gryphon states that by the time Sphere requested assistance from Gryphon, the mining equipment had already been seized by U.S. Customs and Border Protection, leaving little that Gryphon could do at that point to assist Sphere with the release of the equipment. Answering further, Gryphon specifically denies the allegation in Paragraph 35 that it "shirked its duties to provide the assistance and information needed to release the miners" and asserts that Gryphon at all times complied with its obligations under the Sphere MSA. Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35, and therefore denies such allegations.

36.     Gryphon denies the allegations in Paragraph 36.

37.     Gryphon denies the allegations in Paragraph 37.

38.     Gryphon denies the allegations in Paragraph 38.

39.     In response to the first sentence in Paragraph 39, Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover Sphere's costs and expenses as they come due. Answering further, Gryphon admits it has informed Sphere that Gryphon, consistent with its obligations under the Sphere MSA, cannot fulfill a request to sell assets in Sphere's digital wallet that would leave the value of the remaining assets in Sphere's digital wallet insufficient to cover amounts due and owing on Sphere's behalf or otherwise leave Sphere

unable to pay its debts as they become due. Except as so stated, Gryphon denies the allegations in the first sentence of Paragraph 39, and denies the remaining allegations in Paragraph 39.

40.     Gryphon denies the allegations in Paragraph 40.

41.     Paragraph 41 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegations of Paragraph 41.

42.     Paragraph 42 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the parties' relationship, including without limitation any role in which Gryphon serves for Sphere and any obligation Gryphon owes to Sphere, is set forth in the Master Services Agreement between Gryphon and Sphere, dated August 19, 2021 (the "Original Sphere MSA"), as subsequently amended on December 29, 2021 (together with the Original Sphere MSA, the "Sphere MSA"), copies of which are purportedly attached as Exhibits 1 and 2, respectively, to the Second Amended Complaint. Answering further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 42.

43.     Paragraph 43 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the parties' relationship, including without limitation any role in which Gryphon serves for Sphere and any obligation Gryphon owes to Sphere, is set forth in the Sphere MSA, a copy of which is purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint. Answering further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 43.

44.     Paragraph 44 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the parties' relationship, including without limitation any role in which Gryphon serves for Sphere and any obligation Gryphon owes to Sphere, is set forth in the

Sphere MSA, a copy of which is purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint. Answering further, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 44.

45.     The first sentence of Paragraph 45 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegation in the first sentence of Paragraph 45. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 45 that "when Sphere entered into the Sphere MSA, it did so based on Gryphon's representations that it had superior knowledge of and abilities in the crypto-industry, including that Gryphon would be able to negotiate better deals with third-parties, implement better investment strategies, and better manage Sphere's crypto-business," and therefore denies such allegation. Gryphon denies the remaining allegations in paragraph 45.

46.     Paragraph 46 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the document or documents referred to in Paragraph 46 as the "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 46.

47.     Paragraph 47 contains a legal conclusion to which no answer is required. To the extent any answer is required, Gryphon denies the allegation in Paragraph 47 that Gryphon "has prioritized its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets." Answering further, Gryphon admits that it has reported a higher mining efficiency ratio than Sphere, but denies the allegation in Paragraph 47 that this "would not occur if Gryphon were acting to avoid self-dealing" because there are a multitude of factors that may determine mining efficiency, including

10

without limitation the type and quality of mining equipment used and how the mining efficiency ratio is calculated. Gryphon denies the allegation that it engaged in "self -dealing." Except as so stated, Gryphon denies the allegations in Paragraph 47.

48.     Gryphon answers Paragraph 48 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Answering further, Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation that "all Sphere emails have the same domain name," and therefore denies such allegation. Except as so stated, Gryphon denies the allegations in Paragraph 48.

49.     Gryphon answers Paragraph 49 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Gryphon denies the allegations in Paragraph 49.

50.     Gryphon answers Paragraph 50 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Gryphon denies the allegations in Paragraph 50.

51.     Gryphon admits only that, due to Sphere's negligence and failure to maintain proper security and control of its own technology and computer infrastructure, a third-party hostile threat actor was allowed to impersonate Sphere's CFO, Mr. Kalbfleisch, and induce Gryphon to send digital assets to a hostile threat actor's public key address rather than to Sphere, even though Sphere's CEO was copied on all such emails. Except as so stated, Gryphon denies the allegations in Paragraph 51.

52.     Gryphon admits only that, as a result of Sphere's negligence, it was induced to transfer eighteen (18) bitcoin to the third-party hostile threat actor's public key address. Except as so stated, Gryphon denies the allegations in Paragraph 52.

53.     Gryphon admits only that, as a result of Sphere's negligence, it was induced to transfer an additional eight (8) bitcoin to the third-party hostile threat actor's public key address on or about

11

February 1, 2023. Answering further, Gryphon states that the emails described in this paragraph speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 53.

54.     Gryphon answers Paragraph 54 by stating that the email described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 54.

55.     Gryphon admits that following the spoofing attacks, Sphere requested to review certain of Gryphon's policies and procedures. Answering further, Gryphon states that it has established processes, developed in coordination with Sphere, for transferring digital assets to Sphere—and, in fact, has successfully transferred digital assets to Sphere on several occasions pursuant to such processes, without incident. Except as so stated, Gryphon denies the allegations in Paragraph 55.

56.     Gryphon denies the allegations in Paragraph 56.

57.     Gryphon denies the allegations in Paragraph 57.

58.     Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58, and therefore denies such allegations.

59.     Gryphon admits only that a proposed merger between itself and Akerna Corp., a publicly-traded technology firm, has been publicly announced. Answering further, Gryphon states that the Form S-4 Registration Statement described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 59.

60.     Gryphon answers Paragraph 60 by stating that the Form S-4 Registration Statement described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 60.

61.     Gryphon answers Paragraph 61 by stating that the Form S-4 Registration Statement described in this paragraph speaks for itself and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 61.

62.     Gryphon admits that a proposed merger between itself and a publicly-traded technology firm has been publicly announced. Gryphon denies the remaining allegations in Paragraph 62.

63.     Gryphon denies the allegations in Paragraph 63.

64.     Gryphon admits only that it alleges Sphere, as a consequence of Sphere's negligence, allowed a third-party hostile threat actor to infiltrate Sphere's computer and technology infrastructure, send spoofing emails appearing to emanate from Sphere's email domain while impersonating Sphere's CFO, Mr. Kalbfleisch, and induce Gryphon to send cryptocurrency that was intended to be sent to Sphere but instead was sent to the hostile threat actor's public key address. Except as so stated, Gryphon denies the allegations in Paragraph 64.

65.     Gryphon answers Paragraph 65 by stating that the letter described in this paragraph and purportedly attached as Exhibit 3 to the Second Amended Complaint speaks for itself and hereby denies any allegations inconsistent therewith and specifically denies Sphere's characterization of such letter. Except as so stated, Gryphon denies the allegations in Paragraph 65.

66.     Gryphon answers Paragraph 66 by stating that the letter described in this paragraph and purportedly attached as Exhibit 4 to the Second Amended Complaint speaks for itself and hereby denies any allegations inconsistent therewith and specifically denies Sphere's characterization of such letter. Except as so stated, Gryphon denies the allegations in Paragraph 66.

67.     Gryphon admits that it has informed Sphere of its failure to provide Gryphon with the contact information for certain third parties Gryphon understands as performing services relevant to the Sphere MSA, including services the parties agreed Gryphon is obligated to perform under the Sphere

13

MSA, and that Sphere did not promptly provide such information when requested by Gryphon. Except as so stated, Gryphon denies the allegations in Paragraph 67.

68.    Gryphon lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 68 that Sphere "generates substantially all of its revenue by mining for digital assets," and therefore denies such allegation. Answering further, Gryphon admits that, pursuant to the Sphere MSA, digital assets generated by Sphere's cryptocurrency mining machines are maintained on a digital wallet operated by Gryphon. Answering further, Gryphon states that the document or documents referred to in Paragraph 68 as the "Master Services Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint, and the Form S4 Registration Statement quoted in this paragraph, speak for themselves and hereby denies any allegations inconsistent therewith. Except as so stated, Gryphon denies the allegations in Paragraph 68.

69.    Gryphon denies the allegations in Paragraph 69.

70.    Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover Sphere's costs and expenses as they come due. Answering further, Gryphon admits that it has requested Sphere maintain a minimum amount of funds in its digital wallet sufficient to pay Sphere's projected monthly costs, but Gryphon specifically denies that any minimum amounts requested bear any relation to any claim asserted by Gryphon in this action or otherwise; rather, the amounts requested reflect Gryphon's estimate of Sphere's projected near-term costs and expenses arising from its cryptocurrency mining efforts, which Gryphon is obligated to pay on Sphere's behalf from the Digital Wallet, pursuant to the Sphere MSA. Except as so stated, Gryphon denies the allegations in Paragraph 70.

71.    Paragraph 71 contains legal conclusions to which no answer is required. To the extent any answer is required, Gryphon states that the document or documents referred to in Paragraph 71 as

the "Master Services Agreement" or "Sphere MSA" and purportedly attached as Exhibits 1 and 2 to the Second Amended Complaint, the Form S-4 Registration Statement quoted in this paragraph, and the unidentified document or communication quoted in this paragraph, speak for themselves and hereby denies any allegations inconsistent therewith.  Except as so stated, Gryphon denies the allegations in Paragraph 71.

72.     Gryphon admits it has informed Sphere that, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly pay Sphere's operating costs, the digital wallet Gryphon operates for Sphere must maintain adequate value to cover Sphere's costs and expenses as they come due. Answering further, Gryphon admits it has informed Sphere that Gryphon, consistent with its obligations under the Sphere MSA, cannot fulfill a request to sell assets in Sphere's Digital Wallet that would leave the value of the remaining assets in Sphere's Digital Wallet, when converted to fiat currency, insufficient to cover amounts due and owing on Sphere's behalf, or otherwise leave Sphere unable to pay its debts as they become due. Answering further, Gryphon states that Sphere's allegations to the contrary are efforts to twist correspondence between the parties that speaks for itself to Sphere's own devices, and are expressly denied. Except as so stated, Gryphon denies the allegations in Paragraph 72.

73.     Gryphon denies the allegations in Paragraph 73. Gryphon specifically denies Sphere's allegation in Paragraph 73 that Gryphon has demanded Sphere resolve this litigation as a condition of selling Sphere's digital assets, or that Gryphon has otherwise advised Sphere it will simply resume selling Sphere's digital assets, irrespective of Sphere's financial condition, if the litigation is resolved.

74.     Gryphon denies the allegations in Paragraph 74.

75.     Gryphon admits that it has denied breaching any obligation under the Sphere MSA or otherwise. Answering further, Gryphon admits that Sphere has failed to provide Gryphon with

sufficiently specific factual information concerning Gryphon's purported breaches of the Sphere MSA. Except as so stated, Gryphon denies the allegations in Paragraph 75.

76.    Gryphon denies the allegations in Paragraph 76.

77.    Gryphon denies the allegations in Paragraph 77.

78.    Gryphon admits the allegation in Paragraph 78 that "[o]n April 7, 2023, Sphere issued a press release . . . ." Gryphon denies the remaining allegations in Paragraph 78.

79.    Gryphon denies the allegations in Paragraph 79.

80.    Gryphon has withdrawn its defamation claim against Sphere. Gryphon denies the remaining allegations in Paragraph 80.

81.    Gryphon has withdrawn its defamation claim against Sphere. against Sphere's Chief Executive Officer, Patricia Trompeter. Gryphon denies the remaining allegations in Paragraph 81.

82.    Gryphon denies the allegations in Paragraph 82.

83.    Gryphon admits the allegation in Paragraph 83 that Sphere has "prepared" and filed a "pre-motion letter" which purports to identify bases for dismissal of Gryphon's defamation claim. Gryphon has now withdrawn its defamation claim against Sphere. Gryphon denies the remaining allegations in Paragraph 83.

84.    Gryphon incorporates and re-alleges its answers to Paragraphs 1 through 83 of the Second Amended Complaint as if fully set forth herein.

85.    Paragraph 85 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon admits only that Count I purports to assert a claim for breach of contract against Gryphon, but Gryphon specifically denies that Gryphon has breached any contract with Sphere, including without limitation the Sphere MSA, and asserts that Gryphon has complied at all times with all obligations to Sphere. Gryphon denies the remaining allegations in Paragraph 85.

16

86.     Paragraph 86 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith.

87.     Gryphon denies the allegations in Paragraph 87, as set forth in more detail in Gryphon's Counterclaims below.

88.     The allegation in Paragraph 88 that Gryphon "has materially breached the Sphere MSA" is a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegation. Gryphon denies the remaining allegations in Paragraph 88.

89.     Paragraph 89 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

90.     Gryphon incorporates and re-alleges its answers to Paragraphs 1 through 83 of the Second Amended Complaint as if fully set forth herein.

91.     Paragraph 91 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon admits only that Count II purports to assert a claim for breach of the implied covenant of good faith and fair dealing against Gryphon, but Gryphon specifically denies that Gryphon has breached any implied covenant, and asserts that Gryphon acted in good faith at all times with respect to all obligations to Sphere. Gryphon denies the remaining allegations in Paragraph 91.

92.     Paragraph 92 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon states that the Sphere MSA speaks for itself and hereby denies any allegations inconsistent therewith.

93.     Gryphon denies the allegations in Paragraph 93, as set forth in more detail in Gryphon's Counterclaims below.

94.     Paragraph 94 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

95.     Paragraph 95 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

96.     Paragraph 96 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

97.     Gryphon incorporates and re-alleges its answers to Paragraphs 1 through 83 of the Second Amended Complaint as if fully set forth herein.

98.     Paragraph 98 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon admits only that Count III purports to assert a claim for breach of fiduciary duty against Gryphon, but Gryphon specifically denies that Gryphon has breached any fiduciary duty.  Gryphon denies the remaining allegations in Paragraph 98.

99.     Paragraph 99 contains a legal conclusion to which no answer is required.

100.    Paragraph 100 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

101.    Paragraph 101 contains a legal conclusion to which no answer is required. To the extent that an answer may be required, Gryphon denies the allegations in Paragraph 89.

102.    Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 102.

103.    Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 103.

104.    Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 104.

105.     Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 105.

106.     Sphere has voluntarily dismissed Count IV and Gryphon therefore denies the allegations in Paragraph 106.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof or burden going forward not required by law, Gryphon alleges the following affirmative defenses, while reserving the right to amend its affirmative defenses or add affirmative defenses as this case and/or discovery proceeds:

1.     Sphere's Second Amended Complaint fails to state any claim upon which relief may be granted.

2.     Sphere's claim for breach of the implied covenant of good faith and fair dealing is barred because it is duplicative of its claim for breach of contract.

3.     Sphere's claims against Gryphon are extinguished by Sphere's own breaches of the Sphere MSA.

4.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrines of waiver, estoppel, acquiescence, and/or ratification.

5.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrine of unclean hands.

6.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrine of accord and satisfaction.

7.     Sphere's claims against Gryphon are barred, in whole or in part, by the doctrine of payment.

8.      Sphere's claims against Gryphon are barred, in whole or in part, by Sphere's failure to exercise due care or due diligence and/or failure to act reasonably to protect itself from, or to mitigate, any alleged damages.

9.      Sphere's claims against Gryphon are barred, in whole or in part, by Sphere's own negligence.

10.     Sphere's claims against Gryphon are barred, in whole or in part, because its claimed damages are speculative, uncertain, and/or not ripe.

11.     Sphere fails to allege facts sufficient to entitle Sphere to an award of punitive damages.

12.     Sphere's claims against Gryphon are barred, in whole or in part, because the alleged breaches by Gryphon are not material.

13.     Sphere's claims against Gryphon are barred, in whole or in part, because Sphere has not suffered any damages as a result of any conduct by Gryphon.

14.     Sphere's claims for relief against Gryphon are barred, in whole or in part, because Sphere has waived its right to recover any damages, including specifically punitive damages.

Gryphon reserves its right to amend and supplement its affirmative defenses subject to discovery in this action.

## FOURTH AMENDED COUNTERCLAIMS

For its Counterclaims against Plaintiff and Counterclaim-Defendant SPHERE 3D CORP. ("Sphere"), Defendant and Counterclaim-Plaintiff GRYPHON DIGITAL MINING, INC. ("Gryphon"), by and through its undersigned counsel, Hogan Lovells US LLP, states as follows:

### INTRODUCTION

1.      Gryphon is a privately held bitcoin mining company and industry leader in environmentally responsible bitcoin mining.

2.      Bitcoin is a decentralized digital currency (or "cryptocurrency") that can be stored on and transferred among digital wallets via peer-to-peer transactions.

3.      Bitcoin mining is the process of applying computing power to solve cryptographic problems to produce or "mint" new bitcoins, a process that is "energy intensive."

4.      Bitcoin miners who operate at a large scale typically either operate their own facilities, or contract with a hosting provider who will provide low-cost electricity to power those bitcoin mining computers, and will host and operate those bitcoin mining computers for a fee. Both Sphere and Gryphon contract with hosting providers.

5.      Most bitcoin miners will direct their mining computers to a bitcoin mining pool, which aggregates the bitcoin mining power of various miners together, and pays miners *pro rata* based on a miner's contribution to the overall production of all mining computers participating in the pool.

6.      Sphere is a cryptocurrency mining company.

7.      On or about June 3, 2021, Sphere announced a planned merger with Gryphon, to be closed in Q3 2021.[2]  As a result of the merger, Gryphon and Sphere intended to "set the bar for future

---

[2] Sphere 3D News Release June 3, 2021, *available at* Sphere 3D Corp. Announces Merger Agreement with Gryphon Digital Mining, Inc.

bitcoin mining companies," and were "excited about the developing applications of blockchain technology" and becoming "a major player in its development."[3] Sphere publicly touted Gryphon's "world class expertise" and its "expertise in bitcoin mining" in its own public statements.[4]

      8.      On or about August 5, 2021, Sphere announced that it has assumed and executed an agreement pursuant to which it would purchase 60,000 new bitcoin mining machines.[5] Sphere repeatedly touted the anticipated mining capacity it and Gryphon would have following the anticipated merger, resulting from the 60,000 machines Sphere would contribute and the 7,200 machines Gryphon would contribute to the newly formed company.[6]

      9.      In anticipation of the eventual merger, on or about August 19, 2021, Gryphon, as provider, and Sphere, as customer, entered into a Master Services Agreement governing the pre-merger relationship between the parties. On or about December 29, 2021, Gryphon and Sphere entered into Amendment No. 1 to the August 19, 2021 Master Services Agreement (the Amendment and the August 19, 2021 Master Services Agreement are together defined as the "Sphere MSA").[7]

---

[3] Sphere 3D News Release January 12, 2022, *available at* Questions and Answers Regarding Sphere 3D Corp.'s Proposed Merger with Gryphon Digital Mining, Inc. | Sphere3D (gcs-web.com)

[4] Sphere 3D News Release August 20, 2021, *available at* Gryphon and Sphere Announce SPHERE MSA and Agreement to Purchase Additional Carbon Offset Credits Bringing Total to Half a Million Credits | Sphere3D (gcs-web.com), *and* Sphere 3D News Release April 4, 2022, *available at* https://sphere3d.gcs-web.com/news-releases/news-release-details/sphere-3d-corp-and-gryphon-digital-mining-inc-move-forward-after

[5] Sphere 3D News Release August 5, 2021, *available at* Sphere 3D Announces Agreement to Acquire Exclusive Rights for Assignment of Cryptocurrency Mining Assets.

[6] Sphere 3D News Release September 3, 2021, *available at* Sphere 3D Announces Pricing of $192.1 Million Registered Direct Offering Priced At-the-Market to Help Secure the Initial Order of 60,000 Miners ("The 60,000 miners, in combination with the Gryphon Digital Mining's 7200 miners will have a combined capacity of approximately 6.4 Exahash."); Sphere 3D News Release September 21, 2021, *available at* Sphere 3D Secures Order for 60,000 BTC Antminers, One of the Largest Single Orders in Digital Mining Industry History ("In addition, upon the closing of the Gryphon Digital Mining merger, the combined companies will have a total capacity of 6.7 exahash, which is capable of producing in excess of 1,300 bitcoin per month, based on current difficulty rates.").

[7] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the SPHERE MSA.

10.     Pursuant to the Sphere MSA, Gryphon and Sphere agreed that up until closing of the planned merger, Gryphon would serve as the exclusive provider of any and all management services to Sphere for all of its blockchain and cryptocurrency-related operations, which services include, but are not limited to: exclusive control over any and all relevant digital asset wallets and selection of the mining pool and custodians of such digital assets. *See* Sphere MSA at Exclusivity Clause and Commercial Terms Clause. The Parties further agreed that Gryphon would serve as the exclusive provider of services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Sphere. *Id.* at Exclusivity Clause.

11.     The Sphere MSA has been fruitful for both Parties. Under the Sphere MSA, Sphere has benefitted from Gryphon's significant and unique experience, credibility, and expertise in cryptocurrency mining operations, including the "design, implementation and management of additional mining capacity" deployed by Sphere.[8] In exchange, Gryphon has enjoyed the exclusive nature of the agreement between the Parties and has collected a reasonable, specifically negotiated and contractually agreed-upon fee for its services.

12.     On or about September 12, 2021 Gryphon and Sphere secured a hosting services deal with Core Scientific, Inc. ("Core"), a blockchain data center operator.[9]  The deal was governed by a Master Services Agreement (the "Core MSA") executed by Gryphon and Core.  A true and correct copy of the Core MSA is attached hereto as **Exhibit A**. Pursuant to the Core MSA, Gryphon and Core on September 12, 2021, Gryphon and Core entered into an order ("Order #2") pursuant to which Core agreed to provide the infrastructure to host 71,000 Gryphon mining machines. A true and correct copy of Order #2 is attached hereto as **Exhibit B**. Under the terms of the Core MSA, Gryphon was

---

[8] *Supra,* n. 4, *available at* Gryphon and Sphere Announce SPHERE MSA and Agreement to Purchase Additional Carbon Offset Credits Bringing Total to Half a Million Credits | Sphere3D (gcs-web.com).
[9] Sphere 3D News Release October 13, 2021, *available at* Sphere 3D and Gryphon Secure Largest Single Hosting Services Deal in Core Scientific's History.

obligated to deliver all 71,000 machines to Core pursuant to an agreed-upon schedule.  Pursuant to the Sphere MSA, Gryphon and Sphere understood that Sphere's machines would be used to fulfill Order #2.

13.     On or about October 8, 2021, Gryphon and Sphere entered into a Sub-License and Delegation Agreement, pursuant to which Gryphon sub-licensed certain rights and delegated certain obligations under the MSA and Order #2 to Sphere, and Sphere accepted such sub-license of rights and delegation of obligations. On or about December 29, 2021, Gryphon and Sphere entered into Amendment No. 1 to the October 8, 2021 Sub-License and Delegation Agreement (the Amendment and the October 8, 2021 Sub-License and Delegation Agreement are together defined as the "Sub-License Agreement"). A true and correct copy of the Sub-License Agreement is attached hereto as **Exhibit C**.

14.     Pursuant to the Sub-License Agreement, Sphere contractually assumed, among other things, Gryphon's obligation to provide Core with the 71,000 machines contemplated by Order #2. In an October 13, 2021 press release issued by Sphere, Sphere acknowledged that it had assumed this obligation and promised to provide at least 60,000 of those machines. Specifically Sphere stated that the Core agreement would "provide hosting capacity for up to 71,000 state-of-the-art bitcoin mining machines, and furnishes [Sphere] with a world-class partner to host the 60,000 Bitmain S19j Pro miners whose purchase was previously announced by Sphere."

15.     Although Gryphon and Sphere's business relationship has previously been mutually beneficial, in recent months, Sphere has repeatedly and in bad faith breached the Sphere MSA.

16.     Specifically, and despite Gryphon fully and competently performing its obligations under the Sphere MSA at all times, Sphere has repeatedly breached the Sphere MSA by (a) seeking mining hosting services independent of those arranged by Gryphon while rebuffing or ignoring Gryphon's inquiries as to whether Sphere required additional hosting services, (b) directing its

cryptocurrency miners to mining pools that Gryphon did not select and does not manage despite Gryphon maintaining mining pool relationships for Sphere's miners as part of Gryphon's exclusive services under the Sphere MSA, (c) creating its own digital wallets to receive proceeds of its mining efforts despite agreeing under the Sphere MSA that Gryphon has the exclusive right to manage digital wallets on Sphere's behalf, (d) actually receiving proceeds of cryptocurrency mining through those independently maintained and operated digital wallets without using Gryphon's choice of custodian in violation of the Sphere MSA, and (e) failing to pay Gryphon management fees for its cryptocurrency-related operations.

17.     In other words, Sphere has flagrantly violated the exclusivity provision of the Sphere MSA and other express obligations under the Sphere MSA, engaged in conduct that stymies and frustrates Gryphon's ability to provide the Services required under the Sphere MSA, and engaged in conduct that ultimately circumvents the fees that would be rightfully due and owing to Gryphon under the Sphere MSA.

18.     Moreover, Sphere has breached the Sphere MSA by failing to deliver the 71,000 mining machines to Core, despite its assumption of the obligation under Order #2. As a result of this breach, Gryphon suffered losses including, but not limited to, loss of the value of the MSA, lost profits, loss of business opportunities, and losses associated with litigation against Core.

19.     Sphere also acted negligently by allowing a hostile threat actor to infiltrate its computer systems and information technology infrastructure, failing to detect or intercept spoofing emails appearing to be sent from Sphere's email domain which copied Sphere's CEO, and failing to detect or intercept the emails sent by threat actors (and before that, the presence of a threat actor in Sphere's systems) before such threat actors impersonated Sphere and induced Gryphon to send a material amount of bitcoin intended to be paid to Sphere pursuant to the Sphere MSA to the threat actor's bitcoin public key address (the "Data Security Incident").

20.     In the aftermath of the Data Security Incident, and despite Gryphon's repeated inquiries and demands, upon information and belief, Sphere has taken no action to remediate the Data Security Incident or to secure its email servers, email accounts, or other impacted computer systems and information technology infrastructure, thereby subjecting Gryphon and all of Sphere's other commercial partners to ongoing risk to their own financial well-being and to those commercial partners' own information security infrastructure.

21.     The parties announced termination of the planned merger in early 2022.

## PARTIES

22.     Gryphon is a corporation duly incorporated under the laws of the state of Delaware with its principal place of business located in Las Vegas, Nevada. Gryphon is an industry-leading net carbon neutral bitcoin miner.

23.     Upon information and belief, Plaintiff and Counter-Defendant Sphere is a Canadian corporation with its principal of business located in Toronto, Ontario, Canada. Sphere is a publicly traded company whose shares trade on the NASDAQ. Sphere specializes in industrial-scale cryptocurrency mining operations.

## VENUE AND JURISDICTION

24.     This Court has personal jurisdiction over the Sphere pursuant to the terms of the Sphere MSA, which contains a binding forum selection clause pursuant to which the Parties explicitly "consent to the exclusive jurisdiction of the State of New York in connection with any dispute, suit action or proceeding . . ." and waived "any defense of *forum non conveniens* in connection therewith." *See* Sphere MSA at Governing Law/Jury Waiver/Fee Clause.

25.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391 and the terms of the Sphere MSA which require all actions to be brought in the state or district courts located within the State of New York. *Id.*

26

## FACTUAL ALLEGATIONS

<u>SPHERE'S BREACHES OF THE SPHERE MSA</u>

26.     In advance of their anticipated merger, Sphere and Gryphon began combining their business operations in 2021 pursuant to the terms of the Sphere MSA.  Shortly after entering into the Sphere MSA, the parties secured the deal with Core governed by the Core MSA. On or about October 13, 2021, Gryphon secured hosting for Sphere's miners with Core Scientific, which Sphere's then-CEO, Peter Tassiopoulos, touted as a "blue chip" and "industry leading hosting partner."[10]

27.     Pursuant to the Core MSA and in light of the Sphere MSA providing Gryphon with access to Sphere's mining machines, Core agreed to provide location hosting services for Gryphon and Sphere's mining machines.  The agreement provided that the parties would subsequently agree to Orders setting forth the number of machines to be hosted by Core. The agreement further provided that Gryphon would be "fully responsible for delivering" the machines required by each order to Core.

28.     Following the execution of Order #2, Sphere assumed certain rights and responsibilities pursuant to the Sub-License Agreement.  Specifically, the agreement provided "Gryphon hereby (i) exclusively sub-licenses to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2. Sphere hereby accepts such sub-license and delegation in all respects."  As evidenced by Sphere's statements to the public, the parties understood this to include the obligation to deliver the machines required by Order #2.

29.     Despite assuming these obligations, Sphere failed to deliver the entirety of the mining machines to Core, thereby breaching its obligations under the Sublicense Agreement.

---

[10] Sphere 3D News Release October 13, 2021, *available at* Sphere 3D and Gryphon Secure  Largest Single Hosting Services Deal in Core Scientific's History | Sphere3D (gcs-web.com)

30.     Moreover, pursuant to the Sphere MSA, Sphere agreed that Gryphon "shall at all times control the digital wallet, which shall be a wallet address selected by Gryphon on behalf of Sphere for storing digital assets (the 'Digital Wallet'). The digital assets shall be in the denomination of cryptocurrencies, virtual currencies or coins mined by [Gryphon] for or on behalf of [Sphere] at any location whatsoever (the 'Digital Assets')." *Id.* at Commercial Terms Clause.

31.     Under the Sphere MSA, Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *Id.*

32.     The Sphere MSA provides that Gryphon "shall at all times select the mining pool and custodian of the Digital Assets." *Id.*

33.     As consideration for Gryphon's management services, Sphere agreed that "[Gryphon] shall receive the equivalent of twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations (the 'Management Fee')." *Id.* at Management Fee/Operating Costs Clause.

34.     Pursuant to the terms of Sphere MSA, in addition to any damages incurred, Gryphon is entitled to its reasonable attorneys' fees and costs in connection with bringing this action. *See* Sphere MSA at Governing Law/Jury Waiver/Fees Clause.

35.     On or about April 11, 2022, Gryphon's CEO, Rob Chang, contacted Sphere with an offer to help obtain hosting for Sphere's bitcoin miners. Sphere directed Gryphon to "[s]tand by" but did not follow up regarding Mr. Chang's offer.

36.     On June 17, 2022, Gryphon's president, Dan Tolhurst, contacted Sphere to determine whether Sphere needed additional hosting for its bitcoin miners. Sphere stated it did not.

37.     Despite stating that it did not need additional bitcoin miner hosting, on or about August 8, 2022, Sphere entered into an agreement with Compute North, a hosting provider, without the consent, approval, or involvement of Gryphon.

38.     Such relationship is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which the Parties agreed that Gryphon shall serve as the exclusive provider of Services relating to cryptocurrency mining equipment.

39.     Mr. Tolhurst contacted Sphere again on September 30, 2022, but again was told that Sphere did not need additional hosting. Sphere also stated that it was looking to resolve issues directly with Core Scientific.

40.     On November 16, 2022, Gryphon, through its CEO Rob Chang, contacted Sphere and offered to set up a meeting with Foundry Digital, a mining pool operator ("Foundry").

41.     In December 2022, Core Scientific filed for relief under the U.S. Bankruptcy Code.

42.     Thereafter, in December 2022, Gryphon again attempted to obtain new hosting services for Sphere's bitcoin miners.

43.     However, Sphere refused to provide critical information required by Gryphon to enable Gryphon to procure replacement hosting for Sphere's devices, and instead sought to circumvent Gryphon's exclusive right to provide the Services by: (a) seeking alternative hosting independent of Gryphon's control, (b) creating its own digital wallets, (c) attempting to select its own crypto mining pool, and (d) actively concealing, beginning in Spring 2023, its own mining efforts and proceeds to avoid paying Gryphon the Management Fees owed under the Sphere MSA.

44.     On or about December 12, 2022, Sphere entered into a business relationship with US Bitcoin ("USBTC"), a mining hosting provider which at the time managed prior Compute North hosting facilities, without the consent, approval, or involvement of Gryphon.

45. On March 8, 2023, Mr. Tolhurst contacted Alex Tierney, Sphere's Director of Corporate Development, and inquired regarding Sphere's hosting needs. Sphere did not respond to Mr. Tolhurst's inquiry.

46. On March 9, 2023, Mr. Tolhurst contacted Kurt Kalbfleisch, Senior Vice President and CFO of Sphere, and further inquired regarding Sphere's hosting needs. Mr. Kalbfleisch indicated that he would speak to Sphere's CEO, Patricia Trompeter, and revert back.

47. On or about March 10, 2023, Sphere attempted to enter into a business relationship with Foundry without the knowledge, consent, approval, or involvement of Gryphon.

48. This attempt to create a business relationship with Foundry, a mining pool operator, and to create its own account outside of Gryphon's control, is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment and wherein Gryphon and Sphere agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.*

49. Moreover, Sphere's attempt to establish its own mining pool accounts with Foundry, without the consent, approval or involvement of Gryphon, would result in higher costs to Sphere because it does not enjoy the same lower cost tier available to Gryphon through the mining pools Gryphon manages; while this would reduce Sphere's profitability, it would also reduce the Management Fee ultimately received by Gryphon.

50. In response to Gryphon's inquiries concerning Sphere's attempts to establish a mining pool account with Foundry, Sphere has claimed that it did so at the recommendation of Sphere's auditor for purposes of revenue recognition. However, the mere fact that Sphere's attempt to establish an account with Foundry was recommended and/or even demanded by Sphere's auditor does not excuse Sphere's breach of the Sphere MSA. Furthermore, Sphere has failed to engage with Gryphon for purposes of considering alternative solutions concerning its revenue recognition issues.

51. On March 15, 2023, Mr. Tolhurst followed up with Sphere's CFO, Mr. Kalbfleisch, regarding Mr. Tolhurst's March 9 inquiry regarding Sphere's hosting needs. Sphere did not respond.

52. On or about March 16, 2023, Sphere entered into an agreement with Lancium Mining, a mining hosting provider, without the knowledge, consent, approval, or involvement of Gryphon.

53. The Lancium agreement included an expectation to direct the hashrate deployed at Lancium to a mining pool managed by Luxor Technologies as compensation for the introduction of Lancium by Luxor to Sphere.

54. Such relationship and agreement with Lancium and with Luxor is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to cryptocurrency mining equipment, and wherein Gryphon and Sphere agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.* at Exclusivity Clause and Commercial Terms Clause

55. On or about March 19, 2023, Sphere entered into a business relationship with Luxor Technologies, a crypto mining pool provider, without the consent, approval or involvement of Gryphon. Without Gryphon's consent or approval, Sphere created an account with Luxor and obtained an account ID.

56. This relationship is a material breach of the exclusivity provision in the Sphere MSA, pursuant to which Gryphon serves as the exclusive provider of Services relating to Sphere's cryptocurrency mining equipment, and wherein Gryphon and Sphere agreed that "[Gryphon] shall at all times select the mining pool and custodian of the Digital Assets." *Id.* at Exclusivity Clause and Commercial Terms Clause.

57. In furtherance of its improper relationships with Luxor and Foundry (and in breach of the Sphere MSA), Sphere has established Digital Wallets without the consent, approval, or

31

involvement of Gryphon. On March 21, 2023 Sphere, through its CEO, Patricia Trompeter, admitted to having created a digital wallet for Sphere without the consent or approval of Gryphon. Sphere has not transferred control of that digital wallet to Gryphon and has not paid the Management Fee required to be paid to Gryphon from that digital wallet, as required under the Sphere MSA.

58.      These actions are a material breach of the commercial terms of the Sphere MSA, which give Gryphon exclusive control over Sphere's Digital Wallets, and which specifically grant Gryphon the exclusive power to select the custodian of the Digital Assets. These actions prevent Gryphon from accurately calculating Sphere's operating costs and paying those amounts for Sphere as Gryphon is required to do under the Sphere MSA. These actions further prevent Gryphon from accurately calculating the Management Fee due to be paid to Gryphon.

59.      Gryphon has repeatedly requested from Sphere the information it would require to secure mining hosting services for Sphere but Sphere has repeatedly failed to provide that information to Gryphon. Sphere also refused for months to provide Gryphon with information relating to current hosting providers, only doing so recently, and has continued to refuse to provide Gryphon with authorization to manage those relationships to the current hosting providers as required under the SPHERE MSA.

60.      On March 21, 2023, Gryphon sent a demand letter (the "Demand Letter"), to Sphere, putting Sphere on notice of its breaches of the Sphere MSA and demanding all documentation relating to Sphere's efforts to circumvent the exclusive rights granted to Gryphon by Sphere, including its efforts to create business relationships with third party cryptocurrency-related service providers. A true and correct copy of the Demand Letter is attached hereto as **Exhibit D.**

61.      Sphere has not provided the requested documentation and remains in breach of the Sphere MSA.

32

62.     Even after filing its lawsuit, Sphere continues to breach the Sphere MSA and to tout its breaches publicly. For example, in its March 2023 Investor Update, Sphere disclosed that it has established a "partnership with Rebel Mining," and that it is "deploying miners to a facility in Missouri for anticipated energization in May."[11] Sphere publicly claims to have entered additional discussions with hosting providers for the placement of over 5,000 cryptocurrency miners.[12]

63.     Subsequent to its receipt of the Demand Letter, Sphere has continued to breach the Sphere MSA and continued to withhold information required by Gryphon to perform the services required of Gryphon under the Sphere MSA.

64.     Sphere has breached the Sphere MSA by directly paying vendors for operating costs associated with mining, the responsibility for which is explicitly charged to Gryphon under the Sphere MSA. Moreover, Sphere has refused to provide Gryphon with certain information relating to the hosting services it has independently (and in breach of the Sphere MSA) sought out and obtained. Such information is necessary for Gryphon to fulfill its obligations under the Sphere MSA relating to management of payments for operating costs.

65.     Specifically, the Sphere MSA provides, in pertinent part, that Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *See* Sphere MSA at Commercial Terms Clause. Consistent with its obligations under the Sphere MSA, Gryphon historically has directly paid invoices for hosting services relating to Sphere's mining operations out of Sphere's Digital Wallet.

---

[11] *See, e.g*., Sphere 3D Corp. Provides Bitcoin Production and Mining Updates for March 2023 | Sphere3D (gcs-web.com)

[12] Sphere 3D News Release March 16, 2023, *available at* Sphere 3D Corp. Provides Bitcoin Production and Mining Updates for February 2023 | Sphere3D (gcs-web.com)

66.     Sphere's independent arrangement of hosting services has and continues to prevent Gryphon from managing payments for such services. Sphere has refused to provide Gryphon with access and contact information relating to these services so that Gryphon can fulfill its obligations under the Sphere MSA. Instead, Sphere insists that it pay these vendors directly. Not only is this a breach of the Sphere MSA, but it has caused delay in payment because for Sphere to pay the vendors directly it has required Gryphon to first sell assets in the Digital Wallet, which requires Gryphon to transfer the cash received for those assets to Gryphon's bank account, then to transfer the cash from Gryphon's bank account to Sphere's bank account, and then finally for Sphere to transfer the cash from Sphere's bank account to the vendor. This unnecessarily convoluted process, which violates the Sphere MSA, creates a payment lag that has resulted in, and continues to pose a risk of, Sphere failing to timely pay invoices (and which poses a risk to Sphere's broader mining operations).

67.     For example, Sphere has admitted to independently establishing hosting agreements with hosting providers, *e.g.*, Lancium and Rebel Mining. Despite multiple requests, Sphere has refused to authorize Rebel to provide Gryphon with authority to make changes concerning the designated addresses of mining pools. Despite multiple requests, Sphere repeatedly refused to provide contact information for Lancium until finally such information was provided to Gryphon on May 16, 2023, and Lancium still has not responded to Gryphon's inquiries because Sphere's CEO, Ms. Trompeter, has not authorized Lancium to do so, notwithstanding the Sphere MSA's requirements. As a result of Sphere's actions and inactions, Gryphon is and/or has been unable to provide the Services required of it by the Sphere MSA. (*See* correspondence attached as **Group Exhibit E**.)

68.     Sphere has likewise continued to act to frustrate Gryphon's ability to perform under the Sphere MSA. Specifically, Sphere has on multiple occasions requested that Gryphon liquidate bitcoin held in the digital wallets managed by Gryphon. Although this is not, in and of itself, a breach of the Sphere MSA, in order for Gryphon to fulfill its obligations under the Sphere MSA to directly

pay Sphere's operating costs, the Digital Wallet must maintain adequate value to cover Sphere's costs and expenses as they come due. Although Gryphon has informed Sphere of this necessity, Sphere has repeatedly demanded the sale of assets in the Digital Wallet such that the value of the remaining assets in the Digital Wallet would be insufficient to cover amounts due and owing by Sphere, which Gryphon is supposed to pay on Sphere's behalf. (*See* correspondence attached as **Group Exhibit F**.)

69.     Sphere's refusal to maintain sufficient value in the Digital Wallet prevents payment of Sphere's operating costs as they come due, prevents payment of those costs in a timely manner, and prevents payment to Gryphon of its contractually mandated Management Fee. The result would be Gryphon providing the equivalent of working capital financing to Sphere, which is not required by the Sphere MSA.

70.     These breaches, and the damage they caused Gryphon, have been further compounded by Sphere's creation and use of digital wallets other than the Digital Wallet that Gryphon created for Sphere pursuant to the Sphere MSA. Indeed, on August 14, 2023, Sphere announced its Q2 2023 financial results. (A true and correct copy of Sphere's press release announcing those results is attached hereto as **Exhibit G**.) According to Sphere's own press release, Sphere mined 178.4 Bitcoin in Q2 2023. But only 92.7 Bitcoin was mined using the miners and pools that Gryphon manages for Sphere pursuant to the Sphere MSA. By definition, then, the other 85.7 Bitcoin that Sphere mined in Q2 2023 was directed to pools and addresses not selected by Gryphon, in breach of the Sphere MSA. And Gryphon has therefore lost its right, under the Sphere MSA, to that portion of the Management Fee that would otherwise be due and owing to Gryphon for Sphere's mining of those 85.7 Bitcoin (whose market value as of this filing is $2,514,609.40), all due to Sphere's flagrant breaches of the Sphere MSA, which Sphere has all but admitted in its most recent financial release.

## THE DATA SECURITY INCIDENT

71.     As required under the Sphere MSA, Gryphon and Sphere have developed and relied upon a regular course of dealing whereby the parties request and confirm transfers of cryptocurrency from the Digital Wallets managed by Gryphon to Sphere.

72.     Specifically, Gryphon regularly provides information to Sphere that allows Sphere to understand the Net Operating Profit generated through its cryptocurrency mining operations as managed by Gryphon. From that information, Gryphon calculates the amount owned by Sphere and sends an invoice to Sphere pursuant to the policies and procedures jointly developed by the parties and as required by the first Amendment to the Sphere MSA. Gryphon is required to pay Sphere's operating costs and is required to withdraw its Management Fee from Sphere's Digital Wallet. Thereafter, Gryphon has on several occasions transferred any remaining funds to Sphere by wire or, at Sphere's request, via a bitcoin transfer.

73.     If Sphere has requested a direct transfer of BTC, Gryphon sends the requested amount of digital assets in the Digital Wallets to Sphere, at Sphere's request, according to an established course of dealing. First, Sphere will send an email requesting a transfer. The transfer request will generally include (i) the amount of cryptocurrency to be transferred, and (ii) the public key address of its digital asset wallet (the "Transferee Wallet").

74.     If Sphere requests a transfer into a new Transferee Wallet, Gryphon will take steps to confirm the new Transferee Wallet. Specifically, when a transfer request is made by Sphere requesting that bitcoin be transferred to a new Transferee Wallet, Gryphon will send a *de minimis* test transaction to the Transferee Wallet public key address. The test transaction amount must then be confirmed as received by Sphere via email. Once confirmed, Gryphon then sends the full transfer amount to the Transferee Wallet, less the amount already transferred as part of the test transaction.

36

For subsequent transactions paid to known Transferee Wallet public key addresses, Gryphon will send the full requested amount without verification or test transactions.

75.    Gryphon and Sphere used the established protocol described herein for six (6) transactions of bitcoin beginning on August 26, 2022 without incident or objection by Sphere at any time before January 27, 2023.

76.    On or about January 27, 2023, however, Gryphon received a transfer request for eighteen (18) bitcoin from the email address belonging to Kurt Kalbfleisch, Senior Vice President and CFO of Sphere (the "First January 27 Request"). The email included all information typically provided to Gryphon by Sphere when requesting a cryptocurrency transfer, including a request that the eighteen (18) bitcoin be transferred to a known public key address for Sphere's Transferee Wallet. The January 27 Request also copied Ms. Trompeter's Sphere3d.com email address, which is consistent with Sphere's typical practice in transmitting these requests to Gryphon.

77.    Upon receipt of the First January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request and in a response email informed Mr. Kalbfleisch that the transfer would not be completed until January 30, 2023 at the earliest.

78.    On the same day and within the same email chain, Mr. Chang received a second email from what appeared to be Mr. Kalbfleisch's email address. The email stated that the previously-provided public key address for Sphere's Transferee Wallet was under audit and requested that the bitcoin be transferred to a different Transferee Wallet public key address (the "Second January 27 Request"). Sphere's CEO, Ms. Trompeter, was copied on this email via her correct email address.

79.    Upon receiving the Second January 27 Request, Gryphon, through its CEO Rob Chang, acknowledged receipt of the request that the bitcoin be transferred to a different Transferee Wallet public key address and consistent with established practice, responded that the request required verification of the new address.

37

80.     On January 30, 2023, Gryphon sent a *de minimis* test transaction (0.0001 bitcoin) to the new Transferee Wallet public key address identified in the Second January 27 Request. After the bitcoin was transferred, Mr. Chang sent an email to the email address appearing to be Mr. Kalbfleisch's Sphere3d.com email address from which the Second January 27 Request was sent, stating that the *de minimis* test transaction was complete and requesting that Sphere confirm receipt of the test transaction. Sphere's CEO, Ms. Trompeter, was copied on Mr. Chang's email via her correct email address.

81.     Shortly thereafter, Mr. Chang received an email response from what appeared to be Mr. Kalbfleisch's email address confirming that Sphere received the test transaction and requesting the full amount of the transfer request be sent. Ms. Trompeter was copied on the response email confirming Sphere's receipt of the test transaction at her correct email address, again consistent with Sphere's practice in communicating such confirmations to Gryphon.

82.     After receiving confirmation of the test transaction and the request that the full amount be transferred, Gryphon sent the remainder of the requested transfer amount (17.9999 bitcoin) on January 31, 2023, to the new Transferee Wallet public key address identified in the Second January 27 Request.

83.     On February 1, 2023, Gryphon received an email from what appeared to be Mr. Kalbfleisch's email address requesting the transfer of an additional eight (8) bitcoin to the new Transferee Wallet public key address (the "February 1 Request"). Once again, Ms. Trompeter was copied on this email via her correct email address. Later that day, Gryphon received another email from what appeared to be Mr. Kalbfleisch's email address inquiring about the status of the requested transfer. Ms. Trompeter was copied on this email via her correct email address.

84.     Gryphon, through Mr. Chang, responded to the email from what appeared to be Mr. Kalbfleisch's email address stating the transfer request was being processed. Ms. Trompeter was copied on Mr. Chang's response via her correct email address.

85.     On February 1, 2023, Gryphon transferred eight (8) bitcoin to the new Transferee Wallet public key address.

86.     A true and correct copy of the email correspondence regarding the transfers described herein are attached hereto as **Group Exhibit H.** In total, Gryphon transferred twenty-six (26) bitcoin to the new Transferee Wallet public key address provided in the Second January 27 Request via three separate bitcoin transactions.

87.     On or about February 2, 2023, Gryphon was informed that Sphere never received the bitcoin transactions sent by Gryphon. After examination, Gryphon discovered that emails sent from what appeared to be Mr. Kalbfleisch's email address, beginning with the Second January 27 Request, were compromised when sent by Sphere to Gryphon; those emails came from a spoofed domain impersonating Sphere's domain. As such, the transfers of bitcoin were sent to a digital asset wallet address with no apparent affiliation to Sphere. Mr. Kalbfleisch's email was compromised as a result of the Data Security Incident in Sphere's systems; upon information and belief, Mr. Kalbfleisch's email was compromised due to Sphere's failure to implement proper security and controls over its computer systems, including its executives' email accounts and email server, and its failure to detect the compromise when a threat actor was actively diverting Gryphon's funds, despite Sphere's CEO, Ms. Trompeter, being copied on and privy to all relevant communications. *See* **Group Exhibit H**.

88.     Unlike Mr. Kalbfleich's email address, Ms. Trompeter's email address was not spoofed on the Second January 27 Request or any subsequent correspondence with Gryphon, including the February 1 Request; Ms. Trompeter was copied to her Sphere3d.com email address on all correspondence between Gryphon and the hostile actor spoofing Mr. Kalbfleisch's email. Thus,

Ms. Trompeter—Sphere's CEO—was well-positioned to ascertain and detect her colleague's compromise, but apparently did not do so. *See* **Group Exhibit H**.

89.     In an abundance of caution, in the aftermath of the Data Security Incident, Gryphon engaged an independent third-party forensic investigator to perform a privileged investigation of any potentially impacted systems on Gryphon's part. The investigation revealed that the compromise of Mr. Kalbfleisch's Sphere3d email account was not the result of any intrusion, vulnerability, hostile actor, or lack of proper security or controls over computers, email accounts, or email servers used by Gryphon.

90.     On March 3, 2023, Gryphon and Sphere scheduled a meeting with the documented stipulated purpose of allowing the Parties' respective experts to compare their investigations and findings into the Data Security Incident. In particular, Gryphon indicated in its correspondence to Sphere that it had "completed [its] forensic research and believe[s] it is the right time for our forensic investigators to discuss their findings. Could we please arrange a time for them to connect?" On March 3, Ms. Trompeter, CEO of Sphere, agreed to a meeting including both parties' experts, noting, "[w]e have a forensic review as well." (*See* correspondence attached as **Group Exhibit I**.)

91.     On March 15, 2023, Gryphon and Sphere joined their scheduled call wherein their respective experts were expected to discuss their investigations into the Data Security Incident. Gryphon attended the call with its expert. Sphere, however, did not put forward any expert on the call. Instead, Sphere refused to provide any information to Gryphon, claimed it was undergoing "many investigations" and did not know what investigation Gryphon was referring to, and claimed that its understanding of the purpose and scope of the meeting was that Gryphon would present its own findings without any exchange of information.

92.     Despite multiple requests by Gryphon, Sphere has failed to reschedule a meeting of the parties' respective experts, has failed to provide any information regarding its investigation, and

has failed to provide any evidence that it undertook any investigation into the Data Security Incident at all.

93.     Upon information and belief, the hostile actor that caused the spoofed emails acted through Sphere's computer systems and/or information technology infrastructure and, without adequate investigation and remedial measures, presents a continuing threat to Sphere's ongoing operations, and specifically to Sphere's existing and future commercial partners.

94.     Despite the transfer of bitcoin to the hostile threat actor being the sole fault of Sphere and due to Sphere's negligence alone, in order to attempt to maintain an amicable business relationship with Sphere, Gryphon transferred the U.S. dollar-equivalent value of twenty-six (26) bitcoin, approximately $560,215.53, from a digital wallet of Gryphon's to Sphere via wire transfer on a courtesy basis, reserving Gryphon's rights. Sphere has acknowledged receipt of this transfer.

95.     Despite good faith efforts, including blockchain forensic tracing, Gryphon has been unable to recover the twenty-six (26) bitcoin transferred to the threat actor whose public key address was included in the emails sent to Gryphon, copying Sphere's CEO.

96.     Since the Data Security Incident, Gryphon has discontinued transfers of digital assets to Sphere. Instead, Gryphon makes payments to Sphere in U.S. Dollars via wire transfer.

## UNLAWFUL AND DISPARAGING STATEMENTS BY SPHERE AND TROMPETER

97.     Following the Data Security Incident, Sphere and its Chief Executive Officer, Patricia Trompeter, have made unlawful and disparaging statements to third parties concerning Gryphon. In a news release issued on April 7, 2023, Trompeter, acting in her capacity as Sphere's CEO, accused Gryphon of "materially breaching the Master Services Agreement," "put[ting] [Sphere's] assets at significant risk," "willfully violat[ing] [Gryphon's] contractual duties," and "bull[ying] [and]

threaten[ing]" Sphere.[13] After acknowledging that "[c]orporate integrity is essential . . . in [the cryptocurrency] industry," Trompeter further accuses Gryphon of "fail[ing] to act with integrity . . . [and] . . . fail[ing] to honor our contract." Trompeter's statement that Sphere will "hold . . . accountable" and "protect" itself from "the likes of Gryphon," alongside the statement that Gryphon has "failed to act with integrity," is a transparent attempt to improperly associate Gryphon, a well-respected industry leader, with certain high-profile bad actors in the crypto industry whose wrongful conduct has recently come to light.

98.     The false and disparaging statements of Sphere and Trompeter in the April 7, 2023 news release were reported on, quoted, and re-published by various cryptocurrency news media outlets, including without limitation CoinDesk, Cointelegraph, Binance, and Blockchain News, as well as by the broader news media, including without limitation Barron's, Law.com, MarketWatch, Seeking Alpha, and Yahoo! Finance.

99.     Apparently acting in her individual capacity, Trompeter further republished the April 7, 2023 news release containing the false statements on her personal Twitter account.

100.     Despite the serious nature of Sphere's allegations, it did not identify any specific action Gryphon took that it should not have taken, or any specific action Gryphon failed to take but should have, leaving Gryphon incapable of responding meaningfully, let alone determining how it might try to cure any purported breaches.

101.     On April 7, 2023, Sphere initiated this action against Gryphon. Sphere's original Complaint in this action, as well as its later-filed Amended and Second Amended Complaints, lack specific detail concerning Gryphon's purported breaches of the Sphere MSA. *See* ECF Nos. 1, 20, 36. For example, none of these pleadings identifies any specific instance in which Gryphon "refused to

---

[13] Sphere 3D News Release April 7, 2023, *available at* Sphere 3D Files Litigation Against Gryphon Digital Mining | Sphere3D (gcs-web.com)

find hosting space for Sphere's miners" or "delayed in setting up and ensuring the operation of Sphere's miners." *See generally* ECF Nos. 1, 20, 36.

102.     In light of the vague and generic allegations in Sphere's various pleadings, Gryphon made multiple requests to Sphere—both directly and through counsel—asking Sphere to specify exactly how Gryphon allegedly breached the Sphere MSA, and how Gryphon could, in Sphere's view, cure any such breaches, so that Gryphon could review and evaluate such information and attempt to cure, as Gryphon is entitled to do under the Sphere MSA.

103.     For example, Gryphon's Chief Executive Officer, Rob Chang, asked Sphere to provide specific information concerning the nature of Gryphon's purported breaches of the Sphere MSA on at least the following occasions, with Sphere each time failing to respond substantively, if at all:

- May 10, 2023: Gryphon emailed Sphere that Gryphon was "willing to work with [Sphere] to address any perceived shortcomings," but that it was "not at all clear from [Sphere's] various correspondence (or lawsuit, frankly) what Sphere actually thinks Gryphon has done to breach the Sphere MSA," and asking Sphere to "identify, in detail, how [Sphere] thinks Gryphon has purportedly breached the Sphere MSA." (*See* correspondence attached as **Group Exhibit J**.) Sphere did not respond to this email.

- May 23, 2023: After Sphere did not respond, Gryphon emailed Sphere "[f]ollowing up" on Gryphon's May 10, 2023 email. *Id.* Sphere responded by stating Gryphon's response "was clear that [Gryphon] had no intent to undertake any effort at remediation, so [Sphere] [does] not see any need to engage further." *Id.*

- May 24, 2023: Gryphon emailed Sphere reiterating that "[a]ll [Gryphon] [is] asking is for Sphere to identify for Gryphon what, exactly, Gryphon needs to do, in Sphere's

43

view, to cure any breaches," and informing Sphere that, "[w]ithout that specificity, it is hard to see how [Gryphon] can even attempt to cure." *See id.* Gryphon further asked Sphere "to specifically identify how Sphere believes that Gryphon has purportedly breached the Sphere MSA, so [Gryphon] can attempt to move forward productively," and informed Sphere that, "absent a clear and consistent recitation of how [Gryphon] [has] breached the Sphere MSA, any cure becomes difficult, if not impossible to accomplish." Sphere responded by "refer[ring] [Gryphon] to [its] attorney's correspondence to [Gryphon's] lawyers and [Sphere's] Complaint," and stating that "[i]t is [Gryphon's] job to cure the breaches we identified, not ours." *See id.*

104.    Similarly, Gryphon's counsel sent three separate letters to Sphere's counsel—on June 6, 2023, on June 22, 2023, and on August 1, 2023—each asking Sphere to specify "***exactly what*** Gryphon has allegedly done to breach the Sphere MSA, and as to ***exactly how*** Gryphon can cure those alleged breaches." (*See* correspondence attached as **Group Exhibit K** (all emphasis in original).)

105.    Despite the clear and unambiguous language of the Sphere MSA and the clear requirements of New York law with respect to the Sphere MSA's notice-and-cure provisions, Sphere has ***never*** provided Gryphon sufficient notice of Gryphon's purported breaches of the Sphere MSA. This has made it impossible for Gryphon to exercise its cure rights under the Sphere MSA in response.

106.    Nevertheless, on October 6, 2023, Sphere purported to terminate the Sphere MSA on the basis of its prior correspondence and pleadings in this action. Because Sphere has failed to comply with the Sphere MSA's explicit notice-and-cure provisions, however, Sphere's purported termination is wrongful and ineffective

107.    All conditions precedent to bring these claims have been met, or have been waived, or would be futile to attempt prior to bringing this action.

## COUNT I – BREACH OF THE SPHERE MSA

(Against Counter-Defendant Sphere 3D Corp.)

108.    Gryphon adopts by reference the allegations of Paragraphs 1-107 as if fully stated herein.

109.    Gryphon and Sphere are parties to the Sphere MSA.

110.    The Sphere MSA is a valid and enforceable contract governed by New York law.

111.    Sphere knew it was responsible for delivering the 71,000 mining machines to Core.

112.    Gryphon has fully performed and complied with all of its obligations and duties under the Sphere MSA.

113.    Sphere's conduct, as described herein, constitutes a breach of the Sphere MSA.

114.    Specifically, Sphere has breached its obligations to deliver to Core the 71,000 mining machines.

115.    As a direct and proximate cause of Sphere's breaches, Gryphon has been directly damaged in an amount to be determined at trial, but in all events including but not limited to loss of the value of the MSA, lost profits, loss of business opportunities, and losses associated with litigation against Core.

## COUNT II – BREACH OF THE SPHERE MSA

(Against Counter-Defendant Sphere 3D Corp.)

116.    Gryphon adopts by reference the allegations of Paragraphs 1-107 as if fully stated herein.

117.    Gryphon and Sphere are parties to the Sphere MSA.

118.    The Sphere MSA is a valid and enforceable contract governed by New York law.

119.     Under the Sphere MSA, the Parties agreed that Gryphon shall serve as Sphere's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by [Sphere] and/or its subsidiaries and/or affiliates at any location . . . ." *See* Sphere MSA at Exclusivity Clause.

120.     The Parties further agreed that Gryphon shall "at all times control the digital wallet, which shall be a wallet address selected by [Gryphon] on behalf of [Sphere] for storing digital assets," and shall "at all times select the mining pool and custodian of the Digital Assets." *See* Sphere MSA at Commercial Terms Clause.

121.     The Parties also agreed that Gryphon "shall pay directly from the Digital Wallet on behalf of [Sphere] all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee." *See id.*

122.     The Parties further agreed that Sphere could terminate the Sphere MSA under certain conditions "[s]ubject to written notice from [Sphere] and an opportunity by [Gryphon] to cure for a period of up to one hundred eighty (180) days." *See id.*

123.     Gryphon has fully performed and complied with all of its obligations and duties under the Sphere MSA.

124.     Sphere's conduct, as described herein, constitutes a breach of the Sphere MSA.

125.     Specifically, Sphere has materially breached the exclusivity terms of the Sphere MSA by entering into agreements with, potentially among others, Luxor, Foundry, USBTC, Rebel Mining, and Lancium without the consent, approval, or involvement of Gryphon.

126.     Sphere has further materially breached the commercial terms of the Sphere MSA by, among other things, creating and operating its own digital wallets without the consent, approval or involvement of Gryphon.

46

127.     Sphere has further materially breached the Sphere MSA by collecting amounts believed to be mining proceeds, in the amount of 2.82168614 bitcoin, into its Digital Wallet and failing to remit Management Fees to Gryphon.

128.     Sphere has further materially breached the Sphere MSA by directly paying the operating costs associated with its mining activity rather than allowing Gryphon, as required under the Sphere MSA, to pay such costs and expenses from the Digital Wallet.

129.     Finally, Sphere has materially breached the Sphere MSA by purporting to terminate the Sphere MSA on October 6, 2023 without granting Gryphon its contractually bargained-for rights to sufficient notice of any alleged breaches and a 180-day period to cure those alleged breaches.

130.     As a direct and proximate cause of Sphere's breaches, Gryphon has been directly damaged in an amount to be determined at trial, but in all events in excess of $75,000, exclusive of interest and costs, for its prior breaches of the Sphere MSA, plus at least $10,000,000 for its wrongful purported termination of the Sphere MSA.

## COUNT III – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(Against Counter-Defendant Sphere 3D Corp.)

131.     Gryphon adopts by reference the allegations of Paragraphs 1-107 as if fully stated herein.

132.     Gryphon and Sphere are parties to the Sphere MSA.

133.     The Sphere MSA is a valid and enforceable contract governed by New York law.

134.     Gryphon has fully performed and complied with all of its obligations and duties under the Sphere MSA.

135.     Under New York law, Sphere owes Gryphon an implied duty to act in good faith and conduct itself fairly in connection with the Sphere MSA.

136.     Pursuant to the exclusivity terms of the Sphere MSA, Gryphon is the exclusive provider of any and all management services relating to mining equipment owned, purchased, leased, or otherwise controlled by Sphere.

137.     Despite multiple requests made by Gryphon, Sphere has failed to disclose the number of cryptocurrency miners owned, purchased, leased or otherwise controlled by Sphere.

138.     Despite multiple requests made by Gryphon, Sphere has failed to provide Gryphon with information required for Gryphon to find hosting for Sphere's cryptocurrency miners.

139.     Despite multiple requests made by Gryphon, Sphere has failed to provide Gryphon with certain access and contact information relating to the various hosting facilities that Sphere has, on its own, arranged to host its cryptocurrency miners.

140.     Further, Sphere has refused to provide authorization for Gryphon to manage the relationships it has created with those hosting facilities, which has prevented Gryphon from managing the cryptocurrency miners hosted at those hosting facilities.

141.     Further, Sphere has refused to provide Gryphon with sufficient information to allow Gryphon to pay operating costs incurred by Sphere.

142.     Though the Sphere MSA does not explicitly address Sphere's failure to disclose all this information, Sphere's failure to provide this information to Gryphon has prevented Gryphon from fulfilling its duties under the Sphere MSA, and, as such, frustrated the parties from obtaining the benefit of their bargain under New York law.

143.     Although Sphere's failure to disclose information is not an express breach of the Sphere MSA, it has prevented Gryphon from providing Services as required under the Sphere MSA and therefore deprived Gryphon of the benefits of its bargain under the Sphere MSA.

144.     Sphere's failures to disclose this information thus constitute a breach of the implied covenant of good faith and fair dealing inherent in every contract under New York law.

145.     As a direct and proximate cause of Sphere's breach, of the implied covenant of good faith and fair dealing, Gryphon has been damaged in an amount to be determined at trial, but in all events in excess of $75,000, exclusive of interest and costs.

## COUNT IV – NEGLIGENCE

(Against Counter-Defendant Sphere 3D Corp.)

146.     Gryphon adopts by reference the allegations of Paragraphs 1-107, above, as if fully stated herein.

147.     Sphere owed duties to Gryphon to maintain proper security and control of Sphere's computer systems and information technology infrastructure, including its company email accounts and email server, to take proper precautions to protect Gryphon from being targeted by fraudulent activities in connection with Gryphon's business dealings with Sphere, including the transfer of assets under the Sphere MSA, to safeguard information relating to such business dealings and transactions, and to recognize and notify Gryphon of fraudulent activity occurring within Sphere's computer systems and information technology infrastructure.

148.     Sphere knew or should have known that its failure to exercise due care in the performance of the foregoing duties would result in an unreasonable risk of harm to Gryphon.

149.     Sphere knew or should have known of the prevalence of, and industry warnings relating to, business email scams whereby a hostile actor may infiltrate a company's technology systems and impersonate an employee of the company for the purpose of fraudulently inducing a customer or business partner to send the hostile actor money or confidential business or personally identifying information.

150.     Sphere breached each of the aforementioned duties by allowing the email account of its CFO Mr. Kalbfleisch (and potentially other email accounts) to be impersonated or otherwise compromised by an unknown hostile actor in connection with the Data Security Incident.

151.     As a direct and proximate cause of Sphere's negligence, the unknown hostile actor was able to send Gryphon a fraudulent request to transfer of twenty-six (26) bitcoin.

152.     Sphere's CEO, Ms. Trompeter, was copied on all of the emails at issue using her correct email address.

153.     As such, Ms. Trompeter should have identified and notified Gryphon of the hostile actor activity and email compromise.

154.     Despite being copied on the email, Sphere's CEO Ms. Trompeter failed to recognize the hostile actor activity and failed to notify Gryphon that Mr. Kalbfleisch's email was compromised and that the Second January 27 Request and the February 1 Requests were fraudulent.

155.     Despite being copied on the email, Sphere's CEO Ms. Trompeter failed to recognize the hostile actor activity within Sphere's own computer systems and information technology infrastructure and failed to take reasonable steps to address the hostile actor activity within Sphere's own computer systems and information technology infrastructure.

156.     As a direct and proximate cause of Sphere's negligence in connection with the Data Security Incident, including Sphere's CEO Ms. Trompeter's failure to recognize that a hostile actor had impersonated Sphere's CFO, Gryphon was not notified of the hostile actor activity occurring within Sphere's technology systems and that the Second January 27 Request and the February 1 Requests were fraudulent.

157.     As a direct result and proximate cause of Sphere's negligence, Gryphon transferred twenty-six (26) bitcoin to the unknown hostile actor, which it has been unable to recover despite diligent efforts to do so.

158.     Although Sphere claims it has investigated the email compromise, Sphere has refused and failed to provide its own report of its investigation at a meeting arranged by the Parties for that purpose. *Supra*, ¶¶ 85-89. Sphere has subsequently refused multiple requests for the parties to allow

their forensic experts to meet and share their investigative findings, and has refused to share their findings with Gryphon.

159.    Despite Gryphon's compliance with the standard procedures that Gryphon and Sphere used for six previous bitcoin transactions, Sphere negligently failed to follow its established course of dealing and standard procedures when requesting a transfer of bitcoin from Gryphon, including by failing to ensure that the transfer of bitcoin was initiated by Sphere personnel and directed into a Sphere controlled account and not by an unknown threat actor impersonating Sphere and diverting Gryphon's funds into unauthorized accounts not affiliated with Sphere.

160.    But for Sphere's negligence, Gryphon would not have transferred twenty-six (26) bitcoin from its own digital wallet to one belonging to an unknown hostile actor, and would not have been required to pay the value of those 26 bitcoin to Sphere out of its own assets.

161.    As a direct and proximate cause of Sphere's negligence, Gryphon has been damaged in an amount totaling twenty-six (26) bitcoin which had the market value of no less than $560,225.53 at the time of the transfers.

## **PRAYER FOR RELIEF**

WHEREFORE, Gryphon respectfully asks this Court to enter judgment in its favor as follows:

1.      An order dismissing Sphere's Second Amended Complaint in its entirety with prejudice;

2.      On Count I, awarding Gryphon damages, and its reasonable attorneys' fees and costs pursuant to the prevailing party provision of the Sphere MSA (Ex. A, p. 3), in an amount to be determined at trial;

3.      On Count II, awarding Gryphon damages and its reasonable attorneys' fees and costs pursuant to the prevailing party provision of the Sphere MSA (Ex. A, p. 3), in an amount to be determined at trial;

4.      On Count III, awarding Gryphon damages, and its reasonable attorneys' fees and costs  (Ex. A, p. 3), in an amount to be determined at trial

5.      On Count IV, awarding Gryphon damages, including punitive damages, in an amount to be determined at trial;

6.      Any and all other and further relief that the Court deems just and proper.


Dated: January 17, 2024

> */s/ Dennis H. Tracey*
> Dennis H. Tracey, III
> Allegra M. Bianchini
> HOGAN LOVELLS US LLP
> 390 Madison Avenue
> New York, NY 10017
> T  +1 212 918 3000
> dennis.tracey@hoganlovells.com
> allegra.bianchini@hoganlovells.com
>
> *Attorneys for Defendant*
> *Gryphon Digital Mining, Inc.*

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SPHERE 3D CORP.,<br><br>*Plaintiff*,<br><br>v.<br><br>GRYPHON DIGITAL MINING, INC.,<br><br>*Defendant*. | Case No. 23-cv-02954 (PKC)<br><br>**Jury Trial Demanded** |

**SECOND AMENDED COMPLAINT**

<u>**TABLE OF CONTENTS**</u>

**PRELIMINARY STATEMENT** ................................................................................. 1

**PARTIES** ................................................................................................................... 9

**JURISDICTION & VENUE** .................................................................................... 10

**FACTUAL ALLEGATIONS** ................................................................................. 10

I.      BACKGROUND ON CRYPTOCURRENCY MINING ................................................. 10

II.     IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO
        PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND
        CRYPTOCURRENCY-RELATED OPERATIONS" ..................................................... 11

III.    THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT
        MANAGEMENT SERVICES, IN BREACH OF THE MSA ......................................... 12

IV.     GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL
        ASSETS, IN BREACH OF THE MSA .................................................................... 13

V.      GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH
        OF ITS FIDUCIARY DUTIES ............................................................................. 14

VI.     GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND
        POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE
        LAW    17

        A.      Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost
                Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry
                Standard Procedures For Transferring Bitcoin ................................................. 17

        B.      Gryphon Lacks Industry Standard Internal Controls And Policies And
                Procedures, In Violation Of The MSA And Almost Certainly In Violation Of
                Applicable Law ............................................................................................. 18

VII.    IN AN EFFORT TO COW SPHERE AND DISSUADE IT FROM EXPOSING GRYPHON'S
        NUMEROUS BREACHES, GRYPHON HAS BASELESSLY SOUGHT TO THREATEN SPHERE
        WITH MANUFACTURED BREACHES ................................................................... 21

VIII.   SINCE SPHERE FILED THIS LAWSUIT, GRYPHON HAS RETALIATED BY REFUSING TO
        TRANSFER THE PROCEEDS OF THE SALES OF SPHERE'S DIGITAL ASSETS TO SPHERE ..... 22

IX.     SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO
        PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES .......... 25

X.      AFTER SPHERE FILED THIS LAWSUIT, GRYPHON ASSERTED MERITLESS DEFAMATION
        CLAIMS DESIGNED TO PUNISH SPHERE FOR BRINGING THIS LAWSUIT ............................ 26

CAUSES OF ACTION ............................................................................................................ 28

PRAYER FOR RELIEF ......................................................................................................... 31

Plaintiff Sphere 3D Corp. ("Sphere"), by and through its undersigned attorneys, respectfully submits this Amended Complaint against defendant Gryphon Digital Mining, Inc. ("Gryphon").

## PRELIMINARY STATEMENT

1.      This is an action for breach of contract and breach of fiduciary duty.  Sphere and Gryphon are in the business of digital asset mining—*i.e.*, using computers referred to as "miners" to earn bitcoin and bitcoin-related transaction fees.  In contemplation of a potential merger that ultimately fell through, the parties entered into a Master Services Agreement dated August 19, 2021 (the "MSA," attached as Exhibit 1), as subsequently amended on December 29, 2021 (the "MSA Amendment," attached as Exhibit 2).  Under the MSA, Gryphon (among other things) undertook an obligation to be the "exclusive provider of any and all management services for" Sphere's "blockchain and cryptocurrency-related operations" and the custodian of certain of Sphere's digital assets.  MSA at 1.  In return, Sphere promised to pay Gryphon an exorbitant management fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations" (the "Management Fee").  *Id.*  Separate from the contract, Gryphon's power over Sphere and its status as custodian of Sphere's digital assets and miners gave rise to fiduciary duties, including the duty of loyalty, including to avoid self-dealing, duty of care, and duty of good faith.

2.      For over a year now, the parties' relationship has proven to be completely one-sided: Gryphon has dutifully collected its exorbitant Management Fee while shirking its duties under the MSA and delivering abhorrent management services, causing untold damage to Sphere. Worse still, Gryphon has been skimming off the top (*i.e.*, stealing) from Sphere's assets and, as recent events have revealed, has no internal controls systems or policies and procedures in place,

as needed not only to comply with the MSA, but also applicable law. And Gryphon has breached its fiduciary duties by nakedly prioritizing its own interests over those of Sphere's.

3.      Gryphon's failures under the MSA are persistent, ongoing, uncured despite repeated entreaties from Sphere, and too many to catalogue. In general, Gryphon has been content to sit back and collect millions of dollars in Management Fees while delivering no services whatsoever. When it has delivered services, the results have been appalling. By way of illustration only, Gryphon has refused to find hosting space for Sphere's miners (and instead directed Sphere to undertake the task of finding space itself); allowed Sphere's miners to languish with the U.S. Customs and Border Protection agency ("U.S. Customs") for weeks (a situation Sphere itself ultimately resolved); persistently delayed in setting up and ensuring the operation of Sphere's miners; inexplicably ignored Sphere's instructions to sell its digital assets; failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges; and generally failed to manage relationships with third-parties. The result has been lost revenues for Sphere while Gryphon eats a free lunch.

4.      And, egregiously, Sphere has good reason to believe that Gryphon has been skimming off the top from—in other words, stealing—Sphere's digital assets. Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to provide Sphere with documentation to verify that it is not using or otherwise taking Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit. The only rational reason for such concealment is to make it harder for Sphere to know which assets are mined for its own account— and to detect Gryphon stealing Sphere's assets. Regardless of Gryphon's intent, it is apparent that it has failed to remit all that Sphere is owed.

5.    Recently, Gryphon's gross incompetence has reached a new level that raises substantial concerns about Gryphon's ability to safeguard Sphere's digital assets, the effectiveness of its internal controls, and its compliance with the law.  Gryphon holds itself out as a sophisticated entity and its CEO, Rob Chang, as an "experienced executive" in the crypto-space.  Gryphon and Mr. Chang, however, recently fell for multiple spoofing attacks targeting Sphere's digital assets that would have been avoided had Gryphon had internal controls systems and policies and procedures in place and adhered to applicable law.

6.    On January 27, 2023, at 1:22 p.m., Sphere CFO Kurt Kalbfleisch requested by email that Mr. Chang transfer 18 bitcoin (worth over $400,000) from a wallet controlled by Gryphon to one controlled by Sphere, which was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name: "@sphere3d.com."  Mr. Chang responded that he would initiate the transfer.

7.    At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch, as depicted in the figures below.  The email came from a different domain than the Sphere domain, namely, "@spheres3d.com"[1] (with an added s in the middle), not @sphere3d.com. In the email, the person pretending to be Mr. Kalbfleisch stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address that Sphere had never used.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

---

[1] All emphases have been added unless otherwise noted.

## Re: Coin Transfer

KK  Kurt Kalbfleisch <kurt.kalbfleisch@spheres3d.com>
To  ○ Rob Chang
Cc  ○ Patricia Trompeter

(Fig 1. From/to/cc line reflecting that the email originated from the spoofer with an incorrect domain, @spheres3d.com)

Rob,

Well Noted. I have just been notified that the address below is being audited. So kindly proceed with the transfer of 18 BTC from our "Sphere Mined Coins" wallet to the following address: **bc1qmrykeusq73xd7ad6h2y27mw0fu2e9wcqrfrlvr.**

(Fig. 2. The relevant portion of the body of the spoofing email containing an implausible request to transfer bitcoin to a new wallet address in light of an audit.)

**Kurt Kalbfleisch**
**Senior Vice President and CFO**
4542 Ruffner Street Suite 250, San Diego, CA 92111 USA
t 858.495.4211: m 858.775.6801
kurt.kalbfleisch@sphere3d.com

(Fig. 3. The signature block containing the correct email address.)

8.    This was a transparent spoofing attack in which a third-party was impersonating

Mr. Kalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets.

Even a cursory review of the spoofing email—which did not originate from a Sphere email address,

included the correct email address in the signature block, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags for any competent employee, let alone a supposedly "experienced" executive like Mr. Chang, and prevented any unauthorized transfer. So too would any independent verification of the requestor's identity, such as video or other identity verification.

9.      Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker. Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that Sphere had never used before, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

10.     Not to be outdone, mere days later, on February 1, 2023, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000). Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again). On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company— to realize that he had been fooled by not one, but two, spoofing attacks.

11.     The incident revealed to Sphere the woeful state of Gryphon's internal controls and policies and procedures, which should have prevented the attack. Following the spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide. The failure to include effective internal controls demonstrates not only that Gryphon cannot comply

with its duties under the MSA, but also that Gryphon is almost certainly in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs. Illustratively, Gryphon panicked when Sphere suggested that the incident be reported to law enforcement, including the Federal Bureau of Investigations ("FBI"), insisted that the issue could be handled between the parties, and demanded that no one report the theft to the authorities. This put the onus on Sphere to report the incident, which it did by filing a suspicious activity report ("SAR") with the Financial Crimes Enforcement Network ("FinCEN").

12. Gryphon's official version of events raises substantial concerns regarding its ability to rectify any of the issues raised by this litigation—and also its ability to tell the truth. Gryphon is presently in the process of merging with Akerna Co. ("Akerna"), a publicly-traded cannabis company. The Form S-4 Registration Statement dated May 11, 2023 for the transaction (the "Gryphon-Akerna Form S-4" or the "Form S-4") describes the spoofing attacks as follows:

> The threat actor requested that the BTC be transferred to an alternate wallet. As a result, 26 BTC, with a value of approximately $560,000 at the time, was transferred to a wallet controlled by the threat actor. Via counsel, Gryphon engaged with US Federal law enforcement to recover the BTC. Despite these attempts by law enforcement to recover the BTC, recovery was not possible. Gryphon subsequently wired the commensurate amount in USD to Sphere 3D to make them whole for the stolen BTC. . . . Sphere 3D made a claim with its insurance carrier. If Sphere 3D's is reimbursed from its insurance carrier, the Company would request a reimbursement from Sphere 3D. The Company has also subsequently modified its control systems to protect against any future attempted incursion.

See Gryphon-Akerna Form S-4 at F-76.

13. The description contains material inaccuracies. Most glaringly, the assertion that Sphere "made a claim with its insurance carrier" is totally wrong. On the contrary, as Sphere

explicitly informed Gryphon shortly after the spoofing attacks and long before the filing of the Form S-4, Sphere *did not make a claim with its insurance carrier, as it does not have any insurance that would cover the incident*. That Gryphon could claim the direct opposite is beyond belief.

14.     In addition, the claim that Gryphon made Sphere "whole" for the theft of approximately $560,000 worth of Sphere's assets omits that Gryphon has demanded that Sphere repay that amount to Gryphon. And while Gryphon claims it engaged with law enforcement, it has not disclosed any information about that engagement to Sphere—to the contrary, it actively tried to dissuade Sphere from engaging with law enforcement. Nor has Gryphon disclosed its purportedly updated internal controls to Sphere, despite multiple requests by Sphere. Finally, the description omits the most salient details, such as that Mr. Chang sent Sphere's digital assets to the "threat actor" on multiple occasions in response to email requests from an email address not associated with Sphere.

15.     There are additional indicia that Gryphon lacks anything resembling effective internal controls. In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability). In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere understands that Gryphon, when it goes public, intends to recognize Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.

16.     Beyond the MSA, Gryphon has breached its fiduciary duties. These fiduciary duties are inherent in nature and arise from, among other places, Gryphon's role as a manager of substantially all of Sphere's business operations (a role akin to an officer or trustee), agent, custodian, investment adviser, and broker-dealer. They also arise from the unusual trust and confidence Sphere places in Gryphon and the control and dominance Gryphon exerts over Sphere's

operations.  Gryphon has taken the position that Sphere cannot even *attempt* to "create" any "business relationships" with any third-party in the crypto-space unless it obtains Gryphon's approval first.  Gryphon's breaches of fiduciary duty include prioritizing its own proprietary miners and mining pool strategies over Sphere's.  Indeed, Gryphon's miners consistently outperform Sphere's, which would not occur if Gryphon were acting to avoid self-dealing.

17.     The situation has only become more dire since Sphere initiated this litigation on April 7, 2023.  In the ordinary course, Sphere generates substantially all of its revenue by mining for digital assets and those digital assets flow through a wallet controlled by Gryphon.  In the ordinary course, Gryphon is required to remit the proceeds from sales of those digital assets to Sphere.  The MSA specifically provides that Gryphon must honor Sphere's "written instructions . . . with respect to all decisions to sell or hold Digital Assets."  MSA at 3.  The Gryphon-Akerna Form S-4 (at F-55, F-66) likewise acknowledges that Gryphon must "[s]ell and/or transfer the coins at the request of Sphere" and that Sphere "retains legal ownership of the cryptocurrency" and "has the right to sell, pledge, or transfer the cryptocurrency."

18.     Since Sphere initiated this lawsuit, however, Gryphon has taken the position, for the first time in the history of the parties' relationship, it need *not* remit the proceeds of Sphere's own digital assets to Sphere and has ignored repeated instructions to sell assets.  Gryphon has offered no viable justification for failing to do so.  To the contrary, it has communicated that it is trying to put Sphere in a position where Sphere cannot meet its ordinary course obligations and where it cannot pay for the expenses and costs associated with this litigation so that it will be forced to capitulate.  Indeed, Gryphon has communicated that it will resume selling Sphere's digital assets and remitting the proceeds to Sphere if Sphere drops this lawsuit.  Sphere, however, will not give into this extortionate behavior.

8

19.     It is apparent that Gryphon is incapable of addressing its issues and performing under the MSA, both because the breaches are incurable and because Gryphon is simply unwilling to remedy its breaches.  Confirming as much, since Sphere filed its lawsuit, Gryphon has denied breaching any of its obligations.  Incredibly, it has denied that Sphere has given it sufficient specificity to know what its material breaches of the MSA are.  It has done so *even though Gryphon has conceded that Sphere's breach claims are sufficient to state a claim and thus inherently gave it reasonable notice of the allegations against it.*

20.     Accordingly, by this lawsuit, Sphere brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and for breach of fiduciary duty to seek redress for the millions of dollars in damage Gryphon's misconduct has caused, as well as to recover its attorney's fees and costs under the MSA.

## PARTIES

21.     Sphere 3D Corp. is a bitcoin mining company incorporated in Ontario, Canada, with its principal place of business in Ontario, Canada.  Unlike many mining companies, Sphere's operations are net carbon neutral.  Sphere is a publicly traded company whose securities have historically been dual listed in Canada and the U.S. and is currently listed for trading in the U.S. on the Nasdaq exchange.

22.     Gryphon Digital Mining, Inc. is a bitcoin mining company with its principal place of business in Las Vegas, Nevada.  In addition to providing management services to Sphere under the MSA, Gryphon utilizes its own mining fleet for its own account.

**JURISDICTION & VENUE**

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of attorneys' fees and costs and because diversity of citizenship is established.

24.     This Court has jurisdiction over this action pursuant to the forum selection clause of the MSA, which requires that "[a]ll disputes, suits, actions or proceedings relating to" the MSA "be brought solely in the state or federal courts located in the State of New York."  Venue is also proper under the forum selection clause, which provides that: "Each party hereby consents to the exclusive jurisdiction and venue of the State of New York in connection with any such dispute, suit, action or proceeding, and waives any defense of forum non conveniens in connection therewith."

**FACTUAL ALLEGATIONS**

**I.      BACKGROUND ON CRYPTOCURRENCY MINING**

25.     Sphere is in the business of "mining" for bitcoin.  Mining ensures that the payment network underlying bitcoin functions.  Through mining, companies generate new bitcoin for themselves and earn revenue through transaction fees.  To mine for bitcoin, mining companies use purchased or leased "miners," which are generally sophisticated, high-capacity computers that run programs designed to support the network underlying bitcoin.  Companies may direct their miners to participate in a "mining pool," which aggregates mining power attributable to multiple miners and typically pays out on a pro rata basis based on the company's contribution to the pool.  Not all mining pools are created equal; selecting lucrative mining pools is critical to commercial success in the crypto-space.

26.     Hosting services for miners (*e.g.*, warehouse space, electricity, security, internet access, cooling, and so on) is a core component of digital asset mining.  Digital asset miners often

turn to third parties for hosting services in exchange for fees, which can be among the most significant costs associated with digital asset mining.

27.     Cryptocurrency is stored in an individual's digital "wallet," which is akin to an online bank account.  A wallet is the primary mechanism for managing cryptocurrency balances and allows individuals and organizations to hold and control their cryptocurrency.

## II.   IN EXCHANGE FOR A TREMENDOUS MANAGEMENT FEE, GRYPHON WAS SUPPOSED TO PROVIDE "MANAGEMENT SERVICES FOR ALL" OF SPHERE'S "BLOCKCHAIN AND CRYPTOCURRENCY-RELATED OPERATIONS"

28.     On August 19, 2021, Sphere and Gryphon entered into the MSA in contemplation of a merger that never closed.  The MSA was subsequently amended on December 29, 2021.

29.     Under the MSA, Gryphon undertook an obligation to be Sphere's "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations."  MSA at 1.  In return, Sphere promised to pay Gryphon a tremendous Management Fee equal to 22.5% of the "Net Operating Profit of all of [Sphere's] blockchain and cryptocurrency-related operations."  *Id.*  The Management Fee was exorbitant and meant that Sphere could expect commensurate service.

30.     In addition, the MSA made Gryphon a custodian of certain of Sphere's digital assets, which it maintains in a wallet.  *Id.*  The MSA also required Gryphon to sell Sphere's digital assets upon Sphere's "instruction."  *Id.*

31.     The MSA further required that Gryphon perform its services "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services" and not engage in "gross negligence, fraud or willful misconduct in connection with performing the Services."  MSA Amendment § 2.a.

32.     Finally, the MSA contains a prevailing party provision.  *See* MSA at 3.

11

III.    **THROUGHOUT THE PARTIES' RELATIONSHIP, GRYPHON HAS PROVIDED ABHORRENT MANAGEMENT SERVICES, IN BREACH OF THE MSA**

33.    Although the MSA required Gryphon to be the "exclusive provider of any and all management services" and to perform its duties "in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services," Gryphon has completely and absolutely shirked its duties, with disastrous consequences for Sphere.  MSA at 1.  Often, Gryphon simply provides no services whatsoever—and expects to collect a Management Fee for the privilege of sitting on its hands.  When it does provide "management services," it provides abhorrent services, far below those generally recognized in the crypto-mining industry.

34.    By way of example, when Sphere needed hosting space in 2022 (a perquisite to turning on its miners and generating money), Gryphon refused to find hosting space and instead directed Sphere to find such space on its own.  Delays in finding hosting space meant that Sphere could not run its miners, costing it money.  Moreover, Sphere had to expend its own efforts to find such hosting space.

35.    As another example, in 2022, Sphere ordered certain miners from overseas for delivery into the United States.  The miners, however, were seized and held by U.S. Customs. Obtaining their release was simply a matter of providing U.S. Customs with certain manufacturing information, which would have informed U.S. Customs that no additional fees were due.  Despite repeated pleas from Sphere, however, Gryphon shirked its duties to provide the assistance and information needed to release the miners.  Due to Gryphon's misfeasance, the miners languished in U.S. Customs for weeks, costing Sphere dearly.  Eventually, Sphere secured the release of the miners itself by interfacing with third-parties to provide the information.

36.     As yet another example, Gryphon has inexplicably delayed setting up mining pools, resulting in lost revenue.  It has also outright ignored instructions to sell Sphere's bitcoin on a timely basis. And Gryphon has failed to review third-party invoices for accuracy, resulting in Sphere paying erroneous charges.  Indeed, Gryphon has generally failed to manage any of Sphere's relationships with third-parties.  It has not had regular calls with mining hosts.  It has not, in a way that is consistent with industry standard, responded to inquiries about why miners are down or acted appropriately to ensure they remain running.  It does not, consistent with industry standard, provide evaluations or recommendations to improve miner efficiency. It failed to file a proof of claim in a pending bankruptcy proceeding in which Sphere has a substantial claim, jeopardizing Sphere's ability to pursue its claim because Gryphon interacted with the debtor on Sphere's behalf.

37.     These examples are part and parcel of a general failure to provide management services consistent with Gryphon's obligations under the MSA throughout the parties' relationship.  And, throughout the parties' relationship, Sphere has raised its concerns to Gryphon over its lack of performance to no avail:  despite repeated entreaties from Sphere, Gryphon has proven incapable of curing its innumerable and persistent breaches of the MSA.

## IV.    GRYPHON HAS BEEN SKIMMING OFF THE TOP (I.E., STEALING) SPHERE'S DIGITAL ASSETS, IN BREACH OF THE MSA

38.     Even worse than its utter failure to provide management services, upon information and belief, Gryphon has been skimming off the top—effectively stealing money—from Sphere. Gryphon has prevented Sphere from learning the true extent of its theft by repeatedly refusing to provide Sphere with documentation to verify that it is not using or otherwise seizing Sphere's assets for its own account and indeed taken actions to conceal the breakdown of revenues and costs associated with Sphere's business as opposed to for Gryphon's own benefit.  For example, it appears that Gryphon is comminglingly its assets with Sphere's, as it refuses to provide Sphere

with bank statements.  The only rational reason for such concealment is to make it harder for Sphere to know which assets are mined for its own account—and to detect Gryphon stealing Sphere's assets.

39.     Since Sphere filed this lawsuit, Gryphon has dropped the pretense and is holding Sphere's digital assets while refusing to sell them in accordance with Sphere's instructions. Gryphon has even sold Sphere's digital assets and simply retained the proceeds (tens of thousands of dollars), treating the funds as its own.

40.     In all events, regardless of Gryphon's intent, it is apparent that it has failed to remit all that Sphere is owed.

## V.     GRYPHON HAS PRIORITIZED ITS OWN INTERESTS OVER THOSE OF SPHERE, IN BREACH OF ITS FIDUCIARY DUTIES

41.     Separate from the MSA, Gryphon owes fiduciary duties to Sphere, which arise from the unusual amount of trust placed in Gryphon by Sphere, control that Gryphon has over Sphere, and status as a custodian of Sphere's digital assets and miners.  Indeed, as discussed *infra*, Gryphon has taken the position that Sphere cannot even *attempt* to "create" any "business relationships" with any third-party in the crypto-space unless it obtains Gryphon's approval first.

42.     The fiduciary duties Gryphon owes Sphere's are inherent in nature.  By any conception, Gryphon exercises a dominant role and undue influence over Sphere's operations. Indeed, Gryphon's serves as the exclusive manager of Sphere's "blockchain and cryptocurrency-related operations"—*i.e.*, essentially Sphere's business.  As an exclusive manager, Gryphon occupies a relationship akin to an officer or trustee of Sphere's business, classic relationships that give rise to inherent fiduciary duties.

43.     In addition, Gryphon acts as Sphere's agent in managing Sphere's "blockchain and cryptocurrency-related operations"—including in managing Sphere's miner fleet and digital

14

assets, and in interacting with third-parties—and must act on Sphere's behalf consistent with the fiduciary duties inherent in an agency relationship.

44. Also, Gryphon acts as a custodian of Sphere's digital assets and miners, including in holding, safekeeping, and selling Sphere's digital assets and in transferring the proceeds therefrom. Likewise, Gryphon also effectively acts as a broker-dealer and investment advisor for Sphere, including in selling digital assets, transferring the proceeds therefrom, making investments on behalf of Sphere, and determining how Sphere's miners are utilized. Gryphon must act as a fiduciary consistent with the obligations inherent in a custodial, broker-dealer, and investment adviser relationship.

45. Even aside from inherent fiduciary duties, the pure dominance Gryphon has over Sphere too gives rise to fiduciary duties, including due to its status as a broker and agent, exercise of discretionary control over Sphere's assets, operations, and investments, veto rights over many of Sphere's operations, superior knowledge of its interactions with Sphere's counterparties—as Gryphon controls those relationships—as well as its superior knowledge of the crypto-market at the time the parties entered into the MSA (or at least so Sphere believed at the time it entered into the MSA). Indeed, Gryphon often interacts with actual and potential counterparties without informing Sphere or disclosing the contents of its discussions—even when requested. And when Sphere entered into the MSA, it did so based on Gryphon's representations that it had superior knowledge of and abilities in the crypto-industry, including that Gryphon would be able to negotiate better deals with third-parties, implement better investment strategies, and better manage Sphere's crypto-business.

46. The terms of the MSA confirm that Gryphon owes fiduciary duties to Sphere. There is no fiduciary duty disclaimer anywhere in the MSA—or in fact any affirmative language

that is even inconsistent with the imposition of a fiduciary duty.  Nor is there a waiver of an agency, brokerage relationship, or other relationship that gives rise to inherent fiduciary duties.  The barebone MSA (all of three pages, with a one-and-a-half-page amendment) is merely a binding term sheet in contemplation of a more robust agreement that never came to be and is entirely consistent with the imposition of fiduciary duties on Gryphon.

47.    Notwithstanding its clear fiduciary duties, throughout the parties' relationship, Gryphon has prioritized its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets.  For example, on a monthly basis, Gryphon has reported a substantially higher mining efficiency ratio than Sphere, which would not occur if Gryphon were acting to avoid self-dealing.  And, as noted, Gryphon failed to file a proof of claim in a pending bankruptcy proceeding in which Sphere has a substantial claim, jeopardizing Sphere's ability to pursue its claim because Gryphon interacted with the debtor on Sphere's behalf.  At bottom, Gryphon has breached its duties of loyalty, including the duty to avoid self-dealing, the duty of care, and the duty of good faith.

## VI. GRYPHON RECENTLY REVEALED THAT IT LACKS THE INTERNAL CONTROLS AND POLICIES AND PROCEDURES NEEDED TO COMPLY WITH THE MSA AND APPLICABLE LAW

### A. Rob Chang, The CEO Of Gryphon, Fell For Multiple Spoofing Attacks And Lost Over $500,000 Worth Of Sphere's Digital Assets By Failing To Follow Industry Standard Procedures For Transferring Bitcoin

48.     On January 27, 2023, at 1:22 p.m., Kurt Kalbfleisch, Sphere's Chief Financial Officer and Senior Vice President, requested by email to transfer 18 bitcoin (worth over $400,000) from a wallet controlled by Gryphon to one controlled by Sphere.  Mr. Kalbfleisch provided the wallet address, which he specifically noted was an "address [Mr. Chang] [had] used previously." Mr. Kalbfleisch emailed from his Sphere domain email address, Kurt.Kalbfleisch@sphere3d.com. Indeed, all Sphere emails have the same domain name:  "@sphere3d.com."

49.     At 1:33 p.m., Mr. Chang responded: "[r]eceived and initiated."

50.     At 2:44 p.m., Mr. Chang received an email from someone pretending to be Mr. Kalbfleisch.  The email came from a different domain than the Sphere domain, namely, @sphere**s**3d.com (with an added s in the middle), not @sphere3d.com.  In the email, the person pretending to be Mr. Kalbfleish stated that Sphere's normal wallet address was "being audited" and requested that the 18 bitcoin be rerouted to a different wallet address.  The signature block, which the spoofer had forgotten to change, included Mr. Kalbfleisch's correct email address.

51.     This was a transparent spoofing attack in which a third-party was impersonating Mr. Kalbfleisch in an effort to fool Mr. Chang into sending the third-party Sphere's digital assets. Even a cursory review of the spoofing email—which did not originate from a Sphere email address, included two different domains within the same email, did not direct a transfer to a wallet associated with Sphere, and provided an implausible reason for the requested transfer (namely, that Sphere's wallet was under "audit")—should have raised red flags and prevented any unauthorized transfer. So too would any independent verification of the requestor's identity.

52. Instead, Mr. Chang fell for the spoofing attack hook, line, and sinker. Oblivious to the non-Sphere domain name, and undaunted by the implausible explanation for the transfer or request to send the bitcoin to a new wallet address that *Sphere had never used before*, and apparently without performing video or other identity verification, Mr. Chang transferred the bitcoin to the third-party.

53. Merely days later, the spoofer *again* tricked Mr. Chang into transferring another eight bitcoin (worth over $175,000). Specifically, on February 1, 2023, the spoofer again emailed Mr. Chang to ask him to transfer 8 bitcoin to his wallet. Apparently without performing any sort of video or other check (such as a review of the domain name), Mr. Chang sent the eight bitcoin to the spoofer.

54. Given sufficient time, the spoofer would likely have fooled Mr. Chang again (and again and again). On February 2, 2023, however, the real Mr. Kalbfleisch inquired what had become of his legitimate January 27, 2023 request to transfer the 18 bitcoin to Sphere's wallet, which finally led Mr. Chang—the CEO of a supposedly sophisticated cryptocurrency company— to realize that he had been fooled by not one, but two, spoofing attacks.

**B. Gryphon Lacks Industry Standard Internal Controls And Policies And Procedures, In Violation Of The MSA And Almost Certainly In Violation Of Applicable Law**

55. Based on the foregoing, it is apparent that Gryphon lacks the internal controls and policies and procedures needed to comply with the MSA. Had it had such controls and policies and procedures in place, Gryphon would have detected the numerous red flags in the spoofer's emails indicating that they were illegitimate and would not have fallen for any spoofing attack, let alone multiple ones. Indeed, following the spoofing attacks, Sphere requested to review Gryphon's relevant policies and procedures, which Gryphon refused to provide—leading to the conclusion that Gryphon, in fact, simply has none to provide.

18

56.     The absence of internal controls and policies and procedures strongly suggest that Gryphon is also in violation of applicable law, which requires Gryphon to establish an effective compliance program, effective customer due diligence systems and monitoring programs, an effective suspicious activity monitoring and reporting process, and risk-based anti-money laundering programs.  It is apparent, however, that Gryphon has none of these programs in place. The laws Gryphon appears to be in violation of include federal regulations promulgated by FinCEN and various state laws applicable to money transmitters.[2]

57.     Consistent with industry best practices, Sphere advised Gryphon to report the spoofing attack to the appropriate authorities, including the FBI.  When Sphere made the suggestion, Gryphon panicked, stated the issue could be handled between the parties, and demanded that no one report the event.  Upon information and belief, Gryphon did not want to report the theft to the authorities because it was concerned that involvement by a law enforcement agency would lead to the uncovering of Gryphon's violations of the law.  In the same vein, upon knowledge and belief, Gryphon did not file a SAR with FinCEN.

58.     This put the onus on Sphere to report the incident, which it did by filing a SAR with FinCEN.

59.     Gryphon's official version of events raises substantial concerns regarding its ability to rectify any of the many issues Sphere has raised—and also regarding its ability to tell the truth. Gryphon is presently in the process of merger with Akerna, a cannabis company.  The Gryphon-Akerna Form S-4 describes the spoofing attacks as follows:

> The threat actor requested that the BTC be transferred to an alternate wallet. As a result, 26 BTC, with a value of approximately $560,000 at the time, was transferred to a wallet controlled by the threat actor. Via counsel, Gryphon engaged with US Federal law enforcement to

---

[2] *See* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf, at 27.

recover the BTC. Despite these attempts by law enforcement to recover the BTC, recovery was not possible. Gryphon subsequently wired the commensurate amount in USD to Sphere 3D to make them whole for the stolen BTC. . . . Sphere 3D made a claim with its insurance carrier. If Sphere 3D's is reimbursed from its insurance carrier, the Company would request a reimbursement from Sphere 3D. The Company has also subsequently modified its control systems to protect against any future attempted incursion.

*See* Gryphon-Akerna Form S-4 at F-76.

60.     The description contains material inaccuracies. Most glaringly, the assertion that Sphere "made a claim with its insurance carrier" is totally wrong. On the contrary, as Sphere explicitly informed Gryphon shortly after the spoofing attacks and long before the filing of the Form S-4, Sphere *did not make a claim with its insurance carrier, as it does not have any insurance that would cover the incident*. That Gryphon could claim the direct opposite is beyond belief.

61.     In addition, the claim that Gryphon made Sphere "whole" for the theft of approximately $560,000 worth of Sphere's assets omits that Gryphon has demanded that Sphere repay that amount to Gryphon. And while Gryphon claims it engaged with law enforcement, it has not disclosed any information about that engagement to Sphere. Nor has Gryphon disclosed its purportedly updated internal controls to Sphere—an apparent concession that its internal controls were inadequate at the time of the spoofing attacks. Finally, the description omits the most salient details, such as that Mr. Chang sent bitcoin on multiple occasions in response to email requests from an email address not associated with Sphere.

62.     There are additional indications that Gryphon lacks anything resembling effective internal controls. In disclosures, Gryphon has claimed Sphere's mining efficiency as Gryphon's own mining efficiency (mining efficiency is a strong indicator of profitability). In addition, Gryphon is poised to go public soon by merging with a publicly traded company and Sphere

understands that Gryphon, when it goes public, intends to recognize Sphere's revenues attributable to Sphere's own mining fleet as Gryphon's own.

## VII.   IN AN EFFORT TO COW SPHERE AND DISSUADE IT FROM EXPOSING GRYPHON'S NUMEROUS BREACHES, GRYPHON HAS BASELESSLY SOUGHT TO THREATEN SPHERE WITH MANUFACTURED BREACHES

63.     After it came to light that Gryphon had no internal compliance program, Gryphon understood that Sphere could no longer tolerate its abject failure to comply with the MSA and numerous breaches of fiduciary duty since the inception of the parties' relationship.  Gryphon could see the writing on the wall: a lawsuit was coming.  Rather than compensate Sphere for its many breaches, however, Gryphon has taken the opposite tact by attempting to manufacture breaches of the MSA in an effort to cow Sphere into not seeking to enforce its rights in court.

64.     For example, incredibly, Gryphon has claimed that it is *Sphere* that is responsible for Gryphon's inability to detect the spoofing attacks, attacks any competent employee (let alone the CEO of a supposedly sophisticated mining company) should have been able to detect.  Gryphon has conceded that the third-party spoofer was unrelated to Sphere, but nevertheless has sought to blame Sphere, accusing it of lacking sufficient protections over its computer systems.  The allegation is untrue but it gets Gryphon nowhere: even if it were true (and it is not), Gryphon has never identified any provision of the MSA that Sphere purportedly breached.  Spoofing attacks by now have become ubiquitous in the commercial world; the onus was on Gryphon to detect them, which it failed to do.

65.     And, recently, Gryphon has claimed that Sphere cannot even seek to "create," let alone actually enter into, business relationships with any third party in the digital asset industry.  To that end, on March 21, 2023, Gryphon sent Sphere a heavy-handed letter (attached as Exhibit 3) in which it accused Sphere of "enter[ing] into, or at a minimum, . . . attempting to enter into, business relationships with various third-party cryptocurrency mining-related service providers."

21

According to the letter, "[a]ny such conduct, if true, is in direct violation of the" MSA.  The letter further demanded that, *in fewer than 24 hours*, Sphere "provide *any and all documentation* related to its efforts to create business relationships with the Third Party Service Providers (and any other similar digital asset-related service provider), including evidence of disclosure of the MSA to those Third Party Service Providers, if any."

66.     The following day, Sphere responded by letter (attached as Exhibit 4) to explain why it was not in breach (although it would consider the issues raised by Gryphon) and, yet again, explain why Gryphon was failing to perform under the MSA.  Demonstrating that the breaches were "drummed up," Gryphon had long been aware of and even blessed many of the contacts it now claimed were breaches.  In any event, as Sphere also explained, Gryphon's allegations (which Sphere is still considering the merits of) had, at most, identified technical breaches that were easily curable and gave rise to no damages.  Certainly, any damages paled in comparison to the harm Gryphon's utter mismanagement and skimming have inflicted on Sphere.

67.     Gryphon has tried to continue manufacturing breaches since Sphere filed this litigation.  For example, after Sphere filed this litigation, Gryphon claimed that Sphere had not provided it with certain contacts at counterparties as it tried to build a case that Sphere was frustrating its ability to perform under the MSA.  The claims were demonstrably false claims, as Sphere provided the contacts long ago.  Indeed, Gryphon had already *interacted* with the contacts before repeatedly insisting that it had not been provided with them.

## VIII.   SINCE SPHERE FILED THIS LAWSUIT, GRYPHON HAS RETALIATED BY REFUSING TO TRANSFER THE PROCEEDS OF THE SALES OF SPHERE'S DIGITAL ASSETS TO SPHERE

68.     The situation has only become more dire since Sphere initiated this litigation on April 7, 2023.  In the ordinary course, Sphere generates substantially all of its revenue by mining for digital assets and those digital assets flow through a wallet controlled by Gryphon.  In the

ordinary course, Gryphon is required to remit the proceeds from sales of those digital assets to Sphere pursuant to Sphere's written instructions. The MSA specifically provides that Gryphon must honor Sphere's "written instructions . . . with respect to all decisions to sell or hold Digital Assets." MSA at 3. The Gryphon-Akerna Form S-4 (at F-55, F-66) likewise acknowledges that Gryphon must "[s]ell and/or transfer the coins at the request of Sphere" and that Sphere "retains legal ownership of the cryptocurrency" and "has the right to sell, pledge, or transfer the cryptocurrency."

69. Since Sphere initiated this lawsuit, however, Gryphon has taken the position, for the first time in the history of the parties' relationship, it need *not* remit the proceeds resulting from the sales of Sphere's own digital assets to Sphere and has ignored repeated instructions to sell digital assets. Gryphon has offered no viable justification for failing to do so and its breach goes to the very essence of the MSA. Its explanations have shifted over time:

70. For example, Gryphon has claimed that it needs to keep a minimum deposit of over $530,000 before it can release any funds to Sphere—an amount that just so happens to coincide with the amount Gryphon lost in the spoofing attacks and has stated it will seek to recover in this litigation.

71. Next, Gryphon has claimed that the MSA, in fact, *does not require Gryphon to sell Sphere's digital assets and transfer the proceeds to Sphere upon Sphere's written instruction*. Gryphon has done so by advancing an unreasonable interpretation of the MSA, which provides: "[Sphere] shall provide written instructions to [Gryphon] with respect to all decisions to sell or hold Digital Assets." MSA at 3. Although the Form S-4 acknowledges the obvious—that the provision requires Gryphon to honor each and every of Sphere's instructions to sell digital assets and further to transfer the proceeds to Sphere at its request—Gryphon has taken the position that

"the MSA simply requires that appropriate requests as contemplated . . . must be in writing; the MSA does not state that if a request is made in writing, it must be adhered to."  The made-for-litigation position is inconsistent with the plain language of the MSA, the obvious intent of the parties, the past practice of the parties, and the position in the Gryphon-Akerna Form S-4 that Sphere "retains legal ownership of the cryptocurrency" and "has the right to sell, pledge, or transfer the cryptocurrency."  Gryphon-Akerna Form S-4 at F-66.

72.     Gryphon has also taken the position that it must pay certain hosting obligations with Sphere's digital assets and that selling Sphere's digital assets will not leave sufficient funds to do so.  The position is contrary to the MSA but also plainly wrong:  the sales requests Sphere has made would leave Gryphon with sufficient funds to pay the hosting obligations, as Sphere has repeatedly made clear.   Sphere has made numerous requests to sell digital assets (*e.g.,* 13 bitcoin one day, 17 another) all of which have been rebuffered.  To support its refusal to sell digital assets on this basis, however, Gryphon has resorted to alchemy:  Gryphon recently treated each of Sphere's individual requests (each of which Gryphon refused to comply with) as cumulative, adding them all together to claim there were insufficient funds to cover the requests.  The requests were clearly not cumulative—and illustrating that there was no confusion from Gryphon, it has continued to refuse to honor any subsequent requests for the sale of Sphere's digital assets, regardless of the size of the request, small or large.  As another example of Gryphon's obfuscation, it has treated what it knows to be non-recurring expenses as recurring expenses to inflate Sphere's expenses and support its baseless position that it need not remit the proceeds of the sale of digital assets to Sphere.

73.     The truth is that, as Gryphon has communicated, it is trying to put Sphere in a position where Sphere cannot meet its ordinary course obligations and where it cannot pay for the

expenses and costs associated with this litigation so that Sphere will be forced to capitulate. Indeed, Gryphon has communicated that it will resume selling Sphere's digital assets and remitting the proceeds to Sphere if Sphere's drops this lawsuit. Sphere, however, will not give into this extortionate behavior.

## IX. SPHERE CAN NO LONGER TOLERATE GRYPHON'S SELF-DEALING, UTTER FAILURE TO PERFORM UNDER THE MSA, AND INABILITY TO CURE ITS NUMEROUS BREACHES

74.    It is time for Gryphon to be held to account for its breaches of fiduciary duty, utter failure to perform under the MSA, and apparent inability to cure its breaches, many of which are simply uncurable. Sphere has provided Gryphon with numerous opportunities to fix its deficiencies, which have only gotten worse with time. Gryphon's modus operandi is to simply ignore Sphere's requests while collecting its exorbitant management fee—a completely one-sided arrangement that has proved extremely lucrative for Gryphon and deleterious for Sphere. And the absence of anything resembling internal controls at Gryphon makes clear that Sphere's digital assets are unsafe in Gryphon's hands.

75.    Since Sphere filed this lawsuit, Gryphon has confirmed that is incapable of addressing its issues and performing under the MSA, both because the breaches are incurable and because Gryphon is simply unwilling to remedy its breaches. Indeed, since Sphere filed its lawsuit, Gryphon has denied breaching any of its obligations. And incredibly, Gryphon has denied that Sphere has given it sufficient specificity to know what its material breaches of the MSA are. It has done so *even though Gryphon has conceded that Sphere breach claims are sufficient to state a claim and thus inherently gave it reasonable notice of the allegations against it*.

76.    This is part-and-parcel of Gryphon's general ostrich strategy: accept exorbitant fees, play dumb regarding what services should be delivered. What Gryphon should have done to not breach the MSA is obvious. By way of example only, rather than direct Sphere to find hosting,

Gryphon should have found hosting for Sphere.  Rather than allow Sphere's miners to languish in U.S. Customs, depriving Sphere of millions of dollars in revenue, Gryphon should have provided the information needed to secure their release—which Sphere ultimately had to do itself.  Rather than failing to properly review vendor invoices, Gryphon should have ensured that Sphere is only charged for what is owed.  Rather than falling for transparent spoofing attacks that led Gryphon to part with Sphere's assets, Gryphon should have detected the attack—and should have compensated Sphere for the loss without reservation, instead of asserting that Sphere is responsible and threatening litigation.   Rather than refusing to honor written instructions to sell Sphere's digital assets, Gryphon should comply.

77.     Instead of even attempting to rectify its historical breaches, such as by compensating Sphere for the losses caused, Gryphon has decided to double-down by breaching the MSA further.  Unwilling to be bullied, Sphere pursued its claims.

## X.     AFTER SPHERE FILED THIS LAWSUIT, GRYPHON ASSERTED MERITLESS DEFAMATION CLAIMS DESIGNED TO PUNISH SPHERE FOR BRINGING THIS LAWSUIT

78.     On April 7, 2023, Sphere issued a press release (the "Press Release") in which it announced the filing of this action and accurately summarized the allegations of the Complaint.[3] The Press Release did not set forth any facts or allegations beyond those set forth in the Complaint.

79.     On August 22, 2023, Gryphon stooped to a new low by initiating frivolous litigation designed to punish Sphere for bringing this lawsuit.

80.     First, Gryphon asserted a meritless defamation claim against Sphere premised solely upon Sphere's issuance of the Press Release and the statements contained therein.  Notably,

---

[3] The Press Release is available at https://sphere3d.gcs-web.com/news-releases/news-release-details/sphere-3d-files-litigation-against-gryphon-digital-mining

Gryphon failed to identify any statement of fact not described in the Complaint, let alone a false statement of fact.

81.     Second, Gryphon took the remarkable step of suing Patricia Trompeter, Sphere's CEO, in her personal capacity.  Gryphon's defamation claim against Ms. Trompeter is premised on Ms. Trompeter tweeting a hyperlink to the Press Release.  Yet again, Gryphon did not even try to identify any statement of fact not described in the Complaint, let alone a false statement of fact.

82.     Gryphon asserted these claims not because they have merit but because they serve its broader strategic aims.  Gryphon knows that the content of the challenged communications is substantially identical to the allegations of Sphere's Complaint.  Rather than fight Sphere's claims on their merits, Gryphon through the use of frivolous defamation claims seeks to force Sphere to expend resources and pressure it to drop this lawsuit.  This is a quintessential strategic litigation against public participation.

83.     While Sphere will not give into Gryphon's sharp tactics, Gryphon's meritless claims have already imposed significant costs.  By way of example, Sphere prepared, as required by this Court's Individual Practices, a pre-motion letter (Dkt. 31) setting forth the multitude of reasons why Gryphon's defamation claims are frivolous.  In doing so, Sphere incurred costs and attorneys' fees that it would not have were it not for Gryphon's bad-faith efforts to snuff out speech it disfavors and retaliate against Sphere.  Because Gryphon has refused to withdraw its groundless claims, Sphere anticipates that it will continue to suffer such damages until Gryphon's groundless claims are dismissed.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

84.     Sphere repeats and re-states the allegations above as if fully set forth herein.

85.     This is a claim for breach of contract against Gryphon.

86.     The MSA is an enforceable contract.

87.     Sphere has complied with its obligations under all relevant contracts.

88.     Gryphon has materially breached the MSA, including, without limitation, by failing to provide management services for blockchain and cryptocurrency-related operations at the level required by the MSA, charging Sphere in excess of the proscribed Management Fee, and refusing to honor Sphere's written instructions to sell digital assets.

89.     Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

### COUNT II
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(IN THE ALTERNATIVE TO COUNT I)

90.     Sphere repeats and re-states the allegations above as if fully set forth herein.

91.     This is a claim for breach of the implied covenant of good faith and fair dealing against Gryphon.

92.     The MSA is an enforceable contract.

93.     Sphere has complied with its obligations under all relevant contracts.

94.     Gryphon is in breach of its good faith obligations under the MSA.  For example, the MSA provides that "[Sphere] shall provide written instructions to [Gryphon] with respect to all decisions to sell or hold Digital Assets."  MSA at 3.  To the extent this provision is unclear on its face, the intent and purpose of the provision was that Gryphon would sell digital assets when

instructed to do so and remit the proceeds of such sales to Sphere.  Any other interpretation would frustrate the purpose of the provision and the MSA itself—there is no point to providing written instructions to Gryphon unless they will be honored and unless Gryphon will remit the proceeds of such sales to Sphere.  Indeed, there is no other mechanism for Sphere to receive the proceeds of sales of its own digital assets under the MSA and there is no point to the MSA unless Sphere can actually reap its benefits, namely, revenue.

95.     Gryphon has materially breached its implied obligations.  By refusing to honor instructions to sell digital assets, Gryphon is acting in bad faith and in a way that is frustrating the intent and purpose of the MSA.  Indeed, Gryphon has communicated it is trying to put Sphere in a position where it cannot meet its ordinary course obligations and where it cannot pay for the expenses and costs associated with this litigation so that Sphere will be forced to capitulate.  This smacks of bad faith.

96.     Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

## COUNT III
### BREACH OF FIDUCIARY DUTY

97.     Sphere repeats and re-states the allegations above as if fully set forth herein.

98.     This is a claim for breach of fiduciary duty.

99.     Gryphon owes Sphere fiduciary duties.  Those fiduciary duties are inherent in nature and arise from, among other places, Gryphon's role as a manager of substantially all of Sphere's business operations (a role akin to an officer or trustee), agent, custodian, investment adviser, and broker-dealer.  Those fiduciary duties also arise from the unusual trust and confidence Sphere places in Gryphon and the control and dominance Gryphon exerts over Sphere's operations.  Sphere depended on Gryphon to serve its interests.

100.    Gryphon breached its fiduciary duties by prioritizing its own interests over those of Sphere's, including by prioritizing the operations of its own miners over Sphere's and employing more advantageous mining pool strategies for its own digital assets.

101.    Gryphon's breach of its fiduciary duty has caused Sphere damage. Sphere is entitled to damages in an amount to be proven at trial, but in all events in excess of $75,000, exclusive of interest and costs.

## COUNT IV
## NEW YORK'S ANTI-SLAPP STATUTE

102.    Under New York law, a party to "an action involving public petition and participation . . . may maintain an action, claim, cross claim, or counterclaim to recover damages, including costs and attorney's fees" if a court finds that a defamation claim asserted against it "was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification, or reversal of existing law."  N.Y. Civ. Rights Law § 70-a(1)(a)–(b).

103.    Gryphon's defamation claim involves public petition and participation because it is premised on Sphere's substantially accurate and privileged speech concerning "an issue of public interest"—namely, the institution of proceedings before this Court.

104.    Gryphon's claim was commenced or continued without a substantial basis in fact or law, and could not be supported by a substantial argument for the extension, modification, or reversal of existing law, because the statements set forth in the Press Release and any link to the Press Release were a substantially accurate—and thus absolutely privileged—fair report of a judicial proceeding.

105.    Despite its actual awareness of the accuracy of the statements set forth in the Press Release and the privileged nature of such statements, Gryphon commenced and continued its claim

30

against Sphere in a transparent attempt to punish Sphere for asserting its rights.  Reinforcing Gryphon's bad faith conduct, it has maintained its defamation claim even after Sphere explained the many reasons Gryphon's defamation claim is frivolous and expressly stated that it would not seek its attorney's fees under the anti-SLAAP law if Gryphon dropped the claim.  Dkt. 31.

106.    In its anticipated motion to dismiss (or a motion for summary judgment), Sphere will demonstrate that Gryphon's defamation claim lacks any basis in fact or law.  Upon grant of that motion, Sphere shall be entitled to recover the costs and fees incurred in defending against Gryphon's meritless claims.

## PRAYER FOR RELIEF

WHEREFORE, Sphere respectfully requests that the Court award the following relief:

(1)    All damages to which Sphere is entitled, including, without limitation, compensatory and punitive damages, in an amount to be determined at trial;

(2)    All pre- and post-judgment interest to which Sphere is entitled;

(3)    All costs and expenses to which Sphere is entitled, including, without limitation, attorneys' fees and costs under the MSA and under New York's anti-SLAPP statute; and

(4)    All other such relief as the Court may deem just and proper under the circumstances.

Dated:     September 20, 2023
           New York, NY


                              **DONTZIN NAGY & FLEISSIG LLP**

                              _____
                              Tibor L. Nagy, Jr.
                              Gregory N. Wolfe
                              Maxine Peskens
                              Rahul Srinivas (pro hac vice forthcoming)
                              David Moosmann (pro hac vice forthcoming)
                              980 Madison Avenue
                              New York, NY 10075
                              Tel: 212-717-2900
                              tibor@dnfllp.com
                              greg@dnfllp.com
                              mpeskens@dnfllp.com
                              rsrinivas@dnfllp.com
                              dmoosmann@dnfllp.com


                              *Counsel for Sphere 3D Corp.*