# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


SPHERE 3D CORP.,                    : Docket #23-cv-02954

                    Plaintiff,      :

     -against-                      :

GRYPHON DIGITAL MINING, INC.,       : New York, New York
                                      June 27, 2024
                    Defendant.

--------------------------------:

                      PROCEEDINGS BEFORE
              THE HONORABLE VALERIE FIGUEREDO
              UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:          DONTZIN NAGY & FLEISSIG, LLP
                        BY:  GREGORY N. WOLFE, ESQ.
                        980 Madison Avenue
                        New York, New York 10075


For Defendant:          HOGAN LOVELLS US, LLP
                        BY:  ELIZABETH C. CARTER, ESQ.
                             WILLIAM C. WINTER, ESQ.
                        390 Madison Avenue
                        New York, New York 10017




Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1              THE DEPUTY CLERK:  Sphere 3D Corp. versus
 2    Gryphon Digital Mining, Inc, Case Number 23-cv-2954.
 3    The Honorable Valerie Figueredo presiding.
 4              Counsels, can you please make your
 5    appearances for the record, starting with
 6    plaintiff's counsel.
 7              MR. WOLFE:  Greg Wolfe on behalf of Sphere
 8    3D.
 9              THE DEPUTY CLERK:  Defense?
10              MS. CARTER:  Elizabeth Carter from Hogan
11    Lovells, representing the defendant and
12    counter-plaintiff Gryphon Digital Mining, Inc.
13              MR. WINTER:  William C. Winter on behalf of
14    Gryphon Digital Mining, Inc.
15              THE COURT:  Good morning, everyone.  This
16    is Judge Figueredo.
17              So we have, I guess, two sets of disputes.
18    I have the letter from Gryphon that came in May
19    21st.  It's at ECF-81.  And then there was a
20    response by Sphere, May 28th.  It was ECF-82.  I
21    think we can start with that dispute first.
22              But I'll just -- I guess just before we get
23    into the details of the issues raised at ECF-81, I
24    just, by way of background, would just appreciate
25    just, you know, a very brief explanation as to --
```

```
 1    just to get the context of what these two businesses
 2    do.  And I know there was, like, this spoofing
 3    incident where these bitcoins were taken, but I'll
 4    just admit I have no idea.  I don't really
 5    understand how bitcoins work or anything like that.
 6    So if there's just some context or background that
 7    you think would be helpful to better understand why
 8    some of these -- you want some of these documents or
 9    just to put some of these discovery requests in
10    context, I'd be very appreciative.
11         And either side can go ahead, or if both
12    sides want to give me the background, that's fine,
13    too.
14         MR. WOLFE:  I'm happy to do --
15         MS. CARTER:  Greg, do you mind if I go,
16    just because it sounds like our motion is going to
17    occur first?
18         MR. WOLFE:  No problem.  And I'm sure
19    you'll give a neutral recitation.  And I would just
20    ask, Judge, if there's anything I disagree with, I'd
21    be given the opportunity to respond.
22         THE COURT:  Yeah, no, and, again, this is
23    just my lack of understanding of, I guess, mining of
24    bitcoins.  And I thought maybe before we got into
25    the disputes, it would just make sense for me to get
```

1    a better sense of what these businesses do.  But I'm

2    happy to have both sides speak, if that's helpful.

3            MS. CARTER:  Yeah.  No problem.  Elizabeth

4    Carter again for Gryphon.

5            So Gryphon -- my client, Gryphon Digital

6    Mining, Incorporated, is a digital miner, and what

7    that means is that it operates many, many, many

8    miners, which are very sophisticated computers, that

9    are constantly running and solving complicated

10   algorithms for the purpose of trying to obtain

11   bitcoin.  And obviously, there is a market for the

12   value of bitcoin, which, you know, fluctuates up and

13   down quite precipitously one way and the other.

14           And so its business essentially is to, you

15   know, purchase, you know, thousands of computers,

16   find adequate hosting spaces for these computers to

17   operate.  You know, they require a lot of

18   electricity, as you might imagine.  They require

19   kind of a very specific environment, like a

20   condition in which they operate.  It has to be cool.

21   As you know, computers break down.  They need

22   maintenance.  So making sure that the computers are

23   kind of constantly operating in order to solve

24   these, essentially, math problems with the hope of

25   getting bitcoin.

1          And then beyond that, there's also some

2     strategy involved to the extent that there are

3     various mining pools.  So, you know, computers that

4     tend to be quite expensive that can essentially join

5     their forces together in order to obtain bitcoin,

6     which, again, has a value that fluctuates up or down

7     based on the market for that particular bitcoin.

8          THE COURT:  Okay.  So that's super helpful

9     because I think one of the disputes involved

10     information about the miners.  And --

11          MS. CARTER:  Yeah.

12          THE COURT:  -- I guess I'll admit, I

13     thought at one point, I was like, are these actual

14     humans?  It sounds like it's not.  It's a computer.

15     So this is very helpful, Ms. Carter.

16          Mr. Wolfe, did you want to add anything?

17          MR. WOLFE:  Yeah.  I think Ms. Carter's

18     description is generally correct.  And I'll admit,

19     the first time I heard about bitcoin mining, I, too,

20     thought that they were people in mine shafts.

21          The only additional context I'll provide is

22     some companies do what's called self-hosting,

23     meaning they host the miners themselves.  Sphere

24     and, my understanding, Gryphon, too, they don't do

25     their own hosting.  So what they do is they go out

1    into the market and they find third-party hosts,

2    who -- you know, they'll sign a contract with the

3    host.  And, basically, that host is then responsible

4    for hosting the miners, doing all the things Ms.

5    Carter described, making sure the miners are

6    running, keeping them cool, et cetera, et cetera.

7            THE COURT:  And is Sphere in the same

8    business, then?

9            MR. WOLFE:  Exactly right.  So Sphere and

10   Gryphon are in the same line of business.  And to

11   give a little bit more background, then, I'll try

12   and be as neutral as possible.

13           The parties were, at one point, thinking

14   about merging, and as part of merger negotiations,

15   the parties agreed to enter into a management

16   services agreement in which Gryphon -- and I'll just

17   track the language -- became the exclusive provider

18   of management services, basically, for Sphere's

19   crypto operations.  Sphere does have some legacy

20   operations from before it became a crypto company,

21   but generally, its business is just

22   cryptocurrencies.  So they're both crypto miners in

23   the same industry.

24           THE COURT:  Okay.  Okay.  So then, Ms.

25   Carter, I guess since we're going to start with the

1    dispute at ECF-81, did you want to go ahead?

2             MS. CARTER:  I would love to.  Thank you

3    for the opportunity to speak, Your Honor.

4             Fortunately for us, at least the first

5    issue that's been teed up for Your Honor, this

6    so-called spoofing incident, doesn't necessitate a

7    deep understanding of cryptocurrency and miners to

8    kind of grasp what the issue is.

9             So what we refer to as the, quote/unquote,

10   spoofing attack in shorthand really refers to an

11   incident that happened in January of 2023 between

12   Sphere and Gryphon.  And what it included was

13   basically, at that time in January, there was a

14   third-party hostile actor that was basically able to

15   kind of infiltrate Sphere's systems and basically

16   impersonate its CFO, Kurt Kalbfleisch, using a very

17   similar, but slightly different email account in

18   order to kind of induce Gryphon's CEO, Mr. Chang,

19   into sending this third-party actor bitcoin, as

20   opposed to Sphere.

21            So Mr. Kalbfleisch, you know, sends an

22   email -- you know, the real Mr. Kalbfleisch sends an

23   email to Mr. Chang, says, you know, pursuant to

24   this, you know, agreement that we have, that we're

25   operating under the MSA, please send us, you know,

1    this number of bitcoin, and then Mr. Chang responds.
2    And then at that point, a third party who was not
3    Mr. Kalbfleisch, although, using an email that is
4    extremely close to his real email, just with an
5    additional S -- so instead of "Sphere," it says
6    "Spheres" -- is able to somehow insert him or
7    herself into the email and basically kind of takes
8    over the conversation from Mr. Kalbfleisch and says,
9    you know, Gryphon, you should, you know, send us the
10   bitcoin, you know, to this wallet.  It's the new
11   one, yada, yada, yada.

12        It's basically total chicanery farce that,
13   unfortunately, resulted in Mr. Chang sending bitcoin
14   to a wallet that was actually unaffiliated with
15   Sphere, so it was fraud.

16        So in the second amended complaint, which
17   was filed by Plaintiff, and that's at ECF-36, it's
18   riddled with references to this spoofing incident.
19   I actually counted beforehand, and I think of the
20   approximately 100 or so paragraphs in the paragraph,
21   24 of them actually describe and reference the
22   spoofing incident.  And then there are another -- I
23   think there were 36 times that either "spoof" or
24   "spoofing" is used.  So suffice it to say, it
25   features largely in the complaint.

```
 1              So Sphere essentially blames Gryphon for
 2      the incident.  It says that Mr. Chang, he shouldn't
 3      have been fooled so easily by this third party, and
 4      that it's -- you know, the fact that he was fooled
 5      really evidences a lack of internal controls that
 6      Gryphon had.  And that really underlies both its
 7      breach of contract, the MSA agreement, and also
 8      another claim that Sphere has lodged against
 9      Gryphon, which is breach of fiduciary duty.
10              And that's, for example, at paragraph 5 of
11      the second amended complaint where it says:  Gryphon
12      and Mr. Chang, however, recently found for multiple
13      spoofing attacks targeting Sphere's digital assets
14      that would -- and this is the key part -- that would
15      have been avoided had Gryphon had internal control
16      systems and policies and procedures in place and
17      adhered to applicable law.
18              So, not surprisingly, given the number of
19      times that this spoofing incident was referenced in
20      the complaint, Sphere has sought discovery of
21      Gryphon into the incident through its document
22      requests that were exchanged by the parties, more
23      recently, in April of this year.  For example, at
24      Request Number 3, Sphere thought all documents and
25      communications relating to Gryphon's internal
```

1    policies.  Again, that's at Request Number 3.

2         We objected, but agreed to produce

3    documents pursuant to a reasonable search and

4    agreement by the parties on things like search

5    terms, et cetera.

6         And, likewise, Gryphon asked for discovery

7    of Sphere into this spoofing incident, and that

8    really is what forms the basis for the parties'

9    present dispute.  So Gryphon -- and this is at

10   Request Number 17, 18, 19, and 24, and I'll just

11   kind of summarize them here, rather than read each

12   one into the record; although, you know, if Your

13   Honor prefers, certainly I can do that.  But the

14   gist of these requests -- and I know because I wrote

15   them -- was that, essentially, you know, we want the

16   information into, essentially, your internal

17   control, because, you know, it's our position that,

18   while you assert that, you know, this spoofing

19   incident was Gryphon's fault, you know, we actually

20   think it was your fault because how did this

21   third-party actor even get into your system in the

22   first place?

23         And so, therefore, we ask for documents

24   concerning their cybersecurity hardware, documents

25   that maybe have reflected any sort of forensic

1    investigation that Sphere did after the incident,

2    and then any communications kind of underlying its

3    claims that it was basically Gryphon's fault that

4    this incident happened.

5         So, essentially, our argument is pretty

6    simple.  It boils down to the fact that, having

7    raised the claims regarding the spoofing incident in

8    the second amended complaint, Gryphon should be

9    entitled to probe Sphere's accusations that the

10   spoofing incident is Gryphon's fault, as opposed to

11   Sphere's.  As the Court well knows and needs no

12   education from me on this point, but Rule 26

13   entitles civil litigants in discovery about

14   information that is relevant not only to a party's

15   claim, but also to its defenses.

16        And, here, discovery into the spoofing

17   incident goes right to the heart of Gryphon's

18   affirmative defenses as to the spoofing claims.  For

19   example, in our fourth amended complaints -- and

20   this is at ECF-62 -- we've raised affirmative

21   defenses like failure to state a claim, unclean

22   hands, Sphere's claims against Gryphon are barred in

23   whole or in part by Sphere's own negligence.  You

24   know, we deny Gryphon's allegations.  For example,

25   the one that I read earlier by saying that, you

1    know, we deny that Gryphon's at fault here, you

2    know, and, instead, we think that this is really

3    Sphere's undoing.

4         So it seems like Sphere's entire kind of

5    objection by the way of producing any documents

6    about spoofing -- this isn't a situation where the

7    parties kind of disagree around, you know, the

8    margins as to, you know, what kind of narrowed

9    construction, you know, the parties will agree to.

10   Here, it's that Sphere's flat out refusing to

11   producing anything to Gryphon with respect to this

12   spoofing claim.

13        And I think -- as I understand the

14   argument, and Mr. Wolf I'm sure will go into it in

15   further detail, but as I understand it, they're

16   basically saying, well, you know, Gryphon, you

17   previously asserted an affirmative claim over the

18   spoofing incident for negligence, and because you

19   withdrew it, that claim -- that affirmative claim or

20   counterclaim against us, that means that you don't

21   get discovery into it.  And on that one, really, we

22   just -- we don't understand it because I think the

23   language of Rule 26 is quite clear that, you know, a

24   party gets discovery not only into its claims, but

25   also defenses.

1          And then it also has raised this issue

2    that, well, you know, we're no longer seeking

3    monetary relief as a result of these allegations

4    about the spoofing incident.  So because we're not

5    seeking any monetary relief, like, you shouldn't be

6    worried about it and you're not entitled to

7    discovery.  But, you know, with all due respect, at

8    the same time, I said to Mr. Wolfe that, well, if

9    you're not seeking any monetary relief, then why are

10   you asserting the claim, you know, and we can kind

11   of all like go home and forget about the discovery

12   if you're willing to basically strike those

13   allegations from your complaint, because I don't

14   feel comfortable proceeding with the case if those

15   allegations remain live.  Again, there are 24

16   paragraphs addressing it in the complaint, and he

17   refused to do so, which was well within his rights

18   to do so.

19          But, that said, the claims remain live in

20   the case and we're entitled to probe that.  And so,

21   today, what we're here to ask the Court to do is

22   basically -- either if Mr. Wolfe has had an

23   opportunity to kind of reconsider his position,

24   accept his striking of those allegations, or if he's

25   not prepared to do that, we would ask for the

1    following:  So Sphere, essentially -- as I

2    mentioned, this spoofing incident is the subject of

3    discovery on both sides.  So they asked for

4    information about Gryphon's internal controls, and

5    then we obviously asked for information into the

6    spoofing incident and their internal controls.

7         The parties exchanged search terms.  We

8    include a number of, like, specific search terms

9    that were specifically tailored to our requests

10   regarding this spoofing incident, you know, as

11   parties do.  Sphere came back to us and said, you

12   know, here are the number of hits for all of these

13   requests -- or these search terms that you've

14   provided, including the specific ones that have to

15   do with the spoofing.  And I'm talking about search

16   terms like "spoof" or "hack" or "attack."

17        And we know, based on the hit report that

18   Sphere gave to us, that all of the search terms that

19   specifically relate to the spoofing incident only

20   generate about 1,000 unique hits.  And so our

21   position is that the information relating to the

22   spoofing incident is relevant.  The Court should

23   order Sphere to produce these documents in full.

24        And if it's not willing to do that, we're

25   willing to accept yet another compromise; basically,

```
 1    Sphere reviewing those around 1,000 documents that

 2    we know hit on our search terms specifically defined

 3    to get at those assets.  And then we would,

 4    furthermore, request that the Court orders Sphere to

 5    produce any kind of report that we understand exists

 6    stemming from Sphere's investigation into the

 7    incident.

 8         So with that, unless the Court has any

 9    other questions, I'm happy to seize the podium, so

10    to speak, to Mr. Wolfe.

11         THE COURT:  Just one, I guess.  Just to sum

12    it up, it sounds like Gryphon's argument is that

13    there's these various -- or specifically 24

14    paragraphs in the complaint that reference the

15    spoofing incident.  So even if Sphere is not seeking

16    monetary damages based off of the incident, there

17    are still allegations that support the claim.  And

18    for that reason, you think they're relevant and

19    you'd be entitled to this discovery?

20         MS. CARTER:  That's completely correct.

21    You very eloquently said what I said in 10 minutes

22    in about 30 seconds.

23         THE COURT:  Okay.  I just wanted to make

24    sure, because sometimes I miss it, and I want to

25    make sure I understand.  So, you know, again, I'm
```

1    happy to give you time to respond once I hear from

2    Mr. Wolfe, if he wants to chime in.

3              MS. CARTER:  Thank you.

4              MR. WOLFE:  Sure, Your Honor.  Thank you.

5              So let me start at the end and then I'll go

6    and provide some background.

7              What I would say is, lots of times parties

8    include allegations in their complaint to give the

9    court context into the claims.  In this case, the

10   context of the spoofing attacks is, now that Gryphon

11   had been asserting meritless claims against Sphere

12   and that that is what prompted the lawsuit and that

13   they had been -- they had been advocating Scorsese

14   litigation against Sphere, unless Sphere exceeded to

15   their claims.

16             When we first filed the complaint, we had

17   needed to assert damages on those claims.  And the

18   reason for that was Gryphon had purported to return

19   the stolen assets to Sphere, but it had done so with

20   reservation.  It wasn't a true return.  During the

21   course of the litigation, Gryphon gave up any claim

22   that it was, in fact, entitled to those assets.  It

23   gave up any claim that Sphere had been negligent.

24             And here's the background I'll give you,

25   Your Honor.  Gryphon -- after Sphere asserted its

```
 1    complaint, Gryphon filed counterclaims asserting a
 2    negligence claim, and Sphere filed a partial motion
 3    to dismiss that claim on the ground that Sphere owed
 4    no duty to Gryphon to prevent third parties from
 5    impersonating Sphere.  And based on that partial
 6    motion, Judge Castel stayed all discovery, including
 7    into the negligence claim.  And Gryphon asked to
 8    lift the stay, and Sphere opposed on two grounds:
 9    Number One, that the claim was totally without
10    merit; and, second, that dismissal of that claim
11    would narrow discovery, including because it would
12    obviate the need for discovery into Sphere's
13    internal documents, into the phishing attack.  And
14    Judge Castel agreed with us and maintained the stay.
15             And in response, and this tells you what
16    Gryphon thinks about its own negligence claim and
17    the notion that Sphere was negligent and owed to a
18    duty, Gryphon elected to dismiss the negligence
19    claim with prejudice.  So Gryphon has no basis to
20    pursue internal discovery into Sphere, into Sphere's
21    reaction to the spoofing attack because it's not
22    ultimately relevant to any claim or defense.
23             We've disclaimed that we're pursuing
24    damages on our affirmative claims stemming from the
25    spoofing attack.  But even if we had been, it's
```

1  simply not relevant to any affirmative defense that

2  Gryphon is purporting to raise, right.  It raises

3  an -- we made very detailed arguments in our letter

4  about why that is so.  There is an unclean hands

5  defense, but that only applies when a party is

6  seeking equitable relief, right.  Unclean hands can

7  only be used to bar a claim for equitable release.

8  We're not seeking equitable relief.

9        And then a party's negligence is no defense

10  to a breach of contract claim, and it's also no

11  defense to a breach of fiduciary duty claim.  So

12  we're not seeking damages based on the spoofing

13  attacks.  There's no basis to pursue our reaction to

14  the spoofing attacks.  And even if we were, Your

15  Honor, the affirmative defenses would just fail at

16  the outset because negligence isn't a defense to

17  breach of contract or to breach of fiduciary duty.

18        Your Honor, with that, I'm happy to answer

19  any questions you might have.  Otherwise, I'll rest.

20        THE COURT:  Ms. Carter, was there anything

21  you wanted to add?

22        MS. CARTER:  Very briefly.

23        So I take Mr. Wolfe to say that, you know,

24  all of the numerous, numerous allegations about the

25  spoofing allegations and complaint are just context.

1    Well, if that's really true, then why is he pursuing

2    discovery as to it?  He's never offered to withdraw

3    that discovery of Gryphon on this topic.  And,

4    frankly, what I really don't want to happen here,

5    Your Honor, is I don't want this -- like, I don't

6    want Sphere to be able to kind of willy-nilly

7    whenever it wants to kind of bring out these

8    allegations about spoofing.

9         The spoofing incident is evidence that, A,

10   Sphere -- or my client, Gryphon, either didn't

11   perform under the MSA or did a bad job performing

12   under the MSA, or somehow there was a breach of

13   fiduciary duty as a result of that, and that's my

14   concern.  If Mr. Wolfe really means what he says,

15   that it's just context, that he would be okay with

16   just basically reducing the statement to one

17   paragraph, I guess, in the paragraph, or -- and

18   additionally, not pursue discovery of it.

19        And then as to his position that negligence

20   is not a defense to breach of contract, as everyone

21   on this phone call knows, breach of contract, an

22   element of that is causation.  And we're entitled to

23   say that Sphere cannot establish breach of contract

24   on the basis of these claims, because it wasn't

25   our -- it wasn't Gryphon's fault.  It wasn't -- we

```
 1    weren't the cause of this act of the spoofing

 2    incident, and it's just completely unfair and -- and

 3    like I said, I've offered, I think, a meaningful,

 4    narrowing, even, of the request, as stated, to just

 5    basically review the 1,000 or so hits that resulted

 6    from our specific search terms, in addition to

 7    ordering any reports that resulted from it.  And,

 8    frankly, I think that's very, very reasonable under

 9    the circumstances.

10            And that's all I have.  Thank you.

11            MR. WOLFE:  May I respond very briefly,

12    Your Honor?

13            THE COURT:  Yes.  So, Mr. Wolfe, I just did

14    have a question.

15            MR. WOLFE:  Of course.

16            THE COURT:  Is part -- I guess, is part of

17    your breach of the -- breach of contract or breach

18    of fiduciary duty claims relying on an argument that

19    Gryphon somehow caused or lack of internal controls

20    led to the spoofing incident?

21            MR. WOLFE:  For our affirmative claims, we

22    no longer need to rely on that because there's no

23    damage anymore.

24            THE COURT:  Okay.  So is there any part of

25    your affirmative claims that rely in any way on the
```

1    spoofing incident?

2              MR. WOLFE:  Other than -- at this point,

3    other than for context, no, our affirmative claims

4    do not.  And you have my representation, which I

5    think is binding.

6              THE COURT:  So let me just ask, I'm just

7    curious, why are you seeking discovery about

8    their -- I guess the controls or whatever

9    obligations they had to prevent this spoofing

10   incident?

11             MR. WOLFE:  You know, I think that's

12   probably an artifact, Your Honor, of a time when --

13   when that would have been relevant.  Let me -- I'm

14   not sure that we actually need that discovery

15   anymore, so if I could, you know, give that some

16   thought.  But I don't think we'll need it for

17   our ...

18             THE COURT:  Because it sounds --

19             And Ms. Carter, you should let me know if

20   this doesn't work.

21             But it sounds like we have a representation

22   on the record from counsel that the spoofing

23   incident is not underlying any part of their claim.

24             And it sounds like Mr. Wolfe is going to

25   confirm whether he even continues to need this

1    discovery.  It sounds like there wouldn't be a

2    reason for it.  And so now it sounds like -- I don't

3    know how many -- how much Gryphon has already -- how

4    much discovery has already been provided on this

5    issue, but it sounds like there'd be parity and that

6    no one might potentially be providing discovery that

7    stems from the spoofing incident.

8         MS. CARTER:  Thank you, Your Honor.  I

9    would accept that representation with the caveat

10   that I would like to be able to basically raise this

11   issue to the Court's attention again to the extent

12   that Sphere continues in the future, to reference a

13   spoofing incident as a source of wrongdoing or

14   liability.

15        THE COURT:  Okay.  So maybe I can do this,

16   just to clear up, so we have, like, a record in the

17   future in case this becomes a problem later on.  I

18   can enter an order sort of memorializing Mr. Wolfe's

19   representation.  And then should there be a reason

20   to, Gryphon could have something to rely on if

21   there's a reason to raise it again.

22        MS. CARTER:  Thank you, Your Honor.  May I

23   just -- I think it's -- if I may, and I'm sorry.  I

24   hope I didn't interrupt.  It just seems cleaner to

25   me --

1           Greg, is there any reason why you just

2      can't agree on the record to strike those

3      allegations from the complaint?

4           MR. WOLFE:  I don't know why I need to

5      strike allegations that are context to the

6      litigation.  You know, the plaintiffs include

7      context in their claims all the time, right.  We're

8      not seeking damages on the claims, and so it's a

9      question of what's relevant to the discovery, right.

10          The question is, are internal documents

11     relevant?  So I don't see why I have to, Your Honor.

12          THE COURT:  But I didn't think --

13          Sorry.  Go ahead, Ms. Carter.

14          MS. CARTER:  No, please.  I'm sorry, Your

15     Honor.

16          THE COURT:  It's fine.  So I hear what Mr.

17     Wolfe says, but I do think, Ms. Carter, you'd be

18     protected if I make clear in an order what the

19     affirmative -- what the representation is by

20     counsel.  So I just wanted to get Mr. Wolfe, again,

21     to say it on the record so I can write it down and

22     put it in an order.  And I'm not misrepresenting

23     what he's saying either.

24          MR. WOLFE:  Sure.  We're not seeking

25     damages on our affirmative claims that stem from the

1  spoofing attack.

2          THE COURT:  But I thought it was a little

3  bit -- and maybe this is just -- right.  I thought

4  it was a little broader earlier, which is that no

5  part of your affirmative claims relied on the

6  spoofing incident.

7          MR. WOLFE:  Sure.  We will not be asserting

8  that there's a liability.  I do want to make clear,

9  though, that doesn't mean that the spoofing incident

10 won't be relevant to our defenses that we're

11 asserting against Gryphon.  And it's their burden to

12 us to articulate relevance on this.  But as far as

13 our affirmative claims, we will not be.

14          MS. CARTER:  I'm a little concerned.  I

15 think we're actually backtracking here because if

16 you intend to raise this as part of your defense to

17 our allegations, that you breached the contract, and

18 you're going to throw it back in my face and say,

19 well, actually, you breached the contract here, I

20 don't see how that memorializes kind of the spirit

21 of what I think you're agreeing to here, which is

22 that it's no longer -- spoofing incident is no

23 longer a part of this case.

24          MR. WOLFE:  Yeah, I didn't say that, and

25 that wasn't the basis for relevance articulated by

1    your side, ever, right.

2            THE COURT:  Let me just ask, because I

3    might be missing something, if Sphere intends to

4    point to the spoofing incident in defense to some of

5    Gryphon's counterclaims, Mr. Wolfe, can you just

6    explain to me, then, why it wouldn't be relevant for

7    Gryphon to understand whatever internal controls or

8    procedures Sphere has?

9            MR. WOLFE:  Sure.  So I'll give two bases:

10   Number One, it's my adversary's burden to articulate

11   this, Your Honor, and they haven't articulated it.

12   I'm helping them out now because they never

13   articulated, but I don't want there to be any -- as

14   you said, I don't want there to be anything from

15   either side, a misunderstanding, and I don't want to

16   mislead the Court on that.

17            Number Two is, it's what I said earlier.

18   They've asserted but one claim, and that's that

19   there's a -- we breached our contract, right.

20   Negligence is, categorically, not a defense to

21   breach of contract.  We cited case law to Your Honor

22   of that.  There's only about four causations in

23   breach of contract.  There's no proximate causation,

24   right.

25            So negligence is not a defense to breach of

1    contract.  So there's a reason that they never

2    asserted that their affirmative claims have anything

3    to do with negligence.  It's because negligence

4    couldn't -- our negligence, whatever it was, could

5    not be a defense.  And, second, even if it could be,

6    we owed no duty to Gryphon.  And Your Honor knows

7    this because they dropped the claim with prejudice

8    in response to our motion to dismiss, in which we

9    said that the reason it should be dropped is that we

10   owe no duty to them.  There's simply no duty that

11   parties owe each other to prevent the spoofing

12   attack.

13        MS. CARTER:  Your Honor, if I may offer

14   potentially a solution that could be helpful?

15        THE COURT:  Sure.

16        MS. CARTER:  Could we just -- I mean, I

17   would agree to a stipulation that basically says

18   that neither party asserts liability -- any

19   liability with respect to the spoofing incident, and

20   that the spoofing incident is not relevant to

21   discovery or should not be a subject of discovery.

22   I mean, if neither party is asserting liability with

23   respect to the spoofing incident, I just -- it seems

24   simple that we could just say that.

25        MR. WOLFE:  Yeah.  I think it's a defense

1    to the breach of contract claims you've asserted

2    against us, right.  The spoofing attack is relevant

3    to that.

4         MS. CARTER:  But we haven't asserted any --

5    we haven't asserted the spoofing incident as a basis

6    for a breach of contract claim.  And as you said

7    earlier, we withdrew our negligence claim with

8    respect to spoofing.  Spoofing is not any part of

9    our -- our affirmative case, and it won't be a part

10   of our defensive case, so long as you make a

11   representation that you're not promising any

12   liability on it.

13        MR. WOLFE:  It won't be part of your --

14        I'm sorry, Your Honor, that we're doing

15   cross talk now.

16        THE COURT:  No, no, no.  If it's helpful,

17   if you can resolve the --

18        MR. WOLFE:  Yeah.  So -- I apologize.  I

19   feel like we're on a meet and confer.

20        So it won't be a part of our affirmative

21   case.  We're not seeking damages on it.  We don't

22   need to.

23        But as far as -- you know, we do contend

24   that it's a -- as far as our defense case, right, we

25   contend that the spoofing attack was a breach as

1    part of the defense's case, and that that's a

2    defense for us.  And that defense is --

3         MS. CARTER:  Then we just come back full

4    circle to Rule 26, which says that either party is

5    entitled to discovery on any claims -- any party's

6    claim or defense.

7         MR. WOLFE:  But, Your Honor -- and I'll

8    reiterate -- they still need to articulate a basis

9    of how they could use the discovery, and this was my

10   point, right.  Even if -- even if we had thought

11   affirmative, right -- they only mentioned one basis

12   for relevance.  But even if we have been seeking

13   damages and now we're on to our defenses, even if

14   it's a defense, they still have to be able to use it

15   in a way to defeat the defense.  And it can't be

16   used because, A, it's not -- a party's negligence

17   has nothing to do with a defense to breach of

18   contract, ultimately; and, B, it just -- there's no

19   duty here.

20        THE COURT:  So, Mr. Wolfe, I think I follow

21   you, but this is where you may have lost me.  So it

22   sounds like Ms. Carter had represented that spoofing

23   is not part of Gryphon's case, and that her client

24   was not asserting liability with regards to the

25   spoofing, which sounds somewhat similar, if not

1    identical, to what you had previously said.  But

2    then when you said why you needed discovery into the

3    spoofing from Gryphon, you said it would be relevant

4    to your defenses to their claim; am I right?

5         MR. WOLFE:  Correct.  So an act can be,

6    right, a breach of contract, right.  So I no longer

7    need to pursue a breach of contract claim based on

8    this, because they've returned the assets and

9    they've now given up any claim to the assets.

10         But they've claimed that Gryphon breached

11    the contract, that Gryphon breached the -- excuse

12    me.  They've claimed that Sphere breached the MSA,

13    and I'm entitled to assert that they breached the

14    MSA as a defense, right.  And that's the difference,

15    right.  I'm not trying to argue -- I mean, that's

16    the inherent difference.  I'm able to assert it as a

17    defense on a contractual ground.

18         THE COURT:  And your defense would be that

19    they breached the contract because they were

20    negligent in preventing the spoofing?

21         MR. WOLFE:  Not negligent, necessarily,

22    Your Honor.  By disobeying the plain terms of the

23    contract, right.  They're only allowed to -- they're

24    only allowed to respond to our written

25    construction -- instructions, right.

1                So to give you more background, Your Honor,

2       Gryphon held Sphere's digital assets as part of the

3       deal, right.  And as part of that, they -- there's a

4       provision in the contract that they -- they have to

5       essentially obey our instructions to hold or sell

6       those digital assets.  Obviously, they can't be just

7       transmitting those assets to a third party under the

8       contract.  And so that's the distinction, Your

9       Honor.

10               THE COURT:  Okay.  So I just wanted to make

11      sure, because I thought you had told me none of this

12      was on defense.  And it sounded like, potentially,

13      you were looking into Gryphon's negligence, but it

14      sounds like that's not really the argument you'd be

15      making.  It'd be something related to whether they

16      were authorized to release this, based on whatever

17      the MSA required for instructions for bitcoin.

18               MR. WOLFE:  Exactly, Your Honor.  And it's

19      not -- and it's not a claim I'm -- right.  And it's

20      not a claim I'm seeking further damages on anymore,

21      because I don't need to.  Because they've -- right.

22      I did when I first filed the case because they were

23      asserting that -- you know, they were asserting that

24      it was our fault, essentially.  I don't need to

25      anymore because they've conceded that, right.  They

1    dismissed their negligence claim with prejudice, and

2    so I don't need to anymore.

3            But as far as a contractual defense, I

4    still maintain it, and they didn't raise it.  But I

5    want to -- they didn't raise it in this conference

6    as a basis of relevance, but I want to be very clear

7    with the Court that it will be relevant to our

8    affirmative claims in terms of context, but it's not

9    a basis of "I need to establish liability against

10   them."  In order to prove my affirmative claims, I

11   won't be seeking to do it, I won't be seeking

12   damages from them.  As far as a defense, it will be

13   relevant to this defense.

14           THE COURT:  Okay.  So, Ms. Carter, I guess,

15   given what we've discussed with Mr. Wolfe, I guess

16   I'm -- I'm not seeing a clear link showing why this

17   information would be relevant to Gryphon's case.

18           MS. CARTER:  Right.  So if Mr. -- first of

19   all, to be very clear, our breach of contract case

20   has to do with Sphere violating exclusivity

21   provision.  Okay?  I don't see how information

22   relating to the spoofing incident is relevant to

23   that.

24           But in any event, if they somehow construe

25   our breach of contract claim as involving or is

1    warranting the spoofing incident as part of its

2    defense, then we've come full circle, and I need

3    discovery into the spoofing incident so that we can

4    make an argument into that.  And I think we're right

5    back where we are, which is I've already made a

6    reasonable proposal myself.  Even though Sphere

7    hasn't offered any narrowing options of our

8    discovery, I have offered to narrow my own request

9    by saying, okay, then you need to review the 1,000

10   documents that hit on our specific search terms for

11   the spoofing incident, review those, and then

12   produce any that are not privileged, in addition to

13   any reports.

14         I just feel like Mr. Wolfe, in some ways,

15   is talking out of both sides of his mouth.  It is in

16   the case.  It's not in the case.  It's just context.

17   And, frankly, these are not clear lines.  And I

18   think that the best thing to do would be either, if

19   it's at any -- if it forms any part of any party's

20   claim or defense, there should be discovery into it.

21         MR. WOLFE:  Yeah.  And I'll just end with,

22   Your Honor, it's still their burden to articulate

23   how they would use the discovery.  And even if it's

24   part of my defenses, I'm not hearing how they could

25   use the discovery as a defense -- you know, as a way

```
 1    to (inaudible), right.  There's no articulation of
 2    how we have a duty.
 3          They basically admitted we don't have a
 4    duty by dismissing their own negligence claim of
 5    prejudice.  And there's no articulation of how it --
 6    you know, how they would say, if I say you breached
 7    the contract and that's an antecedent breach, that
 8    forgives performance, that they can then say, well,
 9    Sphere, you were negligent, you can't use that as a
10    defense, right.  The case was very clear.
11          The concept of negligence, those are tort
12    concepts.  They don't have anything do with contract
13    with --
14          MS. CARTER:  Just to be clear, I mean, the
15    argument that I made earlier with respect to the
16    elements of a breach of contract are true on both
17    sides, right.  If I have to prove up on a breach of
18    contract and you're basically saying you can't prove
19    causation because I think that, you know, you were
20    breaching under the contract, then it is relevant to
21    that.
22          And I just -- I don't -- I can't imagine a
23    world in which that you can assert an affirmative
24    defense that you're unwilling to give up, that I
25    don't get, under Rule 26, discovery into that, even
```

1    the limited discovery I've asked you to review.

2            MR. WOLFE:  Sorry, Your Honor.  I have one

3    more back-and-forth.

4            I think I'll reiterate it, which is, you

5    know, we cited very clear case law on this, that --

6    you know, you normally -- you see the four elements

7    of breach of contract.  It's usually an agreement, a

8    breach, material, and damage, right.  You normally

9    don't see causation.  It is probably true that "but

10   for causation" is an element.

11           But we're aware -- we cite case law telling

12   Your Honor that negligence concepts are just not

13   applicable to breach of contract.  And I don't hear

14   my adversary, who's seen that case law for a month,

15   prepare to propose a case to you that says, no, no,

16   actually, these negligence concepts are applicable

17   in breach of contract cases.  And the fact that one

18   side didn't exercise reasonable care forgives my own

19   breach, right.  And -- and --

20           MS. CARTER:  Sorry.

21           THE COURT:  Mr. Wolfe, are you done or ...

22           MR. WOLFE:  I am done.

23           THE COURT:  And, Ms. Carter, did you want

24   to respond?

25           MS. CARTER:  Just one thing.

1          I mean, Mr. Wolfe just conceded that "but

2     for causation" is a component of breach of contract

3     and we have -- there are -- there are affirmative

4     defenses that you failed to say the cause of action.

5     Just because we did not pursue a motion to dismiss

6     does not mean that we've conceded anything.  And I

7     just -- I think that we are very, very far into the

8     minutia, which is, frankly, not required under Rule

9     26, which, in this context, provides a broad

10    standard for relevance.

11         And I think I've been more than reasonable,

12    willing to make all sorts of representations on the

13    record.  I've been willing to, as a result, drop the

14    discovery, but I'm not willing to drop the discovery

15    if it remains an issue in the case, whether it's

16    part of someone's claims or defenses.

17         THE COURT:  I think -- so I'm just going

18    to -- if we want to just table this one and move on

19    to the next issue.  So that's the dispute that

20    Sphere raises like (inaudible) --

21         MR. WOLFE:  Yes.  Thank you.  Give me one

22    moment, Your Honor, if I may.

23         Okay.  So, Your Honor, I guess we'll go

24    back to our affirmative claims.  So the -- the gist

25    of our theory is that -- excuse me.  Sphere has

 1    brought a breach of fiduciary duty claim predicated

 2    on Gryphon treating its miners and investment

 3    strategies better than Spheres.  The gist of our

 4    claim is that Gryphon undertook a fiduciary duty to

 5    Sphere to treat basically Sphere's property as if it

 6    were its own property, and that it prioritized its

 7    own interests over those of Sphere.

 8          And I saw a reference in my adversary's

 9    letter that we -- you know, we haven't pleaded any

10    facts to support the claim.  The fact is -- are that

11    based on monthly reports that we've received and

12    reviewed, Gryphon's miners consistently outperformed

13    Sphere's miners, and Sphere has studied the issue.

14    It's looked into potential explanations, and it

15    can't find a legitimate explanation.  You know, the

16    machines, the way the machines operate, if they're

17    all being operated by the same operator or, in this

18    case, provider, they should all perform basically

19    equally.  It shouldn't be a case where Gryphon's

20    machines consistently outperform Sphere's.

21          Now, if Gryphon wanted to avoid discovery

22    on this issue, it was incumbent to move to dismiss

23    the claim on the pleadings, and Gryphon opted not to

24    move to dismiss the claim; thus, conceding its legal

25    sufficiency.  There's no dispute, nor can there be,

1    that the claim is legally sufficient.  And even if

2    Gryphon wants to say, well, we haven't conceded

3    that, the claim remains in the case, and it will

4    until summary judgment, which won't be heard, you

5    know, probably for another six months, should either

6    side choose to move.

7          Now, nevertheless, Gryphon's contention is

8    that it should not have to yield discovery on the

9    subject because it doesn't like the claim, it

10   doesn't think much of it, and that's not permitted

11   by the discovery rules.  What Gryphon can't do is it

12   can't concede the legal sufficiency of the claim by

13   not moving to dismiss and then refuse to give any

14   discovery that would validate our allegations and

15   then assert on summary judgment that Sphere has

16   failed to do sufficient facts to support the claim,

17   precisely because Gryphon has withheld discovery.

18         Gryphon has asserted no particularized

19   relevance objection.  You don't see a relevance

20   objection anywhere in their R and Os.  And what you

21   do see are boilerplate objections of an undue burden

22   overbreadth, and disproportionality.  And the burden

23   is on Gryphon, of course, to assert an objection

24   there.  And what we're ultimately asking Gryphon to

25   do is nothing that we're unwilling to do ourselves

1    and that Gryphon hasn't asked of us.

2            And in terms of overbreadth, undue burden,

3    proportionality, the law in the district is clear:

4    What's good for the goose is good for the gander.

5    And Gryphon has no response for that -- I'm sure

6    Your Honor has heard that a thousand times.  Gryphon

7    has no response to that background principle, other

8    than just to wave it away and say, well, our

9    discovery into Sphere shouldn't matter.

10           Gryphon's seeking the exact same intrusive

11   discovery into Sphere's business.  It simply states

12   that the Court should assume that its claims are

13   going to have merit and that Sphere's claims won't,

14   and, thus, it should be permitted to seek

15   wide-ranging discovery into Sphere's business, and

16   that's not fair.

17           Gryphon has not suggested how the request

18   will increase the volume of documents it has to

19   review and produce.  Although we sent search terms

20   to Gryphon weeks ago, Gryphon just produced its hit

21   report after we filed our letter.  And in its

22   letter, it asserts that our hit report hit on 80,000

23   documents, and that's twice the number that Sphere's

24   agreed to review.  So it's evidence of overbreadth

25   and undue burden, and that's, at best, misleading,

1  Your Honor.

2        We were very clear that -- right, we sent

3  an initial set of search terms and, of course,

4  that's subject to negotiation.  It looks like one of

5  the terms wasn't appropriately calibrated and it

6  returned something like 40,000 unique hits.  And, of

7  course, Gryphon responded that it's going to remove

8  that term and substitute new terms in, and our

9  expectation -- and we're not going to ask Gryphon to

10  do anything we're unwilling to do.  Our expectation

11  is that Gryphon will review around the same number

12  of documents that we will, ultimately, where we're

13  hoping to land somewhere around 40,000.  And --

14  nothing Sphere's unwilling to do.

15        So the notion that our search is asking

16  Gryphon to search for something unreasonable is

17  baseless.  We're only asking Gryphon to search

18  documents that hit on search terms and to produce

19  go-gets, which we define as easily identifiable

20  documents, such as mining reports that are not

21  necessarily amenable to search terms, but that a

22  party knows exists and are easily -- that can easily

23  be produced.

24        Obviously, we're not asking Gryphon to

25  search for needles in haystacks as part of this, but

1     in our experience, oftentimes, parties do generate

2     mining reports and performance reports, and they

3     basically know where to find those documents.

4     They're either centrally located or they all come

5     from the same email address.  So there's a program

6     called Minder Report.  And so every day, you'll get

7     a report from @minderreport.com sent to your email.

8     You know, that's something we would expect that

9     Gryphon knows and can easily produce.

10          There's nothing about those reports that

11    will raise privilege concerns that can be identified

12    through one single search term.  So there's been

13    nothing to suggest that, what we're asking them to

14    produce through these requests, is going to somehow

15    exacerbate the burden on them or, you know, cause

16    them to do something, again, that we're unwilling to

17    do.

18          I just want to note, they say that what we

19    basically asked is for discovery into the entire

20    business, but I don't think that's quite right.

21    Like we discussed at the beginning, Your Honor,

22    Gryphon and Sphere are in the business of mining,

23    and they send their miners out to hosts.  It's the

24    host that really ensure the operation of the miners.

25    But what the customer does is they say if their

1    miners are down, if they're not performing up to
2    snuff, they'll then reach out to the host and say,
3    why is this going on?  Can you repair my miners?
4    Can you improve this?  Can you make it so that they
5    run better?
6            It's not like Gryphon and Sphere, I don't
7    think, at least, are generating, you know, hundreds
8    of emails every day about the operation of miners,
9    and I haven't heard that from the other side.
10   Gryphon does lots of stuff that we're not seeking
11   discovery into.  It purchases miners.  It has
12   employees, right.  It rents space.  It raises money.
13   It has securities filings.  We're not seeking any of
14   that.
15           What we're seeking is how -- their searches
16   for hosting.  My understanding is they have about
17   one or two hosting partners.  So you find hosting,
18   and then, presumably, you're not doing much else
19   beyond that.  And then, like I said, you're making
20   sure that the host keeps your miners operational,
21   and that's what we're really after here.  And we're
22   not -- we're not going to be asking that -- you
23   know, search for tens of thousands of additional
24   documents that don't hit on a search term universe
25   that's not proportional to what we'll agree to

1    search for, too.

2            I want to address the cases that my

3    adversary cited.  One is the Edmondson case, which

4    states that disclosure should not be directed simply

5    to permit a phishing expedition.  And that line of

6    case law really goes to where relevance is at issue.

7    Parties have failed to articulate relevance, and

8    that's not this case -- the relevance is clear.  We

9    have an allegation that Gryphon's miners

10   outperformed ours, but, of course, we need discovery

11   to validate that allegation.  And the relevance is

12   clear, and there is no relevance objection.

13           Gryphon also notes -- cites the Viossi

14   (phonetic) case for this proposition, that

15   proportionality and relevance are conjoined

16   concepts.  What Viossi (phonetic) is saying is the

17   greater the relevance of information in an issue,

18   the less likely discovery will be found to be

19   disproportionate.  And, again, the discovery we're

20   seeking is directly relevant to our claim.  We need

21   to know how Sphere's miners performed.  We need to

22   know how Gryphon's miners performed, and we need to

23   know why Gryphon's miners performed the way they did

24   and why Sphere's miners performed the way they did.

25           So with that, unless Your Honor has

1    questions, I'll turn it over to my adversary.

2            THE COURT:  No.  Mr. Carter, I understand

3    the argument on this one.

4            Ms. Carter?

5            MS. CARTER:  Yes.  Thank you.

6            THE COURT:  I got the names wrong.  I

7    apologize.

8            MS. CARTER:  No, it's okay.

9            So, first of all, on this issue that, you

10   know, we haven't -- we refuse to provide discovery,

11   first of all, that's not correct.  I have actually

12   offered to provide Gryphon with narrowly tailored

13   discovery that seems extremely relevant to whatever

14   claims that it's asserting, essentially agree --

15   agree to produce documents that, you know, discuss

16   the relative performance of Gryphon's versus

17   Sphere's, but that wasn't good enough.

18            The major problem that I have here, which I

19   have asserted since the beginning, is that Sphere

20   refuses to limit its requests, which do go to the

21   heart of Gryphon's business.  For example, I mean,

22   even the example that Mr. Wolfe provided about, you

23   know, communications between Gryphon's and its --

24   its hosting companies about whether or not miners

25   are online or offline, like that would be

1    encompassed by Mr. Wolfe's, like, very broad,

2    far-ranging discovery, which includes all documents

3    and communications concerning Gryphon's efforts to

4    ensure the operations of its miners.

5         So my issue from the beginning, and,

6    frankly, I think that Sphere has been unreasonable

7    in that it has not come back with any suggestion for

8    the narrowing of these overbroad requests.  And with

9    respect to proportionality, the argument there is

10   clear, I can identify one factual assertion that --

11   in the complaint that Sphere has that underpinned

12   this fiduciary duty claim on this kind of

13   self-prioritization concept, which is that -- I'm

14   reading from paragraph 47 right now.  For example,

15   on a monthly basin, Gryphon has reported a

16   substantially higher mining efficio ratio than

17   Sphere, which would not occur if Gryphon were acting

18   to avoid self-dealing.

19        Well, first of all, I contest that that's

20   the only explanation for why there might be

21   differences in efficiency rations.  But, moreover,

22   why does that one allegation that's completely

23   conclusory entitle Sphere to all sorts of

24   information about Gryphon's business that has

25   nothing to do with Sphere?  I, frankly, don't

1    understand that, and I think Mr. Wolfe has been

2    unreasonable in refusing to engage in real

3    discussion about the narrowing of those terms.

4         Although, you know, the only suggestion

5    that Mr. Wolfe has made is that, well, we can use

6    search terms and that will ameliorate any burden

7    concern that you have, Gryphon.  Well, we ran the

8    terms -- and, by the way, Mr. Wolfe knew that we

9    were on the cusp of producing a hit report when he

10   decided to file the letter motion on Friday evening.

11   That was his prerogative to do so.  And I understand

12   why he did it because he obviously wanted to tee the

13   issue up with enough time for Your Honor to hear it

14   today.  That's fine, but then don't criticize me

15   that you didn't have -- you know, you didn't have

16   the information from me that -- that underscored the

17   burden that's associated with this far-flung

18   discovery.

19        And not only that, he's not even agreeing

20   to just cap, essentially, the discovery at whatever

21   search terms or the application of search terms

22   applied to the documents for custodians.  He's not

23   even agreeing to a cap it at like the 80,000 or

24   whatever documents.  He also wants certain

25   unspecified, quote/unquote, go-gets, which go to

1    Gryphon's only business, having nothing to do here.

2    And he provides, by way of example, reports, things

3    like that, and, "Oh, don't worry, I won't ask you

4    for other things."  But, frankly, anything that

5    Gryphon does that it knows of, that is potentially

6    responsible, is potentially at fair game under the

7    parameters of his discovery.

8         Although, for example, although the parties

9    have agreed to four custodians, there's more than

10   four people who work at Gryphon.  And so does that

11   mean I have to go rooting around all of their emails

12   trying to find, oh, I'm going to email X person

13   about our miners.  How are they doing at the host?

14   Are they okay?  Again, none of this has anything to

15   do with Sphere.  And, frankly, I don't even

16   understand, then, the purpose of applying search

17   terms, because under this, like, theory that I still

18   have to provide, notwithstanding the search terms,

19   additional documents that are responsive, that are

20   go-gets, like, then why would I just have to review,

21   like, for example, the entire mailbox of Ron

22   Chang -- of Rob Chang, the president of Gryphon,

23   that this is what he does all day, every day, you

24   know, manage the miners, think about where are we

25   deploying them, which pool should we use?

```
 1              And, frankly, I don't understand why Mr.

 2    Gryphon -- or Mr. Wolfe needs this for the purposes

 3    of his claim.  He apparently has access to reports,

 4    unspecified reports, that show in his

 5    characterization that, allegedly, Gryphon's miners

 6    are doing better than Sphere's.  I mean, he has that

 7    information.  So if he has that, why does he need to

 8    have invasive discovery into Gryphon's operations of

 9    its own miners that have nothing to do with Sphere?

10              And for that reason, I have consistently

11    objected to the overbreadth and proportionality of

12    the request.  And I take issue with Mr. Wolf's

13    position that I didn't raise relevance as an

14    objection in response to these requests.  Quite

15    clearly, relevance is part of the proportionality

16    consideration.  And to the extent that there is any

17    relevance here to the fiduciary duty claim, we would

18    maintain that it is small.  And in light of that

19    small amount of relevance, we have commensurately

20    agreed to produce a narrow set of documents, which

21    apparently is just, frankly, not good enough for Mr.

22    Wolfe.

23              And in terms of the goose and the gander,

24    I'm not sure what he's referring to.  If he's

25    referring to the document request that he's agreed
```

1    to respond to that are not the subject of a motion

2    to compel, frankly, I don't understand.  It's not

3    incumbent on me to make arguments for him on what he

4    should object to or not object to or agree to

5    produce.  And all of the document requests that he's

6    referring to are specific to Sphere's engagement

7    with third parties, which is the entire basis of

8    this lawsuit, is that that was in breach of an

9    exclusivity provision under the MSA.

10           I would submit that this fiduciary duty on

11    the basis of the relative performance of miners,

12    so-called justifying, that sort of far-flung

13    discovery, is just a sideshow, and I hope that the

14    Court can appreciate that.  And, again, I think I've

15    more than met my obligations to meet and confer.  I

16    didn't just stand on my objection to producing

17    documents.  I offered to compromise.  And my offers

18    of compromise have been met with nothing, no

19    yielding on the other side.  And I don't think that

20    the Court should countenance that type of broad

21    discovery on kind of threadbare allegations about

22    respective performance.  Thank you.

23           THE COURT:  So I guess just a question,

24    because it seems like there's a few categories of

25    topics that are at issue.  And so I'm just curious,

1    the topic relating to the selection of mining pools

2    for Gryphon, I just want to understand the process

3    that went on.  Is this where you ran the search

4    terms and the hit report had 80,000 documents?

5         MS. CARTER:  Yeah, it's a good question.

6    It's a little confusing.  Sphere -- if I may answer,

7    and then, of course, Mr. Wolfe will weigh in,

8    but ...

9         So Sphere propounded these requests,

10   including a request for, what is, a selection of

11   mining pools, right.  And they said, don't -- I

12   said, that's -- you know, that's too much.  It's too

13   burdensome.  And they said, well, don't worry about

14   it, we'll give you search terms.

15        They gave a search term for four

16   custodians.  We ran them.  That yielded 80,000

17   documents.  And my point being that, is that even

18   there, even there, Gryphon has not -- or Sphere has

19   not limited itself to just reviewing those

20   documents.  It's maintained that, in addition to

21   those documents that hit on search terms, I still

22   need to go out and find other documents that are

23   responsive to this request, which, as I've said, is

24   essentially Gryphon's business.  So I just think

25   that these are extremely overbroad and unwarranted

1    in light of the relevance, if any.

2              THE COURT:  But let me just ask, I guess,

3    is there no way to, perhaps, reduce the number

4    either through more targeted search terms or fewer

5    custodians or a time period?

6              MS. CARTER:  It's certainly possible.  And,

7    frankly, you know -- again, Mr. Wolfe didn't have

8    the benefit of the search report when he kind of

9    initiated this process.  But, again, I would

10   maintain that, unless Mr. Wolfe is willing to limit

11   discovery to the application of reasonable search

12   terms across four custodians, then it's kind of like

13   a Sphere victory in some ways, because he's still

14   asking for these unspecified categories of,

15   quote/unquote, go-gets for the same --

16             THE COURT:  And what's the -- so let's

17   say -- what's the -- when you say unspecified

18   categories of go-gets, are these the monthly reports

19   that reflect Gryphon's miners -- what miners --

20   Gryphon miners have done?

21             MS. CARTER:  Yeah.  If you don't -- I'm

22   just going to read -- so I'm sorry.  If you could,

23   do you mind holding on just one second?

24             THE COURT:  Yeah, no worries.

25             MS. CARTER:  Hold on, Mr. -- I just -- I

```
 1    want to answer -- be responsive to the judge's

 2    request.

 3            So here -- so I'm now reading from a letter

 4    that I received on June 3rd from Mr. Wolfe.  And it

 5    says:  "In addition for certain requests, it will be

 6    appropriate for Gryphon to produce so-called

 7    go-gets, such as reports reflecting the performance

 8    of Gryphon's miners and Sphere's miners.  For

 9    example, reports from Foundry and Coinmint

10    reflecting uptime and revenues generated, software

11    upgrades, Gryphon's internal policies,

12    communications with potential hosts for Sphere's

13    miners, calculations reflecting consideration --"

14    ba-ba-ba-ba.

15            Like, it is -- but this -- and then "for

16    the avoidance of doubt, this list of go-gets is

17    illustrative, not exhaustive."

18            So, you know, even if we were like, okay,

19    we can get these search terms down to some, like,

20    manageable number, like I just -- there's an

21    infinite number of additional responsive material

22    that I would have to produce.

23            THE COURT:  And I suppose I don't -- do we

24    know what the universe -- I guess you don't have a

25    number for the universe of these go-get documents?
```

```
 1              MS. CARTER:  No, because I don't even know
 2    what the universe of those documents is.  Like,
 3    go-get --
 4              MR. WOLFE:  Your Honor --
 5              MS. CARTER:  Go ahead.
 6              MR. WOLFE:  May I respond, Your Honor?
 7              THE COURT:  Yes.  Go ahead.
 8              MR. WOLFE:  Sure.  So the 80,000 -- the
 9    80,000 hit report number isn't real, right.
10    We've -- it's clear what we said, the hit reports.
11    Obviously, we're willing to negotiate that down.
12    And even in the email transmitting the hit reports,
13    Gryphon said to us, you know, this isn't a
14    reasonable number.  We're going to -- we're going to
15    tweak some of the search terms.
16              I think one of them, right, it was clearly
17    something erroneous had happened in the term we had
18    suggested, right.  It returned something like 60,000
19    or 40,000 unique hits.  Obviously, there's something
20    wrong there.  We have agreed to review about 40,000
21    search terms.  We're not asking -- we're not going
22    to be asking Gryphon to review double the search
23    terms we reviewed.  We want them to review a similar
24    number.
25              On the go-gets, I think in every
```

```
 1    litigation, there are certain repositories of
 2    documents that parties know won't necessarily hit on
 3    search terms, but they never let -- agree to produce
 4    and, of course, we've agreed to do that, right.  If
 5    I know that there's some category of report where it
 6    hasn't hit on a search term, but I can run one term
 7    and they're all there, of course I would produce it,
 8    right.  What I'm not asking Counsel to do is sift
 9    through emails with additional terms where they're
10    not easily collectible.
11            Unless Your Honor has questions, I would
12    like to respond to some of the points my adversary
13    made.
14            THE COURT:  No.  Sure.  Go ahead, Mr.
15    Wolfe.
16            MR. WOLFE:  Sure.  So my adversary
17    complained that she would be producing a lot of
18    communications with third-party hosts.  That's sort
19    of expected.  That's a very easy universe to search
20    for, right.  You plug in one term, which is the
21    opposing side's, the counterparty's email address.
22    There's no privilege concern because they're
23    counterparties.  And then you can batch hack all the
24    documents as relevant.  Of course, you'll need to
25    review them for -- you know, in the context of
```

1    depositions, but that's very easy.

2           And, in fact, it's very similar to what our

3    adversaries have had no problem asking us to do.

4    And if I could, Your Honor, I'd like to read you

5    some of the requests they've served on us.

6           THE COURT:  (Unintelligible.)

7           MR. WOLFE:  Sorry.  I'm sorry, Your Honor?

8    Okay.  Fair enough.

9           I mean, if you line them up -- and I regret

10   not putting a chart in the -- in the letter, but

11   they're basically asking for the same discovery of

12   us.  The only difference is they think our claim

13   isn't worth anything, right.  You know, they don't

14   think we're going to prevail.  Well, if they thought

15   we weren't going to prevail, they should have moved

16   to dismiss on the pleadings.  And they didn't, and

17   so the claim is live.

18          I'm entitled to discover, right.  I can't

19   just say, oh, your miners outperformed us.  And then

20   I have them come back and say, well, look at all

21   these other -- right, we haven't given you any

22   discovery, right?  Look at -- Court, look at all

23   these other countervailing reasons that the

24   miners -- our miners could have outperformed yours.

25   Thus, we weren't prioritizing our miners over yours,

1    right?  It's just not -- it's not how discovery

2    works.

3            As far as the go-gets, look, we've

4    suggested -- let me return to that for just one

5    moment, right.  We've suggested something that's

6    pretty common in litigation, right.  Search terms

7    and then easily identifiable documents, whether

8    they're located -- whether you can identify them

9    because they're located in a central repository or

10   because you know that, right, at the top of the

11   document, the same term's going to reappear.  They

12   always -- or they always come from the same email

13   address, and there's no privilege concern, yada,

14   yada, yada.  The same exact thing we'll be doing in

15   our own searches and that Gryphon has asked us to

16   do.

17           Obviously, if opposing counsel thinks that

18   this procedure is unreasonable, right, A, we

19   wouldn't expect that they'd be asking us to do it,

20   and, B, they should let us know, right.  We

21   suggested categories of documents that came to mind

22   and that seemed easily identifiable, right.  Mining

23   reports, efficiency reports, and reports reflecting

24   uptime, which basically means, how long is your

25   miner operational?

```
 1              Why is that relevant?  Let's say -- let's
 2    say Sphere's and Gryphon's miners go down at the
 3    same time for some reason.  And Gryphon emails the
 4    host and says, get our miners back online first and
 5    then get Sphere's miners back online, right;
 6    obviously relevant to our claim.  It should not be
 7    something that is difficult for them to identify.
 8              So with that, Your Honor, unless you have
 9    questions, I'll turn it back over.
10              MS. CARTER:  Thank you.
11              THE COURT:  I guess, Ms. Carter, just to
12    maybe, perhaps, offer some type of compromise,
13    because it sounds like this might be a situation
14    where the parties can go back and meet and confer,
15    given that Mr. Wolfe acknowledges that they're not
16    asking you to search through the 80,000 documents
17    and there might be, perhaps, ways to narrow the
18    search terms to something that would yield fewer
19    results.  Is that a possibility for resolution of
20    this?
21              MS. CARTER:  I'm certainly willing to
22    continue to meet on this issue.  I would just say,
23    and I just really don't want this to be lost on,
24    Your Honor, is that there is no -- okay.  This case
25    is about the MSA.  They say we breached it.  We say
```

1    they breached it.  That is the main show.

2           They've added this tagalong breach of

3    fiduciary duty claim, and the only factual

4    allegation they have to support it is they say

5    there's some report somewhere that says that

6    Gryphon's miners did better than Sphere's, and the

7    only reason -- explanation for that is because,

8    obviously, Gryphon was engaging in self-dealing.

9           Like, why does that one bare-bone

10   conclusory allegation entitle Sphere to access to

11   Gryphon's entire business, whether or not they're

12   search terms or not?  Like, fundamentally, why does

13   Sphere get access to emails that have nothing to do

14   with Sphere's miners?  I just reject the premise

15   that this is a fair scope of discovery.

16          And just to give, like, an example of the

17   types of documents that are subsumed by Sphere's

18   overbroad requests, they, for example, say, you

19   know, we need anything that's -- any documents

20   relating to Gryphon's, you know, offer -- or

21   Gryphon's efforts to ensure the operations of its

22   miners.  Like, so do they want me to go and pull

23   invoices?  Do they want every email, you know,

24   between the CEO and some third-party hoster saying,

25   "How are the miners doing today?  Oh, the

1    air-conditioning broke.  It's 98 degrees in here.

2    It should be 96."  Like, I don't understand why they

3    should be entitled to that sort of far-flung

4    discovery, based on this bare allegation.

5            And, to be honest, I have to repeat it

6    again.  I don't understand Mr. Wolfe's comparison

7    about the goose and the gander.  And we've asked for

8    this and we've, you know, not asked for that.  All

9    of the discovery that it asked for is directly

10   relevant to Sphere's admitted use of third parties

11   in contravention of the MSA.  That is what this case

12   is about.  It's obviously -- you know, it's not

13   based on a bare allegation.  Gryphon has actually --

14   or Sphere actually admitted in public filings that

15   it's used third-party hosting.  So it's -- like,

16   it's not a phishing expedition, because we know that

17   Sphere entered into agreements with third parties,

18   and we're trying to find out more about that for our

19   breach of contract claim.

20           By contrast, here, Sphere is saying one

21   conclusory allegation, that there's some report

22   somewhere that says that our things are doing better

23   than theirs, and then they say, okay, open up your

24   business, Gryphon.  I fundamentally think that it is

25   not at all the same situation; although, Mr. Wolfe

1     tries to draw analogy between the two.

2               That said --

3               MR. WOLFE:  Your Honor --

4               MS. CARTER:  -- I'm happy to continue to

5     meet and confer on this issue, and we can always

6     revisit it with Your Honor, if we're unable to reach

7     agreement.

8               MR. WOLFE:  Your Honor, if I may?  It's a

9     notice pleading regime, right?  I gave notice of my

10    claims.  I'm not required to do anything more than

11    that.  The Gryphon -- if it thought that it could

12    get this claim to dismissed on the pleadings, right,

13    if it thought our, allegedly, bare-bone allegation

14    was insufficient, it could have moved to dismiss,

15    and Judge Castel would have made a ruling.  It knew

16    it wouldn't work, so it didn't move to dismiss.

17              I'm not hearing why it's burdensome to

18    produce communications between Gryphon's CEO and its

19    hosting counterparties, right.  It's actually very

20    easy, right.  Coinmint was a third-party host.  I

21    believe there were really only two third-party

22    hosts.  It's Coinmint and Core.  Plug in "at Core"

23    and "at Coinmint" and simply produce the documents.

24    I haven't heard how many -- it's what we'll be doing

25    in response to their requests.  It's not hard.

1    There's no privilege review involved.

2            And I'm concerned about the suggestion that

3    we just go back and meet and confer, because what

4    I'm not hearing is a concession, oh, the requests

5    are relevant here, or I think what Your Honor had

6    suggested was a good one and what we've already

7    conceded to, right, which is -- we know 80,000

8    search hits is way too much, right.  We've agreed to

9    review around 30- to 40-, and we think that's where

10   Gryphon should be.

11           So I'm just not hearing why what we're

12   willing to do is so unfair to Gryphon at the end of

13   the day.  And I would like a ruling that there is no

14   relevance objection here, right.  There is a

15   proportionality objection, but there's no relevance

16   objection, and they shouldn't be able to withhold

17   documents from us on the basis of relevance.  Of

18   course, we're not expecting them to search for --

19   through every single email they have to find

20   relevant documents.  We've suggested a typical

21   process, which is search terms plus easily

22   identifiable documents, the exact same thing we'll

23   be looking through.

24           MS. CARTER:  And one more thing, just to

25   address that.  I just -- I don't even -- I don't

1    even see how Sphere has set up a discrete universe

2    of documents that it's asking the Court compel us to

3    review, given this amorphous concept, without detail

4    of, quote/unquote, go-gets of easily identifiable

5    documents.  Even if the Court were to order

6    production in response to this to review, you know,

7    documents hitting on search terms and this amorphous

8    category, like, what is that category?

9         I think that there's, obviously, additional

10   room, you know, left for the meet and confer.  And,

11   you know, perhaps, this, you know, was not timely

12   brought to the Court's attention, just in light of

13   the ongoing negotiation of search terms, et cetera.

14        MR. WOLFE:  Your Honor, I think it was

15   timely brought before because I'm still not

16   hearing -- I confessed that our requests are seeking

17   relevant information.  And, you know, we put in the

18   letter to Your Honor, right, what we said about, you

19   know, what our expectation for search is, which is

20   easily collectible categories of documents, namely,

21   what we know, mining reports, revenue information,

22   and communications with potential hosts.

23        And that's easily collectible.  It's not

24   going to be an extraordinary number of documents.

25   Gryphon may not like that it has to produce it, but

1    there's a protective order in place.  Obviously, we

2    will adhere to that.  So, you know, I would

3    encourage -- you know, obviously, there's more

4    meeting and conferring to be doing because we need

5    to agree on a set of search terms.  And, you know,

6    to the extent Ms. Carter has qualms about searching

7    for, you know, what I call go-gets, she can raise

8    those to me.

9            But I think it should be made clear that

10   our requests need to be responded to as written, at

11   least in terms of relevance.

12           THE COURT:  So I guess just -- I think on

13   this issue, I see why some of these categories of

14   documents could produce relevant -- documents that

15   are relevant, excuse me, to Sphere's claims, but

16   part of the problem is, I think because there

17   wasn't -- I'm not blaming any side on this, but just

18   because there potentially could have been more meet

19   and confers to try to dwindle down the search terms.

20   I haven't really heard the undue burden argument

21   that I typically hear in other cases when parties

22   bring a burden argument where, you know, there's a

23   clear declaration or information concerning what the

24   burden would be of collecting a voluminous

25   production viewing it.

```
 1            And it sounds like that's because there
 2    could be more of a meet and confer to try to either
 3    narrow the scope of the search terms or the
 4    custodians or whatever the parties can come up with
 5    to really get a sense of what the volume would be.
 6            And in terms of the go-get documents,
 7    again, it sounds like Mr. Wolfe is willing to have a
 8    discussion about what potentially those documents
 9    are, and then, perhaps, after a meet and confer, it
10    becomes evident or clear exactly where these reports
11    or documents might be found.
12            So this is all to say that I think the
13    parties should go and have a discussion, and if you
14    can't agree to narrow the scope of some of these
15    requests, recognizing that they seek relevant
16    information, but potentially are hitting on too
17    voluminous -- the document count is too voluminous,
18    you can always come back to me and we can address
19    the issue again.
20            MS. CARTER:  Thank you, Your Honor.
21            MR. WOLFE:  Thank you, Your Honor.
22            THE COURT:  If you would like, just because
23    it's the summer and it tends to get busy, is I could
24    give you -- I can schedule you for a conference now,
25    and that way you know you have a date by when you'd
```

1   have to come back if you don't reach a resolution.

2           MR. WOLFE:  That would be fantastic, Your

3   Honor, you know, for all our -- you may not have

4   known it from today, but I do think that the parties

5   have negotiated in good faith, and I expect we'll be

6   able to work it out.  But it would be good to have a

7   date on the calendar.

8           MS. CARTER:  May I ask a clarifying

9   question?

10          THE COURT:  Sure.

11          MS. CARTER:  To that end, it's somewhat

12  wrapped in this, but, yes, I think it would be very

13  helpful to have a date on the calendar to kind of

14  act as stick, so to speak, in forcing further

15  discussion on this topic.  Just, you know, kind of

16  given the length of time that is taken to negotiate

17  search terms and all this and basically the scope of

18  the review, if the parties -- and I'm not saying

19  that we will need to, but if the parties decide that

20  we need additional time in the schedule to complete

21  discovery -- again, I'm not saying we will -- but

22  what would be the best kind of mechanism to bring

23  that to your attention, Your Honor?

24          THE COURT:  Yeah.  Let me -- let me -- I'm

25  just pulling it up, unless you happen to know the

```
 1   scope of my referral?
 2            MS. CARTER:  I think you would --
 3            MR. WOLFE:  All pretrial.
 4            THE COURT:  Okay.  It's just a general
 5   pretrial referral?
 6            MR. WOLFE:  Yes.
 7            THE COURT:  Okay.  So unless he's told
 8   you -- I mean, I'm -- under the scope of that
 9   referral, I can extend your deadline, unless he's
10   told you otherwise.  But if you're working together
11   and you need more time, you know, unless you tell me
12   that Judge Castel said no on any extensions, I can
13   give you an extension.
14            MS. CARTER:  Okay.  That's helpful to know.
15   Again, that can -- you know, we can discuss it, and
16   this issue has not come up yet.  I'm just
17   anticipating issues that may or may not arise down
18   the road.  Thank you.
19            THE COURT:  Of course.  Yeah.  No problem.
20   So I'm going to give you -- I just want to take a
21   few minutes to think about the issue we started
22   with, which was that ECF-81, and, that, I'll just
23   issue like, a very short -- very short order, just
24   giving you the resolution there.
25            MS. CARTER:  Thank you.
```

```
 1                THE COURT:  And that won't take me long,
 2      you know, either later today or tomorrow.
 3                Is there any other issue anyone else wants
 4      to raise?
 5                MR. WOLFE:  No, Your Honor.  I would just
 6      ask that, in scheduling, I have hearings on the 19th
 7      and the 31st of July, so that you don't pick those
 8      dates, if it's okay with Your Honor.
 9                THE COURT:  19th and 31st?
10                MR. WOLFE:  Of July.
11                MS. CARTER:  And I'm also out this 15th
12      through the 19th, so if maybe we could just avoid
13      that week.
14                THE COURT:  Okay.  I will avoid those
15      dates.  And so my order later today will also
16      schedule the next conference.
17                MS. CARTER:  Thank you very much for, you
18      know, the time that the Court has given the parties.
19      We do appreciate it.
20                MR. WOLFE:  Yeah.  Thank you -- thank you
21      for indulging us, Your Honor.
22                THE COURT:  No, of course.  It was all very
23      helpful, and thanks for all the background
24      information.
25                Thank you very much, everyone.
```

1                    MS. CARTER:   Thank you, Your Honor.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    C E R T I F I C A T E

2

3        I, Marissa Lewandowski, certify that the

4    foregoing transcript of proceedings in the case of

5    Sphere 3D Corp. v. Gryphon Digital Mining, Inc.,

6    Docket #1:23-cv-02954-PKC-VF, was

7    prepared using digital transcription software and is

8    a true and accurate record of the proceedings.

9

10

11    Signature  _Marissa Lewandowski_____

12                    Marissa Lewandowski

13

14    Date:      July 3, 2024

15

16

17

18

19

20

21

22

23

24

25